# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————— )
EMPRESA CUBANA EXPORTADORA )
DE ALIMENTOS Y PRODUCTOS )
VARIOS d/b/a CUBAEXPORT, )
 )
        Plaintiff, )
 )
        v. )    Civil Action No. 1:06CV01692 (ESH)
 )
 )    Hon. Ellen S. Huvelle
UNITED STATES DEPARTMENT OF )
THE TREASURY, OFFICE OF FOREIGN )
ASSETS CONTROL, )
HENRY M. PAULSON, JR., as Secretary )
of Treasury, ADAM J. SZUBIN, as )
Director of the Office of Foreign Assets )
Control, and THE UNITED STATES, )
 )
        Defendants. )
—————————————————— )

## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants respectfully move to dismiss the Plaintiff's Complaint pursuant to Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6). In the alternative, Defendants move for

summary judgment pursuant to Federal Rule of Civil Procedure 56 on the claims in the

Complaint. In support of this Motion, defendants respectfully refer the Court to the

accompanying Memorandum of Law and the attached declaration of Adam J. Szubin. A

proposed order is also attached.

Dated December 21, 2006                    Respectfully submitted,

                                          PETER D. KEISLER
                                          Assistant Attorney General

                                          JEFFREY A. TAYLOR
                                          U.S. Attorney for the District of Columbia

                                          SANDRA M. SCHRAIBMAN
                                          (DC Bar No. 188599)
                                          Assistant Branch Director
                                          Federal Programs Branch


                                            *s/ Eric R. Womack*
                                          ERIC R. WOMACK (IL Bar No. 6279517)
                                          Trial Attorney
                                          U.S. Department of Justice
                                          Civil Division, Federal Programs Branch
                                          Post Office Box 883
                                          Washington, D.C.  20001
                                          Tel: (202) 514-4020
                                          Fax: (202) 616-8470

                                          *Counsel for the Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
EMPRESA CUBANA EXPORTADORA )
DE ALIMENTOS Y PRODUCTOS )
VARIOS d/b/a CUBAEXPORT, )
)
        Plaintiff, )
)
    v. )      Civil Action No. 1:06CV01692 (ESH)
)
)      Hon. Ellen S. Huvelle
UNITED STATES DEPARTMENT OF )
THE TREASURY, OFFICE OF FOREIGN )
ASSETS CONTROL, )
HENRY M. PAULSON, JR., as Secretary )
of Treasury, ADAM J. SZUBIN, as )
Director of the Office of Foreign Assets )
Control, and THE UNITED STATES, )
)
        Defendants. )
_____)

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 7.1(h), defendants submit this statement of material facts as to

which there is no genuine issue:

### Background of the Parties

1.    The Office of Foreign Assets Control ("OFAC") is the office within the

Department of the Treasury ("Treasury") that is principally responsible for administering United

States economic sanctions programs to implement U.S. foreign policy and national security

goals.  Declaration of Adam J. Szubin, Director of OFAC ("Szubin Decl.") ¶ 4.

2.    OFAC has been delegated authority under the Trading With the Enemy Act

("TWEA"), 50 U.S.C. App. §§ 1-44, to regulate transactions in which Cuba or a Cuban national

1

has an interest.  See Szubin Decl. ¶¶ 4, 15.

3.     Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a Cubaexport ("Cubaexport") is a "Cuban state-owned enterprise located" in Cuba.  Compl. ¶ 5.

4.     "Cubaexport was established in 1965 by the Cuban Ministry of Foreign Commerce for the purpose of exporting food and other products."  Id.

5.     President Kennedy imposed an embargo on all trade with Cuba in February 1962. See Proclamation 3447 of February 3, 1962, 27 Fed. Reg. 1085 (1962).  The current terms of the embargo and related restrictions are reflected in the Cuban Assets Control Regulations ("CACR"), see 31 C.F.R. § 515.101 et seq., which were promulgated pursuant to section 5(b) of the Trading With the Enemy Act, 50 U.S.C. App. § 1 et seq.  See Szubin Decl. ¶ 9.

6.     Persons subject to the jurisdiction of the United States are prohibited from engaging in economic transactions with Cuba or its nationals, including importing or purchasing Cuban goods, unless licensed by the Secretary of the Treasury or its designated agent, OFAC. See 31 C.F.R. §§ 515.201(b); 515.204; see also Szubin Decl. ¶ 9.

**General Background of the Havana Club Trademark**

7.     In 1995, Cubaexport applied to OFAC for a specific license authorizing the assignment of the "Havana Club" trademark from Cubaexport to Havana Rum & Liquors, S.A. to Havana Club Holding, S.A. ("HCH").  See Szubin Decl. ¶ 23.

8.     On November 13, 1995, Cubaexport issued a license to authorize the assignment. See Szubin Decl. ¶ 24.

9.     All licenses issued by OFAC, whether general or specific, may be amended, modified, or revoked at any time.  See 31 C.F.R. § 501.803; Szubin Decl. ¶ 17.

10.     On April 17, 1997, OFAC issued a Notice of Revocation for the license issued on

2

November 13, 1995.  <u>See</u> Szubin Decl. ¶ 25.

11.  Both OFAC's grant of the November 13, 1995, specific license and its subsequent revocation of that license were litigated in a trademark infringement action brought by HCH and Havana Club International against a number of defendants, including Galleon S.A. and Bacardi-Martini USA, Inc. ("Bacardi").  <u>See, e.g.</u>, <u>Havana Club Holding, S.A., et al.  v. Galleon S.A., et al.</u>, 961 F. Supp. 498 (S.D.N.Y. 1997) ("<u>HCH I</u>"); 974 F. Supp. 302 (S.D.N.Y. 1997) ("<u>HCH II</u>"); 96 Civ. 9655, 1998 WL 150983 (S.D.N.Y. Mar. 31, 1998) ("<u>HCH III</u>"); 62 F. Supp.2d 1085 (S.D.N.Y. 1999) ("<u>HCH IV</u>"); 203 F.3d 116 (2d Cir. 2000) ("<u>HCH V</u>").

12.  In <u>HCH I</u>, 961 F. Supp. at 503-05, the Court rejected Bacardi's challenge to OFAC's initial grant of the November 13, 1995, license.

13.  In <u>HCH II</u>, 974 F. Supp. at 306-11, the Court held that OFAC's revocation of the November 13, 1995, license authorizing transfer of the Havana Club trademark had the effect of eliminating the plaintiffs' rights in the mark.

14.  However, the Court refused to grant Bacardi's request to cancel the registration in <u>toto</u>, holding that the rights to the Havana Club trademark were restored to Cubaexport.  <u>Id.</u> at 311.

15.  Following this decision, the Court proceeded to a bench trial on the plaintiffs' trade name infringement claims against Bacardi.  <u>HCH IV</u>, 62 F. Supp.2d 1085.

16.  In 1998, Congress passed section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act ("section 211").  Pub. L. No. 105-277, § 211, 112 Stat. 2681, 2681-88.

17.  In light of section 211's passage "prior to the trial but well into the course of this litigation," the Court held that the plaintiffs were prohibited from asserting a claim for trade

3

name infringement under the General Inter-American Convention for Trademark and

Commercial Protection, 46 Stat. 2907 (1931).  HCH IV, 62 F. Supp.2d at 1091-94.

18.    The Court based this conclusion on "the evidence at trial," which "established that

on October 13, 1960, the Revolutionary Cuban Regime confiscated the physical assets, property

and business records of  [Jose Arechabala, S.A. ("JASA")], the original owner of the Havana

Club trademark" without affording any compensation to JASA.  Id. at 1090, 1092.

19.    The Court found that Bacardi was the successor-in-interest to JASA's interest in

the Havana Club trademark.  Id. at 1090.

20.    On appeal, the Second Circuit affirmed the district court's judgment.  HCH V,

203 F.3d 116.

21.    The Second Circuit refused to provide the plaintiffs with an opportunity to

conduct additional discovery in an attempt to prove that the "Havana Club" trade name was not

associated with confiscated property, holding that "[w]here Cuba has not returned JASA's

property, not made even a gesture toward compensation, and not settled the claim, the

confiscation inquiry ends."  Id. at 129-30.  The Court also found it "undisputed" that JASA has

never consented to the Plaintiffs' use of the Havana Club trademark.  Id. at 129.

22.    Following the litigation, the United States Patent and Trademark Office ("PTO")

amended its records to restore Cubaexport as the owner of the registration of the Havana Club

trademark.  Galleon S.A. et al. v. Havana Club Holding, S.A. et al., 2004 WL 199225, at *11

(Trademark Tr. And App. Bd. Jan. 29, 2004); see also Compl. ¶¶ 21-22.

23.    Bacardi challenged this decision in its proceeding before the PTO, originally filed

in 1995, seeking cancellation of the registration of the Havana Club mark.  See Galleon, 2004

WL 199225; Compl. ¶ 21.  However, the PTO concluded that the district court's decision in the

4

Havana Club litigation contemplated that the registration would continue to exist in Cubaexport's name.  Galleon, 2004 WL 199225 at *14-16.

24.    In addition, the Trademark Trial and Appeal Board refused to cancel Cubaexport's registration of the mark on the basis of Bacardi's pleading of fraud in the original application.  Id. at *18-19.

25.    Bacardi has challenged the decision by the Board in United States District Court for the District of Columbia.  See Bacardi & Co. Ltd. v. Empresa Cubana Exportadora de Alimentos y Productos Varios, et al., 1:04-CV-00519 (EGS) (D. D.C.) (filed Mar. 29, 2004); see also Compl. ¶ 23.  That litigation is ongoing.  Compl. ¶ 23.

26.    OFAC is, and has been, aware of legal proceedings involving the Havana Club trademark, including factual findings made in the New York Havana Club Holding litigation. See Szubin Decl. ¶ 27.

### Recent Proceedings Between Cubaexport and OFAC Relating to Cubaexport's Application for a Specific License

27.    Under the CACR, a lawyer must seek a specific license from OFAC to receive compensation for fees and expenses incurred in representing the Cuban government or Cuban entities in legal proceedings.  See 31 C.F.R. § 515.512; Szubin Decl. ¶ 18.

28.    In order to obtain reimbursement for the fees and expenses related to the representation of Cubaexport in legal proceedings in the United States, including proceedings before the PTO Trademark Trial and Appeal Board, Cubaexport's attorneys have applied for and received various legal and travel licenses.  See, e.g., License Nos. CU-75745, CT-7571, Administrative Record ("A.R.") 45-48; License Nos. CU-74488, CT-4558, A.R. 83-86; License No. CT-1943, A.R. 99-100.

5

29.    Ropes & Gray, which had merged with the law firm of Fish & Neave, Cubaexport's prior counsel, in January 2005, applied to OFAC for a renewal of the legal and travel licenses previously issued to Fish & Neave.  See January 5, 2005, Letter from Renee Stasio to OFAC, A.R. 97-98; Compl. ¶ 35; see also January 26, 2005, Letter from Renee Stasio to OFAC, A.R. 87.

30.    In the application, Ropes & Gray asserted that it "will be the law firm representing Cubaexport in connection with the . . . matters" mentioned previously in the application.  A.R. 98.

31.    The legal matters specifically referenced in the application were the cancellation proceeding filed by Bacardi before the Trademark Trial and Appeal Board, number 24,108, and the Complaint filed by Bacardi against Cubaexport in United States District Court for the District of Columbia.  See A.R. 87, 97.

32.    OFAC ultimately granted the application.  See License No. CU-74488, A.R. 83-84; Szubin Decl. ¶ 32.

33.    Like all specific licenses, the authorization contained in legal licenses are based upon the statements and representations made in the application.  See Szubin Decl. ¶¶ 12-14.

34.    The limitation on the authorization contained in a specific license to the statements and representations within an application is typically stated in explicit terms in the license.  See, e.g., A.R. 83-84; Szubin Decl. ¶¶ 12-13.

35.    The legal license that OFAC issued, License No. CU-74488, authorized "[a]ll transactions . . . to enable the Licensee, in connection [with] the legal representation of [Cubaexport] and Havana Club Holdings S.A. in legal proceedings in the United States related to the HAVANA CLUB trademark, as described in the application, to receive payment for such

services and reimbursement for expenses related to such services."  A.R. 84; see also Szubin Decl. ¶ 32.

36.    OFAC also issued a companion travel license authorizing travel-related transactions in connection with the legal proceedings.  License No. CT-4558, A.R. 85-86; see also Szubin Decl. ¶ 32.

37.    OFAC responded to Ropes & Gray's request for renewal of these licenses by issuing two new licenses.  See License Nos. CU-75745, CT-7571, A.R. 45-48; Szubin Decl. ¶ 32.

38.    On December 13, 2005, counsel for Cubaexport filed an application with the PTO on Cubaexport's behalf to renew the Havana Club trademark.  See Letter from Vincent Palladino to Commissioner of Trademarks, A.R. 59-82.

39.    In the letter, counsel for Cubaexport represented that "[p]ayment of the filing fee is being made pursuant to License No. CU 74488."  A.R. 59.

40.    Ropes & Gray notified OFAC in a December 13, 2005, letter of Cubaexport's application for renewal with the PTO.  Letter from Vincent Palladino to OFAC, A.R. 56; see also Szubin Decl. ¶ 33.

41.    On April 6, 2006, OFAC informed both Ropes & Gray and the PTO that, for the reasons stated in the April 6 letter, License No. CU-74488 "does not authorize Ropes & Gray LLP to pay a filing fee to the U.S. Patent and Trademark Office ("PTO") for renewal of Registration No. 1,031,651 (the "HAVANA CLUB trademark") on behalf of [Cubaexport]." Letter from OFAC to Vincent Palladino, A.R. 52; see also Szubin Decl. ¶ 34.

42.    In the April 6, 2006, letter, OFAC informed Ropes & Gray that its discussion was limited to the extent of authorization conferred by License No. CU-74488 and did not answer the question of whether renewal could be otherwise authorized:

7

We note that this discussion does not in any way prejudice the ability of Ropes &
Gray LLP to request separate authorization from OFAC to engage in transactions
related to the renewal of the HAVANA CLUB trademark registration at the PTO.
If you wish to request such a specific license or further guidance from OFAC, you
may do so by writing directly to OFAC's Licensing Division.  Should you have
any further questions, please contact the Deputy Chief Counsel (Foreign Assets
Control) . . . .

A.R. 53; see also Szubin Decl. ¶ 34.

43.    On April 7, 2006, Ropes & Gray responded to OFAC's letter by requesting a

specific license to authorize payment for the renewal of the Havana Club trademark, on behalf of

Cubaexport, for the reasons contained therein.  Letter from Vincent Palladino to OFAC, A.R. 49-

51; see also Szubin Decl. ¶ 35.

44.    As part of its consideration of the request for a specific license, OFAC referred the

request to the United States Department of State for guidance concerning whether the grant of

such a license would be consistent with United States foreign policy.  See Mem. from State

Department to OFAC, A.R. 2-3; Szubin Decl. ¶ 38.

45.    The State Department informed OFAC that "[d]enial of the license application

would be consistent with the U.S. approach toward non-recognition of trademark rights

associated with confiscated property" as well as "consistent with . . . the policy of the United

States to deny resources to the Castro regime."  A.R. 2-3.  Accordingly, "[h]aving weighed the

facts and foreign policy concerns presented by this referral, the Department of State

recommend[ed] that OFAC deny Ropes & Gray's application."  Id.; Szubin Decl. ¶ 39.

46.    After considering the State Department's guidance, the facts and circumstances of

the case, and the implementation of section 211 in the CACR, OFAC denied the request for a

specific license.  Letter from OFAC to Vincent Palladino, A.R. 1; Szubin Decl. ¶ 40.

47.    In the letter, OFAC explains that the Department of State had informed OFAC

8

that "it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark."  A.R. 1; Szubin Decl. ¶ 41.

48.     While OFAC was considering the application, Ropes & Gray continued to pursue renewal of the Havana Club trademark with the PTO.  See Letters from Vincent Palladino to Commissioner for Trademarks, A.R. 6-9, 34-40; Szubin Decl. ¶ 37.  Counsel for Bacardi opposed any such action in letters to the PTO.  See Letters from William Golden to Commissioner for Trademarks, A.R. 4-5, 10-33; Szubin Decl. ¶ 37.

49.     OFAC was copied on this correspondence.  See A.R. 4-40; Szubin Decl. ¶ 37.


Dated December 21, 2006                    Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           JEFFREY A. TAYLOR
                                           U.S. Attorney for the District of Columbia

                                           SANDRA M. SCHRAIBMAN
                                           (DC Bar No. 188599)
                                           Assistant Branch Director
                                           Federal Programs Branch

                                              s/ Eric R. Womack
                                           ERIC R. WOMACK (IL Bar No. 6279517)
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           Post Office Box 883
                                           Washington, D.C.  20001
                                           Tel: (202) 514-4020
                                           Fax: (202) 616-8470

                                           Counsel for the Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
EMPRESA CUBANA EXPORTADORA        )
DE ALIMENTOS Y PRODUCTOS             )
VARIOS d/b/a CUBAEXPORT,                  )
                                                    )
                        Plaintiff,                 )
                                                    )
            v.                                      )          Civil Action No. 1:06CV01692 (ESH)
                                                    )
                                                    )          Hon. Ellen S. Huvelle
UNITED STATES DEPARTMENT OF        )
THE TREASURY, OFFICE OF FOREIGN    )
ASSETS CONTROL,                             )
HENRY M. PAULSON, JR., as Secretary    )
of Treasury, ADAM J. SZUBIN, as            )
Director of the Office of Foreign Assets    )
Control, and THE UNITED STATES,         )
                                                    )
                        Defendants.             )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN
THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

    Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport"), an agent

of the Cuban government whose connections to this country are necessarily constrained by

federal law, seeks to invalidate a decision by the Office of Foreign Assets Control ("OFAC")

denying an application for a specific license to authorize the payment of a filing fee to renew the

"Havana Club" trademark in Cubaexport's name.  OFAC requested guidance from the United

States Department of State and received a recommendation, based on foreign policy

considerations, that the application be denied.  Despite this consultation with the State

Department and the extensive deference due OFAC in its licensing determinations, Cubaexport

asks this Court to second-guess OFAC's decision, based in large part on its claim to fundamental

rights under the United States Constitution.  This Court should see Cubaexport's challenge for

what it truly is—an attempt by the Cuban government to invalidate the foreign policy decisions of the political branches of the United States—and reject Cubaexport's claims.

As an initial matter, this Court lacks jurisdiction to entertain Cubaexport's constitutional claims. As a judicially-recognized agent or instrumentality over which the Cuban government exercises extensive control, Cubaexport stands in the shoes of the Cuban government for the purposes of the Fifth Amendment. Accordingly, as a foreign state lies outside of the constitutional structure of the nation, Cubaexport lacks rights guaranteed by the Fifth Amendment. Moreover, even if Cubaexport were deemed an entity independent from the Cuban government, it nevertheless is a Cuban national whose connections with the United States, which are inherently limited by the provisions of the Cuban Assets Control Regulations ("CACR"), are not substantial enough to entitle Cubaexport to constitutional protections.

Further, even assuming that this Court has jurisdiction over Cubaexport's Fifth Amendment claims, the claims lack merit. As an initial matter, given OFAC's discretion over licensing determinations, Cubaexport lacks an entitlement or property interest that is recognized by the Fifth Amendment. In addition, even assuming that Cubaexport is entitled to rights protected by the Fifth Amendment, OFAC's actions in this case comported with constitutional requirements. First, OFAC satisfied the requirements of due process by providing Cubaexport with both notice and an opportunity to be heard on its request for a license. Second, as numerous courts have recognized, the adverse effect of OFAC's actions on entities subject to economic sanctions does not constitute a vested "taking" of private property. To hold otherwise would render such sanctions schemes hollow, allowing the foreign targets of such regulations to simply stand in line to receive compensation for their losses.

Cubaexport's remaining challenge to the denial of its specific license falls under the

2

Administrative Procedure Act ("APA").  In light of the extensive deference due OFAC in interpreting its own regulatory authority as well as the deference due the foreign policy judgments of the political branches, OFAC's decision to deny a request for a specific license is not arbitrary or capricious.  The decision, which is supported by judicial precedent and the advice of a fellow agency, is entirely consistent with applicable statutes and regulations.

## STATUTORY AND REGULATORY BACKGROUND

In response to the expropriation of U.S. property in Cuba and other acts by the Castro regime deemed antagonistic to the interests of this country, President Kennedy imposed an embargo on all trade with Cuba in February 1962.  See Proclamation 3447 of February 3, 1962, 27 Fed. Reg. 1085 (1962).  The current terms of the embargo and related restrictions are reflected in the CACR, see 31 C.F.R. Part 515, which were promulgated pursuant to section 5(b) of the Trading With the Enemy Act, 50 U.S.C. App. § 1 et seq.

## I.    TRADING WITH THE ENEMY ACT

Section 5(b) of the Trading With the Enemy Act ("TWEA") broadly authorizes the President, through a designated agency, to "investigate, regulate, . . . prevent or prohibit, any . . . use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or . . . transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States."  50 U.S.C. App. § 5(b)(1)(B).  The President has authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes of TWEA.  See, e.g., Exec. Order No. 12854, 58 Fed. Reg. 36587 (July 4, 1993).

As originally enacted in 1917, TWEA authorized the use of the specified economic

3

powers only during times of war, see Act of Oct. 6, 1917, ch. 106, 40 Stat. 411, but it was

expanded in 1933 to deal with peacetime national emergencies, see Act of March 9, 1933, ch. 1,

48 Stat. 1.  Regan v. Wald, 468 U.S. 222, 227 n.2 (1984).  In 1977, Congress amended section

5(b) to limit the President's authority under TWEA once again to times of war.  See Pub. L. No.

95-223, § 101, 91 Stat. 1625, 1625-26; Wald, 468 U.S. at 227–28.[1]

The 1977 amendment, however, included a "grandfather clause," which authorized the

President to continue to exercise his authority under section 5(b) of TWEA with respect to any

country that was subject to sanctions on July 1, 1977, including Cuba.  See Pub. L. No. 95-223, §

101(b), 91 Stat. 1625, 1625-26 (reported as note following 50 U.S.C. App. § 5); Wald, 468 U.S.

at 228–29.  The grandfather clause also provided that the President "may extend the exercise of

such authorities for one-year periods upon a determination for each such extension that the

exercise of such authorities with respect to such country for another year is in the national

interest of the United States."  Pub. L. No. 95-223, § 101(b), 91 Stat. 1625, 1625; Wald, 468 U.S.

at 229. Pursuant to this authority, Presidents have annually, since 1978, determined that it is in

the national interest to continue the exercise of emergency powers with respect to Cuba.  See,

e.g., Determination No. 2006-23, 71 Fed. Reg. 54399 (Sept. 13, 2006) (most recent renewal of

the President's TWEA authority to continue economic sanctions against Cuba); see also Wald,

468 U.S. at 229; Walsh v. Brady, 927 F.2d 1229, 1230 (D.C. Cir. 1991).

---

[1]   In the same 1977 bill amending TWEA, Congress enacted the International Emergency
Economic Powers Act ("IEEPA"), which governs the President's exercise of emergency
economic powers during peacetime.  See Title II, Pub. L. No. 95-223, 91 Stat. 1626 et seq.,
codified at 50 U.S.C. § 1701 et seq.; Wald, 468 U.S. at 227–28.  The authorities granted to the
President by section 203 of IEEPA are substantially similar to those in section 5(b) of TWEA.
See Wald, 468 U.S. at 228, 228 n.8.

II.    **THE CUBAN ASSETS CONTROL REGULATIONS**

The CACR, 31 C.F.R. Part 515, were first promulgated in 1963 pursuant to TWEA and

are administered by OFAC.  See United States v. Brodie, 403 F.3d 123, 127 (3d Cir. 2005);

Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462, 465 (2d Cir. 2005).  Among other

things, the CACR prohibit economic transactions in the United States involving property in

which Cuba or any Cuban national has "any interest of any nature whatsoever, direct or indirect,"

except "as specifically authorized by the Secretary of the Treasury (or any person, agency, or

instrumentality designated by him)."  31 C.F.R. § 515.201(b).  Accordingly, in order for Cuba or

a Cuban national to engage in any prohibited transaction with an individual or entity in the

United States involving property, that individual or entity must be licensed to engage in that

transaction.  See id. § 515.201(b).  That license may be either general, where the terms of the

authorization are set forth in OFAC publications or regulations, see id. § 515.317, or specific to

an applicant or transaction, see id. § 515.318.

The CACR define the concept of property and property interests broadly, including

interests in patents, trademarks, and copyrights.  Id. § 515.311.  Certain transactions relating to

the registration and renewal of trademarks have historically been authorized under a general

licensing provision.  See id. § 515.527(a)(1).  In 1998, however, Congress abrogated this general

license in part through the passage of section 211 of the Omnibus Consolidated and Emergency

Supplemental Appropriations Act ("section 211"), which prohibited the approval of any

"transaction or payment" pursuant to 31 C.F.R. § 515.527 "with respect to a mark, trade name, or

commercial name that is the same as or substantially similar to a mark, trade name, or

commercial name that was used in connection with a business or assets that were confiscated[2] unless the original owner of the mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented."  Pub. L. No. 105-277, § 211(a)(1), 112 Stat. 2681, 2681-88.  In the same Act, Congress also prohibited United States courts from "recogniz[ing], enforc[ing] or otherwise validat[ing] any assertion of rights by a designated national based on common law rights or registration obtained under such section 515.527 of such a confiscated mark, trade name, or commercial name," as well as "any assertion of treaty rights by a designated national or its successor-in-interest under sections 44(b) or (e) of the Trademark Act of 1946." Id. § 211(a)(2), (b), 112 Stat. at 2681-88.

In accordance with the statutory mandate in section 211, see id. § 211(c), 112 Stat. at 2681-88, OFAC amended its regulations on May 13, 1999, to remove the general license authority for U.S. persons to engage in transactions or payments related to the registration or renewal of a mark, trade name, or commercial name in which a Cuban national has an interest that is the same as or substantially similar to a mark used in connection with confiscated assets unless the original owner or bona fide successor-in-interest has expressly consented.  31 C.F.R. § 515.527(a)(2).  This amendment precluded such transactions on behalf of Cuban nationals in the absence of a specific license issued by OFAC.  Id. § 515.318; see also Decl. of Adam J. Szubin ("Szubin Decl.") ¶ 22.

---

[2]  The term "confiscated" is defined to include "[t]he nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959: (1) Without the property having been returned or adequate and effective compensation provided; or (2) Without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure."  31 C.F.R. § 515.336.

## PROCEDURAL BACKGROUND

### I.    GENERAL BACKGROUND OF THE HAVANA CLUB TRADEMARK

In 1976, the United States Patent and Trademark Office ("PTO") granted Cubaexport's application to register a trademark including the name "Havana Club" in the United States. Compl. ¶¶ 12-13.  In 1995, Cubaexport applied to OFAC for a specific license authorizing the assignment of the "Havana Club" trademark from Cubaexport to Havana Rum & Liquors, S.A. to Havana Club Holding, S.A. ("HCH").  See Szubin Decl. ¶ 23.  On November 13, 1995, OFAC issued a license authorizing the assignment.  See id. ¶ 24.  However, on April 17, 1997, OFAC issued a Notice of Revocation of the license.  See id. ¶ 25.

Both OFAC's grant of the specific license to transfer the Havana Club mark and the effect of OFAC's subsequent revocation of that license were extensively litigated in a trademark infringement action brought by HCH and Havana Club International, S.A. ("the plaintiffs"), against a number of defendants, including Galleon S.A. and Bacardi-Martini USA, Inc. ("Bacardi").  See Havana Club Holding, S.A. et al. v. Galleon S.A. et al., 961 F. Supp. 498 (S.D. N.Y. 1997) ("HCH I"); 974 F. Supp. 302 (S.D. N.Y. 1997) ("HCH II"); 96 Civ. 9655, 1998 WL 150983 (S.D. N.Y. Mar. 31, 1998) ("HCH III"); 62 F. Supp.2d 1085 (S.D. N.Y. 1999) ("HCH IV"); 203 F.3d 116 (2d Cir. 2000) ("HCH V").  In HCH I, 961 F. Supp. at 503-05, the Court rejected Bacardi's challenge to OFAC's initial grant of the license, holding that Bacardi lacked standing to challenge OFAC's issuance of the license, that the foreign policy considerations of the Executive Branch should not be disturbed by the judiciary, and that OFAC has considerable discretion in granting or revoking licenses.

Following OFAC's revocation of the specific license, Bacardi moved for summary judgment in the litigation on the ground that the plaintiffs had no continuing right to the Havana

Club trademark.  See HCH II, 974 F. Supp. at 306.  Giving "considerable weight" to OFAC's

interpretation of the CACR, the Court held that the "express terms of the general license . . .

compel the conclusion that OFAC has properly construed [TWEA] to preclude a transfer under

the general license," that the CACR impliedly repealed the General Inter-American Convention

for Trademark and Commercial Protection, 46 Stat. 2907 (1931), that there was a rational basis

to prohibit transfer of the mark under the CACR, and that the trademark fell within the scope of

property covered by the CACR.  HCH II, 974 F. Supp. at 306-11.  Accordingly, the Court held

that the plaintiffs lacked rights in the Havana Club trademark.  Id. at 311.  However, the Court

refused to grant Bacardi's request to cancel the registration in toto, holding that the rights to the

registration of the Havana Club trademark reverted to Cubaexport.  Id.

Following this decision, the Court proceeded to a bench trial on the plaintiffs' trade name

infringement claims against Bacardi.  HCH IV, 62 F. Supp.2d 1085.  In light of Congress's

passage of section 211 "prior to the trial but well into the course of this litigation," the Court held

that the plaintiffs were prohibited from asserting a claim for trade name infringement under the

Inter-American Convention.  Id. at 1091-94.  The Court based this conclusion on "the evidence at

trial," which "established that on October 13, 1960, the Revolutionary Cuban Regime confiscated

the physical assets, property and business records of  [Jose Arechabala, S.A. ("JASA")], the

original owner of the Havana Club trademark" without affording any compensation to JASA.  Id.

at 1092.  The Court also found that the plaintiffs lacked standing to raise a claim under the

Lanham Act, as the likelihood of competitive injury from Bacardi's actions was "too remote"

given the Cuban embargo's prohibition on the sale of Cuban products in the United States.  Id. at

1099.  Accordingly, the Court entered judgment in Bacardi's favor.  Id. at 1100.

On appeal, the Second Circuit affirmed the district court's judgment.  HCH V, 203 F.3d

116.  The Second Circuit refused to provide the plaintiffs with an opportunity to conduct additional discovery in an attempt to prove that the "Havana Club" trade name was not associated with confiscated property, holding that "[w]here Cuba has not returned JASA's property, not made even a gesture toward compensation, and not settled the claim, the confiscation inquiry ends."  Id. at 129-30.

The effect of the HCH litigation was to add an element of confusion to the status of the Havana Club trademark.  In January of 1996, HCH, as the "owner of record" of the mark, had renewed the registration of the mark for a period of ten years, to expire on July 27, 2006.  Compl. ¶ 19.  However, following the litigation, HCH maintained no continuing interest in the mark.  Id. ¶ 20.  To correct this situation, the PTO amended its records to restore Cubaexport as the owner of the renewed registration.  Galleon S.A. v. Havana Club Holding, S.A., 2004 WL 199225, at *11 (Trademark Tr. and App. Bd. Jan. 29, 2004); see also Compl. ¶¶ 21-22.

Bacardi challenged this action in its proceeding before the PTO, originally filed in 1995, seeking cancellation of the registration of the Havana Club mark.  See Galleon, 2004 WL 199225; Compl. ¶ 21.  The PTO concluded that the district court's decision in the Havana Club litigation contemplated that the registration would continue to exist in Cubaexport's name.  See Galleon, 2004 WL 199225 at *14-16.  In addition, the Trademark Trial and Appeal Board refused to cancel Cubaexport's registration of the mark on the basis of Bacardi's pleading of fraud in the original application.  Id. at *18-19.

Bacardi has sought review of the Board's decision in United States District Court for the District of Columbia.  See Bacardi & Co. Ltd. v. Empresa Cubana Exportadora de Alimentos y Productos Varios, et al., 1:04-CV-00519 (EGS) (D. D.C.) (filed Mar. 29, 2004); see also Compl. ¶ 23.  That litigation is ongoing.  Compl. ¶ 23.

## II.    RECENT PROCEEDINGS BETWEEN CUBAEXPORT AND OFAC RELATING TO CUBAEXPORT'S APPLICATION FOR A SPECIFIC LICENSE

As a result of the CACR's prohibition on persons subject to the jurisdiction of the United States engaging in transactions involving property in which the Cuban government or a Cuban national has an interest, a lawyer is unable to receive compensation for fees and expenses incurred in representing such entities in legal proceedings without a specific license from OFAC. See 31 C.F.R. § 515.512.  Similarly, that lawyer cannot engage in Cuban travel-related transactions to engage in research related to the legal representation without a specific travel license.  See 31 C.F.R. § 515.560.  Accordingly, in order to obtain reimbursement for the fees and expenses related to the representation of Cubaexport in legal proceedings in the United States, including proceedings before the Trademark Trial and Appeal Board, Cubaexport's attorneys have applied for and received various legal and travel licenses.  See, e.g., License Nos. CU-75745, CT-7571, Administrative Record ("A.R.") 45-48; License Nos. CU-74488, CT-4558, A.R. 83-86; License No. CT-1943, A.R. 99-100.

Ropes & Gray, which had merged with the law firm of Fish & Neave, Cubaexport's prior counsel, in January 2005, applied to OFAC for a renewal of the legal and travel licenses previously issued to Fish & Neave.  See Compl. ¶ 35; see also January 5, 2005, Letter from Renee Stasio to OFAC, A.R. 97-98.  In the application, Ropes & Gray asserted that it "will be the law firm representing Cubaexport in connection with the . . . matters" previously mentioned in the application.  A.R. 98.  The legal matters specifically referenced were the cancellation proceeding filed by Bacardi before the Trademark Trial and Appeal Board, number 24,108, and the Complaint filed by Bacardi against Cubaexport in federal district court.  See A.R. 97; see also January 26, 2005, Letter from Renee Stasio to OFAC, A.R. 87.

OFAC granted the application on March 4, 2005.  <u>See</u> License No. CU-74488, A.R. 83-84.  The legal license that OFAC issued, License No. CU-74488, authorized "[a]ll transactions . . . to enable the Licensee, in connection [with] the legal representation of [Cubaexport] and Havana Club Holdings S.A. in legal proceedings in the United States related to the HAVANA CLUB trademark, as described in the application, to receive payment for such services and reimbursement for expenses related to such services."  A.R. 84.  OFAC also issued a companion travel license authorizing travel-related transactions in connection with the legal proceedings.  License No. CT-4558, A.R. 85-86.  OFAC responded to Ropes & Gray's request for renewal of these licenses by issuing two new licenses in April 2006.  <u>See</u> License Nos. CU-75745, CT-7571, A.R. 45-48.

On December 13, 2005, Cubaexport filed an application with the PTO to renew the Havana Club trademark.  <u>See</u> Letter from Vincent Palladino to Commissioner of Trademarks, A.R. 59-82.  In a letter attached to the application, Ropes & Gray represented on Cubaexport's behalf that "[p]ayment of the filing fee is being made pursuant to License No. CU 74488 issued by the Office of Foreign Assets Control . . . on March 4, 2005 . . . in order to maintain the *status quo* by maintaining Registration No. 1,031,651 until a decision regarding cancellation of the registration can be rendered in ongoing litigation, *Bacardi & Company Limited v. Cubaexport and Havana Club Holding*, 1:04-CV-00519 (EGS) (D. D.C. 2004)."  A.R. 59.  Ropes & Gray forwarded a copy of this letter to OFAC, again explaining that Ropes & Gray "has relied on License No. CU 74488 to maintain the *status quo* until a decision in [*Bacardi & Company Limited v. Cubaexport and Havana Club Holding*] is rendered by the Court or by any court to which such a decision may finally be appealed."  December 13, 2005, Letter from Vincent Palladino to OFAC, A.R. 57.

11

On April 6, 2006, OFAC informed both Ropes & Gray and the PTO that License No. CU-74488 "does not authorize Ropes & Gray LLP to pay a filing fee to the U.S. Patent and Trademark Office ("PTO") for renewal of Registration No. 1,031,651 (the "HAVANA CLUB trademark") on behalf of [Cubaexport]."  Letter from OFAC to Vincent Palladino, A.R. 52.  As explained in the letter, "License No. CU-74488 pertains to a cancellation proceeding."  A.R. 52. According to OFAC, the text of the license therefore authorized "legal representation of [Cubaexport], and Havana Club Holdings S.A. in legal proceedings in the United States related to the Havana Club trademark, as described in the application" submitted by Ropes & Gray for the license.  A.R. 52.  However, "[t]he only legal proceeding described in [the] application was 'a complaint [] currently pending in the U.S. District Court for the District of Columbia against . . . Cubaexport and Havana Club Holdings S.A."  A.R. 52.

In the April 6, 2006, letter, OFAC made clear that its discussion was limited to the extent of authorization conferred by License No. CU-74488 and therefore did not prohibit the filing of a separate request for a specific license to authorize transactions relating to renewal of the Havana Club mark:

> We note that this discussion does not in any way prejudice the ability of Ropes & Gray LLP to request separate authorization from OFAC to engage in transactions related to the renewal of the HAVANA CLUB trademark registration at the PTO.  If you wish to request such a specific license or further guidance from OFAC, you may do so by writing directly to OFAC's Licensing Division.

A.R. 53.  OFAC closed the letter by referring Ropes & Gray to the Deputy Chief Counsel of OFAC for resolution of "any further questions."  A.R. 53.

On April 7, 2006, Ropes & Gray responded to OFAC's letter by requesting a specific license to authorize payment for the renewal of the Havana Club trademark on behalf of Cubaexport.  Letter from Vincent Palladino to OFAC, A.R. 49-51.  The letter asserted as grounds

for issuance of such a license the same reasons provided in the December 13, 2005, letter, including maintaining "the status quo," preventing the "cancellation of the registration," allowing the D.C. district court "to reach a reasoned decision in the pending litigation," and preventing the decision of the Trademark Trial and Appeal Board from being "effectively overrule[d]."  A.R. 50.

As part of its consideration of the request for a specific license, OFAC referred the request to the United States Department of State for guidance concerning whether the grant of such a license would be consistent with United States foreign policy.  See Mem. from State Department to OFAC, A.R. 2-3; Szubin Decl. ¶ 38.  The State Department ultimately informed OFAC that "[d]enial of the license application would be consistent with the U.S. approach toward non-recognition of trademark rights associated with confiscated property" as well as "consistent with . . . the policy of the United States to deny resources to the Castro regime."  A.R. 2-3.  Accordingly, "[h]aving weighed the facts and foreign policy concerns presented by this referral, the Department of State recommend[ed] that OFAC deny Ropes & Gray's application."  A.R. 3.

In accordance with this guidance, the provisions of the CACR, and OFAC's own consideration of the facts underlying the application[3], OFAC informed Ropes & Gray that it had denied the request for a specific license.  Letter from OFAC to Vincent Palladino, A.R. 1; see also Szubin Decl. ¶¶ 40-41.  In the letter, OFAC explains that the Department of State had

---

[3] While OFAC was considering the application, Ropes & Gray nevertheless continued to pursue renewal of the Havana Club mark with the PTO.  See Letters from Vincent Palladino to Commissioner for Trademarks, A.R. 6-9, 34-40.  Counsel for Bacardi opposed any such action. See Letters from William Golden to Commissioner for Trademarks, A.R. 4-5, 10-33.  OFAC was copied on this correspondence with the PTO.  See id.; see also Szubin Decl. ¶ 37.

informed OFAC that "it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark." A.R. 1. On August 3, 2006, the PTO informed Ropes & Gray that Cubaexport's renewal application could not be accepted "[b]ecause the specific license is necessary for authorizing payment of the required fee, and that license has been denied." See Post Registration Office Action, attached as Ex. 24 to Compl.

**STANDARD OF REVIEW**

## I.    MOTION TO DISMISS STANDARD

A motion to dismiss for failure to state a claim should be granted when a complaint fails to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The Court may grant the motion when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Although the plaintiff is entitled to all reasonable inferences, "the court need not accept inferences drawn by [the] plaintiff[] if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). The standard of review is substantially the same for subject matter jurisdiction challenges pursuant to FED. R. CIV. P. 12(b)(1), but the Court may also consider materials outside of the pleadings to determine whether jurisdiction exists. Caesar v. United States, 258 F. Supp.2d 1, 2-3 (D. D.C. 2003).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is "properly regarded . . . as an integral part of the Federal Rules as a whole,

14

which are designed to secure the just, speedy and inexpensive determination of every action."

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (internal quotation omitted).  The relevant

inquiry is "whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  "[T]here is no issue for trial unless there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If

the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted).

### ARGUMENT

## I.    CUBAEXPORT LACKS STANDING TO ASSERT ITS FIFTH AMENDMENT CLAIMS

The Due Process Clause of the Fifth Amendment provides that no "person" shall be

"deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

However, unlike citizens of the United States, or even "States of the Union," "foreign nations"

are "entirely alien to our constitutional system."  Price v. Socialist People's Libyan Arab

Jamahiriya, 294 F.3d 82, 96 (D.C. Cir. 2002).  It would therefore be "highly incongruous to

afford greater Fifth Amendment rights" to foreign entities than to the states who, despite

"help[ing] make up the very fabric of that system," possess no rights as a "person" under the

Fifth Amendment.  Id.; see also South Carolina v. Katzenbach, 383 U.S. 301 (1966).

In accordance with the textual limitations of the Due Process Clause, the judiciary has

been reluctant to extend Fifth Amendment protections to foreign states.  For example, the

Supreme Court has never "suggested that foreign nations enjoy rights derived from the

Constitution, or that they can use such rights to shield themselves from adverse actions taken by

the United States." Id. at 97. Rather than mediating legal disputes between the United States and

a foreign nation through the Constitution, "the federal judiciary has relied on principles of comity

and international law to protect foreign governments in the American legal system." Id. If Fifth

Amendment protections were extended to foreign nations, "serious practical problems" might

arise:

> For example, the power of Congress and the President to freeze the assets of
> foreign nations, or to impose economic sanctions on them, could be challenged as
> deprivations of property without due process of law. The courts would be called
> upon to adjudicate these sensitive questions, which in turn could tie the hands of
> the other branches as they sought to respond to foreign policy crises. The
> Constitution does not command this.

Price, 294 F.3d at 99; see also People's Mojahedin Org. of Iran v. Dep't of State ("PMOI"), 182

F.3d 17, 22 (D.C. Cir. 1999) ("No one would suppose that a foreign nation had a due process

right to notice and a hearing before the Executive imposed an embargo on it for the purpose of

coercing a change in policy."). Based upon these legal and policy considerations, the D.C.

Circuit has expressly held that "foreign states are not 'persons' protected by the Fifth

Amendment."[4] Id. at 96; see also TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d

296, 300 (D.C. Cir. 2005).

    Thus, the question for this Court is whether the Cuban government exerted "sufficient

control over [Cubaexport] to make it an agent of the state" for Fifth Amendment purposes. TMR

Energy, 411 F.3d at 301; see also First Nat'l City Bank v. Banco Para el Comercio Exterior de

---

[4] Although the D.C. Circuit's holding in Price focused on the Due Process Clause of the
Fifth Amendment, its justification for this holding supports the same conclusion under the
Takings Clause of the Fifth Amendment, as its analysis of Supreme Court precedent and practical
foreign policy considerations applies generally to the constitutional rights of foreign
governments. See Price, 294 F.3d at 97; see also Paradissiotis v. United States, 304 F.3d 1271,
1274 (Fed. Cir. 2002).

Cuba, 462 U.S. 611, 629 (1983).  If so, then "there is no reason to extend to [Cubaexport] a constitutional right that is denied to the sovereign itself."  TMR Energy, 411 F.3d at 301.  In the present case, it is clear from the pleadings and judicial precedent that Cubaexport is an agent of the Cuban government.

Cubaexport describes itself in its Complaint as a "Cuban state-owned enterprise" located solely within Cuba.  Compl. ¶ 5.  Moreover, Cubaexport states that it "was established in 1965 by the Cuban Ministry of Foreign Commerce for the purpose of exporting food and other products."  Id.  Accordingly, Cubaexport acknowledges that it is a state-owned entity created by the Cuban government for the purpose of executing state trade policy.  Cf. TMR Energy, 411 F.3d at 301-02 (holding that state exercises plenary control over entity based on several factors including creation of entity for purpose of enacting state policy); Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 849 (D.C. Cir. 2000) ("[A] sovereign need not exercise complete dominion over an instrumentality . . . .  If such domination were required, then agency principles would be superfluous . . . .").

In line with this acknowledgment, other courts have found Cubaexport to be a "wholly owned corporation[] of the Government of Cuba."  Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 357 (11th Cir. 1984); see also HCH V, 203 F.3d at 120 (describing Cubaexport as a "Cuban state enterprise"); HCH IV, 62 F. Supp.2d at 1090 (describing Cubaexport as "a Cuban state foreign trade enterprise established by the Cuban Ministry of Foreign Commerce").  And at least one court that has engaged in this agency analysis under the Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, 116 Stat. 2322, has recently held that Cubaexport is an agent of the Cuban government.  See Weininger v. Castro, — F. Supp.2d —, 2006 WL 3343131, at *33 (S.D. N.Y. Nov. 17, 2006) ("[T]o the extent the funds in the . . . Account belong to Banco Nacional or

17

to CUBAEXPORT, they belong to agencies or instrumentalities of Cuba and Plaintiffs may

execute upon them to satisfy their judgment against Cuba.").  Accordingly, as an agent of the

Cuban government, Cubaexport lacks status as a "person" protected by the guarantees of the

Fifth Amendment.[5]  See TMR Energy, 411 F.3d at 302; see also Cruz v. United States, 387 F.

Supp.2d 1057, 1067-68 (N.D. Cal. 2005) (holding that entities acting as agents or

instrumentalities of foreign state are outside the protections of the Due Process Clause); Banco

Nacional de Cuba v. Farr, 243 F. Supp. 957, 977 (S.D. N.Y. 1965) ("Plaintiff is an

instrumentality of the Cuban government and stands in its shoes.  For the purposes of this case at

least, it is the Cuban government.").

However, even if Cubaexport is determined to have a separate juridical status from the

government of Cuba, it is "far from obvious that even an independent [Cubaexport] would be

entitled to the protection of the Fifth Amendment."  TMR Energy, 411 F.3d at 302 n.  This doubt

arises from the fact that "[t]he Supreme Court has long held that non-resident aliens who have

insufficient contacts with the United States are not entitled to Fifth Amendment protections."

Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004).  The main exception to this rule applies

when aliens "'have come within the territory of the United States and developed substantial

---

[5]  This conclusion is supported by principles of equity, which weigh against recognition
of Cubaexport as a separate juridical entity in the present case.  As will be discussed in detail in
Section IV infra, the Havana Club trademark has been identified as a mark associated with
property confiscated by the Cuban government.  See, e.g., HCH V, 203 F.3d at 119-20.  From
1972 to 1993, Cubaexport was the exclusive exporter of rum under the Havana Club mark.  See,
e.g., id. at 120.  Now that Congress, through the passage of section 211, has qualified the
extension of recognition for trademarks that are the same as or substantially similar to trademarks
used in connection with confiscated Cuban property, it would be incongruous with congressional
intent to allow this sanction to be avoided through recognition of constitutional protections in the
entity that stands in the Cuban government's shoes with respect to goods sold under that
trademark.  Cf. First Nat'l City Bank, 462 U.S. at 632-33.

connections with this country.'"[6] PMOI, 182 F.3d at 22 (quoting United States v. Verdugo-

Urquidez, 494 U.S. 259, 271 (1990)); see also Jifry, 370 F.3d at 1182; Am. Immigration Lawyers

Ass'n v. Reno, 18 F. Supp.2d 38, 59-60, 60 n.17 (D. D.C. 1998) (holding that plaintiffs had not

demonstrated "substantial connections" to the United States despite regularly visiting family in

the country).

Cubaexport is a non-resident corporation operating out of Cuba. See Compl. ¶ 5. Any

activities that Cubaexport wishes to conduct within the United States are strictly regulated, if not

expressly prohibited, by the CACR. See 31 C.F.R. Part 515. Accordingly, Cubaexport's ability

to establish a presence within the United States is, for all practical purposes, restricted by federal

law. In the present case, the only contact alleged by Cubaexport is the registration of a

trademark, through counsel, in the United States PTO, and the defense of that trademark through

litigation by counsel within the United States.[7] If such minimal presence is sufficient to enable a

foreign entity to the protections of the Fifth Amendment, despite the existence of sanctions

against that entity that statutorily limit the entity's presence, then it is unclear what force the

"substantial connections" limitation maintains. See PMOI, 182 F.3d at 22.

_____

[6] In Nat'l Council of Resistance of Iran v. Dep't of State ("NCRI"), 251 F.3d 192, 201-02 (D.C. Cir. 2001), an opinion issued prior to Jifry, the D.C. Circuit questioned in dicta whether an alien's connections need be substantial for the Fifth Amendment to apply. However, in NCRI the Court avoided confronting the question because the government's representations had already sufficiently established the alien entity's presence within the United States. See id. at 202.

[7] In Russian Volunteer Fleet v. United States, 282 U.S. 481, 489 (1931), the Supreme Court extended the protections of the Takings Clause to an "alien friend" with property in the United States. However, as the Supreme Court has subsequently explained, this recognition does not extend to "an enemy alien." Harisiades v. Shaughnessy, 342 U.S. 580, 587 n.9 (1952); see also Russian Volunteer Fleet, 282 U.S. at 489 ("There was no legislation which prevented it from acquiring and holding the property in question."). After all, an enemy alien whose contacts with the United States are prohibited or constrained by law stands in a much different position than those visitors who are fully encouraged to participate in commerce within the United States.

## II.    EVEN ASSUMING CUBAEXPORT HAS RIGHTS GUARANTEED BY THE FIFTH AMENDMENT, ITS DUE PROCESS CLAIM LACKS MERIT

In Count I of the Complaint, Cubaexport alleges that its procedural due process rights were violated because OFAC failed to provide Cubaexport with notice and an opportunity to be heard regarding the applicability of section 211 and 31 C.F.R. § 515.527(a)(2) to Cubaexport. See Compl. ¶ 63.  Cubaexport also alleges in Count II of the Complaint that OFAC's denial of a license to renew the Havana Club trademark was a violation of substantive due process, as OFAC's actions were inconsistent with the underlying purposes of the CACR and TWEA and were therefore "arbitrary and capricious."  See id. ¶ 68.  Both allegations are without merit.

### A.    OFAC's Actions Were Consistent with Procedural Due Process

In order to establish a violation of procedural due process, Cubaexport must establish the existence of a protected property interest as well as a violation of the procedural protections that were due.  See, e.g., Orange v. Dist. of Columbia, 59 F.3d 1267, 1273 (D.C. Cir. 1995).  In the present case, Cubaexport's unilateral expectation of a license from OFAC to permit transactions related to the renewal of the Havana Club trademark does not constitute a property interest protected by the Fifth Amendment.  However, the Court need not decide this issue, as it is apparent that OFAC provided Cubaexport with notice and a meaningful opportunity to be heard on its application for a specific license.

### 1.    Cubaexport Lacks a Property Interest in a Specific License Authorizing Transactions Related to Renewal of the Havana Club Trademark

The Supreme Court has explained that, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd.

20

of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).  The extent of this protected

interest is defined, not by the Constitution, but instead by statutes that establish a legitimate

claim of entitlement to the benefit.  Id.

Cubaexport maintains that it has a vested property interest in the registration of the

Havana Club mark.  See Compl. ¶ 60.  OFAC does not dispute that a property interest could exist

in a trademark.  See generally Coll. Savings Bank v. Florida Prepaid Postsecondary Educ.

Expense Bd., 527 U.S. 666, 673 (1999).  However, as will be discussed infra in Section III,

OFAC did not appropriate the Havana Club trademark from Cubaexport or retroactively negate a

prior registration of the trademark.  Rather, OFAC declined to grant Cubaexport a license for

transactions related to renewal of the trademark with the PTO.  This is an important distinction,

as it narrows the due process inquiry to whether Cubaexport had a Fifth Amendment property

interest in the grant of such a license.

Because a property interest recognized by the Fifth Amendment requires a claim of

entitlement, rather than a unilateral expectation, a property interest does not exist "when a statute

leaves a benefit to the discretion of a government official."  Bloch v. Powell, 348 F.3d 1060,

1069 (D.C. Cir. 2003); see also id. ("To create a protected property interest, regulations must

limit discretion by . . . specific directives to the decisionmaker that if the regulations' substantive

predicates are present, a particular outcome must follow."); Thornton v. City of St. Helens, 425

F.3d 1158, 1165 (9th Cir. 2005) ("[A]n applicant does not have a property interest in the renewal

of a license if the reviewing body has discretion to deny renewal or to impose licensing criteria of

its own creation.").  This inquiry is particularly appropriate when attempting to determine

whether a statute creates an entitlement in the renewal of a government license.  See Thornton,

425 F.3d at 1165; see also Lopez v. FAA, 318 F.3d 242, 249 (D.C. Cir. 2003).

21

Unlike the average applicant for registration or renewal of a trademark before the PTO, Cubaexport's expectation was expressly conditioned on the licensing provisions of the CACR. See 31 C.F.R. § 515.527. Prior to 1998, that authorization was granted by a general license authorizing such transactions. See id. § 515.527(a)(1). However, Congress's passage of section 211 further conditioned the ability of a Cuban entity to register or renew on whether the trademark is the same as or substantially similar to a trademark used in connection with property that had been confiscated. Id. § 515.527(a)(2). Congress did not list in section 211 extensive, mandatory procedures for making a specific licensing determination under section 515.527, opting instead to qualify the existing general license. Pub. L. No. 105-277, § 211, 112 Stat. 2681, 2681-88; see also Compl. ¶ 30.

In situations where the general licensing provision no longer applied, the ability to engage in transactions related to the registration or renewal of a trademark would be prohibited absent the grant of a specific license by OFAC. See 31 C.F.R. § 515.318; see also Szubin Decl. ¶ 22. OFAC is given wide discretion to make this determination. See, e.g., HCH I, 961 F. Supp. at 505 ("The weight to be placed on this consideration when determining whether or not to license the assignment of a trademark is within OFAC's discretion."); cf. Bloch, 348 F.3d at 1069; Tuchman v. Connecticut, 185 F. Supp.2d 169, 174 (D. Conn. 2002) (holding that state permit statute granting discretion to Commissioner to evaluate eligibility for permit does not create constitutional entitlement); Universal Sanitation Corp. v. Trade Waste Comm'n of City of New York, 940 F. Supp. 656, 661 (S.D. N.Y. 1996) (holding that existence of heavily regulated industry disproves property right in continuing expectation of waiver). Moreover, this determination is made expressly revocable by regulation. See 31 C.F.R. § 501.803; see also Lopez, 318 F.3d at 249. Accordingly, whatever interest Cubaexport has in obtaining a license

from OFAC is constrained to such an extent that it could not constitute an "entitlement" protected by the Due Process Clause.

### 2.     OFAC Provided Cubaexport with All of the Process It Was Allegedly Due

Even assuming that Cubaexport's ability to obtain a license was a property interest recognized by the Fifth Amendment, OFAC provided Cubaexport with all of the process it was due in making the licensing determination. The Due Process Clause of the Fifth Amendment generally requires the government to afford notice and a meaningful opportunity to be heard before depriving a person of a recognized property interest. See, e.g., Holy Land Found. for Relief and Dev. v. Ashcroft, 333 F.3d 156, 163-64 (D.C. Cir. 2003); Karpova v. Snow, 402 F. Supp.2d 459, 470 (S.D. N.Y. 2005). In the context of OFAC's enforcement authority under TWEA and IEEPA, courts have held that this opportunity does not entail a full hearing prior to agency action; an opportunity for an affected entity to respond to OFAC in writing is sufficient to satisfy due process. See Holy Land Found., 333 F.3d at 163-64; Nat'l Council of Resistance of Iran v. Dep't of State ("NCRI"), 251 F.3d 192, 209 (D.C. Cir. 2001); Karpova, 402 F. Supp.2d at 470; see also Mathews v. Eldridge, 424 U.S. 319, 335 (1976). In fact, courts have recognized that OFAC's need for prompt action in the context of TWEA or IEEPA has justified the absence of pre-deprivation notice or an opportunity to be heard, even in instances in which an organization is effectively shut down by OFAC's actions. See, e.g., Islamic Am. Relief Agency v. Unidentified FBI Agents, 394 F. Supp.2d 34, 49 (D. D.C. 2005); Holy Land Found. for Relief and Dev. v. Ashcroft, 219 F. Supp.2d 57, 76 (D. D.C. 2002), aff'd, 333 F.3d 156 (D.C. Cir. 2003).

Nevertheless, OFAC provided Cubaexport both notice and an opportunity to be heard

23

prior to acting on the application for a license authorizing transactions relating to the renewal of

the Havana Club mark.  In a December 13, 2005, letter, Ropes & Gray, on behalf of Cubaexport,

informed OFAC of Cubaexport's pending application with the PTO to renew the Havana Club

trademark and to pay the necessary filing fee under the authority granted by License No. CU-

74488.  See A.R. 56-58.  The letter asserted that the failure to maintain the registration of the

mark would be unfair because it would interfere with ongoing litigation and "[e]ffectively

overrul[e]" the decision of the PTO in the cancellation proceeding.  See A.R. 57.

       OFAC responded in a letter dated April 6, 2006, explaining that License No. CU-74488

"does not authorize Ropes & Gray LLP to pay a filing fee to the [PTO] for renewal of [the

'HAVANA CLUB trademark']," as the license authorized them only to engage in legal

representation of Cubaexport in a proceeding in United States District Court for the District of

Columbia that had been specifically referenced in the license application.  A.R. 52.  OFAC

concluded the letter by notifying Ropes & Gray that its explanation of the limitations of the legal

license did not prohibit issuance of a separate license for transactions related to the renewal of

the Havana Club trademark on behalf of Cubaexport:

> We note that this discussion does not in any way prejudice the ability of
> Ropes & Gray LLP to request separate authorization from OFAC to engage in
> transactions related to the renewal of the HAVANA CLUB trademark registration
> at the PTO.  If you wish to request such a specific license or *further guidance*
> from OFAC, you may do so by writing directly to OFAC's Licensing Division.
> Should you have any further questions, please contact the Deputy Chief Counsel
> (Foreign Assets Control) . . . .

A.R. 53 (emphasis added).  Thus, the April 6, 2006, letter provided express notice to Cubaexport

that the legal license did not authorize transactions related to the renewal of the Havana Club

trademark.  OFAC informed Ropes & Gray that it could apply on behalf of Cubaexport for a

specific license directly from OFAC or seek "further guidance" on the issue of renewal.  A.R. 53.

In an April 7, 2006, letter, Ropes & Gray, on behalf of Cubaexport, opted to avail itself of the first procedural option offered by OFAC, applying for a specific license to "incur and receive payment for the expense of renewing the registration."[8]  A.R. 49-51.  As support for this action, however, the application simply repeated Ropes & Gray's arguments from the December 13, 2005, letter to support expansion of the legal license.  A.R. 50.  Thus, the application filed on behalf of Cubaexport was entirely silent on the issue of whether issuance of a specific license pursuant to 31 C.F.R. § 515.527 would be consistent with the CACR or other applicable statutes, such as section 211, or whether such specific authorization was even necessary.  Cf. Global Relief Found. v. O'Neill, 207 F. Supp.2d 779, 805 (N.D. Ill. 2002) ("That Global Relief opted to ignore its administrative due process rights . . . cannot be considered a constitutional violation on the part of defendants."), aff'd, 315 F.3d 748 (7th Cir. 2002).

Cubaexport was certainly aware that such considerations might be relevant to OFAC's decision on a specific license application that would authorize renewal of the Havana Club trademark.  In a series of letters copied to OFAC while OFAC was still considering whether to grant Cubaexport a specific license, Cubaexport, through counsel, requested that, inter alia, the PTO renew the Havana Club registration pursuant to the general licensing provision for trademarks, "31 CACR § 515.527(a)," without waiting for a decision by OFAC.  A.R. 34-40.  That request advanced a series of arguments to the PTO that purportedly supported renewal of the trademark, including the assertion that disallowing renewal would be contrary to the purposes

---

[8] In light of the information provided by Ropes & Gray on behalf of Cubaexport in the December 13, 2005, letter, OFAC was aware that renewal of the Havana Club trademark with the PTO was dependent upon payment of the renewal fee.  See A.R. 56-58.  In seeking authorization to engage in a transaction that would expressly permit the renewal of the Havana Club mark, Ropes & Gray was acting in a representative capacity on Cubaexport's behalf.

25

of the CACR, that section 515.527(a)(2) should not be applied retroactively, and that the <u>Havana Club Holding</u> litigation did not decide whether section 515.227(a)(2) applied to Cubaexport. A.R. 35-39.  Cubaexport did not make these arguments directly to OFAC, instead choosing only to copy the agency on the correspondence.  <u>See</u> Szubin Decl. ¶ 37.

If Cubaexport were confused about how to respond to the April 6, 2006, notice from OFAC, the notice provided Cubaexport with the opportunity to seek further guidance directly from the agency.[9]  A.R. 53.  This opportunity offered Cubaexport the ability to communicate with OFAC to answer questions regarding the nature of the notice or the proper procedure for requesting separate authorization.  <u>See</u> <u>Reeve Aleutian Airways, Inc. v. United States</u>, 982 F.2d 594, 600 (D.C. Cir. 1993) (holding that notice's assurance of the right to communicate with decision maker reduces risk of erroneous deprivation).  Through this avenue, Cubaexport could have argued that it was entitled to rely on the general licensing provision in 31 C.F.R. § 515.527(a)(1).

Given the fact that OFAC notified Cubaexport of the need for additional authorization beyond legal License No. CU-74488 for transactions related to renewal of the Havana Club trademark, as well as Cubaexport's decision to respond to this notice by applying for a specific license in writing, there is no support for the conclusion that OFAC denied Cubaexport necessary procedural protections.  No final agency decision was issued on Cubaexport's ability to engage in transactions related to the renewal of the Havana Club trademark until OFAC denied Cubaexport's application in a July 28, 2006, letter.  <u>See</u> A.R. 1 ("Pursuant to the [CACR] . . . renewal of the HAVANA CLUB trademark under these circumstances would be prohibited

---

[9]  OFAC's regulations also explain the general procedure by which an individual may request a specific license.  <u>See</u> 31 C.F.R. § 501.801.

unless specifically licensed. . . . [Y]our request is hereby denied."); see also United States v. Int'l Harvester Co., 387 F. Supp. 1338, 1340 (D. D.C. 1974) (holding that agency's preliminary decision to prosecute does not deprive individual of property interest); Scott v. City of Seattle, 99 F. Supp.2d 1263, 1267-68 (W.D. Wash. 1999) (holding that deprivation does not occur until final action is taken to deprive individual of property). From April 6 to July 28, Cubaexport was free to submit whatever materials it believed supported its ability to engage in transactions related to renewal of the Havana Club mark. Accordingly, Cubaexport had ample opportunity to respond to the notice issued by OFAC.

**B.    OFAC Did Not Violate Cubaexport's Substantive Due Process Rights by Applying Section 211 and 31 C.F.R. § 515.527 Prospectively to Determine Whether the License Should Be Granted**

Cubaexport additionally alleges that section 211 and 31 C.F.R. § 515.527 constitute a violation of substantive due process. Compl. ¶¶ 67, 68. Such claims are difficult to maintain, requiring proof that the government has acted in an "arbitrary" manner. E.g. County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998); Comm. of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 944 (D.C. Cir. 1988). And "only the most egregious official conduct" can be deemed arbitrary in the constitutional sense. County of Sacramento, 523 U.S. at 846; see also Holy Land Found., 219 F. Supp.2d at 77 (rejecting substantive due process claim since designation of Muslim charitable organization as terrorist supporter and blocking of all of its assets did not "rise to the level of a constitutional violation"), aff'd, 333 F.3d. at 163. Viewing this standard in light of the extensive deference due the political branches in the realm of foreign affairs, there is no basis to second-guess Congress's action in promulgating section 211 or OFAC's implementation of the statute. See, e.g., Comm. of U.S. Citizens, 859 F.2d at 944-45 (expressing "reluctance to constitutionalize foreign policy choices").

27

As will be explained in section IV infra, neither section 211 nor OFAC's implementation of that section in 31 C.F.R. § 515.527 constitutes "arbitrary" official conduct. Among other purposes, both the statute and the regulation demonstrate Congress's desire to protect the integrity of intellectual property by ensuring that the United States does not recognize rights to intellectual property that is the same as or substantially similar to a mark used in connection with confiscated assets. See infra section IV. OFAC's denial of Cubaexport's application, following advice from the State Department, was fully consistent with this purpose, among others.[10]

## III.  EVEN ASSUMING CUBAEXPORT HAS CONSTITUTIONAL RIGHTS GUARANTEED BY THE FIFTH AMENDMENT, ITS TAKINGS CLAIM LACKS MERIT

In Count III of the Complaint, the plaintiff alleges that section 211 and 31 C.F.R. § 515.527, on their face or as applied by OFAC, constitute a "regulatory taking" of Cubaexport's property for which Cubaexport received no compensation.[11] Compl. ¶¶ 70-71. As an initial matter, it is doubtful that this is the appropriate forum for such a claim. Except for cases in which the amount in controversy is less than $10,000, the Tucker Act, 28 U.S.C. § 1491(a); see also 28 U.S.C. § 1346(a)(2), provides for exclusive jurisdiction in the United States Court of

---

[10] Moreover, Cubaexport's Complaint fundamentally misunderstands the statute and the regulation by suggesting that either constitutes a "retroactive" removal of a vested property interest. Compl. ¶¶ 66-67. On their face, neither section 211 nor 31 C.F.R. § 515.527 denies any individual a right to property. And even OFAC's ultimate denial of that license had no retroactive effect; OFAC prospectively denied Cubaexport's application to authorize *future* transactions related to the renewal of that mark. See HCH IV, 62 F. Supp.2d at 1094-95.

[11] The analysis of Cubaexport's takings claim will focus on the as-applied challenge. Cubaexport's suggestion that a facial claim exists against section 211 or 31 C.F.R. § 515.527 belies common sense and precedent. The "mere enactment" of neither law by itself constitutes a taking of private property. See Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc., 452 U.S. 264, 295 (1981). The laws simply regulate the manner in which a Cuban entity may register or renew a trademark, whether by general or specific license. Id. at 296.

Federal Claims.  See Ry. Labor Executives' Ass'n v. United States, 987 F.2d 806, 815-16 (D.C. Cir. 1993); Holy Land Found., 219 F. Supp.2d at 77; Global Relief Found., 207 F. Supp.2d at 802.  This exclusive jurisdiction exists even when a complainant styles its claim as a request for injunctive, rather than monetary, relief.[12]  See Ry. Labor, 987 F.2d at 816; see also Rose Acre Farms, Inc. v. Madigan, 956 F.2d 670, 673-74 (7th Cir. 1992).

Even if this Court has concurrent jurisdiction over Cubaexport's takings claim, the claim is without merit.  Courts have consistently rejected such claims in the economic sanctions context.  See, e.g., Paradissiotis v. United States, 304 F.3d 1271, 1274 (Fed. Cir. 2002) ("On several occasions, this court has addressed Fifth Amendment takings claims raised by persons or entities that have been adversely affected by actions taken for national security reasons to . . . prohibit transactions by . . . foreign entities . . . and on each occasion we have held that the actions have not violated the Takings Clause.");  Holy Land Found., 219 F. Supp. 2d at 78.  The fundamental basis for these decisions was first set forth by the Supreme Court and has been repeated frequently in the sanctions context despite the subsequent evolution of takings jurisprudence:

> A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless.  They may destroy the worth of contracts.  But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared? . . .  [W]as it ever imagined this was taking private property without compensation or without due process of law?

E.g. Paradissiotis, 304 F.3d at 1274; Chang v. United States, 859 F.2d 893, 897 (Fed. Cir. 1988)

---

[12] In Eastern Enterprises v. Apfel, 524 U.S. 498, 520-21 (1998), the Supreme Court discussed the question of whether suits seeking only equitable relief are subject to the Tucker Act.  However, in finding that district courts have jurisdiction over the claim alleged in Eastern, the Supreme Court limited its reasoning to instances in which a government statute mandates a direct transfer of funds rather than burdening property.  Id. at 521.

(quoting Legal Tender Cases (Knox v. Lee), 79 U.S. 457, 551 (1870)).  After all, "[e]conomic

sanctions would hardly be sanctions if the foreign targets of the sanctions could simply stand in

line to be compensated for the losses those sanctions caused them."  Paradissiotis, 304 F.3d at

1275.

Consequently, relying upon the broad executive authority conferred by IEEPA and

TWEA, courts have recognized that a complete blocking of an entity's assets does not represent a

taking because, inter alia, such sanctions are temporary and do not "vest" property in the United

States.  See, e.g., Nielsen v. Sec'y of Treasury, 424 F.2d 833, 844 (D.C. Cir. 1970); see also

Propper v. Clark, 337 U.S. 472, 481-82 (1949); Tran Qui Than v. Regan, 658 F.2d 1296, 1304

(9th Cir. 1981); Islamic Am. Relief Agency, 394 F. Supp.2d at 51; Holy Land Found., 219 F.

Supp.2d at 78; Global Relief Found., 207 F. Supp.2d at 802.  This reasoning has been extended

even to those actions by OFAC that have had the effect of reducing or eliminating the value of

blocked property.  See Paradissiotis, 304 F.3d at 1275-76; see also Nielsen, 424 F.2d at 843.

In denying a specific license to Cubaexport, a Cuban entity, OFAC did not vest any

property in the United States government.  Nor did OFAC's denial prohibit all economically

viable uses of the trademark, as the trademark could still be used in Cuba or other countries

where the mark has been recognized.  Instead, OFAC's action had, at most, the effect of

preventing Cubaexport from renewing recognition of the mark in the United States, a transaction

that would otherwise be prohibited in the absence of governmental authorization.  See, e.g., 31

C.F.R. § 515.201(b); see also 31 C.F.R. § 501.803 ("[L]icenses (whether general or specific) . . .

may be amended, modified or revoked at any time.").  The denial of such a limited expectation

by an entity already the target of foreign sanctions could not be deemed a taking in violation of

the Fifth Amendment.[13]  See Paradissiotis, 304 F.3d at 1275; see also Am. Int'l Group, Inc. v.

Islamic Republic of Iran, 657 F.2d 430, 448 (D.C. Cir. 1981) ("[W]e fail to grasp how such

interest obtained only by grace of a revocable license can be thought of as property.  The holders

of the interests had no reasonable expectation that, against the factual backdrop of an unresolved

international crisis, the President would not revoke what he had granted.").

## IV.    CUBAEXPORT'S APA CLAIM LACKS MERIT

### A.    A Deferential Standard of Review Governs Judicial Review of OFAC's Licensing Decision

Under the APA, a court may set aside agency action that is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review

under the arbitrary and capricious standard is narrow and the reviewing court may not substitute

its judgment for that of the agency.  Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378

(1989); Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  Agency action

is entitled to a "presumption of regularity," Citizens to Pres. Overton Park, 401 U.S. at 415, and

the relevant inquiry for the reviewing court is "whether the decision was based on a consideration

of the relevant factors and whether there has been a clear error of judgment."  Marsh, 490 U.S. at

378 (internal quotation omitted).  "If the agency's reasons and policy choices . . . conform to

---

[13]  Even entities which are not themselves the targets of economic sanctions have been
unable to state a valid regulatory takings claim when such sanctions interfere with their contracts
with a foreign government.  "When dealing in foreign commerce, the possibility of changing
world circumstances and a corresponding response by the United States government can never be
completely discounted."  Chang, 859 F.2d at 897.  Accordingly, when an entity chooses to
engage in business in or with a country that has strained relationships with the United States, it
does so with the knowledge that such strain could negatively impact its business.  See id.; see
also Rockefeller Ctr. Properties v. United States, 32 Fed. Cl. 586, 593 (1995).  This conclusion
arises in large part out of the recognition that foreign commerce is subordinate to the President's
foreign policy powers, including those powers granted by TWEA and IEEPA.  See Chang, 859
F.2d at 897; Rockefeller Ctr., 32 Fed. Cl. at 592-93.

certain minimal standards of rationality . . . the rule is reasonable and must be upheld, even

though the Court itself might have made different choices."  Holy Land Found., 219 F. Supp. 2d

at 67 (citation and internal quotation omitted).

In addition, the CACR involve "weighty concerns of foreign policy," Wald, 468 U.S. at

242; Walsh, 927 F.2d at 1235, and in the area of foreign policy, the Supreme Court has

recognized that special deference is owed to the Executive Branch, Wald, 468 U.S. at 242

("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the

political branches of government as to be largely immune from judicial inquiry or interference.'")

(quoting Harisiades v. Shaughnessy, 342 U.S. 580, 589 (1952)); see also Miranda v. Sec'y of

Treasury, 766 F.2d 1, 3 (1st Cir. 1985); Capital Cities/ABC Inc. v. Brady, 740 F. Supp. 1007,

1013 (S.D. N.Y. 1990).  Accordingly, Congress has delegated to the President—who, in turn, has

delegated to the Secretary of the Treasury—broad authority to administer TWEA.[14]  See Dames

& Moore v. Regan, 453 U.S. 654, 672 (1981); Miranda, 766 F.2d at 3.

Given the highly deferential standard under the APA and the broad authority vested in the

Executive over foreign policy, a challenge to OFAC's interpretation of its regulatory authority

"must either demonstrate that the statute clearly forbids the agency's interpretation or that the

interpretation is unreasonable."  Consarc Corp. v. OFAC, 71 F.3d 909, 914 (D.C. Cir. 1995); see

---

[14] See also, e.g., Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431, 1439 (9th Cir. 1996) (declining to examine the policy reasons underlying the Cuban travel ban and citing the "history of judicial deference" to executive decision-making in the foreign policy area); De Cuellar v. Brady, 881 F.2d 1561, 1570 (11th Cir. 1989) (OFAC's application of CACR to a U.S. person and denial of a specific license is "entitled to great deference from this court"); Richardson v. Simon, 560 F.2d 500, 504 (2d Cir. 1977) ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.").

32

also id. at 915 (holding that, in interpreting the CACR, OFAC is afforded an "'even greater degree of deference than the Chevron standard, and must prevail unless plainly inconsistent with the regulation.'") (quoting Consarc Corp. v. Iraqi Ministry, 27 F.3d 695, 702 (D.C. Cir. 1994)). Accordingly, "even if [OFAC's] interpretation of section 515.527(a)(1) were fairly debatable, the interpretation of the provision given by the agency charged with enforcing the embargo is normally controlling." HCH V, 203 F.3d at 125.

### B.    OFAC's Interpretation Is Not "Plainly Inconsistent" with the CACR

In Count IV of the Complaint, Cubaexport alleges that two actions by OFAC were arbitrary or capricious: (1) the letter from OFAC dated April 6, 2006, and (2) the letter from OFAC dated July 28, 2006.  However, given the extraordinary deference due OFAC's interpretation, there is no basis to conclude that the interpretations contained in the letters were plainly inconsistent with existing statutes or regulations.

### 1.    Letter Dated April 6, 2006

The action taken by OFAC in the April 6, 2006, letter was to notify Cubaexport that the legal license issued to Ropes & Gray did not authorize Cubaexport to renew the Havana Club trademark through payment to the PTO, and to inform Cubaexport, via Ropes & Gray, of its remaining procedural options.  A.R. 52-53.  OFAC's explanation of the limitations of the legal license issued to Cubaexport's attorneys is mandated by the clear language of the license as well as the practice by which OFAC issues licenses to law firms to engage in the legal representation of a Cuban entity.

Lawyers seeking to represent Cuban entities in administrative or judicial proceedings and to receive reimbursement for their work, transactions that would otherwise be prohibited by the CACR, must seek a specific license from OFAC.  Szubin Decl. ¶ 18; see also 31 C.F.R.

§ 515.512.  Licenses issued in response to such requests, like all specific licenses, are based upon the statements and representations made in the application, which in the context of a request to license payment for legal representation refers to proceedings that are expressly identified.  See Szubin Decl. ¶¶ 12-14.

In a letter dated December 13, 2005, Ropes & Gray explained its belief that it was authorized to "prepare[]the renewal application" and "pay the filing fee" for the Havana Club trademark pursuant to License No. CU-74488 on behalf of Cubaexport.  That license authorized Ropes & Gray to receive payment for services and reimbursement for expenses connected with "the legal representation of [Cubaexport] and Havana Club Holdings S.A. in legal proceedings in the United States related to the HAVANA CLUB trademark, *as described in the application*."  A.R. 52, 84 (emphasis added).  The same license also contains a "Precedence" section explaining that "[t]he authorization contained in this license is limited to the facts and circumstances specific to the application."  A.R. 84.

The application that Ropes & Gray submitted to OFAC expressly requested a license for counsel to serve as "the law firm representing Cubaexport in connection with the . . . matters" mentioned previously in the application.  A.R. 98.  The only legal matters referenced in the letter are the Trademark Trial and Appeal Board's dismissal of cancellation proceeding number 24,108, and a complaint filed by Bacardi against "Havana Club Holding S.A. and Cubaexport" that appeals the decision of the Board and asserts additional claims.  A.R. 97.  In response to a notice of deficiency from OFAC, A.R. 89, Ropes & Gray supplemented this application in a January 26, 2005, letter, A.R. 87.  That letter again references a "complaint . . . currently pending in the U.S. District Court for the District of Columbia against our clients Cubaexport and Havana Club Holdings S.A."  A.R. 87.

34

Given the fact that License No. CU-74488 expressly authorized payment for services related to counsel's "legal representation" of Cubaexport in "legal proceedings" as described in the application, and that the application for that license expressly referenced a legal proceeding in the United States District Court for the District of Columbia, plaintiff could not reasonably attempt to unilaterally broaden the scope of the license to authorize transactions related to Cubaexport's renewal of the Havana Club trademark itself, including payment of the renewal fee to the PTO. Requests by lawyers for reimbursement of legal expenses incurred in litigation are governed by a separate provision of the CACR, 31 C.F.R. § 515.512, than requests to authorize transactions related to the registration or renewal of trademarks, id. § 515.527. Congress's modification of section 515.527 in section 211 expressly conditioned transactions related to registration or renewal of a trademark that is the same as or substantially similar to a mark used in connection with confiscated assets on the grant of a specific license by OFAC. Thus, OFAC was faced with the question whether the grant of a specific license to authorize transactions related to the renewal of the Havana Club trademark would be consistent with section 211 and foreign policy. See Szubin Decl. ¶ 38.

As OFAC explained in the April 6, 2006, letter, there is certainly a universe of potential matters that could, either directly or indirectly, impact the litigation that License No. CU-74488 authorizes. A.R. 53. For that reason, when authorizing legal representation, OFAC "is not in a position to gauge the extent to which any other administrative or judicial proceedings may have some effect on that litigation." A.R. 53. Accordingly, in order to prevent the grant of a specific license for reimbursement of legal expenses from becoming so expansive that it renders the remaining licensing provisions of the CACR superfluous, the license is limited to payment for expenses and fees incurred in the specific proceedings referenced in the application. See

35

Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462, 476 (2d Cir. 2005) ("[T]he special

license issued by OFAC to Cubatabaco, which allows Cubatabaco to 'pursue . . . judicial

remedies with respect to claims to the COHIBA trademark,' . . . . allows Cubatabaco to seek

relief in U.S. courts, but does not authorize transfers of property barred by the Regulations.").

Moreover, to the extent that the April 6, 2006, letter from OFAC could be construed as a

determination of Cubaexport's inability to qualify for a general license pursuant to 31 C.F.R.

§ 515.527(a)(1), that determination would not be clearly forbidden by the CACR.  31 C.F.R.

§ 515.527(a)(2) currently provides that "[n]o transaction or payment is authorized or approved

pursuant to paragraph (a)(1) of this section with respect to a mark . . . that is the same as or

substantially similar to a mark . . . that was used in connection with a business or assets that were

confiscated . . . unless the original owner . . . or the bona fide successor-in-interest has expressly

consented."  Section 515.336 of the CACR defines the term "confiscated" to include "[t]he

nationalization, expropriation, or other seizure by the Cuban Government of ownership or control

of property, on or after January 1, 1959: (1) Without the property having been returned or

adequate and effective compensation provided; or (2) Without the claim to the property having

been settled pursuant to an international claims settlement agreement or other mutually accepted

settlement procedure."

At the time that the April 6, 2006, letter was issued, there was ample support for the

conclusion that the Havana Club mark is "the same as or substantially similar to a mark . . . that

was used in connection with a business or assets that were confiscated."  In fact, that conclusion

had already been reached by a district and an appellate court in the Havana Club Holding

litigation.  After conducting a bench trial, the United States District Court for the Southern

District of New York found that the Havana Club mark was used in connection with confiscated

36

assets:

> The original producer of Cuban rum under the trademark 'Havana Club' was Jose
> Arechabala, S.A. ('JASA'). . . .  On or about January 1, 1960, . . . armed forces
> from the Castro government forcibly entered into possession and confiscated the
> property and assets of JASA. . . .  On October 15, 1960, Cuban Law No. 890
> ('Law No. 890') was issued, expropriating for the Cuban government the physical
> assets, property, accounts and business records of JASA. . . .  No compensation
> was ever paid to JASA or its owners by the Cuban government or any other entity
> on behalf of the Cuban government for the property and assets that were seized in
> 1960.

HCH IV, 62 F. Supp.2d at 1089-90.  The Second Circuit adopted these findings and denied

further discovery on the issue.  HCH V, 203 F.3d at 119-20 ("JASA exported its rum to the

United States until 1960, when the Cuban government, under the leadership of Fidel Castro,

seized and expropriated JASA's assets.  Neither JASA nor its owners ever received

compensation for the seized assets from the Cuban government."), 130 ("Where Cuba has not

returned JASA's property, not made even a gesture toward compensation, and not settled the

claim, the confiscation inquiry ends.").  The Second Circuit also noted that it was "undisputed"

that JASA, the original owner of the assets associated with the Havana Club trademark, has

never expressly consented to the use of the Havana Club trademark by the plaintiffs.  HCH V,

203 F.3d at 129.  And the non-consent of Bacardi, the recognized successor-in-interest of JASA's

interest in the mark, HCH IV, 62 F. Supp.2d at 1090, was evident in the litigation itself.

To fall within the language of section 211, as enacted by section 515.527(a)(2), a mark

must simply be "substantially similar" to a mark "used in connection with" assets that had been

confiscated.  OFAC was aware of the findings in the Havana Club Holding litigation when it was

considering the request for a specific license.  See Szubin Decl. ¶ 27.  In light of the conclusion

of the federal courts that have considered this issue and the absence of contrary evidence

37

presented by Cubaexport, OFAC's interpretation is clearly reasonable and plainly consistent with the language of the CACR.

### 2.     Letter Dated July 28, 2006

In a letter dated July 28, 2006, OFAC denied Ropes & Gray's request, on behalf of Cubaexport, for a specific license to authorize transactions, including payment of the filing fee, related to renewal of the Havana Club trademark.  A.R. 1.  This decision was made after OFAC requested guidance on the foreign policy considerations from the United States Department of State.  A.R. 2-3.  Such coordination "is a critical part of the process of administering sanctions, helping to ensure that OFAC's actions are consistent with the operational and policy interests of other agencies, as well as with the national security and foreign policy goals of the United States."  Szubin Decl. ¶ 38.

After considering "the particular facts of the case, the United States' Cuba policy, and U.S. policy with regard to the domestic and international protection of intellectual property rights," the State Department recommended denying the license.  A.R. 2-3.  First, the State Department concluded that denial of a specific license would be consistent with "the U.S. approach toward non-recognition of trademark rights associated with confiscated property."  A.R. 2.  Second, to the extent that the Cuban government continues to place value in the Havana Club mark, the State Department concluded that denial of a license would be consistent with "the policy of the United States to deny resources to the Castro regime."  A.R. 3.

Given the State Department's reasoned recommendation and the discretion due OFAC in administering its licensing programs, there is no basis to conclude that OFAC's decision to deny the specific license was an arbitrary or capricious action.  OFAC's decision was informed by

advice from an agency that is expert in the foreign policy of the United States.  See HCH I, 961 F. Supp. at 504 ("Considering that OFAC's actions as an Executive Branch agency rest upon sensitive foreign policy concerns, the courts should not lightly take on the role of second-guessing its determinations."); cf. Wald, 468 U.S. at 243 (citing "traditional deference to executive judgment" over foreign policy matters and relying on foreign policy advice of State Department).  Moreover, the State Department's guidance was consistent with the purposes of TWEA, the CACR, and section 211.

Numerous courts have recognized that one of the goals of TWEA is to limit the flow of hard currency to countries, such as Cuba, with policies hostile to the interests of the United States.  See, e.g., Miranda, 766 F.2d at 4.  It is evident that Cubaexport, an instrumentality of the Cuban government, places a high subjective value on the mark.  See Compl. ¶ 2.  Thus, to the extent that United States recognition of the Havana Club trademark secures an advantage to Cubaexport, the denial of such recognition would be consistent with TWEA.  See Paradissiotis, 304 F.3d at 1275 (explaining that the interests of TWEA include "'depriv[ing] enemies . . . of the opportunity to secure advantages to themselves . . . through the use of assets that happened to be in this country'") (quoting Propper, 337 U.S. at 481).

The State Department's foreign policy advice was also grounded in United States policy opposing government confiscation of private property, including intellectual property such as trademarks.  This policy has been repeatedly expressed by Congress.   First, the explicit language of section 211 leaves no doubt that Congress disfavored the recognition of trademarks associated with confiscated property.  This disapproval extended to transactions in the PTO as well as to recognition in the courts of either treaty or common law rights in such trademarks.  See Pub. L.

No. 105-277, § 211, 112 Stat. 2681, 2681-88; see also HCH IV, 62 F. Supp.2d at 1092 (holding

that Congress's intent to abrogate treaty rights under section 211 was "clear" in the statute).

However, section 211 was not the first time that Congress has expressed a policy against

the confiscation of property.  In the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act

of 1996, Congress established a remedial mechanism for United States citizens who had property

confiscated by the Cuban government.  See Pub. L. No. 104-114, 110 Stat. 785, 814-815

(codified at 22 U.S.C. § 6082).  The congressional findings supporting the Act expressed the

view of the United States that the confiscation of private property was contrary to international

human rights law and United States foreign policy.  See id. at 814 (codified at 22 U.S.C. § 6081)

("(3) Since Fidel Castro seized power in Cuba in 1959--(A) he has trampled on the fundamental

rights of the Cuban people; and (B) through his personal despotism, he has confiscated the

property of– (i) millions of his own citizens . . . .").

OFAC carefully considered Ropes & Gray's application, on behalf of Cubaexport, for a

specific license to authorize transactions related to renewal of the Havana Club trademark,

including payment of the renewal fee.  This consideration included the request for and receipt of

advice from the State Department, a step undertaken by OFAC to ensure that its consideration of

the application would be consistent with United States foreign policy.  In light of the State

Department's guidance, OFAC deemed it consistent with the CACR to deny the license.

Although Cubaexport might disagree with the ultimate conclusion reached by OFAC, that

disagreement does not demonstrate that OFAC acted in an arbitrary or capricious manner in

denying the application for a specific license.

40

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that the Complaint be

dismissed or, in the alternative, that summary judgment be entered in favor of the defendants.


Dated December 21, 2006                    Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           JEFFREY A. TAYLOR
                                           U.S. Attorney for the District of Columbia

                                           SANDRA M. SCHRAIBMAN
                                           (DC Bar No. 188599)
                                           Assistant Branch Director
                                           Federal Programs Branch

                                             *s/ Eric R. Womack*
                                           ERIC R. WOMACK (IL Bar No. 6279517)
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           Post Office Box 883
                                           Washington, D.C.  20001
                                           Tel: (202) 514-4020
                                           Fax: (202) 616-8470

                                           *Counsel for the Defendants*

41

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2006, I caused a true and correct copy of the

foregoing Motion to Dismiss or, in the Alternative, for Summary Judgment; Statement of

Undisputed Material Facts; Memorandum in Support; and the accompanying Declaration and

Proposed Order to be served on Plaintiff's counsel electronically by means of the Court's ECF

system.


_____*/s/ Eric R. Womack*_____
ERIC R. WOMACK

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EMPRESA CUBANA                )
EXPORTADORA DE ALIMENTOS      )
Y PRODUCTOS VARIOS D/B/A      )
CUBAEXPORT                    )
                              )
       Plaintiff,       )
                              )
    v.                      )    Civil Action No. 1:06CV01692 (ESH)
                              )
UNITED STATES DEPARTMENT      )
OF THE TREASURY, OFFICE       )
OF FOREIGN ASSETS CONTROL,    )
et al.,                       )
                              )
       Defendants.      )
_____)

## DECLARATION OF ADAM J. SZUBIN

    I, Adam J. Szubin, pursuant to 28 U.S.C. § 1746, do declare:

    1.  I am the Director of the U.S. Department of the Treasury's ("Treasury") Office of Foreign Assets Control ("OFAC"), and have been employed in this capacity since September 3, 2006.  Prior to becoming the Director, I was Senior Advisor to Under Secretary Stuart Levey in Treasury's Office of Terrorism and Financial Intelligence, a position I assumed in August 2004. Before joining Treasury, I was an attorney at the Department of Justice, serving as Counsel to the Deputy Attorney General from August 2003 to August 2004, and working in the Civil Division from September 2000 to August 2003.

    2.  I am familiar with the mission and operations of OFAC, and I make this declaration based upon information within my personal knowledge or provided to me in my official capacity.

3.  I have been made aware of the Complaint filed in this action by Empresa Cubana Exportadora de Alimentos Y Productos Varios d/b/a Cubaexport. This declaration is made in connection with Defendants' Memorandum in Support of their Motion to Dismiss, or, in the alternative, for Summary Judgment.

<u>OFAC's Mission and Authority</u>

4.  OFAC is the office within Treasury that is principally responsible for administering U.S. economic sanctions programs. These programs are primarily directed against foreign states and nationals to implement U.S. foreign policy and national security goals. Pursuant to authority delegated by the President to the Secretary of the Treasury, OFAC acts under Presidential wartime and peacetime national emergency powers. In performing its function, OFAC relies primarily on its broad delegated powers under the Trading with the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 1-44, and the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706. As Director of OFAC, I am responsible for the implementation, administration, and enforcement of such economic sanctions programs.

5.  OFAC currently administers approximately 30 economic sanctions programs against foreign governments, entities, and individuals whose activities conflict with U.S. national security and foreign policy interests. For instance, OFAC administers sanctions programs relating to Iraq, Iran, Sudan, Burma, Cuba, Syria, North Korea, Zimbabwe, Liberia, Western Balkans, and Cote D'Ivoire. OFAC also implements sanctions programs related to drug trafficking, terrorism, and proliferation of weapons of mass destruction.

Cuba Sanctions Under TWEA

6.   TWEA grants the President broad powers over property in which any foreign country or a national thereof has any interest, during times of war and otherwise as described below, including the authority to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest." 50 U.S.C. App. § 5(b)(1)(B).

7.   TWEA was amended on December 28, 1977, to restrict the use of its powers to times of war and to eliminate its use for peacetime emergencies. *See* Pub. L. No. 95-223, 91 Stat. 1625. However, the amending Act contained a "grandfather" clause. *See* id. at § 101(b).  This clause authorized the President to continue to exercise those powers delegated under TWEA that were being exercised with respect to a country subject to sanctions as of July 1, 1977, as a result of a presidential declaration of national emergency.  Id.  To do so, however, the President must determine on an annual basis that the extension of sanctions with respect to that country "is in the national interest of the United States."  Id.

8.   Since the enactment of Public Law 95-223, the President has consistently determined that the exercise of his authorities under TWEA with respect to Cuba is in the national interest of the United States. *See, e.g.,* Determination No. 2006-23, 71 Fed. Reg. 54399 (Sept. 13, 2006).

9.   Following the expropriation of U.S. property in Cuba and other hostile acts by the Castro regime, President Kennedy imposed an embargo on all trade with Cuba, effective in February 1962. *See* Proclamation No. 3447, 27 Fed. Reg. 1085 (1962).  On July 8, 1963, the Cuban Assets Control Regulations, 31 C.F.R. Part 515 (the "Regulations"), were issued, freezing all

Cuban assets located in the United States, prohibiting all transactions in which Cuba or a Cuban national has on or since the effective date of the Regulations had an interest, and further implementing the embargo on trade. *See* 28 Fed. Reg. 6974 (July 9, 1963). OFAC interprets the term "interest" when used with respect to property to mean an interest of any nature whatsoever, direct or indirect. *See, e.g.,* 31 C.F.R. § 515.312.

OFAC Licensing Authority

10. Under most of its sanctions programs, OFAC can issue licenses to authorize otherwise prohibited transactions. Generally, licenses are either "specific" or "general." A specific license may be issued when a person individually requests authorization to conduct an otherwise prohibited transaction or service. *See* 31 C.F.R. § 501.801(b). A general license authorizes certain categories of transactions and/or services and is issued through publication on OFAC's website and/or in the Federal Register and the Code of Federal Regulations. A person who meets the criteria set forth in a general license may undertake activities in reliance on the general license without submitting any request to OFAC. Persons who are uncertain whether particular facts and circumstances meet the criteria for a general license may write to OFAC requesting guidance.

11. OFAC's licensing division reviews, analyzes, and responds to thousands of requests each year for specific licenses covering a broad range of trade, financial, and travel-related transactions, including those related to the exportation and importation of goods and services and the provision of humanitarian, banking, and financial services. It also provides written and oral guidance to the public on the application of OFAC's regulatory programs to specific facts and circumstances. A selection of OFAC's written responses to these interpretive requests is shared with the public on OFAC's website.

12. Based in part on the volume of license applications received each year, the OFAC licensing division necessarily relies upon the representations made and information provided by applicants. OFAC's reliance on incoming materials is generally memorialized on the first page of a license, which typically states that the license is granted upon statements and representations made in the application and other information filed with or made available to Treasury.

13. Licenses also typically include language in a section titled "Precedence" or "Precedential Effect" noting that the authorization contained in the license is limited to the facts and circumstances specific to the application. The issuance of a license does not constitute a determination regarding undisclosed additional activities that the licensed party may wish to undertake; such activities may be the subject of a separate request for an amendment to the existing license or the issuance of a new license.

14. Because no two sanctions programs are exactly alike, and because applicants often present novel circumstances and requests, OFAC considers applications for specific licenses on a case-by-case basis in light of all facts presented.

15. The Secretary of the Treasury has delegated broad authority under TWEA to OFAC to regulate transactions in which Cuba or a Cuban national has an interest, including to license specific transactions that otherwise are prohibited by the Regulations. *See* 50 U.S.C. App. § 5(b)(1)(B); 31 C.F.R. § 515.802.

16. The denial of a license request does not preclude the reopening of an application or the filing of a further application. *See* 31 C.F.R. § 501.801(b). The applicant may at any time request further explanation of the reasons for a denial by correspondence or personal interview. *See* id.

17. Licenses (whether general or specific) may be amended, modified, or revoked at any time. *See* 31 C.F.R. § 501.803. Specific licenses typically note their revocability on the first page of the license.

OFAC Licensing of Payment for Professional Fees and Expenses Incurred In the Legal Representation of Cuba or Cuban Nationals

18. OFAC sanctions programs, including the Cuba sanctions program, typically include a general license permitting the provision of certain legal services to a designated person, or in the case of the Cuba sanctions program, to Cuba or a Cuban national. *See, e.g.,* 31 C.F.R. § 515.512. The scope of the general license does not cover all possible legal services; it is limited to certain services listed in the applicable regulations. *See, e.g.,* id. The general license also does not cover payment of professional fees and reimbursement of incurred expenses, which must be specifically licensed by OFAC. *See, e.g.,* id.

OFAC Licensing of Certain Transactions with Respect to Recognition of U.S. Intellectual Property In Which Cuba or Cuban Nationals Have An Interest

19. Since the time of their issuance in 1963, the Regulations have contained a provision authorizing certain transactions with respect to U.S. patents, trademarks, and copyrights. *See* 28 Fed. Reg. 6974 (July 9, 1963); 31 C.F.R. § 515.527. On October 20, 1995, OFAC amended the Regulations to revise § 515.527 and make other changes. *See* 60 Fed. Reg. 54194 (Oct. 20, 1995). Amended § 515.527 included a general license authorizing "transactions related to the registration and renewal in the United States Patent and Trademark Office or the United States Copyright Office of patents, trademarks, and copyrights in which the Government of Cuba or a Cuban national has an interest." *See* § 515.527(a).

20.  This general license was, however, materially restricted by the passage on October 21, 1998, of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, 112 Stat. 2681 (the "Omnibus Appropriations Act").  Section 211 of the Omnibus Appropriations Act ("Section 211") states:

> Notwithstanding any other provision of law, no transaction or payment shall be authorized or approved pursuant to section 515.527 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

21. On May 13, 1999, OFAC amended the Regulations to bring them into conformity with Section 211 by designating the then-existing text of 31 C.F.R. § 515.527 as paragraph (a)(1) and adding a new paragraph (a)(2) incorporating the limitations on general licensing authority contained in Section 211.  *See* 64 Fed. Reg. 25808 (May. 13, 1999).

22. The new language in § 515.527(a)(2) qualified the previously existing general license by imposing new criteria to be met before a person could act in reliance on the general license.  In amending § 515.527 to implement the Congressional command in Section 211, OFAC limited the scope of the general license while retaining the authority to issue a specific license, should facts and circumstances and current U.S. foreign policy militate in favor of authorizing a transaction that does not qualify for the general license in paragraph (a)(1).  OFAC has understood this interpretation to be consistent with the plain language of Section 211.

Background of OFAC's History with Cubaexport

23. OFAC has been engaged with issues related to the HAVANA CLUB trademark at least as far back as October 1995, when it received an application for a specific license authorizing assignments of the HAVANA CLUB trademark from Cubaexport to Havana Rum & Liquors, S.A. ("HR&L") and from HR&L to Havana Club Holdings, S.A. ("Havana Club Holdings").

24. On November 13, 1995, OFAC issued a specific license to Cubaexport in response to the October 1995 application.

25. On April 17, 1997, OFAC issued a Notice of Revocation revoking the November 13, 1995, license.

26. Under the Reporting, Procedures and Penalties Regulations, 31 C.F.R. part 501, persons subject to the jurisdiction of the United States participating in litigation, arbitration, or other binding alternative dispute resolution proceedings in the United States on behalf of or against persons whose property or interests in property are blocked, or when the outcome of any proceeding may affect blocked property, must (unless OFAC is a party), among other requirements, submit copies of all pleadings, motions, and memoranda submitted to a court or other adjudicatory body, and all orders, decisions, opinions, or memoranda issued by the court, to OFAC's Chief Counsel. *See* 31 C.F.R. § 501.605.

27. Among other court documents in the various legal proceedings concerning the HAVANA CLUB trademark, OFAC is, and has been, aware of findings made in a June 1999 decision by the U.S. District Court in the Southern District of New York, *see* Havana Club Holding, S.A., v. Galleon, S.A., 62 F. Supp. 2d 1085 (S.D.N.Y. 1999), and affirmed in a February 2000 decision by the U.S. Court of Appeals for the Second Circuit, *see* Havana Club Holding S.A. v. Galleon,

S.A., 203 F.3d 116 (2d Cir. 2000), concerning the connection between the Havana Club trademark and assets confiscated by the Cuban government.

Cubaexport's Request for a Specific License to Pay for Renewal of the Havana Club Trademark

28. In a letter dated February 11, 2004, the law firm Fish & Neave submitted an application requesting the renewal or extension of an existing license or, in the alternative, the issuance of a new license related to its legal representation of Cubaexport in connection with matters related to *Galleon S.A. v. Havana Club Holding, S.A.*, Trademark Trial and Appeal Board Cancellation No. 24,018. License No. CT-1943, issued February 20, 2004, authorized certain travel-related transactions involving Cuba and such additional transactions as were directly incident to professional research relevant to legal proceedings in the United States, including but not limited to conducting interviews and depositions, and creating written and other records, as described in the licensee's application. *See* Administrative Record ("AR") 99. The license further authorized the licensee, Fish & Neave, to provide legal services to, and receive payment for such services from, Cubaexport.

29. In a letter dated January 5, 2005, Ropes & Gray LLP ("Ropes & Gray") notified OFAC's Chief of Licensing of various changes to the law firm Fish & Neave, including its merger with Ropes & Gray, and requested either a renewal of License No. CT-1943, or a new license naming Ropes & Gray as the licensee and giving Ropes & Gray the same authorizations as License No. CT-1943. *See* AR 97.

30. In a response dated January 11, 2005, OFAC notified Ropes & Gray that it had not addressed some of the relevant criteria in OFAC's published guidelines and suggested that Ropes & Gray review and address the guidelines should it wish to reapply for a specific license. *See* AR 89.

31. In a letter dated January 26, 2005, Ropes & Gray provided additional information regarding the renewal of License No. CT-1943, referring in relevant part to language in the January 5, 2005, letter explaining that a complaint was then pending before the U.S. District Court for the District of Columbia against defendants Cubaexport and another Ropes & Gray client, Havana Club Holdings. *See* AR 87. The January 5, 2005, letter described the complaint as appealing the decision of the Trademark Trial and Appeal Board of the PTO dismissing cancellation proceeding number 24,108 and asserting additional claims against the defendants. *See* AR 97.

32. On March 4, 2005, OFAC issued two new specific licenses to Ropes & Gray, both expiring on March 31, 2006, and both based on the January 26, 2005, application. License No. CU-74488 authorized all transactions to enable Ropes & Gray, in connection with the legal representation of Cubaexport and Havana Club Holdings in legal proceedings in the United States related to the HAVANA CLUB trademark, as described in the application, to receive payment for such services and reimbursement for expenses related to such services from Cuban nationals. *See* AR 83. License No. CT-4558 authorized Ropes & Gray to engage in travel-related transactions involving Cuba and such additional transactions as were directly incident to professional research in connection with the legal representation of Cubaexport and Havana Club Holdings in legal proceedings in the United States related to the HAVANA CLUB trademark, as described in the application. *See* AR 85. On April 10, 2006, OFAC responded to Ropes & Gray's application dated February 27, 2006, to renew these licenses by issuing new License Nos. CU-7545 and CT-7571. *See* AR 45, 47, 54.

33. In a letter dated December 13, 2005, Ropes & Gray provided to OFAC's Chief of Licensing a copy of a letter of the same date addressed to the Commissioner for Trademarks of

the U.S. Patent and Trademark Office ("PTO") in connection with an application filed by Cubaexport to renew U.S. Trademark Registration No. 1,031,651 of the "HAVANA CLUB & Design" trademark at the PTO.  In its letter, Ropes & Gray stated that it "ha[d] prepared the renewal application and undertaken to pay the filing fee that is required in order to maintain the registration and intend[ed] to recover those expenses from Cubaexport."  Ropes & Gray noted that it had taken such steps, on Cubaexport's behalf, pursuant to OFAC License No. CU-74488. *See* AR 56.

34. In a letter dated April 6, 2006 (the "April 6 Letter"), OFAC informed Ropes & Gray that License No. CU-74488 did not authorize the payment of a filing fee to the PTO for renewal of Registration No. 1,031,651 on behalf of Cubaexport.  *See* AR 52.  In the letter, OFAC explained that License No. CU-74488 was limited to the legal matter described in the application -- a complaint pending before the U.S. District Court for the District of Columbia, which was described as an appeal from the dismissal of a cancellation proceeding before the United States Trademark Trial and Appeal Board concerning the HAVANA CLUB trademark.  *See* AR 52-53. In its closing paragraph, the April 6 Letter made explicit that it did not in any way prejudice the ability of Ropes & Gray to request separate authorization from OFAC to engage in transactions related to the renewal of the HAVANA CLUB trademark registration at the PTO, and that "if [Ropes & Gray] wish[ed] to request such a specific license or further guidance from OFAC," it could do so by writing to OFAC's Licensing Division.  *See* AR 53.

35. In a letter dated April 7, 2006 (the "License Application"), Ropes & Gray requested that a license authorizing Ropes & Gray to incur and receive payment for the expense of renewing the registration be granted.  *See* AR 49.

36. In a letter dated May 9, 2006, Covington & Burling, on behalf of Bacardi & Company Limited and Bacardi U.S.A., Inc., submitted arguments to OFAC in opposition to Ropes & Gray's April 7, 2006, letter. *See* AR 41.

37. Throughout June and in early July 2006, OFAC received copies of correspondence sent by Ropes & Gray, on behalf of Cubaexport, and Kelley Drye & Warren LLP, on behalf of Bacardi, to the PTO Commissioner for Trademarks regarding Cubaexport's application to renew Registration No. 1,031,651 of the HAVANA CLUB & Design trademark. *See* AR 4-40.

OFAC's Response to the License Application

38. Interagency coordination is a critical part of the process of administering sanctions, helping to ensure that OFAC's actions are consistent with the operational and policy interests of other agencies, as well as with the national security and foreign policy goals of the United States. As a general practice, OFAC consults with the Department of State (the "State Department") on foreign policy, referring to the State Department for its review, among other matters, license applications for which there is no established practice of issuance or denial. On May 15, 2006, OFAC referred the License Application to the State Department for its views on the issues raised therein. OFAC also contacted the PTO in connection with the License Application for clarification on the PTO's processes.

39. In a memorandum dated July 28, 2006, the State Department responded to OFAC's request for foreign policy guidance with respect to the License Application, "having weighed the facts and foreign policy concerns presented," with a recommendation that OFAC deny the License Application. *See* AR 2.

40. After considering the State Department's foreign policy guidance, the implementation of Section 211 in the Cuban Assets Control Regulations, and the facts and circumstances of this case, OFAC concluded that a specific license should not be issued to Cubaexport.

41. Accordingly, in a letter dated July 28, 2006, OFAC notified Ropes & Gray that OFAC had engaged in consultation with relevant agencies, including the State Department, had received guidance that it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark, and that the request in the License Application made on behalf of Cubaexport was therefore denied. *See* AR 1.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December ___ 21 ___, 2006.

ADAM J. SZUBIN
Director
Office of Foreign Assets Control
Department of the Treasury

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| EMPRESA CUBANA EXPORTADORA ) | |
| DE ALIMENTOS Y PRODUCTOS ) | |
| VARIOS d/b/a CUBAEXPORT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:06CV01692 (ESH) |
| ) | |
| ) | Hon. Ellen S. Huvelle |
| UNITED STATES DEPARTMENT OF ) | |
| THE TREASURY, OFFICE OF FOREIGN ) | |
| ASSETS CONTROL, ) | |
| HENRY M. PAULSON, JR., as Secretary ) | |
| of Treasury, ADAM J. SZUBIN, as ) | |
| Director of the Office of Foreign Assets ) | |
| Control, and THE UNITED STATES, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## ORDER

Upon consideration of the Defendants' Motion to Dismiss or, in the Alternative, for

Summary Judgment; the memorandum of law and declaration in support thereof; and responses

thereto, it is this _____ day of _____, 2007, ordered that the Motion to Dismiss

or, in the Alternative, for Summary Judgment is GRANTED, and this action is DISMISSED

WITH PREJUDICE.

_____
UNITED STATES DISTRICT JUDGE