IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| EMPRESS CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS d/b/a/CUBAEXPORT, ) ) ) ) | Civil Action No. 1:06CV01692 (ESH) |
| Plaintiff, ) | Hon. Ellen S. Huvelle |
| v. ) | |
| UNITED STATES DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL, HENRY M. PAULSON, JR., as Secretary of Treasury, ADAM J. SZUBIN, as Director of the Office of Foreign Assets Control, and THE UNITED STATES, ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS, OR IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT**

## <u>INTRODUCTION</u>

Contrary to the government's core contention, this case raises no challenge to the lawfulness, or even the wisdom, of any foreign policy pursued by the United States government. Rather, the case presents the question whether, in the ostensible exercise of its foreign-policymaking powers, the government may deprive a foreign business corporation, Cubaexport, of its valuable and long-held United States trademark – and may do so retroactively, summarily, without due process, and for the benefit of another foreign company which has so far been unsuccessful in a twelve-year-old litigation campaign to gain control of that trademark. That question plainly is judicially cognizable. Indeed, it is a question that is *particularly* within the province of this Court to resolve, for it is governed by fundamental and familiar principles of constitutional and administrative law that admit of only one answer: no.

The trademark at issue – HAVANA CLUB – was first registered in the United States Patent and Trademark Office ("PTO") some 31 years ago by plaintiff Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a Cubaexport ("Cubaexport"). That registration was granted pursuant to settled U.S. trademark law and in accordance with the consistent policy of the United States, beginning when the U.S. embargo on trade with Cuba first was imposed in 1963, to permit Cuban nationals to register trademarks in the U.S., regardless of any restrictions on the importation of goods bearing those trademarks into this country. Thus, the Cuban Assets Control Regulations ("CACR") promulgated in 1963 by the United States Treasury Department's Office of Foreign Asset Control ("OFAC") expressly authorized such trademark registrations via a so-called general license (the "General License"), and the PTO routinely granted and renewed such registrations, including the registration of the HAVANA CLUB trademark. This treatment of Cuban trademarks comported with the overarching U.S. policy – mandated by Congress in the Trading With The Enemy Act ("TWEA") of 1917 – of

*preserving* disputed assets of Cuban nationals for potential future disposition. *See Nielsen v. Sec'y of the Treasury*, 424 F.2d 833, 841-42 (D.C. Cir. 1970).

For two decades, Cubaexport maintained and periodically renewed its HAVANA CLUB trademark registration pursuant to the General License without objection or difficulty, as was its statutory right. *No one* challenged that registration, or the General License, as contrary to U.S. foreign policy or other U.S. interests.

In 1994, however, another foreign company, Bacardi & Company Limited ("Bacardi"), began efforts to establish ownership and control of the trademark for itself. It asked the PTO to grant it a registration of the HAVANA CLUB trademark, swearing in its application for registration that "to the best of [its] knowledge and belief no other person, firm, corporation, or association has the right to use said mark [HAVANA CLUB] in commerce." Bacardi swore that oath with full knowledge of a Cuban company, Jose Arechabala, S.A. ("JASA"), which had marketed rum under the HAVANA CLUB trademark in Cuba in the 1930's through the 1950's. In 1995 and 1996, Bacardi sold in the U.S. a few hundred cases of a HAVANA CLUB rum produced in the Bahamas, not Cuba.

When the PTO rejected Bacardi's application in light of Cubaexport's HAVANA CLUB registration and the geographic origin of its rum, Bacardi petitioned to cancel the registration. In aid of its ultimately unsuccessful cancellation petition, Bacardi claimed that in 1997 it had acquired JASA's U.S. HAVANA CLUB trademark rights -- three years after it swore it believed JASA had no such rights. In fact, JASA had left the rum business decades before then, voluntarily allowed the last of its U.S. HAVANA CLUB registrations to expire in 1973 and failed to object to Cubaexport's registration for twenty years.

After years of litigation, Bacardi was unable to persuade the PTO or the Federal Courts that it, not Cubaexport, is the rightful owner of the HAVANA CLUB trademark in the United

States.  In 1998, Bacardi, frustrated with its lack of success at the PTO and in the Courts, used its influence with Congress to insert into a pending omnibus budget bill a provision (denominated "Section 211").  The legislation abrogated the General License with respect to certain trademarks, and was plainly aimed at the HAVANA CLUB registration, which Bacardi maintained was "confiscated" from JASA.

Armed with that legislation, and using officials including Florida Governor Jeb Bush to lobby the PTO on an *ex parte* basis, Bacardi renewed its efforts to cancel Cubaexport's registration of the HAVANA CLUB trademark.  Bacardi's strategy again failed.  In January 2004, after nearly ten years of litigation, the PTO dismissed Bacardi's petition to cancel Cubaexport's registration as a final matter.  Two months later, Bacardi filed an action in this District Court seeking review and reversal of the PTO's decision.  That action is pending before Judge Sullivan and, until the events that prompted the present lawsuit against OFAC, discovery was proceeding.

In addition to its authority to issue general licenses, OFAC also has authority to issue so-called specific licenses permitting transactions involving Cuban assets on a case-by-case basis.  OFAC repeatedly authorized Cubaexport's U.S. attorneys representing Cubaexport and its predecessor Havana Club Holding, S.A. ("HCH"), through specific licenses, to take all actions in connection with the cancellation proceedings launched by Bacardi (the "Specific License").

In 2006, Cubaexport's registration of the HAVANA CLUB trademark came due for routine renewal at the PTO.  Although OFAC previously had authorized such renewals through its General License and, in addition, had repeatedly granted Cubaexport's lawyers the Specific License to defend the HAVANA CLUB registration from cancellation, this time OFAC dramatically reversed field.  In April 2006, OFAC notified both Cubaexport and the PTO that renewal of the HAVANA CLUB registration was *not* authorized under any prior license.  At the

same time, OFAC encouraged Cubaexport to apply for *another* specific license for that renewal, which Cubaexport, facing an imminent deadline for renewing the registration, promptly did. Bizarrely, OFAC then *rejected* that new application in July 2006 with the one-sentence explanation that it would be "inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark."  OFAC also ruled that "renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed," implicitly revoking the General License as well.

In light of OFAC's actions, the PTO duly notified Cubaexport that it was rejecting Cubaexport's renewal application and fee and "accordingly, the registration will be cancelled/expired."  Cubaexport has filed an administrative appeal of that decision, which has been stayed by the PTO Director pending the outcome of this action.  Bacardi, for its part, has moved to stay the pending litigation before Judge Sullivan on the ground that the PTO's decision, if upheld on appeal, will grant Bacardi the relief it had sought (albeit unsuccessfully) from the PTO and thereby will moot the appeal of the PTO's prior decision in this District Court.

In this litigation, Cubaexport challenges three distinct, albeit related, rulings by OFAC:

1. <u>OFAC's April 2006 ruling that the Specific License in effect as of December 2005 did not authorize the renewal of the HAVANA CLUB registration</u>.  This ruling is contradicted by the plain language of the License, which broadly authorizes "*[a]ll transactions . . . in connection [with] the legal representation of [Cubaexport] in legal proceedings in the United States related to the HAVANA CLUB trademark.*"  AR 84.[1]  OFAC's revisionist construction of this license to exclude the filing of the renewal application with the PTO in order to preserve the very *res* at issue in the referenced legal proceedings not only is unsupported by the language of the license, but also is manifestly irrational.  It effectively destroys that *res*, thereby vitiating the entire

---

[1] "AR" refers to the Administrative Record.

purpose of the license and mooting the referenced "legal proceedings" rather than allowing this District Court to resolve the appeal from the PTO's decision rejecting Bacardi's challenge to the HAVANA CLUB registration.

2. OFAC's July 2006 ruling that "renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed."  Although this ruling necessarily implies that renewal is not authorized under the General License, OFAC made no explicit finding in this regard, provided no explanation for its ruling and engaged in no fact-finding concerning the facts (*i.e.*, a "confiscation" and a lack of "consent") that would be necessary to support that ruling, as the Administrative Procedures Act ("APA") requires.  *See, e.g., Lozowski v. Mineta*, 292 F.3d 840, 845 (D.C. Cir. 2002) (APA requires agency to provide reasoned explanation for decision, including a "'rational connection between the facts found and the choice made'") (citation omitted). Further, OFAC failed to afford Cubaexport notice or any opportunity to be heard on these facts.  *See, e.g., Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 205-06 (D.C. Cir. 2001) (APA incorporates the "fundamental requirement of due process," namely, "the opportunity to be heard at a meaningful time and in a meaningful manner").  The government's *post hoc* effort to support its ruling with factual findings in another litigation, in which the Court refused to cancel Cubaexport's registration because Cubaexport was not a party, is patently improper and merely compounds the violation of Cubaexport's procedural rights.

3. OFAC's July 2006 ruling denying the request for a new specific license authorizing renewal of the HAVANA CLUB registration.  OFAC's one-line reference to "U.S. policy" fails to provide the "reasoned explanation" for this decision that the APA requires.  Indeed, as APA case law establishes, that failure is particularly egregious because OFAC's decision conflicts with its prior authorization of the registration and renewal of the registration through the General

License and with OFAC's repeated grants of specific licenses to defend the HAVANA CLUB registration from Bacardi's legal attack. *See, e.g., Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 874 n.17 (D.C. Cir. 1984) (Ginsburg, J.) (overturning OFAC decision representing "a sharp departure from prior practice" in absence of adequate explanation). Moreover, the government's attempt to justify its decision on the ground that Section 211 changed U.S. policy *assumes* that the HAVANA CLUB trademark was "confiscated" and that there was no consent to the registration. Again, OFAC made no such finding, nor did it provide Cubaexport with notice or an opportunity to be heard on these factual issues.

The government seeks dismissal of Cubaexport's constitutional claims under Fed. R. Civ. P. 12(b)(1) and purports to seek dismissal of all claims under Fed. R. Civ. P. 12(b)(6). In the alternative, the government appears to request summary judgment on all claims. The government's motion should be denied, and Cubaexport's cross-motion for summary judgment under the APA granted.[2]

## STATEMENT OF FACTS

### A.    OFAC's General License For Trademark Registrations And Renewals

As the government states, OFAC was established, and the CACR were promulgated, in 1963 under the authority of the TWEA, 50 U.S.C. App. § 1 *et seq.* Pursuant to the CACR, transactions in the United States involving Cuban-owned property are prohibited unless a transaction is authorized by OFAC. 31 C.F.R. pt. 515, subpt. B. As the government notes, such authorization may take one of two forms: a "general license" or a "specific license." 31 C.F.R. §§ 515.317-.318. A general license is one stated in the regulations and covering a type or

---

[2]    Because the issue of whether the Specific License turns only on the undisputed language of that license and the prior licenses, Cubaexport has cross moved for summary judgment on that issue. Should the Court agree with Cubaexport that the license authorizes the renewal of the HAVANA CLUB registration and grant Cubaexport's cross motion, it is likely the PTO would reinstate the registration, effectively mooting all other claims and issues in this action.

category of transactions.  Specific licenses are granted by OFAC for specific transactions, on a case-by-case basis, upon the filing of an application.  A specific license is not needed for a transaction authorized under a general license.

From the outset, the CACR included a general license provision authorizing the registration and renewal of registration of trademarks owned  by Cuban nationals – that is, the General License.  The original General License thus authorized the "filing in the [PTO] of applications for ... [trademark] registration[s]" and "the receipt of ... trademark registration certificates ... or renewal certificates granted pursuant to any such applications in which any designated national has at any time on or since the 'effective date' had any interest."  31 C.F.R. § 515.527 (1963).

In 1995, OFAC amended and clarified the General License to state, *inter alia*, as follows:

> Transactions related to a registration and renewal in the United States Patent and Trademark Office or the United States Copyright Office of patents, trademarks, and copyrights in which the Government of Cuba or a Cuban national has an interest are authorized.

31 C.F.R. § 515.527 (1996); *see* 60 Fed. Reg. 54,194, 54,196 (Oct. 20, 1995).

## B.    Cubaexport's HAVANA CLUB Registration

In the early 1970's, Cubaexport, a company formed in 1965 to market Cuban products internationally, began exporting rum to other countries under a trademark consisting of the words HAVANA CLUB and an original design not previously used.  After registering that trademark in Cuba, Cubaexport, under the authority of the U.S. Trademark Act and the General License, filed an application with the PTO to register its HAVANA CLUB trademark in the United States.[3]

---

[3] Although the United States' embargo on trade with Cuba precluded Cubaexport from selling rum under the HAVANA CLUB & Design trademark in this country, Section 44 of the U.S. Trademark Act permits registration of a mark in the U.S. based on a foreign registration, without the prerequisite of actual use of the mark in commerce. 15 U.S.C. § 1126.

Complaint ("Compl.") Ex. 1.  In 1976, the PTO issued U.S. Trademark Registration No. 1,031,651 of HAVANA CLUB & Design to Cubaexport.  Compl. Ex. 2.

The Trademark Act provides that, during the fifth year after a registration issues, a registrant must file a declaration that the registered mark is still in use or that non-use of the mark is excused, in order to maintain the registration.  15 U.S.C. § 1058(b).  Thus, in 1982, Cubaexport timely filed, and the PTO accepted, the requisite declaration, and the registration was maintained.  Compl. Ex. 3.  Like the filing of the original application, the filing of the declaration was authorized under the General License.

Under the Trademark Act, a trademark registration automatically may be renewed after a fixed number of years, "upon payment of the prescribed fee and the filing of a written application."  15 U.S.C. § 1059(a).  Because the initial term of the HAVANA CLUB registration was 20 years, the registration was due for renewal in 1996.[4]  Meanwhile, Cubaexport had assigned the trademark and U.S. registration to another Cuban company called Havana Rum & Liquors, S.A. ("HRL"), which in turn had assigned it to a company called Havana Club Holding, S.A. ("HCH").  WD Ex. 1.[5]  Accordingly, when the registration was due for renewal, HCH timely filed a renewal application with the PTO under OFAC's General License, and the registration was renewed for an additional ten-year period until January 27, 2006 when it again could be renewed.  Compl. Ex. 5.

### C.    Bacardi's Unsuccessful Campaign To Wrest Ownership Of The U.S. Rights To The HAVANA CLUB Trademark From Cubaexport

From its initial issuance in 1976 until 1994, Cubaexport's HAVANA CLUB registration remained undisturbed.  Neither JASA nor anyone else sought to challenge it.  In September of

---

[4] In 1989, the Trademark Act was amended to fix the initial term for new registrations at 10 years.

[5] "WD Ex. __" hereinafter refers to the Declaration of Michele M. Winneker in Opposition to Defendants' Motion to Dismiss, or in the Alternative, Summary Judgment.

that year, however, Bacardi entered the picture. Through an affiliate named Galleon, S.A., Bacardi first filed an application with the PTO to register HAVANA CLUB in its own name. WD Ex. 2. The application did not recite that Bacardi owned the trademark; it stated that Bacardi had an intention to use it in the future. *Id*., p. 1. It also recited that Bacardi believed no one else had the right to use the trademark. *Id*., pp. 2-3.

The PTO advised Bacardi that its mark could not be registered because, *inter alia*, Cubaexport already had registered the same mark. WD Ex. 3. The PTO refused the registration for the further reason that Bacardi's rum was from the Bahamas, not Cuba, rendering Bacardi's use of the HAVANA CLUB mark geographically deceptively misdescriptive to consumers. *Id*. In response to the first objection, Bacardi filed a petition to cancel Cubaexport's HAVANA CLUB registration, thereby initiating an *inter partes* administrative litigation ("the PTO Cancellation Proceeding") before the PTO's Trademark Trial and Appeal Board ("TTAB"). *See Galleon, S.A. v. Havana Club Holding, S.A.,* Cancellation No. 92024108, 2004 TTAB LEXIS 38, at *31-32 (TTAB Jan. 29, 2004). Bacardi subsequently filed an Amended and Supplemental Petition, which the TTAB dismissed in its entirety in January 2004. *Id*. at *32, 69.

In late 1995, Bacardi took a further step, commencing sales of its non-Cuban rum in the United States under the HAVANA CLUB trademark. In response, HCH initiated a trademark infringement action in the United States District Court for the Southern District of New York against Bacardi. *Havana Club Holding, S.A., v. Galleon, S.A.*, No. 96-Civ-9655 (SAS) (S.D.N.Y. filed Dec. 24, 1996) ("New York Action"). Bacardi counterclaimed, seeking an order directing the PTO to cancel the HAVANA CLUB registration and asking the Court, *inter alia*, to

"declare that ... Bacardi has the prior, superior and exclusive right to use of the designation HAVANA CLUB as a trademark for rum in the United States."[6]  WD Ex. 4, ¶ 45.

In a ruling in 1997, the court in the New York Action nullified Cubaexport's transfer of its HAVANA CLUB registration to HRL, and HRL's assignment to HCH, and restored the *status quo ante*, reaffirming Cubaexport's ownership of the HAVANA CLUB registration and holding that HCH lacked standing to pursue an infringement claim against Bacardi.  *Havana Club Holding, S.A., v. Galleon, S.A.*, 974 F. Supp. 302 (S.D.N.Y. 1997).[7]  Although Bacardi had contended that the HAVANA CLUB registration should be cancelled because of the nullified transfer to HRL and HCH, the court rejected that contention, concluding that cancellation would lead to an "inequitable adjudication" of the "substantial rights" of Cubaexport, which was not a party to the action.  *Id.* at 311.  The court found that Cubaexport had "significant business interests in maintaining the registration of its mark."  *Id.* at 312.  Significantly, Bacardi withdrew its claim for a declaration that it owns the rights in the HAVANA CLUB trademark.

###     D.     Bacardi's Procurement Of Section 211

Stymied in its efforts in the PTO and in the New York Action, Bacardi turned to select members of Congress for help.[8]  Bacardi's lobbying resulted in the last-minute inclusion of the following provision as Section 211 of the voluminous Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1998:

---

[6] The pendency of the New York Action caused the PTO to suspend the PTO Cancellation Proceeding.  *Galleon, S.A.,* Cancellation No. 92024108, 2004 TTAB LEXIS 38, at *32 (TTAB Jan. 29, 2004).

[7] The government's statement that "following the [New York Action], HCH maintained no continuing interest in the mark" (Mem. 9) misrepresents the allegation in Complaint ¶ 20.  The Complaint correctly avers that the New York court held that "HCH lacked standing to pursue an infringement claim against Bacardi."  Since the New York Action ended in 2000, HCH has defended the PTO Cancellation Proceeding and the D.C. Action, which Bacardi brought against both it and Cubaexport.

[8] *Hidden Provision Sparks New Dispute Over Cuba*, Cuba News (Miami Herald Publishing Co. November, 1998) (where an aide to Senator Mack (R-FL) told a reporter that Florida senators "sponsored the provision on behalf of constituents, namely Bacardi enterprises in Florida and Floridians who work for the giant liquor company.").  *See* WD Ex. 5.

(a)(1) Notwithstanding any other provision of law, no transaction or payment shall be authorized or approved pursuant to section 515.527 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name, or commercial name, or the *bona fide* successor-in-interest has expressly consented.
(2) No U.S. court shall recognize, enforce or otherwise validate any assertion of rights by a designated national based on common law rights or registration obtained under such section 515.527 of such a confiscated mark, trade name, or commercial name.

(b) No U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national or its successor-in-interest under sections 44 (b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126 (b) or (e)) for a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the *bona fide* successor-in-interest has expressly consented.

(c) The Secretary of the Treasury shall promulgate such rules and regulations as are necessary to carry out the provisions of this section.

(d) In this section:  (1) The term "designated national" has the meaning given such term in section 515.305 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, and includes a national of any foreign country who is a successor-in-interest to a designated national.
(2) The term "confiscated" has the meaning given such term in section 515.336 of title 31, Code of Federal Regulations, as in effect on September 9, 1998.

Pub. L. No. 105-277, 112 Stat. 2681-88, Sec. 211.  Other than the sponsors of Section 211, few,

if any, members of Congress likely were aware of that provision.  The omnibus budget bill in

which it was buried was a "16-inch tall, 40-pound document [that included] handwritten notes in

the margin, e-mail printouts inserted into the bill, and misnumbered or unnumbered pages."  *See*

WD Ex. 6.  As Representative Peter A. Defazio (D. Oregon) commented at the time, "Heck, half

the members couldn't even lift [the bill], let alone read it."[9]  Moreover, there were no hearings on

---

[9] *See House Passes Spending Bill:  Massive Omnibus Measure Larded With Pet Projects*, Washington Post, Oct. 21, 1998.  *See* WD Ex. 7.  Similarly, the Senate Appropriations Committee's Ranking Democrat, Robert C. Byrd (W. VA.) put it:  "Do I know what's in this bill?... Are you kidding?  No.  Only God knows what's in this monstrosity."  *Id*.  Senator Byrd's counterpart in the House of Representatives was of the same mind.  Representative David R.

Section 211 conducted by either the Senate or the House and no legislative history to mark its

passage.  Nevertheless, it was evident to many observers that Section 211 was intended to benefit

one favored entity – Bacardi.[10]

### E.    OFAC Promulgates A Regulation Implementing Section 211

Following passage of Section 211, OFAC amended its regulations to reflect its

understanding of the new statute.  *See* 64 Fed. Reg. 25,808, 25,813 (May 13, 1999).  In

particular, OFAC retained the original 31 C.F.R. § 515.527 as Paragraph (a)(1) of the amended

regulation, while a new Paragraph (a)(2) was added to comply with Section 211(a)(1):

> (a)(1)   Transactions related to the registration and renewal in the United States
> Patent and Trademark Office or the United States Copyright Office of patents,
> trademarks, and copyrights in which the Government of Cuba or a Cuban national
> has an interest are authorized.
>
> (2)      No transaction or payment is authorized or approved pursuant to
> paragraph (a)(1) of this section with respect to a mark, trade name, or commercial
> name that is the same as or substantially similar to a mark, trade name, or
> commercial name that was used in connection with a business or assets that were
> confiscated, as that term is defined in § 515.336, unless the original owner of the
> mark, trade name, or commercial name, or the *bona fide* successor-in-interest has
> expressly consented.

OFAC's brief describes that amendment as follows:

> In accordance with the statutory mandate in section 211, <u>see id.</u> § 211(c),
> 112 Stat. at 2681-88, OFAC amended its regulations on May 13, 1999, to remove
> the general license authority for U.S. persons to engage in transactions or
> payments related to the registration or renewal of a mark, trade name, or
> commercial name in which a Cuban national has an interest that is the same as or
> substantially similar to a mark used in connection with confiscated assets unless
> the original owner or *bona fide* successor-in-interest has expressly consented.

---

Obey (Wisconsin), the House Appropriations Committee's ranking Democrat said:  "We have this godawful mess on
the floor [that] represents an incredibly outrageous way to do the country's business."  *Id.*

[10] *See, e.g.*, Statement of the Honorable Larry Craig, Testimony to Senate Committee on the Judiciary, July 13, 2004
("First, section 211 benefits one foreign company alone. This point bears emphasis, no U.S. company receives the
slightest advantage from that law. If anyone doubts this I suggest they ask the law's sole beneficiary, Bacardi, Inc.,
to name one U.S. company that benefits from and supports [it].")  *See* WD Ex. 8; *Budget Bill Would Shut Off Trade
With Some Cuban Joint-Ventures: Spending Provision Likely to Draw Fire from EU*, Inside U.S. Trade, October 23,
1998 at 19 ("[Section 211] was specifically pushed by Bacardi-Martini U.S.A., a competitor of HCH for the right to
use the *Havana Club* trademark.").  *See* WD Ex. 9.

31 C.F.R. § 515.527(a)(2). This amendment precluded such transactions on behalf of Cuban nationals in the absence of a specific license issued by OFAC. Id. § 515.318; see also Decl. of Adam J. Szubin ("Szubin Decl.") ¶ 22.

Mem. 6; *accord id.* at 22; Szubin Decl. ¶ 22.

As the final sentence of this paragraph indicates, OFAC interpreted Section 211 to mean only what it literally says: that the *General License*, previously applicable to all Cuban-owned trademarks, no longer was to apply to "confiscated" trademarks. OFAC understood Section 211 to leave undisturbed its discretion to decide, in a given case, to issue a *specific* license for the registration or renewal of registration of such a trademark. *See also* Mem. 22; Szubin Decl. ¶ 22. Indeed, OFAC asserts that it has "wide discretion to make this determination," notwithstanding Section 211. Mem. 22.

### F. Bacardi's Attempt To Pressure The PTO Through *Ex Parte* Contacts

Having failed to achieve the relief it requested in the New York Action, Bacardi returned to the PTO. It reopened the suspended PTO Cancellation Proceeding and moved the TTAB for summary judgment that the HAVANA CLUB registration be cancelled. While its motion was pending, Bacardi solicited help from another of its powerful political allies – Florida Governor Jeb Bush. WD Ex. 10, FOIA 12-13[11] (e-mail from Bacardi to Governor Bush advising him of Bacardi's fight against HCH and saying "I hope you can help us"). From January 2002 through at least September 2002, Governor Bush's office and Bacardi acted in concert and in secret to obtain the cancellation Bacardi was seeking. They began their campaign with a series of *ex parte* contacts with the PTO in February and March 2002, including a meeting between Bacardi President Jorge Rodriguez-Marquez and the Deputy Director for Trademarks Jon Dudas to discuss the cancellation and press Bacardi's case. WD Ex. 10, FOIA 72-74, 42, 44-45, 145-146.

---

[11] "FOIA ____" refers to the page numbering of documents obtained from the PTO and Governor Bush's office by request.

Subsequently, Bacardi's president requested that Governor Bush help put more "pressure" on the PTO. WD Ex. 10, FOIA 70.  On June 13, 2002 Governor Bush personally demanded that the HAVANA CLUB registration be "cancelled immediately" in a letter to Director Rogan:

> I am writing on behalf of Florida-based Bacardi-Martini, USA, Inc. to ask that the Patent and Trademark Office take quick, decisive action on a pending application to expunge the registration of the trademark HAVANA CLUB.  *The out-dated registration belongs to a company . . . called CubaExport and should be cancelled immediately.... A swift resolution to this matter is imperative.*  WD Ex. 10, FOIA 9-10 (emphasis added).

Despite all these efforts, Bacardi was unsuccessful in persuading the TTAB to cancel the HAVANA CLUB registration.  In January 2004, the TTAB denied Bacardi's summary judgment motion and went on to dismiss Bacardi's cancellation petition.  *Galleon, S.A.*, 2004 TTAB LEXIS 38, at *47, *69.

On March 29, 2004, Bacardi appealed the TTAB decision by filing an action in United States District Court for the District of Columbia.  *Bacardi & Co. v. Cubaexport*, No. 1:04-CV-00519 (D.D.C. filed Mar. 29, 2004) (the "D.C. Action").  In the D.C. Action, which is pending before Judge Sullivan, Bacardi alleges that Section 211 entitles it to a declaratory judgment that it "is the true owner of the common law rights in and to HAVANA CLUB as the *bona fide* successor-in-interest to JASA," which in turn allegedly entitles it to enjoin Cubaexport and HCH from using HAVANA CLUB or interfering with Bacardi's alleged right to do so.  WD Ex. 11, ¶¶ 6(c), 39, 142, 160(b)-(c).  Bacardi also alleges that Section 211 requires reversal of the Board's (i) denial of Bacardi's summary judgment motion and (ii) dismissal of Bacardi's cancellation claims.  *Id*., ¶¶ 99-100, 104, 110.

The D.C. Action remains pending.  As of the date of the decision by OFAC under review in the present action, the parties to the D.C. Action were in the midst of discovery.

### G. OFAC's Repeated Grant Of Specific Licenses To Enable Cubaexport To Defend Its Trademark Registration Against Bacardi's Challenge

In connection with the PTO Cancellation Proceeding, lawyers for Cubaexport (and, during its ownership of the registration, HCH) applied for, and obtained, the Specific License. That license – in effect in December 2005 – stated as follows:

> SECTION 1 - AUTHORIZATIONS:  (a) All transactions are authorized to enable the Licensee, in connection [with] the legal representation of Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport"), and Havana Club Holding S.A. in legal proceedings in the United States related to the HAVANA CLUB trademark, as described in the application, to receive payment for such services and reimbursement for expenses related to such services from Cuban nationals through banking channels, provided the funds are routed from Cuba to the United States via a third-country bank.

Pursuant to the Specific License, Cubaexport has incurred substantial fees and expenses in connection with "legal proceedings in the United States related to the HAVANA CLUB trademark."  AR 83-84.

### H. OFAC's April 6, 2006 And July 28, 2006 Rulings Denying Authorization To Renew The HAVANA CLUB Registration

On December 13, 2005, over a month before the January 27, 2006 deadline for renewal of the HAVANA CLUB registration, Ropes & Gray sent a letter to the PTO enclosing a renewal application duly executed by Cubaexport pursuant to Trademark Act §§ 8 and 9, and, in accordance with PTO practice, requesting that the applicable renewal fee of $500 be charged against Ropes & Gray's standing account with the PTO.  AR 59-82.[12]  In that letter to the PTO and in a concurrent letter to OFAC (AR 56-58), Ropes & Gray stated that payment of the filing fee was being made pursuant to the Specific License, in order to preserve the *status quo* in those proceedings by maintaining the HAVANA CLUB registration until a decision regarding cancellation of the registration could be rendered in the D.C. Action.

---

[12] Bacardi sought to intervene in the ex parte renewal process, arguing that the registration should not be renewed. AR 4-5, 10-33.  On July 18, 2006, the PTO Director ruled that the PTO "will not consider the information or documents submitted [by Bacardi] because [Bacardi] is a third party in this ex parte matter."  WD Ex. 12.

Nearly four months later on April 6, 2006, OFAC *sua sponte* intervened in the registration renewal process, issuing a letter to Ropes & Gray and the PTO (the "April 6, 2006 Letter") in which OFAC stated that it did not consider the Specific License to "authorize Ropes & Gray LLP to pay a filing fee to the PTO for renewal of Registration No. 1,031,651 . . . on behalf of Cubaexport."  AR 52-53.  Rather, OFAC stated that the Specific License "covers only those transactions in connection with the pending District Court litigation," although the license itself did not so state.  *Id.*  In the April 6, 2006 Letter, OFAC also stated that Ropes & Gray could apply for a specific license to renew the HAVANA CLUB registration on behalf of Cubaexport at the PTO.  *Id.*  Accordingly, the very next day, on April 7, 2006,  Ropes & Gray expressly sought a license to "incur and receive payment for the expense of renewing the [HAVANA CLUB] registration."  AR 49-51.

Although the PTO's renewal deadline had by this time passed, the Trademark Act's six-month grace period for the HAVANA CLUB registration expired on July 27, 2006.[13]  That day came and went without any response from OFAC to the April 7, 2006 license application.  The following day, July 28, 2006, OFAC issued a one-page letter response (the "July 28, 2006 Letter") to Ropes & Gray, with a copy to the PTO, denying the application.  AR 1.

The July 28, 2006 Letter stated, in its entirety, as follows:

> This is in response to your letter dated April 7, 2006, on behalf of Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport"), requesting a license authorizing transactions related to the renewal at the United States Patent and Trademark Office of Registration No. 1,031,651 of HAVANA CLUB & Design (the "HAVANA CLUB trademark").
>
> Pursuant to the Cuban Asset Control Regulations, 31 C.F.R. Part 515, administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed.

---

[13] The Trademark Act provides for a six-month "grace period" during which an application for renewal of a trademark registration may be filed with an additional fee.  15 U.S.C. § 1059.

> OFAC has been engaged in consultation with the relevant agencies in the
> U.S. Government, including the Department of State ("State"), on this issue. We
> have received guidance from State informing us that it would be inconsistent with
> U.S. policy to issue a specific license authorizing transactions related to the
> renewal of the HAVANA CLUB trademark. Accordingly, your request is hereby
> denied.

*Id*.

Together with the April 6, 2006 Letter, the July 28, 2006 Letter thus represents a decision

by OFAC not to grant a *specific* license to renew the HAVANA CLUB registration. But the July

28, 2006 Letter's statement that "renewal of the HAVANA CLUB trademark under these

circumstances would be prohibited unless specifically licensed" necessarily implies that renewal

of the HAVANA CLUB registration also is not authorized under the *general* license for

registrations and renewals set forth in 31 C.F.R. § 515.527(a)(1). AR 1.

Although the Director of OFAC states in his declaration that "[t]he denial of a license

request does not preclude the reopening of an application or the filing of a further application"

and that "[t]he applicant may at any time request further explanation of the reasons for a denial

by correspondence or personal interview, Szubin Decl. ¶ 16 (citing 31 C.F.R. § 501.801(b)),

OFAC's regulations state, and the government concedes, that "a decision of the Office of Foreign

Assets Control acting on behalf of the Secretary of the Treasury with respect to an application

shall constitute final agency action." 31 C.F.R. § 501.802; *see* 5 U.S.C. § 704; Mem. 26.

## I.    The Cancellation of The HAVANA CLUB Registration

On August 3, 2006, the PTO Post Registration Division issued the following notification

to Cubaexport:

> [T]he Office has received ... [OFAC's July 28, 2006 ruling]. Because the specific
> license is necessary for authorizing payment of the required fee, and that license
> has been denied, the required filing fee for [renewal of the registration] has not
> been submitted; accordingly the registration will be cancelled/expired." (emphasis
> added). Compl. Ex. 24.

Cubaexport promptly appealed this decision to the Commissioner of the PTO.  However, on December 6, 2006, the PTO Director for Trademarks stayed Cubaexport's appeal pending the outcome of this litigation.  WD Ex. 13.

Within days of the PTO's August 3, 2006 ruling, Bacardi was publicly "applauding" the PTO's ruling and claiming ownership of the HAVANA CLUB trademark for itself in connection with a resumption of sales of HAVANA CLUB rum in the United States after a ten year hiatus. WD Ex. 14.  As Bacardi U.S.A.'s Vice President and Group Marketing Director stated on National Public Radio, "[r]ight now, we own the rights to [the HAVANA CLUB] brand and we felt that this was the appropriate time to leverage the brand [by selling HAVANA CLUB rum.]." WD Ex. 15.  Having achieved through OFAC's actions what it had not been able to obtain after a decade of litigation before the PTO, Bacardi moved to stay its appeal of the PTO's decision in the D.C. Action.  WD Ex. 16.  As Bacardi tellingly stated, the PTO's August 3, 2006 refusal to renew the HAVANA CLUB registration, if upheld on appeal, "affords relief equivalent to a key objective that Bacardi has been seeking in this case," namely, cancellation of the registration. *Id.*, p. 5.

## ARGUMENT

### I.    THE GOVERNMENT'S MOTION TO DISMISS CUBAEXPORT'S CLAIMS UNDER FED. R. CIV. P. 12(B)(6) SHOULD BE DENIED BECAUSE IT SUBSTANTIALLY RELIES ON FACTS BEYOND THOSE SET FORTH IN THE COMPLAINT

Although the government moves for, *inter alia*, dismissal of all of Cubaexport's claims under Fed. R. Civ. P. 12(b)(6), it does not allege that Cubaexport's Complaint fails to plead the elements of its claims.  Moreover, the government's brief makes liberal reference to numerous alleged facts going well beyond the facts averred in the Complaint and the Administrative Record and pertaining to the core question of how, and on what basis, OFAC reached the various

decisions under review.[14]  It is hornbook law, of course, that in "evaluating a Rule 12(b)(6) motion to dismiss, the court is limited to considering facts alleged in the complaint, any documents either attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record."  *Hurst v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. A. 02 02147, 2007 WL 274321, at *2 n.6 (D.D.C. Feb. 1, 2007) (citations omitted).[15]

The government makes no attempt to identify which of its arguments rely on facts outside the Complaint and which do not, and this Court should not be obligated to try to read the government's mind in this regard.  The government's motion to dismiss under Rule 12(b)(6) therefore should be exclusively "treated as one for summary judgment and disposed of as provided in Rule 56."[16]

## II.    THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON CUBAEXPORT'S CLAIM UNDER THE ADMINISTRATIVE PROCEDURE ACT, AND CUBAEXPORT IS ENTITLED TO SUMMARY JUDGMENT

In this action, Cubaexport can prevail if it demonstrates that OFAC violated Cubaexport's rights under the APA or the Fifth Amendment in issuing any or all of the three rulings by OFAC under review.  The government thus would be entitled to summary judgment only if it established, with respect to *all three* rulings, that there are no genuine issues as to any material

---

[14] These alleged facts are set forth, variously, in (1) the declaration of OFAC's Director, Adam Szubin, submitted as part of the government's motion papers, *see e.g.* Mem. 6; 7; 13; 22; 33-35; 37; 38 (citing, respectively, Szubin Dec. 22; 23-25; 37-38, 40-41; 22; 18, 12-14, 38; 27; 38); (2) the Administrative Record filed concurrently with the government's motion, *see e.g.* Mem. 13; 25-26; 38 (citing, respectively, AR 2-5, 10-33; 35-39; 2-3); and (3) in the District Court's and Second Circuit's opinions in the New York Action to which Cubaexport was not a party, *see* e.g. Mem. 7-9, 17, 18, 22, 28, 33, 37-39, 40.  Not only are these facts outside the Complaint, but they also are, in many cases, vigorously disputed by Cubaexport.  *See infra* at 25-27.

[15] Moreover,  dismissal under 12(b)(6) is not warranted "unless, taking as true the facts alleged in the complaint, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. . . . [T]he issue presented by a motion to dismiss is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006) (quotations and citations omitted).

[16] Fed. R. Civ. P. 12(b)(6).  The government's application to dismiss Cubaexport's constitutional claims under Fed. R. Civ. P. 12(b)(1) is discussed *infra* at 32-34.

fact and the government is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The government has not met that burden with respect to *any* of the rulings. On the contrary, Cubaexport is entitled to summary judgment.

### A. OFAC Erred In Ruling That The Specific License Does Not Authorize The Renewal Of The HAVANA CLUB Registration

The government seeks a summary judgment upholding OFAC's ruling that the existing Specific License did not authorize renewal of the HAVANA CLUB registration. The government is not entitled to summary judgment because OFAC's ruling is contrary to the plain language of that license – language that OFAC itself crafted. The Specific License broadly authorizes "*[a]ll transactions* . . . in connection [with] the legal representation of [Cubaexport] in legal proceedings in the United States related to the HAVANA CLUB trademark" and to receive "reimbursement for expenses related to such services." AR 84 (emphasis added). That language, on its face, unambiguously encompasses the payment of the PTO's minimal fee for renewal of the registration that was the *res* at issue in those "legal proceedings." Although OFAC's April 6, 2006 letter construed the license to exclude the renewal of the registration and to authorize only actions taken in the litigation itself, nothing in the language suggests the limitation that OFAC has read into it. OFAC should be held to the plain language of its own license.[17]

Moreover, OFAC's decision is inconsistent with its prior license decisions and manifestly unreasonable. Indeed, to construe Specific License to allow the vigorous defense of the HAVANA CLUB registration in the cancellation proceedings but not to allow the simple act of renewal necessary to maintain that defense, as OFAC has done, wholly vitiates the Specific License. Cubaexport's lawyers hardly could continue to represent Cubaexport in the cancellation

---

[17] *See Hispanic Info. & Telecomms. Network, Inc. v. FCC*, 865 F.2d 1289, 1296 (D.C. Cir. 1989) (remanding because agency's interpretation of its own regulation was "'plainly wrong'") (citation omitted). If the Court concludes that the Specific License in effect as of December 2005 is at least ambiguous and may authorize the renewal of the registration, Cubaexport would be entitled to discovery regarding the drafting of the license language, OFAC's understanding thereof, and the reasons that the language was changed in April 2006.

proceeding if OFAC's decision effected the very outcome – cancellation of the registration – that those lawyers were authorized to defend against.  *See, e.g.*, *Commc'ns & Control, Inc. v. FCC*, 374 F.3d 1329, 1336 (D.C. Cir. 2004) (finding FCC's decision to revoke license "unreasonable" where FCC had allowed licensee to operate from disputed location for seven years); *Mobile Commc'ns & Corp. v. FCC*, 77 F.3d 1399, 1407 & n.2 (D.C. Cir. 1996) (even if decision by itself might be rational, it was improper because, *inter alia*, it "failed to address such questions as whether [FCC's] new position was consistent with the reliance interests of Mtel"); *Entergy Servs., Inc. v. Fed. Energy Regulatory Comm'n*, 375 F.3d 1204, 1209 (D.C. Cir. 2004) (agency's interpretation of a regulation that is "'plainly erroneous or inconsistent with the regulation'" may be set aside, as may agency's interpretation of its own order that is not reasonable) (citation omitted); *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 383 F. Supp. 2d 123, 131 (D.D.C. 2005) (declining to accept agency's "'manifestly unreasonable'" interpretation of its own regulation), *aff'd*, 466 F.3d 134 (D.C. Cir. 2006).[18]

Because the question whether the Specific License authorizes the renewal of the HAVANA CLUB registration can be resolved based upon the plain language of the license, Cubaexport submits that summary judgment in *its* favor is appropriate and, accordingly, has filed a cross motion for summary judgment.  If the Court agrees with Cubaexport that the Specific

---

[18] In its April 6, 2006 Letter, OFAC noted Cubaexport's concerns regarding this inconsistency, but brushed them off with the conclusory response that "[t]hese arguments do not extend the limited authorization contained in License No. CU-74488 ... to ... payment of a renewal fee."  AR 53.  Such a response is plainly inadequate under the APA. *See Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1407 (D.C. Cir. 1995) (Silberman, J. concurring in part and dissenting in part) (rejecting decision in which agency recited petitioner's factual allegations and concluded that granting requested relief "'would not be in the interest of justice'"); *Kamargo Corp. v. Fed. Energy Reg. Comm'n*, 852 F.2d 1392, 1397 (D.C. Cir. 1988) (same).

In its brief, the government attempts to correct its omission by proffering various arguments not stated in the decision itself.  Mem. 33-36.  Such arguments may not be considered.  *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) (the arbitrary and capricious standard "mandate[s] that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale *at the time of decision*" (emphasis added)); *Sierra Club v. USEPA*, 167 F.3d 658, 665 (D.C. Cir. 1999) (rejecting agency's theory that was only "made clear in the briefs for the agency"); *Commc'ns & Control*, 374 F.3d at 1337 ("'We do not ordinarily consider agency reasoning that "appears nowhere in the [agency's] order."'") (citations omitted).

License authorizes the renewal of the HAVANA CLUB registration and grants Cubaexport's cross motion, Cubaexport expects that the PTO would authorize that renewal and reinstate the registration. *See Am. Airways*, 746 F.2d at 874 (overturning OFAC decision); *Duggan v. Bowen*, 691 F. Supp. 1487, 1515 (D.D.C. 1988) (holding Department of Health and Human Services' decision to be "arbitrary and capricious," enjoining Department from denying Medicare coverage based on "unlawful" interpretation, and ordering Department to reopen all other claims denied pursuant to that interpretation); *Jet Inv., Inc. v. Dep't of the Army*, 84 F.3d 1137, 1143 (9th Cir. 1996) (finding that Small Business Administration acted arbitrarily and capriciously and directing agency to grant judgment in favor of plaintiff). Such an outcome would render unnecessary the resolution of all other claims and issues in this case, moot Bacardi's motion to stay the D.C. Action, and return the matter to Judge Sullivan where the private trademark dispute underlying this case can and should be decided.

B.    **The Government Is Not Entitled To Summary Judgment Affirming OFAC's Ruling That "Renewal Of The HAVANA CLUB Trademark Under These Circumstances Would Be Prohibited Unless Specifically Licensed"**

1.    **OFAC Failed To State, Or Make, The Requisite Factual Findings That Would Justify Its Ruling**

The government concedes that, under OFAC's regulations, the renewal of a Cuban-owned trademark registration may be authorized under either the General License or a specific license. Mem. 6. Accordingly, OFAC's July 28, 2006 ruling that "renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed" is correct only if renewal of the HAVANA CLUB registration is *not* authorized pursuant to the General License. And under Section 211 and OFAC's regulations, the General License is inapplicable to the HAVANA CLUB registration *only* if the trademark is "the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated" and "the original owner of the mark, trade name, or commercial name, or

the *bona fide* successor-in-interest" has not expressly consented to the renewal of the registration. *See* 31 C.F.R. § 515.527(a)(2).

In its July 28, 2006 Letter, OFAC did not explicitly state that it had determined that the General License is inapplicable to the HAVANA CLUB registration, let alone provide any reasons for such a determination, if one was made. Indeed, even the government's brief avoids directly stating that such a determination was made. These omissions, we submit, are no mere oversight: in fact, there is no indication in the Administrative Record that OFAC ever analyzed the applicability of the General License. Indeed, the record contains no evidence whatsoever concerning the factual issues that must be resolved for a determination that renewal of the HAVANA CLUB registration is not authorized under the General License.

The APA requires the agency, among other things, to state its decisions explicitly and on the record and to provide a reasoned explanation for those decisions, including articulating a "'rational connection between the facts found and the choice made.'" *Lozowski*, 292 F.3d at 845 (citation omitted); *accord, e.g.*, *Chamber of Argentine-Paraguayan Producers of Quebracho Extract v. Holder*, 332 F. Supp. 2d 43, 49 (D.D.C. 2004) ("An agency's action may be deemed arbitrary and capricious if its rationale does not appear in the administrative record so that its decision making 'path may reasonably be discerned.'") (*quoting Sierra Club*, 167 F.3d at 665). Indeed, these requirements are essential to ensuring a reviewing court's ability to fulfill its obligations under the APA. *See Lozowski*, 292 F.3d at 845. Thus, in the absence of any explicit and reasoned determination by OFAC regarding whether the General License authorized renewal of the HAVANA CLUB registration, the government is not entitled to prevail.[19]

---

[19] Cubaexport disputes that the General License does not apply to its registration and so advised the PTO. *See* AR 35-36. Ropes & Gray paid the renewal fee pursuant to the Specific License because the PTO – unlike the Court in the D.C. Action – is not equipped to determine the applicability of the General License to the HAVANA CLUB registration.

## 2.     The Government's Post Hoc Justifications Are Unavailing

With careful ambiguity, the government suggests that OFAC's earlier April 6, 2006

Letter "could be *construed* as a determination of Cubaexport's inability to qualify for a general

license." Mem. 36 (emphasis added).  That is not the same, of course, as saying that OFAC

*actually* made such a determination.  *See Sierra Club*, 167 F.3d at 665 (rejecting agency's theory

that was only "made clear in the briefs for the agency").  In any event, the April 6, 2006 Letter

solely addresses whether the existing Specific License authorized renewal of the HAVANA

CLUB registration; it makes no reference whatsoever to the general license or to any predicate

facts necessary for a determination regarding the applicability of the general license.  *See*

*Commc'ns & Control*, 374 F.3d at 1337 ("'We do not ordinarily consider agency reasoning that

"appears nowhere in the [agency's] order."'") (citations omitted).

With equal ambiguity, the government also asserts that "there was ample *support* for the

conclusion that the Havana Club mark is 'the same as or substantially similar to a mark, [trade

name, or commercial name] that was used in connection with a business or assets that were

confiscated.'" Mem. 36.  The "arbitrary and capricious" standard, however, "mandate[s] that an

agency take whatever steps it needs to provide an explanation that will enable the court to

evaluate the agency's rationale *at the time of decision*."  *Pension Benefit Guar. Corp.*, 496 U.S. at

654 (emphasis added); *see Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 419

(1971) (criticizing agency's use of "affidavits [that] were merely *post hoc* rationalizations").

Thus, the government is not entitled at this juncture to adduce facts or arguments that were not

actually considered by OFAC at the time of its decision, and there is no indication in the record

that the government considered *any* facts or arguments before ruling that "renewal of the

HAVANA CLUB trademark under these circumstances would be prohibited unless specifically

licensed."

Moreover, the "ample support" on which the government now relies *post hoc* is a set of judicial findings in a litigation to which Cubaexport was not a party. Reliance on those findings by the government or this Court thus would be improper. *See Ala. Rivers Alliance v. FERC*, 325 F.3d 290, 295 n.7 (D.C. Cir. 2003) ("'In no event ... can issue preclusion be invoked against one who did not participate in the prior adjudication.'") (citation omitted); *Spawr Optical Research, Inc. v. Baldrige*, 649 F. Supp. 1366, 1369 (D.D.C. 1986) (findings of fact from previous trial only have preclusive effect before agency if "'the normal standards for preclusion are satisfied'") (citation omitted); *see also Havana Club Holdings*, 974 F. Supp. at 311 (refusing to cancel Cubaexport's HAVANA CLUB registration because such an outcome "would lead to an inequitable adjudication of the matter and neglect the substantial rights of Cubaexport, a party not before this court").

Even if OFAC could properly rely on these alleged facts, Cubaexport, which did not participate in the New York Action, vigorously disputes the findings of the court in that action. As set forth in the Declaration of Eric R. Hubbard ("HD"), even in the absence of discovery, Cubaexport is aware of facts which raise serious questions as to whether there was a "confiscation" of JASA under OFAC's own definition of that term.[20] HD ¶¶ 3, 4 (b-f, h-i). Indeed, there is no evidence that JASA was marketing any HAVANA CLUB rum at the time of

---

[20] Contrary to the court in the New York Action's conclusory statement, *Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116, 130 (2d Cir. 2000), under OFAC's own definition, there can be no "confiscation" of a business that was insolvent when expropriated. "Confiscation" requires an absence of "adequate and effective compensation." 31 C.F.R. 515.336(a)(1). "Adequate and effective compensation" for an insolvent business is zero. *In re Goodyear Tire & Rubber Co.*, Claim No. CU-0887 Decision No. CU-887, 1972 *Ann. Rept.* 367, 370-71 (Foreign Claims Settlement Commission ("FCSC")). It is appropriate to consider FCSC and its decisions to determine the adequacy of compensation under the CACR. Like the CACR, the Helms-Burton Act defines "confiscation" to exclude circumstances where "adequate and effective compensation" has been provided. 22 U.S.C. § 6023 (4)(A)(i). Under the Helms-Burton Act, amounts recoverable for expropriations by Cuba may be valued by the FCSC under the International Claims Settlement Act of 1949, which in turn mandates that "[i]n making the determination with respect to the validity and amount of claims and value of properties . . .taken, the [FCSC] shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to (i) fair market value, (ii) book value, (iii) going concern value, or (iv) cost of replacement." 22 U.S.C. §1643b(a).

the alleged confiscation of its rum business.  HD ¶ 4 (i).  Moreover, it is undisputed that JASA's

U.S. HAVANA CLUB trademark registrations were *not* confiscated.  HD ¶ 4 (j-k).

Likewise, by voluntarily surrendering its U.S. trademark registrations and declining to

oppose Cubaexport's applications or seek to cancel its registrations, JASA expressly consented to

Cubaexport's continued ownership of its United States registration.  *See NAACP v. NAACP Legal*

*Defense & Educ. Fund*, 753 F.2d 131, 137-40 (D.C. Cir. 1985) (doctrine of laches applies to bar

enforcement of trademark, particularly in light of the "passing of almost thirteen years without

any reservation of rights"); *Pro Fitness Physical Therapy Ctr. v. Pro-Fit Orthopedic*, 314 F.3d

62, 67 (2d Cir. 2002) (course of conduct, including delay in objecting to use of trademark,

"'connote[s] consent by the owner to ... use of his mark.'") (citation omitted).

Cubaexport also disputes that Bacardi is a "*bona fide* successor-in-interest" to JASA

whose consent to Cubaexport's renewal of the HAVANA CLUB registration is a precondition for

application of the General License, as the government apparently contends.  *See* Statement of

Facts No. 19.  Even the court in the New York Action did not find that Bacardi actually acquired

an interest, via successorship, in the HAVANA CLUB trademark.  Bacardi merely was found to

have purchased in April 1997 "whatever rights (*if any*) the Arechabalas possessed in any Havana

Club trademark."  *Havana Club Holdings, S.A. v. Galleon*, *S.A.*, 62 F. Supp. 2d 1085, 1090

(S.D.N.Y. 1999), *aff'd*, 203 F.3d 116 (2d Cir. 2000).  Thus, because the Arechabalas (the owners

of JASA) had voluntarily surrendered all such rights decades before that transaction, Bacardi

could not have acquired any.  *See, e.g., Uncas Mfg. Co. v. Clark & Cooms Co.*, 200 F. Supp. 831,

835 (D.R.I. 1962), *aff'd on other grounds*, 309 F.2d 818 (1st Cir. 1962) (holding that where a

trademark was abandoned, a later assignment is invalid since the assignor possesses no interest

to legally assign).

These and the other disputed facts set forth in Cubaexport's Response to Defendants' Statement of Undisputed Facts and Counterstatement of Facts preclude the granting of the government's motion for summary judgment.[21]

### 3. OFAC Failed To Give Cubaexport Notice And An Opportunity To Be Heard On The Factual Issues Relevant To The Question Whether The General License Authorizes Renewal Of The HAVANA CLUB Registration

The existence of the factual disputes noted above not only precludes the granting of the government's motion, but also highlights a final defect in OFAC's decision making regarding the applicability of the General License:  before making any determination regarding the factual issues relevant to a decision, OFAC was obligated to provide Cubaexport notice and an opportunity to be heard on those issues.  *Nat'l Council of Resistance of Iran*, 251 F.3d at 208 (the APA incorporates the "'fundamental requirement of due process,'" namely, "'the opportunity to be heard "at a meaningful time and in a meaningful manner"'") (citation omitted).  If OFAC ruled on whether there was a "confiscation" of JASA's assets and whether the original owner or a *bona fide* successor-in-interest consented to Cubaexport's registration of the HAVANA CLUB trademark, Cubaexport is entitled to develop and present evidence on those issues.

OFAC, however, gave Cubaexport *no* notice that a determination regarding these sorts of issues would be made and thus *no* meaningful opportunity to present evidence and arguments

---

[21]  If, however, this Court decides that the facts presented in Plaintiff's Response To Defendants' Statement Of Undisputed Facts And Counterstatement Of Facts are insufficient to dictate denial of defendants' motion, the Court should allow the discovery identified in the Hubbard Declaration, ¶¶ 3, 4, 6 to proceed pursuant to Fed.R.Civ.P. 56(f), before entering judgment on defendants' motion.  *See, e.g., Natural Resources Defense Council v. Train*, 519 F.2d 287, 292 (D.C. Cir. 1975) (permitting discovery to ensure that documents which are properly part of the administrative record have not been withheld); *Amfac Resorts, L.L.C. v. United States Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (In some circumstances, "the completeness of the record and the good faith behind it can only be grasped by looking beyond the record itself.  Thus, in these circumstances, the only way a non-agency party can demonstrate to a court the need for extra-record judicial review is to first obtain discovery from the agency."); *see also Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (the fact that "agency action is not adequately explained in the record before the court" warrants inquiry into the facts and circumstances surrounding an agency's decision making); *see also Fund For Animals v. Williams*, 391 F. Supp. 2d 191, 198  (D.D.C. 2005) (development of the facts beyond the administrative record is appropriate when "the record is so bare that it prevents effective judicial review'") (citations omitted).  The government has refused to allow discovery unless and until ordered to do so by this Court.

relevant to such a determination.[22]  The government's failure to provide notice and an

opportunity to be heard on these issues thus plainly precludes the granting of the government's

motion for summary judgment with respect to the ruling that "renewal of the HAVANA CLUB

trademark under these circumstances would be prohibited unless specifically licensed."[23]

### C.    The Government Is Not Entitled To Summary Judgment Affirming Its Denial Of A Specific License To Renew The HAVANA CLUB Registration

#### 1.    OFAC's Decision Lacks An Adequate Explanation And Contradicted Its Earlier Decisions

Like OFAC's opaque ruling concerning the general license, OFAC's one-sentence

explanation for its decision not to grant a specific license for the renewal of the HAVANA

CLUB registration ("We have received guidance from State informing us that it would be

inconsistent with U.S. policy to issue a specific license authorizing transactions related to the

renewal of the HAVANA CLUB trademark.") falls woefully short of the APA's requirement of a

reasoned explanation.  AR 1. *See Kamargo Corp.*, 852 F.2d at 1397 (requiring the Commission

to provide a justification for its decision rather than offering conclusory statements that its

decision was in its discretion, an assertion of the public interest, and in keeping with the

---

[22] The government suggests that "Cubaexport could have argued that it was entitled to rely on the general licensing provision," but "did not make these arguments directly to OFAC, instead choosing only to copy the agency on the correspondence [with the PTO]."  Mem. 26.  First, that is a distinction without a difference.  Second, as Cubaexport advised the PTO (and OFAC), Cubaexport could not have litigated the applicability of the General License in the PTO and sought to do so in court.  Finally, OFAC's failure to provide Cubaexport with due process only confirms how ill equipped the agency is to give Cubaexport its "day in court" on that issue.  The government is contending that Cubaexport waived its right to notice and an opportunity to be heard on the applicability of the General License; that contention is without merit.  *See United States v. Local 1804-1 Int'l Longshoreman's Ass'n*, 44 F.3d 1091, 1098 n.4 (2d Cir. 1995) ("constitutional rights" may be waived only where the "wavier is voluntary, knowing and intelligent") (citations omitted); *United States v. Karake*, 443 F. Supp. 2d 8, 89 (D.D.C. 2006) ("It remains the government's burden to prove by a preponderance of the evidence that defendant waived his rights under the Fifth Amendment.") (quotation and citation omitted).

[23] As discussed below in connection with Cubaexport's Due Process claim, it is highly questionable whether OFAC could provide Cubaexport an opportunity to be heard on the question whether the General License is applicable to the HAVANA CLUB trademark.

governing statute).  Notably, OFAC did not explain the nature of the "guidance" OFAC received

from the State Department or the nature of the "U.S. policy" referred to in the ruling.[24]

Moreover, OFAC's decision does not even mention, much less address, the fact that

denial of a license to renew the registration would be inconsistent with the agency's repeated

grant of a license to defend the registration in litigation, as noted in Cubaexport's April 7, 2006

letter to OFAC.[25]  *See Am. Airways*, 746 F.2d at 874 n.17 (overturning OFAC decision

representing "a sharp departure from prior practice" in absence of adequate explanation); *see

also, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29

(1983) (holding that NHTSA's rescission of passive restraint requirements was arbitrary and

capricious in the absence of adequate explanation for rescinding requirement); *Ramaprakash v.

Fed. Aviation Admin.*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) ("Agencies are free to change

course . . . but when they do so they must provide a 'reasoned analysis indicating that prior

policies and standards are being deliberately changed, not casually ignored.'") (citation omitted);

*Mobile Commc'ns Corp.*, 77 F.3d at 1407 (same); *Muwekma Ohlone Tribe v. Kempthorne*, 452 F.

Supp. 2d 105, 117 (D.D.C. 2006) (remanding so that the agency could explain why it chose to

exercise its discretion to Muwekma's detriment).

## 2.    OFAC's Post Hoc Justifications For Its Decision Are Unavailing

According to the government's brief, the July 28, 2006 Letter reflects the following "U.S.

policies," as articulated by the State Department (Mem. 38):

First, the State Department concluded that denial of a specific license would be
consistent with "the U.S. approach toward non-recognition of trademark rights

---

[24] In a further mystery, OFAC's July 28, 2006 Letter notes that "OFAC has been engaged in consultation with
relevant agencies in the U.S. Government, including the Department of State ('State')," but fails to identify the other
"relevant agencies" and refers only to "guidance from State" in its one-sentence explanation for its decision.  AR 1.

[25] The brevity of OFAC's explanation of its decision is suggestive of an abbreviated decision making process.
Indeed, OFAC issued its ruling on the very same day that the State Department gave its advice, leading to the
inference that OFAC's consideration of the matter was brief in the extreme.  *See* AR 2-3 (memorandum from State
faxed to OFAC at 11:17 a.m. on July 28, 2006).

associated with confiscated property."  AR 2.  Second, to the extent that the
Cuban government continues to place value in the Havana Club mark, the State
Department concluded that denial of a license would be consistent with "the
policy of the United States to deny resources to the Castro regime."  AR 3.

These supposed policies, however, are not identified in OFAC's July 28, 2006 Letter and thus

may be disregarded by the Court as purely post-hoc rationales.  *See, e.g., Commc'ns & Control*,

374 F.3d at 1337; *Sierra Club*, 167 F.3d at 665.

     In any event, the government's reliance on the cited policies is misplaced.  The first

policy (namely, "the U.S. approach toward non-recognition of trademark rights associated with

confiscated property") is relevant only if the HAVANA CLUB trademark was, in fact,

confiscated.  For all the reasons set forth in Part II.B above, however, the government was not

entitled to assume that fact and was required to support any such factual finding and to provide

Cubaexport with notice and an opportunity to be heard on the matter.[26]

     As for the second policy ("to deny resources to the Castro regime"), neither the State

Department nor OFAC provides any explanation for why it was necessary to destroy

*Cubaexport's* registration to deny resources to the *Castro regime*.  Moreover, there is a profound

difference between "denying resources" through, for example, "blocking" assets and *destroying*

*property*, and it has long been understood that TWEA authorizes *only* the former, not the latter.

*See Am. Airways*, 746 F.2d at 874 (OFAC's authority under the TWEA "extends only to the

freezing or blocking of AAC's assets and the licensing of ... transactions; OFAC has no authority

... to vest [i.e., confiscate]... assets"); *Nielsen*, 424 F.2d at 841 n.19 (same); *see also Regan v.*

*Ward*, 468 U.S. 222, 227-28 & n.8 (1984) (holding that, since 1977, when the "TWEA was

---

[26] Moreover, it is unclear why the fact of "confiscation," even if properly established, would require OFAC to deny a
specific license for renewal of the HAVANA CLUB registration.  The government points to Section 211, but that
provision, as the government elsewhere acknowledges, only addresses the applicability of the general license for
registrations, not OFAC's self-described "wide discretion" to issue specific licenses where the general license is
inapplicable.  See *supra*  12-13; Mem. 22.  OFAC did not explain the connection between Section 211 and its
decision regarding the specific license.

amended to limit the President's power to act pursuant to that statute solely to times of war," the President's power to respond to peace time emergencies has been governed by the International Emergency Powers Act ("IEEPA"), which "does not include the power to vest (*i.e.*, to take title to) foreign assets").

The Cuban Embargo worked no change to this authority. Indeed, even at the height of tensions between the U.S. and Cuba, U.S. policy focused on the *preservation* of the assets of Cuban nationals and permitted them to register and renew the registrations of their trademarks. The State Department, in 1965, advised Congress that:

> "The vesting and sale of Cuban property could set an unfortunate example for countries less dedicated than the United States to the preservation of property rights. The Government of the United States, as a matter of policy, encourages the investment of American capital overseas and endeavors to protect such investment against nationalization, expropriations, intervention, and taking."

*Nielsen*, 424 F.2d at 841 n.19 (*quoting* accompanying report by U.S. Senate Committee on Foreign Relations to Pub. L. No. 89-262, 79 Stat. 988 (Oct. 19, 1965)).

In any case, OFAC acted pursuant to Section 211, not its TWEA authority. Instead of destroying the registration, OFAC could have explained to the State Department that this concern had already been addressed - within the scope of OFAC's authority - by blocking the transfer of the registration for consideration. *See Miranda v. Sec'y of the Treasury*, 766 F.2d 1, 4 (1st Cir. 1985) (distinguishing between blocking and vesting and stating that the CARC limits funds for Cuba "by prohibiting, unless licensed by the Secretary, the transfer, sale or other disposition of assets in which the Cuban government or Cuban nationals have an interest"); *Havana Club Holding*, 974 F. Supp. at 310 (limiting funds for Cuba is achieved by barring the transfer of a trademark registration, which "creates the opportunity for an individual or corporation to purchase the registration," whereas the "renewal of a trademark, as authorized by the general

license, will generally not promote the flow of funds into Cuba. In such a transaction, an individual or a corporation simply seeks to ... renew protection of a trademark").

### 3. It Was Unreasonable For OFAC To Deny A License To Renew The HAVANA CLUB Registration After Previously Authorizing Its Defense, At Great Cost

The government asserts that OFAC had "wide discretion" to issue a specific license to renew the HAVANA CLUB registration. Mem. 22. Although the government exhorts the Court to show substantial deference to OFAC's exercise of that discretion, the Court is not obliged to accept manifestly unreasonable or inconsistent rulings by the agency. *See*, *e.g.*, *Commc'ns & Control, Inc.*, 374 F.3d at 1336; *Entergy Servs., Inc.*, 375 F.3d at 1209. After having repeatedly authorized the defense of the HAVANA CLUB registration in the cancellation litigation, it was inconsistent and unreasonable for OFAC to deny authorization to effect a renewal necessary to preserve the *res* at issue in that litigation. *See, e.g., Commc'ns & Control, Inc.*, 374 F.3d at 1336; *Mobile Commc'ns Corp.*, 77 F.3d at 1407.

## III. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON CUBAEXPORT'S CLAIMS UNDER THE FIFTH AMENDMENT

### A. Cubaexport Has Standing To Assert Its Constitutional Claims

The government moves for dismissal of Cubaexport's Fifth Amendment claims under Federal Rule of Civil Procedure 12(b)(1), contending that Cubaexport lacks standing to assert those claims. Although the government correctly states the test for standing – the plaintiff may not be an agent of its government, and it must have a substantial connection to the United States, (Mem. 15, 18-19) – Cubaexport easily satisfies this test.

### 1. Cubaexport Is Not An Agent Of The Cuban Government

Under the cases cited by OFAC itself, the mere fact that Cubaexport is a government-owned company does not deprive it of standing to assert its Fifth Amendment claims. "A government instrumentality 'established as [a] juridical entit[y] distinct and independent from

-32-

[its] sovereign should normally be treated as such'; thus, it is presumed to have legal status separate from that of the sovereign." *Transamerica Leasing, Inc. v. La Republica de Venez.*, 200 F.3d 843, 847 (D.C. Cir. 2000) (entity chartered by state in which state maintained a majority interest had standing to sue) (*quoting First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627 (1983)). That presumption may be overcome only "'where a corporate entity ... so extensively control[s] ... [the instrumentality] that a relationship of principal and agent is created.'" *Transamerica Leasing*, 200 F.3d at 848 (citation omitted).

The government has not and cannot overcome this presumption. As the Declaration of Cubaexport's Managing Director Francisco Santiago Pichardo ("PD") makes clear, "Cubaexport was established as an entity distinct and independent from the Republic of Cuba." PD ¶ 5. Since its establishment by Resolution, Cubaexport has acted in accordance with that Resolution, which authorizes it to engage in commercial operations, not government functions. PD ¶¶ 5-6. Cubaexport enters into contracts in its own name, and not as an agent for the Republic of Cuba or any other entity. Cubaexport pays taxes to Cuba. And it was Cubaexport, not Cuba, that applied for and owned the HAVANA CLUB trademark registration. PD ¶¶ 7-9.[27]

### 2. Cubaexport Has A Substantial Connection To The United States

Foreign entities are entitled to constitutional protection when they have established "substantial connections" with the United States. *Nat'l Council of Resistance of Iran*, 251 F.3d at 201-02. Cubaexport's ownership of valuable property in the form of the HAVANA CLUB Registration alone establishes sufficient "connections." As the Second Circuit stated in *Sardino v. Fed. Reserve Bank of N.Y.*, 361 F.2d 106, 111 (2d Cir. 1966), a case involving a Cuban national's $7000 bank account:

---

[27] None of the four cases at Mem. 17-18, which refer to Cubaexport, supports a different conclusion. None engaged in any factual analysis whatsoever with respect to the relationship between the Cuban State and Cubaexport – which was not even a party to three of the cases.

> The Government's . . . answer that "The Constitution of the United States confers no rights on non-resident aliens" is so patently erroneous in a case involving property in the United States that we are surprised it was made. . . . [T]he Court has declared unequivocally, with respect to non-resident aliens owning property within the United States, that they "as well as citizens are entitled to the protection of the Fifth Amendment."[28]

*Id.* at 111 (*quoting United States v. Pink*, 315 U.S. 203, 228 (1942)).

The government nonetheless suggests, without citing any authority, that OFAC may deprive Cubaexport of due process because OFAC is entitled under the TWEA to regulate Cubaexport's conduct. Mem. 19. The government is wrong. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 161 (1951) ("'[T]his Court has never held . . . that administrative officers . . . may disregard the fundamental principles that inhere in "due process of law" as understood at the time of the adoption of the Constitution.'") (citation omitted); *Am. Airways*, 746 F.2d at 872 (OFAC decisions must take into account "due process concerns"). Moreover, it is disingenuous given OFAC's decade-long practice of authorizing Cubaexport and HCH to defend their property at great cost.

### B.    The Government Is Not Entitled To Summary Judgment As To Cubaexport's Procedural Due Process Claim

The government correctly states the elements of a procedural Due Process claim: "the existence of a protected property interest as well as a violation of the procedural protections that were due." Mem. 20 (*citing Orange v. Dist. of Columbia*, 59 F.3d 1267, 1273 (D.C. Cir.

---

[28] By contrast, in the case on which the government puzzlingly relies, "no United States financial institutions held any of [plaintiffs'] property," and the court held that "[a] foreign entity *without property or presence in this country* has no constitutional rights, under the due process clause." *People's Mojahedin Org. of Iran v. United States Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) (emphasis added). The government also is incorrect when it implies (Mem. 19, n.7) that Cubaexport has no Fifth Amendment rights because it is an "enemy alien" and that it is therefore not entitled to the protections of the Takings Clause. *See Lopez v. USINS*, 758 F.2d 1390, 1393 (10th Cir. 1985) ("[A]n alien's property may not be taken without just compensation, absent a state of war existing between the alien's country and the United States.") (citation omitted). Barring war, entities based in disfavored nations have standing to bring constitutional claims. *See Nat'l Council of Resistance of Iran*, 251 F.3d at 201-02 (Iranian organization had "substantial connections").

1995)); *accord PDK Labs, Inc. v. Reno*, 134 F. Supp. 2d 24, 32 (D.D.C. 2001). The government

argues that neither element is satisfied in this case. The government is mistaken.

### 1.    Cubaexport Has A Protected Property Interest

The government contends that Cubaexport's procedural due process claim fails because

"Cubaexport's unilateral expectation of a license from OFAC to permit transactions related to the

renewal of the Havana Club trademark does not constitute a property interest protected by the

Fifth Amendment." The deprivation in question, however, was *not* the mere withholding of a

license, but rather, the loss of the legitimate entitlement conferred by settled *trademark rights* of

long standing. As the government concedes, trademarks are protected by the Due Process

Clause. Mem. 21 (*citing College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,

527 U.S. 666, 673 (1999)); *see also Havana Club Holding*, 974 F. Supp. 302 (the HAVANA

CLUB registration is a "substantial right[] of Cubaexport."); 31 C.F.R. § 515.311(a) (OFAC

regulations defining "property" to include "trademarks").

The government contends that OFAC's denial of authorization to renew a trademark

registration is meaningfully distinct from a taking of that trademark:

> OFAC did not appropriate the Havana Club trademark from Cubaexport or
> retroactively negate a prior registration of the trademark. Rather, OFAC declined
> to grant Cubaexport a license for transactions related to renewal of the trademark
> with the PTO. This is an important distinction, as it narrows the due process
> inquiry to whether Cubaexport had a Fifth Amendment property interest in the
> grant of such a license.

Mem. 21.

This contention is pure sophistry. Pursuant to the Trademark Act, renewal of a trademark

registration is a non-discretionary entitlement when ministerial actions (namely submission of

the application and fee payment) are taken. 15 U.S.C. § 1059. The PTO stated that without

authorization to take such actions (either in the form of a general license or a specific license),

"the registration will be cancelled/expired." Compl. Ex. 24.

Moreover, the government cannot plausibly deny that the cancellation of the HAVANA CLUB registration was the very result that was expected and intended when OFAC denied authorization for renewal. As the government explains, OFAC's decision was intended to implement "'the U.S. approach toward non-recognition of trademark rights associated with confiscated property,'" Mem. 13 (citing AR 2), and "'the policy of the United States to deny resources to the Castro regime,'" Mem. 13 (citing AR 3). Presumably, that is why OFAC "consulted with" the State Department regarding the renewal of registration, AR 1, and why OFAC directly advised the PTO on April 6, 2006, that the existing Specific License did not authorize that renewal, and directly advised the PTO on July 28, 2006, that OFAC had denied the request for a specific license and that "renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed."

The government cannot have it both ways. It cannot attempt to justify its decision to withhold authorization to renew the HAVANA CLUB registration on the basis that "U.S. policy" is antithetical to the underlying trademark rights at stake, and then attempt to shield itself from a due process claim on the basis that it merely denied a *license to renew*, rather than nullifying a trademark registration.

Moreover, even if the loss of the trademark were disregarded, which it should not be, it is not the case that Cubaexport had a mere "unilateral expectation" of a license for renewal of the HAVANA CLUB registration. Cubaexport had *existing* license rights and reasonable expectations of the continuation of those rights. In particular, through the renewal in 1996, the registration had been maintained pursuant to the General License. Even after the passage of Section 211, Cubaexport had received OFAC licenses. These included the Specific License, under which Cubaexport had incurred substantial sums to defend the HAVANA CLUB registration and which Cubaexport reasonably believed to authorize renewal of that registration.

They also included the General License to renew its HAVANA CLUB registration absent a proper determination that 31 C.F.R. § 515.527(a)(2) applied to Cubaexport's registration. *See* AR 83-84.

These licenses gave rise to "legitimate entitlements" not mere "unilateral expectations." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972); *3883 Conn. LLC v. Dist. of Columbia*, 336 F.3d 1068, 1071-73 (D.C. Cir. 2003) (reversing the district court's decision because it "overlooked" the fact that the plaintiff was a holder of – not an applicant for – a license); *Jones v. City of Modesto*, 408 F. Supp. 2d 935, 950 (E.D. Cal. 2005) ("[I]f the governing statute directs that a license shall be granted or renewed upon compliance with certain criteria, none of which involve the exercise of discretion by the reviewing body, the licensee has a property right in the re-issuance of the license." (citation omitted)).[29]

## 2.    OFAC Failed To Afford Cubaexport Due Process

Notice and a "meaningful opportunity" to be heard on the decisive issues are the minimum foundations of due process. *See, e.g.*, *Nat'l Council of Resistance of Iran*, 251 F.3d at 208; *PMD Produce Brokerage Corp. v. United States Dep't. of Agriculture*, 234 F.3d 48 (D.C. Cir. 2000). No extended analysis is needed in this case to determine whether these requirements were met: on the dispositive issues of whether the HAVANA CLUB trademark was "confiscated" and whether consent was given to the registration renewal, OFAC provided *no* notice and *no* meaningful opportunity to be heard. *See supra* at 27-28; *Am. Airways*, 746 F. 2d at 876 (Greene, J. concurring) ("[A] corporation is summarily designated by a government agency [OFAC] as a 'Cuban national,' but it is not allowed effectively to defend itself against that

---

[29] The cases OFAC relies upon at Mem. 21-22 are inapposite. They address only asserted property interests in licenses or annuities that were contingent upon agency discretion from the moment they were issued and throughout their existence. *See, e.g., Bloch v. Powell*, 348 F.3d 1060 (D.C. Cir. 2003) (annuity); *Thornton v. City of St. Helens*, 425 F.3d 1158 (9th Cir. 2005) (license); *Lopez v. FAA*, 318 F.3d 242 (D.C. Cir. 2003) (license); *Tuchman v. Conn.*, 185 F. Supp. 2d 169 (D. Conn. 2002) (permit); *Universal Sanitation Corp. v. Trade Waste Comm'n of City of N.Y.*, 940 F. Supp. 656, 661 (S.D.N.Y. 1996) (agency waiver of contract requirement).

designation....  If there are precedents in American law to such circular processes, they have not been pointed out to us."). [30]

The government seeks to excuse its cursory treatment of this matter on the basis of "OFAC's need for prompt action in the context of the TWEA."  Mem. 23.  That is no justification at all.  OFAC did not act pursuant to the TWEA.  Even if it had, that would not justify OFAC's actions.  *See Am. Airways*, 746 F.2d at 875-76 ("We are a constitutional regime in which even emergency power is subject to limitations under our highest law.").  Mem. 23.  Nor did it act promptly - taking months to render its truncated rulings as the renewal term for Cubaexport's registration wound down.  Finally, this Court need not delve into foreign policy matters to conclude that Bacardi's interest in extinguishing Cubaexport's 30-year registration created no public emergency that might require prompt action.

As a final matter, it is highly questionable whether OFAC can afford meaningful due process.  Although Congress, in Section 211, directed OFAC to "promulgate such rules and regulations as are necessary to carry out the provisions of this legislation," OFAC has promulgated no regulations governing the determination of whether a trademark that is the subject of a specific registration or renewal application is "the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated" or whether "the original owner of the mark, trade name, or commercial name, or the *bona fide* successor-in-interest has expressly consented" to the registration or renewal of the registration.  Moreover, because these questions turn on the facts and events as

---

[30] The government's suggestion that Cubaexport waived these Due Process requirements is misplaced, as such a waiver may be effected only by a "voluntary, knowing, and intelligent" act.  *See Local 1804-1 Int'l Longshoreman's Ass'n*, 44 F.3d at 1098 n.4 ("constitutional rights" may be waived only where the "waiver is voluntary, knowing, and intelligent") (citations omitted).  Likewise misplaced is the government's suggestion that the lack of due process could be justified here on national security grounds.  Renewal of Cubaexport's trademark registration could hardly pose a credible threat to the United States' security.  Indeed, by 1977, Congress had concluded that not even the Cuban Government itself posed such a threat.  *See supra*, 30-31.

much as a half-century old, and because those alleged events involved third parties (including the "original owner" and the Cuban Government), a party's ability to make an adequate evidentiary presentation would depend, in part, on its right to take substantial discovery, including discovery directed at such third parties, and to compel testimony at a hearing. Nothing in the CACR suggests that OFAC is equipped to provide such judicial procedural safeguards even if it were to undertake to amend its regulations.

### C.   The Government Is Not Entitled To Summary Judgment As To Cubaexport's Substantive Due Process Claim

The Due Process Clause exists to protect "vested property rights" from being "compromised by retroactive legislation." *Landgraf v. USI Film Prods*., 511 U.S. 244, 266 (1994); *accord United States v. Carlton*, 512 U.S. 26, 30 (1994); *Nat'l Mining Ass'n v. Dep't. of Labor*, 292 F.3d 849, 859-60 (D.C. Cir. 2002). A statute operates retroactively when it "attaches new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 269-70. Retroactive laws implicate the Due Process Clause because they disregard "familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* at 270. As Justice Kennedy observed, in a comment applicable to this case, "retroactive lawmaking is a particular concern for the courts because of the legislative 'tempt[ation] to use retroactive legislation as a means of retribution against unpopular groups or individuals.'" *E. Enters. v. Apfel*, 524 U.S. 498, 548 (1998) (Kennedy, J. concurring) (*quoting* Landgraf, 511 U.S. at 266).

The government argues that Section 211 and the OFAC regulations implementing it only "prospectively denied Cubaexport's application to authorize future transactions related to the renewal of that mark" and thus should not be deemed retroactive. As the Supreme Court has explained, however, the ban on retrospective legislation embraced all statutes, which, *though operating only from their passage*, affected vested rights and past transactions." *See INS v. St. Cyr*, 533 U.S. 289, 324 (2001) (rejecting Government's argument that statutory grant of

"discretionary power to grant relief" means statute acts only prospectively).  That is plainly true of Section 211:  it imposes new and adverse legal consequences on ownership of a class of existing registered trademarks, prohibiting the renewal, judicial enforcement, or transfer of those registrations to any other party.

Moreover, the retroactivity is not insubstantial.  Section 211 defines the affected class of trademarks to include those that were "confiscated" at any time on or after January 1, 1959, some 39 years before the enactment, *see* 112 Stat. 2681 (incorporating definition of "confiscation" in C.F.R. § 515.336), even those trademarks that had been recognized under United States law for decades, as was the case with the HAVANA CLUB trademark.  *See E. Enters.*, 524 U.S. at 534 ("The distance into the past that the Act reaches back to impose a liability on Eastern and the magnitude of that liability raise substantial questions of fairness."); *Id.*, at 549 (Kennedy, J. concurring) (statute violated substantive due process rights because it retroactively "creat[ed] liability for events which occurred 35 years ago"); *United States. v. Ubaldo-Figueroa*, 364 F.3d 1042, 1052 (9th Cir. 2004) (Pregerson, J., concurring) (to pass constitutional muster, "the period of retroactivity must be moderate and 'confined to short and limited periods required by the practicalities of national legislation'" (*quoting United States v. Carlton*, 512 U.S. 26, 32 (1994)).

The government states that, to violate the Fifth Amendment's guarantee of substantive due process, a statute must be highly "arbitrary."  Mem. 27.  Invoking "Congress's desire to protect the integrity of intellectual property," the government contends that Section 211 and its implementing regulations are not arbitrary.  That argument does not withstand scrutiny because severe retroactivity *itself* is a form of arbitrariness sufficient to establish such a due process violation.[31]  *See E. Enters.*, 524 U.S. at 549, 550 (Kennedy, J., concurring) (reasoning that "in

---

[31] As the Supreme Court stated in *E. Enters.*, and as discussed further below, substantial retroactivity also may establish a taking.  *E. Enters.*, 524 U.S. at 528-29 (a taking occurs where legislation "imposes severe retroactive

creating liability for events which occurred 35 years ago the Coal Act has a retroactive effect of unprecedented scope," necessitating the conclusion that "[t]his case is far outside the bounds of retroactivity permissible under our law" and thus a violation of due process); *Ubaldo-Figueroa*, 364 F.3d at 1052 ("The Supreme Court limits retroactive statutes under the Due Process Clause as part of its longstanding 'prohibition against arbitrary and irrational legislation.'" (*quoting Carlton*, 512 U.S. at 30); *see also Landgraf*, 511 U.S. at 266 (noting that "a justification sufficient to validate a statute's prospective application under the [Due Process] Clause 'may not suffice' to warrant its retroactive application"); *Havana Club Holding*, 203 F.3d at 126 n.9 (Section 211 could be invoked to enjoin a *prospective* transfer of such a mark, but could "encounter retroactivity objections if applied . . . to invalidate a *prior* acquisition.").

### D.    The Government Is Not Entitled To Summary Judgment As To Cubaexport's Takings Claim

To establish its takings claim, Cubaexport must show that it had a protected property interest, the loss of which amounted to a compensable taking. *Chancellor Manor v. United States*, 331 F.3d 891, 901-02 (Fed. Cir. 2003). The Takings Clause is violated *per se* by regulatory actions that "completely deprive an owner of '*all* economically beneficial us[e]' of ... property'" without providing the property owner with just compensation. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (*quoting Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). As discussed above, Cubaexport's HAVANA CLUB registration is a protected property interest. Moreover, OFAC's actions have caused the complete loss of any and all economically beneficial use of the HAVANA CLUB registration: OFAC's actions directly

---

liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience").

The government quibbles that Section 211 "on [its] face" does not "den[y] any individual a right to property." Mem. 28 n.10. It is not clear what the government means by this, but it is immaterial because Cubaexport challenges the statute on its face and as applied. *See* Complaint 67, 68, 70. As the Supreme Court stated in *Landgraf*, "a justification sufficient to validate a statute's prospective application under the [Due Process] Clause 'may not suffice' to warrant its retroactive application." *Landgraf*, 511 U.S. at 266.

resulted in the cancellation of the registration, which in view of the Cuban embargo extinguishes all rights that the owner had while the registration was in force. A compensable *per se* taking has therefore occurred.

OFAC's threshold suggestion that Cubaexport takings claim should have been brought in the Court of Claims is incorrect. *See* Mem. 28-29. Cubaexport seeks only declaratory and injunctive relief, Compl. ¶¶ 20-21, and "it is within the district courts' power to award such equitable relief." *E. Enters*., 524 U.S. at 522; *accord Kidwell v. Dep't. of The Army Bd. for Corrections of Military Records*, 56 F.3d 279, 284 (D.C. Cir. 1995) ("[A]s long as the sole remedy requested is declaratory or injunctive relief that is not 'negligible in comparison' with the potential monetary recovery, we respect the plaintiff's choice of remedies and treat the complaint as something more than an artfully drafted effort to circumvent the jurisdiction of the Court of Federal Claims.") (citation omitted). The cases OFAC cites (Mem. 28-29) are inapposite because they concern "artful pleading" situations, where the plaintiff has masked a monetary claim to avoid Tucker Act jurisdictional limits. That is not the case here. Cubaexport straight-forwardly seeks declaratory and injunctive, but not monetary, relief.

The government next suggests that OFAC's actions should not be deemed a taking because "OFAC did not vest any property in the United States government." Mem. 30. The government does not cite any authority for the proposition that a regulatory taking requires that the government take *ownership* of property, and we are aware of no such authority. To the contrary, the very notion of a regulatory taking is that of an act by the government which, while not formally confiscating the property, nonetheless places sufficient burdens on its use to achieve the same effect. *Lingle*, 544 U.S. at 539 (aim of regulatory takings analysis is to "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain").

Citing the Federal Circuit's decision in *Paradissiotis v. United States*, 304 F.3d 1271 (Fed. Cir. 2002), the government broadly asserts that a taking cannot arise "in the economic sanctions context." Mem. 29. This is incorrect. *See Maritrans, Inc. v. United States*, 40 Fed. Cl. 790, 794-96 (Fed. Cl. 1998) (concluding that "heavy regulation" does not foreclose takings claims, and noting that *Chang v. United States*, 859 F.2d 893 (Fed. Cir. 1988) (cited at Mem. 29, 31 n.13), because it goes through *Penn Central* analysis, "is inconsistent with the Government's theory that heavy regulation mandates the foreclosure of inquiry at the first tier").

Moreover, *Paradissiotis* does not offer the government even modest support, as it presents decisively different facts from those at issue here. Paradissiotis, the director of a Libyan business corporation, lost the right to exercise blocked stock options as a result of actions he took *after* the pertinent, *broadly applicable* statute and regulations had come into existence. *See 767 Third Ave. Assocs. v. United S*tates, 48 F.3d 1575, 1581 (Fed. Cir. 1995) ("no taking occurs when, as occurred in this case, expectations under a contract are merely frustrated by lawful government action *not directed against the takings claimant*") (emphasis added). Here, as discussed above, Section 211 was enacted to target Cubaexport's registration. Further, Cubaexport did nothing *after* the passage of Section 211 to make it more likely that OFAC would seek to destroy its property. On the contrary, Cubaexport relied on OFAC's Specific License in vigorously defending its registration.

The government also argues that OFAC's actions did not "prohibit all economically viable uses of the trademark, as the trademark could still be used in Cuba or other countries where the mark has been recognized." The government fundamentally misunderstands the nature of trademarks. 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 29:1 (4th ed. 2006) ("Under the territoriality doctrine, a trademark is recognized as having a separate existence in each sovereign territory in which it is registered or legally recognized as a

mark.").  The property at issue in this case is not the Cuban trademark or any other foreign

trademark; it is the U.S. trademark, and that is the property that OFAC's actions have destroyed.

Moreover, even if the government were correct that OFAC's actions did not "prohibit all

economically viable uses of the trademark," that would not end the takings inquiry.  Rather,

OFAC's actions would still amount to a compensable taking pursuant to the considerations set

forth in *E. Enters.*, 524 U.S. at 522 (*citing Penn Cent. Transp. Co. v. N.Y. City*, 438 U.S. 104

(1978)).  Under the so-called *Penn Central* analysis, the principal considerations are (1) the

economic impact of the regulation on the claimant; (2) the extent to which the regulation has

interfered with distinct investment-backed expectations; and (3) the character of the

governmental action.  *See E. Enters.*, 524 U.S. at 523.[32]

The government does not address the *Penn Central* considerations, but OFAC's actions

plainly would qualify as a taking if those considerations were applied here.  It is beyond dispute

that OFAC's actions have had an economic impact on Cubaexport.  Moreover, OFAC

indisputably interfered with Cubaexport's investment-backed expectations in the continuation of

its three-decade old trademark registration – expectations that were reinforced by OFAC's

granting of numerous licenses enabling Cubaexport to maintain that registration, even after the

passage of Section 211, when OFAC repeatedly authorized the defense of the registration, at

great expense, in the cancellation proceedings initiated by Bacardi.  OFAC itself induced

Cubaexport to expend great sums.

As for the character of the government's actions, they are, as demonstrated above, highly

retroactive and therefore suspect.  *See E. Enters*, 524 U.S. at 534 (finding that retroactive statute

constitutes an impermissible taking because, in part, "[t]he distance into the past that the Act

_____

[32] These factors are not exclusive.  Ultimately, the "inquiry, by its nature, does not lend itself to any set formula . . . and the determination whether justice and fairness require that economic injuries caused by public action must be compensated . . . is essentially ad hoc and fact intensive."  *E. Enters.,* 524 U.S. at 523 (quotations and citations omitted).

reaches back to impose a liability on Eastern and the magnitude of that liability raise substantial

questions of fairness").  Finally, OFAC's actions effectively decided a pending private litigation

over ownership of the HAVANA CLUB registration now pending before Judge Sullivan who

can and should decide the issues at the heart of this private commercial trademark dispute.  *See*

*Kelo v. City of New London, Conn.,* 545 U.S. 469, 477 (2005) (the government "would no doubt

be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a

particular private party"); *Am. Airways*, 746 F.2d at 874 n.15 (overturning OFAC decision that

would preclude plaintiff from litigating its rights in court).

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should deny OFAC's motion to dismiss, or in the

alternative, for summary judgment, and grant Cubaexport's motion for summary judgment on its

APA claim.

Dated:  March 16, 2007                                  Respectfully submitted,

*/s/ Peter M. Brody*
Peter M. Brody (D.C. Bar No. #398717)
ROPES & GRAY LLP
One Metro Center
700 12th Street, N.W.
Washington, D.C.  20005
Tel. (202) 508-4600
Fax. (202) 508-4650

Herbert F. Schwartz
Vincent N. Palladino
Eric R. Hubbard
Pablo D. Hendler
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York  10036
Tel. (212) 596-9000
Fax. (212) 596-9090

*Counsel for Plaintiff,*
*Empresa Cubana Exportadora de Alimentos y*
*Productos Varios, d/b/a Cubaexport*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................ 1

STATEMENT OF FACTS ............................................................................. 6

A.   OFAC's General License For Trademark Registrations And Renewals ................... 6

B.   Cubaexport's HAVANA CLUB Registration ............................................. 7

C.   Bacardi's Unsuccessful Campaign To Wrest Ownership Of The  U.S. Rights
     To The HAVANA CLUB Trademark From Cubaexport ......................................... 8

D.   Bacardi's Procurement Of Section 211 .................................................. 10

E.   OFAC Promulgates A Regulation Implementing Section 211 ............................... 12

F.   Bacardi's Attempt To Pressure The PTO Through *Ex Parte* Contacts ................... 13

G.   OFAC's Repeated Grant Of Specific Licenses To Enable Cubaexport  To
     Defend Its Trademark Registration Against Bacardi's Challenge ......................... 15

H.   OFAC's April 6, 2006 And July 28, 2006 Rulings Denying  Authorization To
     Renew The HAVANA CLUB Registration ................................................. 15

I.   The Cancellation of The HAVANA CLUB Registration ...................................... 17

ARGUMENT ................................................................................................ 18

I.    THE GOVERNMENT'S MOTION TO DISMISS CUBAEXPORT'S  CLAIMS
      UNDER FED. R. CIV. P. 12(B)(6) SHOULD BE DENIED  BECAUSE IT
      SUBSTANTIALLY RELIES ON FACTS BEYOND  THOSE SET FORTH IN
      THE COMPLAINT ............................................................................. 18

II.   THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON
      CUBAEXPORT'S CLAIM UNDER THE ADMINISTRATIVE PROCEDURE
      ACT, AND CUBAEXPORT IS ENTITLED TO SUMMARY JUDGMENT ................. 19

      A.   OFAC Erred In Ruling That The Specific License  Does Not Authorize The
           Renewal Of The HAVANA CLUB Registration ...................................... 20

      B.   The Government Is Not Entitled To Summary Judgment Affirming OFAC's
           Ruling That "Renewal Of The HAVANA CLUB Trademark Under These
           Circumstances Would Be Prohibited Unless Specifically Licensed" ................... 22

           1.   OFAC Failed To State, Or Make, The Requisite  Factual Findings
                That Would Justify Its Ruling ............................................... 22

           2.   The Government's Post Hoc Justifications Are Unavailing ....................... 24

3.    OFAC Failed To Give Cubaexport Notice And An Opportunity To Be Heard On The Factual Issues Relevant To The Question Whether The General License Authorizes Renewal Of The HAVANA CLUB Registration ...................................... 27

C.    The Government Is Not Entitled To Summary Judgment Affirming Its Denial Of A Specific License To Renew The HAVANA CLUB Registration .................. 28

1.    OFAC's Decision Lacks An Adequate  Explanation And Contradicted Its Earlier Decisions ................................. 28

2.    OFAC's Post Hoc Justifications For Its Decision Are Unavailing ................. 29

3.    It Was Unreasonable For OFAC To Deny A License  To Renew The HAVANA CLUB Registration After  Previously Authorizing Its Defense, At Great Cost ............................................. 32

III.    THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON CUBAEXPORT'S CLAIMS UNDER THE FIFTH AMENDMENT ....................... 32

A.    Cubaexport Has Standing To Assert Its Constitutional Claims............................... 32

1.    Cubaexport Is Not An Agent Of The Cuban Government............................ 32

2.    Cubaexport Has A Substantial Connection To The United States................. 33

B.    The Government Is Not Entitled To Summary Judgment As To Cubaexport's Procedural Due Process Claim .................................................................. 34

1.    Cubaexport Has A Protected Property Interest .............................................. 35

2.    OFAC Failed To Afford Cubaexport Due Process ........................................ 37

C.    The Government Is Not Entitled To Summary Judgment  As To Cubaexport's Substantive Due Process Claim .................................................................... 39

D.    The Government Is Not Entitled To Summary Judgment As To Cubaexport's Takings Claim............................................................................................... 41

CONCLUSION...................................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*767 Third Ave. Assocs. v. United States,*
48 F.3d 1575 (Fed. Cir. 1995)..................................................................43

*3883 Conn. LLC v. Dist. of Columbia,*
336 F.3d 1068 (D.C. Cir. 2003) ..............................................................37

*Ala. Rivers Alliance v. FERC,*
325 F.3d 290 (D.C. Cir. 2003) ................................................................25

*Am. Airways Charters, Inc. v. Regan,*
746 F.2d 865 (D.C. Cir. 1984).............................................6, 22, 29, 30, 34, 37, 38, 45

*Amfac Resorts, L.L.C. v. United States Dep't of the Interior,*
143 F. Supp. 2d 7 (D.D.C. 2001) .............................................................27

*Bd. of Regents of State Colls. v. Roth,*
408 U.S. 564 (1972)................................................................................37

*Bloch v. Powell,*
348 F.3d 1060 (D.C. Cir. 2003) ..............................................................37

*Chamber of Argentine-Paraguayan Producers of Quebracho Extract v. Holder,*
332 F. Supp. 2d 43 (D.D.C. 2004) ..........................................................23

*Chancellor Manor v. United States,*
331 F.3d 891 (Fed. Cir. 2003)................................................................41

*Chang v. United States,*
859 F.2d 893 (Fed. Cir. 1988)................................................................43

*Citizens To Preserve Overton Park v. Volpe,*
401 U.S. 402 (1971)................................................................................24

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
383 F. Supp. 2d 123 (D.D.C. 2005), *aff'd,* 466 F.3d 134 (D.C. Cir. 2006) ................21

*Commc'ns & Control, Inc. v. FCC,*
374 F.3d 1329 (D.C. Cir. 2004).................................................21, 24, 30, 32

*Dickson v. Sec'y of Defense,*
68 F.3d 1396 (D.C. Cir. 1995) ................................................................21

(iii)

*Duggan v. Bowen*,
  691 F. Supp. 1487 (D.D.C. 1988) ..............................................................................22

*E. Enters. v. Apfel*,
  524 U.S. 498 (1998) ..........................................................................39, 40, 42, 44

*Entergy Servs., Inc. v. Fed. Energy Regulatory Comm'n*,
  375 F.3d 1204 (D.C. Cir. 2004) ..........................................................................21, 32

*Esch v. Yeutter*,
  876 F.2d 976 (D.C. Cir. 1989) ..............................................................................27

*Fund For Animals v. Williams*,
  391 F. Supp. 2d 191 (D.D.C. 2005) ..........................................................................27

*Galleon, S.A. v. Havana Club Holding, S.A.*,
  Cancellation No. 92024108, 2004 TTAB LEXIS 38 (TTAB Jan. 29, 2004) ....9, 10, 14

*Havana Club Holding, S.A. v. Galleon, S.A.*,
  203 F.3d 116 (2d Cir. 2000) ..........................................................................25, 41

*Havana Club Holding, S.A., v. Galleon, S.A.*,
  974 F. Supp. 302 (S.D.N.Y. 1997) ..........................................................10, 25, 31, 35

*Havana Club Holdings, S.A. v. Galleon, S.A.*,
  62 F. Supp. 2d 1085 (S.D.N.Y. 1999), *aff'd*, 203 F.3d 116 (2d Cir. 2000) ................26

*Hispanic Info. & Telecomms. Network, Inc. v. FCC*,
  865 F.2d 1289 (D.C. Cir. 1989) ..............................................................................20

*Hurst v. Socialist People's Libyan Arab Jamahiriya*,
  No. Civ. A. 02 02147, 2007 WL 274321 (D.D.C. Feb. 1, 2007) ................................19

*In re Goodyear Tire & Rubber Co.*,
  Claim No. CU-0887 Decision No. CU-887, 1972 *Ann. Rept.* 367 ............................25

*INS v. St. Cyr*,
  533 U.S. 289 (2001) ..............................................................................39

*Jet Inv., Inc. v. Dep't of the Army*,
  84 F.3d 1137 (9th Cir. 1996) ..............................................................................22

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
  341 U.S. 123 (1951) ..............................................................................34

*Jones v. City of Modesto,*
    408 F. Supp. 2d 935 (E.D. Cal. 2005)........................................................37

*Kamargo Corp. v. Fed. Energy Reg. Comm'n,*
    852 F.2d 1392 (D.C. Cir. 1988)..........................................................21, 28

*Kelo v. City of New London, Conn.,*
    545 U.S. 469 (2005)...........................................................................45

*Kidwell v. Dep't. of The Army Bd. for Corrections of Military Records,*
    56 F.3d 279 (D.C. Cir. 1995)..............................................................42

*Landgraf v. USI Film Prods.,*
    511 U.S. 244 (1994).......................................................................39, 41

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005).......................................................................41, 42

*Lopez v. FAA,*
    318 F.3d 242 (D.C. Cir. 2003)............................................................37

*Lopez v. USINS,*
    758 F.2d 1390 (10th Cir. 1985) ..........................................................34

*Lozowski v. Mineta,*
    292 F.3d 840 (D.C. Cir. 2002) ........................................................5, 23

*Lucas v. S.C. Coastal Council,*
    505 U.S. 1003 (1992).........................................................................41

*Maritrans, Inc. v. United States,*
    40 Fed. Cl. 790 (Fed. Cl. 1998) .........................................................43

*Miranda v. Sec'y of the Treasury,*
    766 F.2d 1 (1st Cir. 1985)...................................................................31

*Mobile Commc'ns & Corp. v. FCC,*
    77 F.3d 1399 (D.C. Cir. 1996)..................................................21, 29, 32

*Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).............................................................................29

*Muwekma Ohlone Tribe v. Kempthorne,*
    452 F. Supp. 2d 105 (D.D.C. 2006) ....................................................29

*NAACP v. NAACP Legal Defense & Educ. Fund*,
   753 F.2d 131 (D.C. Cir. 1985) ................................................................................26

*Nat'l Council of Resistance of Iran v. Dep't of State*,
   251 F.3d 192 (D.C. Cir. 2001) ..........................................................5, 27, 33, 34, 37

*Nat'l Mining Ass'n v. Dep't. of Labor*,
   292 F.3d 849 (D.C. Cir. 2002) ................................................................................39

*Natural Resources Defense Council v. Train*,
   519 F.2d 287 (D.C. Cir. 1975) ................................................................................27

*Nielsen v. Sec'y of the Treasury*,
   424 F.2d 833 (D.C. Cir. 1970) ......................................................................2, 30, 31

*PDK Labs, Inc. v. Reno*,
   134 F. Supp. 2d 24 (D.D.C. 2001) ..........................................................................35

*PMD Produce Brokerage Corp. v. United States Dep't. of Agriculture*,
   234 F.3d 48 (D.C. Cir. 2000) ..................................................................................37

*Paradissiotis v. United States*,
   304 F.3d 1271 (Fed. Cir. 2002) ..............................................................................43

*Pension Benefit Guar. Corp. v. LTV Corp.*,
   496 U.S. 633 (1990) ..........................................................................................21, 24

*People's Mojahedin Org. of Iran v. United States Dep't of State*,
   182 F.3d 17 (D.C. Cir. 1999) ..................................................................................34

*Pro Fitness Physical Therapy Ctr. v. Pro-Fit Orthopedic*,
   314 F.3d 62 (2d Cir. 2002) ......................................................................................26

*Ramaprakash v. Fed. Aviation Admin.*,
   346 F.3d 1121 (D.C. Cir. 2003) ..............................................................................29

*Regan v. Ward*,
   468 U.S. 222 (1984) ................................................................................................30

*Rochon v. Gonzales*,
   438 F.3d 1211 (D.C. Cir. 2006) ..............................................................................19

*Sardino v. Fed. Reserve Bank of N.Y.*,
   361 F.2d 106 (2d Cir. 1966) ..............................................................................33, 34

*Sierra Club v. USEPA*,
    167 F.3d 658 (D.C. Cir. 1999) ..................................................................21, 24, 30

*Spawr Optical Research, Inc. v. Baldridge*,
    649 F. Supp. 1366 (D.D.C. 1986) ...............................................................25

*Thornton v. City of St. Helens*,
    425 F.3d 1158 (9th Cir. 2005) ....................................................................37

*Transamerica Leasing, Inc. v. La Republica de Venez.*,
    200 F.3d 843 (D.C. Cir. 2000) ...................................................................33

*Tuchman v. Conn.*,
    185 F. Supp. 2d 169 (D. Conn. 2002) ........................................................37

*Uncas Mfg. Co. v. Clark & Cooms Co.*,
    200 F. Supp. 831 (D.R.I. 1962), *aff'd on other grounds*,
    309 F.2d 818 (1st Cir. 1962) ......................................................................26

*United States v. Carlton*,
    512 U.S. 26 (1994)......................................................................................39

*United States v. Karake*,
    443 F. Supp. 2d 8 (D.D.C. 2006) ...............................................................28

*United States v. Local 1804-1 Int'l Longshoreman's Ass'n*,
    44 F.3d 1091 (2d Cir. 1995).................................................................28, 38

*United States. v. Ubaldo-Figueroa*,
    364 F.3d 1042 (9th Cir. 2004) ..............................................................40, 41

*Universal Sanitation Corp. v. Trade Waste Comm'n of City of N.Y.*,
    940 F. Supp. 656 (S.D.N.Y. 1996)..............................................................37

## FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 704 ...............................................................................................17

31 C.F.R. § 501.802........................................................................................17

31 C.F.R. § 515.311(a).....................................................................................35

31 C.F.R. §§ 515.317-.318................................................................................6

31 C.F.R. § 515.336(a)(1)................................................................................25

31 C.F.R. § 515.527 ...........................................................................7, 12, 13, 17, 23, 37

22 U.S.C. §1643b(a) .........................................................................................25

22 U.S.C. § 6023 (4) .........................................................................................25

15 U.S.C. § 1058(b) ...........................................................................................8

15 U.S.C. § 1059.........................................................................................16, 35

15 U.S.C. § 1059(a) .......................................................................................8, 9

15 U.S.C. § 1126................................................................................................7

Pub. L. No. 105-277, 112 Stat. 2681-88, Sec. 211 ..........................................11

50 U.S.C. App. § 1 *et seq*..................................................................................6

31 C.F.R. § 501.802 ..........................................................................................17

## MISCELLANEOUS

5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition,
   § 29:1 (4th ed. 2006)......................................................................................43

60 Fed. Reg. 54,194, 54,196 (Oct. 20, 1995)....................................................7

64 Fed. Reg. 25,808, 25,813 (May 13, 1999) ..................................................12

Fed. R. Civ. P. 12(b)(1).................................................................................6, 19

Fed. R. Civ. P. 12(b)(6)............................................................................6, 18, 19

Fed. R. Civ. P. 56(c) .........................................................................................20

Fed. R. Civ. P. 56(f).........................................................................................27

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| EMPRESS CUBANA EXPORTADORA ) | |
| DE ALIMENTOS Y PRODUCTOS ) | |
| VARIOS d/b/a/CUBAEXPORT, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 1:06CV01692 (ESH) |
| ) | |
| v. ) | |
| ) | Hon. Ellen S. Huvelle |
| UNITED STATES DEPARTMENT OF ) | |
| THE TREASURY, OFFICE OF ) | |
| FOREIGN ASSETS CONTROL, ) | |
| HENRY M. PAULSON, JR., as Secretary ) | |
| of Treasury, ADAM J. SZUBIN, as ) | |
| Director of the Office of Foreign Assets ) | |
| Control, and THE UNITED STATES, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT
OF UNDISPUTED MATERIAL FACTS AND COUNTERSTATEMENT
OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT**

Pursuant to Local Rule LCvR 7 (h), plaintiff submits this response to defendants'

statement of material facts as to which defendants contend there is no genuine issue and

counterstatement of facts.  Cubaexport maintains that this Court's evaluation of the decisions the

Office of Foreign Assets Control made in its July 28, 2006 letter should be based on the

Administrative Record.  Cubaexport further maintains that defendants' summary judgment

motion should be denied because it is based on facts outside the Administrative Record and there

are genuine disputes as to many of those facts as set forth below.  Finally, if the Court believes

that no such disputes exist on the current record, Cubaexport has identified disputed facts as to

which it believes it is entitled to take discovery.

| Defendants' Statement No. 1 | Plaintiff's Response And Counterstatement |
|---|---|
| 1.      The Office of Foreign Assets Control ("OFAC") is the office within the Department of the Treasury ("Treasury") that is principally responsible for administering United States economic sanctions programs to implement U.S. foreign policy and national security goals. Declaration of Adam J. Szubin, Director of OFAC ("Szubin Decl.") ¶ 4. | 1.      "Those foreign policy considerations clearly do not include [Bacardi's] interest in clearing a path for [its] use of the Havana Club mark." *Havana Club Holding, S.A. v. Galleon, S.A.*, 961 F. Supp. 498, 504 (S.D.N.Y. 1997), relied on by OFAC in Statement of Facts No. 11 *infra*. |
| | 2.      OFAC's authority "extends only to freezing or blocking of ... assets and licensing of transactions; OFAC has no authority...to vest...assets." *Am. Airways Charter, Inc. v. Regan*, 746 F.2d 865, 874 (D.C. Cir. 1984) (Ginsburg, J.). *See also Regan v. Ward*, 468 U.S. 222, 228 n.8. |
| | 3.      The purposes of the Cuban Asset Control Regulations ("CACR") promulgated by OFAC pursuant to the Trading With the Enemy Act ("TWEA") include preserving blocked assets as a negotiating tool with the Cuban government. *Havana Club Holding*, 961 F. Supp. at 505. |
| **Defendants' Statement No. 2** | **Plaintiff's Response And Counterstatement** |
| 2.      OFAC has been delegated authority under the Trading With the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 1-44, to regulate transactions in which Cuba or a Cuban national has an interest. *See* Szubin Decl. ¶¶ 4, 15. | 4.      Pursuant to the International Emergency Economic Powers Act ("IEEPA") referred to in Szubin Decl. ¶ 4, the President lacks the authority to take title to and sell foreign assets in peace time unless that power was exercised pursuant to the TWEA prior to 1977. *Regan v. Ward*, 468 U.S. at 228 n.8. |
| | 5.      That power was not exercised with respect to Cuban assets prior to 1977. *See Am. Airways Charters*, 746 F.2d at 867. |
| | 6.      Accordingly, the authority that the "Secretary of the Treasury has delegated ... under TWEA to OFAC to regulate transactions in which Cuba or a Cuban national has an interest" (Szubin Decl. ¶ 15) "extends only to freezing or blocking of ... assets and licensing of transactions; OFAC has no authority...to vest...assets." *Am.* |

| | *Airways Charter*, 746 F.2d. at 874. |
|---|---|
| **Defendants' Statement Nos. 3-4** | **Plaintiff's Response And Counterstatement** |
| 3.      Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a Cubaexport ("Cubaexport") is a "Cuban state-owned enterprise located" in Cuba.  Compl. ¶ 5.  4.      "Cubaexport was established in 1965 by the Cuban Ministry of Foreign Commerce for the purpose of exporting food and other products."  *Id.* | 7.      Cubaexport was established as an entity distinct and independent from the Republic of Cuba.  *See* Pichardo Decl ¶5.  8.      Cubaexport was established on December 15, 1965 pursuant to Resolution No. 234 of the Cuban Ministry of Foreign Commerce.  *See* Pichardo Decl. ¶4; Pichardo Decl. Ex. A.  9.      Cubaexport is administered by its own Managing Director, and engages only in commercial operations, not governmental functions.  *See* Pichardo Decl. ¶¶5-6.  10.    Cubaexport enters into contracts exclusively in its own name, and not as an agent for the Republic of Cuba or any other entity.  *See* Pichardo Decl. ¶7.  11.    Cubaexport pays taxes to the Republic of Cuba.  *See* Pichardo Decl. ¶8. |
| **Defendants' Statement No. 5** | **Plaintiff's Response And Counterstatement** |
| 5.      President Kennedy imposed an embargo on all trade with Cuba in February 1962.  *See* Proclamation 3447 of February 3, 1962, 27 Fed. Reg. 1085 (1962).  The current terms of the embargo and related restrictions are reflected in the Cuban Assets Control Regulations ("CACR"), *see* 31 C.F.R. § 515.101 *et seq.*, which were promulgated pursuant to section 5(b) of the Trading With the Enemy Act, 50 U.S.C. App. § 1 *et seq.*  *See* Szubin Decl. ¶ 9. | 12.    31 C.F.R. § 515.527 (a)(2) was not promulgated pursuant to Section 5(b) of the TWEA.  It was promulgated pursuant to Section 211 of the Omnibus Appropriations Act.  *See* Pub. Law 105-277, 112 Stat. 2681-88, Sec. 211 (1998) ("Section 211"). |
| **Defendants' Statement No. 6** | **Plaintiff's Response And Counterstatement** |
| 6.      Persons subject to the jurisdiction of the United States are prohibited from engaging in economic transactions with Cuba or its nationals, including importing or purchasing Cuban goods, unless licensed by the Secretary | 13.    The material factual issues raised by OFAC's motion for summary judgment concern the propriety of OFAC's:      a.    July 28, 2006 ruling that "[p]ursuant |

<table>
<tr><td>

of the Treasury or its designated agent, OFAC. *See* 31 C.F.R. §§ 515.201(b); 515.204; *see also* Szubin Decl. ¶ 9.

</td><td>

to ... 31 C.F.R. Part 515. ... renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed."  AR 1.

    b.   July 28, 2006 ruling that "it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark."  AR 1.

14.   It is not material to OFAC's motion for summary judgment that OFAC has the authority to regulate the "importing or purchasing of Cuban goods."

15.   Szubin Decl. ¶ 9 states *inter alia* that the CACR "were issued, freezing all Cuban assets located in the United States."

16.   The Szubin Declaration does not state that the CACR authorizes OFAC to vest and sell or otherwise destroy frozen Cuban assets.

</td></tr>
<tr><td>

**Defendants' Statement Nos. 7-13**

</td><td>

**Plaintiff's Response And Counterstatement**

</td></tr>
<tr><td>

7.      In 1995, Cubaexport applied to OFAC for a specific license authorizing the assignment of the "Havana Club" trademark from Cubaexport to Havana Rum & Liquors, S.A. to Havana Club Holding, S.A. ("HCH").  *See* Szubin Decl. ¶ 23.

8.      On November 13, 1995, Cubaexport issued a license to authorize the assignment. See Szubin Decl. ¶ 24.

9.      All licenses issued by OFAC, whether general or specific, may be amended, modified, or revoked at any time.  *See* 31 C.F.R. § 501.803; Szubin Decl. ¶ 17.

10.     On April 17, 1997, OFAC issued a Notice of Revocation for the license issued on November 13, 1995.  *See* Szubin Decl. ¶ 25.

11.     Both OFAC's grant of the November 13, 1995, specific license and its subsequent

</td><td>

17.   Whether OFAC had the authority to authorize the assignment by Cubaexport of the HAVANA CLUB registration in 1995 and to revoke that authorization in 1997 is not material to whether Cubaexport was entitled to renew its registration in 2006.  *See Havana Club Holding,* 974 F. Supp. at 310 (distinguishing between renewal of a registration in which "an individual or a corporation simply seeks to...renew protection of a trademark" and "transfer of a registration [which] creates the opportunity for an individual or corporation to purchase the registration from a Cuban entity, thereby allowing hard currency to enter Cuba.").

</td></tr>
</table>

revocation of that license were litigated in a trademark infringement action brought by HCH and Havana Club International against a number of defendants, including Galleon S.A. and Bacardi-Martini USA, Inc. ("Bacardi"). *See, e.g., Havana Club Holding, S.A., et al. v. Galleon S.A., et al.,* 961 F. Supp. 498 (S.D. N.Y. 1997) ("<u>HCH I</u>"); 974 F. Supp. 302 (S.D. N.Y. 1997) ("<u>HCH II</u>" 96 Civ. 9655, 1998 WL 150983 (S.D. N.Y. Mar. 31, 1998) ("<u>HCH III</u>"); 62 F. Supp.2d 1085 (S.D. N.Y. 1999) ("<u>HCH IV</u>"); 203 F.3d 116 (2d Cir. 2000) ("<u>HCH V</u>").

12.    In <u>HCH I</u>, 961 F. Supp. at 503-05, the Court rejected Bacardi's challenge to OFAC's initial grant of the November 13, 1995, license.

13.    In <u>HCH II</u>, 974 F. Supp. at 306-11, the Court held that OFAC's revocation of the November 13, 1995, license authorizing transfer of the Havana Club trademark had the effect of eliminating the plaintiffs' rights in the mark.

| **Defendants' Statement No. 14** | **Plaintiff's Response And Counterstatement** |
|---|---|
| 14.    However, the Court refused to grant Bacardi's request to cancel the registration *in toto*, holding that the rights to the Havana Club trademark were restored to Cubaexport. *Id.* at 311. | 18.   The New York District Court did not refuse to "grant Bacardi's request to cancel the registration *in toto*." The court refused to cancel the registration *at all*. While not reversing OFAC's exercise of authority to revoke a specific license with respect to Cubaexport's *transfer* of the HAVANA CLUB registration, the court declined to *cancel* the registration because Cubaexport was not a party to the action. *Havana Club Holding,* 974 F. Supp. at 311-12 (S.D.N.Y. 1997) ("Cancelling the registration ...would lead to an inequitable adjudication of the matter and neglect the substantial rights of Cubaexport, a party not before the Court ... Cubaexport has a substantial business interest in maintaining the registration of its mark.").<br><br>19.   That decision highlights the fundamental distinction between blocking the transfer of assets, which OFAC has authority to do, and vesting or liquidating assets, which |

| | OFAC lacks authority to do. *See* Plaintiff's Statement of Facts Nos. 2, 3, 6 *supra*; *Miranda v. Sec'y of Treasury*, 766 F.2d 1, 4 (1st Cir. 1985) ("[OFAC's] Regulations achieve these objectives [of the TWEA] by prohibiting, unless licensed by the Secretary, the transfer, sale or other disposition of assets in which the Cuban government or Cuban nationals have an interest."). |
|---|---|
| **Defendants' Statement Nos. 15-17** | **Plaintiff's Response And Counterstatement** |
| 15.     Following this decision, the Court proceeded to a bench trial on the plaintiffs' trade name infringement claims against Bacardi. <u>HCH IV</u>, 62 F. Supp.2d 1085.<br><br>16.     In 1998, Congress passed section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act ("section 211"). Pub. L. No. 105-277, § 211, 112 Stat. 2681, 2681-88.<br><br>17.     In light of section 211's passage "prior to the trial but well into the course of this litigation," the Court held that the plaintiffs were prohibited from asserting a claim for trade name infringement under the General Inter-American Convention for Trademark and Commercial Protection, 46 Stat. 2907 (1931). <u>HCH IV</u>, 62 F. Supp. 2d at 1091-94. | 20.     The trial of plaintiffs' trade name infringement claim in the New York Action in 1998 is not material to the propriety of OFAC's July 28, 2006 ruling.<br><br>21.     In dismissing plaintiffs' claim for prospective injunctive relief for alleged trade name infringement, the New York District Court did not apply Section 211(a)(1), which is the only portion of Section 211 implicated by the current case.  In the New York Action, the Court applied Section 211(b), which prohibits United States courts from recognizing, enforcing or otherwise validating "any assertion of [certain] treaty rights by a designated national or its successor-in-interest" for certain marks or names except as provided for in the legislation.  *Havana Club Holding, S.A. v. Galleon, S.A.*, 62 F. Supp. 2d 1085, 1091 (S.D.N.Y. 1999).<br><br>22.     Renewal of the HAVANA CLUB registration was not a transaction at issue in the New York Action.  The New York District Court did not have occasion to consider the applicability of renewal of the HAVANA CLUB registration to Section 211(a)(1), which prohibits a "transaction or payment" with respect to certain marks or names except as provided for in the legislation.  *Havana Club Holding, S.A. v. Galleon, S.A.*, 62 F. Supp. 2d 1085 (S.D.N.Y., 1999).<br><br>23.     Even with respect to the transaction that |

| | was at issue in the New York Action (assignment of the HAVANA CLUB registration), the Second Circuit declined to apply Section 211(a)(1) because that "would arguably encounter retroactivity objections." *Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116, 126 n.9 (2d Cir. 2000). |
|---|---|
| **Defendants' Statement No. 18** | **Plaintiff's Response And Counterstatement** |
| 18.    The Court based this conclusion on "the evidence at trial," which "established that on October 13, 1960, the Revolutionary Cuban Regime confiscated the physical assets, property and business records of [Jose Arechabala, S.A. ("JASA")], the original owner of the Havana Club trademark" without affording any compensation to JASA.  *Id.* at 1090, 1092. | 24.    OFAC's July 28, 2006 ruling did not explain how, if at all, OFAC took into account Cuba's alleged "confiscation" of JASA's business in 1960 in making its ruling.<br><br>25.    Cubaexport is entitled to discovery concerning that disputed factual issue.<br><br>26.    Cubaexport was not a party to the New York Action and was not afforded an opportunity to present evidence concerning whether the registered HAVANA CLUB trademark was the same as or substantially similar to a mark or name used in connection with a business or assets that were "confiscated" within the meaning of 31 C.F.R. 515.336.<br><br>27.    Evidence that JASA was not paid "any compensation" when its business was nationalized in 1960 does not establish that there was a confiscation within the meaning of 31 C.F.R. 515.336, which defines "confiscated" in pertinent part as nationalization "without the property having been returned or *adequate and effective* compensation provided."  31 C.F.R. § 515.336(a)(1) (emphasis added).<br><br>28.    In the New York Action, plaintiffs were denied the opportunity to take discovery concerning whether JASA's HAVANA CLUB business had any value.  *Havana Club Holdings,* 203 F.2d at 130.<br><br>29.    Even in the absence of discovery, the facts set out in the Declaration of Eric |

| | |
|---|---|
| | Hubbard ¶ 4 (a-i) raise a genuine dispute as to whether JASA's business was "confiscated".<br><br>30.    Cubaexport is entitled to discovery regarding that disputed factual issue. |
| **Defendants' Statement No. 19** | **Plaintiff's Response And Counterstatement** |
| 19.    The Court found that Bacardi was the successor-in-interest to JASA's interest in the Havana Club trademark.  *Id.* at 1090. | **Non-materiality**<br>31.    The New York District Court's alleged finding that "Bacardi was the successor-in-interest to JASA's interest in the Havana Club Trademark" is not material to the propriety of OFAC's July 28, 2006 ruling unless Bacardi's alleged ownership of the trademark was a reason OFAC ruled as it did.<br><br>**Insufficient Process**<br>32.    OFAC's July 28, 2006 ruling did not state whether Bacardi's alleged ownership of the HAVANA CLUB trademark was a reason OFAC ruled as it did.<br><br>33.    Cubaexport is entitled to discovery concerning OFAC's use of Bacardi's alleged ownership of the HAVANA CLUB trademark in making its July 28, 2006 ruling.<br><br>**U.S. Policy**<br>34.    OFAC stated that it denied Ropes & Gray's specific license request in its July 28, 2006 ruling because granting the request "would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark."  AR 1.<br><br>35.    United States policy does not include Bacardi's interest in clearing a path for its use of the HAVANA CLUB trademark.  *See* Plaintiff's Statement of Facts No. 1, *supra*.<br><br>36.    Cubaexport is entitled to discovery concerning what, if any, consideration OFAC gave to Bacardi's alleged ownership of the HAVANA CLUB trademark in denying |

Ropes & Gray's specific license request on the ground that granting the request would be contrary to United States policy.

**"Successor-in-interest" is Disputed**

37.    The New York District Court did not find that "Bacardi was the successor-in-interest to JASA's interest in the Havana Club trademark."  The court found that in April 1997 "Bacardi & Co. purchased *whatever rights (if any)* the Arechabalas possessed in any Havana Club trademark."  *Havana Club Holding,* 62 F. Supp. 2d at 1090 (emphasis added).

38.    Even in the absence, of discovery, the facts set out in the Hubbard Decl, ¶ 4 (j-k, o-r) raise a genuine dispute as to whether JASA had any interest in the U.S. registration of the HAVANA CLUB's trademark that could have been passed to Bacardi in 1997.

39.    Bacardi has never been adjudicated to be the owner of the HAVANA CLUB trademark in the United States as the successor-in-interest to JASA (or otherwise).

40.    In the New York Action, Bacardi pled that "[t]his Court should *[A] declare* that ... Bacardi has the *prior, superior* and exclusive *right to use of the designation HAVANA CLUB as a trademark* for rum in the United States and ... *[B]*[order that HCH is] permanently *enjoined* from *[1]* using said mark in the United States and from *[2]* interfering in any manner with Bacardi's lawful use of said mark."  *See* Fifth Counterclaim ¶45, Prayer B.1 Winneker Decl. Ex. 4 (emphasis added).

41.    In February 1999, after litigating the issue, Bacardi elected not to pursue its request for *[A]* declaratory relief and *[B][1]* injunctive relief.  *See* Winneker Decl. Ex. 4. Instead, it asked only that the New York District Court enjoin HCH from "interfering

| | with Bacardi's use of the Havana Club mark in the United States." *Havana Club Holding,* 62 F. Supp. 2d at 1089 n.2. The court ruled against Bacardi, stating that Bacardi has "failed even to adequately explain the grounds for or nature of the [injunctive] relief sought." *Id.* at 1089 n.2.<br><br>42.    In *Bacardi & Co. Ltd. v. Cubaexport*, Civ. No. 1:04-CV-0519 (EGS) (D.D.C. 2004) ("the D.C. Action"), Bacardi has sought a declaration that it "is the true owner of the common law rights in and to the HAVANA CLUB mark as the bona fide successor-in-interest to JASA" and an injunction prohibiting Cubaexport and Havana Club Holding from using or registering the HAVANA CLUB mark or interfering with Bacardi's alleged right to do so. Complaint ¶¶ 142, 160(c). Winneker Decl. Ex. 11.<br><br>43.    On September 15, 2006, Bacardi moved to stay the D.C. Action, although no decision has been handed down concerning Bacardi's claims for declaratory and injunctive relief. Winneker Decl. Ex. 16. |
|---|---|
| **Defendants' Statement Nos. 20-21** | **Plaintiff's Response And Counterstatement** |
| 20.    On appeal, the Second Circuit affirmed the district court's judgment. <u>HCH V</u>, 203 F.3d 116.<br><br>21.    The Second Circuit refused to provide the plaintiffs with an opportunity to conduct additional discovery in an attempt to prove that the "Havana Club" trade name was not associated with confiscated property, holding that "[w]here Cuba has not returned JASA's property, not made even a gesture toward compensation, and not settled the claim, the confiscation inquiry ends." *Id.* at 129-30. The Court also found it "undisputed" that JASA has never consented to the Plaintiffs' use of the Havana Club trademark. *Id.* at 129. | 44.    The holding of the Second Circuit, an appellate court, is not a finding of fact.<br><br>**"Confiscation" is Disputed**<br>45.    The Second Circuit denied plaintiffs the opportunity to take *any* "discovery to determine whether JASA had a positive net value at the time of [nationalization]." *Havana Club Holding,* 203 F.3d at 130.<br><br>46.    The Second Circuit's holding does not explain why declining to pay anything for a worthless or defunct business cannot be "adequate and effective compensation" within the meaning of 31 C.F.R. § 515.336(a)(1). *See* Plaintiff's Statement of Facts Nos. 26, 28 |

<table>
<tr>
<td></td>
<td>

*supra*.

**"Express Consent" is Disputed**

47.    The Second Circuit actually stated that "it is undisputed that JASA . . . has not expressly consented to *HCI's [Havana Club International, S.A.'s] use* of the 'Havana Club' name." *Havana Club Holding*, 203 F.3d at 129 (emphasis added).

48.    Neither Section 211(a)(1) nor 31 C.F.R. § 515.527(a)(2) refers to consent to *use* of a name.

49.    Pursuant to Section 211(a)(1), 31 C.F.R. § 515.527(a)(2) prohibits a "transaction or payment" with respect to certain marks and names unless the original owner of a certain mark or name "or the bona fide successor-in-interest has expressly consented."

50.    The issue is whether JASA consented to Cubaexport's registration of the HAVANA CLUB trademark and the maintenance of that registration, not whether it consented to HCI's use of the "Havana Club" name.

51.    Even in the absence of discovery, the facts set out in Hubbard Decl. ¶ 4(k-n) raise a genuine dispute concerning whether JASA expressly consented to Cubaexport's U.S. registration and maintenance of the HAVANA CLUB trademark and maintenance of that registration.

</td>
</tr>
<tr>
<td>

**Defendants' Statement No. 22-24**

</td>
<td>

**Plaintiff's Response And Counterstatement**

</td>
</tr>
<tr>
<td>

22.    Following the litigation, the United States Patent and Trademark Office ("PTO") amended its records to restore Cubaexport as the owner of the registration of the Havana Club trademark. *Galleon S.A. et al. v. Havana Club Holding, S.A. et al.*, 2004 WL 199225, at *11 (Trademark Tr. And App. Bd. Jan. 29, 2004); *see also* Compl. ¶¶ 21-22.

23.    Bacardi challenged this decision in its

</td>
<td>

52.    In 1995 Bacardi petitioned to cancel the HAVANA CLUB registration in a proceeding before Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("USPTO"). *Galleon, S.A. v. Havana Club Holding, S.A.*, Cancellation No. 92024108, 2004 TTAB LEXIS 38, at *31-32 (TTAB Jan. 29, 2004). On January 29, 2004, the TTAB denied Bacardi's summary judgment motion and dismissed all

</td>
</tr>
</table>

proceeding before the PTO, originally filed in 1995, seeking cancellation of the registration of the Havana Club mark. *See Galleon*, 2004 WL 199225; Compl. 121. However, the PTO concluded that the district court's decision in the *Havana Club* litigation contemplated that the registration would continue to exist in Cubaexport's name. *Galleon*, 2004 WL 199225 at * 14-16.

24.    In addition, the Trademark Trial and Appeal Board refused to cancel Cubaexport's registration of the mark on the basis of Bacardi's pleading of fraud in the original application. *Id*. at * 18-19.

of the claims in the petition. *Id*. at *47-*69. In its opinion, the TTAB also recited as background Bacardi's unsuccessful attempt to require the USPTO to construe the decision of the District Court in the New York Action as an order requiring cancellation of the HAVANA CLUB registration. *Id*. at *31-*35.

| Defendants' Statement No. 25 | Plaintiff's Response And Counterstatement |
|---|---|
| 25.    Bacardi has challenged the decision by the Board in United States District Court for the District of Columbia. *See Bacardi & Co. Ltd. v. Empresa Cubana Exportadora de Alimentos y Productos Varios, et al.*, 1:04-CV-00519 (EGS) (D. D.C.) (filed Mar. 29, 2004); *see also* Compl. ¶ 23. That litigation is ongoing. Compl. ¶ 23. | 53.    On September 15, 2006, Bacardi moved to stay the D.C. Action because the August 3, 2006 ruling of the USPTO Post Registration Division refusing to renew the HAVANA CLUB registration, if upheld in appeal, "affords relief equivalent to a key objective that Bacardi has been seeking in this case [cancellation of the registration]." Winneker Decl. Ex. 16. At that time, the Court had not granted Bacardi any of the relief sought in the Complaint. |

| Defendants' Statement No. 26 | Plaintiff's Response And Counterstatement |
|---|---|
| 26.    OFAC is, and has been, aware of legal proceedings involving the Havana Club trademark, including factual findings made in the New York *Havana Club Holding* litigation. <u>See</u> Szubin Decl. ¶ 27. | 54.    Without discovery Cubaexport cannot address the state of OFAC's awareness of these legal proceedings, including when OFAC became aware of them and when, if at all, OFAC considered them in making its and July 28, 2006 ruling. |

| Defendants' Statement Nos. 27-42 | Plaintiff's Response And Counterstatement |
|---|---|
| 27.    Under the CACR, a lawyer must seek a specific license from OFAC to receive compensation for fees and expenses incurred in representing the Cuban government or Cuban entities in legal proceedings. *See* 31 C.F.R. § 515.512; Szubin Decl. ¶ 18. | 55.    The specific OFAC licenses referred to in Statement of Fact No. 28 consistently authorized Ropes & Gray and its predecessor firm Fish & Neave to represent Cubaexport in defense of the HAVANA CLUB registration and to be paid for expenses incurred in the course of that representation. *See, e.g.,* |

28.    In order to obtain reimbursement for the fees and expenses related to the representation of Cubaexport in legal proceedings in the United States, including proceedings before the PTO Trademark Trial and Appeal Board, Cubaexport's attorneys have applied for and received various legal and travel licenses. *See, e.g.*, License Nos. CU-75745, CT-7571, Administrative Record ("A.R.") 45-48; License Nos. CU-74488, CT-4558, A.R. 83-86; License No. CT-1943, A.R. 99-100.

29.    Ropes & Gray, which had merged with the law firm of Fish & Neave, Cubaexport's prior counsel, in January 2005, applied to OFAC for a renewal of the legal and travel licenses previously issued to Fish & Neave. *See* January 5, 2005, Letter from Renee Stasio to OFAC, A.R. 97-98; Compl. ¶ 35; *see also* January 26, 2005, Letter from Renee Stasio to OFAC, A.R. 87.

30.    In the application, Ropes & Gray asserted that it "will be the law firm representing Cubaexport in connection with the ... matters" mentioned previously in the application. A.R. 98.

31.    The legal matters specifically referenced in the application were the cancellation proceeding filed by Bacardi before the Trademark Trial and Appeal Board, number 24,108, and the Complaint filed by Bacardi against Cubaexport in United States District Court for the District of Columbia. *See* A.R. 87, 97.

32.    OFAC ultimately granted the application. *See* License No. CU-74488, A.R. 83-84; Szubin Decl. ¶ 32.

33.    Like all specific licenses, the authorization contained in legal licenses are based upon the statements and representations made in the application. *See* Szubin Decl. ¶¶ 12-14.

License No. CU-74488 (granting license to engage in "[a]ll transactions ... in connection [with] the legal representation of [Cubaexport]" in proceedings involving the HAVANA CLUB registration and to be paid for expenses incurred in the course of that representation.).

56.    Accordingly, when the registration that was the subject of those proceedings came due for renewal, Ropes & Gray paid the renewal fee to the United States Patent and Trademark Office on December 13, 2005. AR 59-82.

57.    On the same day, Ropes & Gray advised OFAC that it was paying the renewal fee as a transaction in connection with Ropes & Gray's authorized representation of Cubaexport in order to maintain the *status quo* pending the outcome of the dispute:

On behalf of our client Cubaexport, Ropes & Gray has prepared the renewal application and undertaken to pay the filing fee that is required in order to maintain the registration and intends to recover those expenses from Cubaexport. Ropes & Gray has taken these steps pursuant to License No. CU 74488, which Ropes & Gray understands authorizes the firm to represent Cubaexport in all matters related to legal proceedings concerning the HAVANA CLUB trademark, including *Bacardi & Company Limited* v. *Cubaexport and Havana Club Holding,* 1:04-CV-00519 (EGS) (D.D.C. 2004) (the "Litigation"), and to be paid for the services it renders and expenses it incurs in the course of that representation. In the Litigation, Bacardi & Company Limited ("Bacardi") has appealed a decision of the Trademarks Trial and Appeal Board (the "Board") and requested cancellation of Registration No. 1,031,651.

While the Litigation is ongoing,

34.     The limitation on the authorization contained in a specific license to the statements and representations within an application is typically stated in explicit terms in the license. *See, e.g.*, A.R. 83-84; Szubin Decl. ¶¶ 12-13.

35.     The legal license that OFAC issued, License No. CU-74488, authorized "[a]ll transactions . . . to enable the Licensee, in connection [with] the legal representation of [Cubaexport] and Havana Club Holdings S.A. in legal proceedings in the United States related to the HAVANA CLUB trademark, as described in the application, to receive payment for such services and reimbursement for expenses related to such services." A.R. 84; *see also* Szubin Decl. ¶ 32.

36.     OFAC also issued a companion travel license authorizing travel-related transactions in connection with the legal proceedings. License No. CT-4558, A.R. 85-86; *see also* Szubin Decl. ¶ 32.

37.     OFAC responded to Ropes & Gray's request for renewal of these licenses by issuing two new licenses. *See* License Nos. CU-75745, CT-7571, A.R. 45-48; Szubin Decl. ¶ 32.

38.     On December 13, 2005, counsel for Cubaexport filed an application with the PTO on Cubaexport's behalf to renew the Havana Club trademark. *See* Letter from Vincent Palladino to Commissioner of Trademarks, A.R. 59-82.

39.     In the letter, counsel for Cubaexport represented that "[p]ayment of the filing fee is being made pursuant to License No. CU 74488." A.R. 59.

40.     Ropes & Gray notified OFAC in a December 13, 2005, letter of Cubaexport's application for renewal with the PTO. Letter from Vincent Palladino to OFAC, A.R. 56; *see also* Szubin Decl. ¶ 33.

Cubaexport seeks to maintain the *status quo* by maintaining Registration No. 1,031,651 until the Court can decide whether the Board's decision should be affirmed or reversed and the registration maintained or cancelled. Given the current posture of the Litigation, no final unappealable decision on those issues will be rendered before Registration No. 1,031,651 must be renewed.
AR 56.

58.     Nearly four months later on April 6, 2006, OFAC advised Ropes & Gray that it had determined that payment of the renewal fee was not a transaction authorized by the existing license in connection with Ropes & Gray's representation of Cubaexport. AR 52-53.

41.     On April 6, 2006, OFAC informed both Ropes & Gray and the PTO that, for the reasons stated in the April 6 letter, License No. CU-74488 "does not authorize Ropes & Gray LLP to pay a filing fee to the U.S. Patent and Trademark Office ("PTO") for renewal of Registration No. 1,031,651 (the "HAVANA CLUB trademark") on behalf of [Cubaexport]." Letter from OFAC to Vincent Palladino, A.R. 52; see also Szubin Decl. ¶ 34.

42.     In the April 6, 2006, letter, OFAC informed Ropes & Gray that its discussion was limited to the extent of authorization conferred by License No. CU-74488 and did not answer the question of whether renewal could be otherwise authorized:

> We note that this discussion does not in any way prejudice the ability of Ropes & Gray LLP to request separate authorization from OFAC to engage in transactions related to the renewal of the HAVANA CLUB trademark registration at the PTO. If you wish to request such a specific license or further guidance from OFAC, you may do so by writing directly to OFAC's Licensing Division. Should you have any further questions, please contact the Deputy Chief Counsel (Foreign Assets Control). . . .

A.R. 53; *see also* Szubin Decl. ¶ 34.

| **Defendants' Statement Nos. 43** | **Plaintiff's Response And Counterstatement** |
|---|---|
| 43.     On April 7, 2006, Ropes & Gray responded to OFAC's letter by requesting a specific license to authorize payment for the renewal of the Havana Club trademark, on behalf of Cubaexport, for the reasons contained therein. Letter from Vincent Palladino to OFAC, A.R. 49-51; *see also* Szubin Decl. ¶ 35. | 59.   The April 6, 2006 ruling stated that it "does not in any way prejudice the ability of Ropes & Gray LLP to request separate authorization from OFAC to engage in transactions related to the renewal of the HAVANA CLUB trademark registration." AR 52-53.<br><br>60.   Facing a deadline to renew the HAVANA CLUB registration, on April 7, 2006 Ropes & Gray sought a specific license one day after OFAC made its April 6, 2006 ruling. AR 49-51. |

| | 61.    In its April 7, 2006 request, Ropes & Gray stated *inter alia*: |
|---|---|
| | Ropes & Gray respectfully submits that in light of OFAC's willingness to grant License No. CU-74488, authorizing payment for large legal and other expenses incurred on Cubaexport's behalf in maintaining the HAVANA CLUB Registration, it would be reasonable to authorize Ropes & Gray to incur and be paid for the minor expense ($500 or less) of maintaining the registration through payment of the renewal fee.  AR 50. |
| **Defendants' Statement Nos. 44** | **Plaintiff's Response And Counterstatement** |
| 44.    As part of its consideration of the request for a specific license, OFAC referred the request to the United States Department of State for guidance concerning whether the grant of such a license would be consistent with United States foreign policy.  *See* Mem. from State Department to OFAC, A.R. 2-3; Szubin Decl. ¶ 38. | 62.    Without discovery Cubaexport cannot address the claim that OFAC referred Ropes & Gray's request to the United States Department of State, including how that was done. 63.    Without discovery.  Cubaexport cannot address the statements in Szubin Decl. ¶ 38, concerning: a. OFAC's practice regarding interagency coordination; b. OFAC's practice regarding referral to the State Department; c. OFAC's "contact … [with] PTO." |
| **Defendants' Statement Nos. 45** | **Plaintiff's Response And Counterstatement** |
| 45.    The State Department informed OFAC that "[d]enial of the license application would be consistent with the U.S. approach toward non-recognition of trademark rights associated with confiscated property" as well as "consistent with . . . the policy of the United States to deny resources to the Castro regime." A.R. 2-3.  Accordingly, "[h]aving weighed the facts and foreign policy concerns presented by this referral, the Department of State recommend[ed] that OFAC deny Ropes & | 64.    The "U.S. approach toward non-recognition of trademark rights associated with confiscated property" is not adequately explained. 65.    Cubaexport is entitled to discovery concerning the meaning of that "approach" and whether the State Department's July 28, 2006 memorandum is "consistent with" that "approach". |

| | |
|---|---|
| Gray's application."  *Id.*; Szubin Decl. ¶ 39 | 66.    The State Department did not explain how it determined that the HAVANA CLUB registration was a trademark right "associated with confiscated property."<br><br>67.    The "policy of the United States to deny resources to the Castro regime" is not adequately explained.<br><br>68.    Cubaexport is entitled to discovery concerning the meaning of that "policy" and whether the State Department's July 28, 2006 memorandum is "consistent with" that "policy".<br><br>69.    For over forty years, the policy of the United States has been to preserve, not destroy, Cuban assets.  *See* Plaintiff's Statement of Facts No. 3, *supra; Nielsen v. Sec'y of Treasury*, 424 F.2d 833, 841-42 (D.C. Cir. 1970):<br><br>    [In endorsing legislation in 1965 prohibiting the vesting and sale of Cuban assets] the Senate Committee on Foreign Relations [was] persuaded by the following argument advanced by the Department of State:<br><br>    ***it is the Department's view that the vesting and sale of Cuban property could set an unfortunate example for countries less dedicated than the United States to the preservation of property rights.  *The Government of the United States, as a matter of policy*, encourages the investment of American capital overseas and *endeavors to protect such investment against nationalization, expropriations, intervention, and taking.  To vest and sell Cuban assets* could, therefore, be counterproductive.  (emphasis added)<br><br>70.    In its July 28, 2006 memorandum, the State Department stated that "to the extent that registration of the trademark in this case has current or potential financial value to the Cuban government," renewal should be |

|  | denied. AR 2-3. |
|  | 71.   Cubaexport is entitled to discovery concerning the basis for that decision, including whether the State Department determined that the registration has "current" or "potential" value and, if so, how it did so. |
|  | 72.   Even if the State Department made that determination, OFAC lacked the authority to deny the specific license on that basis because OFAC may block the transfer of assets, but not destroy them.  *See* Plaintiff's Statement of Facts Nos. 2, 6, 17 *supra*. |
|  | 73.   Even if the State Department had made that determination, OFAC could have addressed that issue within the scope of its authority by barring Cubaexport's transfer for consideration of the HAVANA CLUB registration.  *See* Plaintiffs' Statement of Facts Nos. 2, 6, 17 *supra*. |
|  | 74.   One purpose of the CACR is "preventing the Cuban government from acquiring dollars."  *Havana Club Holding, ,* 961 F. Supp. at 505. |
|  | 75.   Despite that purpose, the CACR provides a general license for the renewal of trademark registrations.  31 C.F.R. § 515. 527(a)(1). |
| **Defendants' Statement Nos. 46-47** | **Plaintiff's Response And Counterstatement** |
| 46.      After considering the State Department's guidance, the facts and circumstances of the case, and the implementation of section 211 in the CACR, OFAC denied the request for a specific license.  Letter from OFAC to Vincent Palladino, A.R. 1; Szubin Decl. ¶ 40. | 76.   The State Department supplied the memorandum containing its "guidance" to OFAC by facsimile at 11:17 a.m. on July 28, 2006, the same day OFAC rendered its ruling to Cubaexport.  AR 1. |
| 47.      In the letter, OFAC explains that the Department of State had informed OFAC that "it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB | 77.   Neither OFAC's July 28, 2006 ruling nor the evidence submitted in support of its Statement of Facts provides any explanation for OFAC's July 28, 2006 ruling that "[p]ursuant to … 30 C.F.R. Part 515 . . . renewal of the HAVANA CLUB Trademark |

trademark."  A.R. 1; Szubin Decl. ¶ 41.

under these circumstances would be prohibited unless specifically licensed."  AR 1.

78.    Cubaexport is entitled to discovery concerning the basis for that ruling.

79.    Cubaexport is entitled to discovery concerning the consideration OFAC gave the State Department's July 28, 2006 memorandum issued on the same day OFAC denied Ropes & Gray's request for a specific license.

80.    Cubaexport is entitled to discovery concerning the unidentified "facts and circumstances of the case" OFAC allegedly took into account in denying Ropes & Gray's request for a specific license.

81.    Cubaexport is entitled to discovery concerning the unidentified consideration OFAC gave to "the implementation of Section 211 in the CACR," including how, if at all, it considered:

    a. the issue of confiscation.  *See* Plaintiff's Statement of Facts Nos. 24-30, 45-46 *supra*.

    b. the issue of consent.  *See* Plaintiff's Statement of Facts Nos. 47-51 *supra*.

82.    The July 28, 2006 ruling makes no mention of the "facts and circumstances of the case" or the "implementation of Section 211 in the CACR" that OFAC says it took into account in reaching its July 28, 2006 ruling.

83.    Cubaexport is entitled to discovery concerning that omission.

84.    OFAC's July 28, 2006 ruling provides two reasons for its denial of Ropes & Gray's request for a specific license:

<table>
<tr><td></td><td>a. "consultation with relevant agencies in the U.S. Government, including the Department of State"</td></tr>
</table>

|  | a. "consultation with relevant agencies in the U.S. Government, including the Department of State" |
|---|---|
|  | b. the "guidance" it received from the State Department.  AR 1. |
|  | 85.    There is no explanation of either of these reasons in OFAC's July 28, 2006 ruling. |
|  | 86.    Cubaexport is entitled to discovery concerning the identity of the "relevant agencies" other than the State Department and the nature of OFAC's consultations with those agencies. |
|  | 87.    Cubaexport is entitled to discovery concerning the consideration that OFAC gave the State Department's "guidance". |
| **Defendants' Statement Nos. 48** | **Plaintiff's Response And Counterstatement** |
| 48.      While OFAC was considering the application, Ropes & Gray continued to pursue renewal of the Havana Club trademark with the PTO.  *See* Letters from Vincent Palladino to Commissioner for Trademarks, A.R. 6-9, 34-40; Szubin Decl. ¶ 37.  Counsel for Bacardi opposed any such action in letters to the PTO. *See* Letters from William Golden to Commissioner for Trademarks, A.R. 4-5, 10-33; Szubin Decl. ¶ 37. | 88.    Szubin Decl. ¶ 37 actually states that "[t]hroughout June and in early July 2006, OFAC received copies of correspondence sent by . . . Kelley Drye & Warren LLP, on behalf of Bacardi, to the PTO Commissioner for Trademarks regarding Cubaexport's application to renew Registration No. 1,031,651 of the HAVANA CLUB & Design trademark." |
| **Defendants' Statement Nos. 49** | **Plaintiff's Response And Counterstatement** |
| 49.      OFAC was copied on this correspondence.  *See* A.R. 4-40; Szubin Decl. ¶ 37. | 89.    In deciding whether to renew the HAVANA CLUB registration, the USPTO declined to consider Bacardi's correspondence.  *See* USPTO Director's July 18, 2006 Decision ("The Director will not consider the information or documents submitted [by Bacardi] because [Bacardi] is a third party in this *ex parte* matter.") Winneker Decl. Ex.12. |
|  | 90.    The July 28, 2006 ruling, which OFAC sent to the USPTO, does not state that OFAC |

|  | had considered Bacardi's correspondence in denying Ropes & Gray's request for a specific license. AR 1.

91.    If Bacardi's correspondence was among the "facts and circumstances of the case" (Szubin Decl. ¶ 40) that OFAC considered in denying Ropes & Gray's request to pay the registration renewal fee, OFAC relied on facts and circumstances which the USPTO declined to consider in deciding whether to renew the registration.

92.    Cubaexport is entitled to discovery concerning what consideration, if any, OFAC gave to Bacardi's correspondence and why the July 28, 2006 ruling does not identify it.

93.    Cubaexport is entitled to discovery concerning how, if at all, disclosure of OFAC's consideration of Bacardi's correspondence would have affected the USPTO's August 3, 2006 ruling. |

**Additional Facts Material to Defendants' Motion**

| | |
|---|---|
| | 94.   The following facts referred to in the Szubin Declaration are not part of the Administrative Record:<br><br>a. the mission and operations of OFAC, programs, statutes, sanctions, determinations, regulations, reviews, analyses, requests, website pages, practices, licenses and policies referred to in Szubin Decl. ¶¶ 2, 4-22, 26, 38<br><br>b. the decisions in the HAVANA CLUB trademark litigation referred to in Szubin Decl. ¶ 27<br><br>c. OFAC's consultations with the State Department and the USPTO referred to in Szubin Decl. ¶ 38<br><br>d. OFAC's "considera[tion of] the State Department's foreign policy guidance, the implementation of Section 211 in the Cuban Assets Control Regulations, and the facts and circumstances of this case" referred to in Szubin Decl. ¶ 40<br><br>95.   The following facts referred to in OFAC's Statement of Facts are not part of the Administrative Record:<br><br>a. Cubaexport's Complaint in this action referred to in Statement of Facts Nos. 3-4, 22, 25<br><br>b. the TTAB decision referred to in Statement of Facts Nos. 22-25<br><br>c. the D.C. Action referred to in Statement of Facts Nos. 23-25<br><br>96.   Cubaexport is entitled to discovery concerning what consideration, if any, OFAC gave to those facts in making its July 28, 2006 ruling. |

Dated:  March 16, 2007

Respectfully submitted,

*/s/ Peter M. Brody*_____
Peter M. Brody (D.C. Bar No. #398717)
ROPES & GRAY LLP
One Metro Center
700 12th Street, N.W.
Washington, D.C.  20005
Tel. (202) 508-4600
Fax. (202) 508-4650

Herbert F. Schwartz
Vincent N. Palladino
Eric R. Hubbard
Pablo D. Hendler
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York  10036
Tel. (212) 596-9000
Fax. (212) 596-9090

*Counsel for Plaintiff,*
*Empresa Cubana Exportadora de Alimentos y*
*Productos Varios, d/b/a Cubaexport*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EMPRESS CUBANA EXPORTADORA
DE ALIMENTOS Y PRODUCTOS
VARIOS d/b/a/CUBAEXPORT,

        Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
THE TREASURY, OFFICE OF
FOREIGN ASSETS CONTROL,
HENRY M. PAULSON, JR., as Secretary
of Treasury, ADAM J. SZUBIN, as
Director of the Office of Foreign Assets
Control, and THE UNITED STATES,

        Defendants.

Civil Action No. 1:06CV01692 (ESH)

Hon. Ellen S. Huvelle

## DECLARATION OF ERIC R. HUBBARD IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS, OR IN
## THE ALTERNATIVE, SUMMARY JUDGMENT

I, Eric R. Hubbard, declare:

1.    I am an attorney admitted to practice before the State of New York and the United States District Courts for the Southern and Eastern Districts of New York. I am admitted *pro hac vice* in this Court. I am a partner of the law firm of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York, 10036. Ropes & Gray LLP is counsel for plaintiff Cubaexport. As such, I have personal knowledge of the facts set forth herein.

2.    I make this declaration in support of Cubaexport's Opposition to Defendants' Motion To Dismiss, Or In The Alternative, Summary Judgment.

3.    Facts of which Cubaexport already is aware raise at least a genuine dispute as to the following material issues: (1) whether the original holder of HAVANA CLUB trademarks, Jose Arechabala, S.A. ("JASA"), was "confiscated" by the Cuban state, as the term "confiscated" is defined in 31 C.F.R. § 515.336; (2) whether JASA expressly consented to Cubaexport's registration and maintenance of the HAVANA CLUB trademark in the United States; and (3) whether Cubaexport needed to obtain consent from Bacardi to renew the HAVANA CLUB registration in 2006.

4.    The foregoing issues are in dispute in light of at least the following facts:

a.    JASA was a private company. All of its shareholders were members of the Arechabala family.

b.    By 1959, JASA's business, and particularly its Havana Club rum business, was in decline. In early 1959, a List of Claims was filed by the "Employees' Union" of JASA with the Cuban Labor Ministry. Some of those claims could not be

1

resolved "for reasons of [JASA's] financial incapacity." Exhibit A, which is attached

hereto, is a true and correct copy of the January 4, 1960 Notarized Resolution No. 5 of

Francisco Travieso Damas, Attorney, Director of the Legal and Foreign Relations Office of

the Ministry of Labor and Social Security of the Republic of Cuba (with a certified English

language translation).

        c.     As a result of a "difference of opinion" concerning the results of a

profitability study conducted in the summer of 1959, the workers requested that the

company be put under oversight to allow information to be collected to "determine the

company's true financial situation." Exhibit A.

        d.     By January 1960, the "state of conflict existing at [JASA]" had

"continued to worsen, resulting in a breakdown of normal operations at the work center."

Exhibit A.

        e.     As a result, on January 4, 1960, The Cuban Ministry of Labor

adopted Resolution No. 5, by which Calixto Lopez Rodriguez was designated Inspector of

the Ministry of Labor at JASA. The place and rank of the members of the management of

JASA were transferred to the inspector. Exhibit A. This began the Cuban government's

intervention of JASA.

        f.     Corroborating the statements in Resolution No. 5 (Exhibit A),

Hernando Calvo Ospina wrote that "[i]n 1960, [JASA was] at a virtual standstill due to a

wage dispute with its workers caused by [its] near bankruptcy, [therefore] the state

intervened." Exhibit B, which is attached hereto, is a true and correct copy of selected

pages of Hernando Calvo Ospina, *Bacardi: The Hidden War*, 85, (Pluto Press 2002) (First

published in French in 2000 by EPO).

g.     On October 13, 1960, JASA's facilities, factories and other industrial and commercial enterprises were nationalized by the Cuban state. Exhibit C, which is attached hereto, is a true and correct copy of Cuban Law No. 890, along with a certified English translation. *See also* Exhibit B, p. 85 (Cuba "nationalised [sic] the company.").

h.     At or about the time of JASA's nationalization, JASA "was bankrupt as a result of its failure to stand up to its competitors, the main one, ironically being Bacardi." Exhibit B, p. 85.

i.     Cubaexport currently is aware of no evidence which would establish that JASA was marketing a HAVANA CLUB rum as of October 13, 1960.

j.     Ownership of JASA's U.S. trademark registrations of HAVANA CLUB (alone or with design) was not taken from JASA.

k.     JASA voluntarily allowed its five U.S. trademark registrations of HAVANA CLUB (alone or with design) to expire on the dates indicated below:

| Registration No. | Expiration Date |
| --- | --- |
| 324,385 | May 14, 1955 |
| 335,919 | June 16, 1956 |
| 632,828 | August 14, 1962 |
| 578,679 | August 11, 1973 |
| 578,680 | August 11, 1973 |

*See also* Exhibit B, p. 85 ("In 1973, when it was time to renew the license for the Havana Club name, [the Arechabalas] did not do so in spite of a minimum of red tape and some $25 in cost. Moreover, they could even have written an 'affidavit of non-use', to the effect that the brand would have been retained without the requirement to use it.").

l.     Based upon its own Cuban registration of a HAVANA CLUB & Design trademark that differed from JASA's registrations of its HAVANA CLUB &

Design trademarks, on June 12, 1974, Cubaexport applied to register its HAVANA CLUB & Design trademark in the U.S. Patent and Trademark Office ("USPTO"). Compare Complaint Exhibit 1, which is a true and correct copy of Cubaexport's application for its U.S. registration of a HAVANA CLUB & Design trademark, and illustrates Cubaexport's Cuban registration of its HAVANA CLUB & Design trademark, with Exhibit D, which is attached here to, and is a true and correct copy of JASA's U.S. registrations of its HAVANA CLUB & Design trademarks.

m.     The USPTO granted Cubaexport Registration No. 1,031,651 of the HAVANA CLUB & Design trademark on January 27, 1976 ("Cubaexport's HAVANA CLUB Registration"). Complaint Exhibit 2. *See also* Exhibit B, p. 85 ("Given that the name was in the public domain, in 1974 the Cuban company Cubaexport requested the licence [sic] for its use and was granted it two years later.").

n.     JASA did not oppose Cubaexport's application to register HAVANA CLUB & Design. Nor did JASA petition to cancel Cubaexport's HAVANA CLUB Registration throughout the 1970's and 1980's. *See also* Exhibit B, p. 85 ("Cubaexport requested the licence [sic] . . . 'without any legal opposition in respect of this.'").

o.     On May 2, 1994, one of the members of the Arechabala family, Jose Maria Arechabala Rodrigo ("Rodrigo"), applied in the USPTO to register HAVANA CLUB as *his* – not JASA's – trademark for rum. The application was not based on ownership, or use of HAVANA CLUB as a trademark, by JASA or Rodrigo himself, but on an intention to use HAVANA CLUB in the future. Rodrigo swore that "he believes himself to be entitled to use the mark" and "to the best of his knowledge and belief no other person, firm, corporation or association has the right to use said mark [HAVANA CLUB] in commerce." Rodrigo also filed a petition to cancel Cubaexport's HAVANA

4

CLUB Registration. Rodrigo's HAVANA CLUB application was subsequently abandoned and the USPTO Trial and Trademark Appeals Board dismissed Rodrigo's petition to cancel Cubaexport's HAVANA CLUB Registration. Exhibit E, which is attached hereto, is a true and correct copy of Rodrigo's application for registration of HAVANA CLUB with the USPTO.

        p.      On September 12, 1994, Galleon S.A., a predecessor to Bacardi, applied to register HAVANA CLUB as *its* trademark for rum ("Bacardi's HAVANA CLUB application"). Bacardi's HAVANA CLUB application was not based upon ownership, or use of HAVANA CLUB as a trademark, by JASA or Bacardi, but on an intention to use HAVANA CLUB in the future. Bacardi, like Rodrigo, swore that "to the best of [its] knowledge and belief no other person, firm, corporation, or association has the right to use said mark [HAVANA CLUB] in commerce." *See* Declaration of Michele M. Winneker ("WD") Ex. 2, which is a true and correct copy of Bacardi's September 12, 1994 trademark application filed with the USPTO.

        q.      On March 14, 1995, Bacardi's HAVANA CLUB application was rejected because, *inter alia*, of likely confusion with Cubaexport's HAVANA CLUB Registration. "The examining attorney refuse[d] registration under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d) because [Bacardi's] mark, when used on or in connection with the identified goods, so resembles the mark in U.S. Registration No. 1,031,651 as to be likely to cause confusion, to cause mistake, or to deceive." The examining attorney also refused registration on the grounds that Bacardi's mark was primarily geographically deceptively misdescriptive "because the mark consists of or comprises deceptive matter in that the mark contains a geographic designation [Havana] where the goods for which registration is sought are produced and the goods do not originate from that geographic

location." *See* WD Ex. 3, which is a true and correct copy of the USPTO's March 14, 1995 rejection of Bacardi's September 12, 1994 trademark application.

        r.     In April 1997, Bacardi, JASA, and members of the Arechabala family executed agreements that purported to assign JASA's rights in the HAVANA CLUB trademark in the United States to Bacardi. That agreement was signed three years after Bacardi swore in its application that it did not believe anyone else including JASA and the Arechabalas had any trademark rights in HAVANA CLUB and 24 years after JASA voluntarily allowed the last of its U.S. HAVANA CLUB trademark registrations to expire. Exhibit B, p. 85.

        5.     If defendants are able to rely on statements of fact that go beyond the Administrative Record, Cubaexport will require discovery concerning the matters set forth in paragraphs 3 and 4, above. It will seek such discovery from the following sources:

        a.     Discovery relating to JASA;

        b.     Discovery from individuals involved in the acquisition by Bacardi of purported trademark rights originally held by JASA;

        c.     Discovery from surviving members of the Arechabala family with knowledge of the activities of JASA prior to the 1960 nationalization, its financial health, and the business activities of the Arechabala family particularly concerning the HAVANA CLUB trademark;

        d.     Discovery from surviving individuals familiar with JASA's activities around the time of the January 4, 1960 intervention and October 13, 1960 nationalization;

     e.     Discovery from representatives of organizations including The Trust Company of Cuba, that are believed to have information concerning JASA's financial health at the time it was nationalized;

     f.     Discovery from Hernando Calvo Ospina, concerning the basis for the statements in his book, Exhibit B; and

     g.     Additional discovery that becomes apparent based upon information obtained in the discovery discussed above.

     6.     If defendants are able to rely on statements of fact that go beyond the Administrative Record, Cubaexport also will require discovery on the following additional issues which were identified in Defendants' Statement of Undisputed Material Facts:

| Defendants' Statement No. 18 | Plaintiff's Discovery Regarding No. 18 |
|---|---|
| The Court based this conclusion on "the evidence at trial," which "established that on October 13, 1960, the Revolutionary Cuban Regime confiscated the physical assets, property and business records of [Jose Arechabala, S.A. ("JASA")], the original owner of the Havana Club trademark" without affording any compensation to JASA. *Id.* at 1090, 1092. | How, if at all, OFAC's July 28, 2006 ruling took into account Cuba's alleged confiscation of JASA's assets in 1960. |
| **Defendants' Statement No. 19** | **Plaintiff's Discovery Regarding No. 19** |
| The Court found that Bacardi was the successor-in-interest to JASA's interest in the Havana Club trademark. *Id.* at 1090. | Whether Bacardi's alleged ownership of the HAVANA CLUB trademark was a reason OFAC ruled as it did in its July 28, 2006 ruling, including whether OFAC considered Bacardi's alleged ownership of the HAVANA CLUB trademark in denying Ropes & Gray's specific license request on the ground that granting the request would be contrary to United States policy. |

7

| Defendants' Statement No. 26 | Plaintiff's Discovery Regarding No. 26 |
|---|---|
| OFAC is, and has been, aware of legal proceedings involving the Havana Club trademark, including factual findings made in the New York *Havana Club Holding* litigation. <u>See</u> Szubin Decl. ¶ 27. | OFAC's awareness of these legal proceedings, including when OFAC became aware of them and when, if at all, OFAC considered them in making its July 28, 2006 ruling. |

| Defendants' Statement No. 44 | Plaintiff's Discovery Regarding No. 44 |
|---|---|
| As part of its consideration of the request for a specific license, OFAC referred the request to the United States Department of State for guidance concerning whether the grant of such a license would be consistent with United States foreign policy. *See* Mem. from State Department to OFAC, A.R. 2-3; Szubin Decl. ¶ 38. | OFAC's referral of Ropes & Gray's request to the United States Department of State, including how that was done.<br><br>The statements in Szubin Decl. ¶ 38, including:<br><br>    a. OFAC's practice regarding interagency coordination<br><br>    b. OFAC's practice regarding referral to the State Department<br><br>    c. OFAC's "contact … [with] PTO." |

| Defendants' Statement No. 45 | Plaintiff's Discovery Regarding No. 45 |
|---|---|
| The State Department informed OFAC that "[d]enial of the license application would be consistent with the U.S. approach toward non-recognition of trademark rights associated with confiscated property" as well as "consistent with . . . the policy of the United States to deny resources to the Castro regime." A.R. 2-3. Accordingly, "[h]aving weighed the facts and foreign policy concerns presented by this referral, the Department of State recommend[ed] that OFAC deny Ropes & Gray's application." *Id.*; Szubin Decl. ¶ 39 | The meaning of the "U.S. approach toward non-recognition of trademark rights associated with confiscated property" and whether the State Department's July 28, 2006 memorandum is "consistent with" that "approach."<br><br>How the State Department determined that the HAVANA CLUB registration was a trademark right "associated with confiscated property."<br><br>The meaning of the "policy of the United States to deny resources to the Castro regime" and whether the State Department's July 28, 2006 memorandum is "consistent with" that "policy".<br><br>The basis for the State Department's statement |

8

| | that "to the extent that registration of the trademark in this case has current or potential value to the Cuban government" renewal should be denied, including whether the State Department determined that the registration has "current" or "potential" value and, if so, how it did so. |
|---|---|
| **Defendants' Statement Nos. 46-47** | **Plaintiff's Discovery Regarding Nos. 46-47** |
| After considering the State Department's guidance, the facts and circumstances of the case, and the implementation of section 211 in the CACR, OFAC denied the request for a specific license. Letter from OFAC to Vincent Palladino, A.R. 1; Szubin Decl. ¶ 40.<br><br>In the letter, OFAC explains that the Department of State had informed OFAC that "it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark." A.R. 1; Szubin Decl. ¶ 41. | The basis for OFAC's July 28, 2006 ruling that "[p]ursuant to … 30 C.F.R. Part 515 . . . renewal of the HAVANA CLUB Trademark under these circumstances would be prohibited unless specifically licensed."<br><br>The unidentified consideration OFAC gave the State Department's July 28, 2006 memorandum in issuing its July 28, 2006 ruling.<br><br>The unidentified "facts and circumstances of the case" OFAC allegedly took into account in denying Ropes & Gray's request for a specific license.<br><br>The unidentified consideration OFAC gave to "the implementation of Section 211 in the CACR," including how, if at all, it considered:<br><br>    a. the issue of confiscation.<br><br>    b. the issue of consent.<br><br>The two reasons in OFAC's July 28, 2006 ruling for its denial of Ropes & Gray's request for a specific license:<br><br>    a. "consultation with relevant agencies in the U.S. Government, including the Department of State"<br>    b. the "guidance" it received from the State Department. |

| Defendants' Statement No. 48 | Plaintiff's Discovery Regarding No. 48 |
|---|---|
| While OFAC was considering the application, Ropes & Gray continued to pursue renewal of the Havana Club trademark with the PTO.  *See* Letters from Vincent Palladino to Commissioner for Trademarks, A.R. 6-9, 34-40; Szubin Decl. ¶ 37.  Counsel for Bacardi opposed any such action in letters to the PTO.  *See* Letters from William Golden to Commissioner for Trademarks, A.R. 4-5, 10-33; Szubin Decl. ¶ 37. | What consideration, if any, OFAC gave to Bacardi's correspondence and why the July 28, 2006 ruling does not identify it.<br><br>How, if at all, disclosure to the USPTO of OFAC's consideration of Bacardi's correspondence would have affected the USPTO's August 3, 2006 ruling. |
| | **Additional Discovery** |
| | The following facts referred to in the Szubin Declaration, which are not part of the Administrative Record:<br><br>    a. the mission and operations of OFAC, programs, statutes, sanctions, determinations, regulations, reviews, analyses, requests, website pages, practices, licenses and policies referred to in Szubin Decl. ¶¶ 2, 4-22, 26, 38<br><br>    b. the decisions in the HAVANA CLUB trademark litigation referred to in Szubin Decl. ¶ 27<br><br>    c. OFAC's consultations with the State Department and the USPTO referred to in Szubin Decl. ¶ 38<br><br>    d. OFAC's "considera[tion of] the State Department's foreign policy guidance, the implementation of Section 211 in the Cuban Assets Control Regulations, and the facts and circumstances of this case" referred to in Szubin Decl. ¶ 40<br><br>The following facts referred to in OFAC's Statement of Facts, which are not part of the Administrative Record:<br><br>    a. the TTAB decision referred to in Statement of Facts Nos. 22-25 |

|                                    | b. the D.C. Action referred to in Statement of Facts Nos. 23-25 |
| ---------------------------------- | --------------------------------------------------------------- |

7.     If Cubaexport takes discovery concerning the matters set forth in paragraph 6, above, it will seek discovery from OFAC and third parties including the Department of State and the USPTO.

8.     Attached hereto as Exhibit F is a true and correct copy of Cubaexport's First Set of Requests for Production of Documents and Things (Nos. 1-38), served on OFAC on January 31, 2007.

9.     Attached hereto as Exhibit G is a true and correct copy of Cubaexport's First Set of Interrogatories (Nos. 1-7), served on OFAC on January 31, 2007.

10.     Attached hereto as Exhibit H is a true and correct copy of Eric R. Womack's February 23, 2007 letter to Peter M. Brody regarding Cubaexport's discovery requests.

11.     Attached hereto as Exhibit I is a true and correct copy of Peter M. Brody's March 1, 2007 letter to Eric R. Womack regarding Cubaexport's discovery requests.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 15, 2007, in New York, New York.

_____
Eric R. Hubbard

**EXHIBIT A**



República de Cuba
Ministerio de Trabajo y
Seguridad Social
Director Jurídico y de Relaciones
Internacionales

Lic. Francisco Travieso Damas, Abogado, Director de la Dirección Jurídica y de Relaciones Internacionales del Ministerio del Trabajo y Seguridad Social de la República de Cuba.-----

CERTIFICO: ----------------------------------------------------------------------------------

UNICO: Que en el Protocolo de Resoluciones de este Ministerio, a mi cargo, obra el original de la Resolución Nº 5, de fecha cuatro de enero de mil novecientos sesenta, dictada por el Ministro del Trabajo de la República de Cuba, cuyo texto a continuación transcribo, integra y literalmente.-----------------------------------------------------------

*RESOLUCION Nº 05

POR CUANTO: Vistos los expedientes Nos. 65 y 689, unidos en cuerda floja del Departamento de Asuntos Azucareros, incoados con motivo de la solicitud formulada por el Sr. José Luis Labrit Cabezón, Secretario del Sindicato de Obreros y Empleados de la entidad patronal "José Arechabala, S.A. de Cárdenas, para que por el procedimiento conciliatorio que establece la Ley Nº 247, de 16 de abril de 1959, se tratara y discutiera el Pliego de Reivindicaciones que reclaman a la empresa referida.

POR CUANTO: Por Resoluciones del Ministerio del Trabajo que obran en los expedientes citados de fecha 12 de febrero, 4 de Marzo y 8 de Julio del corriente año, se resolvieron algunas de las cuestiones conflictivas planteadas por el Pliego de Reivindicaciones, quedando subsistentes otras por razones de imposibilidad económica alegada por la empresa.

POR CUANTO: Ambas partes: patronal y obrera, interesaron una investigación de costeabilidad de la empresa con la asistencia de contadores que representaron a la Empresa, a la F.N.T.A. y al Ministerio del Trabajo, lo cual se dispuso por Resolución del Ministerio del Trabajo de fecha 31 de Julio del corriente año.



POR CUANTO: Existiendo disparidad de criterio en el resultado de la investigación económica practicada, y después de reuniones conciliatorias, celebradas bajo la presidencia del Dr. José P. Girón Labrada, Director de la Oficina Nacional de Asuntos Azucareros, la parte obrera solicita el amparo de la Ley Nº 647 de 1959, la intervención oficial de la empresa por medio del Ministerio del Trabajo a los fines de lograr los elementos necesarios que le permitan y faciliten conocer el verdadero estado económico de la empresa que sirva para resolver el conflicto laboral existente que amenaza la estabilización de ese centro de trabajo.

POR CUANTO: El informe rendido por el Dr. José P. Girón Labrada aconseja se proceda a una Intervención de Fondo de la Empresa por un funcionario de este Ministerio, que principalmente se dirija a realizar las siguientes gestiones: a) Intensificación de las ventas de alcohol absoluto y alcoholes finos; b) Normalización de las ventas de refino; c) Crear mercados para los demás productos de la empresa; d- Investigación a fondo de la verdadera situación económica de la entidad y e) Informar concretamente al Ministerio si es posible disponer las incrementaciones salariales solicitadas.

1



República de Cuba
Ministerio de Trabajo y
Seguridad Social
Director Jurídico y de Relaciones
Internacionales

POR CUANTO: Dado el estado conflictivo existente en la referida empresa a pesar de los esfuerzos realizados en las conciliaciones practicadas con intervención oficial y demás gestiones de Delegados del Ministro, no se ha logrado la normalización total en el centro de trabajo, haciéndose necesario que se designe un interventor con las más amplias facultades que le permitan resolver en el menor tiempo posible el conflicto existente, y que deberá tomar en consideración principalmente las recomendaciones apuntadas en el Por Cuanto anterior.

POR CUANTO: El Artículo primero de la Ley Nº 647, de 24 de Noviembre de 1959, autoriza al Ministro del Trabajo a disponer en los centros de trabajo en los cuales en forma ostensible se altere el normal desarrollo de la producción.

POR CUANTO: El estado conflictivo de referencia ha continuado agravándose, lo cual ocasiona un desajuste en el desarrollo normal del centro de trabajo y es función primordial del Gobierno Revolucionario y especialmente de este Ministerio, evitar la paralización de los centros de trabajo o reducción en la producción de los mismos, lo cual trae como consecuencia el aumento del desempleo y obstaculiza el mejor desenvolvimiento del país.

POR TANTO: En uso de las facultades que me están conferidas por la Ley Nº 647, de 24 de Noviembre de 1959.

R E S U E L V O:

PRIMERO: Dejar sin efecto la Resolución de fecha 29 de Diciembre de 1959, por la que se designa al Sr. Jubinar Hernández Salina, como Interventor de este Ministerio en la entidad "José Arechabala, S.A.".

SEGUNDO: Designar al Sr. Calixto López Rodríguez, Interventor de este Ministerio en la entidad "José Arechabala, S.A. y sus filiales", con domicilio en Cárdenas, Prov. de Matanzas, por un término de seis meses.



TERCERO: Subrogar en el lugar y grado de la directiva de la administración de la entidad "José Arechabala, S.A. y sus filiales", al mencionado interventor, con facultades para abrir cuenta bancaria, girar en descubierto, aceptar, endosar y descontar y en cualquier forma negociar pagarés, letras o cualquier otro documento mercantil, solicitar y obtener crédito, realizar operaciones de compra o venta de divisas nacionales o extranjeras, tomar dinero a préstamo con o sin garantía, estipulando tipo de interés, vencimiento, lugar de pago, clase de moneda y todos los demás particulares que estime convenientes; pactar cuando lo crea oportuno sobre sobregiros en cuentas corrientes, pignorar, hipotecar o de cualquier manera gravar cualesquiera bienes pertenecientes a la entidad "José Arechabala, S.A. y sus filiales", comprar, cambiar, vender o en cualquier forma operar en o con acciones, bonos y otros valores, alquilar apartados de seguridad, depositando en los mismos y extrayendo su contenido libremente; pactar condiciones de trabajo con los obreros y empleados de la empresa, así como suscribir convenios colectivos de trabajo a nombre de la misma, y pagar las nóminas de obreros y empleados, y cualesquiera otras facultades que le fueren necesarias para el desarrollo de sus funciones.

CUARTO: Ordenar al Interventor designado por este Ministerio para que haga el inventario y tasación de los bienes muebles que se encuentran en el centro laboral.

2



República de Cuba
Ministerio de Trabajo y
Seguridad Social
Director Jurídico y de Relaciones
Internacionales

QUINTO: Asignarle al Sr. Calixto López Rodríguez, Interventor de este Ministerio en la precitada entidad "José Arechabala, S.A. y sus filiales" un sueldo de $250.00 mensuales, que le deberá ser abonado por la empresa de referencia.

Notifíquese las partes en la forma legal procedente.

Dada en La Habana, Ministerio del Trabajo, a los 4 días del mes de Enero de 1960.

Augusto R. Martínez Sánchez
Ministro del Trabajo"

Y para constancia de todo lo cual, expido y firmo el presente documento en dos ejemplares, ambos con el mismo valor y efectos, en la ciudad de La Habana, a los ocho días del mes de noviembre de mil novecientos noventa y nueve.----------------------------------

Francisco Traviese Damas
Director
Ministerio del Trabajo y Seguridad Social

CAMARA DE COMERCIO
DE LA REPUBLICA DE CUBA
Lic. Odalis Seijo García
DIRECCION JURIDICA

Funcionario Autorizado para certificar autenticaciones de firma.

CERTIFICO: Que la firma que antecede, al parecer es auténtica del funcionario autorizante de este documento por la semejanza que guarda con la que obra registrada en esta institución como la que el mismo acostumbra a usar en sus actos oficiales.

En el caso, autorizo la presente con mi firma y sello de esta Institución.

Ciudad de la Habana,        0 2 1 2 9 9

3

Republic of Cuba
Ministry of Labor and
Social Security
Legal Director and Director of
International Relations

I, Francisco Travieso Damas, Attorney, Director of the Legal and Foreign Relations Office of the Ministry of Labor and Social Security of the Republic of Cuba.

**CERTIFY:** ------------------------------------------------------------------------

**SOLE STATEMENT:** That the Resolutions Register of this Ministry, of which I am in charge, contains the original of Resolution No. 5, dated January fourth, nineteen sixty, issued by the Ministry of Labor of the Republic of Cuba, the complete text of which I transcribe below, verbatim: ------------------------------------------------------

### RESOLUTION No. 5

WHEREAS: Having reviewed File Nos. 65 and 689, joined in separate proceedings under the Department of Sugar Industry Affairs, initiated in connection with the request made by José Luis Labrit Cabezón, Secretary of the Workers' and Employees' Union at the company José Arechabala, S.A. in Cárdenas, to review and discuss the List of Claims made against the aforementioned company following the conciliatory procedure established by Law No. 247 dated April 16, 1959.

WHEREAS: By Resolutions of the Ministry of Labor that appear in the files in question dated February 12, March 4 and July 8 of this year, some of the disputes raised in the List of Claims were resolved, while others persisted for reasons of financial incapacity alleged by the company.

WHEREAS: Both parties, the employer and the employees, agreed to a profitability study on the company, with the assistance of accountants representing the company, the National Federation of Sugar Workers and the Ministry of Labor, which was ordered by the Ministry of Labor Resolution dated July 31 of this year.

WHEREAS: There being a difference of opinion in the results of the economic study conducted, and after conciliatory meetings were held under the chairmanship of Dr. José Girón Labrada, Director of the National Office of Sugar Industry Affairs, the workers requested that, pursuant to Law No. 647 of 1959, the company be put under government oversight through the Ministry of Labor in order to obtain the information needed to allow them to determine the company's true financial situation, which would be used to resolve the existing labor dispute that threatens the stability of that work center.

WHEREAS: The report submitted by Dr. José P. Girón Labrada suggests that the company be placed under Full Oversight by an official from this Ministry, which would basically be intended to take the following steps:  (a) Increase sales of absolute alcohol and fine alcohols;  (b) Bring sales of refined products up to standard;  (c) Create markets for all other products of the company;  (d) An in-depth investigation into the company's true economic situation; and (e)  Specifically report to the Ministry whether it is possible to order the requested salary increases.

Republic of Cuba
Ministry of Labor and
Social Security
Legal Director and Director of
International Relations

WHEREAS:  Given the state of conflict existing at the company in question, despite the efforts made at the conciliation meetings held with official involvement and all other steps taken by Ministry Delegates, total order has not been achieved at that work center, making it necessary to designate an inspector with the broadest powers that would allow him to resolve the existing conflict in the shortest possible time, and that should mainly take into account the recommendations indicated in the preceding 'Whereas Clause.'

WHEREAS:  Article One of Law No. 647 of November 24, 1959 authorizes the Ministry of Labor to supervise work centers where normal production is noticeably altered.

WHEREAS:  The state of conflict mentioned above has continued to worsen, resulting in a breakdown of normal operations at the work center, and it is the fundamental duty of the Revolutionary Government, and particularly of this Ministry, to prevent work centers from being paralyzed or their production from decreasing, which results in increased unemployment and hinders the country's optimum progress.

WHEREAS:  In use of the powers conferred upon me by Law No. 647 dated November 24, 1959.

I  R E S O L V E .

ONE.   To set aside the Resolution dated December 29, 1959, designating Jubinar Hernández Salina as Inspector of this Ministry at the entity "José Arechabala, S.A."

TWO: To designate Calixto López Rodríguez the Inspector of this Ministry at the entity "José Arechebala, S.A. and subsidiaries," headquartered in Cardenas, Matanzas Province, for a term of six months.

THREE: To transfer the place and rank of the members of the management of "José Arechebala, S.A. and subsidiaries" to the aforementioned inspector, with powers to open bank accounts; overdraw; accept, endorse, discount, and deal in any manner in promissory notes, bills of exchange or any other commercial document; request and obtain credit; buy or sell domestic or foreign currencies; borrow money with or without guarantees, stipulating interest rates, due dates, payment location, type of currency and all other details that he deems advisable; arrange checking account overdrafts when he so deems appropriate; pledge, mortgage or in any other manner encumber any assets belonging to the entity "José Arechabala, S.A. and subsidiaries;" buy, exchange, sell or trade in any manner in or with stocks, bonds and other securities; rent security deposit boxes, freely depositing and removing its contents; agree to labor conditions with the company's workers and employees, as well as sign collective labor agreements on the company's behalf, and pay the workers' and employees' wages, and any other powers needed to perform his duties.

FOUR:  Order the Inspector designated by this Ministry to take an inventory of and appraise the moveable assets found at the work center.

**Republic of Cuba**
**Ministry of Labor and**
**Social Security**
**Legal Director and Director of**
**International Relations**

FIVE:    To assign Calixto López Rodríguez, Inspector of this Ministry at the aforementioned entity "José Archebala, S.A. and subsidiaries," a salary of CUP 250.00 a month, which must be paid to him by the company of reference.

Notify the parties in the appropriate legal manner.

Issued in Havana, Ministry of Labor, on January 4, 1960.

Augusto R. Martínez Sánchez
Minister of Labor

And in witness whereof, I issue and sign this document in two copies, both with the same value and effects, in the city of Havana on November eighth, nineteen ninety nine.

[signature]
Francisco Travieso Damas
Director
Ministry of Labor and Social Security

**CHAMBER OF COMMERCE**
**OF THE REPUBLIC OF CUBA**

**Odalia Siejo García**
LEGAL DEPARTMENT

**Authorized official for signature authentications.**

**I CERTIFY: That the above signature appears to be the authentic signature of the official who issued this document because of the resemblance it bears to the signature registered at this institution as the signature which he customarily uses in his official acts.**

**In witness whereof, I authenticate this document with the seal of this Institution.**

**City of Havana**          **0 2 1 2 9 9**

[signature]



100 Park Ave.16th Fl
NY, NY. 10017
Toll-Free: 877-GO-CONSORTRA
(877-462-6676)

Your legal translation partner.    www.consortra.com

STATE of NEW YORK      )
                       )          ss:
COUNTY of NEW YORK     )

### CERTIFICATE OF ACCURACY

This is to certify that the attached document, *"Resolution No. 5"* originally written in *Spanish* is, to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: 3\9\07

James G. Mamera
Consortra Translations

Sworn to and signed before ME this
____ 9ᵗʰ ____ day of March,
2007.

Notary Public

LYSA ROBERTS
Notary Public - State of New York
ID No. 01RO6150349
Qualified in New York County
My Commission Expires July 24, 201

**EXHIBIT B**



# Bacardi
## The Hidden War

**Hernando Calvo Ospina**
Translated by Stephen Wilkinson and Alasdair Holden
Preface by **James Petras**

First published in French 2000 by EPO.

First English language edition published 2002 by Pluto Press
345 Archway Road, London N6 5AA
and 22883 Quicksilver Drive, Sterling, VA 20166–2012, USA

www.plutobooks.com

Copyright © Hernando Calvo Ospina and EPO, 2000; this translation
© Stephen Wilkinson and Alasdair Holden 2002

Author's email address: hcalvospina@hotmail.com

The right of Hernando Calvo Ospina to be identified as the author of
this work has been asserted by him in accordance with the Copyright,
Designs and Patents Act 1988.

British Library Cataloguing in Publication Data
A catalogue record for this book is available from the British Library

Library of Congress Cataloging-in-Publication Data

Calvo Ospina, Hernando, 1961–
    [Ron Bacardí. English]
    Bacardí: the hidden war/Hernando Calvo Ospina; translated by
Stephen Wilkinson and Alasdair Holden; preface by James Petras. – 1st
English language ed.
        p. cm.
    Translation of: Ron Bacardí.
    ISBN 0–7453–1874–6 (hardback) – ISBN 0–7453–1873–8 (paperback)
    1. Bacardí Corporation (Puerto Rico)—History. 2. Bacardí
Corporation (Puerto Rico)—Political activity. 3. Rum industry—United
States. 4. Rum industry—United States—Political activity. I. Title.
    HD9394.U54 B33313 2002
    338.7'66359'097295–dc21

                                                        2001006330

ISBN 0 7453 1873 8 hardback
ISBN 0 7453 1874 6 paperback

10  9  8  7  6  5  4  3  2  1

Designed and produced for Pluto Press by
Chase Publishing Services, Sidmouth, EX10 9QG
Typeset by Replika Press Pvt Ltd, India
Printed in the European Union by Antony Rowe, Chippenham, England

84   Bacardí

trade mark registered with the US Patent and Trademark Office. We refer to the brand Havana Club. We understand that the licence was granted initially due to the misrepresentation by representatives of the Cuban government of the scope and the nature of this transaction to your office.

As you are fully aware, since the commencement of the embargo and through the promulgation of the 1992 Cuban Democracy Act and more recently the Solidarity with Liberty and Democracy Act, it has been the policy of the United States as followed by nine US Presidents with the bipartisan support of Congress to achieve democratic changes in Cuba by applying economic pressure on Castro and depriving him of freely convertible currency. President Clinton has assiduously worked to extend this policy and has made progress in achieving the support of our allies in these efforts.

We understand that as a result of the decision taken on 17 April by OFAC the French government has protested to our State Department. This protest alone should justify OFAC's decision, given that it is highly improbable that the French government would take such an active role had its citizens not paid a significant sum to the government of Cuba for rights to the trade mark in the US ...

[...] Were any other legal move to be undertaken by the Cuban government or its business associates seeking the approval of this legal transaction, we strongly recommend that OFAC continue to apply the principles of our policy towards Cuba and reject any request contrary to this policy [...]

Signed: Jesse Helms, Dan Burton, Robert Torricelli, Robert Menéndez, Ileana Ros-Lehtinen, Robert Graham, Benjamín Gilman, Peter Deutsch.

## BACARDÍ 'DISCOVERS' THE ARECHABALAS

Bacardí-Martini's efforts have fundamentally been aimed at wresting the Havana Club brand from its owners. To achieve this end any means have been justified. They therefore sought and effortlessly found the Arechabalas, the descendants of Basque emigrants who at the end of the nineteenth century had produced Havana Club rum in Cuba.

Back then, the Arechabalas' company registered the brand name in five countries. However, four years prior to the Revolution's

triumph they did not re-register the brand in Spain or the Dominican Republic. As a result the name passed into what is known as the public domain. This meant that any producer had the right to take the name, register it and begin to produce a rum called Havana Club. The company was bankrupt as a result of its failure to stand up to its competitors, the main one, ironically, being Bacardí.

In 1960, at a virtual standstill due to a wage dispute with its workers caused by the near bankruptcy, the state intervened and nationalised the company. Subsequently, the Arechabalas left Cuba never to return to business with the Havana Club brand. In 1973, when it was time to renew the licence for the Havana Club name, they did not do so in spite of a minimum of red tape and some $ 25 in cost. Moreover, they could even have written an 'affidavit of non-use', to the effect that the brand would have been retained without the requirement to use it.

Given that the name was in the public domain, in 1974 the Cuban company Cubaexport requested the licence for its use and was granted it two years later 'without any legal opposition in respect of this'.[2] The new owner had already succeeded in obtaining the right to use the name in 80 countries (since 1966 in Spain) with no legal claims made against it in any instance.

Yet in 1997 the Arechabala family, most of whom were by now resident in Spain, came to an agreement with Bacardí by which a company was established in Liechtenstein, the favourite European tax haven. From that moment, Bacardí-Martini began to talk of having rights to the brand name as a result of their acquisition from the supposed owners. From this emerged another legal minefield for the Franco-Cuban corporation.

The Arechabalas, aided and abetted by Bacardí-Martini, then decided to take back a brand name which, according to all international agreements and conventions, they had completely abandoned years before. Here one can pose the famous conundrum: who is the father? The man who sired the child only to desert it or the man who reared it? What is certain is that since 1997, the Arechabalas have insisted that Havana Club 'is the property of our family'.[3]

When the question was asked as to why they had never previously attempted to regain the brand name Bacardí-Martini they answered that 'they never had any means to undertake the legal struggle such as that they were now initiating through the lawyers Gómez,

**EXHIBIT C**

Case 1:06-cv-01692-RCL   Document 17-6   Filed 09/10/2007   Page 2 of 25

# Leyes de la Revolución

### LEY NUM. 890 DE 13 DE OCTUBRE DE 1960

*(G. O. del mismo día)*

**Nacionalización mediante expropiación forzosa de
ingenios, fábricas y otras empresas de carácter
comercial e industrial**

*HACIENDA*

*Por Cuanto:* La obra creadora de la Revolución,
en sus múltiples aspectos, está basada fundamental-
mente en el pleno desarrollo económico de la Nación.

*Por Cuanto:* Es evidente que ese desarrollo no pue-
de lograrse sino mediante la planificación adecuada
de la economía, el aumento y racionalización progre-
siva de la producción y el control nacional de las in-
dustrias básicas del país.

*Por Cuanto:* Muchas de las grandes empresas pri-
vadas del país lejos de asumir una conducta conse-

35

cuente con los objetivos y metas de la transformación
revolucionaria de la economía nacional, han seguido
una política contraria a los intereses de la Revolución
y del desarrollo económico, cuyos signos más evidentes
y notorios han sido el sabotaje a la producción; la ex-
tracción del numerario sin reinversiones adecuadas;
la utilización exagerada de los medios de financiamien-
tos sin empleo del propio capital operativo con la os-
tensible finalidad de acumular efectivo y de invertirlo
en el extranjero previa obtención clandestina de di-
visas; y el abandono frecuente de la dirección directa
de las fábricas lo que, en muchas ocasiones, ha obli-
gado a la intervención por el Ministerio del Trabajo
en evitación preventiva de la crisis laboral que el
cierre o la disminución de la producción puedan crear.

*Por Cuanto:* Esa conducta resulta aún más defini-
damente contraria a los intereses de la Revolución por
ocurrir a pesar de que ha aumentado considerable-
mente el consumo del país y, por consiguiente, se ha
ampliado el mercado interno para dichas empresas.

*Por Cuanto:* El desarrollo económico de la Nación
ha requerido, como condición insoslayable, la radical
transformación de la estructura de nuestro comercio
exterior, para lo cual se ha impuesto el control na-
cional de las importaciones mediante el funcionamien-
to del "Banco para el Comercio Exterior de Cuba" y
es evidente que la subsistencia de las grandes empresas
importadoras que operan bajo el solo estímulo de la
ganancia y que como intermediarias en el mecanismo
de la distribución no cumplen ya función alguna en
la economía nacional, constituye un obstáculo a la
ejecución de la nueva política de comercio exterior.

36

ansformación
han seguido
la Revolución
nás evidentes
icción; la ex-
s, adecuadas;
financiamien-
vo con la os-
de invertirlo
estina de di-
cción directa
nes, ha obli-
del Trabajo
oral que el
uedan crear.

más defini-
volución por
considerable-
iente, se ha
s empresas.

e la Nación
, la radical
o comercio
control na-
cionamien-
de Cuba" y
es empresas
ímulo de la
mecanismo
alguna en
áculo a la
exterior.

*Por Cuanto:* Las prácticas egoístas y anti-naciona-
les expresadas en el primer Por Cuanto en muchos
casos han obligado a la intervención por organismos
estatales de empresas privadas, creando por otra parte
alarma y confusión en sectores a cuya participación
en la economía del país no se oponen los lineamientos
fundamentales de la planificación económica del Go-
bierno Revolucionario.

*Por Cuanto:* El proceso revolucionario impuso la
necesidad de dictar leyes cuyo contenido de beneficio
popular tendía a liquidar los privilegios de ciertos
núcleos económicos, los que, reaccionando violenta-
mente, ignoraron y violaron esas leyes, llegando aún
al extremo de financiar con los dineros mal adquiridos
a grupos de contrarrevolucionarios en franca alianza
con el imperialismo financiero internacional y cons-
tituye la mejor respuesta a esas actividades que el
Gobierno Revolucionario, con serena valentía, pro-
mulgue las leyes necesarias a la defensa y consolida-
ción de la Revolución Cubana.

*Por Cuanto:* Es deber del Gobierno Revolucionario
tomar las medidas que demandan las circunstancias
expuestas en los Por Cuantos anteriores y adoptar
fórmulas que liquiden definitivamente el poder eco-
nómico de los intereses privilegiados que conspiran
contra el pueblo, procediendo a la nacionalización de
las grandes empresas industriales y comerciales que
no se han adaptado ni se podrán adaptar jamás a la
realidad revolucionaria de nuestra Patria, y a la vez
brindar efectivas garantías y a facilitar por distintos
medios el normal desenvolvimiento de todas aquellas
empresas pequeñas y medias cuyos intereses pueden
y deben coincidir con los grandes intereses de la Nación.

37

*Por Cuanto*: La nacionalización debe verificarse mediante la expropiación forzosa de dichas empresas industriales y comerciales, según lo autoriza el Artículo 24 de la Ley Fundamental de la República.

*Por Tanto*: En uso de las facultades que le están conferidas, el Consejo de Ministros resuelve dictar la siguiente,

### LEY NUMERO 890

*Artículo 1.*—Se dispone la nacionalización mediante la expropiación forzosa de todas las empresas industriales y comerciales, así como las fábricas, almacenes, depósitos y demás bienes y derechos integrantes de las mismas, propiedad de las siguientes personas naturales o jurídicas:

#### GRUPO "A"

##### Ingenios Azucareros

1.—Central Bahía Honda, S. A., operadora del Central "Bahía Honda".
2.—Central El Pilar S. A., operadora del Central "El Pilar".
3.—Central La Francia, S. A., operadora del Central "La Francia".
4.—Azucarera Carmen Rita, S. A., operadora del Central "Niágara".
5.—Cia. Azucarera Bramales, S. A., operadora del Central "Orozco".
6.—Central San Cristóbal, S. A., operadora del Central "San Cristóbal".
7.—Nueva Compañía Azucarera Gómez Mena, S. A., operadora del Central "Amistad".

38

erificarse
empresas
za el Ar-
blica.

e le están
dictar la

mediante
sas indus-
lmacenes,
tes de las
nas natu-

del Cen-

ntral "El

el Central

adora del

adora del

del Cen-

ma, S. A.,

8.—Compañía Azucarera Central Toledo, operadora del Central "Fajardo".

9.—Nueva Compañía Azucarera Gómez Mena, S. A., operadora del Central "Gómez Mena".

10.—Compañía Azucarera Habana, S. A., operadora del Central "Habana".

11.—Hershey Corporation, operadora del Central "Hershey".

12.—Central Josefita, S. A., operadora del Central "Josefita".

13.—Nueva Compañía Azucarera Gómez Mena, S. A., operadora del Central "Mercedita".

14.—Compañía Azucarera Güiro Marrero, S. A., operadora del Central "Occidente".

15.—Compañía Central San José Portugalete, S. A., operadora del Central "Portugalete".

16.—Compañía Azucarera de Güines, S. A., operadora del Central "Providencia".

17.—Rosario Sugar Company, operadora del Central "Rosario".

18.—Compañía Azucarera Gómez Mena, operadora del Central "San Antonio".

19.—Compañía Azucarera Central Toledo, operadora del Central "Toledo".

20.—Central Araujo, S. A. operadora del Central "Araujo".

21.—Compañía Azucarera de Guamacaro, S. A., operadora del Central "Carolina".

22.—Ingenio Dolores, S. A., operadora del Central "Dolores".

23.—The Hires Sugar Company, operadora del Central "Dos Rosas".

24.—Compañía Azucarera Central Elena, S. A., operadora del Central "Elena".

39



25.—Compañía Azucarera y Ganadera Guipúzcoa, S. A., operadora del Central "Guipúzcoa".

26.—Compañía Agrícola Indarra, S. A., operadora del Central "Porfuerza".

27.—Compañía Azucarera Progreso, S. A., operadora del Central "Progreso".

27.—Central Puerto, S. A., operadora del Central "Puerto".

29.—Ingenio San Ignacio, S. A., operadora del Central "San Ignacio".

30.—Compañía Azucarera Coliseo, S. A., operadora del Central "Santa Amalia".

31.—Central Santa Rita, S. A., operadora del Central "Santa Rita".

32.—Central Soledad, S. A., operadora del Central "Soledad"

33.—Central Tinguaro, S. A., operadora del Central "Tinguaro".

34.—Compañía Agrícola e Industrial La Julia, S. A., operadora del Central "Triunfo".

35.—Compañía Azucarera Central Adela, S. A., operadora del Central "Adela".

36.—Azucarera Amazonas, S. A., operadora del Central "Amazonas".

37.—Central Andreíta, Compañía Azucarera, S. A., operadora del Central "Andreíta".

38.—Central Caracas, S. A., operadora del Central "Caracas".

39.—Compañía Azucarera Carmita, S. A., operadora del Central "Carmita".

40.—Azucarera Encrucijada, S. A., operado del Central "Constancia".

41.—Compañía Azucarera Corazón de Jesús, S. A., operadora del Central "Corazón de Jesús".

40

42.—Central Escambray, S. A., operadora del Central "Escambray".

43.—Azucarera Camajuaní, S. A., operadora del Central "Fe".

44.—Central Fidencia, S. A., operadora del Central "Fidencia".

45.—Compañía Azucarera Central Macagua, S. A., operadora del Central "Macagua".

46.—Central Manuelita, Compañía Azucarera, S. A., operadora del Central "Manuelita".

47.—North American Sugar Company, operadora del Central "Narcisa".

48.—Ingenio Natividad, S. A., operadora del Central "Natividad".

49.—Central Nazábal, S. A., operadora del Central "Nazábal".

50.—Central Pastora, S. A., operadora del Central "Pastora".

51.—Central Perseverancia, S. A., operadora del Central "Perseverancia".

52.—Azucarera Luzárraga, S. A., operadora del Central "Portugalete".

53.—Compañía Azucarera Caibarién, S. A., operadora del Central "Reforma".

54.—Nueva Compañía Azucarera Gómez Mena, S. A., operadora del Central "Resolución".

55.—Compañía Azucarera Central Resulta, operadora del Central "Resulta".

56.—Central San Agustín, S. A., operadora del Central "San Agustín" (L).

57.—Corporación Industrial del Trópico, S. A., operadora del Central "San Agustín" (R).

58.—Compañía Azucarera de Cienfuegos, S. A., operadora del Central "San Francisco".

41

59.—Compañía Industrial y Agrícola de Quemado de Güines, S. A., operadora del Central "San Isidro".

60.—Compañía Arrendataria San José, S. A., operadora del Central "San José".

61.—Azucarera Margamo, S. A., operadora del Central "San Pablo".

62.—Central Santa Catalina, S. A., operadora del Central "Santa Catalina".

63.—Azucarera Santa Isabel, S. A., operadora del Central "Santa Isabel".

64.—Central Santa Lutgarda, S. A., operadora del Central "Santa Lutgarda".

65.—Central Santa María, S. A., operadora del Central "Santa María".

66.—Compañía Azucarera Santa Rosa, operadora del Central "Santa Rosa".

67.—Compañía General de Ingenios, S. A., operadora del Central "Santa Teresa".

68.—Compañía Comercial Trinsuco, S. A., operadora del Central "Trinidad".

69.—Ulacia, S. A., operadora del Central "Ulacia".

70.—Azucarera Central Unidad, S. A., operadora del Central "Unidad".

71.—Caribbean Sugar Producing Company, operadora del Central "Victoria".

72.—Azucarera Zaza, S. A., operadora del Central "Zaza".

73.—Adelaida, Compañía Azucarera, S. A., operadora del Central "Adelaida".

74.—Compañía Azucarera Ingenio Algodones, S. A., operadora del Central "Algodones".

75.—Azucarera Sibanicú, S. A., operadora del Central "Najasa".

76.—Compañía Azucarera Central Patria, S. A., operadora del Central "Patria".

42

Quemado de
San Isidro".
. A., opera-
ra del Cen-
:radora del
radora del
:radora del
del Central
eradora del
, operadora
, operadora
i "Ulacia".
:radora del
, operadora
lel Central
operadora
nes, S. A.,
lel Central
S. A., ope-

77.—Compañía Azucarera Buenavista, S. A., operadora del Central "Punta Alegre".

78.—Central Santa Marta, S. A., operadora del Central "Santa Marta".

79.—Central Senado, S. A., operadora del Central "Senado".

80.—Central Siboney-Camagüey, S. A., operadora del Central "Siboney".

81.—Central Violeta Sugar Company, S. A., operadora del Central "Violeta".

82.—Compañía Azucarera Alto Songo, S. A., operadora del Central "Algodonal".

83.—Compañía Azucarera América, S. A., operadora del Central "América".

84.—Antillas Sugar States, operadora del Central "Báguanos".

85.—Belona Sugar Company, operadora del Central "Baltony".

86.—Compañía Azucarera Borjita, S. A., operadora del Central "Borjita".

87.—Compañía Azucarera Holguín, S. A., operadora del Central "Cacocum".

88.—Central Cape Cruz, S. A., operadora del Central "Cape Cruz".

89.—Operadora Dos Amigos, S. A., operadora del Central "Dos Amigos".

90.—Compañía Azucarera Oriental Cubana, S. A., operadora del Central "Esperanza".

91.—Cooperativa Azucarera Estrada Palma, S. A., operadora del Central "Estrada Palma".

92.—Compañía Azucarera Vicana, operadora del Central "Isabel" (B).

93.—Compañía Azucarera Central Mabay, S. A., operadora del Central "Mabay".

43



94.—Compañía Azucarera Maceo, S. A., operadora del Central "Maceo".

95.—Central Niquero, S. A., operadora del Central "Niquero".

96.—Cuban Canadian Sugar Company, operadora del Central "Río Cauto".

97.—Central Salvador, S. A., operadora del Central "Salvador".

98.—Compañía Azucarera Yateras, operadora del Central "San Antonio".

99.—Compañía Azucarera Fidelidad, S. A., operadora del Central "San Germán".

100.—Azucarera Oriental San Ramón, S. A., operadora del Central "San Ramón".

101.—Santa Lucía Company, S. A., operadora del Central "Santa Lucía".

102.—Compañía Agrícola Yara, S. A., operadora del Central "Sofía".

103.—Antilla Sugar Estates, operadora del Central "Tacajó".

104.—Compañía Azucarera Tánamo de Cuba, operadora del Central "Tánamo".

105.—Central Unión, S. A., operadora del Central "Unión".

## GRUPO "B"

### Destilerías

1.—José Arechabala, S. A.

2.—Cía. Destiladora San Nicolás, S. A.

3.—Cía. Destiladora Paraíso, S. A.

4.—The Francisco Sugar Co.

5.—Nauyu Destilling Co.

6.—Cía. Alcoholera Occidental, S. A.

44

operadora
del Central
eradora del
el Central
adora del
operadora
operadora
a del Cen-
adora del
el Central
, operado-
l Central

7.—Cía. Alcoholera Agrícola Defensa, S. A.
8.—Cía. General Destiladora, S. A.
9.—Cía. Agrícola Indarra, S. A.
10.—Cía. Azucarera Progreso, S. A.
11.—Cia Industrial Zumaquera,
12.—Cía. Comercial Trinsuco, S. A.
13.—Derivados Industriales de la Caña.
14.—Incera y Hnos. S. A.
15.—Cía. Destiladora Laguabo, S. A.
16.—Cía. Destiladora Oriente, S. A.
17.—Crédito y Fomento, S. A.
18.—Destilería San Miguel, S. A.

### GRUPO "C"
*Bebidas Alcohólicas*

1.—Cía. Ron Bacardí, S. A.
2.—Cervecería Modelo S. A.
3.—Cervecería Central, S. A.
4.—Cía. Cervecera Internacional, S. A.
5.—Nueva Fábrica de Hielo, S. A.
6.—Cía. Cervecera de Las Antillas, S. A.

### GRUPO "D"
*Jabones y Perfumes*

1.—Crusellas y Cía., S. A. y Detergentes Cubanos, S. A.
2.—Sabatés Industrial, S. A. y Productos Detergentes, S. A.
3.—Cía. Mennen de Cuba, S. A.

45

## GRUPO "E"

### Derivados Lácteos

1.—Cía. Lechera de Cuba, S. A.
2.—Cía. Eléctrica Industrial, S. A.
3.—Derivados de Leche, S. A.
4.—Cía. Operadora de Productos Lácteos, S. A.
5.—Cía Nacional de Alimentos, S. A.

## GRUPO "F"

### Fábricas de Chocolates

1.—Cuba Industrial y Comercial, S. A. ("La Estrella").
2.—La Ambrosia Industrial, S. A.

## GRUPO "G"

### Molinos de Harina

1.—Molinera Oriental, S. A.

## GRUPO "H"

### Fábricas de Envases

1.—Envases Industriales y Comerciales, S. A.
2.—Francisco Sobrín Ovalle.
3.—Latas Modernas, S. A.
4.—Envases Perga de Cuba, S. A.
5.—Hubert y Cía.
6.—Industria General Cartonera, S. A.
7.—Impresos y Envases Industriales, S. A.
8.—Pérez Hermanos, S. A.

46

### GRUPO "I"
#### *Fábricas de Pinturas*

1.—Fábrica Nacional de Pinturas, S. A.
2.—Pittsburgh Plate Glass International, S. A.
3.—The Sherwin Williams Co. of Cuba, S. A.
4.—Dupont Interamerica Chemical Co, Inc.

### GRUPO "J"
#### *Químicos*

1.—American Agrícola Chemical.
2.—Electro Química del Caribe, S. A.
3.—Cia. Zimotécnica de Cuba, S. A.

### "GRUPO K"
#### *Metalurgia Básica*

1.—Cia Distribuidora Cafeteras Nacional, S. A.
2.—Fundición Pujol, S. A.
3.—Tubos de Aluminio, S. A.
4.—Especialidades Metálicas Vidal y Hnos., S. A.
5.—Panam Products Co., S. A.
6.—Sanitario Pujol, S. A.

### "GRUPO L"
#### *Papelerías*

1.—The Bohon Trading Corp. (Cia. Comercial Bohon, S. A.)
2.—Papelera Moderna, S. A.
3.—Cia Litográfica de La Habana, S. A.
4.—Antigua Papelera Cubana, S. A.

47

5.—Papelera Río Verde, S. A.
6.—Pedro A. López e Hijos.
7.—Antonio Suárez y Cía.

### "GRUPO M"

#### Lámparas

1.—Lámparas Quesada, S. A.

### "GRUPO N"

#### Textiles y Confecciones

1.—Confecciones Mascot, S. A.
2.—Fábrica de Medias Corona, S. A.
3.—Gold Seal Hosiery, S. A.
4.—Tejidos Soltex, S. A.
5.—Tejidos y Confecciones Perro, S. A.
6.—López, Paz y Cía., S. en C.
7.—García Hermanos y Cía.
8.—Villar Pico y Co.
9.—Acebo Pérez y Co.
10.—Ortiz y Hermano.
11.—López y Co.
12.—José Matos y Co.
13.—Kaba Hnos.
14.—Klepach y Hnos.
15.—Basch Carrió y Co.
16.—Berros y Co.
17.—Prado García y Co.
18.—Seijó Martínez y Co.
19.—Hnos. Ferreiro y Co.
20.—Bernardo González.
21.—Fraguela Fajo y Co.
22.—García Hnos. y Co.

48

23.—Abascal Hnos. y Co.
24.—J. M. Díaz y Co.
25.—Lejarza y Co.
26.—Villamil Martínez y Co.
27.—Gañiz y Hnos.
28.—Pernas y Co.
29.—José A. Rodríguez y Co.
30.—Aguirre, Villar y Co.
31.—Alvarez, Suárez y Co.
32.—López Paz y Co.
33.—Emilio Leyva y Co.
34.—Azze Hosiery Mills, S. A.
35.—Ribbon Fabric Co. of Cuba, S. A.
36.—Textilera Mayabeque, S. A.
37.—Glamour Textile, S. A.
38.—Textilera de Calabazar, S. A.
39.—Industria Textil Nemaseda, S. A.
40.—Cordelería Carranza, S. A.
41.—Fábrica Textilera Antex, S. A.
42.—Libertaria Piñón Alcalde.
43.—Confecciones Exclusiva, S. A.
44.—Confecciones Vigil, S. A.
45.—Cía. de Confecciones Dibés.
46.—Cía. de Ropa en Géneral, S. A.
47.—Benigno Fernández Gómez.
48.—Creaciones Femeninas, S. A.
49.—Textilera El Roble, S. A.
50.—Industria de la Aguja, S. A.
51.—Cía. de Confecciones, S. A.
52.—Isidoro Marín Padilla.
53.—José M. Menéndez.
54.—Sedanita Textil, S. A.
55.—Manuel Galluzi.
56.—San Antonio Textil, S. A.

49

57.—Confecciones Rayda, S. A.
58.—Cía. Onix de Cuba.
59.—Confecciones Modernas de Bejucal, S. A.
60.—Glamour y Textiles, S. A.
61.—Textilera Tricana, S. A.

### "GRUPO Ñ"

*Molinos de Arroz*

1.—Cecilio Mateu Sosa.
2.—Molino Arrocero Los Palacios, S. A.
3.—Hermanos Alfonso y Cía.
4.—Esteban y Felipe Cacicedo Gutiérrez.
5.—Molinos Arroceros de Camagüey, S. A.
6.—Molino Arrocero Valles, S. A.
7.—Molino Arrocero Castaño, S. A.
8.—Molino Arrocero Jayama, S. A.
9.—Molino Arrocero Jagua, S. A.
10.—Manipuladora Agrícola, S. A.
11.—Vila Alvarez y Montero.
12.—Agrícola Industrial Garata, S. A.
13.—Pérez Castillo.
14.—Molino Arrocero La Paloma.
15.—Molino Arrocero Sancti Spíritus.
16.—Central Sta. Marta.

### "GRUPO O"

*Productos Alimenticios*

1.—Industrias Ferro, S. A.
2.—Conservas Selectas, S. A.
3.—Abuín López y Compañía.
4.—Compañía Empacadora La Unión, S. A.
5.—El Ebro, S. A.

50

6.—Víveres y Conservas Wilson, S. A.
7.—Carvajal Ferro, S. A.

## "GRUPO P"
### Aceites y Grasas

1.—Aceites Vegetales, S. A.
2.—Hershey, S. A.

## "GRUPO Q"
### Almacenes de Víveres

1.—J. Pérez, S. A.
2.—Peláez Pirez, S. A., Import. y Export.
3.—Cia. Importadora de Víveres del Norte, S. A.
4.—Importadores Sánchez Loret de Mola, S. A.
5.—Graells y Cía., S. en C.
6.—Roza & Cia.
7.—Hernández Cagigal y Cía.
8.—Tous y Cia., S. A., Import. y Exportadores.
9.—Rodríguez y Cía.
10.—J. Noval, S. en C.
11.—Almacenes de Víveres Rafael Martínez, S. A.
12.—Casas y Cía., S. en C.
13.—Porben y Hno., S. A.
14.—Hijos de Pio Ferro.
15.—Cia. en C. Artemisa, S. A.
16.—Almacenes La Cruz Verde.
17.—Margallón, Vázquez y Cía.
18.—Swift y Cía.
19.—Marcelino González y Cía.
20.—Piñán, Arxer y Cía.
21.—Viv. Luis Vega Castaño.
22.—F. Bonet y Cía.

51

23.—Suero y Cía., S. A.
24.—Prados y Hnos., S. en C.
25.—Gondra y Tenreiro, S. A.
26.—Suc. Santeiro y Cía., S. L.
27.—Otero y Cía.
28.—Suc. de F. Suárez y Cía., S. A.
29.—Framil, García y Cía., S. en C.
30.—Mercantil Balcells, S. A.
31.—Cacicedo y Cía., S. L.
32.—García, Barquín y Cía.
33.—Suc. de Alonso y Cía., S. en C.
34.—Garriga, S. A.
35.—V. Fornias y Cía., S. en C.
36.—Holguín Comercial e Industrial, S. A.
37.—Compañía Empacadora Georgiana, S. A.
38.—Vív. San Juan, S. A.
39.—Cía. Granera.
40.—Amadeo Pardo Estrada.
41.—Llobera y Cía., S. en C.
42.—Cerdá, Llanos y Cía.
43.—Imp. de Vív. Fernández Nuevitas, S. A.
44.—Cía. Industrial y Com. Casal, S. A.
45.—F. Alvarez y Cía., S. L.
46.—Pérez, Rodríguez y Cía.
47.—Imp. Rodríguez, S. A.

### "GRUPO R"

#### Tostaderos de Café

1.—La Diana, Torrefactora de Café, S. A.
2.—Cía. Comercial Tupy, S. A.
3.—Tostadero de Café Las Villas, S. A.
4.—Baquedano y Cía.
5.—Cía. Comercial La Flor de Tibes, S. A.

6.—Souto y Cía., S. en C.
7.—Trueba Hno. y Cía.
8.—Carbajosa y Alvarez.
9.—Martínez y Bulnes.
10.—López y Rivas.
11.—El Leader.

## "GRUPO S"
### Droguerías

1.—Droguería Sarrá, S. A.
2.—Droguería de Johnson, S. A.
3.—Droguería Taquechel, S. A.

## "GRUPO T"
### Tiendas por Departamento

1.—Los Precios Fijos, S. A.
2.—Tiendas Flogar, S. A.
3.—López y Río, S. en C. (Bazar Inglés).
4.—Menéndez Hermanos (La Nueva Isla).
5.—La Isla de Cuba, S. A.
6.—Cía. Distribuidora de Medias, S. A. (Roseland) Hosiery Distribuitors Corp.
7.—La Filosofía, S. A.
8.—Gabriel Sixto y Cía., S. A. (Fin de Siglo).
9.—Solís, Entrialgo y Cía., S. A. (El Encanto).
10.—Tejidos La Epoca, S. A.
11.—Sánchez Mola y Cía., S. A.
12.—Almacenes Ultra, S. A.
13.—Tiendas de Ropa y Sedería La Opera, S. A.

53

## "GRUPO X"
### Construcción

1.—Concreto Caribe, S. A.
2.—Central de Mezcla.
3.—Cantera Caribe.
4.—Concretera Terraza, S. A.
5.—Materiales para Pavimentos y Construcción Camoa, S. A.
6.—Transporte Camoa, S. A.
7.—Maderera Antonio Pérez, S. A.
8.—Pérez y Hno., S. A.
9.—Cia. de Madera Gancedo, S. A.
10.—Tuberías Cubanas de Presión, S. A.
11.—Nueva Compañia de Productos de Asbesto Cemento Perdurit, S. A.
12.—Cia. Pavimentadora Atlas, S. A.
13.—Operadora de Cantera Atlas, S. A.
14.—Equipos de Bar y Cafetería, S. A.
15.—Master Electric, S. A.
16.—Industria Hormigón Estructural Pre-Fabricado, S. A.
17.—Industria Alfarera Azorín, S. A.
18.—Fábrica de Mosaicos La Cubana.
19.—Transporte de Asfalto Ortega, S. A.

## "GRUPO Y"
### Electricidad

1.—Cia. de Electricidad Hernández y Hno.

55

## "GRUPO Z"
### Marítimo

1.—Operadora Marítima Unión, S. A.
2.—Muelle de Beguiristaín.
3.—Terminal Auxiliar Marítima, S. A.
4.—Regla Coal.
5.—Muelle No. 9 Almacenes Afianzados del Puerto de Sagua.
6.—Pita y Cía., S. en C.
7.—Almacenes Casilda, S. A.
8.—Muelle Sarría de Almacenes Jagua, S. A.
9.—Muelle Avilés de Almacenes Jagua, S. A.
10.—Muelle Cacicedo de Cacicedo y Cía.
11.—Muelle Donestévez de José Donestévez.
12.—La Marítima, S. A.
13.—Terminal Oriental de Puertos, S. A.

Artículo 2.—Se adjudican, por lo tanto, a favor del Estado Cubano, todos los bienes, derechos y acciones de las empresas relacionadas en el Artículo 1 de esta Ley, transfiriéndose todos sus activos y pasivos y en su consecuencia se declara al Estado subrogado en el lugar y grado de las personas naturales o jurídicas propietarias de las mencionadas empresas.

Artículo 3.—La Administración y Dirección de las empresas industriales y comerciales que se dejan adjudicadas al Estado por esta Ley, se les asigna a los siguientes organismos y dependencias:

1) Las empresas comprendidas en el "Grupo A" se asignan a la Administración General de Ingenios del Departamento de Industrialización del Instituto Nacional de Reforma Agraria.

56

2) Las empresas comprendidas bajo los "Grupos B a la N", ambos inclusive, se asignan al Departamento de Industrialización del Instituto Nacional de Reforma Agraria.

3) Las empresas relacionadas en los "Grupos Ñ a la P", ambos inclusive, se asignan al Departamento de Producción del Instituto Nacional de Reforma Agraria.

4) Las empresas que aparecen en los "Grupos Q a la T", ambos inclusive, se le asignan a la Oficina Comercial del Instituto Nacional de Reforma Agraria.

5) Las empresas relacionadas en el "Grupo U", se asignan a la Corporación Nacional de Transportes.

6) Las empresas relacionadas en el "Grupo V", se le asignan a la Imprenta Nacional de Cuba.

7) Las empresas que aparecen relacionadas en el "Grupo W", se le asignan al Instituto Cubano del Arte e Industria Cinematográficos.

8) Las empresas relacionadas en los "Grupos X e Y", se le asignan al Ministerio de Obras Públicas.

9) Y las empresas relacionadas en el "Grupo Z" se le asignan al Departamento de Fomento Marítimo.

*Artículo 4.*—Los funcionarios competentes de los organismos y departamentos del Estado a los cuales se les asigna la administración y dirección de las empresas nacionalizadas, podrán designar para cada una de ellas los administradores que elijan, sin perjuicio de las facultades de la Junta Central de Planificación.

*Artículo 5.*—Las expropiaciones y consecuentes nacionalizaciones y adjudicaciones a favor del Estado

57

cubano de las empresas señaladas en el Artículo 1 de esta Ley, se hacen extensivas a las empresas subsidiarias o colaterales de aquéllas, lo cual se llevará a efecto por medio de resoluciones que dictarán los jefes de los organismos o departamentos del Estado a quienes se les encomiende la dirección y administración de las empresas expresamente expropiadas por esta Ley.

*Artículo 6.*—Se declaran como causas de utilidad pública y de interés social y nacional, así como de la necesidad de expropiación, las expuestas en los Por Cuantos de la presente Ley.

*Artículo 7.*—Los medios y formas de pago de las indemnizaciones que correspondan a las personas naturales o jurídicas afectadas por las expropiaciones que se disponen en esta Ley, serán reguladas mediante una Ley posterior.

A ese efecto, la Junta Central de Planificación, procederá a elevar al Consejo de Ministros dentro del más breve plazo posible el correspondiente proyecto de Ley.

### DISPOSICION TRANSITORIA

En cuanto a las empresas industriales y comerciales que en la actualidad se encuentren intervenidas por disposición de organismos estatales, no incluidas en la presente Ley, se faculta a la Junta Central de Planificación para proceder a la nacionalización de las que correspondan de acuerdo con los principios de esta Ley o en su defecto disponer el cese de la intervención.

58

Artículo 1
resas sub-
se llevará
tarán los
el Estado
adminis-
propiadas

: utilidad
como de
s en los

de las in-
nas natu-
iones que
mediante

ificación,
s dentro
ente pro-

/ comer-
interve-
s, no in-
Central
alización
rincipios
se de la

## DISPOSICION FINAL

Se derogan cuantas disposiciones legales y reglamen-
tarias se opongan a lo dispuesto en la presente Ley,
la que comenzará a regir a partir de su publicación
en la "Gaceta Oficial" de la República.

## LEY NUM. 891 DE 13 DE OCTUBRE DE 1960

### (G. O. del mismo día)

**Nacionalización de los Bancos cubanos y extranjeros,
con exclusión de los Canadienses, y liquidación
del Fondo de la Moneda y del de Hipotecas
Aseguradas.**

## HACIENDA

*Por Cuanto:* La política monetaria y crediticia
forma parte de la política económica general del Go-
bierno y desempeña una función estratégica funda-
mental en la asignación y orientación de los recursos
productivos del país.

*Por Cuanto:* Es indispensable transformar la vieja
estructura bancaria de la Nación y adecuarla a las
nuevas condiciones del desarrollo económico creadas
como consecuencia del proceso revolucionario.

*Por Cuanto:* La creación de dinero y la asignación
del crédito deben constituir funciones públicas que
correspondan exclusivamente al Estado, acorde con
los requerimientos de la planeación económica, y no
deben estar a cargo de empresas privadas que fun-
cionan bajo el acicate de la ganancia y con mayor
consideración al interés individual que al colectivo.

59

*Por Cuanto*: Para lograr los objetivos antes expuestos es necesario proceder a la nacionalización y consiguiente expropiación a favor del Estado de todas las empresas bancarias privadas nacionales que operan en el país, como paso previo a la definitiva estructuración del sistema bancario nacional.

*Por Tanto*: En uso de las facultades que le están conferidas, el Consejo de Ministros resuelve dictar la siguiente,

### LEY NUMERO 891

*Artículo 1.*—Se declara pública la función bancaria y en lo adelante sólo podrá ejercerla el Estado a través de los Organismos creados al efecto con arreglo a las disposiciones legales vigentes en cuanto no se opongan a lo dispuesto por la presente Ley.

A los efectos de lo dispuesto en el párrafo anterior se entenderá que la función bancaria incluye todas aquellas operaciones que realizan los bancos de depósito y crédito, de capitalización y ahorro, hipotecarios, de fomento y desarrollo y, en general, todas las demás operaciones realizables por instituciones bancarias de cualquier tipo.

*Artículo 2.*—De conformidad con lo declarado en el artículo anterior se dispone la nacionalización, mediante la expropiación forzosa y, por consiguiente, se adjudican a favor del Estado Cubano, todas las empresas bancarias privadas nacionales, ya se trate de bancos de depósito y crédito, hipotecarios, o de fomento y desarrollo, así como todos los bienes, derechos y acciones pertenecientes a las empresas ban-

60



100 Park Ave.16th Fl
NY, NY 10017

Toll-Free: 877-GO-CONSORTRA
(877-462-6676)

Your legal translation partner.                            www.consortra.com

STATE of NEW YORK )          ss:
)
COUNTY of NEW YORK )

## CERTIFICATE OF ACCURACY

This is to certify that the attached document, *"Law No. 890"* originally written in *Spanish* is, to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: 3|9|07

James G. Mamera
Consortra Translations

Sworn to and signed before ME this
9th day of March,
2007.

Notary Public

LYSA ROBERTS
Notary Public - State of New York
ID No. 01RO6150349
Qualified in New York County
My Commission Expires July 24, 201?

LAWS OF THE REVOLUTION

LAW NO. 890, OCTOBER 31, 1960

(Official Bulletin of the same day)

**Nationalization by means of forcible expropriation of
mills, factories and other
commercial and industrial businesses.**

<u>TREASURY</u>

*Whereas*:  The creative work of the Revolution, in its many facets, is founded on the full economic development of the Nation.

*Whereas*:  It is clear that this development cannot be achieved except through the proper planning of the economy, the increase and progressive rationalization of production, and the national control of the basic industries of the country.

*Whereas*:  Many of the big private companies of the country, far from adopting behavior

35

conforming to the objectives and goals of the revolutionary transformation of the national economy, have followed a policy that is contrary to the interests of the Revolution and economic development. The most obvious and notorious signs of this have been the sabotage of production, the extraction of cash without proper reinvestment, the exaggerated use of financing mechanisms without using the operating capital itself with the clear intention of accumulating cash and investing it abroad after having secretly obtained currency; and the frequent change of the actual address of the factories which has often required the preventive intervention of the Minister of Labor in order to avoid the employment crisis that the closing or reduction of production might cause.

*Whereas*:   Such conduct is even more clearly contrary to the interests of the Revolution because it occurs despite the fact that the country's consumption has increased, and, as a result, the domestic market for those companies has expanded.

*Whereas*:   The economic development of the Nation has required, as an essential condition, the radical transformation of the structure of our foreign commerce, for which purpose national control has been imposed on imports through the operation of the *Cuban Foreign Commerce Bank*. It is clear that the continued existence of the big importing companies that operate solely for the profit motive and which, as middle-men in the distribution system, no longer perform any function in the national economy, constitutes an obstacle to the enactment of the new foreign trade policy.

36

*Whereas*: The egotistical and anti-nationalist practices described in the first clause have often required state agencies to take over private companies, and have also created alarm and confusion among sectors whose participation in the economy does not conflict with any of the fundamental guidelines of the economic planning of the Revolutionary Government.

*Whereas*: The revolutionary process makes it necessary to issue laws that for the public benefit and whose contents may lead to the elimination of the privileges of certain economic nuclei, which react violently, ignoring and violating these laws, and going so far as to use their ill-gotten gains to finance counterrevolutionary groups that are openly allied with international financial imperialism. The best response to these activities is for the Revolutionary Government, with serene courage, to promulgate the laws necessary for the defense and consolidation of the Cuban Revolution.

*Whereas*: It is the duty of the Revolutionary Government to institute the measures required by the circumstances described in the preceding introductory clauses and to adopt systems that would definitively liquidate the economic power of the privileged interests that are conspiring against the people, by proceeding to nationalize the large industrial and commercial companies that have never accepted and will never accept the revolutionary reality of our Nation. At the same time, it must provide effective guarantees and facilitate in any way the normal operation of all of those small and mid-size companies whose interests may and must coincide with the great interests of the Nation.

*Whereas*:  Nationalization must occur through the forcible seizure of such industrial and commercial companies, as authorized by Article 24 of the Constitutional Law of the Republic.

*Therefore*:  Making use of the powers conferred upon it, the Council of Ministers resolves to issue the following

LAW NUMBER 890

*Article 1.*  Nationalization by means of forced expropriation is ordered for all industrial and commercial companies, as well as factories, warehouses, storage facilities, and other assets and rights composing them, owned by the following physical or legal persons:

GROUP A<br>Sugar Plants

1. Central Bahía Honda, S.A., operator of the Bahía Honda plant.
2. Central El Pilar S.A., operator of the El Pilar plant.
3. Central La Francia, S.A., operator of the La Francia plant.
4. Azucarera Carmen Rita, S.A., operator of the Niágara plant.
5. Cía. Azucarera Bramales, S.A., operator of the Orozco plant.
6. Central San Cristóbal, S.A., operator of the San Cristóbal plant.
7. Nueva Compañía Azucarera Gómez Mena, S.A., operator of the Amistad plant.

38

8.    Compañía Azucarera Central Toledo, operator of the Fajardo plant.
9.    Nueva Compañía Azucarera Gómez Mena, S.A., operator of the Gómez Mena plant.
10.   Compañía Azucarera Habana, S.A., operator of the Habana plant.
11.   Hershey Corporation, operator of the Hershey plant.
12.   Central Josefita, S.A., operator of the Josefita plant.
13.   Nueva Compañía Azucarera Gómez Mena, S.A., operator of the Mercedita plant.
14.   Compañía Azucarera Güiro Marrero, S.A., operator of the Occidente plant.
15.   Compañía Central San José Portugalete, S.A., operator of the Portugalete plant.
16.   Compañía Azucarera de Güines, S.A., operator of the Providencia plant.
17.   Rosario Sugar Company, operator of the Rosario plant.
18.   Compañía Azucarera Gómez Mena, operator of the San Antonio plant.
19.   Compañía Azucarera Central Toledo, operator of the Toledo plant.
20.   Central Araujo, S.A., operator of the Araujo plant.
21.   Compañía Azucarera de Guamacaro, S.A., operator of the Carolina plant.
22.   Ingenio Dolores, S.A., operator of the Dolores plant.
23.   The Hines Sugar Company, operator of the Dos Rosas plant.
24.   Compañía Azucarera Central Elena, S.A., operator of the Elena plant.

39

25. Compañía Azucarera y Ganadera Guipúzcoa, S. A. operator of the Guipúzcoa plant.
26. Compañía Agrícola Indarra, S.A., operator of the Porfuerza plant.
27. Compañía Azucarera Progreso, S.A., operator of the Progreso plant.
28. Central Puerto, S.A., operator of the Puerto plant.
29. Ingenio San Ignacio, S.A., operator of the San Ignacio plant.
30. Compañía Azucarera Coliseo, S.A., operator of the Santa Amalia plant.
31. Central Santa Rita, S.A., operator of the Santa Rita plant.
32. Central Soledad, S.A., operator of the Soledad plant.
33. Central Tinguaro, S.A., operator of the Tinguaro plant.
34. Compañía Agrícola e Industrial La Julia, S.A., operator of the Triunfo plant.
35. Compañía Azucarera Central Adela, S.A., operator of the Adela plant.
36. Azucarera Amazonas, S.A., operator of the Amazonas plant.
37. Central Andreíta, Compañía Azucarera, S.A., operator of the Andreíta plant.
38. Central Caracas, S.A., operator of the Caracas plant.
39. Compañía Azucarera Carmita, S.A., operator of the Carmita plant.
40. Azucarera Encrucijada, S.A., operator of the Constancia plant.
41. Compañía Azucarera Corazón de Jesús, S.A., operator of the Corazón de Jesús plant.

40

42.   Central Escambray, S.A., operator of the Escambray plant.
43.   Azucarera Camajuani, S.A., operator of the Fe plant.
44.   Central Fidencia, S.A., operator of the Fidencia plant.
45.   Compañía Azucarera Central Macagua, S.A., operator of the Macagua plant.
46.   Central Manuelita, Compañía Azucarera, S.A., operator of the Manuelita plant.
47.   North American Sugar Company, operator of the Narcisa plant.
48.   Ingenio Natividad, S.A., operator of the Natividad plant.
49.   Central Nazábal, S.A., operator of the Nazábal plant.
50.   Central Pastora, S.A., operator of the Pastora plant.
51.   Central Perserverancia, S.A., operator of the Perserverancia plant.
52.   Azucarera Luzárraga, S.A., operator of the Portugalete plant.
53.   Compañía Azucarera Caibarién, S.A., operator of the Reforma plant.
54.   Nueva Compañía Azucarera Gómez Mena, S.A., operator of the Resolución plant.
55.   Compañía Azucarera Central Resulta, operator of the Resulta plant.
56.   Central San Agustín, S.A., operator of the San Agustín plant (L.)
57.   Corporación Industrial del Trópico, S.A., operator of the San Agustín plant. (R.)
58.   Compañía Azucarera de Cienfuegos, S.A., operator of the San Francisco plant.

41

59.  Compañía Industrial y Agrícola de Quemada de Güines, S.A., operator of the San Isidro plant.
60.  Compañía Arrendataria San José, S.A., operator of the San José plant.
61.  Azucarera Margamo, S.A., operator of the San Pablo plant.
62.  Central Santa Catalina, S.A., operator of the Santa Catalina plant.
63.  Azucarera Santa Isabel, S.A., operator of the Santa Isabel plant.
64.  Central Santa Lutgarda, S.A., operator of the Santa Lutgarda plant.
65.  Central Santa María, S.A., operator of the Santa María plant.
66.  Compañía Azucarera Santa Rosa, operator of the Santa Rosa plant.
67.  Compañía General de Ingenios, S.A., operator of the Santa Teresa plant.
68.  Compañía Comercial Trinsuco, S.A., operator of the Trinidad plant.
69.  Ulacia, S.A., operator of the Ulacia plant.
70.  Azucarera Central Unidad, S.A., operator of the Unidad plant.
71.  Caribbean Sugar Producing Company, operator of the Victoria plant.
72.  Azucarera Zaza, S.A., operator of the Zaza plant.
73.  Adelaida, Compañía Azucarera, S.A., operator of the Adelaida plant.
74.  Compañía Azucarera Ingenio Algodones, S.A., operator of the Algodones plant.
75.  Azucarera Sibanicú, S.A., operator of the Najasa plant.
76.  Compañía Azucarera Central Patria, S.A., operator of the Patria plant.

42

77.   Compañía Azucarera Buenavista, S.A., operator of the Punta Alegre plant.
78.   Central Santa Marta, S.A., operator of the Santa Marta plant.
79.   Central Senado, S.A., operator of the Senado plant.
80.   Central Siboney-Camagüey, S.A., operator of the Siboney plant.
81.   Central Violeta Sugar Company, S.A., operator of the Violeta plant.
82.   Compañía Azucarera Alto Songo, S.A., operator of the Algodonal plant.
83.   Compañía Azucarera América, S.A., operator of the América plant.
84.   Antillas Sugar States, operator of the Báguanos plant.
85.   Belona Sugar Company, operator of the Baltony plant.
86.   Compañía Azucarera Borjita, S.A., operator of the Borjita plant.
87.   Compañía Azucarera Holguin, S.A., operator of the Cacocum plant.
88.   Central Cape Cruz, S.A., operator of the Cape Cruz plant.
89.   Operadora Dos Amigos, S.A., operator of the Dos Amigos plant.
90.   Compañía Azucarera Oriental Cubana, S.A., operator of the Esperanza plant.
91.   Cooperative Azucarera Estrada Palma, S.A., operator of the Estrada Palma plant.
92.   Compañía Azucarera Vicana, operator of the Isabel plant.
93.   Compañía Azucarera Central Mabay, S.A., operator of the Mabay plant.

94.   Compañía Azucarera Maceo, S.A., operator of the Maceo plant.
95.   Central Niquero, S.A., operator of the Niquero plant.
96.   Cuban Canadian Sugar Company, operator of the Rio Cauto plant.
97.   Central Salvador, S.A., operator of the Salvador plant.
98.   Compañía Azucarera Yateras, operator of the San Antonio plant.
99.   Compañía Azucarera Fidelidad, S.A., operator of the San Germán plant.
100.  Azucarera Oriental San Ramón, S.A., operator of the San Ramón plant.
101.  Santa Lucía Company, S.A., operator of the Santa Lucía plant.
102.  Compañía Agrícola Yara, S.A., operator of the Sofia plant.
103.  Antilla Sugar Estates, operator of the Tacajó plant.
104.  Compañía Azucarera Tánamo de Cuba, operator of the Tánamo plant.
105.  Central Unión, S.A., operator of the Unión plant.


GROUP B
Distilleries

1.  José Arechabala, S.A.
2.  Cía. Destiladora San Nicolás, S.A.
3.  Cía. Destiladora Paraíso, S.A.
4.  The Francisco Sugar Co.
5.  Nauyu Destilling [sic] Co.
6.  Cía. Alcoholera Occidental, S.A.

44

7. Cía Alcoholera Agrícola Defensa, S.A.
8. Cía. General Destiladora, S.A.
9. Cía. Agrícola Indarra, S.A.
10. Cía. Azucarera Progreso, S.A.
11. Cía. Industrial Zumaquera.
12. Cía. Comercial Trinsuco, S.A.
13. Derivados Industriales de la Caña.
14. Incera y Hnos. S.A.
15. Cía. Destiladora Laguabo, S.A.
16. Cía. Destiladora Oriente, S.A.
17. Crédito y Fomento, S.A.
18. Destilería San Miguel, S.A.


## GROUP C
### Alcoholic Beverages

1.      Cía. Ron Bacardi, S.A.
2.      Cervecería Modelo, S.A.
3.      Cervecería Central, S.A.
4.      Cía. Cervecera Internacional, S.A.
5.      Nueva Fábrica de Hielo, S.A.
6.      Cía. Cervecera de Las Antillas, S.A.


## GROUP D
### Soaps and Perfumes

1.      Crusellas y Cía., S.A. y Detergentes Cubanos, S.A.
2.      Sabatés Industrial, S.A. y Productos Detergentes, S.A.
3.      Cía. Mennen de Cuba, S.A.

45

GROUP E
Milk Products

1. Cía. Lechera de Cuba, S.A.
2. Cía. Eléctrica Industrial, S.A.
3. Derivados de Leche, S.A.
4. Cía. Operadora de Productos Lácteos, S.A.
5. Cía. Nacional de Alimentos, S.A.


GROUP F
Chocolate Factories

1.    Cuba Industrial y Comercial, S.A. ("La Estrella").
2.    La Ambrosia Industrial, S.A.


GROUP G
Flour Mills

1.    Molinera Oriental, S.A.


GROUP H
Packaging Factories

1.    Envases Industriales y Comerciales, S.A.
2.    Francisco Sobrín Ovalle.
3.    Latas Modernas, S.A.
4.    Envases Perga de Cuba, S.A.
5.    Hubert y Cía.
6.    Industria General Cartonera, S.A.
7.    Impresos y Envases Industriales, S.A.
8.    Pérez Hermanos, S.A.

46

## GROUP I
### Paint Factories

1. Fábrica Nacional de Pintúras, S.A.
2. Pittsburgh Plate Glass International, S.A.
3. The Sherwin Williams Co. of Cuba, S.A.
4. Dupont Interamerica Chemical Co., Inc.

## GROUP J
### Chemicals

1. American Agrícola Chemical
2. Electro Química del Caribe, S.A.
3. Cía. Zimotécnica de Cuba, S.A.

## GROUP K
### Basic Metallurgy

1. Cía. Distribuidora Cafeteras Nacional, S.A.
2. Fundición Pujol, S.A.
3. Tubos de Aluminio, S.A.
4. Especialidades Metálicas Vidal y Hnos., S.A.
5. Panam Products Co., S.A.
6. Sanitario Pujol, S.A.

## GROUP L
### Paper Companies

1. The Bohon Trading Corp. (Cía. Comercial Bohon, S.A.)
2. Papelera Moderna, S.A.
3. Cía. Litográfica de La Habana, S.A.
4. Antigua Papelera Cubana, S.A.

47

5. Papelera Rio Verde, S.A.
6. Pedro A. López e Hijos.
7. Antonio Suárez y Cía.


## GROUP M
Lighting

1. Lámparas Quesada, S.A.


## GROUP N
Textiles and Clothing Manufacturing

1. Confecciones Mascot, S.A.
2. Fábrica de Medias Corona, S.A.
3. Gold Seal Hosiery, S.A.
4. Tejidos Soltex, S.A.
5. Tejidos y Confecciones Perro, S.A.
6. López, Paz y Cía., S. en C.
7. García Hermanos y Cía
8. Villar Pico y Co.
9. Acebo Pérez y Co.
10. Ortiz y Hermano
11. López y Co.
12. José Matos y Co.
13. Kaba Hnos.
14. Klepach y Hnos.
15. Basch Carrió y Co.
16. Berros y Co.
17. Prado García y Co.
18. Seijó Martínez y Co.
19. Hnos Ferreiro y Co.
20. Bernardo González.
21. Fráguela Fajo y Co.
22. García Hnos y Co.

48

23. Abascal Hnos. y Co.
24. J.M. Díaz y Co.
25. Lejarza y Co.
26. Villamil Martínez y Co.
27. Gañiz y Hnos.
28. Pernas y Co.
29. José A. Rodriguez y Co.
30. Aguirre, Villar y Co.
31. Alvarez, Suárez y Co.
32. López Paz y Co.
33. Emilio Leyva y Co.
34. Azze Hosiery Mills, S.A.
35. Ribbon Fabric Co. of Cuba, S.A.
36. Textilera Mayabeque, S.A.
37. Glamour Textile, S.A.
38. Textilera de Calabazar, S.A.
39. Industria Textil Nemaseda, S.A.
40. Cordelería Carranza, S.A.
41. Fábrica Textilera Antex, S.A.
42. Libertaria Piñon Alcalde.
43. Confecciones Exclusiva, S.A.
44. Confecciones Vigil, S.A.
45. Cía. de Confecciones Dibes.
46. Cía. de Ropa en General, S.A.
47. Benigno Fernández Gómez.
48. Creaciones Femeninas, S.A.
49. Textilera El Roble, S.A.
50. Industria de la Aguja, S.A.
51. Cía. de Confecciones, S.A.
52. Isidoro Marin Padilla.
53. José M. Menéndez,
54. Sedanita Textil, S.A.
55. Manuel Galluzi.
56. San Antonio Textil, S.A.

49

57.   Confecciones Rayda, S.A.
58.   Cía. Onix de Cuba.
59.   Confecciones Modernas de Bejucal, S.A.
60.   Glamour y Textiles, S.A.
61.   Textilera Tricana, S.A.


## GROUP Ñ
### Rice Mills

1.    Cecilio Mateu Sosa.
2.    Molino Arrocero Los Palacios, S.A.
3.    Hermanos Alfonso y Cía.
4.    Esteban y Felipe Cacicedo Gutiérrez.
5.    Molinos Arroceros de Camagüey, S.A.
6.    Molino Arrocero Valles, S.A.
7.    Molino Arrocero Castaño, S.A.
8.    Molino Arrocero Jayama, S.A.
9.    Molino Arrocero Jagua, S.A.
10.   Manipuladora Agrícola, S.A.
11.   Vila Alvarez y Montero.
12.   Agrícola Industrial Garata, S.A.
13.   Pérez Castillo.
14.   Molino Arrocero La Paloma.
15.   Molino Arrocero Sancti Spiritús.
16.   Central Sta. Marta.


## GROUP O
### Food Products

1.    Índustrias Ferro, S.A.
2.    Conservas Selectas, S.A.
3.    Abuin López y Compañía.
4.    Compañía Empacadora La Unión, S.A.
5.    El Ebro, S.A.

50

6.     Víveres y Conservas Wilson, S.A.
7.     Carvajal Ferro, S.A.


# GROUP P
## Fats and Oils

1.     Aceites Vegetales, S.A.
2.     Hershey, S.A.


# GROUP Q
## Grocery Warehouses

1.     J. Pérez, S.A.
2.     Peláez Pirez, S.A., Import. y Export.
3.     Cía. Importadora de Víveres del Norte, S.A.
4.     Importadores Sánchez Loret de Mola, S.A.
5.     Graells y Cía, S. en C.
6.     Roza & Cía.
7.     Hernández Cagigal y Cía.
8.     Tous y Ciá, S.A., Import. y Exportadores.
9.     Rodríguez y Cía.
10.    J. Noval, S. en C.
11.    Almacenes de Víveres Rafael Martínez, S.A.
12.    Casas y Cía, S. en C.
13.    Porben y Hno., S.A.
14.    Hijos de Pío Ferro.
15.    Cía. en C. Artemisa, S.A.
16.    Almacenes La Cruz Verde.
17.    Margallón Vázquez y Cía.
18.    Swift y Cía.
19.    Marcelino González y Cia.
20.    Piñán, Arxer y Cía.
21.    Vív. Luis Vega Castaño.
22.    F. Bonet y Cía.

51

23.  Suero y Cía., S.A.
24.  Prados y Hnos., S. en C.
25.  Gondra y Tenreiro, S.A.
26.  Suc. Santeiro y Cía., S. L.
27.  Otero y Cía.
28.  Suc. de F. Suárez y Cía., S.A.
29.  Framil, García y Cía, S. en C.
30.  Mercantil Balcells, S.A.
31.  Cacicedo y Cía., S. L.
32.  García, Barquín y Cía.
33.  Suc. de Alonso y Cía, S. en C.
34.  Garriga, S.A.
35.  V. Fornias y Cía, S. en C.
36.  Holguín Comercial e Industrial, S.A.
37.  Compañía Empacadora Georgiana, S.A.
38.  Vív. San Juan, S.A.
39.  Cía. Granera.
40.  Amadeo Pardo Estrada.
41.  Llobera y Cía, S. en C.
42.  Cerdá, Llanos y Cía.
43.  Imp. de Vív. Fernández Nuevitas, S.A.
44.  Cía. Industrial y Com. Casal, S.A.
45.  F. Alvarez y Cía., S. L.
46.  Pérez, Rodríguez y Cía.
47.  Imp. Rodríguez, S. A.


## GROUP R
### Coffee Roasters

1.  La Diana, Torrefactora de Café, S. A.
2.  Cía. Comercial Tupy, S.A.
3.  Tostadero de Café Las Villas, S.A.
4.  Baquedano y Cía.
5.  Cía. Comercial La Flor de Tibes, S.A.

52

6.      Souto y Cía, S. en C.
7.      Trueba Hno. y Cía.
8.      Carbajosa y Alvarez.
9.      Martínez y Bulnes.
10.     López y Rivas.
11.     El Leader.


GROUP S
Drug Stores

1.      Droguería Sarrá, S.A.
2.      Droguería de Johnson, S.A.
3.      Droguería Taquechel, S.A.


GROUP T
Department Stores

1.      Los Precios Fijos, S.A.
2.      Tiendas Flogar, S.A.
3.      López y Río, S. en C. (Bazar Inglés).
4.      Menéndez Hermanos (La Nueva Isla).
5.      La Isla de Cuba, S.A.
6.      Cía. Distribuidora de Medias, S.A. (Roseland) Hosiery Distribuitors [sic]
        Corp.
7.      La Filosofía, S.A.
8.      Gabriel Sixto y Cía., S.A. (Fin de Siglo).
9.      Solís, Entrialgo y Cía., S.A. (El Encanto).
10.     Tejidos La Epoca, S.A.
11.     Sánchez Mola
12.     Almacenes Ultra, S.A.
13.     Tiendas de Ropa y Sedería La Opera, S.A.


53

GROUP U
Railway Companies

1.     Ferrocarriles Consolidados de Cuba, S.A.
2.     Hershey Terminal Railroad.
3.     Inversiones Consolidadas del Este, S.A.
4.     The Cuba Railroad Company.
5.     Ferrocarriles del Norte de Cuba.
6.     Cía. Ferrocarrilera de Guantánamo y Occidente.
7.     Omnibus Consolidados de Cuba.
8.     Cía. de Fomento de Puerto Tarafa.


GROUP V
Presses

1.     P. Fernández y Cía., S. en C.


GROUP W
Motion Picture Chains and Movie Theatres

1.     Espectáculos Teatrales, S.A.
2.     Circuito Astral.
3.     Circuito Carrerá.
4.     Díaz y Hermano.
5.     Cine Radiocentro.
6.     Cine Arenal.
7.     Cine Alkázar.
8.     Cine Alameda.
9.     Cine Miramar.
10.    Cine Mara.
11.    Cine Santa Catalina.

54

## GROUP X
Construction

1.    Concreto Cariba, S.A.
2.    Central de Mezcla.
3.    Cantera Caribe.
4.    Concretera Terraza, S.A.
5.    Materiales para Pavimentos y Construcción Camoa, S.A.
6.    Transporte Camoa, S.A.
7.    Maderera Antonio Pérez, S.A.
8.    Pérez y Hno., S.A.
9.    Cía. de Madera Gancedo, S.A.
10.   Tuberías Cubanas de Presión, S.A.
11.   Nueva Compañía de Productos de Asbesto Cemento Perdurit, S.A.
12.   Cía. Pavimentadora Atlas, S.A.
13.   Operadora de Cantera Atlas, S.A.
14.   Equipos de Bar y Cafetería, S.A.
15.   Master Electric, S.A.
16.   Industria Hormigón Estructural Pre-Fabricado, S.A.
17.   Industria Alfarera Azorín, S.A.
18.   Fábrica de Mosaicos La Cubana
19.   Transporte de Asfalto Ortega, S.A.


## GROUP Y
Electricity

1.    Cía. de Electricidad Hernández y Hno.


55

GROUP Z

Maritime

1.    Operadora Marítima Unión, S.A.
2.    Muelle de Beguiristain.
3.    Terminal Auxiliar Marítima, S.A.
4.    Regla Coal.
5.    Muelle No. 9 Almacenes Afianzados de Puerto de Sagua.
6.    Pita y Cía, S. en C.
7.    Almacenes Casilda, S.A.
8.    Muelle Sarria de Almacenes Jagua, S.A.
9.    Muelle Avilés de Almacenes Jagua, S.A.
10.   Muelle Cacicedo de Cacicedo y Cía.
11.   Muelle Donestévez de José Donestévez.
12.   La Marítima, S.A.
13.   Terminal Oriental de Puertos, S.A.

*Article 2.*    Therefore, all assets, rights and shares of the companies listed in Article 1 of this Law are awarded to the Cuban Government, with all of their assets and liabilities being transferred and the Government being declared as the successor in place and rank to the physical or legal persons owning the aforementioned companies.

*Article 3.*    The Administration and Direction of the aforementioned industrial and commercial companies that are awarded to the Government under this Law are assigned to the following agencies and offices:

(1)    Companies included in Group A are assigned to the General Plant Administration of the Department of Industrialization of the National Agrarian Reform Agency.

56

(2)    Companies included in Groups B through N are assigned to the Department of Industrialization of the National Agrarian Reform Agency.

(3)    Companies included in Groups Ñ through P are assigned to the Department of Production of the National Agrarian Reform Agency.

(4)    Companies appearing in Groups Q through T are assigned to the Commercial Office of the National Agrarian Reform Agency.

(5)    Companies listed in Group U are assigned to the National Transportation Corporation.

(6)    Companies listed in Group V are assigned to the Cuban National Press.

(7)    Companies listed in Group W are assigned to the Cuban Art and Cinematographic Industries Institute.

(8)    Companies listed in Groups X and Y are assigned to the Ministry of Public Works.

(9)    And companies listed in Group Z are assigned to the Department of Maritime Development.

*Article 4.*    The appropriate officials of the agencies and departments of the Government to which the administration and direction of the nationalized companies are assigned may appoint to each of them those administrators they choose, notwithstanding the powers of the Central Planning Board.

*Article 5.*    The expropriations and resulting nationalizations and awards to the Cuban

57

Government of the companies listed in Article 1 of this Law will extend to the companies that are their subsidiaries or affiliates, and will be put into effect by means of orders to be issued by the heads of the Government agencies or departments which have been entrusted with the direction and administration of the companies expressly appropriated under this law.

*Article 6.* The motives of public benefit and social and national interest, as well as the necessity for expropriation, are deemed to be those set forth in the introductory clauses of this Law.

*Article 7.* Regulations on the methods and forms of payment of the corresponding indemnification to the natural or legal persons affected by the appropriations that are ordered in this Law will be provided in a subsequent Law.

Accordingly, the Central Planning Board will send the corresponding Bill to the Council of Ministers as soon as possible.

TEMPORARY PROVISION

With regard to the industrial and commercial companies that have already been taken over by order of state agencies and are not included in this Law, the Central Planning Board is hereby empowered to proceed with the nationalization of those for which it is appropriate on the basis of the principles of this Law, or otherwise to order that they be released from seizure.

58

Any legal and regulatory provisions that conflict with the provisions of this Law are hereby revoked, and the Law shall be in effect as of its publication in the *Official Bulletin* of the Republic.

59

**EXHIBIT D**

Registered May 14, 1935

Trade-Mark 324,385

# UNITED STATES PATENT OFFICE

Jose Arechabala S. A., Cardenas, Cuba

Act of March 19, 1920

Application October 25, 1933. Serial No. 342,367

# HAVANA CLUB

## STATEMENT

To the Commissioner of Patents:

Jose Arechabala S. A., a corporation organized under the laws of the Republic of Cuba, and doing business at block limited by Dts. 2nd and 3rd and 11th and 13th Aves., Cardenas, Matanzas Province, Republic of Cuba, has adopted and used the trade-mark shown in the accompanying drawing, for

Ethyl Alcohol, Rum, Brandy, Cognac, and Other Potable Distilled Liquors,

in Class 49, Distilled alcoholic liquors, and presents herewith five specimens (or facsimiles) showing the trade-mark as actually used by applicant upon the goods, and requests that the same be registered in the United States Patent Office in accordance with the act of March 19, 1920.

The trade-mark has been continuously used and applied to said goods in applicant's business since September 4, 1933.

The mark has been in bona fide use for not less than one year in commerce between the Republic of Cuba and the United States of America by the applicant.

The trade-mark is applied or affixed to the goods, or to the packages containing the same by means of labels whereon the trade-mark is shown.

Said trade-mark has been registered in the Republic of Cuba under No. 53,614, dated March 19, 1934.

The undersigned hereby appoints the firm of Hervey, Barber & McKee, consisting of Lanier McKee, Morrison T. Hankins, and Wm. Sherman Greene, Jr., whose postal address is 34 Nassau Street, New York city, New York, its true and lawful attorneys, to prosecute this application for registration, with full powers of substitution and revocation, and to make alterations and amendments therein, to receive the certificate, and to transact all business in the Patent Office connected therewith. Said firm is designated on whom process or notice of proceedings affecting the right to ownership of said trade-mark brought under the laws of the United States may be served.

JOSE ARECHABALA S. A.,
By J. FERMIN ITURRIOZ,
Vice-President.

Registered June 16, 1936

# Trade-Mark 335,919

# UNITED STATES PATENT OFFICE

José Arechabala, S. A., Cárdenas, Cuba

Act of February 20, 1905

Application March 9, 1935, Serial No. 363,333



## STATEMENT

To the Commissioner of Patents:

José Arechabala, S. A., a corporation organized under the laws of the Republic of Cuba, and doing business at blocks limited by 2d and 3d Streets and 11th and 12th Avenues, Cárdenas, Matanzas Province, Republic of Cuba, has adopted and used the trade-mark shown in the accompanying drawing, for RUMS, BRANDIES AND WHISKIES in Class 49, Distilled alcoholic liquors and presents herewith five specimens (or facsimiles) showing the trade-mark as actually used by applicant upon the goods, and requests that the same be registered in the United States Patent Office in accordance with the act of February 20, 1905, as amended.

The trade-mark has been continuously used and applied to said goods in applicant's business since February 5, 1935; applicant also being the owner of trade-mark registration No. 315,595, dated July 31, 1934.

All wording appearing in the drawing, with the exception of "Founded 1878" and applicant's name, is disclaimed apart from the mark shown in the drawing.

The trade-mark is applied or affixed to the goods, or to the packages containing the same by means of labels whereon the trade-mark is shown. The undersigned hereby appoints the firm of Harvey, Barber & McKee, consisting of Lahier McKee, Harrison T. Hankins and Wm. Sherman Greene, Jr., whose postal address is 24 Nassau Street, New York City, New York, its true and lawful attorneys, to prosecute this application for registration, with full powers of substitution and revocation, to make alterations and amendments therein, to receive the certificate, and to transact all business in the Patent Office connected therewith.

Said trade-mark was registered in the Republic of Cuba on January 9, 1936, under No. 55,452. Said firm of Harvey, Barber & McKee, is designated on whom process or notice of proceedings affecting the right to ownership of said trade-mark brought under the laws of the United States may be served.

JOSÉ ARECHABALA, S. A.

By JOSÉ FERMIN ITURRIOZ Y. LLAGUNO,

*Vice-President.*

**Registration No. 578,679**

AFFIDAVIT SEC. 8
ACCEPTED — 8    SUPPLEMENTAL REGISTER

Trade-Mark

# UNITED STATES PATENT OFFICE

José Arechabala, S. A., Cardenas, Matanzas, Cuba

Act of 1946

Application November 10, 1951, Serial No. 111,463



## STATEMENT

José Arechabala, S. A., a corporation duly organized under the laws of Cuba, located at Cardenas, Cuba, and doing business at Calle 8, between the Avenues 11 and 13, Cardenas, Province of Matanzas, Cuba, has adopted and is using the trade-mark shown in the accompanying drawing, for RUM, in Class 49, Distilled alcoholic liquors, and presents herewith five specimens showing the trade-mark as actually used in connection with such goods, the trade-mark being applied by means of printed labels affixed to the bottles containing the goods, and requests that the same be registered in the United States Patent Office on the Supplemental Register, in accordance with the act of July 5, 1946.

The trade-mark was first used on June 3, 1950 and first used in commerce between Cuba and the United States which may lawfully be regulated by Congress, on June 3, 1950, and has been in lawful use in such commerce and in commerce among the several States of the United States which may lawfully be regulated by Congress, upon or in connection with the goods for the year preceding the filing of this application.

The lining on the drawing indicates the colors yellow-beige, and red.

Applicant is the owner of the following United States Trade-Mark Registrations: No. 335,919 dated June 16, 1936; No. 324,385 dated May 14, 1935; No. 315,596 dated July 31, 1934.

Hascltine, Lake & Co. (Robert S. Waters and Eric H. Waters being the members of the firm), whose postal address is 19 West 44th Street, New York 18, N. Y., U. S. A., are designated as applicant's representatives on whom notices or process in proceedings affecting the mark may be served.

JOSÉ ARECHABALA, S. A.

BY CORNELIO LARTITEGUI Y ACHIRICA,
Presidente p. s.

Registration No. 578,680

AFFIDAVIT SEC. 8
ACCEPTED

SUPPLEMENTAL REGISTER

Trade-Mark

# UNITED STATES PATENT OFFICE

José Arechabala, S. A., Cardenas, Matanzas, Cuba.

Act of 1946

Application November 29, 1951, Serial No. 631,488



## STATEMENT

José Arechabala, S. A., a corporation duly organized under the laws of Cuba, located at Cardenas, Cuba, and doing business at Calle 6, between the Avenues 11 and 13, Cardenas, Province of Matanzas, Cuba, has adopted and is using the trade-mark shown in the accompanying drawing, for RUM, in Class 49, Distilled alcoholic liquors, and presents herewith five specimens showing the trade-mark as actually used in connection with such goods, the trade-mark being applied by means of printed labels affixed to the bottles containing the goods, and requests that the same registered in the United States Patent Office on the Supplemental Register in accordance with the act of July 5, 1946.

The trade-mark was first used on June 3, 1950, and first used in commerce between Cuba and the United States which may lawfully be regulated by Congress, on June 3, 1950, and has been in lawful use in such commerce and in commerce among the several States of the United States

which may lawfully be regulated by Congress upon or in connection with the goods for the year preceding the filing of this application.

The lining on the drawing indicates the color red.

Applicant is the owner of the following United States Trade-Mark Registrations: No. 335,916, dated June 16, 1936; No. 324,365, dated May 14, 1935; No. 315,595 dated July 31, 1934.

Haseltine, Lake & Co. (Robert S. Waters and Eric H. Waters being the members of the firm), whose postal address is 19 West 44th Street, New York 18, N. Y., U. S. A., are designated as applicant's representatives on whom notices or proceedings affecting the mark may be served.

JOSÉ ARECHABALA, S. A.

BY CORNELIO LARTITEGUI Y ACHIRICA,

Presidente p. s.

# United States Patent Office

632,328
Registered Aug. 14, 1956

## PRINCIPAL REGISTER
### Trademark

**CANCELLED
SECTION 8**

Ser. No. 695,377, filed Sept. 27, 1955

# HAVANA CLUB

Jose Arechabala, S. A. (Cuban corporation)
5 Calle, between the Avenues 11 and 13
Cardenas, Matanzas Province, Cuba.

For: RUM, in CLASS 49.
First use Sept. 4, 1933; and in commerce Sept. 4, 1933.
Sec. 2(f).
Owner of Reg. Nos. 335,919, 578,679, and 578,680.

**EXHIBIT E**



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

October 02, 1998

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS
OF THIS OFFICE OF THE TRADEMARK FILE WRAPPER AND CONTENTS OF:

TRADEMARK APPLICATION: *74/522,925*
FILING DATE: *May 02, 1994*
MARK: *HAVANA CLUB*
JOSE MA. ARECHABALA RODRIGO

By Authority of the

COMMISSIONER OF PATENTS AND TRADEMARKS

P. SWAIN

Certifying Officer

| DAVIT | Section 15 | | 30. O.G. Date |
|---|---|---|---|
| 24. | Approved for Renewal | | |
| RENEWAL | Renewed From | | |

| | | |
|---|---|---|
| REG. NO. | **3. MARK**<br>HAVANA CLUB | **4. SER. NO.**<br>74/522925 |
| **2. REG. DATE** | | **5. REGISTER**<br>PRINCIPAL |
| **6. INTERNATIONAL CLASS**<br>33 | **7. PRIOR U.S. CLASS**<br>49 | **8. FILING DATE** 05/02/94   **9. LAW OFFICE** 13 |

**10. APPLICANT AND POST OFFICE**
JOSE MA. ARECHABALA RODRIG
Paseo Castellana 112
Madrid, SPAIN 28046
INDIVIDUAL SPAIN CITIZEN  ABANDONED

**16. EXAMINING ATTORNEY**
D. C. Reimer

**17. TYPE OF MARK**   SECTION 1(B)
TRADEMARK

**18. FIRST USE**
ICL 033  00/00/0000

**11. CORRESPONDENCE ADDRESS**
Robert B. Kennedy
KENNEDY & KENNEDY
Suite 1250, 400 Northpark Town Center
1000 Abernathy Road
Atlanta, GA 30328

**19. IN COMMERCE**
ICL 033  00/00/0000

**12. DOMESTIC REPRESENTATIVE**
Robert B. Kennedy

**13. APPLICANT'S ATTORNEY**
Robert B. Kennedy

**20. FOREIGN REG. AND APPL. DATA**

**15. GOODS — SERVICES**
033-distilled liquors

**21. OTHER DATA**

PTO-102L (REV. 12/82) U.S. DEPT. OF COMMERCE — PATENT AND TRADEMARK OFFICE

| 22. AMENDED | PRINCIPAL REGISTER | 25. Examiner | |
|---|---|---|---|
| | | 26. Section 1(C) Accepted | |
| | | 27. Section 1(D) Accepted | |
| 23. AFFIDAVIT | Section 8 | 28. Approved for Publication | |
| | Section 15 | 29. Approved for Supplemental Registration | |
| | | 30. O.G. Date | |
| 24. RENEWAL | Approved for Renewal | | |
| | Renewed From | | |

74/522925

TRADEMARK APPLICATION SERIAL NO. _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

100 BA 05/23/94 74522925                    0 362        245.00 CK

PTO-1555
  (5/87)

1/0

245. -361     TM

74/522925

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

TRADEMARK OPERATIONS

Mark:  HAVANA CLUB

International Class:  33

TO THE HONORABLE COMMISSIONER OF PATENTS AND TRADEMARKS:

STATEMENT

JOSE MA. ARECHABALA RODRIGO
Paseo Castellana 132
Madrid, Spain 28046
(A Spanish Citizen)

The above-identified applicant requests registration of the mark shown in the accompanying drawing in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946, as amended, for distilled liquors in International Class 33.

Applicant has a bona fide intention to use the mark in commerce in connection with the goods.

The intended manner or mode of use of the mark in connection with the goods is by printed on containers of the goods.

-1-

## POWER OF ATTORNEY

Applicant hereby appoints Robert B. Kennedy, Reg. No. 24,294, a member of the bars of the State of Georgia and the State of Florida, to prosecute this application to register, to transact all business in the Patent and Trademark Office in connection therewith, and to receive the certificate of registration.

All correspondence should be directed to:

Robert B. Kennedy
KENNEDY & KENNEDY
Suite 1250
400 Northpark Town Center
1000 Abernathy Road
Atlanta, Georgia 30328

All telephone discussion should be directed to Robert B. Kennedy at 404-396-2244.

## DOMESTIC REPRESENTATIVE

Pursuant to 15 USC 1051(d), Applicant hereby appoints as its domestic representative: Robert B. Kennedy, Kennedy & Kennedy, Suite 1250, 400 Northpark Town Center, 1000 Abernathy Road, Atlanta, Georgia 30328.

-2-

## DECLARATION

Jose Ma. Arechabala Rodrigo declares that: he believes himself to be entitled to use the mark sought to be registered; to the best of his knowledge and belief no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods or services of such other person, to cause confusion, or to cause mistake, or to deceive; that all statements made herein of his own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or document or any registration resulting therefrom.

April 22nd 1994
_____
(Date)

Jose Ma. Arechabala Rodrigo
_____
Jose Ma. Arechabala Rodrigo

Docket No. 2M22 3-090

-3-



74/522925

APPLICANT            —  Jose Ma. Arechabala Rodrigo
                     —  (A Spanish Citizen)

P. O. ADDRESS        —  Paseo castellana 132
                        Madrid, Spain 28046

GOODS OR SERVICES    —  Distilled liquors



HAVANA CLUB

ABANDONED

SEP 1 6

—4—

**EXHIBIT F**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------------x

EMPRESA CUBANA EXPORTADORA
DE ALIMENTOS Y PRODUCTOS
VARIOS d/b/a CUBAEXPORT
Calle 24, n 55, edif. MINCEX, 8vo, piso,          Civil Action No. 1:06CV01692
Havana, Cuba,

       Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
TREASURY, OFFICE OF FOREIGN
ASSETS CONTROL, HENRY M.
PAULSON, JR., as Secretary of Treasury,
ADAM J. SZUBIN, as Director of the
Office of Foreign Assets Control; and THE
UNITED STATES,

       Defendants.

-------------------------------------------------------x

**CUBAEXPORT'S FIRST SET OF REQUESTS FOR**
**PRODUCTION OF DOCUMENTS AND THINGS (NOS. 1-38)**

      Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and Local

Rule 26.2 for the District of Columbia, the plaintiff, Empresa Cubana Exportadora de Alimentos

y Productos Varios d/b/a Cubaexport ("Cubaexport"), requests that the defendants, Office of

Foreign Asset Control, Henry M. Paulson, Jr., as Secretary of Treasury, Adam J. Szubin, as

Director of the Office of Foreign Assets Control and the United States (collectively "OFAC"),

produce for inspection and/or copying at the offices of Ropes & Gray, One Metro Center 700

12th Street, N.W., Washington, D.C.  20005, within thirty (30) days of the service of these

requests, the documents and things in their possession, custody or control that are described

below.

## DEFINITIONS AND INSTRUCTIONS

1. The term "DOCUMENT" includes electronically stored information and is defined to be synonymous in meaning and equal in scope to the usage of this term in the Federal Rules of Civil Procedure 34(a). A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "COMMUNICATION" as used herein means any transmittal of information (in the form of facts, ideas, inquiries, or otherwise), and also any response thereto; such term therefore includes, but is not limited to, any telephone conversation, face-to-face meeting or conversation, visit, conference, internal or external discussion, negotiation, correspondence (as defined herein) or exchange of a document or documents. "COMMUNICATION" herein includes without limitation any communication, as defined above, between persons employed by OFAC, or between one or more persons employed by OFAC and one or more third parties, or between third parties.

3. The term "THIRD PARTIES" herein includes without limitation any branch, agency or department of government or any nongovernmental or private entity or individual.

4. The term "CORRESPONDENCE" as used herein means and includes, but is not limited to, any letter, facsimile, telex, electronic mail (including without limitation, archived and deleted electronic mail), notice, message, memorandum, or other written, transcribed, recorded, or otherwise memorialized communication in any form, whether signed or unsigned.

5. The term "PERSON" is defined as any natural person or any business, legal entity or association.

6. The term "CONCERNING" means relating to, referring to, describing, evidencing or constituting.

7.  The terms "ANY" and "ALL" shall be construed to mean each and every.

8.  The connectives "AND" and "OR" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

9.  The use of the singular form of any word includes the plural and vice versa.

10.  The term "CUBAEXPORT" means Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a Cubaexport and includes all of its directors, officers, agents, employees, attorneys, and all other persons acting or purporting to act on its behalf, now or at any time in the past.

11.  The term "ROPES & GRAY" includes attorneys from Fish & Neave who acted on behalf of Cubaexport.

12.  The term "OFAC" means the named defendant, United States Department of Treasury, Office of Foreign Assets Control and the individual named defendants and includes all of its directors, officers, agents, employees, attorneys, and all other persons acting or purporting to act on its behalf, now or at any time in the past.

13.  The term "BACARDI" means Bacardi U.S.A., Inc., and Bacardi & Company, Ltd. and the officers, directors, agents, employees, partners and all other persons acting or purporting to act on behalf of, or who are subject to the direction or control of, any of the foregoing.

14.  The term "U.S. HAVANA CLUB trademark" means the trademark that is the subject of U.S. Registration No. 1,031,651.

15.  The term "SECTION 211" means Section 211 of the Omnibus Consolidation and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, 112 Stat. 2681 (1998).

3

16.  The terms "GENERAL LICENSE" and "SPECIFIC LICENSE" have the meaning set forth in the Cuban Assets Control Regulations, 31 C.F.R. § 515 *et seq.*

17.  The term "31 C.F.R. §515.527(a)(1)" means that section of 31 C.F.R. §515 *et seq.* or any prior version of such regulation including without limitation §515.527(a).

18.  The term "31 C.F.R. §515.527(a)(2)" means that section of 31 C.F.R. §515 *et seq.*

19.  The term "31 C.F.R. §515.527(b)" means that section of 31 C.F.R. §515 *et seq.*

20.  The term "31 C.F.R. §515.527(c)" means that section of 31 C.F.R. §515 *et seq.*

21.  The term "LICENSE REQUEST" means any request for the grant or renewal of a Specific License concerning the U.S. HAVANA CLUB trademark, made by Cubaexport or Ropes & Gray.

22.  The term "CUBAN NATIONAL" has the same meaning set forth in the Cuban Assets Control Regulations, 31 C.F.R. § 515.302.

23.  The term "SZUBIN DECLARATION" means the December 21, 2006 Declaration of Adam J. Szubin submitted in support of Defendants' Motion To Dismiss Or, In The Alternative, For Summary Judgment.

24.  The term "STATEMENT OF FACTS" refers to the Statement of Undisputed Material Facts submitted in connection with Defendants' Motion To Dismiss Or, In The Alternative, For Summary Judgment.

25.  If any document requested is withheld on the ground of any asserted privilege or immunity, including without limitation the attorney-client privilege or work product

4

immunity, state the nature of the privilege or immunity asserted and identify the type of

document, the general subject matter of the document, the date of the document, the author of the

document, the addressees of the document, and any other recipients shown on the document, in

accordance with Fed. R. Civ. P. 26(b)(5).

26. In responding to these requests, OFAC must furnish all documents available

to it, including documents in the possession, custody or control of OFAC's attorneys,

accountants, agents, employees, representatives, or any other persons directly or indirectly

employed or connected with OFAC, OFAC's attorneys or anyone else subject to OFAC's control.

27. Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, the

documents produced are to be produced as they are kept in the ordinary course of business or are

to be reorganized and labeled to correspond to the specific request to which they are responsive.

For example, a document that is part of a file, docket or other grouping should be physically

produced together with all other documents from said file, docket or grouping, in the same order

or manner of arrangement as the original. Additionally, each document should be produced

stapled, clipped or otherwise bound or connected in the same manner as the original. Documents

that comprise electronically stored information should be produced as TIFF images with the

corresponding meta-data and full text from the original native files.

28. Color copies of documents are to be produced where color is necessary to

interpret or understand the contents.

29. If OFAC has no documents or things responsive to a particular request for

production, please so state.

30. If OFAC is aware that a document or group of documents responsive to any

of these requests existed, but has been destroyed or discarded, for each such document or group

5

of documents, identify the document or group of documents, state when the document or group of documents was destroyed or discarded, state why the document or group of documents was destroyed or discarded, and identify the persons most knowledgeable about the contents of the documents or group of documents and the circumstances under which the document or group of documents was destroyed or discarded.

31.  The obligation to provide the information sought by these requests for production is continuing within the terms of Rule 26(a) of the Federal Rules of Civil Procedure.

## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

### REQUEST NO. 1

Documents sufficient to describe OFAC's organizational structure and the reporting relationships among OFAC employees with responsibility for the consideration or issuance of General Licenses and Specific Licenses.

### REQUEST NO. 2

All documents after 1997 concerning any communication between OFAC and any other branch, department, or agency of the United States Government, any branch, department, or agency of the government of any State, or any private party (including Ropes & Gray) concerning the trademark HAVANA CLUB.

### REQUEST NO. 3

All documents created after 1997 concerning License Requests (whether granted or denied), including without limitation communications within OFAC and between OFAC and any other branch, department, or agency of the United States Government, any branch, department, or agency of the government of any State, or any private party (including Ropes & Gray).

6

**REQUEST NO. 4**

All documents concerning Ropes & Gray's December 13, 2005 letter to OFAC, including without limitation communications within OFAC, and between OFAC and any other branch, department, or agency of the United States Government, any branch, department, or agency of the government of any State, or any private party (including Ropes & Gray).

**REQUEST NO. 5**

All documents concerning Section 211, including without limitation any perceived need or reason for enactment of Section 211, the legislative process leading to enactment of Section 211, the lawfulness *vel non* of Section 211, the effect or potential effect of Section 211, and the implementation, application or interpretation of Section 211.

**REQUEST NO. 6**

All documents concerning the legislative process leading to the enactment of Section 211 including communications with any committee, subcommittee, member or employee of either House of the United States Congress.

**REQUEST NO. 7**

All communications concerning Section 211 within OFAC and between OFAC and any other branch, department, or agency of the United States Government, any branch, department, or agency of the government of any State, or any private party (including Ropes & Gray).

**REQUEST NO. 8**

All documents concerning the regulatory process leading to the adoption of the regulations currently codified at 31 C.F.R. §515.527(a)(1), 31 C.F.R. §515.527(b) and 31 C.F.R. §515.527(c), including without limitation any writing, review, or approval of such regulations,

7

the reason or reasons for adoption of the regulations, and any communication concerning the regulations, including without limitation communications within OFAC and between OFAC and any other branch, department, or agency of the United States Government, any branch, department, or agency of the government of any State, or any private party (including Ropes & Gray).

## REQUEST NO. 9

All documents concerning the regulatory process leading to the adoption of the regulation currently codified at 31 C.F.R. §515.527(a)(2), including without limitation any writing, review, or approval of such regulation, the reason or reasons for adoption of the regulation, and any communication concerning the regulation, including without limitation communications within OFAC and between OFAC and any other branch, department, or agency of the United States Government, any branch, department, or agency of the government of any State, or any private party (including Ropes & Gray).

## REQUEST NO. 10

All documents concerning any policies, procedures, or criteria (formal or informal, written or otherwise) used or adopted by OFAC relating to the implementation or application of 31 C.F.R. §515.527(a)(1), 31 C.F.R. §515.527(b) and 31 C.F.R. §515.527(c) or any prior version of such regulations, including without limitation any policies, procedures, or criteria for determining whether an activity is authorized pursuant to the General License set forth in such regulations.

## REQUEST NO. 11

All documents concerning any policies, procedures, or criteria (formal informal, written or otherwise) used or adopted by OFAC relating to the implementation or

8

application of Section 211 or 31 C.F.R. §515.527(a)(2), including without limitation any policies, procedures, or criteria for determining whether a mark is "the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated" and whether "the original owner of the mark, trade name, or commercial name, or the bona fide successor-in-interest" has not expressly consented to the registration of the mark or the renewal of the registration of the mark.

## REQUEST NO. 12

All documents concerning any policies, procedures, or criteria (formal or informal, written or otherwise) used or adopted by OFAC relating to the consideration or issuance of any General License or Specific License for any activity in connection with any trademark, trademark registration, renewal of a trademark registration owned or claimed to be owned by any Cuban National.

## REQUEST NO. 13

All documents concerning any policies, procedures, or criteria (formal or informal, written or otherwise) used or adopted by OFAC relating to the consideration or issuance of any General License or Specific License for any activity in connection with any intellectual property right other than a trademark, trademark registration or renewal of a trademark registration owned or claimed to be owned by any Cuban National.

## REQUEST NO. 14

All documents created after 1997 relating to any application submitted to OFAC by any persons for a Specific License for any activity in connection with any trademark, trademark registration, or renewal of a trademark registration by or on behalf of a Cuban National.

9

**REQUEST NO. 15**

All documents concerning any United States governmental policy, practice, or position regarding any or all trademarks, registrations, or renewals owned or claimed to be owned by any Cuban National.

**REQUEST NO. 16**

All documents concerning OFAC's authority "to implement U.S. foreign policy and national security goals" referred to Szubin Declaration ¶ 4.

**REQUEST NO. 17**

All documents concerning how, if at all, OFAC's April 6, 2006 letter took into account Cuba's alleged confiscation of JASA's assets in 1960 referred to in Statement of Facts No. 18.

**REQUEST NO. 18**

All documents concerning how, if at all, OFAC's July 28, 2006 letter took into account Cuba's alleged confiscation of JASA's assets in 1960 referred to in Statement of Facts No. 18.

**REQUEST NO. 19**

All documents concerning Bacardi's alleged ownership of the HAVANA CLUB trademark referred to in Statement of Facts No. 19.

**REQUEST NO. 20**

All documents concerning how, if at all, OFAC took into account Bacardi's alleged ownership of the HAVANA CLUB trademark in preparing its April 6, 2006 letter.

**REQUEST NO. 21**

All documents concerning how, if at all, OFAC took into account Bacardi's

alleged ownership of the HAVANA CLUB trademark in preparing its July 28, 2006 letter.

**REQUEST NO. 22**

All documents concerning OFAC's "aware[ness]' of the legal proceedings referred to in Statement of Facts No. 26.

**REQUEST NO. 23**

All documents concerning why paying the renewal fee to maintain U.S. Registration No. 1,031,651 was not a transaction necessary for Ropes & Gray to provide Cubaexport representation within the meaning of OFAC License No. CU-74488.

**REQUEST NO. 24**

With respect to OFAC's April 6, 2006 letter, all documents concerning why OFAC could not gauge the extent to which refusing to authorize renewal of U.S. Registration 1,031,651 would affect the outcome of the D.C. Action referred to in Statement of Facts No. 25.

**REQUEST NO. 25**

All documents concerning the statements in Szubin Declaration ¶ 38 regarding:

a.     OFAC's practice regarding interagency coordination

b.     OFAC's practice regarding referral to the State Department

c.     OFAC's "contact ... [with] PTO."

**REQUEST NO. 26**

All documents concerning the meaning of the phrase "U.S. approach toward non-recognition of trademark rights associated with confiscated property" set forth in the State Department's July 28, 2006 letter.

**REQUEST NO. 27**

All documents concerning whether the State Department's July 28, 2006 memorandum is "consistent with" the "approach" identified in Request No. 26, as stated in that memorandum.

## REQUEST NO. 28

All documents concerning how the State Department determined that U.S. Registration No. 1,031,651 is a trademark right "associated with confiscated property" as stated in the State Department's July 28, 2006 memorandum.

## REQUEST NO. 29

All documents created after 1997 concerning the meaning of the "policy of the United States to deny resources to the Castro regime" referred to in the State Department's July 28, 2006 memorandum.

## REQUEST NO. 30

All documents concerning whether the State Department's July 28, 2006 memorandum is "consistent with" the "policy" identified in Request No. 29, as stated in that memorandum.

## REQUEST NO. 31

All documents concerning the basis for the State Department's statement that "to the extent that registration of the trademark in this case has current or potential value to the Cuban government" renewal should be denied.

## REQUEST NO. 32

All documents concerning the basis for the statement in OFAC's July 28, 2006 letter that "[p]ursuant to ... 30 C.F.R. Part 515 ... renewal of the HAVANA CLUB Trademark under these circumstances would be prohibited unless specifically licensed."

12

**REQUEST NO. 33**

All documents concerning the consideration OFAC gave the State Department's July 28, 2006 memorandum in preparing its July 28, 2006 letter.

**REQUEST NO. 34**

All documents concerning the "facts and circumstances of the case" referred to in Statement of Facts No. 46.

**REQUEST NO. 35**

All documents concerning the consideration OFAC gave to "the implementation of Section 211 in the CACR" referred to in Statement Of Facts No. 46.

**REQUEST NO. 36**

All documents concerning the mission and operations of OFAC, programs, statutes, sanctions, determinations, regulations, reviews, analyses, requests, website pages, practices, licenses and policies referred to in Szubin Declaration ¶¶ 2, 4-22, 26, 38.

**REQUEST NO. 37**

All documents concerning the following facts referred to in OFAC's Statement of Facts:

      a.      the TTAB decision referred to in Statement of Facts Nos. 22-25

      b.      the D.C. Action referred to in Statement of Facts Nos. 23-25.

**REQUEST NO. 38**

All documents identified, used, reviewed, or referred to in preparing OFAC's responses to Cubaexport's First Set of Interrogatories (Nos. 1-7).

13

Dated:  January 31, 2007

Peter M. Brody (D.C. Bar No. #398717)
ROPES & GRAY LLP
One Metro Center
700 12th Street, N.W.
Washington, D.C.  20005
(202) 508-4600

Herbert F. Schwartz
Vincent N. Palladino
Eric R. Hubbard
Pablo D. Hendler
ROPES & GRAY LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Attorneys for Plaintiff,
EMPRESA CUBANA EXPORTADORA
DE ALIMENTOS Y PRODUCTOS
VARIOS d/b/a CUBAEXPORT

14

**EXHIBIT G**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------x

EMPRESA CUBANA EXPORTADORA
DE ALIMENTOS Y PRODUCTOS
VARIOS d/b/a CUBAEXPORT
Calle 24, n 55, edif. MINCEX, 8vo, piso,        Civil Action No. 1:06CV01692
Havana, Cuba,

       Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
TREASURY, OFFICE OF FOREIGN
ASSETS CONTROL, HENRY M.
PAULSON, JR., as Secretary of Treasury,
ADAM J. SZUBIN, as Director of the
Office of Foreign Assets Control; and THE
UNITED STATES,

       Defendants.

-------------------------------------------------x

**CUBAEXPORT'S FIRST SET OF INTERROGATORIES (NOS. 1-7)**

       Pursuant to Rule 33 of the Federal Rules of Civil Procedure and Local Civil Rule

26.2, the plaintiff, Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a

Cubaexport ("Cubaexport"), directs the following interrogatories to the defendants, United States

Department of Treasury, Office of Foreign Assets Control, Henry M. Paulson, Jr., as Secretary of

Treasury, Adam J. Szubin, as Director of the Office of Foreign Assets Control and the United

States (collectively "OFAC") to be answered separately and fully, under oath by such officers or

agents of OFAC as have knowledge of the facts, by serving written responses to the offices of

Ropes & Gray LLP, One Metro Center 700 12th Street, N.W., Washington, D.C. 20005 within

thirty (30) days after service of these requests, the documents and things in their possession,

custody or control that are described below.

## DEFINITIONS AND INSTRUCTIONS

1. Cubaexport incorporates by reference the definitions and instructions set forth in Cubaexport's First Set of Requests for Production of Documents and Things (Nos. 1-31).

2. "DESCRIBE" with respect to a "COMMUNICATION" means to state the date of the communication, the place where the communication occurred, and the medium by which the communication occurred (i.e. in-person meeting, telephonic, e-mail, fax), to identify the parties to the communication, and to describe with specificity the substance of the communication.

3. OFAC's responses to these interrogatories should include all information within their possession, custody or control, including, but not limited to, knowledge within the possession, custody or control of any subsidiary, parent, consultant, attorney, or other agent or representative of OFAC. Where facts set forth in answers or portions thereof are supplied upon information and belief rather than upon actual knowledge, OFAC should describe, in detail, their efforts to obtain such knowledge.

4. If OFAC elects to avail itself of the procedure authorized by Fed. R. Civ. P. 33(d) for answering interrogatories, Cubaexport requests, for each interrogatory so answered, that OFAC specify the production numbers of the documents from which the answer may be derived or ascertained.

5. If OFAC acquires additional knowledge or information with respect to any of these interrogatories after service of its responses, OFAC is requested to serve a supplemental response as to each such interrogatory in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

2

6.  When referring to a person, to "IDENTIFY" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment.  Once a person has been identified in accordance with this paragraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

7.  When referring to documents, to "IDENTIFY" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s) of that document.

## INTERROGATORY REQUESTS

### INTERROGATORY NO. 1

With respect to each License Request, identify all persons, including without limitation persons within OFAC and those employed by any other branch, department, or agency of the United States Government, any branch, department, or agency of the government of any State, or any private party (including Ropes & Gray), who participated in the preparation of OFAC's response or were consulted concerning OFAC's review of the request, and identify each person's role in such review or preparation.

### INTERROGATORY NO. 2

With respect to Ropes & Gray's December 13, 2005 letter, identify all persons, including without limitation persons within OFAC and those employed by any other branch, department, or agency of the United States Government, any branch, department, or agency of the government of any State, or any private party (including Ropes & Gray), who participated in, or were consulted concerning, the review of the letter and preparation of OFAC's response, and identify each person's role in such review or preparation.

3

**INTERROGATORY NO. 3**

Identify all persons, other than clerical staff, within OFAC who had any involvement in the legislative process leading to the enactment of Section 211, including persons who had any communication with any committee, subcommittee, member, or employee of either House of the United States Congress.

**INTERROGATORY NO. 4**

Identify all persons, other than clerical staff, within OFAC who had any involvement in the regulatory process leading to the adoption of the regulations 31 C.F.R. §515.527(a)(1), 31 C.F.R. §515.527(b) and 31 C.F.R. §515.527(c) including the identity of any person or persons responsible for the writing, review, or approval of such regulations, the reason or reasons for adoption of the regulations, and any communication concerning the regulations and identify each person's role in any such writing, review and approval.

**INTERROGATORY NO. 5**

Identify all persons, other than clerical staff, within OFAC who had any involvement in the regulatory process leading to the adoption of the regulation 31 C.F.R. § 515.527(a)(2), including the identity of any person or persons responsible for the writing, review, or approval of such regulation, the reason or reasons for adoption of the regulation, and any communication concerning the regulation and identify each person's role in any such writing, review and approval.

**INTERROGATORY NO. 6**

Describe with specificity any policies, procedures, or criteria (formal or informal, written or otherwise) used or adopted by OFAC relating to the implementation or application of 31 C.F.R. §515.527(a)(1), 31 C.F.R. §515.527(b) and 31 C.F.R. §515.527(c) or any prior version

of such regulations, including any policies, procedures, or criteria for determining whether an

activity is authorized pursuant to the general license set forth in such regulations, and including

any communication relating to such policies, procedures or criteria.

## INTERROGATORY NO. 7

Describe with specificity any policies, procedures, or criteria (formal or informal,

written or otherwise) used or adopted by OFAC relating to the implementation or application of

Section 211 or 31 C.F.R. §515.527(a)(2), including any policies, procedures, or criteria for

determining whether a trademark is "the same as or substantially similar to a mark, trade name,

or commercial name that was used in connection with a business or assets that were confiscated"

and whether "the original owner of the mark, trade name, or commercial name, or the bona fide

successor-in-interest" has not expressly consented to the renewal of the registration, and

including any communication relating to such policies, procedures or criteria.

Dated: January 31, 2007

Peter M. Brody (D.C. Bar No. #398717)
ROPES & GRAY LLP
One Metro Center
700 12th Street, N.W.
Washington, D.C.  20005
(202) 508-4600

Herbert F. Schwartz
Vincent N. Palladino
Eric R. Hubbard
Pablo D. Hendler
ROPES & GRAY LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Attorneys for Plaintiff,
EMPRESA CUBANA EXPORTADORA
DE ALIMENTOS Y PRODUCTOS
VARIOS d/b/a CUBAEXPORT

5

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2007, I caused copies of the foregoing to be

served upon the following by hand delivery:

Eric R. Womack
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW.
Washington, DC 20530

/s/
Peter M. Brody

**EXHIBIT H**



**U.S. Department of Justice**
Civil Division
Federal Programs Branch

| *Via U.S. Mail:* | *Via Special Delivery:* |
|---|---|
| P.O. Box 883 | 20 Massachusetts Ave. NW |
| Ben Franklin Station | Room 7122 |
| Washington, D.C. 20044 | Washington, D.C. 20001 |

---

Eric R. Womack
Trial Attorney

Tel: (202) 514-4020
Fax: (202) 616-8470
E-mail: eric.womack@usdoj.gov

February 23, 2007

**Via Federal Express**
Peter M. Brody
ROPES & GRAY LLP
One Metro Center
700 12th Street, N.W.
Washington, DC 20005

       Re:    <u>Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a</u>
                <u>Cubaexport v. OFAC et al.</u>, No. 1:06CV01692 (ESH)

Mr. Brody:

       I am writing to confirm the agreement that we reached in our telephone conversation on February 22, 2007, concerning your first set of interrogatories and document requests.

       As we discussed in our conversation, we received your discovery requests on January 31, 2007. At that time, however, we had not yet conducted a discovery conference pursuant to Federal Rule of Civil Procedure 26(f). Although we believe that no discovery, and therefore no Rule 26(f) conference, is appropriate in this matter, <u>see</u> FED. R. CIV. P. 26(a)(1)(E)(i), it is our understanding that you intend to pursue discovery in your response to the pending Motion to Dismiss or, in the Alternative, for Summary Judgment.

       Accordingly, we have agreed to schedule a Rule 26(f) conference at a mutually agreeable future date. At the conference, we will discuss whether discovery is appropriate in this matter. Until that conference is held, we have agreed that the defendants are under no obligation to respond to your discovery requests. <u>See</u> FED. R. CIV. P. 26(d). Through this compromise, we hope to avoid duplicative briefing on discovery, as that issue is expected to be thoroughly argued in our remaining briefs on the pending Motion to Dismiss or, in the Alternative, for Summary Judgment.

       If you have any questions, please feel free to call me at (202) 514-4020. I look forward to

Letter to Peter M. Brody
February 23, 2007
Page 2

working with you on future issues as they arise.

Sincerely,

Eric R. Womack
Trial Attorney
Federal Programs Branch

**EXHIBIT I**



# ROPES & GRAY

ROPES & GRAY LLP

ONE METRO CENTER   700 12TH STREET, NW   SUITE 900   WASHINGTON, DC 20005-3948   202-508-4600   F 202-508-4650

BOSTON   NEW YORK   PALO ALTO   SAN FRANCISCO   WASHINGTON, DC   www.ropesgray.com

March 1, 2007

Peter M. Brody
202-508-4612
Peter.Brody@ropesgray.com

VIA FACSIMILE

Eric R. Womack
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW.; Room 7122
Washington, DC 20530

Subject:     *Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a*
             *Cubaexport v. United States Dept. of Treasury, Office of Foreign Assets Control,*
             *Henry M. Paulson Jr., as Secretary of Treasury, Adam J. Szubin, as Director of*
             *Foreign Assets Control; and the United States*

Dear Eric:

This letter responds to yours of February 23, 2007, and confirms our telephone call today, which
we agreed shall be deemed to satisfy the parties' obligations, if and to the extent they have any,
under Federal Rule of Civil Procedure 26(f).

As you stated today, and in our telephone call on February 22, 2007, it is the government's
position that Cubaexport is not entitled to discovery of the government unless and until the
District Court has so ruled. Thus, the government does not intend to serve responses to
Cubaexport's pending written discovery requests absent such a ruling.

Accordingly, in conjunction with the filing of its opposition to the government's pending
dispositive motion, Cubaexport anticipates filing a motion seeking an order directing the
government to provide such discovery as Cubaexport has requested and may request. As we
agreed today, in the event the Court orders the government to produce documents in response to
any or all of Cubaexport's pending document requests or serve answers to any or all of
Cubaexport's pending interrogatories, the government shall do so within 30 days of the date of
the Court's order.

Sincerely,

Peter M. Brody

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| EMPRESS CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS d/b/a/CUBAEXPORT, | ) ) ) ) |
| Plaintiff, | ) )  Civil Action No. 1:06CV01692 (ESH) |
| v. | ) ) ) |
| UNITED STATES DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL, HENRY M. PAULSON, JR., as Secretary of Treasury, ADAM J. SZUBIN, as Director of the Office of Foreign Assets Control, and THE UNITED STATES, | ) )  Hon. Ellen S. Huvelle ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF MICHELE M. WINNEKER IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS, OR IN
## THE ALTERNATIVE, SUMMARY JUDGMENT

I, Michele M. Winneker declare:

      1.     I am an attorney admitted to practice before the States of New York and New Jersey and the United States District Court for the Eastern and Southern Districts of New York. I am admitted *pro hac vice* in this Court. I am an associate at the law firm of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York, 10036. Ropes & Gray LLP is counsel for plaintiff Cubaexport. As such, I have personal knowledge of the facts set forth herein.

      2.     I make this declaration in support of Cubaexport's Opposition to Defendants' Motion To Dismiss, Or In The Alternative, Summary Judgment.

      3.     Attached hereto as **Exhibit 1** is a true and correct copy of the January 10, 1994 Assignment of the HAVANA CLUB & Design mark (U.S. Registration 1,031,651) from Cubaexport to HRL and the June 22, 1994 Assignment of the HAVANA CLUB & Design mark (U.S. Registration 1,031,651) from HRL to HCH.

      4.     Attached hereto as **Exhibit 2** is a true and correct copy of the September 12, 1994 Intent to Use Trademark Application (Serial No. 74572667) filed by Galleon, S.A. for registration of the mark "Havana Club" (hereinafter "Bacardi's HAVANA CLUB application").

      5.     Attached hereto as **Exhibit 3** is a true and correct copy of the March 14, 1995 Office Action from the United States Patent and Trademark Office ("PTO") regarding Bacardi's HAVANA CLUB application.

      6.     Attached hereto as **Exhibit 4** is a true and correct copy of selected pages of Bacardi's Answer, Affirmative Defenses and Counterclaims to First Amended Complaint,

dated October 17, 1997, filed in *Havana Club Holdings, S.A. v. Galleon, S.A.*, No. 96-Civ-9655 (S.D.N.Y. filed Dec. 23, 1996).

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the article entitled *Hidden Provision Sparks New Dispute Over Cuba* published in CUBA NEWS in November 1998.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of the article entitled *House Passes Spending Bill Despite Jeers* published in the WASHINGTON TIMES on October 21, 1998.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of the article entitled *House Passes Spending Bill: Massive Omnibus Measure Larded with Pet Projects* published in the WASHINGTON POST on October 21, 1998.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of the Statement, United States Senate Committee on the Judiciary, *An Examination of Section 211 of the Omnibus Appropriations Act of 1998*, dated July 13, 2004.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of the article entitled *Budget Bill Would Shut Off Trade With Some Cuban Joint Ventures: Spending Provision Likely to Draw Fire from EU* published in INSIDE U.S. TRADE on October 23, 1998.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of documents obtained from the PTO and Governor Jeb Bush's office by request pursuant to the Freedom of Information Act, bearing page numbering FOIA 9, 10, 12, 13, 42, 44-45, 70, 72-74, 145-146.

13.    Attached hereto as **Exhibit 11** is a true and correct copy of selected pages of the Complaint in *Bacardi & Co. v. Cubaexport*, No. 1:04-CV-00519 (D.D.C. filed March 29, 2004).

14.    Attached hereto as **Exhibit 12** is a true and correct copy of the PTO's denial of Bacardi's petition opposing renewal of Cubaexport's U.S. Registration 1,031,651, dated July 18, 2006.

15.    Attached hereto as **Exhibit 13** is a true and correct copy of the U.S. Trademark Applications and Registrations Retrieval (TARR) report for U.S. Registration No. 1,031,651.

16.    Attached hereto as **Exhibit 14** is a true and correct copy of the press release entitled *U.S. Government Resolves Havana Club Dispute in Bacardi's Favor*, dated August 8, 2006.

17.    Attached hereto as **Exhibit 15** is a true and correct copy of the transcript from the August 8, 2006 broadcast on National Public Radio.

18.    Attached hereto as **Exhibit 16** is a true and correct copy of the Partially-Consented Motion to Stay Pending Final Resolution of Patent and Trademark Office Post Registration Office Action, dated September 15, 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 15, 2007, in New York, New York.

Michele M. Winneker

3

**EXHIBIT 1**

## ASSIGNMENT

Whereas Empresa Cubana Exportadora de Alimentos y Productos Varios, S.A., doing business as Cubaexport, of 55, 23 Street, Vedado, Havana, Cuba, is the owner of the following trademark registered in the United States Patent and Trademark Office:

| Trademark | Registration No. | Date of Registration |
|---|---|---|
| HAVANA CLUB and Design | 1031651 | January 27, 1976 |

and Whereas Havana Rum and Liquors, S.A., doing business as H.R.L., S.A., of __305, 44 Street, Miramar, Havana, Cuba__
------------------------------------------------
_____ (address),
Is desirous of acquiring said mark and the registration thereof;
Now, therefore, for $10 and other good and valuable consideration, receipt of which is hereby acknowledged, said Empresa Cubana Exportadora de Alimentos y Productos Varios, S.A., doing business as Cubaexport does hereby assign unto the said Havana Rum and Liquors, S.A., doing business as H.R.L., S.A. all right, title and interest in and to the said mark, together with the good will of the business symbolized by the mark, and the above identified registration thereof.

Signed at __Cuba export/ of 55, 23 Street, Vedado, Havana__ (address of signing) this __10__ day of __january__, 199__4__.

(Seal)

Empresa Cubana Exportadora de Alimentos y Productos Varios, S.A., doing business as Cubaexport

By: _____ (Signature)

__Milda Picos River's__ / __Manager__
Type name and offical title

### Acknowledgment

On this __10__ day of __january__, 199__4__, personally appeared __Milda Picos River's__ ___, to me known and known to me to be the (Name of Signing officer), __Manager__ ___ (Title) of Empresa Cubana Exportadora de Alimentos y Productos Varios, S.A., doing

REEL 104 FRAME 047

TRADEMARK

business as Cubaexport, the assignor above named, and acknowledged that he(she) executed the foregoing Assignment on behalf of said assignor and pursuant to authority duly received.

_____
(Signature)

Milda Picos River's / Manager
(Type Name and Title)*

(Seal or Stamp of Authority)


* The person who signs the acknowledgment must be authorized to do so by the law of the jurisdiction where the document is executed, and the seal or stamp of the notary, or other evidence of authority in the jurisdiction of execution, must be affixed.


FEB 10 94
RECORDED
PATENT AND TRADEMARK
OFFICE

TRADEMARK
REEL: 1104 FRAME: 0488

-2-

## ASSIGMENT

Whereas HAVANA RUM AND LIQUORS, S.A., doing business as HRL,S.A., of 305, 44 Street, Playa, Havana, Cuba, is the owner of the following trademark registered in the United States Patent and Trademark Office:

| Trademark | Registration No. | Date of Registration |
|---|---|---|
| HAVANA CLUB and Design | 1031651 | January 27, 1976 |

and Whereas HAVANA CLUB HOLDING,S.A., doing business as HCH,S.A., of 6, rue Heine, Luxembourg, is desirous of acquiring said mark and the registration thereof;

Now, thereof, for $ 10 and other good and valuable conside-ration, receipt of which is hereby acknowledged, said HAVANA RUM AND LIQUORS,S.A., doing business as HRL,S.A. does hereby assing unto the said HAVANA CLUB HOLDING,S.A., doing business as HCH,S.A. all right, title and interest in and to the said mark, together with the good will of the business symbolized by the mark, and the above identified registration thereof.

Signed at HRL,S.A./ of 305, 44 Street, Playa, Havana Cuba, this 22 day of June, 1994.

HAVANA RUM
&
LIQUORS, S.A.

HAVANA RUM AND LIQUORS,S.A.,
doing business as HRL,S.A.

By: _____

Vidal Manuel Prieto Espiña
General Director

### Acknowledgment

On this 22 day of June,1994, personally appeared Vidal Manuel Prieto Espiña, to me known and known to me to be the General Director of HAVANA RUM AND LIQUORS,S.A., doing business as HRL,S.A., the assignor above named, and acknowledged that he executed the foregoing Assignment on behalf of said assignor and pursuant to authority duly received.

_____
Vidal Manuel Prieto Espiña
General Director
HRL, S.A.

RECORDED
PATENT & TRADEMARK OFFICE

SEP 13 94

HAVANA RUM
&
LIQUORS, S.A.

REEL 1219 FRAME 129
TRADEMARK

**EXHIBIT 2**

74572667



KELLEY DRYE & WARREN
A PARTNERSHIP INCLUDING PROFESSIONAL ASSOCIATIONS

101 PARK AVENUE

NEW YORK, N.Y. 10178

(212) 808-7800

FACSIMILE
(212) 808-7897
TELEX 12369

WRITER'S DIRECT LINE
(212) 808-7815

WASHINGTON, D.C.
LOS ANGELES, CA.
FL.
CHICAGO, IL.
STAMFORD, CT.
PARSIPPANY, N.J.

BRUSSELS, BELGIUM
TOKYO, JAPAN

September 12, 1994

EXPRESS MAIL

Assistant Commissioner for Trademarks
2900 Crystal Drive
Arlington, VA  22202-3513

        Re:  Trademark:  HAVANA CLUB
             ITU Application by Galleon S.A.

Dear Sir:

        We enclose the following documents in connection with
the above-noted ITU trademark application:-

        Application for Trademark Registration

        A drawing of the mark

        Our check in the amount of $245.00 to cover the filing
fees.

        Kindly confirm receipt by stamping and returning to us
the attached self-addressed postcard.

                                Sincerely,

                                Barbara Salerno
                                Barbara Salerno
                                Trademark Administrator

Enclosures

## NY33/SALES/28079.21

*B 24500/361*

*lm*

74572667

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## APPLICATION FOR TRADEMARK REGISTRATION

MARK:                    HAVANA CLUB

APPLICANT:               Galleon S.A.

INTERNATIONAL CLASS:     33

TO THE COMMISSIONER OF PATENTS AND TRADEMARKS:

GALLEON S.A., an International Business company with an office located at First Floor, 49 Collins Avenue, Nassau, Bahamas, has a bona fide intention to use the trademark shown in the accompanying drawing in commerce on or in connection with the following goods in Class 33:

Rum and Rum Specialty Drinks

and requests that said mark be registered in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946.

The trademark will be used by applying it to labels and packaging for the goods and in other ways common to the trade.

Applicant hereby appoints William R. Golden, Jr., Keith E. Sharkin and Margaret Ferguson (members of the Bar of the State of New York) of the firm of Kelley Drye & Warren, 101 Park Avenue, New York, New York 10178, its attorneys to prosecute this application to register, with full powers of substitution and revocation, to make  alterations and amendments therein, to

## NY33/SALEB/27908.21

transact all business in the Patent and Trademark Office in connection therewith, and to receive the Certificate of Registration.

Kelley Drye & Warren, whose postal address is 101 Park Avenue, New York, New York 10178 is hereby designated applicant's representative upon whom notice of process in proceedings affecting the mark may be served.

<u>DECLARATION</u>

Catherine Lorandos, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any registration resulting therefrom, declares that she is a Director of applicant corporation and is authorized to execute this instrument on behalf of said corporation; that she believes said corporation to be entitled to use such mark in commerce; that to the best of her knowledge and belief no other person, firm, corporation, or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods or services of such other person, to cause confusion, or to cause mistake, or to deceive; that the facts set forth in this application are true; and that all statements made of her own knowledge are true and all

## NY33/SALEB/27908.21                  -2-

SEP-07-1994 15:28 FROM BACARDI & CO.                TO        KELLEY DRYE    P.02
SEP 07 '94 14:49 FR KELLEY DRYE WARREN NY212 808 7897 TO 4204362810003347

statements made on information and belief are believed to be
true.

Dated:  September 7 , 1994

                                    GALLEON S.A.

                                    By: *Catherine Lorandos*
                                        Name:  Catherine Lorandos
                                        Title: Director

Express Mail, Mailing No. EF440597962
Date of Deposit  September 12, 1994
I hereby certify that this paper or fee is being
deposited with the United States Postal Service
"Express Mail Post Office to Addressee" service
under .37 CFR 1.10 on the date indicated above
and is addressed to the Commissioner of Patents
and Trademarks, Washington D.C. 20231

      Barbara Salerno
(typed or printed name of person mailing
paper or fee)

      *Barbara Salerno*
(Signature of person mailing paper or fee)

## NYSS/SALES/27908.21                      -3-

SEP 07 '94 15:19                    809 362 1918    TOTAL P.02
                                                    PAGE.02



<u>DRAWING</u>

Applicant:    Galleon S.A.
an International Business company
1st Floor, 49 Collins Avenue
Nassau, Bahamas

Goods:    Rum and Rum Specialty Drinks
in Class 33



REVIVED

HAVANA CLUB

REVIVED

KELLEY DRYE & WARREN
101 Park Avenue
New York, New York 10178
(212) 808-7800

## NY33/SALEB/27908.21                    -4-

TRADEMARK APPLICATION SERIAL NO. 74572667

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

060 KK 11/14/94 745?2667

0 361     245.00 CK

PTO-1555
(5/87)

**EXHIBIT 3**

# UNITED STATES DEPARTMENT OF COMMERCE
## Patent and Trademark Office

| SERIAL NO. | APPLICANT |
|---|---|
| 74/572667 | GALLEON S.A. |

| MARK |
|---|
| HAVANA CLUB |

| ADDRESS | |
|---|---|
| William R. Golden, Jr. | ACTION NO. 01 |
| 101 Park Avenue | |
| New York, NY  10178 | MAILING DATE 03/14/95 |
| | REF. NO. |

FORM PTO-1525 (5-90)     U.S. DEPT. OF COMM. PAT. & TM OFFICE

PAPER NO.

ADDRESS:
ASSISTANT COMMISSIONER
FOR TRADEMARKS
2900 Crystal Drive
Arlington, Virginia  22202-3513

If no fees are enclosed, the address should
include the words "Box 5."
Please provide for all correspondence.

1. Filing Date, serial number, mark and
   Applicant's name.
2. Mailing date of this Office action.
3. Examining Attorney's name and
   Law Office number.
4. Your telephone number and ZIP code.

A PROPER RESPONSE TO THIS OFFICE ACTION MUST BE RECEIVED WITHIN 6 MONTHS FROM THE DATE OF THIS ACTION IN ORDER TO AVOID ABANDONMENT. *For your convenience and to ensure proper handling of your response, a label has been enclosed. Please attach it to the upper right corner of your response. If the label is not enclosed, print or type the Trademark Law Office No.; Serial No., and Mark in the upper right corner of your response.*

RE: Serial Number 74/572667

The examining attorney refuses registration because the mark consists of or comprises deceptive matter in that the mark contains a geographic designation where the goods for which registration is sought are produced and the goods do not originate from that geographical location. Trademark Act Section 2(a), 15 U.S.C. Section 1052(a). *See In re Budge Mfg. Co.*, 857 F.2d 773, 8 USPQ2d 1259 (Fed. Cir. 1988); *In re Perry Mfg. Co.*, 12 USPQ2d 1751 (TTAB 1989); *In re Shapely, Inc.*, 231 USPQ 72 (TTAB 1986); TMEP section 1203.02.

The primary significance of the term "Havana" is geographic. The public is likely to believe that the goods come from this place. Furthermore, this belief would materially influence consumers to purchase the goods. *In re House of Windsor, Inc.*, 221 USPQ 53 (TTAB 1983), *recon. denied* 223 USPQ 191 (TTAB 1984). *See* TMEP sections 1210.04 and 1210.07.

If the goods, however, will not originate in Havana, the examining attorney refuses registration on the Principal Register because the mark is primarily geographically deceptively misdescriptive of the applicant's goods. Trademark Act Section 2(e)(3), 15 U.S.C. Section 1052(e)(3); TMEP section 1210.06.

A mark which, when used on or in connection with the applicant's goods or services, is primarily geographically deceptively misdescriptive of them, is registrable upon a showing of acquired

74/568588                                    -2-

distinctiveness under Trademark Act Section 2(f), 15 U.S.C. Section 1052(f), only if it became distinctive of the goods or services in commerce before December 8, 1993, the date of the enactment of the North American Free Trade Agreement Implementation Act, Public Law 103-182, 107 Stat. 2057. Similarly, such a mark, capable of distinguishing the applicant's goods or services, may be registered on the Supplemental Register only if it has been in lawful use in commerce by the owner since before December 8, 1993.

The examining attorney refuses registration under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d), because the applicant's mark, when used on or in connection with the identified goods, so resembles the mark in U.S. Registration No. 1,031,651 as to be likely to cause confusion, to cause mistake, or to deceive. TMEP section 1207. See the enclosed registration.

Although the examining attorney has refused registration, the applicant may respond to the refusal to register by submitting evidence and arguments in support of registration.

The examining attorney encloses information regarding pending Application Serial No. 522,925. The filing date of the referenced application precedes the applicant's filing date. There may be a likelihood of confusion between the two marks under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d). If the referenced application matures into a registration, the examining attorney may refuse registration in this case under Section 2(d). 37 C.F.R. Section 2.83; TMEP section 1208.01.

The wording "rum specialty drinks" in the identification of goods is unacceptable as indefinite. The applicant must amend the identification to specify the commercial name of the goods. If there is no common commercial name for the product, the applicant must describe the product and its intended uses. TMEP section 804.


                                         David C. Reihner, Examining Attorney
                                         Law Office 12, (703) 308-9112 ex 223

DCR

*** User: EX188284 *** Serial Number: 73023981 ***



Word Mark
     HAVANA CLUB

Goods/Services
     IC 033; US 049; G & S; RUM; FIRST USE: 1913.11.01; FIRST USE IN COMMERCE:
     1913.11.01

Mark Drawing Code
     (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS

Design Search Code
     04.01.25; 20.03.10; 26.11.21

Serial Number
     73-023981

Filing Date
     1974.06.12

Registration Number
     1031651

Registration Date
     1976.01.27

Owner Name/Address
     (REGISTRANT) EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS
     DBA CUBA EXPORT COMPANY CUBA 55, 23RD ST. VEDADO HAVANA CUBA

Section 44
     SECT 44

Disclaimer

*** Search: 3 *** Document Number: 58 ***                    (cont)

*** User: EX188284 *** Serial Number: 73023981 ***

APPLICANT DISCLAIMS THE WORDS "HAVANA" AND "FUDNADA EN 1876" APART FROM
THE MARK AS A WHOLE.

Description of Mark
    THE DRAWING IS LINED FOR THE COLOR GOLD.

Type of Mark
    TRADEMARK

Register
    PRINCIPAL

Affidavit
    SECT 8.

*** Search: 3 *** Document Number: 58 ***

```
*** User: EX188284 *** Ser  1 Number: 74522925 ***

Word Mark
    HAVANA CLUB
Goods/Services
    IC 033; US 049; G & S: distilled liquors
Mark Drawing Code
    (1) TYPED DRAWING
Serial Number
    74-522925
Filing Date
    1994.05.02
Owner Name/Address
    (APPLICANT) JOSE MA. ARECHABALA RODEIGO INDIVIDUAL SPAIN Paseo Castellana
    132 Madrid SPAIN 28046
Type of Mark
    TRADEMARK
Register
    PRINCIPAL
```

*Abandoned 7/98*

```
*** Search: 3 *** Document Number: 23 ***
```

**EXHIBIT 4**

*56*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x
                                              :
HAVANA CLUB HOLDING, S.A. and                 :
HAVANA CLUB INTERNATIONAL, S.A.,              :   No. 96-Civ.-9655 (SAS)
                                              :
                        Plaintiffs,           :   ANSWER, AFFIRMATIVE
                                              :   DEFENSES AND
                                              :   COUNTERCLAIMS TO FIRST
          - against -                         :   AMENDED COMPLAINT
                                              :
GALLEON, S.A., BACARDI-MARTINI U.S.A.,        :   JURY TRIAL DEMANDED
INC., GALLO WINE DISTRIBUTORS, INC.,          :
G.W.D. HOLDINGS, INC. and PREMIER             :
WINE AND SPIRITS,                             :
                                              :
                        Defendants.           :
                                              :
———————————————————————x

Defendants BACARDI-MARTINI U.S.A., Inc. ("BACARDI-MARTINI") and

Galleon, S.A. (now after its merger into its parent, Bacardi & Company Limited, the

surviving entity of the merger, known as Bacardi & Co. Ltd.) ("Bacardi"), for their Answer

to the First Amended Complaint and their Affirmative Defenses and Counterclaims herein,

through their undersigned counsel, Kelley Drye & Warren, LLP, allege as follows:

        1.        Admit, in respect of paragraphs 1 and 2 of the First Amended

Complaint, that plaintiffs have instituted the present action under the Lanham Act, 15 U.S.C.

§ 1051 et seq and 28 U.S.C. § 1331, but deny any violations of the Lanham Act or any

other law or treaty of the United States, and except as so admitted, deny each and every

other allegation contained therein.

*## NY27/FPERQM/84125.21*

*10/17/97*

WHEREFORE, defendant-counterclaimants pray for the relief requested hereinafter.

## AS AND FOR A FIFTH
## AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### V.

### Declaratory Judgment

39.    Paragraphs 1 through 38 are incorporated herein by reference.

40.    This is a counterclaim for a declaratory judgment brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the Lanham Act, 15 U.S.C. § 1051, et. seq, which arises from an actual controversy between defendant-counterclaimants and plaintiff-counterclaim-defendants as to whether defendant-counterclaimants are entitled to use of the term HAVANA CLUB as a trademark for rum in the United States. Plaintiff-counterclaim-defendants have asserted that this use by defendant-counterclaimants infringes on their purported rights in the mark HAVANA CLUB and Design as a result of a purported registration obtained under Section 44 of the Lanham Act, which issued on January 27, 1974 and/or violates Section 43(a) of the Lanham Act.

41.    Neither plaintiff-counterclaim-defendants Havana Holding nor HCI has ever used the mark HAVANA CLUB and Design in interstate commerce in the United States and plaintiffs have no rights whatsoever in the HAVANA CLUB mark for rum in the United States. Furthermore, plaintiff-counterclaim-defendants could not lawfully sell HAVANA CLUB rum in the United States if the embargo were lifted tomorrow.

42.    Long before January, 1986, the HAVANA CLUB name and mark was used on rum produced by or under the authority of Bacardi's predecessors-in-interest,

including Galleon, S.A. and Arechabala, that was distributed, offered for sale, and sold in interstate commerce in the United States.

43.    Pursuant to the Lanham Act, 15 U.S.C. § 1052(a), as amended, trademarks of spirits which may have geographic significance but which were in use prior to January 1, 1996 are exempt from any statutory proscription against the use of trademarks that might otherwise be considered geographically misdescriptive. In the Statement of Administrative Authority, Cong. Rec. Vol. 140 (1994), U.S.C.C.A.N., 103d Cong. 2nd Sess. 1994, Congress, in connection with TRIPs, explicitly stated, with respect to wine and spirits brands, that "[a]ny trademark containing a geographic indication that is currently registered or in use, or that is registered or in use [before January 1, 1996] may be maintained" (emphasis added). This policy was incorporated in the amendment to 15 U.S.C. § 1052(a), which "grandfathers" defendants' said usage of the mark HAVANA CLUB.

44.    Consequently, even assuming, arguendo, that the mark "Havana Club" may have geographic significance, which defendant-counterclaimants deny, defendant-counterclaimants are entitled to maintain use of that term as a trademark for rum in the United States.

45.    By reason of the foregoing, this Court should declare that defendant-counterclaimant Bacardi has the prior, superior, and exclusive right to use of the designation HAVANA CLUB as a trademark for rum in the United States and that plaintiff-counterclaim-defendant Havana Holding has acquired no valid rights in or to use of the words HAVANA CLUB as a trademark for rum in the United States and cannot stop Bacardi from use of said mark as aforesaid.

46.    Defendant-counterclaimants have been and are being damaged by Havana Holding's assertion of trademark rights in the term HAVANA CLUB and an actual controversy exists as to the existence of said rights as is demonstrated by the institution of the present suit.

WHEREFORE, defendant-counterclaimants respectfully pray for the relief requested hereinafter.

### AS AND FOR A SIXTH
### AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### VI.

### Failure to State Claim

47.    Paragraphs 1 through 46 are incorporated herein by reference.

48.    The First Amended Complaint fails to state any claims against defendant-counterclaimants upon which relief can be granted and plaintiffs have failed to demonstrate standing to assert said claims.

WHEREFORE, defendant-counterclaimants respectfully pray:

A.    That the First Amended Complaint herein be dismissed with prejudice; and that defendant-counterclaimants be awarded their reasonable attorneys' fees and their costs and disbursements incurred herein.

B.    That with respect to the Affirmative Defenses and Counterclaims asserted herein, the Court adjudge and decree as follows:

1.    That this Court declares that defendant-counterclaimant Bacardi has the exclusive right to use the trademark HAVANA CLUB for rum in the United States and that Havana Holding and HCI have acquired no rights in said trademark in the United

States and are permanently enjoined from using said mark in the United States and from

interfering in any manner with Bacardi's lawful use of said mark;

      2.     That defendant-counterclaimants recover their monetary damages

suffered as a result of the aforesaid violations of 15 U.S.C. § 1120 as well as their costs and

attorneys fees incurred in prosecuting said claim; and

      3.     That defendant-counterclaimants have such other and further

relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

      Defendant-counterclaimants hereby demand trial by jury on all issues so triable

as of right.

Dated:    New York, New York
         October 17, 1997

                         Respectfully submitted,

                         KELLEY DRYE & WARREN, LLP

                         By: _Margaret Ferguson_
                          William R. Golden, Jr. (WG9406)
                          Margaret Ferguson (MF4036)
                          Jennifer Bernheim (JB9897)
                Attorneys for Defendants-counterclaimants
                Bacardi & Company Limited and
                BACARDI-MARTINI U.S.A., Inc.
                101 Park Avenue
                New York, New York 10178
                (212) 808-7800

**EXHIBIT 5**

# CUBANEWS

www.cubanews.com

LUXNER NEWS INC. • 3005 Portofino Isle • Coconut Creek, FL 33066 • USA • Tel: (1.954.970.4518 • E-mail:larry@luxner.com

Dear Executive:

With Fidel Castro incapacitated, his brother Raul running the Cuban government and long-anticipated changes suddenly on the horizon — there's never been a better time to subscribe to **CubaNews**.

Since its establishment in 1993, **CubaNews** has been regarded as the No. 1 source of business information on this secretive nation of 11 million consumers only 90 miles from Florida's shores. U.S. firms already sell food and medicines to Cuba, and Caribbean companies are boosting their trade with Cuba every day. *It's only a matter of time before even more lucrative opportunities open up.*

If you haven't seen our publication lately, you're definitely missing out. That's why we've selected you to receive a free copy of **CubaNews**, enclosed with this letter.

As a regular subscriber to **CubaNews**, you'll get:

✔ *16 pages a month* packed with articles, charts, graphs and maps covering key aspects of the Cuban economy: agribusiness, banking, biotechnology, e-commerce, manufacturing, nickel mining, oil and gas exploration, real estate, shipping, sugar, telecommunications, tobacco and tourism.

✔ *exclusive stories directly from Cuba,* along with expert political and economic analysis from our veteran correspondents in Washington, Miami and Havana.

✔ *in-depth interviews* with key people involved in Cuba-related issues.

✔ *two full pages of business briefs* and a comprehensive calendar of events.

✔ *contact names,* phone numbers, fax numbers and e-mail addresses and websites, so you can get in touch directly with Cuban government officials or foreign investors who are involved in upcoming events and other potential business opportunities.

A one-year subscription costs only US$429, and includes the option of receiving **CubaNews** electronically (in PDF format) at no extra cost. Subscribers also get access to all issues going back to 1998 via our user-friendly website at www.cubanews.com.

Enjoy the enclosed issue of **CubaNews**, then send in your subscription today. Let us help you take advantage of Cuba's gradual transition away from a past dominated by Fidel Castro and toward a more promising, exciting future.

Sincerely,

*Larry Luxner*

Larry Luxner
Editor & Publisher

P.S. — If you enclose payment with your subscriber form, we'll give you two extra months of **CubaNews** for free — and we'll also send you a large full-color wall map of Havana. In the event you're not satisfied, cancel your subscription within 30 days for a full refund, and the map will be yours to keep — just for trying **CubaNews!**

## WASHINGTON REPORT

# Hidden Provision Sparks New Dispute Over Cuba

A new statute aimed at helping Bacardi-Martini U.S.A. win a battle over the prized Havana Club trademark threatens to spark new disputes between the United States and its allies over investment in Cuba.

The provision was tucked away in the massive omnibus spending bill that will fund most federal agencies in the coming year. President Bill Clinton signed it into law in October following weeks of tense negotiations between the White House and Congressional leaders

Florida Sens. Connie Mack, a Republican, and Bob Graham, a Democrat, championed the provision affecting Cuba. It bars U.S. courts from upholding trademarks that were "used in connection with a business or assets that were confiscated" by Fidel Castro's government, unless the "original owner of the mark...has expressly consented." Responsibility for determining whether the disputed trademark is linked to confiscated property would lie with the courts and the Treasury Department's Office of Foreign Assets Control, which grants licenses to those hoping to register Cuban trademarks in the United States.

The provision was slipped into the 4,000-page omnibus bill to help Bacardi-Martini win the right to market a premium grade rum under the Havana Club name. From 1976 to 1995, the trademark was assigned to Havana Club Holdings of Luxembourg, a joint venture between a Cuban state enterprise and Pernod Ricard, a French company.

Havana Club Holdings registered the trademark in Washington in the hopes of distributing Cuba's premier rum in the United States after the U.S. embargo against Cuba is lifted. Bacardi-Martini successfully challenged the trademark in the U.S. Patent and Trademark Office, claiming Havana Cub Holding has no right to the name of a rum that was once made by Jose Arechabala, S.A., a Cuban company nationalized in 1960.

Moreover, in 1995, Bacardi began producing its own aged rum in the Bahamas under the Havana Club label (see CUBANEWS, May 1997), prompting Havana Club Holdings to sue Bacardi in a federal court in New York. That case, scheduled for trial early next year, could be affected by the new trademark law.

"We've said you ain't going to be able to trademark (Havana Club) in the United States because you've stolen it," an aide to Mack said.

Registered in Bermuda and founded by Cuban exiles, Bacardi-Martini is not a U.S. company. Nonetheless, the aide to Mack said the Florida senators sponsored the provision on behalf of constituents, namely Bacardi enterprises in Florida and Floridians who work for the giant liquor company.

Rick Wilson, an attorney for Bacardi-Martini in Miami, said the new law does nothing more than codify existing case law that prohibits trademarks that are confiscated without compensation from being recognized in the United States.

Wilson also said codification of the case law will "provide clearer guidance" to courts in trademark disputes. But the Bacardi provision's impact will reach farther than the U.S. court system.

The French government has complained of the extraterritoriality of the law, echoing a criticism leveled at the Helms-Burton Act. The new law also threatens to upset a truce between the European Union and the United States over Helms-Burton. Moreover, say critics, the provision may violate international patent and trademark agreements.

The new trademark law caught many in the Clinton administration by surprise.

Linda Beresford, an attorney for the U.S. Patent and Trademark Office who specializes in legislation and international trade, said the provision was included in the bill during the last, hectic hours of negotiations between the White House and Republican congressional leaders.

Beresford said international reaction to the Bacardi amendment could take several forms. Cuba may interpret the provision as an abrogation of their right under the 1931 Interamerican Convention on Trademarks to file and maintain a trademark in the United States. In retaliation, Cuba could argue that it is relieved of its treaty obligation to recognize some 400 U.S. trademarks registered in Cuba, including Hilton, Coca-Cola and Palmolive.

France, as well as other nations, could also maintain that the new law may violate other international trademark accords, possibly resulting in a challenge to the U.S. law at the World Trade Organization, the Geneva-based trade dispute settlement organization, according to Beresford.

A State Department official, speaking on condition of anonymity, conceded the new law is likely to provoke new trade and diplomatic problems and that it might hurt U.S. efforts to keep allies from challenging Helms-Burton at the WTO. The official said he thinks the administration failed to object because the last-minute nature of the omnibus bill negotiations prevented a thorough review by the administration.

Mike Helzer, the legislative affairs director of the New York-based International Trademark Association, said his group does not endorse the Bacardi provision and is "shocked" that it was made law. "It was just thrown in at the last minute," Helzer said, echoing Clinton administration officials. "We were not given notice at all."

Helzer also complained that the new law could be applied in other disputes over Cuban trademarks, that it is ambiguously worded and that there's "a degree of uncertainty as to how it will be implemented."

Yet, even if the new law is applied only in the dispute between Bacardi-Martini and Havana Club Holdings, it's likely to cause Washington problems.

At the very least, Beresford of the U.S. Patent and Trademark Office said, the new law blunts the message the United States wants to send to other nations. "We're certainly out there pushing other people to protect intellectual property," she said.

—Ana Radelat

Flora 646·728·2910

**EXHIBIT 6**

50 of 85 DOCUMENTS

Copyright 1998 The Washington Times LLC
All Rights Reserved
The Washington Times

October 21, 1998, Wednesday, Final Edition

**SECTION:** Part A; Pg. A1

**LENGTH:** 2710 words

**HEADLINE:** House passes spending bill despite jeers

**BYLINE:** John Godfrey; THE WASHINGTON TIMES

**BODY:**

The House approved last night a mammoth end-of-the-year spending bill that even supporters called a $485 billion pig in a poke.

The House passed the bill by a vote of 333-95, over the objections of conservatives who said the package "squanders" the budget surplus. Democrats and Republicans alike criticized the spending package.

"I dare say no member understands completely what is in this legislation," Sen. Robert C. Byrd said. "It is a creation without a mother or father - rather more like a Frankenstein creature - a being patched together from old legislative body parts that don't quite fit," said the West Virginia Democrat and ranking minority member of the Senate Appropriations Committee.

The Senate debated the measure yesterday and will vote this morning.

House Speaker Newt Gingrich defended the bill against critics.

"Were they petty dictators, they could write a perfect bill," the Georgia Republican said. "But that's not the way it works. . . . In a free society, you have to have give and take."

The bulk of the bill funds the ongoing business of the federal government, including $203 billion for the routine annual appropriations for the Internal Revenue Service, the Smithsonian Institute, the Department of Commerce, the Department of Justice and hundreds of other agencies, departments and programs.

But it also:

* Cuts foreign aid to countries that owe the District of Columbia parking fines and penalties for diplomatic vehicles.

* Asks the secretary of agriculture to loan Russia the money to buy frozen chickens shipped from Mississippi, which recent economic woes have left Russian importers unable to buy.

House passes spending bill despite jeers The Washington Times October 21

* Extends the duck hunting season in Mississippi until Jan. 31.

* Provides for the transfer of Lorton prison to Virginia.

* Authorizes a $95 million buyout for Bering Sea pollock fisheries.

* Replaces a road through Alaska's Izenback wilderness to King Cove with $37.5 million to build a road and docks on private land, and repair an airstrip and clinic at King Cove.

* Prevents the government from increasing royalties on oil leases.

Last minute changes to the legislation were made as late as Monday and copies of the final draft did not appear until noon yesterday. The 16-inch-tall, 40-pound document includes handwritten notes in the margin, e-mail printouts inserted into the bill, and misnumbered or unnumbered pages.

"I've killed a forest this week," said one House appropriations committee aide who made multiple copies of the 4,000-page document and its various incarnations.

"This contains eight appropriations bills, a $9 billion tax bill, a supplemental appropriation and a substantial number of legislative riders," Mr. Byrd said. "What a gargantuan monstrosity."

"I am not going to stand and defend the process, because I think it has been ugly," said Rep. Bob Livingston, Louisiana Republican, chairman of the House Appropriations Committee. But he defended the final bill, saying, "I urge the members to vote for this and go home with great pride."

Conservative Republicans objected to the bill because of the extra spending it included.

"This bill squanders the first surplus in 30 years," said Sen. Chuck Hagel, Nebraska Republican. "It is wrong for America."

"I reluctantly stand in opposition because it breaks the balanced budget deal," said Rep. Linda Smith, Washington Republican. "It breaks our promise to save Social Security first."

In total, the bill spends $27 billion more than was agreed to in the 1997 budget agreement, but technically does not violate that agreement.

By cashing in the District of Columbia's pension fund, auctioning part of the broadcast spectrum, cutting block grants for social services, and cracking down on student loans, $3 billion of that new spending will be offset. Another $4 billion will not actually be spent until the next fiscal year, and thus does not count in 1999 for budget purposes.

The remaining $20 billion will lower federal surpluses in 1999, but because it has been declared "emergency spending" does not count against spending caps.

"What does this say about the politics of surplus? It says party on, the bar is open," said one Senate Budget Committee aide.

Senate Appropriations Committee Chairman Ted Stevens, Alaska Republican, noted that delays and amassing of the appropriations bills was not the fault of his committee or the House Appropriations Committee. He blamed leaders who could not move the bills off the House and Senate floor.

"I am not ashamed of this work product. This is a good bill," Mr. Stevens said. "We have added $7.5 billion so the men and women who serve us in uniform can be better equipped."

Rep. Gerald B.H. Solomon, New York Republican, agreed, citing an extra $1 billion for anti-ballistic missile systems.

"We all know that the People's Republic of China have no less than 13 intercontinental ballistic missiles aimed at U.S. today and we can't do anything about it. This funding is absolutely critical," Mr. Solomon said.

Mr. Solomon also cited an extra $690 million in anti-drug spending."A vote for this package is a vote to rededicate ourselves to the fight against all aspects of the drug trade."

Yesterday, Republican leaders convened a press conference to hail the virtues of the budget focusing specifically on the new teachers that would be hired under an extra $1.2 billion program. Mr. Gingrich said he fought to make certain those teachers were hired locally and for every grade.

Like many others, Rep. Earl Pomeroy, North Dakota Democrat, said he will vote for the bill because on balance it is acceptable - including both local and national programs Mr. Pomeroy can brag about.

The bill authorizes $154 million for flood control in Grand Forks, N.D., $6 billion in disaster relief for farmers, and $1.2 billion for new teachers, $5.6 million of which would go to his state.

"When you have a state as small as North Dakota," Mr. Pomeroy said, "that's an impact."

* Staff writer Susan Ferrechio contributed to this report.

****BOX A

THE HOUSE BUDGET VOTE

By a vote of 333-95, the House last night passed a $485 billion spending bill for 1999. Voting yes were 170 Democrats, 162 Republicans and one independent. Voting no were 31 Democrats and 64 Republicans. X denotes those not voting. There are no vacancies in the 435-member House.

ALABAMA

Republicans - Aderholt, Y; Bachus, N; Callahan, Y; Everett, Y; Riley, Y.

Democrats - Cramer, Y; Hilliard, Y.

ALASKA

Republicans - Young, Y.

ARIZONA

Republicans - Hayworth, Y; Kolbe, Y; Salmon, N; Shadegg, Y; Stump, N.

Democrats - Pastor, Y.

ARKANSAS

Republicans - Dickey, Y; Hutchinson, Y.

Democrats - Berry, Y; Snyder, Y.

CALIFORNIA

Republicans - Bilbray, N; Bono, Y; Calvert, Y; Campbell, N; Cox, Y; Cunningham, Y; Doolittle, Y; Dreier, Y; Gallegly, Y; Herger, Y; Horn, Y; Hunter, Y; Kim, Y; Lewis, Y; McKeon, Y;

House passes spending bill despite jeers The Washington Times October 21

Packard, Y; Pombo, Y; Radanovich, Y; Riggs, N; Rogan, Y; Rohrabacher, N; Royce, N; Thomas, Y.

Democrats - Becerra, Y; Berman, Y; Brown, Y; Capps, Y; Condit, N; Dixon, Y; Dooley, Y; Eshoo, Y; Farr, Y; Fazio, X; Filner, N; Harman, Y; Lantos, Y; Lee, N; Lofgren, Y; Martinez, Y; Matsui, Y; Millender-McDonald, Y; Miller, N; Pelosi, Y; Roybal-Allard, Y; Sanchez, Y; Sherman, Y; Stark, X; Tauscher, Y; Torres, Y; Waters, Y; Waxman, Y; Woolsey, Y.

COLORADO

Republicans - Hefley, N; McInnis, Y; Schaefer, Dan, Y; Schaffer, Bob, N.

Democrats - DeGette, N; Skaggs, N.

CONNECTICUT

Republicans - Johnson, Y; Shays, N.

Democrats - DeLauro, Y; Gejdenson, Y; Kennelly, Y; Maloney, Y.

DELAWARE

Republicans - Castle, N.

FLORIDA

Republicans - Bilirakis, Y; Canady, Y; Diaz-Balart, Y; Foley, Y; Fowler, Y; Goss, Y; McCollum, Y; Mica, N; Miller, N; Ros-Lehtinen, Y; Scarborough, N; Shaw, Y; Stearns, N; Weldon, N; Young, Y.

Democrats - Boyd, N; Brown, Y; Davis, Y; Deutsch, Y; Hastings, Y; Meek, Y; Thurman, N; Wexler, Y.

GEORGIA

Republicans - Barr, N; Chambliss, Y; Collins, N; Deal, N; Gingrich, Y; Kingston, Y; Linder, Y; Norwood, Y.

Democrats - Bishop, Y; Lewis, Y; McKinney, Y.

HAWAII

Democrats - Abercrombie, Y; Mink, Y.

IDAHO

Republicans - Chenoweth, Y; Crapo, Y.

ILLINOIS

Republicans - Crane, N; Ewing, Y; Fawell, Y; Hastert, Y; Hyde, N; LaHood, N; Manzullo, N; Porter, Y; Shimkus, Y; Weller, Y.

Democrats - Blagojevich, Y; Costello, N; Davis, Y; Evans, Y; Gutierrez, Y; Jackson, Y; Lipinski, Y; Poshard, X; Rush, Y; Yates, N.

INDIANA

Republicans - Burton, Y; Buyer, Y; Hostettler, N; McIntosh, N; Pease, Y; Souder, Y.

House passes spending bill despite jeers The Washington Times October 21

Democrats - Carson, Y; Hamilton, Y; Roemer, Y; Visclosky, Y.

IOWA

Republicans - Ganske, Y; Latham, Y; Leach, Y; Nussle, Y.

Democrats - Boswell, Y.

KANSAS

Republicans - Moran, Y; Ryun, Y; Snowbarger, Y; Tiahrt, Y.

KENTUCKY

Republicans - Bunning, Y; Lewis, Y; Northup, Y; Rogers, Y; Whitfield, Y.

Democrats - Baesler, Y.

LOUISIANA

Republicans - Baker, Y; Cooksey, Y; Livingston, Y; McCrery, Y; Tauzin, Y.

Democrats - Jefferson, Y; John, Y.

MAINE

Democrats - Allen, Y; Baldacci, Y.

MARYLAND

Republicans - Bartlett, N; Ehrlich, Y; Gilchrest, Y; Morella, Y.

Democrats - Cardin, N; Cummings, Y; Hoyer, Y; Wynn, Y.

MASSACHUSETTS

Democrats - Delahunt, Y; Frank, Y; Kennedy, Y; Markey, Y; McGovern, Y; Meehan, X; Moakley, Y; Neal, Y; Olver, Y; Tierney, Y.

MICHIGAN

Republicans - Camp, Y; Ehlers, N; Hoekstra, N; Knollenberg, Y; Smith, N; Upton, N.

Democrats - Barcia, Y; Bonior, Y; Conyers, Y; Dingell, Y; Kildee, Y; Kilpatrick, Y; Levin, Y; Rivers, N; Stabenow, Y; Stupak, N.

MINNESOTA

Republicans - Gutknecht, Y; Ramstad, Y.

Democrats - Luther, N; Minge, N; Oberstar, Y; Peterson, N; Sabo, Y; Vento, Y.

MISSISSIPPI

Republicans - Parker, Y; Pickering, Y; Wicker, Y.

Democrats - Taylor, N; Thompson, Y.

MISSOURI

Republicans - Blunt, Y; Emerson, Y; Hulshof, Y; Talent, Y.

Democrats - Clay, Y; Danner, Y; Gephardt, Y; McCarthy, Y; Skelton, Y.

House passes spending bill despite jeers The Washington Times October 21

MONTANA

Republicans - Hill, Y.

NEBRASKA

Republicans - Barrett, Y; Bereuter, Y; Christensen, N.

NEVADA

Republicans - Ensign, N; Gibbons, Y.

NEW HAMPSHIRE

Republicans - Bass, Y; Sununu, Y.

NEW JERSEY

Republicans - Franks, Y; Frelinghuysen, N; LoBiondo, Y; Pappas, N; Roukema, N; Saxton, Y; Smith, N.

Democrats - Andrews, Y; Menendez, Y; Pallone, Y; Pascrell, Y; Payne, Y; Rothman, Y.

NEW MEXICO

Republicans - Redmond, Y; Skeen, Y; Wilson, Y.

NEW YORK

Republicans - Boehlert, Y; Forbes, Y; Fossella, Y; Gilman, Y; Houghton, Y; Kelly, Y; King, N; Lazio, Y; McHugh, Y; Paxon, Y; Quinn, Y; Solomon, Y; Walsh, Y.

Democrats - Ackerman, Y; Engel, Y; Hinchey, Y; LaFalce, Y; Lowey, Y; Maloney, Y; Manton, Y; McCarthy, Y; McNulty, Y; Meeks, Y; Nadler, Y; Owens, Y; Rangel, Y; Schumer, Y; Serrano, Y; Slaughter, Y; Towns, Y; Velazquez, Y.

NORTH CAROLINA

Republicans - Ballenger, N; Burr, N; Coble, N; Jones, N; Myrick, Y; Taylor, Y.

Democrats - Clayton, Y; Etheridge, Y; Hefner, Y; McIntyre, Y; Price, Y; Watt, Y.

NORTH DAKOTA

Democrats - Pomeroy, Y.

OHIO

Republicans - Boehner, Y; Chabot, N; Gillmor, Y; Hobson, Y; Kasich, Y; LaTourette, Y; Ney, Y; Oxley, Y; Portman, N; Pryce, X; Regula, Y.

Democrats - Brown, Y; Hall, Y; Kaptur, N; Kucinich, Y; Sawyer, Y; Stokes, Y; Strickland, Y; Traficant, Y.

OKLAHOMA

Republicans - Coburn, N; Istook, N; Largent, N; Lucas, Y; Watkins, Y; Watts, Y.

OREGON

Republicans - Smith, Y.

House passes spending bill despite jeers The Washington Times October 21

Democrats - Blumenauer, N; DeFazio, N; Furse, Y; Hooley, Y.

PENNSYLVANIA

Republicans - English, Y; Fox, Y; Gekas, Y; Goodling, Y; Greenwood, Y; McDade, Y; Peterson, Y; Pitts, Y; Shuster, Y; Weldon, N.

Democrats - Borski, Y; Brady, Y; Coyne, Y; Doyle, Y; Fattah, Y; Holden, N; Kanjorski, N; Klink, N; Mascara, Y; McHale, Y; Murtha, Y.

RHODE ISLAND

Democrats - Kennedy, Y; Weygand, Y.

SOUTH CAROLINA

Republicans - Graham, N; Inglis, N; Sanford, N; Spence, Y.

Democrats - Clyburn, Y; Spratt, Y.

SOUTH DAKOTA

Republicans - Thune, Y.

TENNESSEE

Republicans - Bryant, Y; Duncan, N; Hilleary, Y; Jenkins, Y; Wamp, N.

Democrats - Clement, Y; Ford, Y; Gordon, Y; Tanner, Y.

TEXAS

Republicans - Archer, Y; Armey, Y; Barton, N; Bonilla, Y; Brady, N; Combest, Y; DeLay, Y; Granger, Y; Johnson, Sam, N; Paul, N; Sessions, Y; Smith, Y; Thornberry, Y.

Democrats - Bentsen, Y; Doggett, N; Edwards, Y; Frost, Y; Gonzalez, Y; Green, Y; Hall, Y; Hinojosa, Y; Jackson-Lee, Y; Johnson, E. B., Y; Lampson, Y; Ortiz, Y; Reyes, Y; Rodriguez, Y; Sandlin, Y; Stenholm, Y; Turner, Y.

UTAH

Republicans - Cannon, Y; Cook, Y; Hansen, X.

VERMONT

Independent - Sanders, Y.

VIRGINIA

Republicans - Bateman, Y; Bliley, Y; Davis, Y; Goodlatte, Y; Wolf, N.

Democrats - Boucher, Y; Goode, N; Moran, Y; Pickett, Y; Scott, Y; Sisisky, Y.

WASHINGTON

Republicans - Dunn, Y; Hastings, Y; Metcalf, Y; Nethercutt, Y; Smith, Linda, N; White, N.

Democrats - Dicks, Y; McDermott, N; Smith, Adam, N.

WEST VIRGINIA

Democrats - Mollohan, X; Rahall, Y; Wise, Y.

House passes spending bill despite jeers The Washington Times October 21

WISCONSIN

Republicans - Klug, N; Neumann, N; Petri, N; Sensenbrenner, N.

Democrats - Barrett, N; Johnson, N; Kind, N; Kleczka, N; Obey, Y.

WYOMING

Republicans - Cubin, Y.

****BOX B

SPENDING THE MONEY . . .

Some of the major spending items in the $520 billion fiscal 1999 spending bill President Clinton is expected to sign today.

$56 billion for farm and food programs, including $22.6 billion for food stamps, $9.2 billion for child nutrition programs and $1 billion for the Food and Drug Administration.

$34 billion for the departments of Commerce, Justice and State, including $1 billion for the year-2000 census, $4.8 billion for state and local law enforcement and $300 million for the Legal Services Corp.

$500 million for the District of Columbia.

$31.3 billion for foreign operations, including $17.9 billion for the International Monetary Fund.  North Korea gets $35 million in aid contingent on progress on ending its nuclear program.

$14.1 billion for Interior and Indian programs, including $1.7 billion for the National Park Service and $98.5 million for the National Endowment for the Arts.

$292 billion for the departments of Labor, Education and Health and Human Services, including $1.2 billion to begin hiring 100,000 new elementary school teachers, $15.6 billion for the National Institutes of Health and $168.2 billion for the administration of Medicare and Medicaid.

$47 billion for the Transportation Department, including $25.8 billion for highway spending.

$26.8 billion for the Treasury Department and related agencies, including $7.9 billion for the Internal Revenue Service.

$21 billion in emergency spending, including $1.2 billion for natural disaster relief, $3.4 billion for the year-2000 computer problem, $1.8 billion for embassy security and $1.9 billion for Bosnia-Herzegovina operations.  An allotment of $6.8 billion for the Pentagon includes $1 billion for a national missile-defense system.

* The extension of expiring tax credits worth $9.2 billion over 10 years.

. . . AND CHANGING THE LAW

Policy changes included in the omnibus spending bill.

Allows U.S.  food exports to India and Pakistan, despite sanctions on other exports.

Links U.N.  past-due payments to passage of a bill banning aid to international family planning groups promoting abortion.

House passes spending bill despite jeers The Washington Times October 21

Bans local and federal funding for needle-exchange programs in the District of Columbia and bans federal funding for a city referendum on legalizing marijuana.

Eliminates funding for the U.N. Population Fund, which is starting new programs in China.

Prohibits introduction of wolves or grizzly bears in Idaho and Montana.

Prohibits funds for implementing national education tests.

Bans the implementation of regulations changing how organs for transplants are allocated.

Prohibits federal funding for a rerun of the Teamsters election.

Bars federal funding for human embryo research.

Blocks a pay raise for members of Congress.

Requires health plans for federal workers to cover prescription contraceptives.

Provides temporary visas for foreign nationals with high-tech skills.

Approves the Chemical Weapons Convention Implementation Act.

Associated Press

**GRAPHIC:** Photo, The spending bill is 16-inches tall, weighs 40 pounds and includes about 4,000 pages - many of them misnumbered or unnumbered., By Kenneth Lambert/The Washington Times; Boxes, A) THE HOUSE BUDGET VOTE; B) SPENDING THE MONEY . . .AND CHANGING THE LAW, A) NO CREDTI; B) By The Washington Times

**LOAD-DATE:** October 21, 1998

**EXHIBIT 7**

1 of 1 DOCUMENT

Copyright 1998 The Washington Post
The Washington Post

October 21, 1998, Wednesday, Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 1642 words

**HEADLINE:** House Passes Spending Bill; Massive Omnibus Measure Larded With Pet Projects

**BYLINE:** George Hager, Washington Post Staff Writer

**BODY:**

The House approved a massive year-end spending measure last night, funding scores of federal agencies, averting a government shutdown and leaving the members who voted for it in the dark about most of what it contained.

"Who among the rank-and-file members of the House can say they've read and understood the entire package?" asked Rep. Peter A. DeFazio (D-Ore.). "Heck, half the members couldn't even lift it, let alone read it."

The 40-pound, 16-inch-tall bill includes dozens of high-profile spending compromises on issues such as funding the International Monetary Fund, hiring 100,000 new teachers, providing relief for hard-pressed farmers and ranchers and injecting billions more into the nation's armed forces.

At the same time, though, members honeycombed the bill with scores of smaller provisions to name post offices, extend Mississippi's duck hunting season, fund water projects and earmark money for local airports.

And as the last major legislation leaving Congress before the House and Senate adjourn, the measure became a vehicle for bills that members could not finish any other way, including measures to implement the international chemical weapons treaty and reorganize the nation's foreign policy agencies.

From the sublime to the ridiculous, the crucial to the arguably inconsequential, the bill's 3,825 pages included so many provisions that even members who helped draft it confessed to ignorance about exactly what was in it.

"Do I know what's in this bill?" asked Senate Appropriations Committee ranking Democrat Robert C. Byrd (W.Va.). "Are you kidding? No. Only God knows what's in this monstrosity."

House Passes Spending Bill; Massive Omnibus Measure Larded With Pet Proj

The measure also includes a $ 9.2 billion, nine-year package of tax provisions that extend eight expiring tax and trade items, including the research and development credit for business and an assistance program for workers harmed by the lowering of U.S. trade barriers.

Other tax provisions include one that will accelerate to 2003 previously enacted legislation to allow self-employed persons to deduct 100 percent of their health insurance costs. The measure was paid for with four changes to tax law, chiefly one that affects real estate investment trusts.

The Senate was expected to vote to approve the measure this morning, joining the House in clearing the measure for President Clinton's signature and sending members home to campaign barely two weeks before the Nov. 3 elections.

Despite criticism from conservative Republicans that the bill broke budget discipline and was laden with special-interest projects, the House voted 333 to 95 to approve it. Sixty-four Republicans joined with 31 Democrats to oppose the bill.

The enormous measure allows Congress to finally finish an annual funding process that was badly hobbled this year by an election-shortened schedule, policy disputes between House and Senate Republicans, and a desire by GOP hard-liners to confront the president on fiscal issues. This was in sharp contrast with last year, when Republicans compromised with the White House to generate the first balanced budget in a generation.

The omnibus bill packaged eight spending measures Congress never finished, funding at least 10 Cabinet departments and scores of federal agencies for the rest of the fiscal year that began Oct. 1. The government has been kept open pending passage of this bill by a series of short-term funding measures.

In a bow to election-year spending pressure, the huge bill also permits $ 21 billion of spending beyond legally imposed caps for measures that evade budget limits, on the grounds they are emergencies: Bosnia peacekeeping, anti-ballistic missile defense, embassy security, relief for farmers and ranchers, and other matters.

Congress in effect earmarked nearly a third of this year's surplus for such spending. Critics said most of the "emergencies" in the measure could have been foreseen and accommodated in the regular spending bills, had their colleagues been willing to cut other spending.

Estimates of the bill's size varied. The House Appropriations Committee pegged the measure at less than $ 490 billion, but other calculations showed it to be roughly $ 520 billion -- nearly one-third of all federal spending.

Members from both parties reviled the year-end negotiations that brought them the bill.

"We have this godawful mess on the floor [that] represents an incredibly outrageous way to do the country's business," said Rep. David R. Obey (Wis.), the House Appropriations Committee's ranking Democrat.

"I'm not going to stand here and defend the process because I think it has been ugly," agreed House Appropriations Chairman Bob Livingston (R-La.). But Livingston defended the bill and urged his colleagues to vote for it. "By adopting this bill we can show that we can govern," he said. "It is important to vote for this bill and go home to our districts to explain why we should come back."

House Passes Spending Bill; Massive Omnibus Measure Larded With Pet Proj

Republicans sold their colleagues on the measure's increases for defense, anti-drug efforts and other GOP priorities. Democrats touted big increases for education and other social spending.

Negotiators jockeyed for almost two weeks to assemble the measure, and most of the high-profile additions and subtractions were measured in the billions -- for example, nearly $ 18 billion for the IMF and more than $ 1 billion each for hiring teachers, providing disability payments for Persian Gulf War veterans and allowing the Tennessee Valley Authority (TVA) to refinance expensive federal loans.

But the battles were also won and lost down in the fiscal weeds, often for amounts smaller than $ 1 million.

For example, Senate Majority Leader Trent Lott (R-Miss.) led a successful effort to wedge $ 750,000 into the omnibus bill to pay half the cost of rebuilding a flood-destroyed dam on Archusa Lake in Quitman, Miss.

The money had been removed from an earlier Senate-passed supplemental appropriations bill, in part, critics said, because the lake is purely recreational and the dam is not the sort of flood control, navigation or shoreline protection project the U.S. Army Corps of Engineers normally performs.

While the Mississippians were winning, however, New York's delegation lost a battle to provide a tax exemption that would have been worth about $ 370,000 to David Kaczynski, who plans to turn over to victims the $ 1 million reward he got from the FBI for turning in his brother, Unabomber Theodore J. Kaczynski. The tax exemption would have increased the amount that could go to the victims.

Included in the spending measure at the last minute was a bill to bring the United States into compliance with a treaty -- banning production, storage or use of chemical weapons -- that was approved last year by the Senate. The treaty compliance bill had been held up earlier by maneuverings involving a variety of other issues, including payment of back dues to the United Nations and an unrelated antiabortion restriction.

The legislation authorizes inspection of American chemical facilities by international personnel but only under restrictions demanded by lawmakers as the price for approval of treaty. These restrictions give the president authority to block surprise inspections on national security grounds, require an FBI counterintelligence officer to attend inspections and mandate that samples from American inspection sites be tested in this country.

Without passage of the law, the United States would have been in technical violation of the treaty.

The bill also was expanded to include long-delayed legislation to reorganize foreign policy agencies, including merging the U.S. Information Agency and the Arms Control and Disarmament Agency into the State Department.

Staff writers Charles R. Babcock and Helen Dewar contributed to this report.

Special Interests

Below are some of the more controversial provisions that were hashed out in the massive year-end spending measure.

Issue

House Passes Spending Bill; Massive Omnibus Measure Larded With Pet Proj

Sponsor Outcome

Extend duck hunting season in Mississippi

Lott (R)/Cochran (R) In

Credits to Russia for chickens ($ 350 million)

Lott (R)/Cochran (R) Out

Superfund liability exemption for scrap metal industry

Lott (R) Out

Unabomber reward tax break

Moynihan (D) Out

Alaska overflight tariff ban

Stevens (R) Out

Change patent extension process/Claritin

Lautenberg (D) Out

Mohair loan program

Stenholm (D)/Bonilla (R) Out

Military pension increase

Murtha (D) Out

Curtail federal prosecutors

Murtha (D)/McDade (R) In*

Tobacco export promotion ($ 10 million)

Faircloth (R) Out

Home health care funding ($ 1.7 billion)

Several members In

Tennessee Valley Authority loan refinancing

Thompson (R)/Frist (R) In

Funding for I-69 construction project in Arkansas

Dickey (R) In

Auto salvage bill

Lott (R) Out

Red Cross disaster relief ($ 30 million)

Unknown In

Dole Institute at University of Kansas

House Passes Spending Bill; Massive Omnibus Measure Larded With Pet Proj

Roberts (R) In

\* Provision doesn't take effect for six months.

House Budget Committee Chairman John R. Kasich (R-Ohio), left, chats with Speaker Newt Gingrich (R-Ga.) at adjournment rally. House Speaker Newt Gingrich and colleagues share a laugh as Gingrich is introduced by Majority Whip Tom DeLay at GOP celebration of 105th Congress.

**GRAPHIC:** PH,,ROBERT A. REEDER; IG,,TWP

**LOAD-DATE:** October 21, 1998

**EXHIBIT 8**

Statement
*United States Senate Committee on the Judiciary*
**An Examination of Section 211 of the Omnibus Appropriations Act of 1998**
July 13, 2004

**The Honorable Larry Craig**
United States Senator , Idaho

Mr. Chairman, Mr. Leahy, thank you for holding today's hearing.

This hearing is a first step in resolving the problems Section 211 poses for the U.S. in terms of honoring the commitments we have undertaken in various international trademark agreements.

Clearly we must do something legislatively about Section 211 and we must do it by December 31 if we are to meet the WTO's deadline for the U.S. to cure that law's violations of the Trade Related Aspects of Intellectual Property Rights Agreement (TRIPS).

To that end, Mr. Chairman, S. 2373 modifies Section 211 slightly based on the notion that minor amendments will make the law compliant with TRIPS and in so doing will put an end to the EU's WTO case.

By contrast, a bill I introduced last year, S. 2002, repeals Section 211 outright. We took that approach for a simple reason: Even if S. 2373 is successful in amending Section 211 to bring it into compliance with the TRIPS Agreement -- and I understand there is some doubt about that -- a straight repeal of that law is an indisputable guarantee of a quick end to the ongoing WTO dispute.

This has been confirmed by the U.S. Trade Representative who has told Congress more than once that repealing Section 211 would bring the U.S. into immediate compliance with the TRIPS Agreement.

Therefore the question is, why forego repeal and adopt a half-measure, such as S. 2373, when it will most likely only breed further TRIPS-based disputes in Geneva with the EU?

Simply put, there is no case to be made for Section 211, so why preserve it?

To succeed, an argument for amending Section 211 (rather than repealing it) must demonstrate convincingly that there are positive aspects to that law. A successful argument for amending Sec. 211 instead of repeal must also demonstrate an absence of negatives in such an approach. In other words, preserving Section 211 makes sense only if: (1) it is of real benefit to U.S. intellectual property holders and (2) it can be guaranteed to do them no harm.

Without question, Section 211 fails on both counts.

First, section 211 benefits one foreign company alone. This point bears emphasis, no U.S. company receives the slightest advantage from that law. If anyone doubts this I suggest they ask the law's sole beneficiary, Bacardi, Inc., to name one U.S. company that benefits from and supports Section 211.

Second, Section 211 is a positive danger to U.S. trademarks because, until it is taken off the statute books, the U.S. will remain in violation of the Inter-American Convention for the Protection of Trademarks. Section 211's violation will place thousands of U.S. trademarks registered in Cuba in serious jeopardy.

Some may ask why the Inter-American Convention on Trademarks matters and why Section 211 puts U.S. Companies' Trademark Rights under the convention in danger?

Not long ago nearly 300 American companies from over 30 states – including Idaho – participated in the first exposition of U.S. agricultural products in Havana in nearly 50 years. Many of the exhibitors were producers or distributors of branded food products. For example one mid-western exhibitor, ConAgra Foods, displayed samples of such trademarked goods as Hunt's Ketchup, Wesson Oil, Chef Boyardee, Orville Redenbacher and Swiss Miss Cocoa. Other exhibitors included Gallo, Wrigley's, Libby's, Chiquita, Smithfield Foods, Archer Daniels Midland, Sara Lee, Cargill, Gerber, Land O' Lakes, Perdue Farms, Southcorp Wines and Unilever Bestfoods which includes Knorr, Lipton, Hellman's and Ragu brands.

The present and future importance of sales of branded foods to Cuba is recognized by the U.S. Department of Agriculture. In its guide to exporting to Cuba, under the Trade Sanctions Reform Act of 2000, U.S.D.A. states that it:

"highly recommend[s] that U.S. exporters make every effort to register their trademarks and brand names in Cuba."

Those marks can only be registered pursuant to the Inter-American Convention on Trademarks, a reciprocal intellectual property agreement signed in 1928 that governs trademark protection between the U.S. and Cuba to this day.

Even to this day, the Convention remains in effect despite the U.S. embargo on Cuba. The fact that a U.S trade embargo was imposed on Cuba in the early 1960's did not affect the operative status of the Convention.

It is important to note that the one area of continuing commercial cooperation between the U.S. and Cuba, in the forty years of the embargo, has been in the field of trademark protection. Since the Cuban embargo's inception, specific provisions of U.S. laws and regulations have made it legal for American companies to pay fees to register, renew and even litigate the enforcement of their trademarks in Cuba. Until Section 211 was enacted, Cuban trademark owners had reciprocal rights in the U.S. under the Inter-American Convention.

The common sense inherent in the U.S. government's policy of ensuring reciprocal trademark protection with Cuba is irrefutable. Every U.S. embargo is meant to be a temporary halt of trade with the targeted country. U.S.-origin trademarks must be kept in good order in embargoed countries, such as Cuba, if we are to ensure a rapid and efficient resumption of trade when an embargo is terminated.

Failure to do so will inevitably produce the situation in Cuba we witnessed in South Africa where, following the end of the apartheid regime, a number of U.S. companies including Burger King and Victoria's Secret, discovered that their trademarks had been appropriated by South African companies during the apartheid era. Recovering the rights to their trademarks required lengthy and expensive litigation or buying out the South African registrant. Efforts to secure trademarks before the political transition would have saved many companies from improper exploitation and would have facilitated market reform.

In contrast to South Africa, a treaty – the Inter-American Convention – protects U.S. trademarks in Cuba. Section 211 unfortunately and unnecessarily puts that treaty in grave jeopardy.

What is the status of the Inter-American Convention on Trademarks?

A U.S. federal court of appeals ruled recently, in 2000, that the Inter-American Convention on Trademarks:

"remains in force between the United States and Cuba" and "governs trademark relations between the two countries."

Nearly 5,000 U.S. trademarks are currently registered in Cuba under the Convention. More are being registered every day. In fact, applications for new registrations from U.S. companies have, in the four years post-TSRA, created an administrative backlog at the Cuban Trademark Office.

As I just pointed out, U.S. corporations invoke the Inter-American Convention regularly not only to register and renew their trademarks, but also to defend them from infringers. Examples include, Jello, Winchester, Pizza Hut and Dupont.

Until Section 211 was enacted, owners of Cuban trademarks enjoyed identical and reciprocal rights in the U.S. Section 211 removed those rights by denying U.S. courts the jurisdiction to enforce certain Cuban-origin trademarks. This was done in direct violation of the Convention, which in the ruling of one U.S. federal judge,

"compels signatory nations to grant to the nationals of other signatory nations the same rights and remedies which their laws extend to their own nationals."

What are Cuba's International Law Remedies for U.S. Violations of the Inter-American Convention? Well, Section 211 effectively entitles Cuba to suspend U.S. rights under the Convention.

Cuba's remedy for U.S. breaches of the Inter-American Convention is found in international treaty law. Article 60(2) of the 1969 Vienna Convention on Treaties provides:

"A material breach of a multilateral treaty by one of the parties entitles a party specially affected by the breach to invoke it as a ground for suspending the operation of the treaty in whole or in part in the relations between itself and the defaulting State."

Our bill, S. 2002, the full repeal of Sec. 211, will put all questions to do with the validity of Cuban-Origin Trademarks back in U.S. Federal Courts.

I gather one of today's witnesses will be a member of a family that owned a rum business in Cuba that was expropriated by the Cuban government in 1960. He has my sincere sympathy.

As a conservative, I have no tolerance for coerced governmental takings of anyone's property anywhere. It is wrong to expropriate private enterprises without compensation.

However, I ask members of the committee to keep in mind that nothing that happened in Cuba over 40 years ago required enactment of Section 211 in 1998.

Trademarks registered in the U.S. were untouched by the expropriations in Cuba. The witness's family lost its Havana Club registration in the U.S. solely because family members chose not to renew it here in Washington, D.C. in 1973. That decision was made fully 14 years after the revolution in Cuba and the expropriation of the family's business there.

To the same extent that I believe in property rights, I believe in the responsibilities that accompany such rights. If someone fails to maintain a trademark as required by law, ordinarily it will be deemed abandoned and he will lose all rights to it. In saying this, I am not prejudging the ultimate outcome of Bacardi's claim to the U.S. trademark it purportedly purchased from today's witness and other members of his family twenty-five years after they let it expire at the U.S. Patent and Trademark Office.

A repeal of Section 211 simply returns the question of ownership to the courts where it belongs. Indeed if Section 211 had not been enacted several weeks before trial in the Havana Club dispute, the ownership of that trademark would have been judicially determined over five years ago.

It is time to repeal Section 211 and let the company that engineered that law – to the extent that it has a case – go tell it to a judge and let Congress out of the trademark dispute resolution business.

So far Cuba has continued to honor U.S. trademarks – even though it is entitled by international law to suspend the obligations it owes U.S. companies under the Convention. However, if Congress fails to repeal Section 211 and merely amends the law in a WTO-specific fashion (as S. 2373 proposes), it will thereby reaffirm the U.S. breach of the Inter-American Convention vis-à-vis Cuba. At that point Cuban forbearance can be expected to end. The result will very likely be disastrous for U.S. companies with trademarks registered in Cuba.

As I previously stated, the problem with S. 2373's approach is that even if it makes Section 211 technically compliant with TRIPS, it does nothing to remedy that provision's breaches of the Inter-American Convention. For that reason alone it should not be voted out of this Committee.

Some of you no doubt co-sponsored S. 2373 from the conviction that it is necessary for the U.S. to return to compliance with the TRIPS Agreement. I agree. But, as I said earlier, not only does S. 2002 ensure such compliance, it also preserves U.S. trademarks registered in Cuba under the Inter-American Convention. Accordingly, it deserves the support of the Committee as it seeks to fulfill its mandate to protect the intellectual property rights of this country's corporate citizens, wherever in the world those assets are located.

I'll conclude with this – let's not let the hostility that exists today between Cuba and the U.S. poison trade relations in a more hopeful future.

Once again, thank you Mr. Chairman for affording me the opportunity to offer my views on the important issues before the Committee in today's hearing.

**EXHIBIT 9**



NOTICE
THIS MATERIAL MAY BE
PROTECTED BY COPYRIGHT
LAW (TITLE 17 U.S. CODE)



N.Y.P.L.
OCT 2 1998
S.I.B.L.

An
Inside
Washington
Publication

ment and industry trade action

Vol. 16, No. 42 - October 23, 1998

## BRITTAN, BARSHEFSKY CONTINUE TO WORK ON REMAINING PROBLEMS IN TEP

U.S. Trade Representative Charlene Barshefsky and European Union External Relations Commissioner Leon Brittan failed in an Oct. 19 meeting to reach final agreement on bilateral trade measures to be taken under the Transatlantic Economic Partnership, according to informed sources. As a result, the two sides will continue to work on the TEP in the hopes of completing it in time for an Oct. 26 meeting of the EU Council of member states.

One informed source said it is possible that there "may still be a few brackets" in the text presented to the Council next week. But this is unlikely to cause a serious problem, since member states only plan to begin examining the TEP at that time, and are not scheduled to approve it until a November 9 meeting.

The two sides failed to bridge their differences on bilateral negotiations on government procurement, according to these sources. Going into this week, the EU was seeking a more aggressive opening of procurement procedures and an

*continued on page 18*

## BUDGET BILL WOULD SHUT OFF TRADE WITH SOME CUBAN JOINT VENTURES

The omnibus spending bill that was passed by both houses of Congress this week includes language that would effectively shut off U.S. trade with certain joint ventures between foreign companies and Cuban-owned entities, according to informed sources. These sources said the language would deny these joint-venture companies the right to apply for a U.S. trademark license if the trademark in question was once expropriated by the Cuban government.

Sources said U.S. and foreign government officials were still examining the language, which is found in Section 211 of the bill, reprinted below. But these sources said the language is expected to be controversial, since it will likely impact Havana Club Holding (HCH), a joint-venture rum distributor formed by Pernod Ricard of France and a Cuban-owned company.

*continued on page 19*

## DALEY ATTACKS CHINA AS ADMINISTRATION AVOIDS SECTION 301 CASE

U.S. Commerce Secretary William Daley this week attacked China for what he called the lack of openness in its market and its demands that U.S. firms transfer technology as a condition of investment. U.S. technology then allows Chinese goods to compete with U.S. products, contributing further to a spiraling trade deficit, he charged.

"The lack of openness in China is bad for business, and its bad for our overall relationship," Daley said in Oct. 21 remarks to the World Affairs Council of Washington, DC. "And, frankly, it may stimulate a domestic backlash if it persists much longer."

Daley added that the growing trade deficit with China "does not sit well" with him, "with President Clinton, with Congress, or with American firms and workers."

But Daley's tough message stands in contrast to an Administration decision earlier this month not to launch

*continued on page 20*

## GEPHARDT CALLS FOR STEEL SECTION 201 AS USTR CHIDES EU FOR QUOTAS

House Democratic Leader Richard Gephardt (D-MO) this week urged the Administration to act against increased low-priced steel imports beyond a quick review of four pending trade remedy petitions targeting Russia, Japan and Brazil. One possible option is to have the International Trade Commission initiate a Section 201 investigation along with temporary quotas, Gephardt said in an Oct. 20 letter to President Clinton.

"I advocate the strongest possible action to assist the industry," he said. "For example, a USTR request to ITC for a self initiated 201 investigation coupled with temporary quantitative restrictions on imports is a response that could be pursued."

Strong Administration action is needed to protect U.S. workers from unfair competition, especially since the U.S. has acted on a priority demand of U.S. business by replenishing the International Monetary Fund,

*continued on next page*

## U.S., EU CLASH OVER PLANNED RETALIATION FOR EU BANANA POLICY

The U.S. and European Union this week clashed in a World Trade Organization meeting on whether the U.S. is entitled to prepare retaliation measures against the EU for what it expects to be a failure to change its pending banana import policy. U.S. Ambassador to the WTO Rita Hayes told the Oct. 21 meeting of the WTO Dispute Settlement Body that the U.S. is entitled to prepare for what it expects to be an EU failure to comply, while EU Ambassador Roderick Abbott charged that the U.S. threat of retaliation appeared to be based on a unilateral U.S. determination that the EU's proposed system is not WTO consistent.

Any retaliatory action based on a unilateral determination would be illegal under Article 23 of the Dispute Settlement Understanding and would be challenged by the EU, he said. Instead, the U.S. must allow a panel established under Article 21.5 to determine EU compliance, he said.

Only then can a member seek compensation or withdraw concessions under Article 22, which allows for these steps in the event that panel rulings are not implemented within the reasonable period of time allowed.

Hayes responded that U.S. law requires a public comment period before taking action and the U.S. has been very transparent in announcing the domestic procedures that it will follow for responding to the EU's anticipated failure on January 1 to implement a WTO panel and appellate body ruling on its banana policy.

The domestic process will allow the U.S. to exercise its rights under Article 22 of the DSU, Hayes said.

Hayes also criticized the EU for refusing to consult with it and the other complainants in the banana dispute on how to change its system in a way that complies with the ruling.

"We have provided ample opportunity for the EC to test its claim that its new measures are WTO consistent," she said. "We are exercising our rights under the WTO to withdraw concessions if the EC is not in compliance, which it clearly is not."

The U.S. said it is well within its rights under the WTO and U.S. law to begin considering how to respond to what it expects will be EU non-compliance with WTO rules. The Clinton Administration earlier this month assured Congress that it will retaliate against the EU if it fails to change its banana import policy in accordance with the ruling (*Inside U.S. Trade*, Oct. 16, p. 1).

In a related development, the Office of the U.S. Trade Representative yesterday (Oct. 22) published a notice in the *Federal Register* requesting public comment on the EU measures and the pending USTR determination that they will fail to meet WTO obligations.

Hayes also countered that the EU is the party taking a unilateral approach to the implementation of the panel decision, and said the U.S. and other claimants had been rebuffed in their efforts to work with the EU to find an acceptable solution. She added that the U.S. continues to hope that a WTO-consistent solution can be found before having to request suspension of concessions. U.S. Trade Representative Charlene Barshefsky this week also publicly emphasized her determination to negotiate a settlement (see related story).

Ecuador, speaking at the meeting for the complaining parties Guatemala, Honduras, Mexico, Panama and the U.S., urged the EU to consult with the complaining parties on implementing a WTO-consistent arrangement before the end of the year, trade sources said.

*continued on page 21*

## *In This Issue*

Brittan, Barshefsky continue to work on remaining problems in TEP ............................ p.1

Budget bill would shut off trade with some Cuban joint ventures ...................................... p.1

Daley attacks China as Administration avoids Section 301 case .............................................. p.1

Gephardt calls for steel Section 201 as USTR chides EU for quotas........................................ p.1

Korea to open auto market, end negative campaign on foreign cars................................. p.3

OECD nations forego MAI decision, agree to examine possible changes .............................. p.5

Private-sector skepticism creates new hurdle for Helms-Burton deal ...................................... p.7

Final deal on IMF funding includes reform conditions, targets Korea ................................ p.8

Roth, Moynihan urge Administration hardline on foreign subsidies ....................................... p.11

EU assessing U.S. proposal to improve U.S. meat testing system ...................................... p.12

Congress approves anti-bribery bill after last-minute wrangling .......................................... p.13

CIT judge to decide case on lumber classification without trial ........................... p.14

Congress directs USTR to scrutinize subsidies to Korea steel firms ...................................... p.15

U.S. signals acceptance of EU terms in wine talks, but waits for EU .................................. p.16

Union calls on EU to drop WTO challenge of Massachusetts Burma law ........................... p.17

U.S., EU clash over planned retaliation for EU banana policy ................................................ p.22

**SPENDING BILL PROVISION LIKELY TO DRAW FIRE FROM EU . . . begins page one**

Informed sources this week noted that HCH's trademark license was already revoked by the Treasury Department's Office of Foreign Assets Control (OFAC) last year. But sources said the language in the appropriations bill would effectively codify that decision, which could spark strong EU criticism.

In turn, sources said this could increase friction in the U.S.-European Union effort to resolve an ongoing dispute over the Helms-Burton law. While the two issues are technically unrelated, these sources said France and the rest of the EU are likely to see the language as another extraterritorial U.S. law. They could decide to demand changes to the language before the Helms-Burton agreement can be finalized (see separate story).

Adding to the controversy is that the language was specifically pushed by Bacardi-Martini USA, a competitor of HCH that has been fighting for the right to use the Havana Club trademark, informed sources said. Bacardi purchased the trademark right from the original owner, which prompted HCH to sue Bacardi based on the argument that HCH was the owner of the trademark. When Bacardi countered that HCH was not the owner, OFAC learned of the case and decided to revoke HCH's license.

Until the language in the appropriations bill was passed this week, sources said HCH might have been able to reapply for the license after the lawsuit. The case is expected to go to trial next year, and is now focused on HCH's claims that Bacardi should not be allowed to use the Havana Club trademark because Bacardi is not based in Cuba.

In addition to HCH, the language will likely affect other Cuban joint ventures such as Trinidad Cigar, which could lose its U.S. trademark license if the law is applied.

Informed sources said Bacardi won the support of Sens. Connie Mack (R-FL) and Bob Graham (D-FL), who put the language in the appropriations bill that was signed by President Clinton on Oct. 21. While one informed source said the language is supported by the International Trademark Association, another said only that ITA worked with Bacardi on the language to ensure that the Patent and Trademark Office would not be burdened with deciding which trademark licenses to revoke.

In its final form, Treasury is charged with drafting regulations for the implementation of the provision.

**Specifically, the language would prevent the U.S. from accepting payment in exchange for** licenses for trademarks that were "confiscated" unless the original owner of the trademark has consented. This would appear to prevent the U.S. from licensing the Havana Club trademark to HCH, since the Cuban government confiscated that trademark in the 1960s from the original owner.

Second, the language would prevent U.S. courts from recognizing or otherwise validating claims to a trademark by a "designated national." Designated nationals are identified by OFAC, which then places certain restrictions on these entities.

Sources said the apparent intention of this section is to deny HCH and possibly other joint ventures the right to fight the provision by preventing them from arguing in court that they are the rightful holders of a trademark.

Third, the language said that "[n]o U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national." While the meaning of this is also unclear, one source said it appears to require the U.S. to ignore international treaties that might otherwise hold that the designated national in question does in fact hold a trademark right.

A number of sources criticized this last provision, since it seems to be an effort to override pre-existing U.S. commitments. One source indicated that the Clinton Administration is likely to put forward the argument that treaty rights still supersede the amendment.

**While Clinton signed the bill into law this week, informed sources indicated that the** Administration may already be examining ways to get around the language. Sources said one possible way around the provision could be to argue that the Havana Club trademark was not technically confiscated by Cuba, and was merely picked up by Cuba after the revolution as a trademark that fell into disuse.

This reasoning could allow the Administration to argue that the trademark in question does not fall under the purview of the provision, sources said.

Other sources criticized supporters of the amendment for injecting it into the appropriations bill without leaving enough time to debate its possible impacts on international law. These sources said international law would hold that the Cuban-owned company is the true owner of the Havana Club trademark, since Cuba expropriated the trademark in the 1960s from Cubans.

The amendment would reject this finding by preventing HCH from filing a trademark license in the U.S., they said.

But supporters argued that the language would not violate international law, because Cuba never compensated the original owners for the trademark, and therefore the trademark does not belong to the Cuban company. Instead,

Bacardi should be seen as the rightful owner, since it paid the original owner for use of the trademark, these sources said.

OFAC last year revoked HCH's trademark license after deciding that the sale of the trademark from the Cuban-owned company to the joint venture with Pernod Ricard could be seen as the Cuban government's sale of a U.S. asset, the trademark, for money from the French company. As OFAC is charged with enforcing the Trading with the Enemy Act, it found that this transaction was a violation of U.S. law and revoked HCH's U.S. license (*Inside U.S. Trade*, Aug. 22, p. 1).

## Spending Bill Language on Trademark Rights

SEC. 211. (a)(1) Notwithstanding any other provision of law, no transaction or payment shall be authorized or approved pursuant to section 515.527 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

(2) No U.S. court shall recognize, enforce or otherwise validate any assertion of rights by a designated national based on common law rights or registration obtained under such section 515.527 of such a confiscated mark, trade name, or commercial name.

(b) No U.S. Court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national or its successor-in-interest under sections 44 (b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126 (b) or (e)) for a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

(c) The Secretary of the Treasury shall promulgate such rules and regulations as are necessary to carry out the provisions of this section.

(d) In this section:

(1) The term "designated national" has the meaning given such term in section 515.305 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, and includes a national of any foreign country who is a successor-in-interest to a designated national.

(2) The term "confiscated" has the meaning given such term in section 515.336 of title 31, Code of Federal Regulations, as in effect on September 9, 1998.

---

## DALEY BLASTS CHINA ON TRADE DEFICIT, TECH TRANSFER . . . begins page one

any Section 301 cases against China, informed sources said. The Administration decided against announcing such a case in the context of renewing the Super 301 provision this month despite an acknowledgment that the bilateral trade relationship faces problems in agriculture, intellectual property and telecommunications, an official said. The official indicated that the Administration is leaning toward not making any announcements on trade cases at that time, even though a final decision has not been made yet.

In a meeting of the National Economic Council earlier this month, Commerce and the Office of the U.S. Trade Representative were advocating in favor of a Section 301 case, but met with opposition from the Treasury Dept., sources said. Treasury's position was backed by the State Dept., one informed source said.

At the same time, informed sources said that no U.S. business association or firm favors such a confrontational approach with China for fear of retaliation. As a result, they argue, it is highly unlikely that the U.S. would ever launch a case against China.

The bilateral trade problems and a burgeoning trade deficit come at a time when negotiations for China's accession into the World Trade Organization are stalled. China's negotiator Long Yongtu last week made very vague proposals for further concessions to the U.S., but insisted to business representatives that he hopes to wrap up negotiations by April next year.

U.S. government officials have said they assume China's accession would take at least another two to three years, with other estimating three to five years. Some U.S. officials have said these time periods have been conveyed by Chinese officials, and are not independent U.S. estimates.

After his speech, Daley said the Clinton Administration is considering possible steps to effectively address its problems with China, but he refused to specify what these might be. In addition, the U.S. must remain adamant that China not be allowed to enter the WTO before making better market access offers, he said.

Daley said that U.S. investors and consumers have shown faith in China and that he will press China to show reciprocal faith in U.S. goods and services in the upcoming December meeting of the U.S.-China Joint Commission on Commerce and Trade.

**EXHIBIT 10**



STATE OF FLORIDA

# Office of the Governor

THE CAPITOL
TALLAHASSEE, FLORIDA 32399-0001

www.flgov.com
850-488-7146
850-487-0801 fax

JEB BUSH
GOVERNOR

June 13, 2002

The Honorable James E. Rogan
US Patent and Trademark Office
Crystal Park, Building 2, Room 906
2121 Crystal Drive
Arlington, VA 22202

Dear Under Secretary Rogan:

I am writing on behalf of Florida-based Bacardi-Martini, USA, Inc. to ask that the Patent and Trademark Office take quick, decisive action on a pending application to expunge the registration of the trademark Havana Club. The out-dated registration belongs to a company owned by Fidel Castro called CubaExport and should be cancelled immediately.

Bacardi-Martini, USA, Inc. generates close to $1 billion of business a year nationally. The company's domestic headquarters are located in Miami and has a workforce of more than 300 Floridians and more than 600 employees throughout the United States.

As I understand, since 1997 Bacardi-Martini, USA, Inc. has sought, through every legal channel, to cancel the Fidel Castro regime's registration of the Havana Club trademark. In 1960, Fidel Castro confiscated the Havana Club brand from the family who owned the company. Castro transferred the brand name to CubaExport, a Cuban government-controlled company in 1976. In 1993, the company Havana Club Holdings, jointly owned by Castro's Cuban government and the French company Pernod-Ricard, applied for and was granted, legal registration of the brand for use in the United States. However, it was not theirs to register. Furthermore, Bacardi-Martini, USA, Inc. purchased the Havana Club brand and assets in 1997 from the original owners.

Though Bacardi-Martini, USA, Inc. has spent a great deal of time and money to cancel the delinquent registration owned by the Castro regime, there has been no relief for the company. Instead, they have been faced with a process mired in lengthy bureaucratic procedures, with no end in sight.

FOIA 0009

Exhibit F

The Honorable James E. Rogan
June 13, 2002
Page Two

A swift resolution to this matter is imperative. Should you have further questions, please do not hesitate to contact my office. You may also feel free to contact my Washington, D.C., Office at 202/624-5885. Thank you for your consideration of this matter.

Sincerely,

Jeb Bush

FOIA 0010

Exhibit F

FEB-01-2002  09:36     EXECUTIVE OFC OF GOVERNOR          852 922 4292     P.02

*Bruce Slager*

Kathleen Shanahan

*Nina, 2/1/02*

From:        Jeb Bush [jeb@jeb.org]
Sent:        Wednesday, January 09, 2002 7:53 PM
To:          Kathleen Shanahan (E-mail); Arlene Dibenigno (E-mail)
Subject:     FW: BACARDI NEEDS HELP

for our discussion.

Jeb Bush

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++
Please note: Florida has a very broad public records law.
Most written communications to or from state officials
regarding state business are public records available to the
public and media upon request.   Your e-mail communications
may therefore be subject to public disclosure.


-----Original Message-----
From: J Rodriguez-Marquez [mailto:jrodriguez-marquez@bacardi.com]
Sent: Tuesday, January 08, 2002 9:16 PM
To: Jeb Bush
Subject: BACARDI NEEDS HELP
Importance: High


Dear Jeb,
As you know Castro in partnership with Pernod, a French company, has
been
fighting Bacardi since 1996 over the Havana Club brand rights inside the
US.
Bacardi prevailed in Federal Court regarding the dispute.
We also prevailed in Federal Appellate Court, and then the US Supreme
Court
refused to review the case.

The aggressors, unsatisfied with the end results, created an
international
dispute between the European Union and the US over a US law (Section
211)
which they blamed for their repeated defeats in US courts.The EU filed a
complaint at WTO against the US law.
Last week the WTO ruled in favor of the US and Bacardi. This law
prohibits
recognizing rights in the US to any illegally confiscated trademarks in
Cuba.

This should be the end of the line for Castro and Pernod on this issue.
However, since 1997 there are two very relevant  and significant issues
which are still unresolved and are damaging to Bacardi.

ISSUE #1
The US Treasury Department's Office of Foreign Asset Control (OFAC) has
been holding a pending license application from Havana Club Holdings
(Castro-Pernod) which could grant them some rights to the HC brand. If
that
license is granted it will be contradicting current US law, plus it will
be
  nying the Federal Court rulings.
..e have worked with OFAC and with Under Secretary of State Alan Larson
for
over three years to have this pending license application denied but to

FOIA 0012

FEB-01-2002 09:36    EXECUTIVE OFC OF GOVERNOR    850 922 4292    P.03

no
avail.

ISSUE #2

~~The~~ US Department of Commerce's Patent and Trademark Office (PTO) has in
hand  since 1997 a Federal Court Mandate instructing them to erase from
their records the Havana Club Holdings (Castro and Pernod) registration
to
the Havana Club brand. Because of the multiple appeals PTO withheld
action.
But since the US Supreme Court decision in October of 2000 (15 months
ago),
they have found every excuse not to act on that court mandate.
We have been working with PTO and also with Alan Larson on this issue
too,
but so far, nothing.

We need your help.
Perhaps we should meet with Secretary O'Neil and Secretary Evans, or
whomever you think might be helpful.
I have mentioned this case to Kelley McCullough from Karl Rove's office
last December 8th when they visited Miami and have sent her briefings.
Al Cardenas also knows of our needs and has talk to some people.

I hope you can help us. We are asking that current laws be respected
(issue
#1) and that a Federal Court order is complied with (issue#2).
Thanks for your time, I am sure you don't have much available.
Best regards,

Jorge

In Dudes--

∘ find out about why lawyer have not
  been orders.
∘ court must say Cuba Export
         -Contested Litigation
∘ transfer legitimate due to OFAC
         -OFAC

∘ application remains in limbo
         -not proper names
         -need to reinstate a cancellation
∘ should be a slam dunk case

FOIA 0013

2

TOTAL P.03

## Muniz, Carlos

| | |
|---|---|
| **From:** | Jeb Bush [jeb@jeb.org] |
| **Sent:** | Tuesday, February 26, 2002 6:10 PM |
| **To:** | Oviedo, Nina; Kathleen Shanahan |
| **Subject:** | FW: THANK YOU |
| **Importance:** | High |

Jeb Bush

*******************************************************
Please note: Florida has a very broad public records law.
Most written communications to or from state officials
regarding state business are public records available to the
public and media upon request.   Your e-mail communications
may therefore be subject to public disclosure.

-----Original Message-----
From: J Rodriguez-Marquez [mailto:jrodriguez-marquez@bacardi.com]
Sent: Tuesday, February 26, 2002 5:56 PM
To: Jeb Bush
Subject: THANK YOU
Importance: High

Dear Jeb,

Thank you for your valuable support regarding our problems at Commerce and
Treasury.

Both Nina Oviedo and Melissa Freedman are GREAT people and they are both
helping very effectively.

The meeting yesterday at 4:00 PM at Patent &Trademark Office (PTO)
reconfirmed to us that, at least one, and most likely two female career
lawyers at PTO have personal problems with our Havana Club case. One of
these two lawyers was present at the meeting yesterday and in some of her
answers to my complaints she incriminated herself by revealing personal
negative feelings about our case.

With your continued support I am sure we can have it solved soon. I will
continue working  with Nina and Melissa.

Thank you for the wonderful cufflinks I received through Slater.

GRACIAS MIL,

Jorge

FOIA 0042

1

**Muniz, Carlos**

| | |
|---|---|
| From: | Melissa Freedman [freedmm@sso.org] |
| Sent: | Monday, March 18, 2002 5:41 PM |
| To: | Oviedo, Nina |
| Subject: | RE: Bacardi and Patent &Trademark Office |

I don't have Jon's email, but may be able to get it from his office.

I will do it by email...and CC you?

-----Original Message-----
From: Nina Oviedo [mailto:oviedon@sso.org]
Sent: Monday, March 18, 2002 5:45 PM
To: 'Melissa Freedman'
Subject: RE: Bacardi and Patent &Trademark Office

I wouldn't "formalize" it....do you have Jon's e-mail address.

-----Original Message-----
From: Melissa Freedman [mailto:freedmm@sso.org]
Sent: Monday, March 18, 2002 5:28 PM
To: Nina Oviedo
Subject: RE: Bacardi and Patent &Trademark Office

Jon Dudas, from PTO, called me about two weeks ago to make sure that the
meeting we had with Eleanor Meltzer and himself, has been helpful. We
talked a little about the case. Now that I know Bacardi has sent in the
request for cancellation of CubaExport's registration, I thought I would
send Jon a note on our stationary, thanking him for his time on the case,
and letting him know that Bacardi has made their move. Please let me know
if I should go ahead with that.

(Jorge did not like some of the issues that Eleanor Meltzer brought up in
our meeting, so keeping up contact with Jon would be the most preferred
method to Bacardi, I am sure.)

Otherwise, we should do nothing for the moment. We need to wait a few weeks
until PTO takes action, which from all indications will be favorable. Then
its on to Commerce...

-----Original Message-----
From: Nina Oviedo [mailto:oviedon@sso.org]
Sent: Monday, March 18, 2002 5:25 PM
To: Melissa Freedman (E-mail)
Subject: FW: Bacardi and Patent &Trademark Office
Importance: High

What do I need to do here?

-----Original Message-----
From: J Rodriguez-Marquez [mailto:jrodriguez-marquez@bacardi.com]
Sent: Monday, March 18, 2002 4:57 PM
To: oviedon@sso.org; freedmm@sso.org
Subject: Bacardi and Patent &Trademark Office
Importance: High

Dear Nina and Melissa,

This past Friday, March 15th our lawyers Kelley Drye & Warren of New York,
filed with Patent And Trademark Office a motion for cancellation of the
CubaExport registration on Summary Judgment.

FOIA 0044

1

Below you can find two attachments:

one is the complete set of documents as filed Friday with PTO;

the other shows most (but not all) of the key points extracted from the documents filed with PTO, which I selected only for your easy reading.

(See attached file: PTO-Summary Judgment-3-15-02.DOC)          (See attached file: PTO- Key Captions from Summary Judgment-3-15-02.doc)

Since our meeting at PTO, Monday February 25th our lawyers have also filed an official complaint with PTO showing them that they DID NOT notify Bacardi of their decision dated January 15th, even though they have insited they did. Last week PTO finally issued a fomal reply to us admitting that in fact the notification to Bacardi was never sent out. It is the second time in 18 months that PTO finds a problem notifying Bacardi on issues of Havana Club.

Assumming that now PTO would "want to" act equitably and follow the straight line, ( I will not hold my breath on that), this new request from us now asking to cancel Cuba Export from their records should put the final end to this ever lasting problem.

Cuba Export, as you might remember is Castro's government entity which registered Havana Club in the US in 1976 and later sold all its rights to Havana Club Holdings (HCH) which is the partnership between Castro and Pernod-Ricard, the French beverage company. HCH lost its rights in Federal Court and Cuba Export willingly lost theirs when they sold them to HCH.

Would you please, help us by making sure that Patent and Trademark Office's Mr. Dudas knows that all they need to do now is be very much aware of this motion for summary judgment, so that it can go through its normal process without any undue negative "influence" from certain parties knonw to us.

Let me know if you have any questions.

Jorge

FOIA 0045

2

Bacardi Issue-Continued                                                                Page 1 of 1

## Muniz, Carlos

**From:**      Nina Oviedo [oviedon@sso.org]
**Sent:**      Tuesday, April 09, 2002 6:32 PM
**To:**        Governor Bush (E-mail); Kathleen Shanahan (E-mail); Frank R. Jimenez (E-mail)
**Cc:**        Melissa Freedman (E-mail)
**Subject:**   FW: Bacardi Issue-Continued

Pls see Melissa's update below. We would be happy to make appropriate contacts...pls advise. Nina

-----Original Message-----
From: Freedman, Melissa [mailto:freedmm@SSONet.sso.org]
Sent: Tuesday, April 09, 2002 6:12 PM
To: Oviedo, Nina
Subject: Bacardi Issue-Continued


Nina,

Jorge Rodriguez, President of Bacardi, just emailed us today, to give us an update on his problems with the Patent and Trademark Office and the Office of Foreign Asset Control...and to ask for help.

Patent and Trademark Office Issue-- At a meeting that Bacardi and our office attended, with representatives from the Patent Office, Bacardi was told that in order to obtain their license and registration for Havanna Club Holdings, Bacardi would have to request that the Patent Office expunge CubaExport/Pernod's registration of the company. After requesting the cancellation of the registration (3/15/02), Bacardi has now been told that the Patent Office has granted Cuba Export/Pernod's request to extend the comment period for the cancellation, by 30 days. Bacardi is understandably upset, as they feel this issue has been dragged out for years.

Office of Foreign Asset Control Issue--Bacardi has been told for the last six months that a pending license application for Havanna Club Holdings that Pernod applied for in 1997, will finally be denied. However, no action has been taken by the Foreign Asset Office. Bacardi is frustrated because they feel that if the license application is not denied, the Patent Office may hold up cancellation of CubaExport/Pernod's registration.

Mr. Rodriguez is requesting our help to put pressure on these two bureaucracies, where possible. He is in Washington today and tomorrow, and would like us to call.

Thanks. Melissa

FOIA 0070

<freedmm@sso.org>       uez                 cc:   oviedon@sso.org
                                            Subject:   RE: Bacardi's Problems
@ PTO and OFAC(Document link: J
               04/09/2002                   Rodriguez-Marquez)
               12:39 PM


(Embedded
image moved      (Embedded image moved to file: pic09961.pcx)
to file:
pic16827.pcx)


Dear Melissa,

"Business as Usual" is all I can say about Patent and Trademark Office's
behavior in our case.

Once again and unfortunately, we do not see ANY favorable reaction from PTO
to our case.

The TTAB's response to our actions of March 15th, (as copy of my e-mail to
you below) has been to grant Pernod-Ricard their requested extension of 30
days. Therefore, ANYTHING Pernod asks from PTO's administration they get,
and Bacardi is left to wait, and wait.

I do not know IF THERE IS ANYTHING ELSE, that Bacardi can do to receive a
FAIR treatment from Patent and Trademark office. Perhaps, we need to learn
from Pernod, they seem to be getting PTO's attention.

Regarding, the second issue, the one at OFAC (Office of Foreign Asset
Control at Treasury), we have heard from Ambassador Larson (State
Department) many times during the last six months that the pending license
application which Pernod applied for in 1997 will be finally denied, but
that is still pending (after almost five years) and as I am sure you
remember, Eleanor Meltzer from PTO mentioned it as a possible winning card
in Pernod's game. That application NEEDS to be denied, but here again
Pernod is still receiving help from this other side of our government.

I WISH SOMEONE COULD TELL ME WHAT IS BACARDI DOING WRONG??????????????

Our business is STILL being disturbed, by the lack of FAIR actions from our
government, while the Federal courts and WTO tells us we are on the side of
right.

Frustrating.
I am in Washington DC today and tomorrow, call my cell if you have any
comments or ideas. (305)613-5099
Regards,
Jorge


                        "Melissa
                        Freedman"        To:   "J Rodriguez-Marquez"
<jrodriguez-marquez@bacardi.com>
                        <freedmm@sso.    cc:
                                              2                        FOIA 0072

org>                          Subject:    RE: Bacardi and Patent
&Trademark Office

03/22/2002
05:26 PM

Hi Jorge,

I apologize for just getting back to you--we have been so busy, though it
always seems that way!  I received your voicemail--the night we received
your email about filing the motion to cancel Cuba Export's registration, we
emailed Jon Dudas at PTO to let him know that you had taken that step.  So,
we have made the contact already, and will now await their response to your
filing.

Please let us know how things progress, and do not hesitate to call or
email.

Have a pleasant weekend,
Melissa Freedman
Office of Governor Jeb Bush
(202) 624-5885

-----Original Message-----
From: J Rodriguez-Marquez [mailto:jrodriguez-marquez@bacardi.com]
Sent: Monday, March 18, 2002 4:57 PM
To: oviedon@sso.org; freedmm@sso.org
Subject: Bacardi and Patent &Trademark Office
Importance: High

Dear Nina and Melissa,

This past Friday, March 15th our lawyers Kelley Drye & Warren of New York,
filed with Patent And Trademark Office a motion for cancellation of the
CubaExport registration on Summary Judgment.

Below you can find two attachments:

    one is the complete set of documents as filed Friday with PTO;

    the other shows most (but not all) of the key points extracted from the
    documents filed with PTO, which I selected only for your easy reading.

(See attached file: PTO-Summary Judgment-3-15-02.DOC)             (See
attached file: PTO- Key Captions from Summary Judgment-3-15-02.doc)

Since our meeting at PTO, Monday February 25th our lawyers have also filed
an official complaint with PTO showing them that they DID NOT notify
Bacardi of their decision dated January 15th, even though they have insited
they did. Last week PTO finally issued a fomal reply to us admitting that
in fact the notification to Bacardi was never sent out. It is the second
time in 18 months that PTO finds a problem notifying Bacardi on issues of
Havana Club.

Assuming that now PTO would  "want to" act equitably and follow the
straight line. ( I will not hold my breath on that), this new request from
us now asking to cancel Cuba Export from their records should put the final
end to this ever lasting problem.

                                        3

FOIA 0073

Cuba Export, as you might remember is Castro's government entity which registered Havana Club in the US in 1976 and later sold all its rights to Havana Club Holdings (HCH) which is the partnership between Castro and Pernod-Ricard, the French beverage company. HCH lost its rights in Federal Court and Cuba Export willingly lost theirs when they sold them to HCH.

Would you please, help us by making sure that Patent and Trademark Office's Mr. Dudas knows that all they need to do now is be very much aware of this motion for summary judgment, so that it can go through its normal process without any undue negative "influence" from certain parties known to us.

Let me know if you have any questions.

Jorge

FOIA 0074

4

## Fawcett, Robert D.

**From:** Knight, Bernard
**Sent:** Thursday, October 17, 2002 6:54 PM
**To:** Briskin, Michael; Fawcett, Robert D.
**Subject:** FW: New Important Developments

**Follow Up Flag:** Follow up
**Flag Status:** Flagged


PTO-Summary
Judgment-3-15-02.D...


PTO- Key Captions
from Summary...    FYI--An email received from Dudas.

-----Original Message-----
From: Dudas, Jon
Sent: Thursday, October 17, 2002 5:43 PM
To: Knight, Bernard
Subject: FW: New Important Developments

-----Original Message-----
From: TThomas@doc.gov [mailto:TThomas@doc.gov]
Sent: Thursday, March 21, 2002 5:49 PM
To: Jon.Dudas@USPTO.GOV
Subject: New Important Developments

check this out -- just talked to Jorge
----- Forwarded by Travis Thomas/HCHB/Osnet on 03/21/2002 05:48 PM -----

"J Rodriguez-Marquez"
<jrodriguez-marquez@b          To:      tthomas@doc.gov
acardi.com>                    cc:
                               Subject:  New Important Developments
03/20/2002 08:14 PM

Since our last conversation on the telephone Tuesday February 26th and as I
mentioned to you we would, last Friday March 15th our lawyers Kelley Drye &
Warren of New York filed with PTO a Motion for Cancellation of the
CubaExport Registration under Summary Judgment.
I am attaching here for your information the complete set of documents we
filed last Friday.          (See attached file: PTO-Summary
Judgment-3-15-02.DOC)

Also, this next attachment gives you a short version of the filing, based
on a selection I made of some of the  most important issues of the filing.

(See attached file: PTO- Key Captions from Summary Judgment-3-15-02.doc)    FOIA 0145

In summary, PTO can not show CubaExport as the current holder of the Havana
Club trademark because:

First.............................CubaExport willingly gave up all their
rights in 1993 when they transferred them to HCH.
Second.....................CubaExport's 20 year registration ended in 1996
and they choose not to renew it. That is six years ago.
Third.........................CubaExport was notified by US Federal Court
in 1997 that HCH had just lost any and all rights to the brand and yet they
still never tried            to claim any rights at all.

We have had too many strange experiences with PTO during the last few years
including PTO's failing to notify Bacardi as required, when the January
15th, 2002 decision was adopted; also the continued disappearances of very
sensitive files from PTO records which we have been requesting for months.
These complaints are all documented and acknowledged by PTO. Our latest
unfortunate experience was last February 25th when I met at PTO with Jon
Dudas and attorney Eleanor Meltzer and Ms Meltzer told me that "Bacardi
should not have rights to the Havana Club brand because we can not make it
in Havana" and  before we ended the meeting she told us that "if the OFAC
pending license application is granted it could change the total picture".
We were all very surprised to learn that Ms Meltzer was mixing two
allegations into the PTO's process which are totally independent from PTO's
main concern, and also  the fact that she was ready to pass judgement on
two scenarios in which she has no knowledge of or  jurisdiction on.

We are confident that our Motion for Summary Judgment will be dealt with
expeditiously and without any undue negative influence from parties who may
not agree with Bacardi's rights under the law.
Please, let me know if you have any questions. You can call me at my office
305-446-9050 or at my cell 305-613-5099.
Thank you for your time and interest in our case.
Jorge(See attached file: PTO-Summary Judgment-3-15-02.DOC)(See attached
file: PTO- Key Captions from Summary Judgment-3-15-02.doc)

FOIA 0146

**EXHIBIT 11**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BACARDI & COMPANY LIMITED,
1000 Bacardi Road
New Providence, Bahamas

and

BACARDI U.S.A., INC.,
2100 Biscayne Boulevard
Miami, Florida 33137

Civil Action No. _____

Plaintiffs,

v.

EMPRESA CUBANA EXPORTADORA DE
ALIMENTOS Y PRODUCTOS VARIOS d/b/a
CUBAEXPORT
Calle 24, n 55, edif. MINCEX, 8vo, piso.
Havana, Cuba

and

HAVANA CLUB HOLDING, S.A. d/b/a
HCH, S.A.
5 Rue Eugène Ruppert L2453
Luxembourg

Defendants.

ENTERED IN DOCKET
3/29/04 MTC

**COMPLAINT**

Plaintiffs, by their attorneys, Kelley Drye & Warren LLP and Covington & Burling,

allege upon personal knowledge as to their own acts and information and belief as to all other

acts, as follows:

5.     In the HC Cancellation Proceedings initiated by BACO to cancel the Extant U.S. HAVANA CLUB Registration, the TTAB refused to strike that Registration from the PTO's records despite Cubaexport's failure to file a timely renewal application, and dismissed BACO's petition to cancel that Registration for failure to state a claim. The TTAB declined to rule whether Cubaexport's registration should be cancelled because it rested on an uncompensated expropriation of JASA's assets. The TTAB further stated that Bacardi had not adequately shown that Cubaexport made material false representations in obtaining, maintaining, and renewing the Extant U.S. HAVANA CLUB Registration.

6.     In this action, Plaintiffs seek:

(a)     Reversal of the TTAB's decision and rectification of the records of the PTO by (i) striking the Extant U.S. HAVANA CLUB Registration from the Principal Register of the PTO on the ground that Cubaexport failed to file the mandatory renewal application and declaration prior to the end of the statutory period or (ii) alternatively, canceling that Registration on the grounds, among others, that the Extant U.S. HAVANA CLUB Registration was fraudulently obtained, maintained, and renewed; that the registered mark was abandoned; and that the registered mark misrepresents the source of goods;

(b)     A declaration that BACO owns the common law rights in the HAVANA CLUB mark for rum and that Defendants have no common law or other rights in any mark incorporating or consisting of the words HAVANA CLUB;

(c)     A declaration that Plaintiffs' use of the HAVANA CLUB mark does not infringe on any mark owned by the Defendants or otherwise violate any enforceable rights of the Defendants, because longstanding U.S. public policy and Section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, Public Law No. 105-277, 112

-4-

Stat. 2681 (Oct. 21, 1998) ("Section 211"), preclude recognition and enforcement of purported

rights in a trademark or registration that are founded on the Cuban government's expropriation of

assets; and

(d)    An injunction prohibiting Defendants from using or registering in the PTO

or in any State of the United States any mark incorporating or consisting of the words HAVANA

CLUB and from interfering with Plaintiffs' use and registration of the HAVANA CLUB mark.

## PARTIES AND RELATED ENTITIES

**Plaintiffs and Related Entities**

7.    Plaintiff Bacardi & Company Limited ("BACO") is a Liechtenstein company

having its principal place of business at 1000 Bacardi Road, New Providence, Commonwealth of

the Bahamas. BACO is the successor to Compañía Ron Bacardí S.A., a Cuban *sociedad*

*anónima* (joint-stock company) which was headquartered in Santiago de Cuba, Republic of

Cuba, until its assets in Cuba were confiscated by the Cuban government in October 1960.

8.    BACO, through its affiliates, licensees, and distributors, produces and markets

distilled spirits worldwide. BACO owns the internationally renowned name and mark

BACARDI, together with the registrations of that name and mark and the related business and

goodwill, on a worldwide basis. BACO was a party to the HC Cancellation Proceeding.

9.    José Arechabala S.A. ("JASA") is a *sociedad anónima* organized and existing

under the laws of the Republic of Cuba. JASA's headquarters and principal place of business

were in Cárdenas, Cuba, until its assets in Cuba were confiscated by the Cuban government in

1960. JASA's current principal place of business is in Vaduz, Principality of Liechtenstein.

JASA is the creator and the original owner of the HAVANA CLUB trademark in Cuba, the

United States, and other countries, and the trademark registrations associated therewith. JASA is

21, 1998) ("Section 211"), codifying, in part, the Non-Recognition Doctrine. Section 211(b)

provides that:

> "No U.S. court shall recognize, enforce or otherwise validate any assertion of
> treaty rights by a designated national or its successor-in-interest under sections
> 44(b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126(b) or (e)) for a mark,
> trade name, or commercial name that is the same as or substantially similar to a
> mark, trade name, or commercial name that was used in connection with a
> business or assets that were confiscated unless the original owner of such mark,
> trade name, or commercial name, or the bona fide successor-in-interest has
> expressly consented."

      39.    The term "designated national" is defined to mean "Cuba and any national thereof

including any person who is a specially designated national." *See* Section 211(d)(1) and 31

C.F.R. § 515.305. The term "specially designated national" is defined in the CACR to include,

among others, any entity that is owned or controlled by the Cuban government. *See* 31 C.F.R. §

515.306(a)(3). The term "confiscated" is defined in Section 211 to mean "expropriated by the

Cuban government on or after January 1, 1959, without payment of adequate and effective

compensation." *See* Section 211(d)(2) and 31 C.F.R. § 515.336.

**E.**    **Cubaexport's Registration of the Confiscated HAVANA CLUB Mark**

      40.    After Law No. 890 was issued, the Cuban government or its successors claimed

title to property owned by Cuban companies located outside Cuba, including rights to the

BACARDI trademark. In a series of cases decided over several years and involving Cuban

companies in exile, courts in the United States and elsewhere refused to recognize such claims,

including claims to the BACARDI trademark, based on the principles underlying the Non-

Recognition Doctrine.

      41.    Having failed to obtain worldwide title to the BACARDI trademark, BACARDI

being the most popular rum that had been produced in Cuba, the Cuban government then turned

to HAVANA CLUB, the mark designating the second most popular Cuban rum. As a result of

the rum business and could not truthfully aver that, but for the Cuban embargo, it was ready and able to export HAVANA CLUB rum to the United States.

96.    The TTAB agreed with Bacardi that "[a] proper renewal application must be executed and filed by the owner of a registration" (TTAB Decision p. 36) and stated, citing 15 U.S.C. § 1127, that the term "registrant" includes "both the original registrant [Cubaexport] and a person who has acquired ownership through *proper transfer* of title." (TTAB Decision p. 36 n. 23) (emphasis added). Therefore, the TTAB concluded, "continuity of title from the registrant to the present owner must be shown." (TTAB Decision p. 36).

97.    The TTAB stated that "well before the nine-month renewal period commenced [on July 27, 1995] it appeared that Cubaexport was no longer the owner of the registration." (TTAB Decision P. 37)  This statement disregarded the Judgment, which had held that the transfers were void and that the *status quo ante* as of November 23, 1993, was restored. Cubaexport, not HCH, was then the putative owner of the Extant U.S. HAVANA CLUB Registration as of November 23, 1993, and through April 27, 1996, the statutory deadline for filing a valid renewal application and declaration.

98.    The TTAB also stated that "[a]ccording to HCH and Cubaexport, all of the parties concerned considered HCH as the owner of the registration." (TTAB Decision p. 37).  This statement ignored that the United States was also a concerned party and that HCH and Cubaexport had created their own predicament by violating the CACR.  The Judgment held, among other things, that HCH never "obtained any rights in the HAVANA CLUB mark in the United States by transfer" (Judgment ¶ 6).  Therefore, Cubaexport was the only party that the TTAB could deem to be the putative "owner" of that registration consistent with the Judgment.

99.    The TTAB then observed that:

-32-

"[T]here is no opportunity now for Cubaexport to file a new, substitute or amended renewal application. The statutory renewal period has long passed, and neither we, nor the parties, may extend or reopen that period." (Judgment, p. 38)

But the TTAB went on to conclude, contrary to Section 211 and the Judgment, that HCH had complied with the PTO Renewal Rules when it filed its renewal application in its own name, that it had filed a proper renewal application, that the PTO had acted properly in accepting the renewal application and renewing the application in HCH's name, and that the resulting renewal application was valid.

100.    The TTAB never ruled on Section 211. The only rationale the TTAB offered for ignoring the nullification of the transfers ordered by the Judgment is that, to avoid confusion and administrative burden on the PTO, the TTAB "must focus on circumstances when the renewal applicant filed its application, not on the circumstances which existed years later." (TTAB Decision p. 38) This was legal error. The Judgment conclusively established that HCH never had any claim whatsoever to legal or equitable title to the Extant U.S. HAVANA CLUB Registration, so the TTAB was bound to treat HCH's renewal filing as a nullity.

101.    The TTAB Decision went on to consider whether any of the other claims in Bacardi's 1996 Supplemental and Amended Petition were ones on which the TTAB could grant relief. The TTAB dismissed Bacardi's claim of fraud in obtaining the registration on the ground that Bacardi did not allege that JASA had used the HAVANA CLUB mark in the United States in 1974 when Cubaexport filed its trademark application. Similarly, in dismissing Bacardi's claim of fraud in maintaining the registration, the TTAB found that Cubaexport could not have knowingly made a misrepresentation concerning ownership of the mark in its Section 8 affidavit, since no allegation of JASA's use of the mark in the United States in 1974 was made. In 1974, however, JASA was not able to use the mark in the United States because its assets had been

confiscated by the Cuban government and because, as a Cuban entity, it was barred by the Cuban embargo from selling rum in the United States.

102.    The TTAB further held that, since OFAC had not explained the reasons for revoking the transfer license, the allegation that Cubaexport and HCH had willfully violated the CACR and that HCH had knowingly filed a false Renewal Declaration failed to state a claim for fraudulent renewal.  This confused the rules for pleading fraud with proof of a fraud allegation. The TTAB declined to determine whether there was a fraudulent transfer of the mark under the CACR on the ground that the TTAB "has little or no experience in determining violation of statutes or regulations that do not directly concern registrations of trademarks." (TTAB Decision p. 51).

103.    The TTAB rejected the abandonment claims on the ground that the assignment-in-gross rule does not apply to this case because Cubaexport, HRL and HCH never had business assets in the United States that could be separated from the trademark.

104.    Finally, the TTAB refused to consider whether the HAVANA CLUB & DESIGN mark was being used to misrepresent the source of the goods because this "claim is premised on the assumption that Cubaexport is not the true and legitimate owner of the HAVANA CLUB mark, which can only be regarded as a political question based on the premise that the Cuban government is not legitimate." (TTAB Decision p. 55).  The TTAB added that it did not have the authority to answer this question.  The TTAB did not rule on the applicability of the Non-Recognition Doctrine or the other bases, including Section 211, for concluding that Cubaexport was not the true owner of the Extant U.S. HAVANA CLUB Registration.

108.    Cubaexport did not file a renewal application and declaration on or before April 27, 1996, or thereafter.  As a result of this omission by Cubexport, the Extant U.S. HAVANA CLUB Registration expired automatically under the Lanham Act.

109.    On or about January 18, 1996, HCH filed a Renewal Declaration in its own name, claiming, under pain of perjury, that HCH owned the Extant U.S. HAVANA CLUB Registration based on the recorded assignments from Cubaexport to HRL and from HRL to HCH.  The Judgment held, however, that those recorded assignments were null and void *ab initio* under 31 C.F.R. § 515.203(a), and also canceled any rights HCH may have had, may have or claims to have had in the Extant U.S. HAVANA CLUB Registration from forever until the October 27, 1997 date of the Judgment (¶8).  Therefore, HCH could not satisfy the renewal requirement of continuity of title from Cubaexport and was not at that or any other time the owner of the Extant U.S. HAVANA CLUB Registration.

110.    Furthermore, the HAVANA CLUB trademark that is the subject of the aforesaid federal registration is, as the District Court held, similar to the HAVANA CLUB mark used with the assets of JASA seized by the Cuban government without compensation in 1960, so the TTAB was proscribed from recognizing or enforcing any interest of HCH in said registration.

111.    No renewal application and declaration was ever filed by the owner of the Extant U.S. HAVANA CLUB Registration prior to the statutory deadline for filing such renewal applications and declarations.

112.    Because the requirements of 15 U.S.C. § 1059 were not met, and the Extant U.S. HAVANA CLUB Registration expired, the records of the PTO must be rectified by striking and expunging said registration from the Principal Register of the PTO.

-36-

approved by JASA, or as being the same quality as the only HAVANA CLUB rum ever sold legally in the United States, which was produced by JASA.

138.    Furthermore, said advertising and promotional use of said HAVANA CLUB & DESIGN mark and Cubaexport's other aforesaid acts and omissions are intended to confuse the American public into wrongly believing that Cubaexport is somehow the legitimate successor to the original producer of the HAVANA CLUB rum sold in the United States, JASA. Indeed, the use of the statement "founded in 1878" as part of the HAVANA CLUB & DESIGN mark can have no other purpose.

139.    Through the aforesaid acts, Cubaexport has used the purported HAVANA CLUB & DESIGN mark as a vehicle for fraud and said mark is being used in violation of 15 U.S.C. § 1064(3) to misrepresent the source of Defendants' ersatz HAVANA CLUB rum.

140.    Wherefore, said mark was used by or with the permission of Cubaexport in violation of § 1064(3) and the registration thereof should be cancelled.

## COUNT II
### DECLARATION OF COMMON LAW RIGHTS IN THE HAVANA CLUB TRADEMARK

141.    Paragraphs 1 through 140 are incorporated herein by reference.

142.    BACO is the true owner of the common law rights in and to the HAVANA CLUB mark as the bona fide successor-in-interest to JASA, the original owner of those rights. JASA never abandoned its rights in and to the HAVANA CLUB mark; JASA was prevented from using the mark in the United States and elsewhere as a result of the Cuban government's confiscation of JASA's assets in 1960. At all times prior to BACO's acquisition of the mark, JASA intended to resume use of the mark when it had the means to do so.

-43-

154.    Defendants have not been damaged, and will not in the future be damaged, by Plaintiffs' use of the HAVANA CLUB mark or by any alleged violation of state law based on Plaintiffs' use of said marks.

155.    An actual controversy exists between the parties with respect to the foregoing claims of non-violation and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below.  Plaintiffs have no adequate remedy at law.

### COUNT V
### TREATY VIOLATIONS AND CONSTITUTIONAL GROUNDS

156.    Paragraphs 1 through 155 are incorporated herein by reference.

157.    Contrary to Section 44 of the Lanham Act, 15 U.S.C. § 1126, and international conventions, the HAVANA CLUB mark was not used in commerce in the United States within a reasonable period after Cubaexport's original application was filed.

158.    Indeed, the HAVANA CLUB mark has never been used by the original registrant, Cubaexport, in interstate or foreign commerce of the United States.

159.    Wherefore, the purported HAVANA CLUB mark has never been used in commerce which may lawfully be controlled by Congress, so the PTO has no power to maintain the U.S. HAVANA CLUB & DESIGN Registration on the Principal Register of the PTO and said registration should be cancelled.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs pray for relief as follows:

160.    Plaintiffs request that this Court enter judgment:

(a)    Adjudging and declaring that Reg. No. 1,031,651 of the HAVANA CLUB & DESIGN mark be cancelled and stricken from the Principal Register of the PTO;

-46-

(b)    Declaring that BACO owns the common law rights to the HAVANA

CLUB trademark in the United States, that BACO's use of the HAVANA CLUB trademark does

not infringe on any mark owned by Defendants or otherwise violate any enforceable rights of the

Defendants, and that Defendants have no rights in any mark incorporating the words HAVANA

CLUB;

(c)    Enjoining Defendants, their agents, servants, employees, parents,

subsidiaries, affiliates and all persons in active concert with Defendants, from using or

registering in the PTO or in any State of the United States any mark incorporating or consisting

of the words HAVANA CLUB and from interfering with Plaintiffs' use and registration of the

HAVANA CLUB mark;

(d)    Awarding Plaintiffs their costs and attorneys' fees pursuant to 15 U.S.C. §

1117 and applicable state law; and

(e)    Awarding Plaintiffs such further relief as the Court may deem just and

proper.

Respectfully submitted,

William R. Golden, Jr.
KELLEY DRYE & WARREN
101 Park Avenue
New York, New York 10178
(212) 808-7800

Eugene D. Gulland (D.C. Bar No. 175422)
Oscar M. Garibaldi (D.C. Bar No. 251330)
Gregory M. Williams (D.C. Bar No. 467950)
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
(202) 662-6000

Attorneys for the Plaintiffs Bacardi & Company Limited
and Bacardi-Martini U.S.A., Inc.

-47-

**EXHIBIT 12**



Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451
www.uspto.gov

Re: Trademark Registration of    :
Empresa Cubana Exportadora de    :
Alimentos y Productos Varios d/b/a   :
Cubaexport                        :
Registration No. 1,031,651        :       On Petition
Registered: January 27, 1976      :
Mark: HAVANA CLUB and Design      :
Petition Filed: January 25, 2006  :

Bacardi & Company Limited and Bacardi USA, Inc. (collectively, petitioner) have petitioned the
Director of the United States Patent and Trademark Office (Director) to deny renewal of the subject
registration. The Director has authority to review the request under 37 C.F.R. §2.146. The petition is
denied.

## FACTS

The above-mentioned registration issued on January 27, 1976. On December 14, 2005, Empresa
Cubana Exportadora de Alimentos y Productos Varios d/b/a Cubaexport (registrant) filed a combined
Section 8 declaration of excusable nonuse and Section 9 renewal application (combined filing)
pursuant to 15 U.S.C. §§1058 and 1059. This petition was filed on January 25, 2006.[1]

## ANALYSIS

Petitioner seeks to introduce documents and information for the Director's consideration in regard to
the combined filing submitted by the registrant. The review of a combined filing is an *ex parte* matter.
Neither the Trademark Act nor the Trademark Rules of Practice provide for a third party to intervene
in an *ex parte* matter. Therefore, petitions filed by third parties to review actions taken in *ex parte*
matters are generally denied. *Trademark Manual of Examining Procedure* (TMEP) §1705.01.

Here, petitioner seeks to involve itself in the Director's review of a combined filing in connection with
a registration of which petitioner is not the owner. The Director will not consider the information or
documents submitted with this petition because petitioner is a third party in this *ex parte* matter.

---

[1] On July 19, 1994, petitioner instituted cancellation proceedings regarding the subject registration before the Trademark
Trial and Appeal Board (TTAB). While the proceedings were under way, the subject registration was granted a first
renewal, on June 18, 1996, for a term of ten years. In a decision issued January 29, 2004, the TTAB dismissed the petition
to cancel. On March 29, 2004, petitioner commenced a civil action in the United States District Court for the District of
Columbia (District Court) seeking review of the TTAB decision. The District Court has not yet issued a decision in this
matter.

**DECISION**

The petition is denied.

Sharon R. Marsh
Deputy Commissioner
 for Trademark Examination Policy

SRM:CPC

Date:  JUL 1 8 2006

Attorney for Petitioner:

William R. Golden, Jr.
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY  10178

Attorney for Registrant:

Vincent N. Palladino
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY  10020-1104

**EXHIBIT 13**

**Thank you for your request. Here are the latest results from the <u>TARR web server.</u>**

**This page was generated by the TARR system on** 2007-03-14 19:14:08 ET

**Serial Number:** 73023981 <u>Assignment Information</u>

**Registration Number:** 1031651

**Mark**



**(words only):** HAVANA CLUB

**Standard Character claim:** No

**Current Status:** Pending Petition/Court Decision

**Date of Status:** 2006-12-06

**Filing Date:** 1974-06-12

**Transformed into a National Application:** No

**Registration Date:** 1976-01-27

**Register:** Principal

**Law Office Assigned:** (NOT AVAILABLE)

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at <u>TrademarkAssistanceCenter@uspto.gov</u>**

**Current Location:** 450 -Petitions Office

**Date In Location:** 2007-01-18

---

### LAST APPLICANT(S)/OWNER(S) OF RECORD

---

1. EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS

**Address:**
EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS
CALLE 23 N. 55, 8 VO. PISO VEDADO

CIUDAD DE LA HABANA 10400
Cuba
**Legal Entity Type:** Company
**State or Country Where Organized:** Cuba

---

## GOODS AND/OR SERVICES

**International Class:** 033
**Class Status:** Active
RUM
**Basis:** 44(e)
**First Use Date:** (DATE NOT AVAILABLE)
**First Use in Commerce Date:** (DATE NOT AVAILABLE)

---

## ADDITIONAL INFORMATION

**Disclaimer:** APPLICANT DISCLAIMS THE WORDS "HAVANA" AND "FUDNADA EN 1878" APART FROM THE MARK AS A WHOLE.

**Lining and Stippling:** THE DRAWING IS LINED FOR THE COLOR GOLD.

**Design Search Code(s):**
**04.01.25** - Genies; Giants; Men, Wizards; Other supernatural, fictional or legendary characters; Paul Bunyan; Pied Piper; Robin Hood; Sherlock Holmes; Witches; Wizards
**20.03.10** - Alcohol bottle labels; Bottles, labels for alcohol bottles; Labels, alcohol bottles
**26.11.21** - Rectangles that are completely or partially shaded

**Foreign Registration Number:** 110353
**Foreign Registration Date:** 1974-02-12
**Country:** Cuba

---

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

2007-02-21 - PAPER RECEIVED

2007-01-19 - PAPER RECEIVED

2006-12-05 - Assigned To Petition Staff

2006-10-05 - Petition To Director Received

2006-10-05 - PAPER RECEIVED

2006-08-03 - Post Registration action mailed Sections 8 & 9

2006-08-02 - PAPER RECEIVED

2006-08-01 - FAX RECEIVED

2006-07-20 - Post Registration action mailed Sections 8 & 9

2006-07-20 - Assigned To Paralegal

2005-12-14 - Combined Section 8 (10-year)/Section 9 filed

2006-07-17 - Petition To Commissioner Denied

2006-07-07 - PAPER RECEIVED

2006-06-30 - PAPER RECEIVED

2006-06-28 - PAPER RECEIVED

2006-07-05 - FAX RECEIVED

2006-06-29 - FAX RECEIVED

2006-06-27 - FAX RECEIVED

2006-06-15 - PAPER RECEIVED

2006-06-14 - FAX RECEIVED

2006-05-09 - FAX RECEIVED

2006-04-07 - FAX RECEIVED

2006-04-07 - FAX RECEIVED

2006-04-07 - FAX RECEIVED

2006-02-21 - PAPER RECEIVED

2006-02-17 - FAX RECEIVED

2006-02-17 - FAX RECEIVED

2006-02-15 - PAPER RECEIVED

2006-02-14 - FAX RECEIVED

2006-02-02 - FAX SENT

2006-02-02 - FAX RECEIVED

2006-01-25 - Petition To Director Received

2006-01-31 - PAPER RECEIVED

2006-01-30 - FAX RECEIVED

2006-01-25 - FAX RECEIVED

2005-12-14 - PAPER RECEIVED

2004-01-29 - Cancellation dismissed for Proceeding

1997-07-30 - Abandonment deleted by TTAB

1997-07-30 - Counter claim canc.for Proceeding

1997-07-30 - Abandonment deleted by TTAB

1996-06-18 - First renewal 10 year

1993-02-10 - Section 9 filed/check record for Section 8

1996-04-17 - Cancellation terminated for Proceeding

1996-04-17 - Cancellation dismissed for Proceeding

1996-01-18 - Section 9 filed/check record for Section 8

1995-10-19 - Cancellation dismissed for Proceeding

1995-08-15 - Cancellation Instituted No. 999999

1995-08-15 - Cancellation Instituted No. 999999

1994-07-19 - Cancellation Instituted No. 999999

1982-04-12 - Section 8 (6-year) accepted

---

## ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**
HERBERT F. SCHWARTZ

**Correspondent**
MICHAEL KRINSKY
RABINOWITZ, BOUDIN, STANDARD
KRINSKY & LIBERMAN P.C. 740 BROADWAY
NEW YORK, NY 10003

**Domestic Representative**

ROPES & GRAY

**EXHIBIT 14**

Yahoo!  My Yahoo!  Mail    Make Y! your home page                    Search:

**YAHOO!** FINANCE    Sign In                Finance Home - Help
                      New User? Sign Up

Welcome [Sign In]                                To track stocks & more, Register
**Financial News**

Enter symbol(s)                Basic            Symbol Lookup

Press Release

Source: Bacardi U.S.A., Inc.

# U.S. Government Resolves Havana Club Dispute in Bacardi's Favor
Tuesday August 8, 4:05 am ET
### Cuba's Trademark Registration "Cancelled/Expired"

MIAMI--(BUSINESS WIRE)--Aug. 8, 2006--Bacardi U.S.A. applauds the long-awaited decision by the U.S. Patent and Trademark Office (PTO) declaring that Cuba's registration of the HAVANA CLUB trademark is "cancelled/expired." The decision means that the Cuban government can no longer claim any rights to the mark in the United States. Bacardi -- which owns the rights to the brand based on use and as a successor to the original owners -- has a pending application to register the mark in its own name.

The PTO's action, dated August 3, comes just six days after the U.S. Treasury's Office of Foreign Assets Control (OFAC) denied a Cuban government agency a specific license that was necessary to seek renewal of the trademark registration at the PTO.

Bacardi purchased the HAVANA CLUB brand from the original owners, whose brand and other assets were confiscated by the Cuban government without compensation.

"Bacardi commends OFAC and the PTO for following U.S. law and worldwide principles that prevent registration or renewal of trademarks obtained through confiscation, without compensation to the original owners," said John P. Esposito, President and CEO of Bacardi U.S.A.

The OFAC and PTO decisions are watershed events in the ten-year dispute between Bacardi and the Cuban government and its French partner over the rights to the HAVANA CLUB trademark in the United States. In a case that went all the way up to the Supreme Court, the U.S. courts ruled that the Cuban-French joint venture had no rights to the trademark. Bacardi continued to fight the Cuban government's claim to the U.S. registration in the PTO and the courts, even though by law that claim cannot be recognized or enforced in the U.S. Now Cuba's registration has finally been declared expired and cancelled.

Bacardi has been preparing for a relaunch of Havana Club rum in the United States.

About Bacardi

Bacardi U.S.A. is the import, sales, and marketing arm of one of the world's leading wine and spirits producers. Bacardi U.S.A. boasts a brand portfolio of some the United States' most recognized and top selling spirits including: BACARDI rum, the favorite spirit in the U.S. and favorite rum in the world; GREY GOOSE vodka, the world leader in ultra premium vodka; MARTINI & ROSSI vermouth, the world leader in Vermouth; DEWAR'S scotch whisky, the favorite selling blended scotch whisky in the United States; BOMBAY SAPPHIRE gin, the best selling super premium gin in the U.S.; and CAZADORES blue agave tequila, the top selling 100% blue agave tequila in the world and other fine brands.

Havana Club Background:

Havana Club rum was created in Cuba in 1935 by Jose Arechabala S.A., a company owned by the Arechabala family. The Arechabalas registered the trademark in the U.S. in 1935 and sold their rum in the U.S. over a twenty year period. The Castro regime seized the Arechabala business without compensation in 1960 and the Arechabalas were forced into exile, except for the company lawyer who was imprisoned for ten years. The Arechabala family had no means to make rum outside Cuba but always planned to resume producing and marketing Havana Club rum as soon as they could do so. Those plans became possible in the 1990s, when the Arechabalas formed an alliance with Bacardi.

U.S. Government Resolves Havana Club Dispute in Bacardi's Favor: Financial News - Yahoo! Fi...   Page 2 of 2

In 1976, after the Arechabala family's HAVANA CLUB trademark registration expired, Cubaexport (a Cuban government agency) registered the mark in the U.S. through a loophole in the trade embargo. In 1993 the Cuban government established a joint venture with the French liquor company Pernod Ricard to exploit the brand.

Congress closed the loophole in the Cuban embargo in 1998, when it passed a law to prevent registration, renewal or recognition of rights to trademarks confiscated without compensation by Cuba, except with the consent of the rightful owners.

As a result of the OFAC and PTO action, Cuba's registration has not been renewed and has been declared expired and cancelled. This confirms that Cuba has no rights in the HAVANA CLUB trademark in the United States.

*Contact:*

```
For Bacardi U.S.A., Inc., Miami
Amy Federman, 305-347-4343
or
Patricia Neal, 305-446-9050
```

Source: Bacardi U.S.A., Inc.

Copyright © 2006 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Ad Feedback
Copyright © 2006 Business Wire. All rights reserved. All the news releases provided by Business Wire are copyrighted. Any forms of copying other than an individual user's personal reference without express written permission is prohibited. Further distribution of these materials by posting, archiving in a public web site or database, or redistribution in a computer network is strictly forbidden.

**EXHIBIT 15**

# • National Public Radio

**National Public Radio**
**All Things Considered**
August 8, 2006
**Rumble Brewing over 'Real' Cuban Rum**
Edition: 21:00-22:00 PM
Index Terms:
5627722
Estimated printed pages: 3
Article Text:

MELISSA BLOCK, host:
The Bacardi Company today announced it will soon start selling a new version of Havana Club Rum, a brand that originated in Cuba more than 70 years ago. The company that originally made Havana Club was taken over by the Cuban government in 1960. A Cuban made rum by that name is still sold in Cuba and around the world, though the U.S. embargo has blocked its distribution in this country.
As NPR's Tom Gjelten reports, the competition between the two Havana Club rums may foreshadow some of the battles to come in Cuba's future.

TOM GJELTEN reporting:
Back in pre-Castro Cuba, Bacardi and Havana Club were the two best known brands of rum on the island. Both were made by long established Cuban families, the Bacardis and the Arechabalas. John Gomez, the marketing director of Bacardi USA, says the Bacardis regarded Havana Club as a competitor to their own rum.

Mr. JOHN GOMEZ (Bacardi USA): This is a brand that was served in the hottest night spots in Havana. It was a favorite of American and European tourists there. And it was also sold in the U.S. from the 1930s until 1960.

GJELTEN: In 1960, both family companies were taken over by Fidel Castro's government. Bacardi had operations outside Cuba and was able to regroup. The Arechabalas were not so fortunate and got out of the rum business.

The Cuban government, however, continued to make rum at the Arechabalas' old factory, selling it under the Havana Club trademark, mostly to countries in the Soviet block. Thinks stayed that way until the early 1990s, when Cuba started looking for new markets. The French liquor firm Pernod Ricard began a joint venture with the Cuban government to market Havana Club Rum internationally.

The Arechabala family then sold its claim to the Havana Club trademark and its old rum recipe to Bacardi. There followed a long legal battle over who had the right to make and sell Havana Club. Bacardi ultimately won, but only with respect to the use of the Havana Club trademark in the United States. Again, John Gomez of Bacardi.

Mr. GOMEZ: Right now, we own the rights to this brand and we felt that this was the appropriate time to leverage the brand to take advantage of some of the hot trends that are taking place and to give the consumer what they're looking for.

GJELTEN: Havana Club Rum made by the state-owned Cuban company is now sold around the world, but not in the United States, where the trade embargo excludes all products made in Cuba. But now the Bacardi version of Havana Club will go on sale, a premium white rum based – according to the company – on the Arechabala family's original rum recipe. The product has been in preparation for more than three years, so its launch this week at a time when Cuba is back in the news is coincidental. The rum is made in Puerto Rico and the bottle will say so in large letters. John Gomez of Bacardi says the product will be marketed simply as a top quality white rum.

Mr. GOMEZ: Super premium rums were growing, but most of those rums were dark rums. And we felt that there was an opportunity in the marketplace for a super premium white rum. And that was one of the reasons we felt the time was right for Havana Club.

GJELTEN: The Bacardis' Cuban roots are still important, however. The company is still almost entirely owned by Bacardi family members, and they have not forgotten how Fidel Castro essentially forced them into exile. Beverage analyst Tom Pirko says the company's strong feelings about its Cuban heritage may be one reason it has moved to associate itself with an identifiably Cuban brand.

Mr. TOM PIRKO (BevMark LLC): They're trying to capitalize upon this extraordinary energy that is invested in Cuba and the changes that are taking place and will take place in Cuba. And so it's a business decision. However, that being said, anyone who looks at this company is looking at a culture that is this highly emotional and has a certain view of itself. Their attitudes in terms of what they do are uniquely Bacardian.

GJELTEN: The contest to see which Havana Club Rum will triumph is a fight that has much to do with the future of Cuba as well. Once Fidel Castro's regime is replaced by a democratic government and the U.S. trade embargo is lifted, made in Cuba products are likely to flood the United States. With its right to the Havana Club Rum brand now seemingly secure, Bacardi may have blocked the rival Havana Club product from getting a U.S. foothold.
Tom Gjelten, NPR News, Washington.

Copyright ©2006 National Public Radio®. All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to National Public Radio. This transcript may not be reproduced in whole or in part without prior written permission. For further information, please contact NPR's Permissions Coordinator at (202) 513-2030.
Record Number: 200608082106

**EXHIBIT 16**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BACARDI & COMPANY LIMITED,<br><br>and<br><br>BACARDI U.S.A., INC.,<br><br>Plaintiffs,<br><br>v.<br><br>EMPRESA CUBANA EXPORTADORA<br>DE ALIMENTOS Y PRODUCTOS<br>VARIOS d/b/a CUBAEXPORT<br><br>and<br><br>HAVANA CLUB HOLDING, S.A. d/b/a<br>HCH, S.A.,<br><br>Defendants. | Case No. 1:04-CV-00519 (EGS) |

**PARTIALLY-CONSENTED MOTION TO STAY
PENDING FINAL RESOLUTION OF PATENT AND TRADEMARK OFFICE
POST REGISTRATION OFFICE ACTION**

Plaintiffs Bacardi & Company Limited and Bacardi U.S.A., Inc. ("Bacardi")

request that the Court stay this action pending final resolution of any available appeals from the

Post Registration Office Action of the Patent and Trademark Office ("PTO") dated August 3,

2006 ("the PTO Action"). A copy of the PTO Action is attached as Exhibit A to the

accompanying Declaration of Emily Johnson Henn ("Henn Decl."). Defendants Havana Club

Holding, S.A. d/b/a HCH, S.A. ("HCH") and Empresa Cubana Exportadora de Alimentos y

Productos Varios d/b/a Cubaexport ("Cubaexport") have consented to a stay of Counts I and V

of the complaint, but they oppose a stay of Counts II-IV. The parties have agreed to suspend discovery pending the Court's ruling on this motion. For the reasons set forth below, the Court should grant Bacardi's request for a stay of this action in its entirety.

## STATEMENT OF FACTS

In this action Bacardi seeks (i) review of the decision of the Trademark Trial and Appeal Board ("TTAB") dismissing Bacardi's petition to cancel U.S. Registration No. 1,031,651 of the trademark HAVANA CLUB & DESIGN for rum (the "Extant Registration"); (ii) rectification of the PTO records by striking or canceling the Extant Registration; and (iii) declaratory and injunctive relief concerning related rights.

On August 3, 2006, the PTO Action ruled that the Extant Registration "will be cancelled/expired." (Henn Decl. Ex. A at 1.) The cancellation or expiration of the Extant Registration will afford equivalent relief to the primary relief that Bacardi has been seeking in this case and may in a practical sense make it unnecessary to litigate the disputes over related rights. Pernod Ricard (the owner of fifty percent of Defendant HCH's stock) has announced that it will seek review of the PTO Action.

The background leading to the PTO Action is as follows. Cubaexport's Extant Registration was due to expire on January 27, 2006, with a statutory six-month grace period for renewal running to July 27, 2006.[1] On December 14, 2005, Mr. Vincent N. Palladino of Ropes & Gray LLP submitted to the PTO an application for renewal of the Extant Registration. (Henn Decl. Ex. B.) In the ensuing months, there were communications between the PTO and Mr.

---

[1] Under Section 9(a) of the Lanham Act, 15 U.S.C. § 1059(a), a registration must be renewed every ten years through filing of a written application and payment of a prescribed fee. Under the Trademark Rules, "an application for renewal must be filed within one year before the expiration date of the registration, or within the six-month grace period after the expiration date of the registration. If no renewal application is filed within this period, the registration will expire." T.M.R.P. § 2.182.

Palladino concerning whether Cubaexport possessed sufficient authority to seek renewal of the registration under licenses issued by the Office of Foreign Assets Control ("OFAC").[2]  On April 6, 2006, OFAC determined that there was no such authority under existing OFAC licenses and on the following day Cubaexport applied for a specific license authorizing the renewal of the registration.

On July 20, 2006, the PTO issued a "Post Registration Office Action" stating that the application for renewal of the Extant Registration could not be accepted and directing "Registrant . . . to notify the USPTO" whether the necessary specific OFAC license "has been granted or denied." (Henn Decl. Ex. C. at 1.)  The PTO warned that "[i]f the owner . . . or if OFAC notifies the USPTO that the specific license has been denied, the registration will be deemed cancelled/expired." (*Id.* at 2.)

In a letter dated July 28, 2006, Mr. J. Robert McBrien, Acting Director of OFAC notified Mr. Palladino that the necessary specific license had not been and would not be granted:

> "Pursuant to the Cuban Assets Control Regulations, 31 C.F.R. Part 515, administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed.
>
> OFAC has been engaged in consultation with relevant agencies in the U.S. Government, including the Department of State ('State'), on this issue.  We have received guidance from State informing us that it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark.  Accordingly, your request is hereby denied." (Henn Decl. Ex. D.)

---

[2] Transactions related to the renewal of a U.S. trademark registration in which Cuba or a Cuban national has an interest are forbidden by the general prohibitions of 31 C.F.R. §515.201(b) in the absence of a license from OFAC.  While a general license is provided in 31 C.F.R. § 515.527(a)(1), certain transactions are excluded from that general license by 31 C.F.R. § 515.527(a)(2) and are prohibited in the absence of a specific license from OFAC. *See* 31 C.F.R. § 515.527(a).

Having received OFAC's notice of denial, Cubaexport notified the PTO on August 1, 2006, that OFAC had "declined to grant the specific license." (Henn Decl. Ex. E at 1.) Cubaexport requested that the Extant Registration be renewed "notwithstanding OFAC's decision not to grant Cubaexport a specific license." (*Id.*)

On August 3, 2006, the PTO issued another Post Registration Office Action ("the PTO Action") stating: "Because the specific license is necessary for authorizing payment of the required fee, and that license has been denied, the required fee . . . has not been submitted; accordingly, the registration will be cancelled/expired." (Henn Decl. Ex. A.) The PTO Action noted that Cubaexport "may file a petition to the Director requesting review of this decision." (*Id.*)

On August 8, 2006, Bacardi announced the relaunch of its HAVANA CLUB rum in Florida. After stating its intent to contest the PTO Action, Pernod Ricard acting through Pernod Ricard USA, LLC ("Pernod USA") filed suit in U.S. District Court for the District of Delaware on August 15, 2006. (Henn Decl. Ex. F.) Pernod USA — which is represented in Delaware by the same counsel representing Cubaexport in this case — asserts that Bacardi has made representations that are likely to mislead consumers into buying Bacardi's HAVANA CLUB rum, thereby diverting sales from Pernod USA's own spirits. (*Id.* ¶¶ 21-24, 30-33.) In particular, Pernod USA claims that it is harmed by Bacardi's allegedly false claims that it has rights to the HAVANA CLUB brand. (*Id.* ¶¶ 30-34.)

## ARGUMENT

This Court has broad discretion to stay all proceedings in this action pending the resolution of proceedings elsewhere. *Naegele v. Albers*, 355 F. Supp. 2d 129, 140 (D.D.C. 2005) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its

docket with economy of time and effort for itself, for counsel, and for litigants." *Landis,* 299 U.S. at 254. "Indeed, '[a] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case.'" *IBT/HERE Employee Representatives' Council v. Gate Gourmet Div. Americas,* 402 F. Supp. 2d 289, 292 (D.D.C. 2005) (quoting *Leyva v. Certified Grocers of Cal., Ltd,* 593 F.2d 857, 863-64 (9th Cir. 1979)).

      The PTO Action ruling that Cubaexport's HAVANA CLUB registration is cancelled or expired affords relief equivalent to a key objective that Bacardi has been seeking in this case. A stay of this case pending final resolution of any appeals of the PTO Action will therefore economize judicial resources and save time and effort for the Court and the parties in this case. The parties are currently engaged in discovery related to renewed dispositive motions that Defendants have indicated they intend to file, but such motions will likely be moot in whole or in part if the PTO Action stands. Further discovery and efforts to prepare and argue dispositive motions may be unnecessary, and the resources of the Court and parties should not be spent unless it becomes clear that the claims must be litigated. Because the resolution of any available PTO appeals will likely affect any remaining questions in this case, a stay of all claims is appropriate. *See Naegele,* 355 F. Supp. 2d at 141.

      Defendants will suffer no harm from a stay in this case. As they have filed no counterclaims, the effect of the stay operates entirely on Bacardi's claims. The parties have already agreed to suspend discovery pending the resolution of this motion. The parties also agree that Counts I and V of Bacardi's complaint (Bacardi's appeal of the TTAB's decision and Treaty/Constitutional claims) should be stayed. While Defendants maintain their position that this Court should dismiss Counts II, III, and IV, the posture of the case after resolution of any

available PTO appeals may eliminate the need for this Court to entertain dispositive motions. As in *IBT/HERE Employee Representatives' Council*, the resolution of the related proceeding "may affect the parties' understanding of the scope of this case going forward, may reorient the parties' arguments, may catalyze a settlement of this matter, may moot the defendants' motion to dismiss, or may resolve the issues raised in this lawsuit in their entirety." 402 F. Supp. 2d at 293.

*Count II.*  In Count II, Bacardi seeks a declaration that it has common law rights in the HAVANA CLUB mark and that Defendants have no rights in any mark incorporating the words HAVANA CLUB. (Compl. ¶¶ 142-45.) Bacardi alleges, *inter alia*, that Defendants' claimed trademark rights are contrary to the public policy of the United States (*id.* ¶¶ 144-45) — which was borne out by OFAC's letter of July 28 stating that "it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark." (Henn Decl. Ex. D.) The PTO's decision that the Extant Registration is cancelled or expired — assuming it withstands appeal — undermines Defendants' principal basis for claiming rights in the HAVANA CLUB mark. Defendants moved to dismiss Counts II-IV on the ground, *inter alia*, that "Cubaexport has a valid registration for trademark 'Havana Club.'" (Cubaexport Mot. to Dismiss at 34.) If the PTO Action stands, this argument will no longer be available to Defendants, and the parties' arguments will be reoriented if there is any further basis for the parties to litigate Count II. *See IBT/HERE Employee Representatives' Council*, 402 F. Supp. 2d at 293. Indeed, affirmance of the PTO Action may catalyze settlement or otherwise eliminate the need to continue litigation over Count II. *See id.*

*Counts III & IV.*  Bacardi also seeks declarations that its use of the HAVANA CLUB mark does not violate any rights purportedly held by Defendants under federal trademark laws (Count III) or state laws (Count IV). (Compl. ¶¶ 149-50, 153-54.) The cancellation or

expiration of the Extant Registration pursuant to the stated policy of the United States necessarily affects the resolution of these counts. As in the case of Count II, Defendants moved to dismiss Counts III and IV on the ground, *inter alia*, that "Cubaexport has a valid registration for trademark 'Havana Club,'" (Cubaexport Mot. to Dismiss at 34) and these arguments must necessarily be abandoned or changed if Cubaexport's registration is cancelled or expired. Moreover, it is difficult to understand how Defendants could assert rights under federal or state law that are inconsistent with U.S. policy established by the State Department and recognized in the PTO Action.

Other developments between the parties and their affiliates also counsel in favor of a stay of all claims in this action. As previously noted, Bacardi relaunched its HAVANA CLUB rum in Florida on August 8, 2006, and one week later, Pernod USA (whose parent, Pernod-Ricard, owns a 50% interest in Defendant HCH (Compl. ¶¶ 17, 19)) filed suit against Bacardi. *See Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 06-505 (SLR) (D. Del. 2006). (*See* Henn Decl. Ex. F.) Pernod USA is represented in that case by the same counsel at Ropes & Gray who represent Cubaexport in this case. Pernod USA alleges in that suit that it is harmed by Bacardi's use of the HAVANA CLUB name — even though Pernod USA itself asserts no interest in the trademark and despite the PTO's determination that Pernod Ricard S.A.'s joint venture partner, Cubaexport, has lost any rights it may have had in the HAVANA CLUB registration. Bacardi's rights to the HAVANA CLUB mark are being litigated in that proceeding, brought by an affiliate of Defendants HCH and Cubaexport, which may affect or resolve the issues raised in Counts II-IV. *See IBT/HERE Employee Representatives' Council*, 402 F. Supp. 2d at 293.

In these circumstances, a stay of Bacardi's remaining claims will ensure that the Court and the parties need not expend resources dealing with allegations and arguments that will likely be moot. *Cf. In re Lorazepam & Clorazepate Antitrust Litigation*, 208 F.R.D. 1 (D.D.C. 2002) (concluding that a stay pending an appellate decision was warranted where "proceeding headlong with discovery and other matters before this Court has the very real potential of unnecessarily wasting significant resources of all parties . . . and the Court, because two significant issues are currently pending before the Court of Appeals, one of which could dispose of the litigation while the other could substantially reshape it").

Respectfully submitted,

/s/
_____
Eugene D. Gulland (D.C. Bar No. 175422)
Oscar M. Garibaldi (D.C. Bar No. 251330)
Emily Johnson Henn (D.C. Bar No. 471077)
Jenny C. Ellickson (D.C. Bar No. 489905)
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

William R. Golden, Jr.
Michelle Graham
KELLEY DRYE & WARREN
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

September 15, 2006          *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned member of the bar of this court hereby certifies that true

and correct copies of the Partially-Consented Motion To Stay Pending Final Resolution

of Patent and Trademark Office Post Registration Action, Declaration of Emily Johnson

Henn, and Proposed Order were served upon:

| | |
|---|---|
| Peter M. Brody (D.C. Bar No. 398717)<br>ROPES & GRAY LLP<br>One Metro Center<br>700 12th Street, NW, Suite 900<br>Washington, DC 20005-3948<br>Telephone: (202) 508-4600<br>Facsimile: (202) 508-4650 | Mark J. Biros (D.C. Bar No. 181719)<br>PROSKAUER ROSE LLP<br>1001 Pennsylvania Avenue, N.W.<br>Suite 400 South<br>Washington, DC 20004<br>Telephone: (202) 778-1104<br>Facsimile: (202) 416-6899 |
| Herbert F. Schwartz<br>Vincent N. Palladino<br>Pablo D. Hendler<br>Michele M. Winneker<br>ROPES & GRAY LLP<br>1251 Avenue of the Americas<br>New York, New York 10020-1104<br>Telephone: (212) 596-9000<br>Facsimile: (212) 596-9090<br><br>*Attorneys for Defendant Cubaexport* | Charles S. Sims<br>Jenifer deWolf Paine<br>PROSKAUER ROSE LLP<br>1585 Broadway<br>New York, NY 10036<br><br>*Attorneys for Defendant HCH* |

by electronic filing under the Rules of this Court.

September 15, 2006

_____
Emily Johnson Henn

EN EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO DE COLUMBIA

-------------------------------------------------------x

EMPRESA CUBANA EXPORTADORA
DE ALIMENTOS Y PRODUCTOS
VARIOS d/b/a CUBAEXPORT,
Calle 23, n 55, 8vo. piso, Havana, Cuba                 Causa Civil Número 1:06CV01692 (ESH)

   Demandante,

contra

DEPARTAMENTO DEL TESORO DE LOS                          Su Señoría Ellen S. Huvelle
ESTADOS UNIDOS, OFICINA DE
CONTROL
DE ACTIVOS EXTRANJEROS, HENRY M.
PAULSON, JR., Secretario del Tesoro,
ADAM J. SZUBIN, Director de la Oficina de
Control de Activos Extranjeros; y LOS
ESTADOS UNIDOS,

Demandados,

-------------------------------------------------------x

## DECLARACIÓN DE FRANCISCO SANTIAGO PICHARDO EN APOYO DE LA OPOSICIÓN DEL DEMANDANTE AL FUERO DE EXCEPCIÓN DE LOS DEMANDADOS O EN LA ALTERNATIVA DE JUICIO SUMARIO

El que suscribe, Francisco Santiago Pichardo, declara por medio del presente lo siguiente:

1.    Soy Director General de Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a "CUBAEXPORT", ubicada en Calle 23 No. 55, 8vo. piso, Vedado, Ciudad de La Habana, Cuba. En este cargo, soy responsable de la operación general de CUBAEXPORT y de todas las cuestiones en las que participa CUBAEXPORT. No soy empleado ni funcionario vinculado al Gobierno de la República de Cuba ("Cuba").



2.    Soy empleado de CUBAEXPORT desde 1980.

3.    CUBAEXPORT es una entidad constituida, que goza de existencia válida y que desarrolla sus actividades con sujeción a las leyes de la República de Cuba, "Cuba".

4.    CUBAEXPORT fue constituida el 15 de diciembre de 1965, de acuerdo con lo previsto en la Resolución Número 234 del Ministro del Ministerio del Comercio Exterior, comenzando a operar, el día 1° de enero de 1966. Se adjunta a esta declaración una copia de esa Resolución, incluida como Anexo A.

5.    Tal como se establece en la Resolución Número 234. CUBAEXPORT fue constituida como entidad distinta e independiente de la República de Cuba. En el primer párrafo, la Resolución establece lo siguiente:

> PRIMERO: Crear una empresa de comercio exterior, con personalidad jurídica independiente y patrimonio y administración propios, que se denominará "EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS", la que también podrá ser oficialmente identificada, en forma indistinta, por el nombre de CUBAEXPORT y tendrá su domicilio social en la Ciudad de la Habana.

En el séptimo párrafo, la Resolución establece además lo siguiente:

> SÉPTIMO: La Empresa CUBAEXPORT actuará con independencia del Ministerio del Comercio Exterior en virtud de la personalidad jurídica y patrimonio propios que la misma tiene: consiguientemente, el Estado Cubano no responderá de las obligaciones que contraiga dicha Empresa, la que, a su vez, no será responsable de las obligaciones del Estado Cubano.

Además, la Resolución establece, en el quinto párrafo, que "la dirección, administración y representación legal de la Empresa CUBAEXPORT estará a cargo exclusivamente de su Director-Gerente". Por último, la Resolución sólo autoriza a CUBAEXPORT a participar en operaciones comerciales, no en funciones gubernamentales ("la promoción y ejecución de todas las operaciones de comercio exterior relacionadas con las exportaciones de productos alimenticios [etc.]"). La Resolución no otorga a la empresa ninguna autoridad soberana.



6.    Desde su constitución mediante la Resolución Número 234. CUBAEXPORT ha existido y operado de acuerdo con las disposiciones de esa Resolución.

7.    CUBAEXPORT celebra contratos exclusivamente en su nombre, y no como representante de la República de Cuba ni de ninguna otra entidad.

8.    CUBAEXPORT paga impuestos a la República de Cuba.

9.    CUBAEXPORT, y no Cuba, solicitaron y recibieron el Registro de los Estados Unidos Número 1,031651 de la marca comercial de diseño de HAVANA CLUB.

El que suscribe declara, bajo pena de falso testimonio en virtud de las leyes de los Estados Unidos, que lo que antecede es verdadero y correcto.

Firmado a los 16 días del mes de marzo de 2007.

_____

Francisco Santiago Pichardo



**consortra**
translations

Your legal translation partner.

100 Park Ave.16th Fl
NY, NY 10017

Toll-Free: **877-GO-CONSORTRA**
(877-462-6676)

www.consortra.com

STATE of NEW YORK     )
                      )     ss:
COUNTY of NEW YORK    )

## *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"Pichardo Declaration"* originally written in *English* is, to the best of our knowledge and belief, a true, accurate and complete translation into *Spanish*.

Dated: 3|9|07

*James G. Mamera*
James G. Mamera
Consortra Translations

Sworn to and signed before ME this
___9th___ day of ___March___,
2007.

*Lysa Roberts*
Notary Public

LYSA ROBERTS
Notary Public - State of New York
ID No. 01RO6150349
Qualified in New York County
My Commission Expires July 24, 20

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

EMPRESS CUBANA EXPORTADORA )
DE ALIMENTOS Y PRODUCTOS )
VARIOS d/b/a/CUBAEXPORT, Calle 23, )
n 55, 8vo, piso, Havana, Cuba )
                                   )
                                   )   Civil Action No. 1:06CV01692 (ESH)
            Plaintiff,             )
                                   )
        v.                         )
                                   )   Hon. Ellen S. Huvelle
UNITED STATES DEPARTMENT OF        )
THE TREASURY, OFFICE OF            )
FOREIGN ASSETS CONTROL,            )
HENRY M. PAULSON, JR., as Secretary )
of Treasury, ADAM J. SZUBIN, as    )
Director of the Office of Foreign Assets )
Control, and THE UNITED STATES,    )
                                   )
            Defendants.            )
                                   )

DECLARATION OF FRANCISCO SANTIAGO PICHARDO
IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR
SUMMARY JUDGMENT

I, Francisco Santiago Pichardo, hereby declare as follows:

1.      I am the Managing Director of Empresa Cubana Exportadora de Alimentos y

Productos Varios d/b/a "CUBAEXPORT," located at Calle 23 No. 55 8vo. piso, Vedado, Ciudad

de La Habana, Cuba.  In that position, I am responsible for the overall operation of

CUBAEXPORT and all matters in which CUBAEXPORT is involved.  I am not an employee or

official connected with the Government of the Republic of Cuba ("Cuba").

2.      I have been employed by CUBAEXPORT since 1980.

3.    CUBAEXPORT is a company organized and existing under, and conducting

business subject to, the laws of the Republic of Cuba ("Cuba").

4.    CUBAEXPORT was established on December 15, 1965 pursuant to Resolution

No. 234 of the Minister of the Ministry of Foreign Commerce that went into effect on January 1,

1966. A copy of that Resolution is attached to this declaration as Exhibit A.

5.    As set forth in Resolution No. 234, CUBAEXPORT was established as an entity

distinct and independent from the Republic of Cuba. In the first paragraph, the Resolution

provides that:

> ONE: To create an enterprise of foreign commerce with an independent legal
> personality and its own assets and administration which shall be called
> "EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS
> VARIOS," which may also be officially identified, without distinction, by the
> name CUBAEXPORT, and will have its corporate headquarters in the City of
> Havana.

In the seventh paragraph, the Resolution further provides that:

> SEVEN: The Enterprise CUBAEXPORT shall act independently of the Ministry
> of Foreign Commerce by virtue of having its own legal personality and assets;
> consequently, the Cuban State shall not be liable for the obligations contracted by
> said Enterprise, which, in turn, shall not be liable for the obligations of the Cuban
> State.

Additionally, the Resolution provides in the fifth paragraph that the "direction, administration

and legal representation of the Enterprise CUBAEXPORT" shall be the exclusive responsibility

of its Managing Director. Finally, the Resolution only authorizes CUBAEXPORT to engage in

commercial operations, not governmental functions ("the promotion and execution of all the

operations of foreign commerce related to the export of food products, [etc.]"). The Resolution

does not endow the enterprise with any sovereign authority.

6.    Since its establishment by Resolution No. 234, CUBAEXPORT has existed and

operated in accordance with the provisions of that Resolution.

2

7.    Cubaexport enters into contracts exclusively in its own name, and not as an agent for the Republic of Cuba or any other entity.

8.    CUBAEXPORT pays taxes to the Republic of Cuba.

9.    CUBAEXPORT, not Cuba, applied for and was granted U.S. Registration No. 1,031,651 of the HAVANA CLUB & Design trademark.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed this 16th day of March, 2007.

_____
Francisco Santiago Pichardo

3

**EXHIBIT A**

REPUBLICA DE CUBA

# MINISTERIO DEL COMERCIO EXTERIOR

### RESOLUCION No. 234

**POR CUANTO:** El Artículo 9 de la Ley No. 1142 de 21 de enero de 1964, faculta al Ministro del Comercio Exterior para crear y organizar empresas de comercio exterior con personalidad jurídica y patrimonio - propios.

**POR CUANTO:** Para el mejor cumplimiento de los fines asignados al Ministerio del Comercio Exterior, es aconsejable la creación de una empresa de comercio exterior que asuma la ejecución de todas las operaciones relacionadas con la exportación de productos alimenticios, químicos e intermedios, materias primas, minerales, metales, fibras, tejidos, cueros y sus derivados, artículos de consumo general, especialidades farmacéuticas, equipos y materiales médicos, odontológicos y veterinarios, así como de cuantas otras exportaciones se deriven y - tengan causa en las actividades médicas, farmacéuticas, dentales y - veterinarias.

**POR TANTO:** En uso de las facultades que me están conferidas,

### R E S U E L V O :



**PRIMERO:** Crear una empresa de comercio exterior, con personalidad jurídica independiente y patrimonio y administración propios, que se denominará "EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS", la que también podrá ser oficialmente identificada, en forma indistinta, por el nombre de CUBAEXPORT y tendrá su domicilio social en la Ciudad de la Habana.

**SEGUNDO:** La Empresa CUBAEXPORT asumirá la promoción y ejecución de todas las operaciones de comercio exterior relacionadas con las exportaciones de productos alimenticios, químicos e intermedios, materias primas, minerales y metales, fibras, tejidos, cueros y sus derivados, artículos de consumo general, especialidades farmacéuticas, equipos y materiales médicos, odontológicos y veterinarios, y de cuantas otras exportaciones se deriven y tengan causa en las actividades médicas, farmacéuticas, dentales y veterinarias.

**TERCERO:** La Empresa CUBAEXPORT se subroga en los derechos, créditos y acciones e igualmente se sustituye en todas las obligaciones legales, contractuales y extracontractuales, que correspondían a las empresas de comercio exterior que, hasta la fecha de esta Resolución, han tenido a su cargo y han venido realizando las operaciones que - por la misma se asignan y transfieren a la Empresa CUBAEXPORT.

**CUARTO:** La Empresa CUBAEXPORT se regirá en cuanto a su actividad, funcionamiento y organización, por las Reglas Estatutarias que oportunamente se dictarán para el más cabal desarrollo y ejecución de las operaciones y tareas que le vienen encomendadas por la Ley y la presente Resolución y de conformidad con las orientaciones que, a virtud de los planes estatales para el comercio exterior, le imparta el Ministerio del Comercio Exterior.

- 2 -

QUINTO: La dirección, administración y representación legal de la Empresa CUBAEXPORT estará a cargo de un Director-Gerente que, hasta tanto se dicten las Reglas Estatutarias a las que se refiere - el Apartado anterior, asumirá cuantas funciones, facultades y atribuciones sean necesarias y se requieran para el correcto y cabal cumplimiento de los fines que a la Empresa se le asignan.

El Director-Gerente será asistido en las funciones de dirección y administración de la Empresa por un Consejo Asesor integrado por los Sub-Gerentes y demás funcionarios que aquél designe.

La estructura fundamental de la Empresa estará integrada por un - Sub-Gerente Económico, dos Sub-Gerentes Comerciales y un Departamento de Administración.

SEXTO: La Empresa CUBAEXPORT tendrá un capital propio ascendente a la suma de CIENTO VEINTE Y CINCO MIL PESOS ($125,000.00) MONEDA NACIONAL.

SEPTIMO: La Empresa CUBAEXPORT actuará con independencia del Ministerio del Comercio Exterior en virtud de la personalidad jurídica y patrimonio propios que la misma tiene; consiguientemente, el Estado Cubano no responderá de las obligaciones que contraiga dicha Empresa, la que, a su vez, no será responsable de las obligaciones del Estado Cubano.

OCTAVO: La Empresa CUBAEXPORT se entenderá creada desde la fecha de la publicación de la presente Resolución, pero comenzará sus - operaciones comerciales a partir del primero de enero de mil novecientos sesenta y seis.

COMUNIQUESE a los Vice-Ministros y Directores del Organismo, a los Directores-Gerentes de las Empresas, a los Jefes de las Oficinas Comerciales en el extranjero, al Ministerio de Hacienda, a la Junta Central de Planificación y al Banco Nacional de Cuba; publíquese en la Gaceta Oficial de la República para general conocimiento y fíjese en la Tablilla Oficial del Ministerio a los efectos legales previstos en la Ley; y archívese su original en la Dirección Jurídica.

DADA en La Habana, Ministerio del Comercio Exterior, a los quince días del mes de diciembre de mil novecientos sesenta y cinco. - "AÑO DE LA AGRICULTURA".

Marcelo Fernández Font,
Ministro

**Lic. NICOLÁS ARMANDO CUBA RUIZ,** Abogado, Director de la Dirección Jurídica del Ministerio del Comercio Exterior.--------------------------------------------------------------

**C E R T I F I C O:**--------------------------------------------------------------------------

**ÚNICO:** Que la anterior Resolución, es copia fiel y exacta del original que obra en los archivos de esta Dirección Jurídica.------------------------------------------------------------

Y para que así conste, expido la presente en la ciudad de La Habana a los 23 días del mes de octubre de 2001. "Año de la Revolución Victoriosa en el Nuevo Milenio."-
-----------------------------------------------------------------------------------------------

Lic. Nicolás Armando Cuba Ruiz
Director Jurídico
Ministerio del Comercio Exterior



**consortra**
translations

100 Park Ave.16th Fl
NY, NY 10017

Toll-Free: **877-GO-CONSORTRA**
(877-462-6676)

Your legal translation partner.                                    www.consortra.com

STATE of NEW YORK        )
                         )            ss:
COUNTY of NEW YORK       )

### _CERTIFICATE OF ACCURACY_

This is to certify that the attached document, _"Resolution 234"_ originally written in _Spanish_ is, to the best of our knowledge and belief, a true, accurate and complete translation into _English._

Dated: 3|2|07

James G. Mamera
Consortra Translations

Sworn to and signed before ME this
___12th___ day of __March__ ,
2007.

Notary Public

LYSA ROBERTS
Notary Public - State of New York
ID No. 01RO6150349
Qualified in New York County
My Commission Expires July 24, 2010



REPUBLIC OF CUBA
# MINISTRY OF FOREIGN COMMERCE

### RESOLUTION No. 234

WHEREAS: Article 9 of Law No. 1142 dated January 21, 1964 authorizes the Ministry of Foreign Commerce to create and organize foreign trade companies with their own legal identity and assets.

WHEREAS: To better accomplish the objectives assigned to the Ministry of Foreign Commerce, it is advisable to create a foreign trade company that assumes execution of all operations related to the export of food products, chemicals and intermediate products, raw materials, minerals, metals, textiles, hides and their derivatives, general consumer goods, pharmaceutical specialties, medical, dental, and veterinary equipment and materials, as well as all other exports deriving and originating from the medical, pharmaceutical and dental fields.

THEREFORE: In use of the powers conferred upon me,

### I RESOLVE:

ONE:   To create an Enterprise of foreign commerce with an independent legal personality and its own assets and administration which shall be called "EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS," which may also be officially identified, without distinction, by the name CUBAEXPORT, and will have its corporate headquarters in the City of Havana.

TWO: CUBAEXPORT will assume the promotion and execution of all the operations of foreign commerce related to the export of food products, chemicals and intermediate products, raw materials, minerals, metals, textiles, hides and their derivatives, general consumer goods, pharmaceutical specialties, medical, dental, and veterinary equipment and materials, as well as all other exports deriving and originating from the medical, pharmaceutical and dental fields

THREE: CUBAEXPORT subrogates the rights, credits and actions and also assumes all the legal, contractual and extra-contractual obligations that fell to the foreign trade companies, which, up to the date of this Resolution, had been in charge of and engaged in the operations hereby assigned and transferred to CUBAEXPORT.

FOUR: With regard to its activity, operation and organization, CUBAEXPORT will be governed by the Bylaws to be issued in a timely fashion for proper and complete development and execution of the operations and tasks entrusted to it by Law and this Resolution, and in accordance with the instructions issued to it by the Ministry of Foreign trade by virtue of the State plans for foreign trade.

FIVE:    The direction, administration and legal representation of the Enterprise CUBAEXPORT will be the responsibility of the General Manager who, until the Bylaws referenced in the preceding Section are issued, will assume all duties, powers and attributions needed and required to properly and fully accomplish the purposes assigned to the Company.

In the management and administration of the company, the General Manager will be assisted by an Advisory Board consisting of the Assistant Managers and all other executives designated by him.

The basic structure of the Company will consist of one Financial Assistant Manager, two Commercial Assistant Managers and one Administration Department.

SIX:  CUBAEXPRORT will have its own capital totaling ONE HUNDRED TWENTY FIVE THOUSAND CUBAN PESOS (CUP 125,000.00).

SEVEN: The enterprise CUBAEXPORT shall act independently of the Ministry of Foreign Commerce by virtue of having its own legal personality and assets; consequently, the Cuban State shall not be liable for the obligations contracted by said Enterprise, which, in turn, shall not be liable for the obligations of the Cuban State.

EIGHT:  CUBAEXPORT will be understood to have been created as of the publication date of this Resolution, but will commence its business operations as of the first of January, nineteen sixty-six.

LET IT BE KNOWN to the Vice Ministers and Directors of the Ministry, the General Managers of the Companies, the Heads of the Commerce Offices abroad, the Ministry of Finances, the Central Planning Board, and the National Bank of Cuba; publish in the Official Gazette of the Republic for general knowledge and post on the Official Notice Board of the Ministry for the legal purposes set forth in the Law; and file the original in the Legal Department.

**ISSUED in Havana, Ministry of Foreign Commerce, on December fifteenth, nineteen sixty-five. – THE YEAR OF AGRICULTURE.**



Marcelo Fernández Font,
Minister

**NICOLÁS ARMANDO CUBA RUIZ**, Attorney, Director of the Legal Department of the Ministry of Foreign Commerce.------------------------------------------

**I CERTIFY:** ------------------------------------------

**SOLE STATEMENT:** That the above Resolution is a true and exact copy of the original on file in this Legal Department. ----------------------------------

And to so attest, I issue this document in the city of Havana on October 23, 2001. "Year of the Victorious Revolution in the New Millennium."
--------------------------------------------------------------------

Nicolás Armando Cuba Ruíz
Legal Director
Ministry of Foreign Commerce

# CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2007, I caused a true and correct copy of the

following documents to be served on Defendants' counsel electronically by means of the

Court's ECF system:

1.  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
    TO DEFENDANTS' MOTION TO DISMISS, OR IN THE
    ALTERNATIVE, FOR SUMMARY JUDGMENT;

2.  PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
    UNDISPUTED MATERIAL FACTS AND COUNTERSTATEMENT OF
    FACTS IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS,
    OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT;

3.  DECLARATION OF MICHELE M. WINNEKER IN OPPOSITION
    TO DEFENDANTS' MOTION TO DISMISS, OR IN THE
    ALTERNATIVE, SUMMARY JUDGMENT;

4.  DECLARATION OF ERIC R. HUBBARD IN OPPOSITION
    TO DEFENDANTS' MOTION TO DISMISS, OR IN
    THE ALTERNATIVE, SUMMARY JUDGMENT; AND

5.  DECLARATION OF FRANCISCO SANTIAGO PICHARDO IN
    SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS'
    MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR
    SUMMARY JUDGMENT.

*/s/ Peter M. Brody*
PETER M. BRODY
(DC Bar No. 398717)