# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
)
EMPRESA CUBANA EXPORTADORA )
DE ALIMENTOS Y PRODUCTOS )
VARIOS d/b/a CUBAEXPORT, )
)
Plaintiff, )
)
v. )    Civil Action No. 1:06CV01692 (ESH)
)
)    Hon. Ellen S. Huvelle
UNITED STATES DEPARTMENT OF )
THE TREASURY, OFFICE OF FOREIGN )
ASSETS CONTROL, )
HENRY M. PAULSON, JR., as Secretary )
of Treasury, ADAM J. SZUBIN, as )
Director of the Office of Foreign Assets )
Control, and THE UNITED STATES, )
)
Defendants. )
———————————————————— )

## DEFENDANTS' REPLY IN SUPPORT OF THE MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page(s)

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    THERE ARE NO DISPUTED GENUINE ISSUES OF
MATERIAL FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    CUBAEXPORT LACKS STANDING TO PURSUE ITS CONSTITUTIONAL
CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    CUBAEXPORT'S PROCEDURAL AND SUBSTANTIVE
DUE PROCESS CLAIMS LACK MERIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    Cubaexport Lacks a Legitimate Entitlement to the Grant of a Specific
License . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    The Record Demonstrates that Cubaexport Received Notice and a
Meaningful Opportunity to Be Heard . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.    Section 211's Prospective Effect Does Not Violate Substantive
Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.    CUBAEXPORT HAS FAILED TO STATE A VIABLE TAKINGS
CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.    CUBAEXPORT'S THREE APA CLAIMS LACK MERIT . . . . . . . . . . . . . . . 13

    A.    OFAC's Interpretation of Legal License No. CU-74488
Is Neither Arbitrary Nor Capricious . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.    OFAC's Statement that Renewal of the Havana Club
Trademark Would Be Prohibited Unless Specifically
Licensed Is Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C.    OFAC's Denial of the Specific License Was Supported by
the Foreign Policy of the State Department and Consistent
with Congressional Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VI.     AS CUBAEXPORT RECOGNIZES, THE APA LIMITS THE
        SCOPE OF REVIEW OF AGENCY ACTION TO THE
        CERTIFIED ADMINISTRATIVE RECORD  . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

767 Third  Ave. Assocs. v. United States,
    48 F.3d 1575 (Fed. Cir. 1995) .................................................................. 11, 12

Action for Children's Television v. FCC,
    564 F.2d 458 (D.C. Cir. 1977) ...................................................................... 15

Am. Immigration Lawyers Ass'n v. Reno,
    18 F. Supp.2d 38 (D. D.C. 1998) ................................................................... 5

Am. Int'l Group, Inc. v. Islamic Republic of Iran,
    657 F.2d 430 (D.C. Cir. 1981) ...................................................................... 12

American Bioscience, Inc. v. Thompson,
    269 F.3d 1077 (D.C. Cir. 2001) .................................................................... 20

Banco Nacional de Cuba v. Farr,
    243 F. Supp. 957 (S.D. N.Y. 1965) ............................................................ 5, 10

Bell Atlantic Telephone Cos. v. FCC,
    79 F.3d 1195 (D.C. Cir. 1996) ...................................................................... 10

Bergerco Canada v. OFAC,
    129 F.3d 189 (D.C. Cir. 1997) ...................................................................... 10

Bowman Transp., Inc. v. Arkansas-Best Freight Sys.,
    419 U.S. 281 (1974) .................................................................................... 17

Braniff Airways, Inc. v. CAB,
    379 F.2d 453 (D.C. Cir. 1967) ...................................................................... 22

Burlington Truck Lines, Inc. v. United States,
    371 U.S. 156 (1962) .................................................................................... 17

Camp v. Pitts,
    411 U.S. 138 (1973) ................................................................................ 20, 21

Chamber of Argentine-Paraguayan Producers of Quebracho Extract v. Holder,
    332 F. Supp.2d 43 (D. D.C. 2004) ............................................................ 15, 17

Chang v. United States,
        859 F.2d 893 (Fed. Cir. 1988) ................................................................. 12, 13

Clifford v. Pena,
        77 F.3d 1414 (D.C. Cir. 1996) ..................................................................... 21

Commercial Drapery Contractors, Inc. v. United States,
        133 F.3d 1 (D.C. Cir. 1998) ......................................................................... 22

Consarc Corp. v. OFAC,
        71 F.3d 909 (D.C. Cir. 1995) ....................................................................... 13

Conti v. United States,
        291 F.3d 1334 (Fed. Cir. 2002) ................................................................... 6, 7

Cox v. Hart,
        260 U.S. 427 (1922) ..................................................................................... 10

Dean Witter Reynolds, Inc. v. Fernandez,
        741 F.2d 355 (11th Cir. 1984) ....................................................................... 4

Exxon Corp v. FTC,
        663 F.2d 120 (D.C. Cir. 1980) ..................................................................... 23

First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,
        462 U.S. 611 (1983) ....................................................................................... 4

Florida Power & Light Co. v. Lorion,
        470 U.S. 729 (1985) ..................................................................................... 20

Global Relief Found. v. O'Neill,
        207 F. Supp.2d 779 (N.D. Ill. 2002), aff'd, 315 F.3d 748 (7th Cir. 2002) ....... 9

Globalaw Ltd. v. Carmon & Carmon Law Office,
        452 F. Supp.2d 1 (D. D.C. 2006) ................................................................... 3

Harvard Pilgrim Health Care v. Thompson,
         318 F. Supp.2d 1 (D. R.I. 2004) ................................................................... 21

Havana Club Holding, S.A. v. Galleon S.A. (HCH V),
        203 F.3d 116 (2d Cir. 2000) ................................................................. passim

HCH II,
       974 F. Supp. 302 (S.D. N.Y. 1997) ............................................................ 15

HCH IV,
       62 F. Supp.2d 1085 (S.D. N.Y. 1999), aff'd, 203 F.3d 116 ............................... 10, 14, 16

Holy Land Found. for Relief and Dev. v. Ashcroft,
       219 F. Supp.2d 57 (D. D.C. 2002), aff'd, 333 F.3d 156
       (D.C. Cir. 2003) .................................................................................... 12, 15, 21

Holy Land Found. for Relief and Dev. v. Ashcroft,
       333 F.3d 156 (D.C. Cir. 2003), cert. denied,
       540 U.S. 1218 (2004) .............................................................................. 9, 20, 21

Hotel & Restaurant Employees Union, Local 25 v. Attorney General,
       804 F.2d 1256 (D.C. Cir. 1986), vacated on other grounds,
       808 F.2d 847 (D.C. Cir. 1987) .................................................................... 23

Islamic Am. Relief Agency v. Unidentified FBI Agents,
       394 F. Supp.2d 34 (D. D.C. 2005), aff'd, 477 F.3d 728 (D.C. Cir. 2007) ................. 9, 21

Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,
       101 F.3d 145 (D.C. Cir. 1996) .................................................................... 3

Jifry v. FAA,
       370 F.3d 1174 (D.C. Cir. 2004) .................................................................. 5

Karpova v. Snow,
       402 F. Supp.2d 459 (S.D. N.Y. 2005) ........................................................... 9, 21

Landgraf v. USI Film Products,
       511 U.S. 244 (1994) ................................................................................ 10

Learnard v. Inhabitants of the Town of Van Buren,
       182 F. Supp.2d 115 (D. Me. 2002) .............................................................. 3

Lozowski v. Mineta,
       292 F.3d 840 (D.C. Cir. 2002) .................................................................... 17

Maritrans Inc. v. United States,
       342 F.3d 1344 (Fed. Cir. 2003) .................................................................. 12, 13

Marshall County Health Care Auth. v. Shalala,
       988 F.2d 1221 (D.C. Cir. 1993) .................................................................. 16, 20

Milena Ship Mgmt. Co. v. Newcomb,
    995 F.2d 620 (5th Cir. 1993) ........................................ 21

Mitchell Arms, Inc. v. United States,
    7 F.3d 212 (Fed. Cir. 1993) ........................................ 12

Muwekma Ohlone Tribe v. Kempthorne,
    452 F. Supp.2d 105 (D. D.C. 2006) ................................. 21

Nat'l Council of Resistance of Iran v. Dep't of State ("NCRI"),
    251 F.3d 192 (D.C. Cir. 2001) ...................................... 9

Nat'l Oilseed Processors Ass'n v. Browner,
    924 F. Supp. 1193 (D. D.C. 1996) ................................. 15

Nat'l Treasury Employees Union v. Seidman,
    786 F. Supp. 1041 (D. D.C. 1992) ................................. 22

Office of Foreign Assets Control v. Voices in Wilderness,
    382 F. Supp.2d 54 (D. D.C. 2005) ............................. 21, 22

Paridissiotis v. United States,
    304 F.3d 1271 (Fed. Cir. 2002) ................................... 11

Paradissiotis v. Rubin,
    171 F.3d 983 (5th Cir. 1999) ................................. 11, 13

Penn. Cent. Transp. Co. v. City of New York,
    438 U.S. 104 (1978) .......................................... 12, 13

Pension Benefit Guar. Corp. v. R.A. Gray & Co.,
    467 U.S. 717 (1984) .............................................. 11

Plaquemines Port, Harbor and Terminal Dist. v. Fed. Mar. Comm'n,
    838 F.2d 536 (D.C. Cir. 1988) .................................... 21

Price v. Socialist People's Libyan Arab Jamahiriya,
    294 F.3d 82 (D.C. Cir. 2002) ...................................... 5

Reeve Aleutian Airways, Inc. v. United States,
    982 F.2d 594 (D. C. Cir. 1993) .................................... 8

Regan v. Wald,
    468 U.S. 222 (1984) .............................................. 20

-vi-

Richardson v. Nat'l Rifle Ass'n,
         871 F. Supp. 499 (D. D.C. 1994) ................................................................ 23

Rockefeller Ctr. Properties v. United States,
         32 Fed. Cl. 586 (1995) ............................................................................... 13

Sardino v. Fed. Reserve Bank of N.Y.,
         361 F.2d 106 (2d Cir. 1966) ....................................................................... 5

Tran Qui Than v. Regan,
         658 F.2d 1296 (9th Cir. 1981) .................................................................... 21

Trinity Methodist Church, South v. Fed. Radio Comm'n,
         62 F.2d 850 (D.C. Cir. 1932) ...................................................................... 6

Tuchman v. Connecticut,
         185 F. Supp.2d 169 (D. Conn. 2002) .......................................................... 7

Unemployment Comp. Comm'n of Territory of Alaska v. Aragan,
         329 U.S. 143 (1946) ................................................................................... 16

Usery v. Turner Elkhorn Mining Co.,
         428 U.S. 1 (1976) ....................................................................................... 11

Weininger v. Castro,
         462 F. Supp.2d 457 (S.D. N.Y. 2006) ......................................................... 4

Yager v. Carey,
         910 F. Supp. 704 (D. D.C. 1995) ................................................................ 23

**STATUTES**

Pub. L. No. 104-114, 110 Stat. 785, 814-815 (1996) ........................................... 11, 19

Pub. L. No. 105-277, § 211, 112 Stat. 2681, 2681-88 (1998) ................................... 18

**RULES AND REGULATONS**

31 C.F.R. § 501.803 .................................................................................................. 6

31 C.F.R. § 515.201(b) .......................................................................................... 6, 13

31 C.F.R. § 515.204 .................................................................................................. 13

31 C.F.R. § 515.527(a) ............................................................................... passim

28 Fed. Reg. 6985 (July 9, 1963) ................................................................ 6

Fed. R. Civ. P. 12(b) ................................................................................. 2

Fed. R. Civ. P. 56(f) ................................................................ 22, 23, 24, 25

## INTRODUCTION

Although Cubaexport recognizes that "this Court's evaluation" of the specific licensing determination made by the Office of Foreign Assets Control ("OFAC") "should be based on the Administrative Record," Pl.'s Response to Statement of Undisputed Material Facts at 1, Cubaexport nevertheless submits a litany of extra-record evidence to this Court in support of its opposition to the defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Dispositive Motion").  If relevant to its request to the agency, these materials, including book excerpts, letters, and newspaper articles, could and should have been submitted by Cubaexport to OFAC to be considered as part of the administrative record.  Producing them now in an attempt to supplement the administrative record disregards the substantial deference due the agency's decisionmaking process.  Cubaexport had an opportunity to present these materials to OFAC in support of its specific license application, in support of a request for guidance on the applicability of a general license, or in support of a request for reconsideration but failed to do so.  OFAC's decision should not be second-guessed as a result of Cubaexport's own omissions.

OFAC's denial of Cubaexport's specific license application was based on a reasoned interpretation of section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act ("section 211") and the Cuban Assets Control Regulations ("CACR"), and supported by the State Department's expert foreign policy guidance.  Although Cubaexport may disagree with the ultimate decision reached by OFAC, a decision fully revealed by the administrative record and the Szubin declaration, such disagreement does not demonstrate that OFAC's decision was arbitrary or capricious.

Accordingly, the defendants respectfully request that the Court dismiss Cubaexport's constitutional claims, which fail to state a violation of the Fifth Amendment, pursuant to Federal

Rule of Civil Procedure 12(b)(1) or 12(b)(6), and dismiss Cubaexport's claims under the

Administrative Procedure Act ("APA").  In the alternative, the defendants respectfully request

that the Court enter summary judgment on all of the claims in the Complaint.

## ARGUMENT

### I.    THERE ARE NO DISPUTED GENUINE ISSUES OF MATERIAL FACT[1]

Rather than assisting the Court in narrowing the factual disputes in the present case,

Cubaexport has responded to the defendants' Statement of Undisputed Material Facts by

submitting a "Response and Counterstatement" of 96 numbered paragraphs that bear only

tangential relationship to the defendants' 49 paragraphs of facts.  Cubaexport's counterstatement

contains extensive legal argument, see, e.g. Response and Counterstatement ¶¶ 4-6, 19 (arguing

that OFAC has no power to vest assets), ¶¶ 25, 62-63, 78, 80-81, 83, 86-87 (arguing that

Cubaexport is entitled to discovery), ¶¶ 32-33 (entitled "Insufficient Process"); ¶¶ 29, 51 (arguing

that declaration of Eric Hubbard establishes a "genuine dispute" over facts); ¶ 73 (arguing that

OFAC could have responded differently to State Department advice); and groups the defendants'

material facts without specifically responding to each individually numbered paragraph, see, e.g.,

Defs.' Statement of Undisputed Material Facts ¶¶ 7-13 (including ¶ 9, asserting without direct

response that licenses issued by OFAC may be amended, modified, or revoked at any time).

Accordingly, Cubaexport's response does not provide the Court with a basis upon which to

conclude that there is a genuine dispute of material fact that precludes the entry of summary

judgment.  See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 153

---

[1]  There is a typographical error in ¶ 8 of the defendants' Statement of Undisputed
Material Facts.  The paragraph should read, "On November 13, 1995, [OFAC] issued a license to
authorize the assignment."

(D.C. Cir. 1996) (rejecting, as response to material facts, a submission "[r]eplete with factual allegations not material to . . . substantive claims and repeatedly blending factual assertions with legal argument"); Globalaw Ltd. v. Carmon & Carmon Law Office, 452 F. Supp.2d 1, 5 n.3 (D. D.C. 2006) (citing Learnard v. Inhabitants of the Town of Van Buren, 182 F. Supp.2d 115, 119-20 (D. Me. 2002) (recognizing that plaintiff's "two-column table" is "far from 'short and concise'" and contains "statements" which "are not facts at all" and "do not actually controvert the Defendants' facts that they purport to address")).

Both in the "Counterstatement" and the Declaration of Eric Hubbard, Cubaexport seeks to develop a "material disputed issue" by raising arguments to this Court that purport to dispute the connection of the Havana Club trademark to confiscated property.  See, e.g., Hubbard Decl. ¶¶ 3-4.  However, these alleged facts are not material to the question of whether OFAC's denial of the specific license was arbitrary and capricious, as they are presented in an attempt to argue the issues before this Court in the first instance.  None of this material was provided to OFAC in the application for a specific license, as a supplement thereto, or in connection with a request for reconsideration, and it therefore has no bearing on the propriety of OFAC's decision.[2]  See infra at 8, 16.

## II.     CUBAEXPORT LACKS STANDING TO PURSUE ITS CONSTITUTIONAL CLAIMS

Cubaexport disputes the defendants' characterization of its relationship to the Cuban government for Fifth Amendment purposes, arguing that Cubaexport is a commercial entity

---

[2]  Interestingly, many of the materials cited in the Hubbard Declaration support the conclusion that the Havana Club trademark was connected to confiscated assets.  See, e.g., Hubbard Decl. Ex. A (placing control of Jose Arechabala, S.A. ("JASA") in government); Ex. C (ordering "[n]ationalization by means of forced expropriation" for JASA).

distinct from the Cuban government.  Pl.'s Opp. at 33.  This argument is belied by Cubaexport's pleadings and the Cuban law establishing Cubaexport.

Cubaexport states in its Complaint that it was established "for the purpose of exporting food and other products" on behalf of the government.  Compl. ¶ 5.  This statement is supported by Resolution No. 234, attached to the Declaration of Francisco Santiago Pichardo as Ex. A, which outlines the purposes and structure of Cubaexport.  As revealed by the Resolution, Cuba created Cubaexport "[t]o better accomplish the objectives assigned to the Ministry of Foreign Commerce," including "assum[ing] the promotion and execution of all the operations of foreign commerce related to" a laundry list of products.  Pichardo Decl. Ex. A. ¶¶ 2, 5.  In addition, "[w]ith regard to its activity, operation and organization, Cubaexport will be governed by the Bylaws . . . and in accordance with *the instructions issued to it by the Ministry of Foreign Trade by virtue of the State plans for foreign trade*."  Id. ¶ 7 (emphasis added).  Given the direct role of Cubaexport in Cuban foreign trade policy, and Cuba's role in directing the operations in that arena, Cubaexport should not be entitled to a presumption of independence from the government of Cuba.  See Weininger v. Castro, 462 F. Supp.2d 457, 498 (S.D. N.Y. 2006); see also Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 357 (11th Cir. 1984).

Even if the presumption of independence is not overcome by Cubaexport's role in executing Cuban foreign trade policy, that conclusion would not end the agency inquiry.  As explained by the Dispositive Motion, principles of equity weigh against recognition of separate status for Cubaexport in the present case.  See First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 632-33 (1983).  The Havana Club mark has been recognized as a mark used in connection with property confiscated by the Cuban government.  See, e.g., Havana Club Holding, S.A. v. Galleon S.A. ("HCH V"), 203 F.3d 116, 119-20 (2d Cir. 2000).

4

To now permit Cubaexport to avoid congressional condemnation of the recognition of such marks—ignoring the fact that Cubaexport has been the entity enjoying the fruits of Cuba's confiscations—would violate principles of equity.  See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 99 (D.C. Cir. 2002); Banco Nacional de Cuba v. Farr, 243 F. Supp. 957, 978 (S.D. N.Y. 1965).

Moreover, Cubaexport's assertion of Fifth Amendment protections are further clouded by its lack of "substantial connections" with the United States.  See, e.g., Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004).  In its Opposition, Cubaexport does not assert any presence in the United States aside from the registration and renewal of the Havana Club trademark—an action originally permitted only by grace of a general, revocable license.  See infra at 6-7.  Despite the fact that Cubaexport is not currently operating in commerce in the United States under that mark due to the presence of the Cuban embargo, Cubaexport assumes that the mark constitutes property sufficient to establish a "substantial" presence in the United States.  That assumption is erroneous.[3]  Cf. Am. Immigration Lawyers Ass'n v. Reno, 18 F. Supp.2d 38, 59-60, 60 n.17 (D. D.C. 1998).

---

[3] Cubaexport cites the Second Circuit's decision in Sardino v. Fed. Reserve Bank of N.Y., 361 F.2d 106, 111 (2d Cir. 1966), for the proposition that it is "patently erroneous" to argue that the Constitution confers no rights on non-resident aliens.  However, the defendants do not dispute that non-resident aliens may find resort in the Fifth Amendment when those aliens' contacts with the United States are "substantial."  Moreover, Cubaexport's selective quotation of Sardino ignores the Second Circuit's ultimate conclusion that "in dealing with the property of an alien [it does not follow that] the United States must be blind to the acts of the country of which he is a national. . . .  The founders could not have meant to tie one of the nation's hands behind its back by requiring it to treat as a friend a country which has launched a campaign of subversion throughout the Western Hemisphere."  Id.

III.    **CUBAEXPORT'S PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAIMS LACK MERIT**

    A.    **Cubaexport Lacks a Legitimate Entitlement to the Grant of a Specific License**

Cubaexport contends that the renewal of a trademark registration "is a non-discretionary entitlement where ministerial actions (namely submission of the application and fee payment) are taken." Pl.'s Opp. at 35. While only "ministerial" actions may be sufficient to renew a trademark held by entities that are not subject to the provisions of the CACR, Cubaexport recognizes that Cuban nationals are different, as they must "have authorization to take such actions." Id.; see also 31 C.F.R. § 515.201(b). Accordingly, when Cubaexport first registered the Havana Club trademark, it did so by virtue of a general licensing provision. See 31 C.F.R. § 515.527(a)(1).

However, as Cubaexport concedes in its response to the statement of material facts, that general authorization was and is subject to "amend[ment], modifi[cation], or revo[cation] at any time." See Defs.' Statement of Undisputed Material Facts ¶ 9; see also 28 Fed. Reg. 6985 (July 9, 1963); 31 C.F.R. § 501.803. Thus, even prior to the passage of section 211, Cubaexport was on notice that its ability to register or renew a trademark was expressly revocable. See Conti v. United States, 291 F.3d 1334, 1341-42 (Fed. Cir. 2002) (finding no property interest in permit when regulations permitted government to "revoke, suspend, or modify" permit "at all times"); see also Trinity Methodist Church, South v. Fed. Radio Comm'n, 62 F.2d 850, 854 (D.C. Cir. 1932) ("All of these cases indubitably show . . . that one who applies for and obtains a grant or permit from a state, or the United States, to make use of a medium of interstate commerce, under the control and subject to the dominant power of the government, takes such grant or right subject to the exercise of the power of government . . . .").

Moreover, with the passage of section 211 in 1998, the process by which a Cuban entity can be licensed to register or renew a trademark was further conditioned on the relationship of that mark to property that had been confiscated. See 31 C.F.R. § 515.527(a)(2). As explained by the defendants' Dispositive Motion, holders of marks that were excluded from the reach of the general licensing provision had to apply for a specific license, a determination that is largely within the discretion of OFAC. See Dispositive Mot. at 22. In light of this change, the mere fact that Cubaexport enjoyed the benefits of a general license permitting registration and renewal for a period of years does not demonstrate a legitimate entitlement to the granting of a specific license to renew the trademark.[4] See Conti, 291 F.3d at 1341 (finding no property interest in permit even though plaintiff "could and did utilize his permit . . . for more than a decade"); Tuchman v. Connecticut, 185 F. Supp.2d 169, 173 (D. Conn. 2002).

B.     **The Record Demonstrates that Cubaexport Received Notice and a Meaningful Opportunity to Be Heard**

As explained in an extended discussion in the Dispositive Motion, OFAC provided Cubaexport with notice and a meaningful opportunity to be heard before denying the specific license application. Dispositive Mot. at 23-27. The notice was provided by OFAC's April 6, 2006, letter, which (1) explained that legal License No. CU-74488 did not authorize payment of a filing fee to renew the Havana Club mark and (2) *expressly* notified Cubaexport of its ability, through counsel, to request a specific license or seek further guidance from OFAC. See A.R. 52-

---

[4] Cubaexport seeks to obscure the facts underlying OFAC's denial of the specific license application by arguing that "[e]ven after the passage of section 211, Cubaexport had received OFAC licenses." Pl.'s Opp. at 36. However, as Cubaexport's last renewal of the mark occurred in 1996, prior to the passage of section 211, any "entitlement" allegedly brought about by OFAC licensing determinations could not extend to a specific licensing determination pursuant to 31 C.F.R. § 515.527(a)(2). See Pl.'s Statement of Undisputed Material Facts ¶ 4; see also Defs.' Opp. to Cross-Mot. for Summ. J.

53.

In response to this letter, Cubaexport, through counsel, submitted a letter to OFAC dated April 7, 2006, seeking a specific license to "incur and receive payment for the expense of renewing the registration." A.R. 49-51. Thus, Cubaexport, after receiving the April 6 notice, expressly availed itself of the option to file an application for a specific license. Both OFAC's April 6 notice and Cubaexport's April 7 response are reflected in the administrative record. See A.R. 49-53. Yet Cubaexport does not even mention, let alone dispute, the government's characterization of these materials.

Cubaexport now attempts to reduce its Due Process claim to one alleging that the notice and opportunity to be heard that was provided by OFAC on the specific license did not extend to the applicability of the general licensing provision of 31 C.F.R. § 515.527(a)(1). See Pl.'s Opp. at 27-28. However, Cubaexport's conclusory analysis fails to provide any basis in the record for such a claim. In OFAC's April 6, 2006, letter, OFAC informed Cubaexport that it was free to seek "further guidance" from the agency on the issue of the trademark renewal. See Reeve Aleutian Airways, Inc. v. United States, 982 F.2d 594, 600 (D. C. Cir. 1993). Despite this option, Cubaexport sought only a specific license from OFAC.

This choice was certainly a "knowing" or "intelligent" one, as Cubaexport did present arguments on the applicability of the general license in 31 C.F.R. § 515.527(a)(1) *to the PTO* while OFAC was considering the application for a specific license. See A.R. 6-9, 34-40. In a series of letters, Cubaexport argued that the PTO should permit renewal pursuant to the general licensing provision even absent specific authority granted by OFAC. See, e.g., A.R. 35. However, the PTO ultimately decided that "the specific license is necessary for authorizing payment of the required fee." Compl., Ex. 24.

8

Unlike Cubaexport's multiple filings with the PTO, Cubaexport's application for a specific license contained no such argument.  <u>See</u> A.R. 49-51.  To explain its failure to file more evidentiary materials, Cubaexport asserts without citation that "it is highly questionable whether OFAC can afford meaningful due process" because "substantial discovery" and "testimony at a hearing" would be required to answer questions raised by the specific license request.[5]  Pl.'s Opp. at 38-39.  However, the contention that a full hearing is necessary to satisfy the procedural requirements of due process has been repeatedly rejected by courts in the context of OFAC's enforcement authority.  <u>See</u> <u>Holy Land Found. for Relief and Dev. v. Ashcroft</u>, 333 F.3d 156, 163-64 (D.C. Cir. 2003), <u>cert. denied</u>, 540 U.S. 1218 (2004); <u>Islamic Am. Relief Agency v. Unidentified FBI Agents</u>, 394 F. Supp.2d 34, 49 (D. D.C. 2005), <u>aff'd</u>, 477 F.3d 728 (D.C. Cir. 2007); <u>Karpova v. Snow</u>, 402 F. Supp.2d 459, 470 (S.D. N.Y. 2005); <u>see also</u> <u>Nat'l Council of Resistance of Iran v. Dep't of State ("NCRI")</u>, 251 F.3d 192, 209 (D.C. Cir. 2001).  What is required instead is an opportunity to respond in writing.  The fact that Cubaexport failed to avail itself fully of the opportunity provided by OFAC does not demonstrate that the opportunity itself lacked meaning.  <u>See</u> <u>Karpova</u>, 402 F. Supp.2d at 470; <u>Global Relief Found. v. O'Neill</u>, 207 F. Supp.2d 779, 805 (N.D. Ill. 2002), <u>aff'd</u>, 315 F.3d 748 (7th Cir. 2002).

### C.    Section 211's Prospective Effect Does Not Violate Substantive Due Process

Cubaexport's assertion that section 211 violates substantive due process through its purportedly retroactive effect is based on an erroneous understanding of section 211 and

---

[5]  Cubaexport also makes the unsupported assertion that "OFAC did not act pursuant to the TWEA."  Pl.'s Opp. at 38.  That assertion is erroneous.  The CACR were promulgated pursuant to the TWEA and are administered by OFAC.  <u>See</u> Disp. Mot. at 3-5.  Section 211's amendment of the CACR does not alter the fact that OFAC's authority to enforce the regulations is granted by the TWEA.

retroactivity jurisprudence.  As the Supreme Court has explained, "[a] statute does not operate

'retrospectively' merely because it is applied in a case arising from conduct antedating the

statute's enactment or upsets expectations based in prior law."  Landgraf v. USI Film Products,

511 U.S. 244, 269 (1994) (internal citation omitted); id. at 270 n.24 ("[A] statute 'is not made

retroactive merely because it draws upon antecedent facts for its operation.'") (quoting Cox v.

Hart, 260 U.S. 427, 435 (1922)); see also Bergerco Canada v. OFAC, 129 F.3d 189, 192 (D.C.

Cir. 1997).

   Section 211's withdrawal of general licensing authority for trademarks used in connection

with a business or assets that were confiscated does not invalidate any prior registration or

renewal of the Havana Club trademark, nor does it impose any additional liability based on the

use of that mark during the term of ownership.  Indeed, Cubaexport enjoyed the use of the

Havana Club trademark through the full ten-year period following renewal in 1996, despite the

enactment of section 211 in 1998.  Instead, section 211 prospectively affects the manner in which

a certain category of trademarks may be renewed or registered once a future application by an

owner of such a trademark is made.  See HCH IV, 62 F. Supp.2d 1085, 1094-95 (S.D. N.Y.

1999) (rejecting argument that section 211 has "impermissibly retroactive effect"), aff'd, 203

F.3d at 129; Banco Nacional de Cuba, 243 F. Supp. at 978, 981 (holding that statute based on

confiscation or other taking "after January 1, 1959" poses "no constitutional infirmity" despite

allegation of retroactivity); see also Bergerco, 129 F.3d at 194 (citing additional cases in the

licensing context); Bell Atlantic Telephone Cos. v. FCC, 79 F.3d 1195, 1206-07 (D.C. Cir.

1996).

   Nevertheless, even assuming arguendo that section 211 has some retroactive effect, that

effect does not render the Act or its implementing regulations unconstitutional.  "It is by now

10

well established that legislative Acts adjusting the burdens and benefits of economic life come to

the Court with a presumption of constitutionality, and that the burden is on one complaining of a

due process violation to establish that the legislature has acted in an arbitrary and irrational way."

Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976); see also Pension Benefit Guar.

Corp. v. R.A. Gray & Co., 467 U.S. 717, 731 (1984); Usery, 428 U.S. at 16 (holding that

"legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise

settled expectations" or "impose[s] a new duty or liability based on past acts."). Cubaexport does

not attempt to overcome the presumption of constitutionality afforded section 211 in the present

case.  Nor could it, given Congress's repeated condemnation of the confiscation of private

property by the Cuban government.  See, e.g., LIBERTAD Act, Pub. L. No. 104-114, 110 Stat.

785, 814-815 (1996) (codified at 22 U.S.C. § 6082).

## IV.    **CUBAEXPORT HAS FAILED TO STATE A VIABLE TAKINGS CLAIM**

Cubaexport continues to assert that OFAC's denial of a specific license application

constitutes a "taking" of private property despite the absence of both jurisdiction, given its

agency relationship with the Cuban government and the exclusive jurisdiction of the Court of

Federal Claims, and legal support for its position.  Cubaexport points to no court in cases

involving OFAC's administration and implementation of economic sanctions regulations that has

held a licensing decision to constitute a taking of private property.  See Paridissiotis v. United

States[6], 304 F.3d 1271, 1274-75 (Fed. Cir. 2002); Holy Land Found. for Relief and Dev. v.

---

[6] Cubaexport argues that Paridissiotis is inapplicable because the regulated entity acted
after sanctions were imposed.  However, that is precisely why Paridissiotis controls the present
case.  When Cubaexport registered the Havana Club trademark, it did so after the passage of the
Cuban embargo and the CACR.  Cubaexport was on notice that relations between the countries
were strained, and that its actions with respect to the trademark were entirely subject to
government regulation, including the maintenance of a revocable general license.  See 767 Third

Ashcroft, 219 F. Supp.2d 57, 78 (D. D.C. 2002), aff'd, 333 F.3d 156 (D.C. Cir. 2003); see also

Am. Int'l Group, Inc. v. Islamic Republic of Iran, 657 F.2d 430, 448 (D.C. Cir. 1981).  In fact,

the cases cited by Cubaexport in its opposition all stand for the proposition that the economic

effect of sanctions does not result in a taking in violation of the Fifth Amendment.[7]

Ignoring this precedent, Cubaexport argues that OFAC's licensing determination

constitutes either a "per se" regulatory taking or a violation of the factors established by the

Supreme Court in Penn. Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978).

Cubaexport's argument that, by denying a specific license application, OFAC committed a "per

se" violation of the Fifth Amendment would effectively render all government licensing

decisions constitutionally suspect.  Such an extension of takings jurisprudence is unwarranted,

particularly when OFAC's denial of the license affected only the use of the Havana Club

trademark and the sale of goods under the mark in the United States.  See Mitchell Arms, Inc. v.

United States, 7 F.3d 212, 217 (Fed. Cir. 1993) ("In revoking the permits, ATF withdrew its prior

authorization . . . .  Mitchell could have done anything it wished with the rifles, except import

them into the United States . . . ."); see also Maritrans, 342 F.3d at 1354 (finding no categorical

---

Ave. Assocs. v. United States, 48 F.3d 1575, 1581 (Fed. Cir. 1995); Chang v. United States, 859 F.2d 893, 897 (Fed. Cir. 1988).

[7] See Maritrans Inc. v. United States, 342 F.3d 1344, 1355 (Fed. Cir. 2003) ("The fact that Maritrans' return on its investment may now be less than it originally expected is not enough to make Congress' enactment of OPA90 a compensable taking."); Paridissiotis, 304 F.3d at 1275 ("[V]alid regulatory measures taken to serve substantial national security interests may adversely affect individual contract-based interests and expectations, but those effects have not been recognized as compensable takings for Fifth Amendment purposes."); 767 Third Ave. Assocs., 48 F.3d at 1581 ("Sage, as a member of the public, was on notice that the government, pursuant to its statutory and constitutional authority, could close a foreign government's offices and freeze its assets."); Chang, 859 F.2d at 897 ("'[P]laintiffs' contracts were in every sense subordinate to the President's power under the IEEPA.'") (quoting Chang, 13 Cl. Ct. 555, 560 (1987) (internal quotation omitted)).

taking when plaintiff enjoyed use of property prior to passage of law).

Given the lack of merit in Cubaexport's Takings Claim, the government believes that it is unnecessary for the Court to evaluate the <u>Penn Central</u> factors.[8]

## V.    **CUBAEXPORT'S THREE APA CLAIMS LACK MERIT**

### A.    **OFAC's Interpretation of Legal License No. CU-74488 Is Neither Arbitrary Nor Capricious**

Cubaexport first asserts that OFAC violated the APA by interpreting legal License No. CU-74488 not to authorize payment of the renewal fee for the Havana Club trademark.  The defendants' response to this assertion is set forth in full in their Dispositive Motion, pp. 33-36, and their Opposition to the Plaintiff's Cross-Motion for Summary Judgment, which the defendants hereby incorporate by reference.  Cubaexport does not mention, let alone dispute, the fact that the explicit language of the license limited the authorization contained within to payment for legal representation in proceedings described in Cubaexport's license application. See A.R. 84.  Moreover, OFAC's interpretation of the license that it prepared and issued is entitled to particular deference.  <u>See</u> <u>Consarc Corp. v. OFAC</u>, 71 F.3d 909, 914-15 (D.C. Cir. 1995); <u>see also</u> <u>HCH V</u>, 203 F.3d at 125; <u>Paradissiotis v. Rubin</u>, 171 F.3d 983, 987 (5th Cir.

---

[8]  However, such an evaluation supports the conclusion that Cubaexport's Takings Claim lacks merit.  The economic impact on Cubaexport from the denial of the specific license would be limited, as the Cuban Embargo, implemented through the CACR, currently prohibits importation of goods under the Havana Club mark, <u>see</u> 31 C.F.R. §§ 515.201, 515.204; <u>see also</u> <u>Chang</u>, 859 F.2d at 898; the interference with Cubaexport's investment-backed expectations would be minimal, as Cubaexport was fully aware of the political and regulatory environment in which it was operating when it registered and sought to renew the Havana Club mark, <u>see</u> <u>Chang</u>, 859 F.2d at 897; <u>Rockefeller Ctr. Properties v. United States</u>, 32 Fed. Cl. 586, 593 (1995); and "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good," <u>Penn. Cent.</u>, 438 U.S. at 124 (internal citation omitted); <u>see also</u> <u>Maritrans</u>, 342 F.3d at 1356.

1999). Accordingly, there is no basis to conclude that OFAC's interpretation is arbitrary or capricious.

**B.    OFAC's Statement that Renewal of the Havana Club Trademark Would Be Prohibited Unless Specifically Licensed Is Reasonable**

Cubaexport's second APA claim relates to OFAC's statement in the July 28, 2006, letter that "renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed." A.R. 1. Cubaexport asserts, inter alia, that the decision of the agency should be vacated because the record "contains no evidence whatsoever concerning the factual issues that must be resolved for a determination that renewal of the HAVANA CLUB registration is not authorized under the General License." Pl.'s Opp. at 23.

As an initial matter, this overstated assertion ignores the history of litigation regarding the applicability of section 211 (and the corresponding withdrawal of general licensing authority) to the Havana Club trademark. As explained in the Dispositive Motion, at least two federal courts had already concluded that the Havana Club mark was the same as or substantially similar to a name used in connection with a confiscated business or assets.[9] See HCH V, 203 F.3d at 119-20, 130; HCH IV, 62 F. Supp.2d at 1089-90, 1092. And the declaration of Adam Szubin, the Director of OFAC, explains that OFAC has been aware of the findings made in these earlier cases—proceedings that evaluated OFAC's licensing authority and discretion with regard to the Havana Club mark. See Szubin Decl. ¶ 27; see also id. ¶ 26 (explaining that OFAC regulations require the submission of all pleadings in a case that may affect blocked property, unless OFAC

---

[9] Cubaexport asserts that it is "undisputed" that JASA's trademark registrations were not confiscated. Pl.'s Opp. at 26. However, the language of section 211 focuses not on the confiscation of the trademark registration itself, but on whether the same, or a substantially similar, trademark was used *in connection with* a confiscated business or assets. 31 C.F.R. § 515.527(a)(2).

is a party); Chamber of Argentine-Paraguayan Producers of Quebracho Extract v. Holder, 332 F.

Supp.2d 43, 49 (D. D.C. 2004) (requiring agency's action to be demonstrated in the

administrative record "so that its decisionmaking 'path may reasonably be discerned.'") (quoting

Sierra Club v. EPA, 167 F.3d 658, 665 (D.C. Cir. 1999)).

Accordingly, OFAC's statement in the July 28, 2006, letter was supported by the findings

of two federal courts in litigation involving the Havana Club trademark, section 211, and, at least

in part, Cubaexport.[10]  OFAC's reliance on the findings in this litigation should therefore come as

no surprise to Cubaexport in an administrative matter involving the Havana Club trademark and

section 211.  Indeed, as its opposition reveals, the true source of Cubaexport's frustration is its

"vigorous[]" disagreement with the findings of these courts.  Pl.'s Opp. at 25.  Cubaexport

believes that the courts erred by concluding that the Havana Club trademark was used in

connection with confiscated assets.  See Pl.'s Opp. at 25-26, 25 n.20.

---

[10]  Cubaexport attacks OFAC's reliance on the prior judicial decisions in the Havana Club
litigation on two grounds.  First, Cubaexport argues that estoppel does not apply because it was
not a party to the litigation.  Pl.'s Opp. at 25.  However, even ignoring Cubaexport's substantial
interest in the proceeding, its relationship to the parties, and its ability to intervene, see HCH II,
974 F. Supp. 302, 315 (S.D. N.Y. 1997) ("As discussed above, Cubaexport should now be a
participant in this action."), estoppel is an entirely separate question from whether reliance on the
findings as they relate to the Havana Club trademark itself would be arbitrary or capricious.
Second, Cubaexport argues that OFAC's reliance on the judicial findings constitutes "post hoc
rationalization."  Pl.'s Opp. at 24.  This argument misunderstands the concept of "post hoc"
decisionmaking.  "The rule against post-hoc rationalizations does not prevent a court from
considering a more detailed explanation of an agency's action in response to a legal challenge."
See Nat'l Oilseed Processors Ass'n v. Browner, 924 F. Supp. 1193, 1204 (D. D.C. 1996).  As the
Szubin declaration explains, OFAC has been aware of the Havana Club Holding litigation.
Accordingly, the declaration contains no "new" basis for the agency's decision that did not
previously exist.  Cf. Action for Children's Television v. FCC, 564 F.2d 458, 471 (D.C. Cir.
1977) ("While the agency must consider, analyze and rely on these factual materials which are in
the public domain, the agency may draw upon its own expertise in interpreting the facts or upon
broader policy considerations not present in the record."); Holy Land Found., 219 F. Supp.2d at
71 (discussing "broad range of evidence," including hearsay, that may support OFAC
designations).

While Cubaexport may "vigorously" disagree with the course of the <u>Havana Club</u> litigation, that disagreement does not demonstrate that OFAC's reliance on the judicial findings was arbitrary or capricious.[11]  Ignoring this standard, Cubaexport would have this Court determine these issues in the first instance, sitting as a finder of fact.  However, that is not the role of this Court, which sits as a court of review to determine whether the conclusion reached by the agency is a reasonable one.  <u>See</u> <u>Marshall County Health Care Auth. v. Shalala</u>, 988 F.2d 1221, 1225 (D.C. Cir. 1993) (explaining that "[t]he district court sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding" whether the basis for an agency's decision "was factually flawed"); <u>see also</u> <u>HCH V</u>, 203 F.3d at 125.

Moreover, Cubaexport never presented these arguments to OFAC in its application for a specific license nor sought reconsideration from OFAC on this rationale after receiving OFAC's decision.  Instead, Cubaexport unsuccessfully attempted to use these arguments to convince the PTO that it should ignore OFAC's specific licensing determination and permit renewal of the Havana Club trademark.  <u>See</u> A.R. 6-9, 34-40.  Accordingly, the fact that OFAC did not address each argument now asserted by Cubaexport regarding the applicability of the general licensing provision is not grounds for overturning the agency's specific licensing determination.  <u>See</u> <u>Unemployment Comp. Comm'n of Territory of Alaska v. Aragan</u>, 329 U.S. 143, 155 (1946) ("A

---

[11]  In fact, the courts in the <u>Havana Club Holding</u> litigation expressly rejected the arguments that Cubaexport now asserts concerning JASA's "abandonment" of its rights to the Havana Club mark.  <u>See</u> <u>HCH V</u>, 203 F.3d at 129 (""[W]e will not create an abandonment exception to section 211(b). . . .  It is not likely that Congress wished to disadvantage a company that understandably ceased to use its trade name after the confiscation of its business."); <u>id.</u> at 130 ("We disagree with HCI's premise that no compensation is 'adequate and effective' compensation . . .  where the confiscated business allegedly had no positive net value at the time of expropriation."); <u>HCH IV</u>, 62 F. Supp.2d at 1094 ("[Section 211] does not require continuous use or provide a defense of abandonment.").

reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action."); Lozowski v. Mineta, 292 F.3d 840, 848 (D.C. Cir. 2002) ("[I]t is difficult to see how the [decision maker] could have acted arbitrarily or capriciously in failing to address an argument never presented to her.").

### C. OFAC's Denial of the Specific License Was Supported by the Foreign Policy of the State Department and Consistent with Congressional Intent

Cubaexport's final APA challenge relates to the central issue in this case: whether OFAC acted arbitrarily and capriciously in denying the specific license application submitted on Cubaexport's behalf. In the July 28, 2006, letter denying the application, OFAC explained that it had "received guidance from [the State Department] informing us that it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark." A.R. 1.

Cubaexport first asserts that this explanation was not "adequate" under the APA because it did not explain the policy decisions made by the State Department. However, Cubaexport again overstates the standard for a reasoned explanation under the APA, which requires a "rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962). Accordingly, even an agency decision "of less than ideal clarity" will be upheld "if the agency's path may reasonably be discerned" from the record. Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 286 (1974); see also Chamber of Argentine-Paraguayan Producers of Quebracho Extract, 332 F. Supp.2d at 49.

Here, the record clearly presents those foreign policy considerations expressed to OFAC by the State Department, including the determination that denial would be consistent with the

"U.S. approach toward non-recognition of trademark rights associated with confiscated property" as well as "the policy of the United States to deny resources to the Castro regime in order to hasten a transition to democracy in Cuba," all of which must be read in conjunction with the policy expressed by Congress. A.R. 2-3. Thus, the agency has provided both the Court and Cubaexport, which disputes each policy consideration, a full view of the agency decisionmaking process preceding the denial of the specific license application.[12]

Cubaexport next contends that OFAC's decision fails to address that denial of the application would be "inconsistent" with its earlier grants of legal licenses to Cubaexport's counsel. This argument makes the assumption that legal licenses are identical to a specific license to authorize transactions related to the renewal of a trademark. As explained in the Opposition to the Cross-Motion for Summary Judgment, that assumption is without merit.

Cubaexport's central argument lies in its disagreement with the foreign policy concerns expressed by the State Department in its memorandum to OFAC. First, Cubaexport argues that the "U.S. approach toward non-recognition of trademark rights associated with confiscated property" is relevant only if the Havana Club trademark was itself confiscated. Pl.'s Opp. at 30. This argument ignores both the language of the State Department's reasoned guidance and section 211, which focus not on the confiscation of the trademark itself but on the use of the same, or a substantially similar, mark in connection with a confiscated business or assets. See Pub. L. No. 105-277, § 211, 112 Stat. 2681, 2681-88 (1998); 31 C.F.R. § 515.527(a)(2). Aside

---

[12] In a cursory sentence, Cubaexport asserts that the State Department memorandum, submitted to OFAC prior to the issuance of its final decision on the specific license, constitutes "post-hoc" decisionmaking. It is unclear what the basis is for this assertion, as OFAC notes in the letter denying the application that it had previously "received" guidance from the State Department recommending against approval of the application. A.R. 1.

from this misguided assertion, Cubaexport does not dispute that Congress has, on multiple occasions, condemned the confiscation of personal property by the Cuban government, including the LIBERTAD Act of 1996, 110 Stat. at 814-815. Accordingly, as the use of the Havana Club trademark, or a substantially similar mark, in connection with a business or assets confiscated by the Cuban government had already been established by multiple judicial decisions, this public policy supports the rationality of OFAC's denial of the application.

Cubaexport also disagrees with the State Department's determination that denial of a specific license would be consistent with the policy of the United States to deny resources to the Castro regime. Pl.'s Opp. at 30-32. Cubaexport, an instrumentality of Cuba, does not dispute that it places a high value on the Havana Club mark. Accordingly, denial of the specific license is consistent with restrictions on economic transactions (such as those in the CACR) in which Cuba, or even Cuban nationals, have an interest. See, e.g., Paradissiotis, 304 F.3d at 1275.

Cubaexport argues that there is a distinction between denying assets to a Cuban national and "vesting" those assets in the United States government. As an initial matter, the characterization of OFAC's licensing decision as a "vesting" of property in the United States government is not only factually unsupportable but entirely inconsistent with Cubaexport's concession in the Takings context that OFAC did not "take title to" the Havana Club trademark. Pl.'s Opp. at 42. Moreover, the assertion that OFAC's licensing decision devalued the mark does not demonstrate that it is inconsistent with United States foreign policy. See Paradissiotis, 304 F.3d at 1275 (rejecting argument that OFAC's refusal to permit individual to exercise stock options, which subsequently expired, was inconsistent with United States policy).

Cubaexport disagrees with the decision made by OFAC based upon the foreign policy guidance of the State Department. However, given the great deference due these agencies in the

exercise of their administrative and foreign policy expertise, that disagreement does not establish

a violation of the APA.  See Regan v. Wald, 468 U.S. 222, 242 (1984).

## VI.    AS CUBAEXPORT RECOGNIZES, THE APA LIMITS THE SCOPE OF REVIEW OF AGENCY ACTION TO THE CERTIFIED ADMINISTRATIVE RECORD

In Cubaexport's response to the defendants' Statement of Undisputed Material Facts,

Cubaexport "maintains that this Court's evaluation of the decisions the Office of Foreign Assets

Control made in its July 28, 2006 letter should be based on the Administrative Record."  Pl.'s

Response at 1.  The defendants are in complete agreement with this concession, as the

administrative record is the basis for review in an APA proceeding.  Camp v. Pitts, 411 U.S. 138,

142 (1973); see also Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Holy Land

Found., 333 F.3d at 162; Marshall County Health Care Auth., 988 F.2d at 1225.  For this reason,

district courts in APA cases eschew discovery, including oral testimony, except in "very unusual

circumstances."  See American Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir.

2001).

These principles apply fully to challenges to actions taken by OFAC pursuant to TWEA

and IEEPA.  Courts reviewing challenges to actions made by OFAC pursuant to these statutes

have traditionally examined those challenges through the lens of the APA and thus strictly

limited their review to the administrative record.[13]  In Holy Land, for example, the D.C. Circuit

---

[13]    The fact that Cubaexport also asserts general constitutional challenges to OFAC's decision to deny the application for a specific license does not alter the analysis.  Courts considering challenges to OFAC actions traditionally have reviewed such challenges based on the administrative record supplied by the agency even where constitutional claims were raised. See Karpova, 402 F. Supp.2d at 470-71 (reviewing Due Process claim on the basis of the administrative record); Islamic Am. Relief Agency, 394 F. Supp.2d at 43 n.9 (rejecting discovery despite existence of constitutional claims separate from APA challenge), aff'd, 477 F.3d at 737-38.

explained that Judge Kessler had "correctly reviewed the actions of the Treasury Department

under the highly deferential 'arbitrary and capricious' standard":

> The district court noted that this standard does not allow the courts to undertake
> their own factfinding, but to review the agency record to determine whether the
> agency's decision was supported by a rational basis.

333 F.3d at 162; see also Milena Ship Mgmt. Co. v. Newcomb, 995 F.2d 620, 624 (5th Cir.

1993); Tran Qui Than v. Regan, 658 F.2d 1296, 1301 (9th Cir. 1981); Islamic Am. Relief

Agency, 394 F. Supp.2d at 43 n.9, aff'd, 477 F.3d at 737-38; Office of Foreign Assets Control v.

Voices in Wilderness, 382 F. Supp.2d 54, 63 (D. D.C. 2005); Karpova, 402 F. Supp.2d at 465.

Accordingly, the defendants agree with Cubaexport that the Court should confine its review of

the appropriateness of OFAC's decision to the administrative record, including the supplemental

declaration already filed with the Court.[14]

Despite Cubaexport's apparent agreement with these principles, they have submitted what

they describe as a "56(f)" affidavit seeking discovery in the event that the "facts . . . are

insufficient to dictate denial" of the defendants' Dispositive Motion.  Pl.'s Opp. at 27 n.21.

---------------

This is consistent with the approach taken by courts in other cases, which have held that the mere assertion of constitutional claims in a matter otherwise governed by record review does not automatically establish a right to discovery or trial de novo.  See Plaquemines Port, Harbor and Terminal Dist. v. Fed. Mar. Comm'n, 838 F.2d 536, 551 (D.C. Cir. 1988); Muwekma Ohlone Tribe v. Kempthorne, 452 F. Supp.2d 105, 113, 124 n.15 (D. D.C. 2006); Harvard Pilgrim Health Care v. Thompson, 318 F. Supp.2d 1, 12 (D. R.I. 2004).

[14]  The fact that Mr. Szubin submitted a declaration does not constitute impermissible extra-record evidence.  Mr. Szubin's declaration was submitted to provide the Court with necessary background information and a concise summary of OFAC's rationale for the decision to deny the request for a specific license to authorize payment of a filing fee to renew the Havana Club trademark.  Submission of such affidavits is not unusual in APA record review cases, see, e.g., Camp, 411 U.S. at 143 (noting that an agency's decision can be supplemented through the agency's affidavits); see also Clifford v. Pena, 77 F.3d 1414, 1418 (D.C. Cir. 1996); Voices in Wilderness, 382 F. Supp.2d at 63, and is done traditionally in the IEEPA or TWEA context.

However, the APA's limitations on discovery are not simply suggestions that can be discarded whenever a litigant wants another bite at the apple.  They confine review to the record in the absence of certain narrow exceptions.  See Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 7 (D.C. Cir. 1998) (internal citation omitted) (holding that the APA "limits review to the administrative record except when there has been a 'strong showing of bad faith or improper behavior,' or when the record is so bare that it prevents effective judicial review.").  Cubaexport does not argue that an exception applies in this case, asking instead to engage in a fishing expedition to determine whether the record contains all the relevant evidence.  Pl.'s Opp. at 27 n.21.  Such discovery would entirely vitiate the APA's traditional limitations.  See Voices in the Wilderness, 382 F. Supp.2d at 62-63 ("Were the rule otherwise, every challenge to administrative action would turn into a fishing expedition into the motives of the defendant agency."); see also Braniff Airways, Inc. v. CAB, 379 F.2d 453, 462 (D.C. Cir. 1967).

Moreover, even if discovery were appropriate in this matter, the Hubbard Declaration does not state that it cannot oppose the motion for summary judgement without discovery on "essential" facts.[15]  See FED. R. CIV. P. 56(f).  Instead, the declaration hedges, stating that discovery would be required "[i]f defendants are able to rely on statements of fact that go beyond the Administrative Record."  Hubbard Decl. at 6, 7.  However, it is entirely unclear what "extra-record" facts are being referenced.  The Hubbard Declaration cites only *two* statements of fact that are purportedly outside of either the administrative record or the Szubin Declaration—the

---

[15]  Of course, in light of Cubaexport's APA claim and the certified administrative record, even the narrow discovery permitted by Rule 56(f) is inappropriate in this case.  See Nat'l Treasury Employees Union v. Seidman, 786 F. Supp. 1041, 1046 (D. D.C. 1992) ("Plaintiffs' rule 56(f) motion is denied because it would create a new administrative record for the purpose of second-guessing the agency.").

TTAB decision and the DC litigation cited in the defendants' Statement of Undisputed Material Facts Nos. 22-25, see Hubbard Decl. at 10-11—both of which are referenced in Cubaexport's Complaint.[16]  See Compl. ¶¶ 21-23; see also Cubaexport's Statement of Undisputed Material Facts in Supp. of the Cross-Mot. for Summ. J. ¶ 2.

Accordingly, even in the absence of record review, the Hubbard Declaration is insufficient to establish the necessity for discovery pursuant to Federal Rule 56(f).  Given its limited purpose, Rule 56(f) is not a license for discovery into any matter that fits within the broad definition of relevance.  A party seeking additional discovery under the Rule must "provide reasons why [it] cannot present facts in opposition and how additional discovery will provide those facts, not simply assert that 'certain information' and 'other evidence' may exist and may be obtained through discovery."  Richardson v. Nat'l Rifle Ass'n, 871 F. Supp. 499, 502 (D. D.C. 1994); see also Exxon Corp v. FTC, 663 F.2d 120, 128 (D.C. Cir. 1980); Yager v. Carey, 910 F. Supp. 704, 731 (D. D.C. 1995).  This requirement is "designed to prevent fishing expeditions by narrowing the scope of discovery."  Hotel & Restaurant Employees Union, Local 25 v. Attorney General, 804 F.2d 1256, 1269 (D.C. Cir. 1986), vacated on other grounds, 808 F.2d 847 (D.C. Cir. 1987).

The Hubbard Declaration's request for discovery on certain facts, Hubbard Decl. at 7-10, still does not explain how the additional discovery that it requests would affect the Court's

---

[16]  Even those facts in the Szubin Declaration that Cubaexport erroneously alleges are "not part of the administrative record," are either publicly available or in fact explained in depth in the record.  See Hubbard Decl. at 10 (citing "the mission and operations of OFAC," which are supported in the Szubin declaration by citation to existing statutes and regulations, the "decisions in the HAVANA CLUB trademark litigation," which are available in the federal reporter, and "OFAC's consultations with the State Department" and "considera[tion of] the State Department's foreign policy guidance," both of which are explained in the record at A.R. 1-3.)

consideration of the issues raised by the Dispositive Motion. Moreover, Cubaexport's general discovery requests, which are not tied in any manner to the "material issues" of fact purportedly identified in the Hubbard Declaration, seek to engage in precisely the type of unlimited fishing expedition that Rule 56(f)'s requirements are designed to prevent. See Hubbard Decl., Exs. F & G. These wide-ranging and burdensome requests, served inappropriately on the defendants prior to the filing of Cubaexport's opposition[17], seek such materials as "[a]ll documents after 1997 concerning any communication between OFAC" and another party or government entity "concerning the trademark HAVANA CLUB"; "[a]ll communications concerning Section 211 within OFAC"; all documents concerning the promulgation and implementation of section 515.527(a)(1), (b) and (c); and all documents concerning "any policies, procedures, or criteria" used by OFAC relating to "the consideration or issuance of any General License or Specific License for any activity in connection with" any intellectual property right "owned or claimed to be owned by any Cuban national." See Doc. Request Nos. 2, 7, 8, 10, 12, 13; see also Interrogatory Nos. 4-6. Thus, the discovery requests are not restricted to Cubaexport, to the time period surrounding Cubaexport's application, to the regulatory provisions that are at issue in this lawsuit, or even to trademarks, let alone specifically tailored to material facts identified in the Hubbard Declaration.

Cubaexport's broad document requests and interrogatories are not designed to inquire

---

[17]  The defendants take great exception to Cubaexport's statement that the government "has refused to allow discovery." Pl.'s Opp. at 27 n.21. As demonstrated by the letters between counsel for the parties, see Hubbard Decl., Exs. H & I, counsel agreed that it was appropriate to debate the propriety of discovery in the context of the pleadings on the Dispositive Motion. As defendants argued, it was entirely inappropriate for Cubaexport to serve discovery requests on the defendants in an APA case, while a dispositive motion was pending, without filing a Rule 56(f) motion, and without conducting a Rule 26(f) conference. See id., Ex. H.

into any exceptions into the administrative record, nor are they tailored to specific factual

disputes.  Instead, they are intended to create a wholly separate record based upon unlimited

discovery.  Neither the APA, nor Rule 56(f), permit such an approach.

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that the Complaint be

dismissed or, in the alternative, that summary judgment be entered in favor of the defendants.


Dated April 13, 2007                                   Respectfully submitted,

                                                       PETER D. KEISLER
                                                       Assistant Attorney General

                                                       JEFFREY A. TAYLOR
                                                       U.S. Attorney for the District of Columbia

                                                       SANDRA M. SCHRAIBMAN
                                                       (DC Bar No. 188599)
                                                       Assistant Branch Director
                                                       Federal Programs Branch


                                                          /s/ Eric R. Womack
                                                       ERIC R. WOMACK (IL Bar No. 6279517)
                                                       Trial Attorney
                                                       U.S. Department of Justice
                                                       Civil Division
                                                       Federal Programs Branch
                                                       Washington, D.C.  20001
                                                       Tel: (202) 514-4020
                                                       Fax: (202) 616-8470

                                                       Counsel for the Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2007, I caused a true and correct copy of the foregoing

Reply Memorandum to be served on Plaintiff's counsel electronically by means of the Court's

ECF system.


　　　　　　　　　　　　　　　　　　　　　　　　　　　　　_____/s/ Eric R. Womack_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　ERIC R. WOMACK