## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

―――――――――――――――――――――
                                              )
**EMPRESA CUBANA EXPORTADORA**   )
**DE ALIMENTOS Y PRODUCTOS**        )
**VARIOS, d/b/a CUBAEXPORT,**         )
                                              )
    **Plaintiff,**                        )
                                              )
    **v.**                                    )    **Civil Action No. 06-1692 (RCL)**
                                              )
**UNITED STATES DEPARTMENT OF**    )
**TREASURY, OFFICE OF FOREIGN**     )
**ASSETS CONTROL,** *et al.***,**              )
                                              )
    **Defendants.**                    )
―――――――――――――――――――――)

### MEMORANDUM OPINION & ORDER

This matter comes before the court on defendants' motion to dismiss, or in the alternative, for summary judgment [5], and plaintiff's cross-motion for partial summary judgment [18]. The Court has considered defendants' motion [5], plaintiff's opposition thereto [17], defendants' reply [22], plaintiff's motion [18], defendants' opposition thereto [23], plaintiff's reply [25], the entire record herein, and the applicable law. For the reasons set forth below, defendants' motion is GRANTED in part and DENIED in part; plaintiff's motion is DENIED; and this matter is hereby REMANDED to the Department of Treasury for the purpose described below.

### BACKGROUND

Plaintiff Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport") is a Cuban state-owned enterprise headquartered in Havana, Cuba. (Pl.'s Compl. 3.) The Cuban Ministry of Foreign Commerce chartered Cubaexport in 1965 "for the purpose of exporting food

1

and other products." (*Id.*)  In 1974, Cubaexport adopted the HAVANA CLUB trademark and registered it in Cuba for use in connection with rum.  (*Id.*)  Two years later, it applied to register the mark in the United States, based on its existing Cuban registration, and the United States Patent and Trademark Office ("PTO") issued Registration No. 1,031,651 on January 27, 1976. (*Id.* at 3-4.)  This registration lies at the heart of the present dispute.

The United States' trade embargo against Cuba, implemented in the Cuban Asset Control Regulations ("CACR"), 31 C.F.R. part 515, precludes Cubaexport from actually using the HAVANA CLUB mark in the U.S., on rum or on any other product.  (*Id.* at 4.)  The Office of Foreign Assets Control ("OFAC"), a division of the United States Department of Treasury ("Treasury"), administers the CACR.  (*Id.* at 3.)  Both Treasury and OFAC are defendants in this suit, as are Henry M. Paulson, Jr., Secretary of the Treasury, and Adam J. Szubin, Director of OFAC, both in their official capacities.  (*Id.*)

In its complaint, Cubaexport lodges multiple claims against these defendants under the United States Constitution's Fifth Amendment and the Administrative Procedure Act and seeks declaratory and injunctive relief.  Before describing the events on which these claims rest, however, the Court must outline several relevant statutes and regulations that give context to the present dispute.

### 1. Statutory and Regulatory Framework

In pertinent part, the Trading With the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 1-44, authorizes the President to impose and administer trade embargoes during wartime.  50 U.S.C. App. § 5(b) (2007).  The President has delegated this authority to the Secretary of the Treasury, who has in turn delegated it to OFAC.  *Regan v. Wald*, 468 U.S. 222, 227 n.2 (1984).  In 1963,

when TWEA also applied to peacetime emergencies, President Kennedy adopted the CACR "to deal with the peacetime emergency created by Cuban attempts to destabilize governments throughout Latin America." *Id.* at 226. Congress later removed peacetime emergencies from TWEA's scope but permitted the President to maintain existing embargoes, including the embargo against Cuba. *Id.* at 228-29.

Generally, the CACR prohibit transactions between U.S. nationals and the Cuban government or Cuban nationals unless authorized by the Secretary of the Treasury. *See* 31 C.F.R. §§ 515.201, 515.305, 515.309 (2007). The Secretary, through OFAC, authorizes such transactions in two ways. *See id.* § 515.501. *General* licenses, codified in 31 C.F.R. part 515, subpart E, broadly authorize entire classes of transactions. *See* 31 C.F.R. §§ 501.801, 515.317 (2007). When no general license applies, "[a]ny person having an interest in a transaction or proposed transaction may file an application [with OFAC] for a [*specific*] license." *Id.* § 515.801(b)(2). The applicable regulation does not dictate how OFAC should review such applications. *See id.* § 515.801(b)(4). It provides only that "denial of a license does not preclude the reopening of an application or the filing of a further application," and that an applicant or other interested party "may at any time request explanation of the reasons for a denial by correspondence or personal interview." *Id.*

Prior to 1998, the CACR included a general license for trademark registration and renewal by Cuban nationals: "Transactions related to the registration and renewal in the United States Patent and Trademark Office . . . of . . . trademarks . . . in which the Government of Cuba or a Cuban national has an interest are authorized." 31 C.F.R. § 515.527(a) (1996). On October 21, 1998, however, in an otherwise unrelated omnibus appropriations bill, Congress exempted a

defined class of transactions from that general license.  Omnibus Consolidation and Emergency

Supplemental Appropriations Act, Pub. L. No. 105-277, § 211, 112 Stat. 2681 (1998).  The

operative provision, Section 211, states

> Notwithstanding any other provision of law, no transaction or payment shall be
> authorized or approved pursuant to [the general license] with respect to a mark, trade
> name, or commercial name that was used in connection with a business or assets that
> were confiscated unless the original owner of the mark, trade name, or commercial name,
> or the bona fide successor-in-interest[,] has expressly consented.

*Id.* § 211(a).  Thus, a Cuban national who wished to renew a trademark registration was now

required to seek a specific license from OFAC if: 1) the mark had been used in connection with

property expropriated by the Cuban government; and 2) the mark's original owner or bona fide

successor-in-interest had neither consented nor received compensation.[1]  *See id.*; 31 C.F.R. §

515.336 (2007) (defining "confiscated").

Congress directed the Secretary of the Treasury - and through him, OFAC - to

promulgate regulations implementing this exception to the general license. § 211(c), 112 Stat. at

2681-88. Accordingly, OFAC amended 31 C.F.R. section 515.527, retaining the general license

as part (a)(1) and adding part (a)(2), which reads:

> `    No transaction or payment is authorized or approved pursuant to [the general license]
> with respect to a mark, trade name, or commercial name that is the same as or
> substantially similar to a mark, trade name, or commercial name that was used in
> connection with a business or assets that were confiscated . . . unless the original owner
> of the mark, trade name or commercial name, or the bona fide successor-in-interest[,] has
> expressly consented.

31 C.F.R. § 515.527(a)(2) (2007).  OFAC did not, however, establish any procedure for

---

[1] According to defendant Szubin, OFAC's director, after Section 211's enactment, OFAC
retained "the authority to issue a specific license, should facts and circumstances and current
U.S. foreign policy militate in favor of authorizing a transaction that does not qualify for the
general license."  (Szubin Decl. 7.)

determining whether part (a)(1) or part (a)(2) applies to a given mark, and indeed, nothing in

Section 211 or the CACR expressly invests OFAC with authority to make this determination.

*See generally* § 211, 112 Stat. at 2681-88; 31 C.F.R. part 515.

    *2. Related Proceedings*

    On October 29, 1993, Cubaexport transferred its rights in the HAVANA CLUB mark to

Havana Club Holdings, Ltd. ("HCH").  (Pl.'s Compl. 5.)  HCH renewed the registration in

January 1996 for a ten-year term ending on July 27, 2006.  (Pl.'s Compl. Exs. 5, 6.)

    Thereafter, HCH filed a complaint alleging trademark infringement against Bacardi-

Martini, U.S.A. and its affiliates ("Bacardi") in the United States District Court for the Southern

District of New York.  (Pl.'s Compl. 5.)  That court determined the CACR barred Cubaexport's

attempted transfer of rights in the HAVANA CLUB registration to HCH, that Cubaexport still

owned the registration, and that HCH therefore lacked standing to prosecute the infringement

action.  (*Id.*)  *See also Havana Club Holding, S.A. v. Galleon S.A.*, 974 F. Supp. 302, 306-11

(S.D.N.Y. 1997).  Ultimately concluding HCH lacked any rights in the HAVANA CLUB mark,

the court entered judgment for Bacardi.  62 F. Supp. 2d 1085 (S.D.N.Y. 1999).  On appeal, the

Second Circuit affirmed, 203 F.3d 116 (2d Cir. 2000), and the U.S. Supreme Court denied

HCH's petition for certiorari, 531 U.S. 918 (2000).[2]

    Meanwhile, Bacardi had instituted a cancellation proceeding against HCH before the

PTO's Trademark Trial and Appeal Board ("TTAB").  (Pl.'s Compl. 6.)  It now claimed that

because HCH, not Cubaexport, had renewed the mark's registration, the renewal must be

---

    [2] Defendant Szubin avers that OFAC "is, and has been, aware of findings made" in this series of decisions, particularly "concerning the connection between the Havana Club trademark and assets confiscated by the Cuban government."  (Szubin Decl. 8.)

ineffective.  (*Id.*)  The TTAB joined Cubaexport as a defendant and ultimately dismissed

Bacardi's cancellation petition on January 29, 2004, concluding that the renewed registration

was valid.  (*Id.* at 6-7.)  Bacardi appealed this decision, and its appeal remains pending before

another court in this district.  (*Id.* at 7.)  *See also Bacardi & Co., Ltd. v. Empresa Cubana

Exportadora de Alimentos y Productos Varios*, No. 04-00519, Order Maintaining Stay [74]

(D.D.C. July 25, 2007) (Sullivan, J.).

     Cubaexport retained the law firm Fish & Neave to represent it in the cancellation

proceeding.  (Pl.'s Compl. 10.)  On application to OFAC, Fish & Neave received specific

licenses enabling it to receive payment for its legal services and permitting its attorneys to travel

to Cuba in connection with the representation.  (*Id.*)  In early 2005, Ropes & Gray LLP merged

with Fish & Neave and sought to renew its legal and travel licenses.  (A.R. 85-88, 99-100.)

OFAC issued both licenses, which were valid through March 31, 2006.  (*Id.* at 85-88.)

     The legal license, CU-74488, reads: "Pursuant to an application dated January 26, 2005,

the following transactions are hereby licensed: SEE REVERSE."  (*Id.* at 85.)  On the reverse

side, the license states: "All transactions are authorized to enable the Licensee, in connection

with the legal representation of [Cubaexport] and [HCH] in legal proceedings in the United

States related to the HAVANA CLUB trademark, *as described in the application*, to receive

payment for such services . . . from Cuban nationals."  (*Id.* at 86 (emphasis added).)  The cited

application, a letter from Ropes & Gray to OFAC, refers to "a complaint [] currently pending in

the U.S. District Court for the District of Columbia against our clients Cubaexport and [HCH]"

and describes a then-pending motion in that case.  (*Id.* at 89.)

     *3. Cubaexport's Attempted Renewal*

*a. Cubaexport's Application to the PTO*

On December 13, 2005, Ropes & Gray applied to renew Cubaexport's HAVANA CLUB registration on its client's behalf. (*Id.* at 61-66.) In his cover letter to the PTO, attorney Vincent Palladino explained as follows: "Payment of the filing fee is being made pursuant to License No. CU 74488 issued by [OFAC] on March 4, 2005 . . . in order to maintain the *status quo* by maintaining Registration No. 1,031,651 until a decision regarding cancellation of the registration can be rendered in ongoing litigation . . . ." (*Id.* at 61.) Palladino's letter then described the ongoing proceeding in this district, before Judge Sullivan. (*Id.* at 61-64.)

Palladino also offered the following rationale for "maintain[ing] the *status quo*":

[N]o final unappealable decision [on Bacardi's cancellation petition] will be rendered before [Cubaexport's registration] must be renewed.

If [that registration] is not maintained, the Court will be denied an opportunity to reach a reasoned decision as to whether the registration should be cancelled, as Bacardi claims, or whether the Board correctly dismissed the Cancellation Petition, as Cubaexport contends. That will, moreover, deprive Cubaexport of the representation Ropes & Gray has been authorized to provide . . . .

That outcome would be and would be perceived to be unfair . . . Effectively overruling the Board Decision while it is on appeal to the Court by declining to maintain the *status quo* would be inappropriate. On the other hand, if the registration is maintained . . . the Court remains free to decide whether the Board Decision should be affirmed or reversed.

Paying the renewal fee will not dictate the outcome . . . but failing to pay it might.

(*Id.* at 63-64.) Palladino submitted a letter to OFAC containing nearly identical language, also on December 13, 2005. (*Id.* at 58-60.) On February 27, 2006, approximately one month prior to its March 31 expiration date, Ropes & Gray applied to renew License No. CU-74488. (*Id.* at 56-57.

*b. OFAC's Letter of April 6, 2006*

7

OFAC responded to the first of these two letters on April 6, 2006. (*See id.* at 54-55.) Barbara Hemerslee, then OFAC's acting director, declared that License No. CU-74488 - which, by that point, had officially expired - "does not authorize Ropes & Gray LLP to pay a filing fee to the [PTO] for renewal of [Cubaexport's registration]." (*Id.* at 54.) Quoting the license's language in full, Hemerslee noted that its authorization extended *only* to transactions connected with the legal representation described in Ropes & Gray's January 26, 2005 application, which referred only to the pending district court proceeding. (*Id.*) She described renewal as "a separate action before the PTO" and stated that payment of a renewal fee would be "external to the pending District Court litigation." (*Id.* at 55.) Hemerslee continued:

> We note that this discussion does not in any way prejudice the ability of Ropes & Gray LLP to request separate authorization from OFAC to engage in transactions related to the renewal of the HAVANA CLUB trademark registration at the PTO. If you wish to request such a specific license or further guidance from OFAC, you may do so by writing directly to OFAC's Licensing Division.

(*Id.*) Hemerslee sent a copy of this letter to the PTO. (*See id.*)

The following day, April 7, Ropes & Gray applied for a separate specific license as suggested in Hemerslee's letter. (*Id.* at 51-53.) Palladino reiterated the arguments detailed above and added that

> in light of OFAC's willingness to grant License No. CU-74488, authorizing payment for large legal and other expenses incurred on Cubaexport's behalf in maintaining the HAVANA CLUB Registration, it would be reasonable to authorize Ropes & Gray to incur and be paid for the minor expense ($500 or less) of maintaining the registration through payment of the renewal fee.

(*Id.* at 52.) Palladino reminded OFAC of the registration's July 27, 2006 expiration date, asked that the requested license be issued promptly "so that the PTO may be so advised," and copied the letter to the PTO. (*Id.* at 53.)

8

On April 10, OFAC renewed Ropes & Gray's travel and legal licenses for the district court litigation, (*see id.* at 47-50), but it did not act on the April 7 application until July 28, (*see id.* at 3). The Administrative Record includes various correspondence that passed in the interim.[3]

    *c. OFAC's Letter of July 28, 2006*

---

[3] On May 9, Bacardi's attorney Oscar Garibaldi of Covington & Burling, wrote to OFAC to oppose Ropes & Gray's specific license application. (*See id.* at 43-46.) Citing Section 211, Garibaldi argued that renewal of the HAVANA CLUB registration "would contradict the policies underlying the Cuban embargo [as well as] long-standing principles of international law and U.S. public policy." (*Id.* at 43.) He quoted 31 C.F.R. section 515.527 and contended that "renewal of the HAVANA CLUB Registration falls squarely within the prohibition set out in paragraph (a)(2)." (*Id.* at 44.) To support this claim, Garibaldi alleged the HAVANA CLUB mark was "identical" to that owned by Jose Arechebala, S.A. ("JASA"), a Cuban rum business whose assets were expropriated by the Cuban government in 1960. (*Id.*) Garibaldi further claimed JASA never received compensation for this confiscation and that neither it nor Bacardi, its bona fide successor-in-interest, had consented to Cubaexport's registration or renewal of the mark. (*Id.*) Finally, Garibaldi accused Cubaexport of making false statements in prior license applications and addressed specific arguments in Palladino's April 7 cover letter. (*Id.* at 45-46.) Notably, that letter does not list Garibaldi or his firm as a recipient. (*See id.* at 53.)

    Meanwhile, Palladino and a second Bacardi attorney, William Golden of Kelley, Drye, & Warren, sent alternating missives to the PTO, debating whether it should renew Cubaexport's registration despite the ruling in OFAC's April 6 letter. (*See id.* at 6-44.) On June 14, Palladino argued: 1) the PTO should not look beyond the statutory renewal requirements in the Lanham Act; 2) even if it does, it should renew Cubaexport's registration based on the general license; 3) renewal would further the CACR's underlying purposes, whereas denial would involve impermissible retroactive application of Section 211; 4) Section 211 does not apply to the HAVANA CLUB mark; and 5) Bacardi's intrusion into the *ex parte* renewal process was improper. (*Id.* at 37-42.)

    On June 27, Golden responded, contending that: 1) the CACR bind all federal agencies, and in any event, to fulfill the Lanham Act's fee requirement, Cubaexport needs a specific license; 2) the general license does not apply to Cubaexport because its mark was confiscated, and neither JASA nor Bacardi has consented; 3) denying renewal would further at least one of the CACR's underlying purposes and would create no retroactivity problem; 4) Section 211 *does* apply to the HAVANA CLUB mark; and 5) as the original owner's bona fide successor-in-interest and a pending registrant of the HAVANA CLUB mark, Bacardi was a legitimately interested party. (*Id.* at 12-17.)

    Palladino fired back on June 29, and Golden answered on July 5, both presenting largely similar arguments. (*See id.* at 6-11.) On July 20, the PTO notified Ropes & Gray that based on OFAC's April 6 letter, it considered the renewal filing fee unpaid. (Pl.'s Compl. Ex. 21.)

OFAC finally responded to Palladino's April 7 letter the day after Cubaexport's registration had expired.  (*See* A.R. 3.)  J. Robert McBrien, Hemerslee's successor as OFAC Acting Director, wrote as follows:

> Pursuant to the [CACR], administered by [OFAC], renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed.
>
> OFAC has been engaged in consultation with relevant agencies in the U.S. Government, including the Department of State ("State") on this issue.  We have received guidance from State informing us that it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark.  Accordingly, your request is hereby denied.

(*Id.*)  OFAC's current director, defendant Szubin, avers that such "[i]nteragency coordination is a critical part of the process of administering sanctions," and "[a]s a general practice," OFAC consults the Department of State on "license applications for which there is no established practice of issuance or denial."  (Szubin Decl. 12.)

Cubaexport notified the PTO of OFAC's decision on August 1, again urging it to grant renewal regardless.  (Pl.'s Compl. Ex. 23.)  Two days later, the PTO formally denied Cubaexport's renewal application, stating that "accordingly, the registration will be cancelled/expired."  (Pl.'s Compl. Ex. 24.)

### 4. Cubaexport's Complaint

Cubaexport filed the present complaint [1] along with twenty-four attached exhibits on September 29, 2006.  It named Treasury, OFAC, and their respective directors, Secretary Henry M. Paulson, Jr., and Adam J. Szubin, as defendants.  The complaint raises four claims: three assert defendants trespassed on rights plaintiff enjoys under the United States Constitution, and the fourth alleges violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

10

Count I states that defendants deprived Cubaexport of procedural due process by "determining that Cubexport is not authorized to renew its U.S. HAVANA CLUB Registration and effectively directing the PTO to cancel that registration by refusing to renew it . . . without allowing Cubaexport the opportunity to be heard on the applicability of [certain regulations] . . . as well as on [underlying] core factual issues." (Pl.'s Compl. 17-18.)  Counts II and III allege that Section 211 and 31 C.F.R. § 515.527, both on their face and as applied by OFAC to Cubaexport, violate substantive due process and "constitute [an uncompensated] regulatory taking of Cubaexport's protected property interest."  (*Id.* at 19.)  Cubaexport thus raises five, interrelated claims under the United States Constitution's Fifth Amendment.  *See* U.S. Const. amend. V ("No person shall be . . . deprived of . . . property without due process of law; nor shall private property be taken for public use, without just compensation.").

In Count IV, Cubaexport alleges OFAC's "determinations" in its April 6 and July 28, 2006 letters violated the APA in that they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; without observance of procedure required by law; and unwarranted by the facts." (Pl.'s Compl. 19-20.)  Cubaexport cites three specific findings: 1) Barbara Hemerslee's April 6 ruling that license CU-74488 did not authorize Ropes & Gray to pay Cubaexport's renewal fee, (Pl.'s Compl. 12); 2) McBrien's July 28 finding that Cubaexport could not renew its trademark unless specifically licensed to do so, (*id.* at 14); and 3) McBrien's July 28 denial of a specific license to renew the mark, (*id.*).  For clarity, the Court will refer to these as three separate claims under the APA.

On December 21, defendants moved [5] to dismiss for lack of subject matter jurisdiction

and failure to state a claim, or in the alternative, for summary judgment.  The motion to dismiss for lack of subject matter jurisdiction pertains only to the constitutional claims.  Cubaexport opposed [17] defendants' motion on March 16, 2007, appending three declarations that reference twenty-six additional exhibits.  That same day, Cubaexport cross-moved [18] for summary judgment as to its APA claims.  On April 13, defendants replied to Cubaexport's opposition [22] and filed their own opposition to Cubaexport's cross-motion [23].  On May 4, Cubaexport replied to defendants' opposition [25].  The case was reassigned to this Court on May 29, 2007.

## DISCUSSION

The Court will first consider the parties' cross-motions for summary judgment as to Cubaexport's APA claims before discussing Cubaexport's constitutional claims.

### I. Plaintiff's APA Claim: Applicable Law

*A. Summary Judgment Standard*

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" suitable for trial.  Fed. R. Civ. Pro. 56(c).  The substantive law on which the claim or defense rests dictates whether a factual issue is "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Such an issue is "genuine" if its resolution could establish an essential element of the nonmoving party's challenged claim or defense. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

In seeking to identify such issues, the court must accept the nonmoving party's evidence as true and must draw "all justifiable inferences" in his favor. *Anderson*, 477 U.S. at 255.

12

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions, not those of a judge . . . ." *Id.* at 255. Yet "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Id.* at 252. As under "the 'reasonable jury' directed verdict standard," the court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or . . . is [instead] so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 250-51.

### B. APA Standard of Review

Courts reviewing agency actions under 5 U.S.C. section 706 must "hold unlawful and set aside agency action, findings, and conclusions" found to meet one of six iterated standards. 5 U.S.C. § 706 (2007). Courts should overturn agency actions that are, *inter alia*: 1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" 2) unconstitutional; 3) "without observance of procedure required by law;" or 4) "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." *Id.*

In assessing agency action against these standards, a court should "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* Yet a "presumption of regularity" applies to agency actions, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) [hereinafter *Overton Park*], and courts should uphold them so long as a "rational connection between the facts found and the choice made" exists, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). This connection need not be clearly articulated but merely reasonably discernible. *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974).

13

When applying the "arbitrary and capricious" standard, in particular, a court should

ascertain whether

> the Agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* The court should not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, it should simply ensure

that whatever the agency's decision, "the process by which [the agency] reaches that result [is]

logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).

When a "finding is not sustainable on the administrative record," the court should remand to the

agency for further consideration. *Camp v. Pitts*, 411 U.S. 138, 141 (1973)

### C. APA Scope of Review

The APA does not require agencies to hold hearings or to make formal findings of fact

when rendering many decisions. *Cf.* 5 U.S.C. §§ 553-557 (2007); *Camp*, 411 U.S. at 141. As

such, when no other applicable law requires a hearing, "the focal point for judicial review [of

agency action under the APA] should be the administrative record already in existence, not some

new record made initially in the reviewing court." *Id.* at 142.

When that record fails to adequately explain the challenged action, a court may also

consider agency affidavits or testimony representing "contemporaneous explanation of the

agency decision."[4] *Id.* at 142-43; *Commercial Drapery Contractors, Inc. v. United States*, 133

---

[4] In its "Response and Counterstatement" to defendants' statement of undisputed material facts, Cubaexport seeks discovery of numerous factual issues, including: "how, if at all, OFAC

F.3d 1, 7 (D.C. Cir. 1998) [hereinafter *Commercial Drapery*] (court may require agency to

supplement a "record [that] is so bare that it prevents effective judicial review").  Moreover,

> [i]f the reviewing court finds it necessary to go outside the administrative record, it
> should consider evidence relevant to the substantive merits of the agency action only for
> background information . . . or for the limited purposes of ascertaining whether the
> agency considered all of the relevant factors or fully explicated its course of conduct or
> grounds for decision.

*Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981).

## II. Plaintiff's APA Claim: Analysis

As noted above, Cubaexport alleges three OFAC "determinations" violated the APA in

that they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law; contrary to constitutional right, power, privilege, or immunity; without observance of

procedure required by law; and unwarranted by the facts."  (Pl.'s Compl. 19-20.)  The Court will

---

took into account Cuba's alleged 'confiscation' of JASA's business in 1960 in making its
ruling," (Pl.'s Resp. ¶ 25); "OFAC's use of Bacardi's alleged ownership of the HAVANA CLUB
trademark in making its July 28, 2006 ruling," (*id.* ¶ 33); OFAC's practice regarding interagency
coordination, in particular with the Department of State, and its contact with the PTO, (*id.* ¶ 63);
and the factors OFAC considered in making the two rulings embodied in its July 28 letter, (*id.* ¶
78-81, 83, 86-87, 91-93, 96).

"[W]hen there has been a 'strong showing of bad faith or improper behavior,'" an APA
plaintiff *may* be entitled to discovery.  *Commercial Drapery Contractors, Inc. v. United States*,
133 F.3d 1, 7 (D.C. Cir. 1998) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401
U.S. 402, 420 (1971)); *Office of Foreign Assets Control v. Voices in the Wilderness*, 382 F.
Supp. 2d 54, 62-63 (D.D.C. 2005) (Bates, J.).  Yet this standard has thus far proven virtually
impossible for plaintiffs to meet.  *See, e.g., James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d
1085, 1095 (D.C. Cir. 1996) (conclusory statements in three affidavits that agency personnel
were hostile, unwilling to correct errors, and apparently predisposed to make adverse findings
not sufficient); *Voices in the Wilderness*, 382 F. Supp. at 62 (plaintiff's allegations of improper
motive "rested entirely on" delay in final agency action and its coincidence with plaintiff's anti-
war protest and thus were insufficient).

Before authorizing "a fishing expedition into the motives of the defendant agency," this
Court will order OFAC to clarify its own decision-making process.  *See id.* at 63.

examine each of these in turn.

### 1. Existing Specific License Does Not Authorize Renewal

In OFAC's April 6, 2006 letter, Barbara Hemerslee, then OFAC's acting director, ruled that License No. CU-74488 "does not authorize Ropes & Gray LLP to pay a filing fee to the [PTO] for renewal of [Cubaexport's registration]." (A.R. 54.) The license reads: "Pursuant to an application dated January 26, 2005, the following transactions are hereby licensed: SEE REVERSE." (*Id.* at 85.) The reverse side states: "All transactions are authorized to enable the Licensee, in connection with the legal representation of [Cubaexport] and [HCH] in legal proceedings in the United States related to the HAVANA CLUB trademark, *as described in the application*, to receive payment for such services . . . from Cuban nationals." (*Id.* at 86 (emphasis added).) Hemerslee interpreted this license as extending *only* to transactions connected with the legal representation described in Ropes & Gray's January 26, 2005 application, which referred only to "a complaint [] currently pending in the U.S. District Court for the District of Columbia against our clients Cubaexport and [HCH]." (*Id.* at 54, 89.)

The parties dispute neither the substance of Hemerslee's finding nor the language of the license and underlying application, all of which are included in the Administrative Record. Rather, they disagree as to how this language should be interpreted. As such, no factual dispute exists, and summary judgment is appropriate.

Cubaexport contends Hemerslee's interpretation of CU-74488 was "contrary to the plain language of that license." (Pl.'s Opp. 20.) This statement is, quite simply, wrong. The license expressly applies only to representation in proceedings "described in the application." (A.R. 86.) That application refers only to Bacardi's appeal from the TTAB's denial of its cancellation

16

petition, now pending before Judge Sullivan. (*See id.* at 89.) The license's "plain language" thus authorizes Ropes & Gray to represent Cubaexport in that proceeding - and nothing more.

Cubaexport next argues that "OFAC's decision is inconsistent with its prior license decisions and manifestly unreasonable." (Pl.'s Opp. 20.) On this theory, renewal was necessary to avoid mooting the ongoing litigation to which CU-74488 applied. (*Id.*) Cubaexport thus seeks to persuade this Court that renewal is necessarily a transaction connected "with the legal representation of [Cubaexport]" in the proceeding before Judge Sullivan. This argument also fails.

First, as a general matter, the Court owes OFAC significant deference in interpreting its own regulatory authority. *Consarc Corp. v. United States Treasury Dep't, Office of Foreign Assets Control*, 71 F.3d 909, 914 (D.C. Cir. 1995) (challenge "must either demonstrate that [a] statute clearly forbids the agency's interpretation or that the interpretation is unreasonable"). In interpreting its own regulations, OFAC merits even greater deference. *Id.* at 915. Consequently, OFAC's interpretation of the operative language in CU-74488 - language that OFAC, itself, crafted - must be virtually above reproach. Hemerslee characterized renewal as a "a separate action before the PTO . . . external to the pending District Court litigation," (*id.* at 55), and on the plain language of the license, her conclusion is not unreasonable.

Second, more particularly, Cubaexport's argument, carried to its logical endpoint, reads CU-74488 to authorize Ropes & Gray to represent Cubaexport in innumerable judicial and administrative proceedings. "Maintaining the *status quo*" would as easily extend to defense of other cancellation proceedings and prosecution of infringement actions as to renewal. This

interpretation opposes the very nature of a *specific* license. The CACR provide that "[a]ny person having an interest in a transaction or proposed transaction [with a Cuban national] may file an application [with OFAC] for a [specific] license authorizing such transaction" - not one authorizing such transaction *and any and all related transactions.* *Id.* § 515.801(b)(2).

Hence, the Court concludes Hemerslee's ruling that CU-74488 does not authorize Ropes & Gray to renew the HAVANA CLUB registration on Cubaexport's behalf was both reasonable and fully warranted by the facts. Defendants are entitled to summary judgment on Cubaexport's first APA claim.

### 2. Renewal Prohibited Unless Specifically Licensed

OFAC's July 28 letter states: "Pursuant to the [CACR], administered by [OFAC], renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed." (A.R. 3.) As Cubaexport observes, this ruling necessarily presumes that "renewal of the HAVANA CLUB registration is *not* authorized pursuant to the General License." (Pl.'s Opp. 22.) Layering a second inference atop the first, Cubaexport then contends OFAC applied Section 211 and 31 C.F.R. section 515.527(a)(1) in reaching this conclusion and that it did so improperly. (*See id.* at 22-23.)

But as Cubaexport, itself, concedes, *nowhere* in the Administrative Record does OFAC *explicitly state* that the general license was inapplicable *or* that it believed Section 211 and 31 C.F.R. section 515.527(a)(1) compelled such a conclusion. (*Id.* at 23.) OFAC Director Szubin's declaration reveals that OFAC was "aware of findings made in a June 1999 decision by the U.S. District Court in the Southern District of New York . . . concerning the connection between the Havana Club trademark and assets confiscated by the Cuban government," (Szubin Decl. 8-9);

18

and that OFAC "consider[ed] . . . the implementation of Section 211," along with "the State Department's foreign policy guidance" and "the facts and circumstances of this case," before concluding that "a specific license should not be issued to Cubaexport," (*id.* at 13). Szubin does not, however, disclose that OFAC concluded the HAVANA CLUB mark had been confiscated and that Section 211 therefore exempted it from the general license.

Defendants' brief is equally non-committal: "[*T*]*o the extent* that the April 6, 2006, letter from OFAC *could be construed* as a determination of Cubaexport's inability to qualify for a general license . . . that determination would not be clearly forbidden." (Def.'s Mem. Supp. Mot. 36 (emphasis added).) Defendants also assert that "OFAC's statement in the July 28, 2006, letter was supported by the findings of two federal courts . . . [and that] OFAC's reliance on the findings in this litigation should [] come as no surprise to Cubaexport . . . ." (Def.'s Reply 15.) Again, defendants imply, but do not quite admit, that OFAC applied Section 211 and concluded the general license did not apply to the HAVANA CLUB mark.

OFAC may well have done just that, but neither the Administrative Record nor the Szubin declaration clearly articulates the reasoning process it followed. Its determination that "renewal of the HAVANA CLUB trademark . . . would be prohibited unless specifically licensed," (A.R. 3), affected Cubaexport adversely. The PTO evidently relied on it in rejecting Cubaexport's renewal application. (*See* Pl.'s Compl. Exs. 21-24.) Moreover, the CACR themselves provide a standard against which the Court may evaluate whether OFAC's determination was "arbitrary and capricious." *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985). To do so, however, the Court must first understand how that determination was made.

Accordingly, as set forth below, the Court declines to grant summary judgment to either

party as to Cubaexport's second APA claim.  Rather, the Court orders defendant OFAC to

supplement the Administrative Record with evidence elucidating the contemporaneous reasons

for its decision that "renewal of the HAVANA CLUB trademark . . . would be prohibited unless

specifically licensed."  In particular, OFAC should address whether it concluded Cubaexport

could not rely on the general license in 31 C.F.R. § 515.527(a)(1), and if so, how and why it

determined the exception in part (a)(2) embraced Cubaexport's HAVANA CLUB registration.

Further, it should explain what process Cubaexport was afforded with respect to this particular

determination.

### 3. Specific License to Renew Denied

In OFAC's July 28, 2006 letter, its then-Acting Director J. Robert McBrien denied Ropes

& Gray's application for a specific license to renew Cubaexport's registration of the HAVANA

CLUB mark on its behalf.  (A.R. 3.)  McBrien articulated the agency's reasoning as follows:

> OFAC has been engaged in consultation with relevant agencies in the U.S. Government, including the Department of State ("State") on this issue.  We have received guidance from State informing us that it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark.  Accordingly, your request is hereby denied.

(*Id.*)  Defendant Szubin declares that "[i]nteragency coordination is a critical part of the process

of administering sanctions," and "[a]s a general practice," OFAC consults the Department of

State on "license applications for which there is no established practice of issuance or denial."

(Szubin Decl. 12.)

The vehicle for the State Department's dispositive "guidance," an unclassified fax

received earlier that day, elaborates as follows:

>The State Department has evaluated this referral in light of a number of factors, including the particular facts of the case, the United States' Cuba policy, and U.S. policy with regard to the domestic and international protection of intellectual property rights. Denial of the license application would be consistent with the U.S. approach toward non-recognition of trademark rights associated with confiscated property. Also, to the extent that registration of the trademark in this case has current or potential financial value to the Cuban government, denial of the license would be consistent with the recommendations of the Commission for Assistance to a Free Cuba and the policy of the United States to deny resources to the Castro regime in order to hasten a transition to democracy in Cuba.

(*Id.* at 4-5.)

Cubaexport argues that because the policies referenced in the State Department's fax are not identified in OFAC's letter, they should be "disregarded . . . as purely post-hoc rationales," (*id.* at 30); that OFAC and the State Department nevertheless misinterpreted and misapplied those policies, (*id.* at 30-32); and that having authorized Cubaexport to incur significant legal fees in defending the cancellation proceeding, it was "inconsistent and unreasonable" for OFAC to effectively render Cubaexport's further participation in that proceeding moot, (*id.* at 33).[5]

As alluded to above, no regulation or statute governs OFAC's specific licensing decisions. *See* 31 C.F.R. § 515.801(b)(4) (describing specific license application and issuance process without any explanation of how licensing decisions are or should be made). It is a fundamental tenet of judicial review that when a court reviews an action or decision, it must do so against some standard. Cubaexport asks this Court to judge whether OFAC's denial of a

---

[5] Cubaexport also contends OFAC's July 28 letter "falls woefully short of the APA's requirement of a reasoned explanation" but does not cite a relevant APA provision. (Pl.'s Opp. 28.) When agency decisions are subject to judicial review, courts do typically require a reasoned explanation. *See, e.g.*, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998); *Camp*, 411 U.S. at 141. But as the Court concludes OFAC's specific licensing decisions under the CACR are not reviewable, this requirement does not apply here.

specific license was consistent with U.S. foreign policy and its own prior licensing decisions. Neither presents a justiciable standard of review.

The APA subjects agency action to judicial review "*except* where there is a statutory prohibition on review or where 'agency action is committed to agency discretion by law.'" *Overton Park*, 401 U.S. at 410 (emphasis added) (quoting 5 U.S.C. § 701 (1964 ed. Supp. V)). This latter exception, though "very narrow," embraces "those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* (quoting S. Rep. No.752, at 26 (1945)). "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to review agency action for 'abuse of discretion.'" *Heckler*, 470 U.S. at 830. Courts may glean such standards not only from statutes and regulations but also from formal and informal policy statements that "create binding norms by imposing rights or obligations on the respective parties." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2000). "As a general rule, an agency pronouncement is transformed into a binding norm" if the statement's language, context, and available extrinsic evidence indicate the agency so intended. *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1981).


As an initial matter, no provision in either the TWEA nor the CACR prescribes any procedure for OFAC to follow, any factors for it to consider, or any standard to which it should adhere in issuing specific licenses. *See* 50 U.S.C. App. §§ 1 *et seq.*, 1701 *et seq.*; 31 C.F.R. §§ 515.316, 515.318, 515.501 (CACR); *id.* § 501.801(b). Indeed, Cubaexport does not allege any statutory or regulatory constraint on OFAC's discretion in such matters exists.

Hence, the Court must ascertain whether OFAC's prior statements or decisions

22

constituted "binding norms" to which it can now be held.  *See Padula*, 822 F.2d at 100.  On this point, Cubaexport offers an estoppel argument: because OFAC had issued several specific legal and travel licenses to Ropes & Gray and its predecessor to defend the TTAB proceeding and subsequent district court appeal, OFAC should reasonably have authorized Ropes & Gray to "preserve the *res* at issue in [that] litigation."  (Pl.'s Opp. 32.)

Each of these prior licenses, however, applied particularly to Cubaexport's defense against Bacardi's cancellation petition, and had OFAC denied renewal of the existing legal license, Cubaexport's argument might be more persuasive.  (*See* Pl.'s Compl. Exs. 7-15.) Previously, Cubaexport had sought - and OFAC had granted - only permission to pay Cubaexport's legal counsel to defend its *already-acquired* property rights in its *existing* HAVANA CLUB registration.  (*See* Pl.'s Compl. Exs. 7-15.)  Cubaexport had never before sought a specific license to renew the HAVANA CLUB mark and to thus *extend its rights in the mark for another ten years*.  *See* 15 U.S.C. § 1059(a) ("each registration may be renewed for periods of 10 years").  (*Cf.* Pl.'s Compl. Ex. 1 (Cubaexport's 1974 registration application, with no license attached or referenced); Pl.'s Compl. Ex. 5 (HCH's 1996 renewal application, referencing the general license)).  A fundamental difference exists between a license to defend existing property rights and one to acquire additional property rights.  As such, the Court finds that denying a specific license to renew a trademark registration on its expiration is not inconsistent with licensing defense of that registration prior to its expiration.

Cubaexport also asks the Court to review OFAC's licensing decision in light of U.S. foreign policy, both as articulated in the State Department's fax and as presented by Cubaexport. (Pl.'s Opp. 29-32; Pl.'s Compl. 17.)  Our Constitution commits foreign policy to the sound

discretion of the political branches, and federal courts do not evaluate foreign policy decisions' wisdom or consistency.  *See*, *e.g.*, *Wald*, 468 U.S. at 242 ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)).  The instant case highlights why: this Court is in no position to second-guess the State Department's interpretation of policies *it formulates* and to challenge its recommendations thereon.

Accordingly, because no justiciable standard for evaluating OFAC's specific licensing decisions exists, the Court concludes "'agency action is committed to agency discretion by law.'" *Overton Park*, 401 U.S. at 410.  Defendants are thus entitled to summary judgment as to Cubaexport's third APA claim.

## III. Plaintiff's Constitutional Claims

"It is a fundamental rule of judicial restraint," that courts should "not reach constitutional questions in advance of the necessity of deciding them."  *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Eng'g*, 467 U.S. 138, 157 (1984).  Cubaexport's three as applied constitutional claims all assume, as an antecedent fact, that OFAC *actually applied* Section 211 and 31 C.F.R. § 515.527(a)(2) to Cubaexport.[6] (*See* Pl.'s Compl. 18, 19.)  Cubaexport also

---

[6] Count I states, in relevant part: "Defendants deprived Cubaexport of its protected property interest without allowing [it] the opportunity to be heard on the applicability of Section 211 and its implementing regulation . . . ."  (Pl.'s Compl. 18.)  Count II states: "Section 211 and 31 C.F.R. § 515.527 . . . as applied by OFAC in the April 6, 2002 OFAC Letter and July 28, 2006 OFAC Letter . . . [violate] the Due Process Clause of the Fifth Amendment."  (*Id.* at 19.)  Count III reads: "Section 211 and 31 C.F.R. § 515.527 . . . as applied by OFAC . . . constitute [an uncompensated] regulatory taking of Cubaexport's protected property interest."  (*Id.*)

presents a facial attack on the statute and its implementing regulation, (*see id.* at 19), but unless OFAC applied them to Cubaexport, any injury Cubaexport suffered would not be "fairly traceable" to the challenged measures, as standing doctrine requires.[7]  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Given its treatment of plaintiff's second APA claim, the Court declines to pass on its constitutional claims, and to that extent, defendants' motion is denied without prejudice.

## CONCLUSION

For the forgoing reasons, this Court concludes plaintiff's evidence presents no genuine issue of material fact as to its first APA claim, and defendants are entitled to judgment as a matter of law.  Accordingly, the Court grants defendants' motion for summary judgment on that claim.  The Court also grants summary judgment for defendants as to plaintiff's third APA claim because it concludes that OFAC's specific licensing decisions are not subject to judicial review.  As to plaintiff's second APA claim, however, the Court remands to the agency for the limited purpose described above, and both parties' motions for summary judgment are consequently denied as to

---

[7] Federal courts derive their subject matter jurisdiction from Article III of the United States Constitution, which empowers them to hear only certain "cases" or "controversies."  U.S. Const. art. III § 2.  Though "[s]tanding doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction," the doctrine's core component arises directly from Article III and implements its jurisdictional circumscription.  *Allen v. Wright*, 468 U.S. 737, 751 (1984).  At its "irreducible constitutional minimum," standing doctrine mandates three elements: 1) "the plaintiff must have suffered an 'injury in fact' . . . which is concrete and particularized . . . and [] 'actual or imminent'[;]" 2) this injury must be "fairly traceable" to the defendant's challenged conduct; and 3) the injury must also be reparable by the relief sought.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Even when unquestioned by the parties, a federal court must itself assure these constitutional requirements are met at all times during the pendency of a case.  *See, e.g.*, *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986); *Juidice v. Vail*, 430 U.S. 327, 331 (1977).  *See also* Fed. R. Civ. Pro. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

that claim.  Finally, as stated, the Court declines to pass on constitutional questions unnecessarily, and defendants' motion is therefore denied as to these claims.  It is therefore

ORDERED that defendant's motion for summary judgment [5] is GRANTED in part and DENIED in part, without prejudice; it is further

ORDERED that plaintiff's cross-motion for partial summary judgment [18] is DENIED without prejudice; it is further

ORDERED that this matter is remanded to the Department of the Treasury for the limited purpose of supplementing the administrative record in a manner consistent with this opinion; it is further

ORDERED that the Court shall retain jurisdiction over this matter and shall require the Department to file a supplement to the record by November 27, 2007; it is further

ORDERED that once the Department has so supplemented the record, the case will be automatically reopened, and a briefing schedule will be set for the filing of dispositive motions.


SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, September 27, 2007.