## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS d/b/a/CUBAEXPORT, ) ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 1:06CV01692 (RCL) |
| v. ) ) | Hon. Royce C. Lamberth |
| UNITED STATES DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL, HENRY M. PAULSON, JR., as Secretary of Treasury, ADAM J. SZUBIN, as Director of the Office of Foreign Assets Control, and THE UNITED STATES, ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
### ON ITS SECOND AND THIRD APA CLAIMS

Pursuant to Federal Rule of Civil Procedure 56, plaintiff Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a/ Cubaexport ("Cubaexport") hereby moves for summary judgment with respect to the second and third claims it has brought pursuant to the Administrative Procedure Act ("APA"). The second claim challenges OFAC's July 28, 2006 decision that a provision in an omnibus budget bill (denominated "Section 211") prohibits payment in the United States Patent and Trademark Office of the fee required to renew Cubaexport's U.S. Registration No. 1,032,651 of the HAVANA CLUB & Design trademark. The third claim challenges OFAC's July 28, 2006 decision refusing to grant a specific license authorizing payment of the fee.

Those claims were the subject of dispositive motions.  On September 27, 2007, this Court granted defendants summary judgment on the third APA claim and declined to grant either party summary judgment with respect to the second APA claim because it was not clear whether OFAC had considered the Section 211 general license exception.  This Court ordered OFAC to supplement the administrative record with evidence elucidating the contemporaneous reasons for its decision; whether the decision relied on Section 211; if it did, how OFAC made the determination that Section 211 prohibits payment of the renewal fee; and what process Cubaexport was afforded with respect to that determination.  *See* 2007 Dist. LEXIS 71363, at *14-15.

Cubaexport is entitled to summary judgment with respect to its second APA claim. OFAC's supplementation of the administrative record makes clear that the agency (i) did not give Cubaexport notice that it would rule on the applicability of Section 211 and (ii) based its decision on a misreading of opinions in a New York case between Bacardi and Havana Club Holding, S.A. to which Cubaexport was not even a party; the *allegations* of Cubaexport's rival, Bacardi, in *Bacardi & Co., Ltd.* v. *Cubaexport*, *Civ. No.* 04-00519 (D.D.C. 2004) ("the D.C. Action"); and the unproven assertions of Bacardi's lawyers that their client is the successor in interest to rights Jose Arechabala, S.A. ("JASA") surrendered decides before Bacardi purported to acquire them.

This Court also should revisit its decision granting defendants summary judgment with respect to Cubaexport's third APA claim and vacate OFAC's July 28, 2006 denial of Cubaexport's request for a specific license authorizing renewal of the HAVANA CLUB registration.  After inviting Cubaexport to seek a specific license, OFAC based the specific license denial on the general license prohibition in Section 211 while ignoring the facts set forth in the license application.  Section 211 does not authorize the grant or denial of specific licenses,

and reliance on it dooms the denial just as it does OFAC's general license decision.  Even if

Section 211 had not been considered, the license denial should be vacated because it runs afoul

of both the authority conferred on OFAC by the Trading With The Enemy Act and agency's own

consistent policy of preserving Cuban assets in accordance with that authority.


Dated:  July 23, 2008                                    Respectfully submitted,

                                                         */s/ Peter M. Brody*
                                                         Peter M. Brody (D.C. Bar No. #398717)
                                                         ROPES & GRAY LLP
                                                         One Metro Center
                                                         700 12th Street, N.W.
                                                         Washington, D.C.  20005
                                                         Tel. (202) 508-4600
                                                         Fax (202) 508-4650

                                                         Vincent N. Palladino
                                                         ROPES & GRAY LLP
                                                         1211 Avenue of the Americas
                                                         New York, New York  10036
                                                         Tel. (212) 596-9000
                                                         Fax (212) 596-9090

                                                         *Counsel for Plaintiff,*
                                                         *Empresa Cubana Exportadora de Alimentos*
                                                         *y Productos Varios, d/b/a Cubaexport*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS d/b/a/CUBAEXPORT, | ) ) ) ) |
| Plaintiff, | ) Civil Action No. 1:06CV01692 (RCL) ) |
| v. | ) ) Hon. Royce C. Lamberth |
| UNITED STATES DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL, HENRY M. PAULSON, JR., as Secretary of Treasury, ADAM J. SZUBIN, as Director of the Office of Foreign Assets Control, and THE UNITED STATES, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
## FOR SUMMARY JUDGMENT ON ITS SECOND AND THIRD APA CLAIMS

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................1

II.  STATEMENT OF FACTS ...................................................................................5

     A.   Registration And Renewal Of The HAVANA CLUB Trademark
          Pursuant To OFAC's General License ....................................................5

     B.   OFAC Amends The General License .......................................................7

     C.   OFAC Licenses Cubaexport To Defend The HAVANA CLUB
          Registration In The D.C. Action...........................................................10

     D.   The July 28, 2006 Ruling Precludes Renewal of The HAVANA
          CLUB Registration Despite The Specific Defense License ...................11

     E.   Cancellation of The HAVANA CLUB Registration ...............................13

     F.   OFAC's July 28, 2006 Interpretation Of The Amended Regulation
          Adjudicates Cubaexport's Rights ..........................................................13

     G.   The Specific License Denial Was Based On Section 211 .......................18

III. THIS COURT SHOULD GRANT CUBAEXPORT SUMMARY
     JUDGMENT WITH RESPECT TO THE SECOND APA CLAIM...............20

     A.   This Court Should Vacate The July 28, 2006 General License
          Decision Even If The Amended Regulation Is Valid .............................22

          1.   The Decision Was Arbitrary And Capricious ................................22

          2.   The Decision Is Not Entitled To Deference ...................................29

     B.   This Court Should Vacate The Decision Because The Amended
          Regulation Is Invalid.............................................................................31

IV.  THIS COURT SHOULD GRANT CUBAEXPORT SUMMARY
     JUDGMENT WITH RESPECT TO THE THIRD APA CLAIM....................34

     A.   This Court Should Vacate The Specific License Denial Because
          OFAC Relied On Section 211 ...............................................................34

     B.   This Court Should Vacate The Specific License Denial Even If OFAC
          Did Not Consider Section 211 ...............................................................38

     C.   It Is Appropriate To Vacate The Specific License Denial.......................44

V.   CONCLUSION .................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967) .................................................................................................... 39

*AFL-CIO v. Chao*,
    409 F.3d 377 (D.C. Cir. 2005) ................................................................................... 40

*Aid Ass'n for Lutherans v. U.S. Postal Service*,
    321 F.3d 1166 (D.C. Cir. 2003) ................................................................................. 39

*Alaska Airlines v. CAB*,
    545 F.2d 194 (D.C. Cir. 1976) ................................................................................... 32

*Alaska Prof'l. Ass'n.* v. *FAA*,
    177 F.3d 1030 (D.C. Cir. 1999) ................................................................................. 36

*\*Am. Airways Charters, Inc. v. Regan*,
    746 F.2d 865 (D.C. Cir. 1984) ............................................................................. passim

*Bacardi & Co., v. Cubaexport*,
    Civ. No. 04-00519 (D.D.C. 2004) ......................................................................... passim

*Balt. & Annapolis R.R. v. WMATC*,
    642 F.2d 1365 (D.C. Cir. 1980) .................................................................... 30, 32, 41

*Blackwell Coll. v. U.S.*,
    454 F.2d 928 (D.C. Cir. 1971) ................................................................................... 34

*Bowen v. Michigan Academy of Family Physicians*,
    476 U.S. 667 (1986) .................................................................................................... 39

*Canales v. Paulson*,
    2007 U.S. Dist. LEXIS 50924 (D.D.C. July 16, 2007) .............................................. 44

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................................... 20

*Cernuda v. Heavy*,
    720 F. Supp. 1544 (S.D. Fla. 1989) ........................................................................... 22

*Chevron v. NRDC*,
  467 U.S. 837 (1984)..................................................................................30

*Clifford v. Pena*,
  77 F.3d 1414 (D.C. Cir. 1996) ...................................................................40

*Color. River Indian Tribes v. NIGC*,
  383 F. Supp. 2d 123 (D.D.C. Cir. 2005),
  aff'd 466 F.3d 134 (D.C. Cir. 2006) .........................................................31

*\*Columbia Broad. Syst. v. FCC*,
  454 F.2d 1018 (D.C. Cir. 1971) ......................................................... passim

*Cubaexport* v. *U.S. Dep't of Treasury*,
  516 F.Supp.2d 43 (D.D.C. 2007) ....................................................... passim

*D.C. Federation of Civic Associations v. Volpe*,
  459 F.2d 1231 (D.C. Cir. 1971).............................................................38, 41

*Dart v. U.S.*,
  848 F.2d 217 (D.C. Cir. 1988) ...................................................................39

*\*DeCuellar v. Brady*,
  881 F.2d 1561 (11th Cir. 1989) ............................................................10, 40

*Dellums v. Powell*,
  566 F.2d 231 (D.C. Cir. 1977)...................................................................34

*Department of the Treasury v. FLRA*,
  43 F.3d 682 (D.C. Cir. 1994)...............................................................38, 41

*Dominion Cogin v. District of Columbia*,
  878 F. Supp. 258 (D.D.C. 1995)...............................................................26

*Ehrman v. U.S.*,
  429 F. Supp. 2d 61 (D.D.C. 2006)........................................................38, 44

*El Rio v. Dept. of Health*,
  300 F. Supp. 2d 32 (D.D.C. 2004),
  *aff'd*, 396 F.3d 1265 (D.C. Cir. 2005) ...............................................30, 32

*Envtl. Defense Fund v. Ruckelshaus*,
  439 F.2d 584 (D.C. Cir. 1971)...................................................................21

*Galleon, S.A. v. Havana Club Holding, S.A.*,
  2004 TTAB LEXIS 38 (Jan. 29, 2004) .............................................. passim

*Geiger* v. *Brown*,
   419 F.2d 714 (D.C. Cir. 1969) .............................................................................22

*Gonzales v. Freeman*,
   334 F.2d 570 (D.C. Cir. 1964) ...........................................................................3, 34

*\*Gonzalez v. Oregon*,
   546 U.S. 243 (2006).............................................................................................3, 29

*Gulf Power Co. v. FERC*,
   983 F.2d 1095 (D.C. Cir. 1993) ..............................................................................45

*Halperin v. Kissinger*,
   606 F.2d 1192 (D.C. Cir. 1979) ..........................................................................36, 43

*Havana Club Holding, S.A. v. Galleon S.A.*,
   203 F.2d 116 (2d Cir. 2000)...............................................................................14, 34

*Havana Club Holding, S.A. v. Galleon, S.A.*,
   961 F. Supp. 498 (S.D.N.Y. 1997)......................................................................40, 43

*Havana Club Holding, S.A. v. Galleon, S.A.*,
   974 F. Supp. 302 (S.D.N.Y. 1997)................................................................28, 42, 43

*Haynesworth v. Miller*,
   820 F.2d 1245 (D.C. Cir. 1987) ...............................................................................34

*Heckler v. Cheney*,
   470 U.S. 821 (1985)..................................................................................................38

*Hispanic Info. & Telecomms. Network, Inc. v. FCC*,
   865 F.2d 1289 (D.C. Cir. 1989) ...............................................................................44

*Int'l Union v. U.S. Dept. of Labor*,
   358 F.3d 40 (D.C. Cir. 2004) ...................................................................................32

*IPT Co. v. Brady*,
   1994 WL 613371 (S.D.N.Y. Nov. 4, 1994) ..............................................................40

*Jordan v. Am. Eagle Fire Ins.*,
   169 F.2d 281 (D.C. Cir. 1948)........................................................................20, 33, 34

*Karmargo Corp. v. FERC*,
   852 F.2d 1392 (D.C. Cir. 1988) ...............................................................................44

*Kidd Commc'ns v. FCC*,
   427 F.3d 1 (D.C. Cir. 2005) ................................................................................38, 41

*Logan v. Zimmerman Brush Co.,
   455 U.S. 422 (1982).........................................................................................................33

McCarthy v. Madigan,
   503 U.S. 140 (1992).........................................................................................................21

McKart v. U.S.,
   395 U.S. 185 (1969).........................................................................................................21

*Michigan v. EPA,
   268 F.3d 1075 (D.C. Cir. 2001) ................................................................................39, 42

Miranda v. Sec'y of Treasury,
   766 F.2d 1 (1st Cir. 1985)......................................................................................39, 41, 42

Mobile Commc'ns v. FCC,
   77 F.3d 1399 (D.C. Cir. 1996) .......................................................................................36

N.Y. York Cross Harbor R. R. v. STB,
   374 F.3d 1177 (D.C. Cir. 2004) ....................................................................................41

NAACP v. NAACP Legal Defense & Educ. Fund,
   753 F.2d 131 (D.C. Cir. 1985) ......................................................................................27

Nasem v. Brown,
   595 F.2d 801 (D.C. Cir. 1979) ..................................................................................3, 29

Nat. Treasury Employee's Union v. FLRA,
   848 F.2d 1273 (D.C. Cir. 1988) ....................................................................................41

Nielsen v. Secretary of Treasury,
   424 F. 2d 833 (D.C. Cir. 1970) .........................................................................39, 40, 43

Orion Reserves v. Norton,
   2006 WL 1126810 (D.D.C. March 31, 2006).................................................................34

Palicio y Compania, S.A. v. Brush,
   256 F. Supp. 481 (S.D.N.Y. 1966);
   aff'd, 375 F.2d 1011 (2d Cir. 1967) .........................................................................26, 27

Pearson v. Shalala,
   164 F.3d 650 (D.C. Cir. 1999) .......................................................................................29

Philadelphia Co. v. SEC,
   175 F.2d 808 (D.C. Cir. 1948), vacated as moot 337 U.S. 901 (1949) .....................24, 29, 32

Pro Fitness Physical Therapy Cir. v. Pro-Fit Orthopedic,
   314 F.3d 62 (2d Cir. 2002)............................................................................................27

v

*Pro-Football, Inc. v. Harjo*,
  2008 U.S. Dist. LEXIS 52622 (D.D.C. June 25, 2008) ........................................33

*Purepac Phar. Co. v. Thompson*,
  238 F. Supp. 2d 191 (D.D.C. 2002),
  *aff'd*, 354 F. 3d 877 (D.C. Cir. 2004) ................................................................32

*Ramaprakash v. FAA*,
  346 F.3d 1121 (D.C. Cir. 2003) ........................................................................39

*Real v. Simon*,
  510 F.2d 557 (5th Cir. 1975) ............................................................................31

*Regan v. Wald*,
  468 U.S. 222 (1984) ..........................................................................10, 31, 39, 42

*Roberts v. Harvey*,
  441 F. Supp. 2d 111 (D.D.C. 2006) ..................................................................44

*Satellite Broad. Co. v. FCC*,
  824 F.2d 1 (D.C. Cir. 1987) ..............................................................................22

*Stockstrom v. Comm'r of Internal Revenue*,
  190 F.2d 283 (D.C. Cir. 1951) ....................................................................24, 36

*Sunshine Anthracite Coal Co. v. Adkins*,
  310 U.S. 381 (1940) ..........................................................................................41

*Transactive Corp. v. Rubin*,
  91 F.3d 232 (D.C. Cir. 1996) ............................................................................41

*U.S. Dept. of the Air Force v. FLRA*,
  952 F.2d 446 (D.C. Cir. 1991) ..........................................................................41

*Uncas Mfg. Co. v. Clark & Cooms Co.*,
  200 F. Supp. 831 (D.R.I. 1962),
  *aff'd on other grounds*, 309 F.2d 818 (1st Cir. 1962) ......................................27

*United States v. Florida East Coast R. Co.*,
  410 U.S. 224 (1973) ..........................................................................................32

*United States v. Utah Constr. & Mining Co.*,
  384 U.S. 394 (1966) ................................................................................3, 23, 29

*Uritsky v. Newcomb*,
  2004 WL 1125203 (D. Mass. May 19, 2004) ....................................................45

*Weyburn v. FCC*,
  984 F.2d 1220 (D.C. Cir. 1993) ................................................................26

*Whalen v. Abell*,
  48 F.3d 1247 (D.C. Cir. 1995) .................................................29, 30, 43

*Williams Natural Gas Co. v. FERC*,
  872 F.2d 438 (D.C. Cir. 1989) ................................................................31

*WLOS TV, Inc. v. FCC*,
  932 F.2d 993 (D.C. Cir. 1991) ..............................................................4, 44

*\*Zittman v. McGraph*,
  341 U.S. 471 (1951) .............................................................................31, 42

## STATUTES

5 U.S.C. § 706(2)(C) ...............................................................................40

15 U.S.C. § 1059 ........................................................................12, 19, 26

15 U.S.C. § 1059(a) ...................................................................................7

15 U.S.C. § 1126 .......................................................................................7

22 U.S.C. §§ 1643 *et seq.* .......................................................................33

22 U.S.C. §§ 1643a(b), 1643b(a), 1643c(a) ............................................33

22 U.S.C. § 1643b(a) ..............................................................................25

50 U.S.C. App. § 1 *et seq.* ........................................................................5

International Claims Settlement Act of 1949 ..........................................25

## OTHER AUTHORITIES

31 C.F.R. § 501.801(b)(4) .......................................................................39

31 C.F.R. 515 ..................................................................................1, 6, 12

31 C.F.R. §§ 515.317-.318 .........................................................................6

31 C.F.R. §515.318 .................................................................................17

31 C.F.R. § 515.336 ........................................................................................8, 25

31 C.F.R. § 515.527 (1963) ............................................................................ passim

31 C.F.R. section 515.527(a)(1)................................................................13, 35, 36, 37

31 C.F.R.§ 515, 527(a)(2) .............................................................................. passim

31 C.F.R. § 515.801(b)(4)..................................................................................39

60 Fed. Reg. 54,194, 54,196 (Oct. 20, 1995)...............................................................6

Fed. R. Civ. P. 54(b) ........................................................................................34

Fed. R. Civ. P. 56(c) ........................................................................................20

3 *J. Thomas McCarthy, Trademarks and Unfair Competition* § 20:76 (4th ed. 2008) .................33

*Pierce, Administrative Law* § 1.5 (4th ed. 2002) .........................................................32

*Pierce, Administrative Law* §11.5 (4th ed. 2002) .................................................26, 38

*Pierce, Administrative Law Cumulative Supplement* (2007)........................................29

*Schwartz, Administrative Law* § 10:15 (3d ed. 1991) .................................................32

*Schwartz, Administrative Law* § 5.8 (3d ed. 1991) ...................................................32

*Schwartz, Administrative Law* § 7.18 (3d ed. 1991) ..................................................24

*Wright, Miller & Cooper, Federal Practice and Procedure* § 4475 (2d ed. 2002)...........29, 30, 43

\* Authorities which we chiefly reply upon are marked with an asterisk.

## I.    <u>INTRODUCTION</u>

This is the second time this case has been before this Court on dispositive motions.  As this Court will recall, Count IV of the Complaint alleged that three decisions of the Office of Foreign Assets Control ("OFAC") violated the Administrative Procedure Act ("APA"). Cubaexport challenged (1) OFAC's April 6, 2006 decision that a specific OFAC license to defend Cubaexport in litigation involving its HAVANA CLUB & Design trademark did not authorize payment in the United States Patent and Trademark Office ("USPTO") of the fee required to renew Cubaexport's U.S. Registration No. 1,032,651 of that trademark; (2) OFAC's July 28, 2006 decision that renewal of Cubaexport's HAVANA CLUB & Design trademark registration "would be prohibited unless specifically licensed" (AR 1); and (3) OFAC's July 28, 2006 decision refusing to grant a specific license authorizing payment of the fee.  Cubaexport also alleged in Counts I-III  that OFAC's conduct deprived it of procedural and substantive due process and constituted a taking of property in violation of the U.S. Constitution.

Both parties made dispositive motions.  On September 27, 2007, this Court granted summary judgment in favor of defendants with respect to the first and third of Cubaexport's APA challenges and denied without prejudice the government's summary judgment motion on the constitutional claims.  This Court denied defendants' motion on Cubaexport's second APA challenge and remanded to OFAC to explain its July 28, 2006 letter ruling.  In particular, this Court stated:

> OFAC may well have [based that ruling on Section 211 of the 1998 Omnibus Consolidated and Supplemental Appropriations Act and 31 C.F.R.§ 515, 527(a)(2)], but neither the Administrative Record nor the Szubin declaration clearly articulates the reasoning process it followed....  Accordingly... defendant OFAC [is ordered] to supplement the Administrative Record with evidence elucidating the contemporaneous reasons for its decision that "renewal of the HAVANA CLUB trademark ... would be prohibited unless specifically licensed." In particular, OFAC should address whether it concluded Cubaexport could not rely on the general license in 31 C.F.R. § 515.527(a)(1), and if so, how and why it

determined the exception in part (a)(2) embraced Cubaexport's HAVANA CLUB
registration.  Further, it should explain what process Cubaexport was afforded
with respect to this particular determination.

*Cubaexport* v. *U.S. Dep't of Treasury*, 516 F.Supp.2d 43, 56-57 (D.D.C. 2007).

In response to this Court's order, OFAC supplemented the administrative record with a

second declaration of its director Adam J. Szubin and nothing else.  The declaration makes plain

that the agency (i) did not advise Cubaexport that it would rule on the applicability of Section

211 while Cubaexport's April 7, 2006 specific license application was pending and (ii) based its

decision on a misreading of opinions in a New York case between Bacardi and Havana Club

Holding, S.A. to which Cubaexport was not even a party; the *allegations* of Cubaexport's rival,

Bacardi, in *Bacardi & Co., v. Cubaexport*, Civ. No. 04-00519 (D.D.C. 2004) ("the D.C.

Action"); and the unproven assertions of Bacardi's lawyers that their client is the successor in

interest to rights Jose Arechabala, S.A. ("JASA") surrendered decades before Bacardi purported

to acquire them.

OFAC's general license decision should be seen for what it really is:  a diktat effectively

deciding a commercial dispute between two foreign companies, Cubaexport and Bacardi,

disguised as an agency's interpretation of a generally applicable regulation.  The United States

itself has recognized that "[trademark] ownership … *is* disputed under ... Section 211.

Section 211 requires a decision maker to consider ... numerous 'ownership' issues ... [including

whether] the trademark ... [was] used with ... confiscated assets ... and whether the original

owner ... has consented to its registration."  Declaration of Vincent N. Palladino ("VNP Decl.")

Exh. 20.  Although OFAC purported to resolve these issues, neither the regulation implementing

Section 211 nor OFAC's decision making process provides anything remotely resembling

judicial or quasi-judicial process.

This Court should vacate OFAC's general license decision. OFAC's resolution of Section 211 issues – including notably its reliance on Bacardi's bald assertions in lieu of evidence – was arbitrary and capricious. *See Columbia Broad. Syst. v. FCC*, 454 F.2d 1018, 1027 (D.C. Cir. 1971) (reversing agency denial of broadcast license). Moreover, the decision is not entitled to deference from this Court because the regulation it purports to interpret merely parrots the legislation – Section 211(a)(1) – that the regulation should clarify and particularize. *See Gonzalez v. Oregon*, 546 U.S. 243, 257 (2006) ("An agency does not acquire special authority to interpret its own words when ... it has elected merely to paraphrase the statutory language.").

Further, vacating the decision will assure that the USPTO renews the HAVANA CLUB registration so that the D.C. Action may proceed. OFAC's non-adjudicative ruling should not be allowed to preclude Judge Sullivan from addressing the Section 211 questions that Bacardi has raised in that case. *See Nasem v. Brown*, 595 F.2d 801, 806-07 (D.C. Cir. 1979), citing *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966).

OFAC's general license decision also should be set aside because, without adequate justification or any quasi-judicial process whatsoever, the amended trademark registration renewal regulation deprives Cubaexport – and Cubaexport alone – of the registration renewal right OFAC itself first conferred on the Republic of Cuba and its nationals in 1963. *See Gonzales v. Freeman*, 334 F.2d 570 (D.C. Cir. 1964) (procedures accorded party in connection with license withdrawal held inadequate under APA).

This Court also should grant Cubaexport summary judgment with respect to its third APA claim and vacate OFAC's July 28, 2006 denial of Cubaexport's request for a specific license authorizing renewal of the HAVANA CLUB registration. That license denial was not an

unreviewable foreign policy decision. Instead, OFAC simply adopted the State Department's view that the general license prohibition in Section 211, implemented in OFAC's own amended regulation, requires denial of Cubaexport's specific license request.

Section 211 does not authorize the grant or denial of specific licenses, and reliance on it dooms the denial just as it does OFAC's general license decision. Even if Section 211 had not been considered, the license denial should be vacated because it runs afoul of both the authority conferred on OFAC by the Trading With the Enemy Act ("TWEA") and the agency's own consistent policy of preserving Cuban assets in accordance with that authority. And OFAC's willingness to entertain Bacardi's intervention in the specific licensing process justifies "ordering the [agency] to grant [a] license." *WLOS TV, Inc. v. FCC*, 932 F.2d 993, 998 (D.C. Cir. 1991) (Silberman, J., concurring).

OFAC's general and specific license rulings reveal an agency bending to pressure from Bacardi and its political allies and improperly taking sides in a private commercial dispute between Bacardi and its rival Cubaexport. Whereas the Commerce Department, including the USPTO, steadfastly resisted that pressure, OFAC stooped to the political winds. It uncritically adopted as a regulation the bare bones language of Section 211 that Bacardi authored; applied that regulation to the HAVANA CLUB registration without notice to Cubaexport or a meaningful opportunity to be heard; relied on Bacardi's undocumented assertions in reaching its general license decision and, in turn, based denial of a specific TWEA license on the general license prohibition in Section 211; substituted another agency's views for an assessment of the facts even though that meant violating its own TWEA mandate and policy; and in the process all but handed Bacardi a victory in the D.C. Action where Cubaexport's rival has yet to prove any of

its claims.  To this course of conduct, the language of precedent readily applies.  *Columbia Broad. Syst., Inc.*, 454 F.2d at 1027:

> The rule of law is intended to eliminate the appearance as well as the reality of arbitrariness, and if the public's faith in its administrative agencies is to be maintained, it is imperative that these agencies act in a wholly rational, logical fashion, completely free from even the appearance of bias, prejudice and improper influence....  The Commission's handling of this case does not mark its finest hour....  Under the circumstances, its arbitrary action may not stand.

This Court should vacate OFAC's general and specific license decisions and allow the applicability of Section 211 to be addressed in the D.C. Action.  This, in turn, will avoid the need for this Court to decide the constitutional challenges that Cubaexport has raised in Counts I-III of the Complaint.  Vacating OFAC's decisions does not require this Court to decide whether Section 211 applies to the HAVANA CLUB registration, second guess OFAC's conclusion that it does, or take sides in the dispute between Cubaexport and Bacardi as OFAC improperly did.  This Court need only determine whether OFAC acted arbitrarily or otherwise in excess of its authority.  Those questions are ripe for resolution on Cubaexport's motion for summary judgment, which should be granted.  Granting Cubaexport's motion will not determine whether the HAVANA CLUB registration ultimately remains registered.  It simply will allow that issue to be addressed in the D.C. Action, where both Bacardi and Cubaexport can avail themselves of judicial process and where OFAC itself has licensed Cubaexport to plead its case.

## II.    STATEMENT OF FACTS

### A.    Registration And Renewal Of The HAVANA CLUB Trademark Pursuant To OFAC's General License

As the government states, OFAC was established, and the Cuban Asset Control Regulations ("CACR") were promulgated, in 1963 under the authority of the TWEA, 50 U.S.C. App. § 1 *et seq.*  Pursuant to the CACR, transactions in the United States involving Cuban-owned property are prohibited unless a transaction is authorized by OFAC.  31 C.F.R. § 515,

subpt. B.  As the government notes, such authorization may take one of two forms:  a "general license" or a "specific license."  31 C.F.R. §§ 515.317-.318.  A general license is one stated in the regulations and covering a type or category of transactions.  Specific licenses are granted by OFAC for specific transactions, on a case-by-case basis, upon the filing of an application. A specific license is not needed for a transaction authorized under a general license.

From the outset, the CACR included a general license provision authorizing the registration *and renewal* of registrations of trademarks owned by the Republic of Cuba and its nationals – that is, the General License.  The original General License thus authorized the "filing in the [USPTO] of applications for ... [trademark] registration[s]" and "the receipt of ... trademark registration certificates ... or renewal certificates granted pursuant to any such applications in which any designated national has at any time on or since the 'effective date' had any interest."  31 C.F.R. § 515.527 (1963).

In 1995, OFAC amended and clarified the General License to state *inter alia* as follows:

Transactions related to a registration and renewal in the United States Patent and Trademark Office or the United States Copyright Office of patents, trademarks, and copyrights in which the Government of Cuba or a Cuban national has an interest are authorized.

31 C.F.R. § 515.527 (1996); *see* 60 Fed. Reg. 54,194, 54,196 (Oct. 20, 1995).

In the early 1970's, Cubaexport, a company formed in 1965 to market Cuban products internationally, began exporting rum to other countries under a trademark consisting of the words HAVANA CLUB and an original design not previously used.  After registering that trademark in Cuba, Cubaexport, under the authority of the U.S. Trademark Act and the General License, filed an application with the USPTO to register its HAVANA CLUB & Design trademark in the

United States.[1]  Complaint ("Compl.") Ex. 1.  In 1976, the USPTO issued U.S. Trademark

Registration No. 1,031,651 of HAVANA CLUB & Design to Cubaexport.  Compl. Ex. 2.

Under the Trademark Act, a trademark registration automatically may be renewed after a

fixed number of years, "upon payment of the prescribed fee and the filing of a written

application."  15 U.S.C. § 1059(a).  Because the initial term of the HAVANA CLUB registration

was 20 years, the registration was due for renewal in 1996.[2]  Meanwhile, Cubaexport had

assigned the trademark and U.S. registration to another Cuban company called Havana Rum &

Liquors, S.A. ("HRL"), which in turn had assigned it to a company called Havana Club Holding,

S.A. ("HCH").  VNP Decl. Exh. 30.  Accordingly, when the registration was due for renewal,

HCH timely filed a renewal application with the USPTO under OFAC's General License, and

the registration was renewed for an additional ten-year period until January 27, 2006 when it

again could be renewed.  Compl. Ex. 5.

**B.    OFAC Amends The General License**

For thirty-five years, OFAC's General License to renew trademark registrations made no

exception for trademarks associated with businesses allegedly confiscated by the Republic of

Cuba.  Then, in 1998 Bacardi persuaded a few members of Congress to orchestrate enactment of

Section 211(a)(1),[3] which purported to withdraw the long standing right to renew a trademark

registration under certain circumstances:

---

[1] Although the United States' embargo on trade with Cuba precluded Cubaexport from selling rum under the HAVANA CLUB & Design trademark in this country, Section 44 of the U.S. Trademark Act permits registration of a mark in the U.S. based on a foreign registration, without the prerequisite of actual use of the mark in commerce. 15 U.S.C. § 1126.

[2] In 1989, the Trademark Act was amended to fix the initial term for new registrations at 10 years.

[3] At Bacardi's urging a few members of Congress were able to secure passage of Section 211, which "was tucked away in [a] massive omnibus spending bill. ... The provision was slipped into the 4000-page omnibus bill to help Bacardi-Martini with the right to market a ... rum under the Havana Club name." *Hidden Provision Sparks New Dispute Over Cuba*, Cuba News (Miami Herald Publishing Co. November, 1998).  VNP Decl. Exh. 6.

> Notwithstanding any other provision of law, no transaction or payment shall be authorized or approved pursuant to section 515.527 of title 31 ... with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name, or commercial name, or the *bona fide* successor-in-interest has expressly consented.

Section 211(c) further instructed the Secretary of the Treasury, acting through OFAC, to "promulgate such rules and regulations as are necessary to carry out the provisions of this section."

Operating pursuant to Section 211, not its TWEA authority, OFAC parroted Section 211(a)(1) when it amended its regulation to read:

> No transaction or payment is authorized or approved pursuant to paragraph (a)(1) of this section with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated, as that term is defined in § 515.336, unless the original owner of the mark, trade name, or commercial name, or the *bona fide* successor-in-interest has expressly consented.[4]

Other than the sponsors of Section 211, few if any members of Congress likely were aware of that provision, which was buried in a "16-inch tall, 40-pound document." [5]  There were no hearings on Section 211 conducted by either the Senate or the House and no legislative history to mark its passage.  Further, whereas "the President has consistently determined that the exercise of his authorities *under TWEA* with respect to Cuba is in the national interest of the United States" (Szubin 2006 Decl. ¶8; emphasis added), the executive has made no such determination with respect to Section 211.

---

[4]  *See* Szubin 2007 Decl. ¶ 7 (the amended regulation "incorporated the limitations on the general licensing provision mandated by Section 211").  "Szubin 2007 Decl." refers to the November 26, 2007 Declaration of Adam J. Szubin.  "Szubin 2006 Decl." refers to the December 21, 2006 Declaration of Adam J. Szubin.

[5]  *House Passes Spending Bill:  Massive Omnibus Measure Larded With Pet Projects*, Washington Post, Oct. 21, 1998.  VNP Decl. Exh. 2.  As Representative Peter A. Defazio commented at the time, "Heck, half the members couldn't even lift [the bill], let alone read it."  VNP Decl. Exh. 2.  Similarly, Sen. Robert C. Byrd (West Virginia) put it:  "Do I know what's in this bill?... Are you kidding?  No.  Only God knows what's in this monstrosity."  *Id.*

Although couched in general language, Section 211 and the amended regulation that copies it actually are aimed at one and only one trademark: HAVANA CLUB. "[D]ubbed the 'Bacardi Bill,'"[6] Section 211 "was specifically pushed by Bacardi-Martini U.S.A., a competitor of HCH for the right to use the Havana Club trademark."[7] "[S]ection 211 benefits one foreign company alone... Bacardi, Inc."[8] Further evidence of Section 211's selective focus is its timing[9] and failure to mention patents and copyrights.[10]

Despite Section 211 and the amended regulation, the Republic of Cuba and Cuban nationals other than Cubaexport have continued to register and renew their trademarks in the U.S.[11] For example, only four months before OFAC decided that 31 C.F.R. § 515.527 prohibits renewal of the HAVANA CLUB rum registration, another Cuban company, Havana Rum & Liquors, S.A., renewed its CANEY & Design rum registration. VNP Decl. Exh. 1 at A1. The renewal of those other Cuban registrations is consistent with OFAC's long standing policy of

---

[6] *Bacardi's Cuban Rumble Spills Into U.S.*, The Wall Street Journal, August 17, 2006. VNP Decl. Exh. 3.

[7] *Budget Bill Would Shut Off Trade With Some Cuban Joint-Ventures: Spending Provision Likely to Draw Fire from EU*, Inside U.S. Trade, October 23, 1998 at 19. VNP Decl. Exh. 4.

[8] Statement of the Honorable Larry Craig, Testimony to Senate Committee on the Judiciary, July 13, 2004. VNP Decl. Exh. 5. *Accord Hidden Provision Sparks New Dispute Over Cuba*, Cuba News (Miami Herald Publishing Co. November, 1998). VNP Decl. Exh. 6. Similarly, after the WTO ruled that Section 211 violates international law, Bacardi proposed to amend the legislation. An aide to Senator Byrd advised the USPTO that "Bacardi ... says this fix will probably apply only to [HAVANA CLUB] ... [Therefore] I think I will recommend no objection.... [W]ho cares about the WTO anyway? ... Don't worry about finding out who is counsel to Havana Club." VNP Decl. Exh. 7.

[9] Section 211 was enacted in 1998 while Bacardi was engaged in U.S. litigation involving the HAVANA CLUB trademark. If Congress believed that trademarks associated with businesses allegedly confiscated by the Republic of Cuba should not be registered and renewed, it logically would have acted in the early 1960's soon after the alleged confiscations occurred. Instead, in 1963 OFAC authorized the Republic of Cuba and its nationals to register and renew trademarks without regard to confiscation.

[10] 31 C.F.R. § 515.527 authorized "[t]ransactions related to the registration and renewal ... of patents, trademarks, and copyrights." If Section 211 was a principled response to the Republic of Cuba's alleged confiscation of its own citizens' property, rather than narrowly targeted legislation, it logically would have addressed patents and copyrights as well as trademarks.

[11] *See* VNP Decl. Exh. 1. These include registrations of trademarks for rum and other alcoholic beverages, as well as registrations obtained or maintained from 2005 to 2007 for these or other products. VNP Decl. Exh. 1 at A1-A31. Indeed, in 2004 the Republic of Cuba itself renewed for the second time a U.S. trademark registration it has owned since 1963 – the very year the executive instituted the trade embargo with Cuba pursuant to its TWEA authority. *See* VNP Decl. Exh. 1 at A16.

preserving Cuban property. "The OFAC Director explained that it has been a consistent policy to keep 'all Cuban assets blocked, pending a decision or settlement regarding all claims against Cuba. Eventually, all blocked assets will be disposed of in accordance with an overall plan.' "[12] That policy, of course, comports with the scope of the executive's TWEA power that Congress put in place more than thirty years ago.[13]

Although Section 211 and the amended regulation require adjudication of ownership[14] and target Cubaexport, they were promulgated without any input from Cubaexport, much less an opportunity for Cubaexport to litigate the propriety of revoking the company's registration renewal right. Neither the statute nor the amended regulation provides any procedures for determining whether they apply to the registration, including whether a confiscation occurred, whether consent was ever granted and whether there exists any successor in interest from whom consent needs to or can be obtained decades after the confiscation allegedly occurred.

C.    **OFAC Licenses Cubaexport To Defend
The HAVANA CLUB Registration In The D.C. Action**

In addition to procuring Section 211, Bacardi filed a petition to cancel Cubaexport's HAVANA CLUB registration, thereby initiating an *inter partes* administrative litigation before the USPTO's Trademark Trial and Appeal Board ("TTAB"). *See Galleon, S.A. v. Havana Club Holding, S.A.,* Cancellation No. 92024108, 2004 TTAB LEXIS 38, at *31-32 (TTAB Jan. 29, 2004). Bacardi subsequently filed an Amended and Supplemental Petition, which the TTAB dismissed in its entirety in January 2004. *Id.* at *32, *69. Bacardi appealed that decision in the D.C. Action. OFAC has granted and repeatedly renewed a specific license authorizing

---

[12]  *DeCuellar v. Brady*, 881 F.2d 1561, 1570 (11th Cir. 1989).

[13]  *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984) (executive's TWEA authority to go beyond blocking assets in peacetime withdrawn by Congress in 1977).

[14]  *See* VNP Decl. Exh. 20 ("Section 211 requires a decision maker to consider ... numerous 'ownership' issues [including confiscation and consent].").

Cubaexport's attorneys to defend Cubaexport in the cancellation proceeding and the D.C. Action

("the Specific Defense License"). *See* VNP Decl. Exh. 28.

The confiscation, consent and successorship questions that underlie Section 211, the

amended regulation and OFAC's July 28, 2006 decision are at issue in the D.C. Action. There,

Bacardi alleges that Section 211 requires the Court to reverse the decision of the TTAB, which

dismissed Bacardi's cancellation petition and denied Bacardi's summary judgment motion

seeking to expunge the registration. VNP Decl. Exh. 10 ¶¶ 5, 99-100, 104, 110. Bacardi also

alleges that Section 211 entitles it to a declaratory judgment that it "is the true owner of the

common law rights in and to the HAVANA CLUB as the bona fide successor-in-interest to

JASA," which in turn allegedly entitles Bacardi to enjoin Cubaexport from using or registering

HAVANA CLUB or interfering with Bacardi's alleged right to do so. VNP Decl. Exh. 10

¶¶ 6(c), 38, 142, 145-146, 160(b)-(c).

     **D.**    **The July 28, 2006 Ruling Precludes Renewal of The**
               **HAVANA CLUB Registration Despite The Specific Defense License**

On December 13, 2005, over a month before the January 27, 2006 deadline for renewal

of the HAVANA CLUB registration, Cubaexport's attorneys, Ropes & Gray, sent a letter to the

USPTO enclosing a renewal application duly executed by Cubaexport pursuant to Trademark

Act §§ 8 and 9, and, in accordance with USPTO practice, requesting that the applicable renewal

fee of $500 be charged against Ropes & Gray's standing account with the USPTO. AR 59-82.

That letter and a concurrent letter to OFAC (AR 56-58) stated that payment of the filing fee was

being made pursuant to the Specific Defense License, in order to preserve the *status quo* by

maintaining the HAVANA CLUB registration until a decision regarding cancellation of the

registration could be rendered in the D.C. Action.

Nearly four months later on April 6, 2006, OFAC *sua sponte* intervened in the registration renewal process, issuing a letter to Ropes & Gray and the USPTO. While leaving the Specific Defense License in place, OFAC stated that the license did not "authorize Ropes & Gray LLP to pay a filing fee to the USPTO for renewal of Registration No. 1,031,651 ... on behalf of Cubaexport." AR 52-53. In the April 6, 2006 letter, OFAC also stated that Ropes & Gray could apply for a specific license to renew the HAVANA CLUB registration on behalf of Cubaexport at the USPTO. *Id*. Accordingly, the very next day, on April 7, 2006, Ropes & Gray expressly sought a license to "incur and receive payment for the expense of renewing the [HAVANA CLUB] registration." AR 49-51.

Although the USPTO's renewal deadline had by this time passed, the Trademark Act's six-month grace period for the HAVANA CLUB registration expired on July 27, 2006.[15] That day came and went without any response from OFAC to the April 7, 2006 license application. The following day, July 28, 2006, OFAC issued a one-page letter response to Ropes & Gray, with a copy to the USPTO, denying the application. AR 1.

The July 28, 2006 letter stated, in its entirety, as follows:

> This is in response to your letter dated April 7, 2006, on behalf of Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport"), requesting a license authorizing transactions related to the renewal at the United States Patent and Trademark Office of Registration No. 1,031,651 of HAVANA CLUB & Design (the "HAVANA CLUB trademark").

> Pursuant to the Cuban Asset Control Regulations, 31 C.F.R. Part 515, administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed.

> OFAC has been engaged in consultation with the relevant agencies in the U.S. Government, including the Department of State ("State"), on this issue. We have received guidance from State informing us that it would be inconsistent with

---

[15] The Trademark Act provides for a six-month "grace period" during which an application for renewal of a trademark registration may be filed with an additional fee. 15 U.S.C. § 1059.

U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark.  Accordingly, your request is hereby denied.  *Id.*

**E.     Cancellation of The HAVANA CLUB Registration**

On August 3, 2006, the USPTO Post Registration Division issued the following

notification to Cubaexport:

> [T]he Office has received ... [OFAC's July 28, 2006 ruling].  Because the specific license is necessary for authorizing payment of the required fee, and that license has been denied, the required filing fee for [renewal of the registration] has not been submitted; accordingly the registration will be cancelled/expired.  (emphasis added).  Compl. Ex. 24.

Cubaexport promptly appealed this decision to the Commissioner of the USPTO.  However, on

December 6, 2006, the USPTO Director for Trademarks stayed Cubaexport's appeal pending the

outcome of this litigation.  VNP Decl. Exh. 31.  Judge Sullivan, in turn, stayed the D.C. Action

pending a decision by the USPTO because Bacardi argued that a USPTO decision denying

renewal would grant it the relief it seeks in the D.C. Action.

**F.     OFAC's July 28, 2006 Interpretation Of The
        Amended Regulation Adjudicates Cubaexport's Rights**

This Court characterized Cubaexport's second APA claim as follows:

> OFAC's July 28 letter states:  "Pursuant to the [CACR], administered by [OFAC], renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed."  As Cubaexport observes, this ruling necessarily presumes that "renewal of the HAVANA CLUB registration is *not* authorized pursuant to the General License."  Layering a second inference atop the first, Cubaexport then contends OFAC applied Section 211 and 31 C.F.R. section 515.527(a)(1) in reaching this conclusion and that it did so improperly.

516 F. Supp. 2d at 56.  Because it was unclear whether OFAC considered Section 211 and the

amended regulation, this Court ordered OFAC to supplement the administrative record and

explain how it had reached its decision.

13

In accordance with this Court's order, OFAC submitted a second declaration of its director Adam J. Szubin. That declaration does not add any documentary evidence to the administrative record, but consists solely of a *post hoc* account of what the agency supposedly did. In "elucidating the contemporaneous reasons for [OFAC's] decision," the declaration makes clear that OFAC focused on litigation to which Cubaexport was not a party, the unproven assertions of lawyers representing Cubaexport's adversary Bacardi, and Bacardi's allegations in the D.C. Action that it is the rightful owner of the HAVANA CLUB trademark. *See* Szubin 2007 Decl. ¶ 9 (OFAC's conclusion that the amended regulation prohibits renewal of the HAVANA CLUB registration "was based on various legal proceedings and judicial findings concerning the HAVANA CLUB trademark, and it took into consideration correspondence from Bacardi-Martini U.S.A., Inc."). *See also* Szubin 2007 Decl. ¶¶ 10-19.

OFAC based its confiscation ruling solely on opinions in a New York case between Bacardi and parties other than Cubaexport (Szubin 2007 Decl. ¶¶ 10-14) in which the Second Circuit refused to permit "discovery on the question of confiscation." Szubin 2007 Decl. ¶ 12.[16] Concerning consent, OFAC accepted advocacy as fact. It took at face value Bacardi's lawyers' claims that JASA did not grant consent and that their client is JASA's successor – finding proof of those claims in the fact that Bacardi continues to assert them:

> 16.     In a letter to OFAC dated May 9, 2006, counsel to Bacardi & Company Limited and Bacardi U.S.A., Inc., ***claimed*** that Bacardi "is the *bona fide* successor-in-interest to all of JASA's rights in the HAVANA CLUB trademark. ***Neither Bacardi nor JASA has ever consented, expressly or otherwise***, to the renewal of the HAVANA CLUB registration by or on behalf of Cubaexport." AR 42; see also AR 12.[17]

---

[16] OFAC mistakenly characterizes this as a refusal to permit "additional discovery" (Szubin 2007 Decl. ¶ 12), when in fact there was no such discovery because Section 211 was enacted on the eve of trial. *See Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.2d 116, 130 (2d Cir. 2000).

[17] These documents are letters from Bacardi's counsel.

14

* * *

18.    ***Based on Bacardi's written statements and the fact that Bacardi
continues to contest matters related to the renewal of the HAVANA CLUB
trademark,*** OFAC understood that, ***to the extent Bacardi claims*** to be a bona fide
successor-in-interest to JASA's assets or rights to the trademark, Bacardi has also
not consented to any transaction related to the registration and renewal of the
HAVANA CLUB trademark by Cubaexport.

19.    Therefore, OFAC knew of no entity ***purporting to be*** either an
original owner or a bona fide successor-in-interest to JASA that had consented to
any transaction related to the registration and renewal of the HAVANA CLUB
mark by Cubaexport.  ***Accordingly, OFAC concluded that Cubaexport had not
received such consent,*** and that the general licensing provision could not apply on
that basis.

Szubin 2007 Decl. ¶¶ 16, 18-19 (emphasis added).  Mr. Szubin does not say who reviewed the

New York decisions and Bacardi's correspondence or when that review took place.  In any

event, the agency cannot have spent more than a few hours addressing the complex contested

issues raised by Section 211.

OFAC also purportedly "found support for Bacardi's claims in the Second Circuit's

recognition of Bacardi as a 'purchase[r] of the Arechabala family's rights (***if any***) to the 'Havana

Club' trademark, the related goodwill of the business, and ***any*** rum business assets still owned by

the Arechabala family [in 1997].'"  Szubin 2007 Decl. ¶ 17 (emphasis added).  The Second

Circuit of course made no findings of fact.  And its statement left unresolved whether or not the

Arechabalas had any rights or assets to convey to Bacardi in 1997.

While relying on litigation to which Cubaexport was not a party, OFAC ignored the

cancellation proceeding Bacardi brought against Cubaexport in which the TTAB declined to

cancel the HAVANA CLUB registration or rule that Bacardi owns the trademark.  *See Galleon,

S.A.,* 2004 TTAB LEXIS 38, at *68-69.  Similarly, while crediting Bacardi's allegations, OFAC

never acknowledged that Cubaexport disputes them.  *See* Szubin 2007 Decl.

OFAC's unwarranted reliance on Bacardi's unsupported views contrasts starkly with the steadfast refusal of the Commerce Department and USPTO to bend under pressure from Bacardi and its political allies.  For example, the Commerce Department denied a request by then Congressman Tom Delay to cancel the HAVANA CLUB registration.  *See* VNP Decl. Exhs. 21-22.  The USPTO director advised Bacardi that it "will not consider the information submitted with this petition because petitioner [Bacardi] is a third party in this *ex parte* [renewal] matter."  *See* VNP Decl. Exh. 25.  And the TTAB was well aware of Bacardi's *ex parte* efforts — through then Florida Governor Jeb Bush and others — to expunge the registration when the Board dismissed Bacardi's cancellation petition.  *See Galleon S.A.,* 2004 TTAB LEXIS 38, at *17-21.[18]

Turning to the process Cubaexport supposedly was afforded, the Szubin 2007 Declaration confirms that Cubaexport received no meaningful process whatsoever.  The declaration does not state that OFAC advised Cubaexport that the agency would rule on the applicability of the amended regulation to the HAVANA CLUB registration, as it ultimately did on July 28, 2006. Nor does the declaration state that the amended regulation provides any quasi-judicial procedure for addressing that issue.  Plainly, the regulation does not.  Nor does the agency contend that it provided any other comparable procedure.  Instead, OFAC simply claims that in the absence of such notice and procedure, "Cubaexport did not provide OFAC with any reason to doubt its conclusions [regarding confiscation and consent]."  Szubin 2007 Decl. ¶ 28.  This statement is not a reasoned decision based on evidence.  It is simply OFAC's conclusion that Cubaexport failed to prove a case the agency gave it no opportunity to litigate.

---

[18] These efforts included repeated overtures by Mr. Bush, including a letter to the USPTO written "on behalf of Florida-based Bacardi-Martini, Inc." in which he urged that the HAVANA CLUB registration "be cancelled immediately."  (VNP Decl. Exhs. 23-24.)

After Cubaexport advised OFAC on December 13, 2005 that it was tendering the registration renewal fee pursuant to the original specific litigation defense license (AR 56-58), OFAC volunteered on April 6, 2006 that this license does not authorize such payment and invited Cubaexport to seek a new specific license. *See* Szubin 2007 Decl. ¶ 20. It was not until OFAC denied Cubaexport's April 7, 2006 specific license request on July 28, 2006 – a day after the renewal deadline – that OFAC volunteered a one sentence interpretation of its regulations. Even that statement was so cryptic this Court ordered OFAC to explain whether the statement referred to Section 211 and the amended regulation.

Despite this and the fact that "[t]here is no application process for a general license," OFAC now says that Cubaexport should have "submitted ... information directly to OFAC ... before its request for a specific license had been denied on July 28, 2006 on the issues raised in ... subsection (2) of the general license" because OFAC provided "procedural opportunities" to do so. Szubin 2007 Decl. ¶¶ 21, 25. Those "opportunities" were a chance to request in writing unspecified "further guidance" on an unidentified schedule and "additional procedures ... after a [specific] licensing determination has been made." Szubin 2007 Decl. ¶¶ 20-24.

The declaration does not explain why Cubaexport should have addressed general license issues while responding to OFAC's invitation to seek a specific license. Indeed, those two licensing avenues are mutually exclusive. *See, e.g*., 31 C.F.R. §515.318 ("A specific license is any license or authorization issued pursuant to this part but not set forth in this part."). Nor does the declaration state that OFAC's guidance would have been timely [19] or explain how the right to

---

[19]  OFAC's April 6, 2006 letter (AR 53) and the Szubin 2007 Declaration do not claim that OFAC would have provided Cubaexport with guidance, much less a chance to follow that guidance, before the registration renewal deadline expired on July 27, 2006. Indeed, OFAC did not rule on Cubaexport's April 7, 2006 specific license request until July 28, 2006.

seek a specific license after July 28, 2006 provided an opportunity to address general license issues before the July 27, 2006 registration renewal deadline.

This highlights the basic flaw in the amended regulation. Section 211 is not a self-executing statute that on its face approves or condemns certain conduct. Rather, it specifically required OFAC to promulgate regulations that implement the statute. Rather than put in place any mechanism for resolving issues such as confiscation, consent and successorship, OFAC simply adopted the words of the statute itself.

### G.    The Specific License Denial Was Based On Section 211

"In amending § 515.527 to implement … Section 211, OFAC limited the scope of the general license while retaining the authority to issue a specific license."[20]  Nevertheless, upon instructions from the State Department, OFAC relied on the Section 211 general license restrictions in denying a specific license to renew the HAVANA CLUB registration pending the outcome of the D.C. Action. OFAC's director confirms the agency's reliance on the statute and regulation,[21] as does the government in explaining the reliance OFAC placed on the State Department's advice:

> The State Department's foreign policy advice was also grounded in United States policy opposing government confiscation of private property, including intellectual property such as trademarks ... [T]the explicit language of section 211

---

[20]    Szubin 2006 Decl. ¶ 22.  *Accord* December 21, 2006 Memorandum In Support Of Defendants' Motion To Dismiss Or, In the Alternative, For Summary Judgment ("Defendants' December 21, 2006 Brief") at 6.

[21]    *See* Szubin 2006 Decl. ¶ 40 ("[a]fter considering the State Department foreign policy guidance, the implementation of Section 211 in the Cuban Assets Control Regulations [31 C.F.R. § 515.527(a)(2)], and the facts and circumstances of this case, OFAC concluded that a specific license should not be issued to Cubaexport"). Because Cubaexport sought a specific license and OFAC has TWEA authority to grant specific licenses despite 31 C.F.R. § 515.527(a)(2), there was no need to identify Section 211 and the OFAC regulation unless they were a factor underlying the specific license denial.  Further, the "facts and circumstances of this case" include the New York courts' consideration of Section 211.  *See* Defendant's December 21, 2006 Statements of Undisputed Material Fact Nos. 18-21, 26; Szubin 2006 Decl. ¶ 27 ("OFAC is, and has been, aware of findings made in [the New York case] concerning the connection between the Havana Club trademark and assets confiscated by the Cuban government.").

leaves no doubt that Congress disfavored the recognition of trademarks associated with confiscated property.[22]

OFAC had the April 7, 2006 specific license application under review for nearly four months. During that period, the agency was reminded of the July 27, 2006 registration renewal deadline on two occasions. *See* AR 34, 51; 516 F. Supp. at 50. Yet, it took no action until it heard from State on July 28, 2006. Then, within at most a few hours it uncritically passed along the other agency's views as the reason why a specific license should not issue:

> We have received guidance from State informing us that it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark. Accordingly, your request is hereby denied. (AR 1)

OFAC did not disclose that State had, in fact, relied on Section 211.

Thus, OFAC came full circle. Seven years after writing the "Bacardi bill" into its regulations, it improperly ceded to the State Department the authority OFAC has to grant or deny specific licenses. Moreover, it uncritically accepted the other agency's view that the general license provision of Section 211 prohibits OFAC from granting a specific license. In doing so, it ignored the facts set forth in the license application, which OFAC customarily considers in ruling on specific license requests. *See* Szubin 2006 Decl. ¶ 14 ("OFAC considers applications for specific licenses on a case-by-case basis in light of the facts presented."). And it accepted State's "guidance" advising OFAC to destroy the HAVANA CLUB registration although that conflicts with OFAC's TWEA authority and consistent policy of preserving blocked Cuban assets.

---

[22]    Defendants' December 21, 2006 Brief at 39. Moreover, because "U.S. policy with respect to the domestic and international protection of intellectual property rights" (AR 2) includes the renewal of Cuban trademark registrations pursuant to both Lanham Act § 9, 15 U.S.C. § 1059, and OFAC's TWEA-based general license regulation, it is difficult to see how State could have found an inconsistency between renewal and U.S. trademark policy (AR 2) unless it considered Section 211. *See also* VNP Decl. Exh. 32 ("The Patent Office refused to accept the renewal after ... the Office of Foreign Assets Control wrote the office had received guidance from the U.S. State Department 'informing us that it would be inconsistent with U.S. policy.' *That decision stems from a provision called Section 211 that was inserted in a 1998 budget bill. Sometimes called the 'Bacardi Bill,' Section 211 has been criticized as a measure solely aimed at benefiting the rum giant....* 'Basically, (the United States) let politics trump trademark policy.'"; emphasis added).

### III.     THIS COURT SHOULD GRANT CUBAEXPORT SUMMARY JUDGMENT WITH RESPECT TO THE SECOND APA CLAIM

When the facts are viewed in the light most favorable to defendants, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), Cubaexport is entitled to prevail on its motion because "there is no genuine issue as to any material fact and [Cubaexport] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As more fully set out in this memorandum, OFAC's general license decision should be vacated so that the USPTO may in turn renew the HAVANA CLUB registration pending the outcome of the D.C. Action.

Having afforded OFAC an opportunity to explain its reasoning and the process it provided, this Court now should reject OFAC's casual and truncated adjudication of Cubaexport's rights by vacating OFAC's decision and allowing the D.C. Action to proceed. OFAC applied the amended regulation to the HAVANA CLUB registration without notice to Cubaexport and based its decision on Bacardi's unproven allegations and the agency's misreading of opinions in a case to which Cubaexport was not even a party. "Under the circumstances, its arbitrary action may not stand." *Columbia Broad. Syst., Inc.*, 454 F.2d at 1027. In addition, OFAC's decision should be vacated because the decision impermissibly threatens to preclude adjudication in the D.C. Action and the amended regulation OFAC purported to apply is itself invalid.

Another remand requiring OFAC to promulgate quasi-judicial procedures is not a reasonable option. Having failed to promulgate such regulations, OFAC would now have to improvise and create a set of rules to apply in this case. It is doubtful that OFAC could develop fair procedures in such an extemporaneous fashion.[23] Assuming it could, only further delay

---

[23] *See Jordan v. Am. Eagle Fire Ins.*, 169 F.2d 281, 287 (D.C. Cir. 1948) ("[T]here is grave doubt that the Superintendent possesses the powers necessary to conduct a quasi-judicial hearing in these proceedings. The

would result from requiring it to do so.[24]  Even with new procedures in place, the agency would

bring to bear no special expertise to address the disputed issues raised by Section 211.[25]  And

OFAC's demonstrated bias should preclude the agency from doing so.[26]  By contrast, a neutral

forum for addressing the applicability of Section 211 to the HAVANA CLUB registration

already exists in the D.C. Action.  There both Cubaexport and Bacardi can be heard by a trier of

fact who *is* expert in resolving disputes such as the dispute over trademark ownership that

underlies Section 211.

On account of OFAC's wholly inadequate decision regarding Section 211, Cubaexport

has been litigating in this Court since September 2006 and Bacardi's appeal of the TTAB's

judgment in Cubaexport's favor has been stayed for over a year.  It is past time that the D.C.

Action resumed.  By permitting that, this Court will in no way be encroaching upon OFAC's fair

exercise of the powers entrusted to the executive by Congress acting in concert.  Rather, it will

be setting right an abuse of agency authority that is fundamentally at odds with the APA.

Finally, we note that vacating OFAC's decision will avoid the need to address the

constitutional challenges Cubaexport has raised in Counts I-III of the Complaint.  *See Am.*

*Airways Charters, Inc. v. Regan*, 746 F.2d 865, 874 (D.C. Cir. 1984) (Ginsberg, J.) (reversing

---

powers to administer oaths and to subpoena witnesses and documents in these cases are not expressly given him by the statute.").

[24]  Promulgating a full set of quasi-judicial procedures for addressing the applicability of Section 211 can hardly be expected to take less time than the seven months OFAC needed to copy virtually verbatim Section 211(a)(1) into 31 C.F.R. § 515.527(a)(2).  *See McCarthy v. Madigan*, 503 U.S. 140, 147 (1992) (avoiding delay excuses failure to exhaust administrative remedies); *Envtl. Defense Fund v. Ruckelshaus*, 439 F.2d 584, 591 (D.C. Cir. 1971) ("To determine whether an [agency] order ... is reviewable [in court] ... it is necessary to look beyond the mere availability of further administrative proceedings and consider ... the context of the particular case.").

[25]  *See McCarthy*, 503 U.S. at 155 (party need not exhaust  administrative remedy where agency "does not bring to bear any special expertise on the type of issue presented here"); *McKart* v. *U.S.*, 395 U.S. 185, 198 (1969) (same). OFAC is not a court with jurisdiction over private disputes, but an "office within Treasury that is principally responsible for administering U.S. economic sanctions."  Szubin 2006 Decl. ¶ 4.

[26]  *See McCarthy*, 503 U.S. at 148 (party need not exhaust administrative remedy where agency "is shown to be biased or has otherwise predetermined the issue before it."); *Columbia Broad. Syst., Inc.*, 454 F.2d at 1027 (agency decision should be "completely free from even the appearance of bias, prejudice and improper influence.").

OFAC decision that raised constitutional concerns); *Columbia Broad. Syst.*, 452 F.2d at 1034 (reversing agency decision that "raises serious questions concerning ... the First Amendment"); *Geiger* v. *Brown*, 419 F.2d 714, 717 (D.C. Cir. 1969) (granting relief in order to avoid addressing constitutional challenge to executive authority); *Cernuda v. Heavy*, 720 F. Supp. 1544, 1554 (S.D. Fla. 1989) (reversing OFAC decision where "not far beneath the surface of [the decision] lies ... the First Amendment").

### A.    This Court Should Vacate The July 28, 2006 General License Decision Even If The Amended Regulation Is Valid

The July 28, 2006 general license decision should be vacated because it violates basic principles of administrative law.  Moreover, the decision is not entitled to any special deference from this Court because OFAC did not rely on its expertise in making the decision and the decision is at odds with OFAC's practice of renewing Cuban trademark registrations.

### 1.    The Decision Was Arbitrary And Capricious

OFAC's decision should be vacated because it was arbitrary and capricious.  OFAC did not advise Cubaexport that it intended to rule on the applicability of Section 211 before it did so. Moreover, the "procedural opportunities" OFAC supposedly provided Cubaexport to address that issue were a hollow offer to provide "further guidance" at some unspecified time and the right to seek a specific license after OFAC's general license decision already had been made. Those plainly were no substitute for timely notice and the application of quasi-judicial procedures by an appropriate trier of fact *before* a decision was made regarding the applicability of the *amended regulation.  See Satellite Broad. Co. v. FCC*, 824 F.2d 1, 4 (D.C. Cir. 1987)

(vacating as arbitrary and capricious agency denial of license application where agency failed to give applicant adequate notice).[27]

Even if OFAC had quasi-judicial procedures in place on April 6, 2006, it is inconceivable that the Section 211 issues of confiscation, consent and successorship could have been adjudicated in any meaningful fashion before the July 27, 2006 registration renewal deadline. OFAC could not even address Cubaexport's three-page April 7, 2006 specific license application until July 28, 2006. It is fantastical to suppose that in less time it could have conducted a "full-dress adversary proceeding, with testimony, cross-examination, exhibits, briefs and arguments." *Utah Constr.*, 384 U.S. at 422.[28] Under these circumstances, OFAC should have allowed the D.C. Action to proceed.[29] Instead, OFAC substituted its truncated ruling for an adjudicated decision in that litigation.

Finally, although both the Commerce Department and USPTO steadfastly had resisted Bacardi's pressure to expunge the registration, OFAC's director says his agency found Bacardi's unsupported claims dispositive of key issues. OFAC's decision, in turn, has caused the USPTO to deny renewal of the registration – a step the USPTO itself refused to take on the strength of Bacardi's assertions. And adjudication by Judge Sullivan is suspended in light of the USPTO's decision (and may never be resumed if OFAC's ruling is allowed to stand and the USPTO refuses to renew the registration). Thus, with OFAC's assistance, Bacardi is on the verge of

---

[27] Indeed, a specific license application *never* could provide an opportunity to address the amended general license regulation unless OFAC improperly intended to base its specific license decision on the amended regulation as it in fact did. *See* Section IV.A., *infra*.

[28] Indeed, the Treasury Department, like the State Department, has yet to produce anything in response to FOIA requests that were made on January 11, 2007. *See* VNP Decl. Exhs. 8-9.

[29] Cubaexport asked OFAC to maintain the *status quo* so that the D.C. Action could proceed (AR 49-51) and urged the USPTO not to decide whether Section 211 applies to the HAVANA CLUB registration because that issue should be addressed in the D.C. Action. (AR 6, 35-36).

converting its unproven allegations into a preclusive judgment that the HAVANA CLUB registration should cease to exist.

OFAC attempts to justify its failure to provide timely notice and a meaningful opportunity to be heard by shifting to Cubaexport the burden of proving that the amended regulation does not apply to its registration.[30]  However, it is OFAC who has failed to show that the HAVANA CLUB registration runs afoul of Section 211 and the amended regulation.  *See Philadelphia Co. v. SEC*, 175 F.2d 808, 810 (D.C. Cir. 1948) ("'The Commission erroneously failed to assume the burden of proof in respect of the propriety of its proposed action.'  Instead, the commission required the company to attempt to persuade it that the prior exemption should not be revoked."), vacated as moot 337 U.S. 901 (1949).[31]

Rather than undertake a factual inquiry to determine whether JASA's business was confiscated, OFAC simply relied on opinions in a case to which Cubaexport was not a party.  *See* Szubin 2007 Decl. ¶¶ 10-14.  If OFAC had provided the quasi-judicial process to which Cubaexport is entitled, it plainly would have been inappropriate for the agency to do that.  *See Schwartz, Administrative Law* § 7.18 at 413 (3d ed. 1991) (in adjudicating a matter, an agency "may not take notice of the testimony and findings in a previous case to 'prove' most of the key facts against a respondent not a party in the prior case.").

---

[30]  *See* Szubin 2007 Decl. ¶ 28 ("Cubaexport did not provide OFAC with any reason to doubt its conclusions concerning (i) the connection between the HAVANA CLUB trademark or a substantially similar trademark and a business or assets that were confiscated by the Cuban government, and (ii) whether or not the original owner or bona fide successor-in-interest had consented.").  It is hardly surprising that Cubaexport's June 2006 letters to the USPTO "did not provide a basis for OFAC to conclude that the District Court and Second Circuit findings ... should be disregarded."  Szubin 2007 Decl. ¶ 26.  Cubaexport was not advised until November 27, 2007 that the agency purportedly had relied on those decisions.

[31]  *See also Columbia Broad. Syst., Inc.*, 454 F.2d at 1027 (reversing agency denial of broadcast license); *Stockstrom v. Comm'r of Internal Revenue*, 190 F.2d 283, 289 (D.C. Cir. 1951) (The public "expect, and are entitled to receive, ordinary fair play from [an agency].  We regard as unconscionable the Commissioner's [taking action] because of Stockstrom's failure . . . when the Commissioner himself was responsible for that failure.").

Equally troubling is OFAC's affirmative reliance on the Second Circuit's refusal to permit discovery regarding confiscation because "'[w]here Cuba has not returned JASA's property, not made a gesture toward compensation, and not settled the claim, the confiscation inquiry end.'"  Szubin 2007 Decl. ¶ 12.  Cubaexport was not a party to that case.  JASA did not make a claim that the Republic of Cuba *could* have settled.  And the confiscation issue was not litigated in the New York case.

"Section 211 requires a decision-maker to consider ... [whether] the business or asset was taken away from that owner *without the payment of just and adequate compensation*."  VNP Decl. Exh. 20 (emphasis added).  Similarly, confiscation is nationalization, expropriation or other seizure "[w]ithout ... adequate and effective compensation," not simply nationalization, expropriation or seizure.  31 C.F.R. § 515.336.  Because the New York court did not address this critical distinction, it concluded that "on October 13, 1960, the Revolutionary Cuban Regime 'confiscated the physical assets, property and business records' of [JASA]."  Szubin 2007 Decl. ¶ 11.  "Nationalization" occurred on October 13, 1960.  Whether that nationalization amounted to a "confiscation" was not decided.[32]

OFAC's consideration of the consent and successorship issues is, if possible, even less defensible.  The agency improperly took at face value Bacardi's lawyers' claim that their client is the successor in interest to JASA, even though that claim is contested in the very D.C. Action

---

[32]  "Adequate and effective compensation" for a bankrupt business is zero.  *In re Goodyear Tire & Rubber Co.*, Claim No. CU-887, 1972 *Ann. Rept.* 367, 370-71 (Foreign Claims Settlement Commission ("FCSC")).  Moreover, under the Helms-Burton Act, whether "adequate and effective compensation" has been provided may be determined under the International Claims Settlement Act of 1949, which in turn mandates that "[i]n making the determination with respect to the validity and amount of claims and value of properties ... taken, the [FCSC] shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to (i) fair market value, (ii) book value, (iii) going concern value, or (iv) cost of replacement."  22 U.S.C. § 1643b(a).  Even in the absence of discovery from Bacardi and its alleged predecessor JASA, it appears that JASA was bankrupt when it was nationalized on October 13, 1960.  *See* March 15, 2007 Declaration of Eric R. Hubbard ("Hubbard Decl.") ¶¶ 4a-4i and Exhs. A-B.  Moreover, it is unclear from the New York decision whether JASA had an ongoing HAVANA CLUB rum business at this time.

OFAC has licensed Cubaexport to defend. Indeed, OFAC found proof of Bacardi's lack of consent in the fact that "Bacardi continues to contest matters related to the renewal of the trademark." Szubin 2007 Decl. ¶ 18. It thus concluded that Section 211 *does* apply because Bacardi has put at issue *whether* it applies, substituted its judgment for that of Judge Sullivan and all but declared Bacardi the winner of its dispute with Cubaexport even though the D.C. Action remains pending and OFAC has licensed Cubaexport to defend that action.[33] If that is not an arbitrary and capricious decision, it is difficult to imagine one that would be.[34]

No more is needed to demonstrate the impropriety of OFAC's decision. However, the agency went beyond relying on Bacardi's unproven allegations. It also failed to take account of evidence that JASA consented to registration of the HAVANA CLUB trademark, that Bacardi did not succeed to any rights JASA may at one time have had, and that Bacardi consistently and repeatedly has failed to establish that it owns the trademark in the U.S. as JASA's successor or otherwise. This failure alone renders the decision arbitrary and capricious.[35]

JASA expressly consented to Cubaexport's registration of U.S. HAVANA CLUB by voluntarily surrendering the last of its U.S. HAVANA CLUB trademark registrations in 1973,[36]

---

[33] Indeed, five days after the USPTO's August 3, 2006 refusal to accept the registration renewal fee, Bacardi issued a press release entitled *U.S. Government Resolves Havana Club Dispute in Bacardi's Favor*. VNP Decl. Exh. 26. *See also* VNP Decl. Exh. 27.

[34] *See Columbia Broad. Syst., Inc.*, 454 F.2d at 1027 (condemning agency decision that was not "completely free from even the appearance of bias, prejudice and improper influence"); *Pierce, Administrative Law* §11.5 at 815 (4th ed. 2002) (APA requires reasoned agency decisions to avoid rulings based on "political favoritism"). *Cf. Dominion Cogin v. District of Columbia*, 878 F. Supp. 258, 268 (D.D.C. 1995) (Lamberth, J.) ("the deliberative process privilege is inappropriate where deliberations of government personal are directly in issue").

[35] *See Weyburn v. FCC*, 984 F.2d 1220, 1234-35 (D.C. Cir. 1993) (in failing to consider countervailing evidence, agency did "not satisfy the standard of reasoned decisionmaking set forth in the Administration Procedure Act.... [I]t is clear that the FCC did not deal adequately with these important issues.").

[36] JASA abandoned two of its U.S. HAVANA CLUB registrations in the mid-1950's before the Cuban revolution and its remaining three U.S. HAVANA CLUB registrations in 1962 and 1973. *See* Hubbard Decl. ¶ 4k. It did so even though those three registrations could have been maintained if non-use of the trademark was attributable to nationalization in 1960 or the 1963 trade embargo (15 U.S.C. § 1059) and even though nationalization did not deprive JASA of its U.S. registrations. *See, e.g., Palicio y Compania, S.A. v. Brush*, 256 F. Supp. 481, 491

declining to oppose Cubaexport's 1974 trademark application and failing to seek cancellation of the registration after it issued in 1976. *See NAACP v. NAACP Legal Defense & Educ. Fund,* 753 F.2d 131, 137-40 (D.C. Cir. 1985) (doctrine of laches applies to bar enforcement of trademark, particularly in light of the "passing of almost thirteen years without any clear reservation of rights"); *Pro Fitness Physical Therapy Cir. v. Pro-Fit Orthopedic*, 314 F.3d 62, 67 (2d Cir. 2002) (course of conduct, including delay in objecting to use of trademark "'connote[s] consent by the owner to ... use of his mark.'") (citation omitted).

Bacardi, in turn, plainly could not succeed to rights JASA did not have in 1997 – decades after JASA left the rum business and voluntarily surrendered its U.S. HAVANA CLUB trademark registrations. *See*, *e.g.*, *Uncas Mfg. Co. v. Clark & Cooms Co.*, 200 F. Supp. 831, 835 (D.R.I. 1962), *aff'd on other grounds*, 309 F.2d 818 (1st Cir. 1962) (holding that where a trademark was abandoned, a later assignment is invalid because the assignor possesses no interest to legally assign).

Decades after JASA left the rum business and surrendered its U.S. HAVANA CLUB registrations,[37] Bacardi applied to register HAVANA CLUB as its trademark in the USPTO in 1994. With knowledge of JASA, Bacardi swore in its trademark application that it had an intention to use HAVANA CLUB as a trademark in the future and that "to the best of [its] knowledge and belief no other person, firm, corporation, or association has the right to use said mark [HAVANA CLUB] in commerce." [38] Only after the USPTO rejected its trademark

---

(S.D.N.Y. 1966) (citing authority) (U.S. trademark rights of former owners of Cuban business not affected by nationalization of business), *aff'd*, 375 F.2d 1011 (2d Cir. 1967).

[37] *See* Hubbard Decl. ¶¶ 3 and 4a-4k.

[38] *See* VNP Decl. Exhs. 11, 10 ¶ 70.

application in 1995 did Bacardi purport to step into JASA's (long empty) shoes.[39]  Despite that

change of course and Bacardi's submission to the USPTO of decisions in the New York

HAVANA CLUB case, the USPTO has refused to approve Bacardi's application.[40]  Neither a

U.S. court nor the USPTO has ever ruled that Bacardi owns the HAVANA CLUB trademark in

the U.S.  Indeed, Bacardi withdrew its claim for such declaratory relief in the New York case.[41]

And both the New York courts and the TTAB have declined to cancel the HAVANA CLUB

registration as Bacardi requested.[42]

> As the Commerce Department advised Mr. Delay in affirming the rule of law:
>
> With respect to the federal court holding to which you refer, we enclose a copy of the partial judgment issued by the United States District Court, Southern District of New York, on October 20, 1997.  … [T]he Court did not order cancellation of [the] Registration No. 1,031,651.  Rather, the Court ordered the USPTO to amend its records to reflect ownership of [the] Registration in … Cubaexport....  Thus, since the Court did not order cancellation…, and because the cancellation proceeding is currently… "suspended"…, the USPTO is without authority to take the action you have suggested.  VNP Decl. Exh. 22.
>
> This Court need not decide whether these facts and facts yet to be unearthed in

discovery[43] exclude the HAVANA CLUB registration from the reach of Section 211.  What this

---

[39]  After its application was rejected (VNP Decl. Exh. 12), Bacardi submitted to the USPTO an Amendment to Allege Use, claiming the HAVANA CLUB "trademark was first used on or in connection with [rum] through BACARDI's predecessor-in-interest, Jose Arechabala, S.A. ('JASA') at least as early as 1934."  VNP Decl. Exh. 13. Subsequently, Bacardi submitted a declaration of Ramon Arechabala attesting to JASA's use of HAVANA CLUB. *See* VNP Decl. Exh. 14.

[40]  Bacardi sent the USPTO copies of decisions in the New York case and urged that "[i]n light of these decisions, applicant [Bacardi] submit [sic] that the present application ... be allowed."  VNP Decl. Exh. 15.  Despite the Arechabala declaration and New York decisions, the USPTO refused to allow Bacardi's application, observing that in the New York case the HAVANA CLUB registration "was neither cancelled nor determined to be the property of [Bacardi]."  VNP Decl. Exhs. 16-17.

[41]  *See* VNP Decl. Exhs. 18-19.  Similarly, the TTAB refused to so rule.  *Galleon, S.A.*, 2004 TTAB LEXIS 38, at *68.

[42]  *Havana Club Holding, S.A. v. Galleon, S.A.*, 974 F. Supp. 302, 312 (S.D.N.Y. 1997); *Galleon, S.A.*, 2004 TTAB LEXIS 38, at 69.

[43]  *See, e.g.,* Hubbard Decl. ¶¶ 5-6.

Court can and should conclude is that OFAC acted arbitrarily by substituting Bacardi's unproven allegations for evidence.

This Court should vacate OFAC's decision on which the USPTO based its refusal to renew the registration. This, in turn, will open the door for Judge Sullivan to lift the stay that currently is in place and assure that OFAC's non-adjudicative resolution of the Section 211 issues does not improperly prevent those issues from being addressed in the D.C. Action. As the court stated in *Nasem,* 595 F.2d at, 806-07:

> [A]n administrative decision will be given collateral estoppel effect when "an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S. Ct. 1545, 1552, 16 L. Ed. 2d 642 (1966).
>
> * * *
>
> [T]he administrative hearing approved by the Supreme Court in Utah Construction provided a "full-dress adversary proceeding, with testimony, cross-examination, exhibits, briefs and argument." ... Section 713.262(b)(1) does not provide procedural safeguards contemplated by *Utah Construction*.[44]

### 2.    The Decision Is Not Entitled To Deference

In reviewing OFAC's decision, this Court need not accord it any special deference because the regulation OFAC purported to interpret simply parrots Section 211(a)(1). *See Gonzalez*, 546 U.S. at 257 ("An agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language."); *Pierce, Administrative Law Cumulative Supplement* 1, 123-24 (2007) ("[S]everal circuit courts [including the court in *Pearson v.*

---

[44] *See also* 18B *Wright, Miller & Cooper, Federal Practice and Procedure* § 4475 at 483, 485 (2002) ("An administrative decision commands preclusive effects only if it resulted from a procedure that seems an adequate substitute for judicial procedure.... [A] non adversary executive action ... clearly cannot constitute an adjudication on any view," citing *Whalen v. Abell*, 48 F.3d 1247, 1255-56 (D.C. Cir. 1995)); *Phila. Co. v. SEC,* 175 F.2d at 816 (rejecting agency's "order of revocation [which] operates as a *pro tanto* restraint or injunction upon the proceedings, and as a diminution of the authority, of the District Court").

*Shalala*, 164 F.3d 650 (D.C. Cir. 1999)] ... have applied [the antiparroting] canon in numerous cases; ... [I]ssuing ... rules that simply parrot statutes and then relying ... on interpretations of those rules ... [makes] 'a mockery of the APA.'").

OFAC's actions do indeed make a mockery of the APA. Far from using its expertise and experience to promulgate the amended regulation, OFAC simply adopted language handcrafted by Bacardi. Indeed, it is fair to say that Bacardi – not OFAC – effectively authored the amended regulation. OFAC thereby acquired no special authority to decide, for example, whether consent was granted to obtain and maintain a trademark registration. And it plainly failed to bring to bear any special expertise or experience when it relied on Bacardi's unproven assertions and mistakenly interpreted opinions in a New York case to which Cubaexport was not even a party.

Deference to an agency acting within the scope of its authority and experience avoids unwarranted judicial intervention in areas where the agency has "more than ordinary knowledge respecting the matters subjected to agency regulations." *Chevron v. NRDC*, 467 U.S. 837, 844 (1984). It does not entitle OFAC to upset the balance between judicial and administrative decision making by summarily resolving questions at issue in pending litigation.[45] Further, the decision to deny renewal of one Cuban trademark registration while preserving all others requires this Court to "make an independent judgment, examining with a more exacting vigilance than [it] might have employed had the [agency's] decisions not conflicted." *Balt. & Annapolis R.R. v. WMATC*, 642 F.2d 1365, 1371 (D.C. Cir. 1980). And OFAC's July 28, 2006 "letter is not entitled to deference under *Chevron* ..., but only 'claims respect according to its persuasiveness.'" *El Rio v. Dept. of Health*, 300 F. Supp. 2d 32, 41 n. 11 (D.D.C. 2004), *aff'd*,

---

[45] *See*, *e.g.*, *Am. Airways Charters, Inc.*, 746 F.2d at 874 n.15 (criticizing OFAC's summary resolution of issue that would "preclude [party] from litigating … [that issue]"); 18B *Wright, Miller & Cooper, Federal Practice and Procedure*, § 4475 at 485 (2d ed. 2002) ("a nonadversary executive action … clearly cannot constitute an adjudication on any view," citing *Whalen v. Abel*, 48 F.3d 1247, 1255-56 (D.C. Cir. 1995)).

396 F.3d 1265 (D.C. Cir. 2005). OFAC's one sentence ruling is singularly unpersuasive, as is its

subsequent explanation of how the decision was made.

> **B.      This Court Should Vacate The Decision**
> **Because The Amended Regulation Is Invalid**

OFAC's decision also should be set aside because an agency may not lawfully apply or

enforce an invalid regulation. *See*, *e.g.*, *Color. River Indian Tribes v. NIGC*, 383 F. Supp. 2d

123, 148 (D.D.C. Cir. 2005) (because agency "does not possess the authority to audit a gaming

activity to ensure its compliance with an invalid regulation, … the fine imposed in this action is

invalid."), *aff'd*, 466 F.3d 134 (D.C. Cir. 2006). Even if Section 211 conferred on OFAC

authority to amend the TWEA-based trademark registration renewal regulation,[46] the amended

regulation is invalid because it rescinds Cubaexport's trademark registration renewal right

without adequate justification. *See Williams Natural Gas Co. v. FERC,* 872 F.2d 438, 443-44

(D.C. Cir. 1989):

> [A] decision [to rescind a regulation] requires a more persuasive justification than
> does the decision to retain an existing rule. As the Supreme Court stated in a
> slightly different context:
>
> > If Congress established a presumption from which judicial review should start,
> > that presumption ... is *against* ... changes in current policy that are not justified
> > by the rulemaking record.

---

[46] It is at best doubtful that Section 211 conferred on OFAC authority to amend a regulation promulgated pursuant to the agency's TWEA authority. *See* Szubin 2006 Decl. ¶ 6 (acknowledging that OFAC's authority to promulgate regulations is conferred by the TWEA). Deciding who lawfully owns a trademark in the case of an alleged confiscation exceeds OFAC's TWEA authority to preserve blocked Cuban assets for the benefit of the U.S. and its nationals. *See Zittman v. McGraph*, 341 U.S. 471, 473-74 (1951) ("while the [TWEA] ... authorizes ... administration of [foreign-owned property] 'in the interest of and for the benefit of the United States,' *it is not a confiscation measure*") (emphasis added). Moreover, if there was no confiscation, the amended regulation does not apply. If there was a confiscation, OFAC has no authority over the registration because it does not lawfully belong to a Cuban national. *See Real v. Simon*, 510 F.2d 557, 565 (5th Cir. 1975) (by promulgating regulation that purported to block non-Cuban assets, the "Secretary of the Treasury has exceeded his statutory authority … [under] the Trading with the Enemy Act"). And the amended regulation improperly requires the destruction of a blocked asset. *See Regan*, 468 U.S. at 227-28 (in 1977 Congress limited the executive to blocking Cuban assets in peace time); *Am. Airways Charter, Inc.*, 746 F.2d at 869 ("AAC's assets are blocked.... But Congress has not authorized the Executive to seize [them].").

"The process of providing a rationale that can withstand public and judicial scrutiny compels the agency to take rule changes seriously." *Balt. & Annapolis R.R.,* 642 F.2d at 1370 (condemning change in rule that had remained unaltered for twelve years).[47]

OFAC has not justified – and cannot justify – departing from a regulatory regime to which it had adhered from 1963 through 1998 and, indeed, continues to adhere in the case of the Republic of Cuba and its nationals other than Cubaexport. The only reason for OFAC's abrupt change of course with respect to one particular Cuban asset was the passage of Section 211 in 1998. *See* Szubin 2007 Decl. ¶ 7. However, OFAC's thoughtless parroting of Section 211 cannot save the amended regulation because the regulation provides no process for adjudicating a particular matter. Although couched in general language, the regulation actually targets only Cubaexport while failing to provide any quasi-judicial process. *See Schwartz, Administrative Law* § 5.8 at 238-39 (3d ed. 1991):

> "The legislative process, i.e. rule-making, is normally directed primarily at 'situations,' rather than particular persons. Individual protestations of injury are normally and necessarily lost in the quantum of the general good." *A different situation is presented when individualized action masquerades as a rule. If the administrative process is directed at particular persons — even if it be termed rulemaking — those affected should be given the same hearing rights as in proceedings that are clearly judicial in nature.* (some emphasis added)[48]

---

[47]  *See Int'l Union v. U.S. Dept. of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) (agency's "statement that there was a 'change in agency priorities,' without explanation, is not informative in the least; it is merely a reiteration of the decision to withdraw the proposed rule."); *El Rio, Santa Cruz Neighborhood Health Center Ctr.,* 300 F. Supp. 2d at 43 (reversing agency action that departed from prior practice without adequate explanation); *Purepac Phar. Co. v. Thompson*, 238 F. Supp. 2d 191, 212 (D.D.C. 2002), *aff'd*, 354 F. 3d 877 (same). OFAC is bound by this standard even if it has been accorded discretion to implement the TWEA because the "requirement that discretion must be exercised reasonably is not changed by broad statutory grants. Even wholesale delegations contain the implied condition of reasonable exercise." *Schwartz, Administrative Law* § 10:15 at 655. "A good agency that starts out with open discretion on major issues ... gradually structures its discretion [through rules] and a vast amount of agency case law." *Pierce, Administrative Law* § 1.5 at 816 (4th ed. 2002).

[48]  *See also Alaska Airlines v. CAB*, 545 F.2d 194, 200 (D.C. Cir. 1976) ("In *United States v. Florida East Coast R. Co.,* 410 U.S. 224, 245, 35 L. Ed. 2d 223, 93 S. Ct. 810 (1973), the Supreme Court ... indicated that the key question was whether the agency's action pertained to a class of individuals, indicating a rule-making function, or whether it focused on a particular individual, indicating an adjudicative function requiring a hearing."); *Phila. v. SEC*, 175 F.2d at 810 ("'The Commission erroneously failed to assume the burden of proof in respect of the propriety of its proposed action.' Instead, the commission required the company to attempt to persuade it that the prior exemption

As an abortive attempt to "restore" to JASA's alleged successor (Bacardi) rights associated with allegedly confiscated property, OFAC's amended regulation bears none of the hallmarks of a valid restitution scheme, including the timely assertion and proof of a claim in accordance with established procedures.[49]  Instead, it unfairly provides that even where a party (JASA) made no claim for restitution, a party (Cubaexport) may be held liable for an alleged confiscation decades after the event without rules concerning how to make that determination or a meaningful opportunity to be heard on the issues of confiscation, consent and successorship.[50]

It may be that OFAC need not have promulgated its original regulation permitting the Republic of Cuba and its nationals to obtain *and renew* trademark registrations.[51]  However, OFAC did so.  Accordingly, from the day Cubaexport obtained its registration in 1976 in accordance with OFAC's regulation, that regulation conferred the right to renew the registration.  OFAC could not lawfully deprive Cubaexport of that renewal right in 1999 without affording Cubaexport adequate procedural safeguards.  *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432 (1982) ("'While the legislature may elect not to confer a property interest, ... it may not ...

---

should not be revoked."); *Jordan,* 169 F. 2d 281 (party entitled to *de novo* review of agency order where agency did not provide quasi-judicial procedures).

[49]  *See* Ortiz, The Illegal Expropriation of Property In Cuba, 22 Loy, L.A. Int'l & Comp. L. Rev. 321, 341 (2000) ("A successful restitution scheme requires well-defined procedures, such as enforcing strict deadlines for filing claims, implementing clear rules establishing claimants' eligibility, and applying fixed evidentiary standards of proof."); International Claims Settlement Act ("ICSA"), 22 U.S.C. §§ 1643 *et seq.*  Under the ICSA, claims by U.S. nationals involving Cuban property had to be certified to the Settlement Claims Commission within 18 months of October 16, 1964 (when the right to submit claims was commenced) and resolved by 1972.  *See* 22 U.S.C. §§ 1643a(b), 1643b(a), 1643c(a).  Remarkably, Section 211 purports to confer rights on non-nationals (JASA and Bacardi) long after U.S. nationals' ICSA rights have expired.

[50]  *Cf. Pro-Football, Inc. v. Harjo,* 2008 U.S. Dist. LEXIS 52622 at 81-83 (D.D.C. June 25, 2008) (granting summary judgment where delay in seeking to cancel trademark registration would cause trial prejudice); 3 *J. Thomas McCarthy, Trademarks and Unfair Competition* § 20:76 at 20-151 (4th ed. 2008) ("prejudice at trial due to loss of evidence or faded memory of witnesses" justifies dismissal of trademark registration cancellation proceedings).

[51]  Whether OFAC could have provided in 1963 for registration without renewal raises constitutional and TWEA issues that need not be addressed by this Court at this time.

33

authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.'").[52]

Adequate procedural safeguards are nowhere to be found in the amended regulation. But they do exist in the D.C. Action, where Bacardi has placed at issue the applicability of Section 211 to the HAVANA CLUB registration. This Court should not permit an invalid agency regulation to stand between Cubaexport and Judge Sullivan's court room.[53]

## IV.    THIS COURT SHOULD GRANT CUBAEXPORT SUMMARY JUDGMENT WITH RESPECT TO THE THIRD APA CLAIM

### A.    This Court Should Vacate The Specific License Denial Because OFAC Relied On Section 211

Cubaexport respectfully requests that this Court revisit its dismissal of the third APA claim and vacate the denial of a specific license to renew the HAVANA CLUB registration.[54] The denial was not an unreviewable exercise by OFAC of its TWEA authority to grant or deny a

---

[52] *Accord Gonzales*, 334 F.2d 570 (Although party has no right, in a legal sense, to do business with the government pursuant to government license, the right (once granted) may not be revoked without adequate procedures. Procedures accorded party by government, including presentation of evidence and argument, held inadequate under APA); *Blackwell Coll. v. U.S.*, 454 F.2d 928, 932 (D.C. Cir. 1971) ("[Blackwell's] approved status was a valuable asset in the nature of a license which the governmental proceedings threatened to terminate [without] any clear cut administrative procedure."); *Jordan,* 169 F.2d at 288 ("Congress could pass a law without any hearing at all, but a man's property could not be taken under that law until he had a full hearing, and even then his property could not be confiscated.").

[53] Given these fundamental flaws in OFAC's regulation, this Court need not decide whether Section 211 and the regulation are constitutionally infirm because they retroactively revoke Cubaexport's registration renewal right. *See Havana Club Holding, S.A.,* 203 F.3d at 126 n. 9 ("Although a statute could be prospectively applied to bar an injunctive remedy with respect to a previously acquired property, it would arguably encounter retroactive objections if applied ... to invalidate a prior acquisition."); *Orion Reserves v. Norton*, 2006 WL 1126810, at *5 (D.D.C. March 31, 2006) (Lamberth, J.) ("rule-making is prospective in operation and general in scope, rather than retroactive and condemnatory in effect. ... Having ... proceed[ed] under rulemaking [rather than adjudication], Interior may not now turn around and apply the rule ('prospective in operation') to conduct that preceded it."; emphasis deleted).

[54] Plainly, this Court has the authority to revisit and revise its decision dismissing Cubaexport's third APA claim. *See* Fed. R. Civ. P. 54(b) (providing that absent an order appropriately directing entry of judgment, "any order ... that adjudicates fewer than all claims ... may be revised at any time before the entry of judgment adjudicating all the claims."); *Haynesworth v. Miller*, 820 F.2d 1245, 1253 (D.C. Cir. 1987) ("The District Court's order ... is subject to revision until the balance of the claims have been adjudicated"); *Dellums v. Powell*, 566 F.2d 231, 234 (D.C. Cir. 1977) (Rule 54(b) authorizes reconsideration of order prior to entry of final judgment although "no express rule provision is needed to justify a motion for reconsideration").

34

specific license *despite* Section 211 and 31 C.F.R. § 515.527(a)(2). In fact, OFAC *relied* on that statute and regulation as the basis for denying the specific license.

OFAC's director makes plain that the agency relied on Section 211 and 31 C.F.R. § 515.527(a)(2) in denying the license, as does the government in explaining the reliance OFAC placed on the State Department's views. *See* Szubin 2006 Decl. ¶ 40; Defendants' December 21, 2006 Brief at 39. The impact of Section 211 and 31 C.F.R. § 515.527(a)(2) also is evident in OFAC's otherwise inexplicable claim that Cubaexport should have addressed general license issues while its specific license application was pending (Szubin 2007 Decl. ¶ 21) and the agency's departure from a consistent practice of authorizing renewal of Cuban trademark registrations through the general license provision of 31 C.F.R. § 515.527(a)(1).

Because OFAC relied on Section 211 and 31 C.F.R. § 515.527(a)(2) in denying the specific license, the denial is subject to review. *See* 516 F.2d at 57 ("the CACR themselves provide a standard against which the Court may evaluate whether OFAC's determination was 'arbitrary and capricious'"). Moreover, OFAC's reliance on Section 211 and the corresponding amended regulation invalidates the specific license denial. In the first place, the statute and regulation do not authorize the grant or denial of specific licenses. *See* Defendants' December 21, 2006 Brief at 6; Szubin 2006 Decl. ¶ 22. Secondly, OFAC's reliance on them condemns the agency's decision for reasons discussed in Section III, *supra*.

The denial of Cubaexport's specific license request is no more defensible than OFAC's general license decision. In extending its invitation to seek a specific license, OFAC did not give Cubaexport notice that the specific license ruling would turn on Section 211. On the contrary, because general and specific licenses are mutually exclusive and there is no application process for a general license, OFAC invited Cubaexport to address its right to a license *wholly apart*

*from* Section 211 – only to base its specific license decision on that statute.[55]  And just as OFAC's general license ruling relied on Bacardi's bald assertions regarding the applicability of Section 211, the agency uncritically accepted State's view that Section 211 – the "Bacardi bill" – prohibits the grant of a specific license to renew the HAVANA CLUB registration.  In applying Section 211 to the registration, State necessarily needed to resolve the issues of confiscation, consent and successorship, but provided no explanation of how it did so.  This cannot be passed off as an unreviewable exercise of U.S. foreign policy.[56]

On the contrary, permitting OFAC's tainted decision to stand would call into question a specific license applicant's right to "receive ordinary fair play from [a government agency]." *Stockstrom*, 190 F.2d at 289.  That is a practice to which this Court should not lend its approval. *See Columbia Broad. Syst., Inc.,* 454 F.2d at 1036 ("[t]his court will not be made a party to [a] sham [agency] proceeding.").

According to its director, OFAC retained TWEA authority "to issue a specific license, should facts and circumstances and current U.S. foreign policy militate in favor of authorizing a transaction that *does not qualify for the general license in paragraph (a)(1) [of 31 C.F.R. § 515.527.*]"  Szubin 2006 Decl. ¶ 22 (emphasis added).  However, on its face the general license of 31 C.F.R. § 515.527(a)(1) is *unqualified* and has been since its inception.  The only qualification on OFAC's general trademark licensing authority is 31 C.F.R. § 515.527(a)(2).[57]

---

[55] *See Alaska Prof'l. Ass'n.* v. *FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999) (plaintiffs "had no reason to know [agency would rely on a certain regulation] ....  Those regulated by an administrative agency are entitled to 'know the rules by which the game will be played.'");  *Mobile Commc'ns v. FCC*, 77 F.3d 1399, 1407 (D.C. Cir. 1996) (after agency "lulled [applicant] into a false sense of security" that an issue need not be addressed, agency resolved issue against applicant).

[56] Labeling a decision an exercise in U.S. foreign policy does not make it so.  *See Halperin v. Kissinger*, 606 F.2d 1192, 1201 n.59 (D.C. Cir. 1979) ("Our duty to decide this case is not diminished because we deal with the President's foreign affairs power....'(Executive) action is not proof of its own necessity.'").

[57] OFAC does not explain how the general license in 31 C.F.R. § 515.527(a)(1) could be inapplicable due to "facts and circumstances" or "U.S. foreign policy" other than the policy reflected in Section 211.  If anything, 31 C.F.R.

OFAC's *post hoc* description of its specific license authority "[creates a] Catch-22." *Am. Airways Charters*, 746 F.2d at 876.  OFAC retained authority to issue a specific license "should facts and circumstances and current U.S. policy militate in favor of authorizing" a registration renewal prohibited by 31 C.F.R. § 515.527(a)(2), which is the only qualification on the general trademark licensing authority in 31 C.F.R. § 515.527(a)(1).  But, according to OFAC, the U.S. policy against confiscation embodied in 31 C.F.R. § 515.527(a)(2) militates against issuing a specific license.  Thus, 31 C.F.R. § 515.527(a)(2) renders OFAC's reservation of specific license authority illusory.

OFAC's April 6, 2006 invitation to seek a specific TWEA license was a sham.  The government claims that even then "OFAC was faced with the question of whether the grant of a specific license to authorize transactions related to the renewal of the Havana Club trademark would be consistent with Section 211."  Defendants' December 6, 2006 Brief at 35.  If that was the case, OFAC's letter did not say so.[58]  Even before referring Cubaexport's application to State on May 15, 2006 (Szubin 2006 Decl. ¶ 38), OFAC apparently was persuaded by the New York HAVANA CLUB case and Bacardi's May 9, 2006 letter that Section 211 applies to the HAVANA CLUB registration.  *See* Szubin 2007 Decl. ¶¶ 9-19.

Responding in good faith to OFAC's invitation, Cubaexport reasonably maintained that OFAC should issue a specific license so that the HAVANA CLUB registration could be preserved pending a decision regarding Section 211 in the D.C. Action.  Instead of considering

---

§ 515.527(a)(1) otherwise *embodies* U.S. foreign policy to permit unrestricted registration and renewal of Cuban trademarks.

[58]  In issuing its invitation to seek a specific license, OFAC did not advise Cubaexport that the agency would base a decision on its or State's views of Section 211 policy, as opposed to the "facts and circumstances specific to the application [which OFAC typically considers]."  Szubin 2006 Decl. ¶ 13.  *See* Szubin 2006 Decl. ¶14 ("OFAC considers applications for specific licenses on a case-by-case basis in light of the facts presented.").  Instead, it advised Cubaexport's attorneys that the agency's interpretation of the Specific Defense License "does not in any way prejudice the ability of Ropes & Gray to request [a new specific license]."  AR 53.

any of the facts Cubaexport advanced in support of its license request, OFAC resorted to

Section 211 to deny the license upon instructions from the State Department.[59]  In doing so, the

agency abdicated its TWEA authority to make specific license decisions[60] in what plainly was a

surrender to political pressure.[61]  OFAC then hid from Cubaexport and the public the true basis

for the license denial, which did not emerge until Cubaexport sued the agency.  Rather than state

openly that Section 211 underlies the denial, OFAC attributed the decision to State's supposedly

unchallengeable views of U.S. policy.[62]

### B.    This Court Should Vacate The Specific License Denial Even If OFAC Did Not Consider Section 211

Even if the specific license denial had not been based on Section 211 and C.F.R.

§ 515.527(a)(2), it should be vacated because it runs afoul of the TWEA and OFAC's consistent

policy of preserving Cuban assets, both of which set standards against which the denial can and

should be measured.  *See Heckler v. Cheney*, 470 U.S. 821, 830 (1985) (APA's very narrow

exception for action committed to agency discretion by law applies only if there is no "judicially

---

[59]  OFAC has not explained why Cubaexport's April 7, 2006 license application required the agency to depart from its practice of considering such applications "on a case-by-case basis in light of the facts presented."  Szubin 2006 Decl. ¶ 14.  *See, e.g.*, *Kidd Commc'ns v. FCC*, 427 F.3d 1, 6 (D.C. Cir. 2005) (agency licensing decision was arbitrary and capricious where agency failed to explain departure from policy).  On April 6, 2006, OFAC articulated why it believed Cubaexport's facts and arguments did not support payment of the renewal fee pursuant to the Specific Defense License.  Equally, it should have been able to explain on July 28, 2006 why they did or did not warrant the grant of the new specific license the agency had invited Cubaexport to seek.  *See, e.g.*, *Ehrman v. U.S.*, 429 F. Supp. 2d 61, 70 (D.D.C. 2006) (Lamberth, J.) (agency failure to address merits of arguments is arbitrary and capricious).

[60]  *See, e.g.*, *Department of the Treasury v. FLRA*, 43 F.3d 682 (D.C. Cir. 1994) (FLRA could not rule on applicability of Treasury Department regulation).  Accordingly, OFAC's reliance on State's views of Section 211 cannot be justified as "[i]nteragency coordination" or "a general practice … [of] referring to the State Department for review … license applications for which there is no established practice of issuance or denial."  Szubin 2006 Decl. ¶ 38.

[61]  *See D.C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971) (agency action is "invalid if based in whole or in part on the pressures emanating from [one member of Congress.]"); *Columbia Broadcasting System, Inc.*, 454 F.2d at 1036  ("changes in position ... leads [one] ... to conclude ... that the Commission has taken a political role of interference contrary to all of the teachings of administrative decision-making."); *Pierce, Administrative Law* §11.5 at 815 (APA requires reasoned agency decisions to avoid rulings based on "political favoritism").

[62]  Indeed, in passing the buck to State on May 15, 2006, OFAC appears to have sought foreign policy cover for a Section 211 decision it already had reached.

manageable standards ... available for judging how and when an agency should exercise its discretion.").[63]

Because OFAC says it retained the right to issue specific licenses under its TWEA authority *despite* Section 211 and 31 C.F.R. § 515.527(a)(2), OFAC's decision to deny Cubaexport's specific license request "must 'have the support of the congressional policies behind the [TWEA].'" *Am. Airways Charters, Inc.*, 746 F.2d at 872. *See* 516 F. Supp. 2d at 58 (considering TWEA); *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) ("It is elementary that ... a federal agency ... has ... only those authorities conferred upon it by Congress"). This Court, in turn, is empowered to decide whether OFAC exceeded its TWEA authority in denying the specific license.[64]

Because Congress has withdrawn from the executive – and thus OFAC – whatever TWEA authority the executive had to go beyond the blocking of Cuban assets in peace time,[65]

---

[63] *See also Am. Airways Charters, Inc.,* 746 F.2d at 868-69  (reversing OFAC's failure to grant plaintiff specific license); *Nielsen v. Secretary of Treasury*, 424 F. 2d 833, 842 (D.C. Cir. 1970) (concluding that OFAC acted reasonably in denying specific license to unblock frozen assets owned by a Cuban corporation).  Respectfully, OFAC may not ignore these standards because "31 C.F.R. § 515.801(b)(4) [*sic* 31 C.F.R. § 501.801(b)(4)] describ[es the] specific license application and issuance process without any explanation of how licensing decisions are or should be made" (516 F. Supp. 2d at 58) or because it claims that a specific license decision concerns "facts and circumstances specific to the application [for a license]" (Szubin 2006 Decl. ¶ 13).  OFAC may not exceed its TWEA authority, and departures from agency practice are arbitrary and capricious even though rulings "depend ... on 'specific facts of future cases'".  *Ramaprakash v. FAA*, 346 F.3d 1121, 1130 (D.C. Cir. 2003).  Moreover, OFAC did not consider the facts set forth in the license application.

[64] There is a "strong presumption that Congress intends judicial review of administrative action," *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986), which can only be overcome by "clear and convincing evidence" that Congress intended to preclude such review.  *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141 (1967).  The presumption is particularly strong that Congress intends judicial review of agency action taken in excess of delegated authority.  *Aid Ass'n for Lutherans v. U.S. Postal Service*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)  ("Appellees' claims here, that the Postal Service 'exceeded it statutory authority'... clearly admit of judicial review.").  *See Dart v . U.S.*, 848 F.2d 217, 223 (D.C. Cir. 1988) (agency condemned for improperly sanctioning unlicensed exportation of goods).

[65] *See Regan*, 468 U.S. at 227-28 (executive's TWEA authority to go beyond blocking assets in peace time withdrawn by Congress in 1977); *Am. Airways Charter, Inc.*, 746 F.2d at 869 ("the district court stumbled in attributing to OFAC more power than Congress conferred upon the Executive.  AAC's assets are blocked.... But Congress has not authorized the Executive to seize [assets]."); *Miranda v. Sec'y of Treasury*, 766 F.2d 1, 4 (1st Cir. 1985) (OFAC's TWEA regulations call for the blocking, not destruction, of Cuban assets to prevent the flow of hard currency to Cuba, for possible future use in settling claims, and for negotiations with the Cuban government).  Other cases recognizing the fundamental difference between blocking and vesting or otherwise liquidating foreign assets

the destruction of one Cuban asset for the commercial benefit of Bacardi exceeded OFAC's TWEA authority and contravened the very purposes that the TWEA is intended to serve. *See* 5 U.S.C. § 706(2)(C) ("The reviewing court shall ... hold unlawful and set aside agency action ... found to be ... in excess of statutory ... authority, or limitations"); *AFL-CIO v. Chao*, 409 F.3d 377, 391 (D.C. Cir. 2005) ("promulgation of Form T-1 exceeds the Secretary's [statutory] authority").

Following State's lead, OFAC promoted Bacardi's private interest at the expense of OFAC's own broader public mission. The agency "dismiss[ed] entirely the possibility of a turn of events with Cuba that may ... eventuate in an international agreement with Cuba relating to mutual recognition and settlement of claims." *Neilsen*, 424 F.2d at 843. And it thus assured that the HAVANA CLUB registration will not "function as [a] bargaining chip ... in United States relations with Cuba," as the TWEA contemplates. *Havana Club Holding, S.A. v. Galleon, S.A.*, 961 F. Supp. 498, 505 (S.D.N.Y. 1997).[66]

Similarly, OFAC improperly violated its own consistent policy, which "provide[s] [a] standard ... rendering what might arguably be unreviewable agency actions reviewable." *See Clifford v. Pena*, 77 F.3d 1414, 1417 (D.C. Cir. 1996). OFAC's policy is to preserve blocked Cuban assets so that they can be disposed of in accordance with an overall plan, not destroy them piecemeal for the benefit of one private party at the expense of another. *See DeCuellar*, 881 F.2d at 1569:

---

include *Neilsen*, 424 F.2d at 842-43 (while providing for the "blocking of Cuban assets ... Congress [has not passed] a statute authorizing the vesting of Cuban assets."); *IPT Co. v. Brady*, 1994 WL 613371, at *5 (S.D.N.Y. Nov. 4, 1994) (although executive may block foreign assets, "[t]itle to the assets may not ... vest in the Government without compensation to the owners. The assets that are frozen must be released into the custody of the owner at the time the blocking order is lifted.").

[66] OFAC's *ultra vires* destruction of a Cuban asset for Bacardi's benefit is particularly improper because Bacardi could not lawfully have acquired JASA's blocked Cuban registrations if JASA had maintained them as it easily could have done.

[T]he continued blocking of [Cuban assets] provides an important bargaining tool for negotiations with the Cuban government....  The OFAC Director explained that it has been a consistent policy to keep "all Cuban assets blocked, pending a decision or settlement regarding all claims against Cuba. Eventually, all blocked assets will be disposed of in accordance with an overall plan." [67]

OFAC departed from that policy with a conclusory one paragraph statement that never even mentions the policy.  That is a violation of the APA even if the decision is entitled to deference. [68]  In any event, the decision is not entitled to deference and should be set aside because OFAC impermissibly "delegate[d] its statutory responsibility to [the State Department.]."  *D.C. Fed'n of Civic Ass'ns*., 459 F. 2d at 1240.  In seeking State's "guidance," OFAC could not bind itself to the other agency's views of how OFAC should exercise its specific license authority.  *See Department of the Treasury*, 43 F.3d 682 (FLRA could not rule on applicability of Treasury Department regulation). [69]

---

[67]  *See also Am. Airways Charters, Inc.,* 746 F.2d at 872 ("OFAC asserts an interest in preserving blocked [Cuban] assets"); *Miranda*, 766 F.2d at 4 (OFAC's TWEA regulations call for the blocking, not destruction, of Cuban assets to prevent the flow of hard currency to Cuba, for possible future use in settling claims, and for negotiations with the Cuban government).

[68]  *See Kidd Commc'ns v. FCC*, 427 F.3d at 6  (agency licensing decision was arbitrary and capricious where agency failed to explain departure from policy); *N.Y. York Cross Harbor R. R. v. STB*, 374 F.3d 1177, 1187 (D.C. Cir. 2004) (agency acted arbitrarily when it "neglected to mention its 'statutory duty to preserve and promote continued rail service'"); *Transactive Corp. v. Rubin*, 91 F.3d 232, 237 (D.C. Cir. 1996) (Treasury Department did not adequately explain failure to "follow its established policies"); *Balt. & Annapolis R.R*, 642 F.2d at 1371 (D.D.C. 1980) (reversing agency order that "attempts to overturn the position indicated by ... an order ... allowed to stand without challenge or contradiction for more than twelve years"); *Am. Airways Charters, Inc.*, 746 F.2d at 874 n.17 (condemning OFAC specific licensing decision that "represents a sharp departure from prior practice").

[69]  *See also U.S. Dept. of the Air Force v. FLRA*, 952 F.2d 446, 450 (D.C. Cir. 1991) ("Deference to the FLRA is especially inappropriate here because Congress specifically delegated to the OPM the authority 'to administer' the FLSA's provisions on payment of overtime."); *Nat. Treasury Employee's Union v. FLRA*, 848 F.2d 1273, 1275 (D.C. Cir. 1988) ("[W]e need not defer to [the Authority's] interpretation of regulations promulgated by other agencies").  Respectfully, State's views could not constitute "dispositive 'guidance'".  516 F. Supp. 2d at 57. Ultimately, OFAC and OFAC alone was charged by law with making a licensing decision consistent with its TWEA-based regulatory authority.  *See* Plaintiff's March 27, 2006 Brief at 30-31; *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 401 (1940) (IRS decision regarding tax issue could not bind commission charged by statute with deciding issue).  *Cf. N.Y. Cross Harbor R.R.*, 374 F.3d at 1185-86 ("the Board in effect said 'the City says abandonment is in the public interest, and therefore it is.' ... The Board cannot abdicate its responsibility to make an independent assessment.").

41

Nor may destruction of the HAVANA CLUB registration be justified by the U.S. policy views State expressed in its July 28, 2006 memorandum.  Even if it were appropriate for OFAC to consider State's views, OFAC was not at liberty to implement them by destroying a Cuban asset in violation of its own TWEA authority.  *See Michigan*, 268 F.3d at 1081 ("[i]t is elementary that ... a federal agency ... has ... only those authorities conferred upon it by Congress.").[70]

OFAC could not lawfully implement State's view that "[d]enial of the license application would be consistent with the U.S. approach toward non-recognition of trademark rights with confiscated property" (AR 2) because non-recognition of rights in confiscated property is not among OFAC's TWEA powers[71] and OFAC has no authority to destroy a blocked Cuban asset.[72] OFAC also was powerless to destroy the registration because State maintained that "to the extent that registration of the trademark ... has current or potential financial value to the Cuban government, denial of the license [to pay the renewal fee] would be consistent with the ... policy of the United States to deny resources to the Castro regime."  (AR 3).  If OFAC wished to implement that policy pursuant to its TWEA authority, it lawfully could only block the transfer of the registration for financial consideration.[73]

---

[70]  Respectfully, the issue now and as originally raised by Cubaexport is whether OFAC contravened its TWEA authority.  *See* Plaintiff's March 27, 2007 Brief at 30-31.  It is not whether "OFAC's denial of a specific license was consistent with U.S. foreign policy."  516 F. Supp. 2d at 58.

[71]  *See* Defendants' December 21, 2006 Brief at 39 (citing Section 211, not the TWEA).  The TWEA authorizes the executive to address "peacetime emergencies and times of war," *Regan*, 468 U.S. at 226, through the "administration [of foreign-owned property] 'in the interest of and for the benefit of the United States', it is not a confiscation measure."  *Zittman*, 341 U.S. at 473-74

[72]  *See, e.g.*, *Regan*, 468 U.S. at 227-28 (discussing Congressional withdrawal of OFAC's authority to go beyond blocking assets).  The TWEA does not confer on the executive open-ended authority over U.S. policy.  That an action is "consistent with" a U.S. policy over which OFAC has no authority does not entitle the agency to take such action, particularly when the action contravenes the authority it does have.

[73]  *See* Defendants' December 21, 2006 Brief at 39 ("one of the goals of the TWEA is to limit the flow of hard currency to countries, such as Cuba", citing *inter alia Miranda*, 766 F. 2d at 4, which distinguishes between blocking and vesting assets and states that OFAC's regulations limit funds for Cuba by prohibiting the "transfer, sale or other disposition of assets in which the Cuban government or Cuban nationals have an interest"); *Havana Club*

In keeping with its policy of preserving blocked Cuban assets, OFAC has drawn "a rational ... distinction between [maintaining] registrations and [prohibiting] assignment [of the registrations for consideration]".  *Havana Club Holding, S.A.*, 974 F. Supp. at 310.  OFAC turned that rational distinction on its head when it denied Cubaexport's specific license request – destroying a Cuban asset which could not be transferred by the Republic of Cuba for consideration because OFAC has not authorized such a transfer.

OFAC's *ultra vires* destruction of a Cuban asset is not immune from judicial scrutiny because OFAC's actions affect certain foreign affairs, as *American Airways* and *Nielsen* attest, or because the decision refers to State's views regarding U.S. policy.  As discussed above, State's views do not entitle OFAC to disregard the particular authority it has to implement U.S. policy.  OFAC's specific licensing decisions in this matter – facilitating the defense of private litigation and barring renewal of the registration at issue in that litigation – have been incidental to an ongoing commercial dispute which raises no issue of U.S. national security.[74]  OFAC may not properly take sides in that litigation under the guise of denying a specific license request.[75]  Indeed, OFAC's willingness to entertain Bacardi's views[76] should draw this Court's close

---

*Holding, S.A.,* 974 F. Supp. at 310 (distinguishing between barring the transfer of a trademark registration, which "creates the opportunity for an individual or corporation to purchase the registration," and the "renewal of a trademark [registration].").  Contrary to State's view, the "recommendations of the Commission for Assistance to a Free Cuba" (AR 3) do *not* include OFAC's destruction of blocked assets as a means of denying revenue to the Republic of Cuba or otherwise.  *See* VNP Decl. Exh. 29.

[74]  *See Halperin v. Kissinger*, 606 F.2d 1192, 1202 (D.C. Cir. 1979) (judicial decision appropriate if "supposed national security concerns [are] ephemeral");  *Havana Club Holding, S.A.*, 961 F. Supp. at 504 ("foreign policy considerations clearly do not include [Bacardi's] interest in clearing the path for [its] use of the HAVANA CLUB mark.").

[75]  *See, e.g. Am. Airways Charters, Inc.*, 746 F.2d at 874 n.15 (criticizing OFAC's summary resolution of issue that would "preclude [party] from litigating ... [that issue]"); 18B *Wright, Miller & Cooper, Federal Practice and Procedure,* § 4475 at 485 ("a nonadversary executive action ... clearly cannot constitute an adjudication on any view," citing *Whalen*, 48 F.3d at 1255-56).

[76]  For example, Bacardi "submitted arguments in opposition to Ropes & Gray's April 7, 2006, letter .... [and] OFAC received copies of correspondence sent … on behalf of Bacardi, to the USPTO ....  After considering … the facts and circumstances of this case, OFAC concluded that a specific license should not be issued."  Szubin 2006

scrutiny and would justify "ordering the [agency] to grant [a] license."  *WLOS TV, Inc.,* 932 F.2d at 998.

### C.    It Is Appropriate To Vacate The Specific License Denial

The July 28, 2006 specific license denial should be vacated because it relied on Section 211.  Moreover, even if it had not the decision impermissibly threatens to preclude adjudication in the D.C. Action;[77] OFAC violated its TWEA authority and consistent policy of preserving Cuban assets; and vacating the decision will avoid the need to address the constitutional challenges Cubaexport has raised in Counts I-III of the Complaint.  Finally, because OFAC entertained the views of Cubaexport's rival, Bacardi, its decision sits under a cloud of suspicion and "may not stand."  *Columbia Broad. Syst., Inc.*, 454 F.2d at 1027.

OFAC departed from its practice of considering "applications for specific licenses ... in light of all facts presented."  Szubin 2006 Decl. ¶ 14.  Stripped of OFAC's misplaced reliance on State's views of U.S. policy including the policy embodied in Section 211, the license denial is unsupported by any facts or reasoning whatsoever.[78]  And OFAC acted arbitrarily in failing to address any of the arguments Cubaexport made in support of the license application.[79]  Far from being frivolous, these arguments (AR 50-51) have been borne out by subsequent events.[80]

---

Decl. ¶¶ 36-37, 40.  Moreover, OFAC mistakenly concluded that the New York court "found that Bacardi was the successor-in-interest to JASA's interest in the Havana Club trademark."  Defendants' December 21, 2006 Statement of Undisputed Material Facts No. 19.

[77] For example, after OFAC advised the USPTO of State's view that "it would be inconsistent with U.S. policy to issue a specific license" (AR 1), Judge Sullivan stayed the D.C. Action in which Bacardi alleges that maintaining the registration would be inconsistent with "long standing U.S. policy."  VNP Decl. Exh. 10 ¶ 6(c).

[78] *See, e.g., Hispanic Info. & Telecomms. Network, Inc. v. FCC*, 865 F.2d 1289, 1297-98 (D.C. Cir. 1989) ("[The agency] offered only the unsupported assertion that the four-channel rule does not apply... The Commission's decision therefore cannot be sustained."); *Karmargo Corp. v. FERC*, 852 F.2d 1392, 1397 (D.C. Cir. 1988) (rejecting agency decision that "failed to articulate ... rationale").

[79] *See Canales v. Paulson*, 2007 U.S. Dist. LEXIS 50924, at *18 (D.D.C. July 16, 2007) (Treasury Department violated APA by withdrawing plaintiff's right to contract with government without adequately addressing plaintiff's arguments); *Ehrman*, 429 F. Supp. at 70 (Lamberth, J.) (agency "acted in an arbitrary and capricious manner by failing to address on the merits [plaintiff's] arguments in support of that claim and summarily disregarding them"); *Roberts v. Harvey*, 441 F. Supp. 2d 111, 121 (D.D.C. 2006) ("failure to address [a non-frivolous] argument renders

Respectfully, OFAC has in effect "denied renewal of the existing legal license [to defend Cubaexport in the D.C. Action]." 516 F. Supp. 2d at 59. While extending that license yet again well into 2009, OFAC has effectively pulled the plug on Cubaexport's exercise of that license by prohibiting renewal of the registration.[81] Although the Specific Defense License authorizes Cubaexport to address in a judicial setting the applicability of Section 211, OFAC used State's non-adjudicative ruling on that very issue to preclude Cubaexport from doing so.

## V.    CONCLUSION

For the foregoing reasons, Cubaexport respectfully requests that this Court grant its motion for summary judgment with respect to the second and third APA claims and vacate OFAC's general and specific license decisions. Vacating those decisions will not resolve the dispute surrounding the HAVANA CLUB registration as OFAC's ill-considered rulings threaten to do. Rather, it will reopen the D.C. Action, where both Bacardi and Cubaexport can avail themselves of judicial process and where OFAC itself has licensed Cubaexport to plead its case.

---

[an agency's] decision arbitrary"). OFAC simply said in its April 6, 2006 letter that these arguments (made on December 15, 2005) did not justify Cubaexport's construction of the original specific license to represent Cubaexport. (AR 52-53). The April 6, 2006 letter "did not answer the question of whether renewal could be otherwise authorized." *See* Defendants' December 21, 2006 Statement of Undisputed Material Facts No. 42. Moreover, the Szubin 2006 Declaration confirms that neither OFAC nor State addressed Cubaexport's arguments. *See* Szubin 2006 Decl. ¶¶ 38-41.

[80] Once OFAC prohibited renewal, the USPTO refused to renew the registration and Judge Sullivan stayed the D.C. Action because Bacardi urged that the USPTO's decision would grant it the relief it seeks in that action. Conversely, OFAC's alleged inability to predict the effect of a license denial in the USPTO and the D.C. Action (AR 53) is baseless now that events in those proceedings have confirmed Cubaexport's predictions. Even before Cubaexport's predictions were confirmed, OFAC's excuse was baseless. Before reaching its decision, "OFAC contacted the USPTO in connection with the License Application." Szubin 2006 Decl. ¶ 38. Predictably, the USPTO refused to renew the registration once it received OFAC's decision. It is inconceivable that OFAC could not and did not anticipate this outcome.

[81] OFAC could have licensed renewal, or stayed the license denial, pending the outcome of the D.C. Action to give effect to its own Specific Defense License. *See Gulf Power Co. v. FERC*, 983 F.2d 1095, 1101 (D.C. Cir. 1993) (vacating agency's complete denial of application for retroactive waiver where agency could have granted "partially retroactive waiver"); *Uritsky v. Newcomb*, 2004 WL 1125203 (D. Mass. May 19, 2004) (OFAC stipulated to stay of action challenging its decision); Szubin 2006 Decl. ¶ 17 ("Licenses ... may be amended [or] modified ... at any time."). Instead, it unreasonably denied the registration renewal license outright while renewing the Specific Defense License.

Dated:  July 23, 2008                    Respectfully submitted,

                                         */s/ Peter M. Brody*
                                         Peter M. Brody (D.C. Bar No. #398717)
                                         ROPES & GRAY LLP
                                         One Metro Center
                                         700 12th Street, N.W.
                                         Washington, D.C.  20005
                                         Tel. (202) 508-4600
                                         Fax (202) 508-4650

                                         Vincent N. Palladino
                                         ROPES & GRAY LLP
                                         1211 Avenue of the Americas
                                         New York, New York  10036
                                         Tel. (212) 596-9000
                                         Fax (212) 596-9090

                                         *Counsel for Plaintiff,*
                                         *Empresa Cubana Exportadora de Alimentos y*
                                         *Productos Varios, d/b/a Cubaexport*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| )<br>EMPRESA CUBANA EXPORTADORA )<br>DE ALIMENTOS Y PRODUCTOS )<br>VARIOS d/b/a/CUBAEXPORT, )<br>)<br>      Plaintiff, )<br>)<br>   v. )<br>)<br>UNITED STATES DEPARTMENT OF )<br>THE TREASURY, OFFICE OF )<br>FOREIGN ASSETS CONTROL, )<br>HENRY M. PAULSON, JR., as Secretary )<br>of Treasury, ADAM J. SZUBIN, as )<br>Director of the Office of Foreign Assets )<br>Control, and THE UNITED STATES, )<br>)<br>      Defendants. )<br>) | Civil Action No. 1:06CV01692 (RCL)<br><br>Hon. Royce C. Lamberth |

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ITS
SECOND AND THIRD APA CLAIMS**

Pursuant to Local Rule LCvR 7(h), plaintiff submits this statement of material facts as to which there is no genuine issue:

## I.    FACTS MATERIAL TO BOTH CLAIMS

1.    On December 13, 2005, Cubaexport's attorneys Ropes & Gray advised OFAC that they were tendering the fee to renew Cubaexport's Registration No. 1,031,651 of the HAVANA CLUB & Design trademark pursuant to a specific license that OFAC previously had issued.  (AR 52-53).

2.    On April 6, 2006, OFAC sent Ropes & Gray a letter.  The letter stated *inter alia* that the specific license OFAC previously had issued did not authorize payment of the

registration renewal fee and invited Ropes & Gray to seek a new specific license authorizing

payment of the renewal fee.  *See* November 26, 2007 Declaration of Adam J. Szubin ("Szubin

2007 Decl.") ¶ 20.

      3.      On April 7, 2006, Ropes & Gray sought a new specific license authorizing payment

of the renewal fee.  (AR 49-51).

      4.      On July 28, 2006, OFAC sent Ropes & Gray a letter.  The letter stated in its

entirety:

> Pursuant to the Cuban Assets Control Regulations, 31 C.F.R. Part 515, administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed.
>
> Pursuant to the Cuban Asset Control Regulations, 31 C.F.R. Part 515, administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed.
>
> OFAC has been engaged in consultation with the relevant agencies in the U.S. Government, including the Department of State ("State"), on this issue.  We have received guidance from State informing us that it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark.  Accordingly, your request is hereby denied.

(AR 1)

      5.      On April 7, 2006, Ropes & Gray sought a new specific license authorizing payment

of the renewal fee.  (AR 49-51).

      6.      On August 3, 2006, the USPTO Post Registration Division issued the following

notification to Cubaexport:

> [T]he Office has received ... [OFAC's July 28, 2006 ruling].  Because the specific license is necessary for authorizing payment of the required fee, and that license has been denied, the required filing fee for [renewal of the registration] has not

been submitted; accordingly the registration will be cancelled/expired.  (emphasis added).

Compl. Ex. 24.

7.    Cubaexport promptly appealed this decision to the Commissioner of the USPTO.

8.    On December 6, 2006, the USPTO Director for Trademarks stayed Cubaexport's appeal pending the outcome of this litigation.  *See* Declaration of Vincent N. Palladino ("VNP Decl.") Exh. **31**.

9.    Judge Sullivan, in turn, stayed *Bacardi & CO., Ltd.* v. *Cubaexport*, Civ. No. 04-00519 (D.D.C. 2004) pending a decision by the USPTO because Bacardi argued that a USPTO decision denying renewal would grant it the relief it seeks in the D.C. Action.

## II.    FACTS MATERIAL TO THE SECOND APA CLAIM

### A.    OFAC's July 28, 2008 Decision

#### 1.    The Basis For The Decision

10.    31 C.F.R. § 515.527(a)(2) "incorporated the limitations ... mandated by Section 211."  Szubin 2007 Decl. ¶ 7.

11.    OFAC determined that 31 C.F.R. § 515.527(a)(2) applies to the HAVANA CLUB registration.  Szubin 2007 Decl. ¶¶ 10-19.

12.    In determining that 31 C.F.R. § 515.527(a)(2) applies to the HAVANA CLUB registration, OFAC took into consideration "legal proceedings and judicial findings concerning the HAVANA CLUB trademark, and ... correspondence from Bacardi-Martini U.S.A., Inc." Szubin 2007 Decl. ¶ 9.  *See also* Szubin 2007 Decl. ¶¶ 10-19.

13.    Cubaexport was not a party to the legal proceedings referred to in the Szubin 2007

Declaration.

14.    The Szubin 2007 Declaration states *inter alia*:

> 16.    In a letter to OFAC dated May 9, 2006, counsel to Bacardi &
> Company Limited and Bacardi U.S.A., Inc., claimed that Bacardi "is the bona fide
> successor-in-interest to all of JASA's rights in the HAVANA CLUB trademark.
> Neither Bacardi nor JASA has ever consented, expressly or otherwise, to the
> renewal of the HAVANA CLUB registration by or on behalf of Cubaexport."  AR
> 42; see also AR 12.

* * *

> 18.    Based on Bacardi's written statements and the fact that Bacardi
> continues to contest matters related to the renewal of the HAVANA CLUB
> trademark, OFAC understood that, to the extent Bacardi claims to be a bona fide
> successor-in-interest to JASA's assets or rights to the trademark, Bacardi has also
> not consented to any transaction related to the registration and renewal of the
> HAVANA CLUB trademark by Cubaexport.

> 19.    Therefore, OFAC knew of no entity purporting to be either an
> original owner or a bona fide successor-in-interest to JASA that had consented to
> any transaction related to the registration and renewal of the HAVANA CLUB
> mark by Cubaexport.  Accordingly, OFAC concluded that Cubaexport had not
> received such consent, and that the general licensing provision could not apply on
> that basis.

15.    OFAC purportedly "found support for Bacardi's claims in the Second Circuit's

recognition of Bacardi as a 'purchase[r] of the Arechabala family's rights (if any) to the 'Havana

Club' trademark, the related goodwill of the business, and any rum business assets still owned by

the Arechabala family [in 1997].'"  Szubin 2007 Decl. ¶ 17.

## 2.    **The Process OFAC Provided Cubaexport**

16.    The Szubin 2007 Declaration does not state that OFAC advised Cubaexport or

Ropes & Gray before July 28, 2006 that the agency intended to rule on the applicability of 31

C.F.R. §515.527(a)(2) to the HAVANA CLUB registration.

4

17.    OFAC's April 6, 2006 letter stated *inter alia* that if Ropes & Gray wanted "to request . . . further guidance from OFAC, you may do so by writing directly to OFAC's Licensing Division."  (AR 53).

18.    The Szubin 2007 Declaration identifies OFAC's April 6, 2006 offer of further guidance as one of the "procedural opportunities" that OFAC provided to Cubaexport to address the applicability of 31 C.F.R. § 515.527(a)(2) to the HAVANA CLUB registration.  Szubin 2007 Decl. ¶¶ 20, 25.

19.    The Szubin 2007 Declaration does not explain why Cubaexport should have addressed the applicability of 31 C.F.R. § 515.527(a)(2) to the HAVANA CLUB registration while the April 7, 2006 specific license application was pending.

20.    OFAC's April 6, 2006 letter did not state that OFAC would have provided any further guidance before July 27, 2006.  (AR 53)

21.    The Szubin 2007 Declaration does not state that OFAC would have provided any further guidance before July 27, 2006.

22.    The Szubin 2007 Declaration states that the right to "reopen . . . [a specific license] application or the filing of a further [specific license] application [and] . . . further explanation of the reasons for a denial" of a specific license are "procedural opportunities" that OFAC provided to Cubaexport to address the applicability of 31 C.F.R. § 515.527(a)(2) to the HAVANA CLUB registration.  Szubin 2007 Decl. ¶¶ 24-25.

23.    The Szubin 2007 Declaration does not explain how the right to pursue these opportunities after the July 28, 2006 denial of the specific license request provided an opportunity to address the applicability of 31 C.F.R. § 515.527(a)(2) before that date.

**B.    OFAC's Amended Regulation**

24.    An article *House Passes Spending Bill:  Massive Omnibus Measure Larded With Pet Projects*, WASHINGTON POST, October 21, 1998, described the Omnibus Consolidated and Emergency Supplementation Appropriations Act as a "16" tall, 40-pound document [that included] handwritten notes in the margin, e-mail printouts inserted into the bill, and misnumbered or unnumbered pages."  VNP Decl. Exh. **2**.  It  reported *inter alia* the comments of Rep. Peter A. Defazio (Oregon) ("Heck, half the members couldn't even lift [the omnibus bill], let alone read it."); Sen. Robert C. Byrd (West Virginia), ("Do I know what's in this bill? ... Are you kidding?  No.  Only God knows what's in this monstrosity."); and Rep. David R. Obey (Wisconsin), ("We have this godawful mess on the floor [that] represents an incredibly outrageous way to do the country's business.").  VNP Decl. Exh. **2**.

25.    An article *Bacardi's Cuban Rumble Spills Into U.S.*, THE WALL STREET JOURNAL, August 17, 2006, reported *inter alia* Section 211 was "dubbed the 'Bacardi Bill'".  VNP Decl. Exh. **3**.

26.    An article *Budget Bill Would Shut Off Trade with Some Cuban Joint-Ventures: Spending Provision Likely to Draw Fire from EU*, INSIDE U.S. TRADE, October 23, 1998, reported *inter alia* that Section 211 "was specifically pushed by Bacardi-Martini U.S.A., a competitor of HCH for the right to use the Havana Club trademark."  VNP Decl. Exh. **4**.

27.    The Statement of the Honorable Larry Craig, Testimony to Senate Committee on the Judiciary, July 13, 2004, stated *inter alia* that "section 211 benefits one foreign company alone.  This point bears emphasis, no U.S. company receives the slightest advantage from that law.  If anyone doubts this I suggest they ask the law's sole beneficiary, Bacardi, Inc., to name one U.S. company that benefits from and supports [it]."  VNP Decl. Exh. **5**.

28.    An article *Hidden Provision Sparks New Dispute Over Cuba*, CUBA NEWS (Miami Herald Publishing Co. November, 1998) reported *inter alia* that a "new statute [Section 211] aimed at helping Bacardi-Martini U.S.A. win a battle over the prized Havana Club trademark … was tucked away in the massive omnibus spending bill."  VNP Decl. Exh. **6**.

29.    There were no Congressional hearings on Section 211.

30.    There is no legislative history for Section 211.

31.    The Republic of Cuba and its nationals apply for, own and renew U.S. trademark registrations.  VNP Decl. Exh. **1**.

32.    The Second Submission of the United States of America to the World Trade Organization in connection with Section 211 states *inter alia*:

> It is ... ownership that *is* disputed under ... Section 211.  Section 211 requires a decision maker to consider... "ownership" issues... [including whether] the trademark ... [was] used with ... confiscated assets ... and whether the original owner ... has consented to its registration....  [T]hese ... "ownership" issues ... address ... who is, and who is not the owner of the trademark ... in the United States.  Each of these questions must be resolved by the decision-maker ... in order to decide whether Section 211 applies.  (original emphasis)

VNP Decl. Exh. **20**.

33.    Congress did not seek input from Cubaexport in connection with the passage of Section 211.

###    C.    Section 211 And The D.C. Action

34.    The applicability of Section 211 to the HAVANA CLUB registration is at issue in *Bacardi & Co., Ltd. v. Cubaexport*, Civ. No. 04-0519 (D.D.C. 2004).  VNP Decl. Exh. **10** ¶¶ 5, 6(c), 38, 99-100, 110, 142, 145-46, 160 (b)-(c).

## III.    FACTS MATERIAL TO THE THIRD APA CLAIM

35.    The Department of State's July 28, 2006 memorandum states *inter alia* that the Department of State considered "the United States' Cuba policy, and the U.S. policy with regard to the domestic and international protection of intellectual property rights" and:

> Denial of the license application would be consistent with the U.S. approach toward non-recognition of trademark rights associated with confiscated property. Also, to the extent that registration of the trademark in this case has current or potential financial value to the Cuban government, denial of the license would be consistent with the recommendations of the Commission for Assistance to a Free Cuba and the policy of the United States to deny resources to the Castro regime in order to hasten a transition to democracy in Cuba.

(AR 2-3)

36.    According to defendants, the State Department's memorandum refers to U.S. policy reflected in Section 211.  *See* December 21, 2006 Memorandum In Support Of Defendants' Motion To Dismiss Or, In the Alternative, For Summary Judgment at 6.

37.    The December 21, 2006 Declaration of Adam J. Szubin ¶ 40 states *inter alia* "[a]fter considering the State Department foreign policy guidance, the implementation of Section 211 in the Cuban Assets Control Regulations [31 C.F.R. § 515.527(a)(2)], and the facts and circumstances of this case, OFAC concluded that a specific license should not be issued to Cubaexport".

Dated:  July 23, 2008                     Respectfully submitted,

                                          */s/ Peter M. Brody*
                                          Peter M. Brody (D.C. Bar No. #398717)
                                          ROPES & GRAY LLP
                                          One Metro Center
                                          700 12th Street, N.W.
                                          Washington, D.C.  20005
                                          Tel. (202) 508-4600
                                          Fax (202) 508-4650

                                          Vincent N. Palladino
                                          ROPES & GRAY LLP
                                          1211 Avenue of the Americas
                                          New York, New York  10036
                                          Tel. (212) 596-9000
                                          Fax (212) 596-9090

                                          *Counsel for Plaintiff,*
                                          *Empresa Cubana Exportadora de Alimentos y*
                                          *Productos Varios, d/b/a Cubaexport*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EMPRESA CUBANA EXPORTADORA
DE ALIMENTOS Y PRODUCTOS
VARIOS d/b/a/CUBAEXPORT,

        Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
THE TREASURY, OFFICE OF
FOREIGN ASSETS CONTROL,
HENRY M. PAULSON, JR., as Secretary
of Treasury, ADAM J. SZUBIN, as
Director of the Office of Foreign Assets
Control, and THE UNITED STATES,

        Defendants.

Civil Action No. 1:06CV01692 (RCL)

Hon. Royce C. Lamberth

## DECLARATION OF VINCENT N. PALLADINO IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT ON ITS SECOND AND THIRD APA CLAIMS

I, Vincent N. Palladino, declare:

     1.     I am an attorney admitted to practice before the State of New York and the United States District Courts for the Southern and Eastern Districts of New York. I am admitted pro hac vice in this Court. I am a partner with the firm of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York, 10036. Ropes & Gray LLP is counsel for plaintiff Cubaexport.

     2.     I make this declaration in support of Cubaexport's motion for summary judgment on its second and third APA claims. I am familiar with the facts, issues and files in this matter. I have personal knowledge of the following facts and, if called upon to do so, could and would testify competently thereto.

     3.     Attached hereto as **Exhibit 1** are true and correct copies of United States Patent and Trademark Office ("USPTO") records of U.S. registrations and applications for registration belonging to the Republic of Cuba or Cuban nationals. These were located through a search of the USPTO TEES data base conducted on November 7, 2007.

     4.     Attached hereto as **Exhibit 2** is a true and correct copy of the article *House Passes Spending Bill: Massive Omnibus Measure Loaded with Pet Projects* published in THE WASHINGTON POST on October 21, 1998.

     5.     Attached hereto as **Exhibit 3** is a true and correct copy of a document produced by the USPTO in response to a FOIA request. It reproduces an article *Bacardi's Cuban Rumble Spills Into U.S.* published in THE WALL STREET JOURNAL on August 17, 2006.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of the article

entitled *Budget Bill Would Shut Off Some Cuban Joint Ventures: Spending Provision*

*Likely to Draw Fire from EU* published in INSIDE U.S. TRADE on October 23, 1998.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of Statement,

United States Senate Committee on the Judiciary, *An Examination of Section 211 of the*

*Omnibus Appropriations Act of 1998*, dated July 13, 2004.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of the article

*Hidden Provision Sparks New Dispute Over Cuba* published in CUBA NEWS in

November 1998.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of a document

produced by the USPTO in response to a FOIA request

10.     Attached hereto as **Exhibit 8** is a true and correct copy of a letter dated

November 30, 2007 from the Department of the Treasury to Ropes & Gray.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of a letter dated

November 26, 2007 from the Department of State to Ropes & Gray.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of the

Complaint in *Bacardi & Co., Ltd. v. Cubaexport*, Civ. No. 04-00519 (D.D.C. 2004).

13.     Attached hereto as **Exhibit 11** is a true and correct copy of the

application Bacardi's subsidiary filed with the USPTO to register HAVANA CLUB

as a trademark on September 12, 1994 ("the Bacardi application").

3

14.    Attached hereto as **Exhibit 12** is a true and correct copy of the First Office Action that the USPTO Examining Attorney issued in connection with the Bacardi application on March 14, 1995.

15.    Attached hereto as **Exhibit 13** is a true and correct copy of the Amendment to Allege Use that Bacardi filed in the USPTO on December 13, 2000.

16.    Attached hereto as **Exhibit 14** is a true and correct copy of a submission Bacardi made to the USPTO on April 12, 2002.  It includes an Affidavit of Ramon Arechabala dated March 19, 2002.

17.    Attached hereto as **Exhibit 15** is a true and correct copy of a "LETTER" Bacardi filed with the USPTO in connection with prosecution of the Bacardi application on March 1, 2001.

18.    Attached hereto as **Exhibit 16** is a true and correct copy of the Fourth Office Action that the USPTO Examining Attorney issued in connection with the Bacardi application on April 16, 2001.

19.    Attached hereto as **Exhibit 17** is a true and correct copy of the Sixth Office Action that the USPTO Examining Attorney issued in connection with the Bacardi application on May 7, 2002.

20.    Attached hereto as **Exhibit 18** is a true and correct copy of the Answer, Affirmative Defenses and Counterclaims To First Amended Complaint in *Havana Club Holdings, S.A. et al. v. Galleon, S.A. et al.*, U.S. 96 Civ. 9655 (SAS) (S.D.N.Y. 1996) ("the New York litigation").

4

21.     Attached hereto as **Exhibit 19** is a true and correct copy of trial transcript page 1798 in the New York litigation.

22.     Attached hereto as **Exhibit 20** is a true and correct copy of a document produced by the USPTO in response to a FOIA request.

23.     Attached hereto as **Exhibit 21** is a true and correct copy of a document produced by the USPTO in response to a FOIA request.

24.     Attached hereto as **Exhibit 22** is a true and correct copy of a document produced by the USPTO in response to a FOIA request.

25.     Attached hereto as **Exhibit 23** is a true and correct copy of a document produced by the USPTO in response to a FOIA request.

26.     Attached hereto as **Exhibit 24** is a true and correct copy of a document produced by the USPTO in response to a FOIA request.

27.     Attached hereto as **Exhibit 25** is a true and correct copy of the July 18, 2006 decision issued by the Office of the USPTO Commissioner for Trademarks.

28.     Attached hereto as **Exhibit 26** is a true and correct copy of the press release entitled *U.S. Government Resolves Havana Club Dispute in Bacardi's Favor*, dated August 8, 2006.

29.     Attached hereto as **Exhibit 27** is a true and correct copy of the transcript from the August 8, 2006 broadcast on National Public Radio.

5

30.     Attached hereto as **Exhibit 28** is a true and correct copy of a License Amendment issued by the Office of Foreign Assets Control on July 9, 2007.

31.     Attached hereto as **Exhibit 29** is a true and correct copy of pages from the Commission for Assistance to a Free Cuba Report to the President (July 2006).

32.     Attached hereto as **Exhibit 30** is a true and correct copy of the January 10, 1994 Assignment of the HAVANA CLUB & Design mark (U.S. Registration 1,031,651) from Cubaexport to HRL and the June 22, 1994 Assignment of the HAVANA CLUB & Design mark (U.S. Registration 1,031,651) from HRL to HCH.

33.     Attached hereto as **Exhibit 31** is a true and correct copy of the December 6, 2006 decision of the USPTO Director for Trademarks staying Cubaexport's appeal to the Commissioner of the USPTO.

34.     Attached hereto as **Exhibit 32** is a true and correct copy of a document produced by the USPTO in response to a FOIA request.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 23, 2008, in New York, New York.

_____
Vincent N. Palladino

6

# EXHIBIT 1


# Trademarks > Trademark Electronic Search System (TESS)

TESS was last updated on Wed Nov 7 04:06:54 EST 2007

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [          ]   OR   Jump   to record: [          ]   **Record 164 out of 212**

TARR Status   ASSIGN Status   TDR   TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| Word Mark | RON CANEY ORO LIGHT LEGITIMO RON CUBANO |
| Translations | The English translation of "RON", "ORO LIGHT", "LEGITIMO RON CUBANO" is "rum", light gold", "authentic Cuban rum". |
| Goods and Services | IC 033. US 047 049. G & S: distilled liquors |
| Mark Drawing Code | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| Design Search Code | 01.15.13 - Ripple (single wave); Waves, single<br>03.21.05 - Alligators; Crocodiles<br>18.07.04 - Brigs (boats); Clippers (boats); Schooners (boats); Ships with two and three masts, including brigs, clippers and schooners<br>24.01.02 - Shields or crests with figurative elements contained therein or superimposed thereon<br>24.11.02 - Crowns open at the top |
| Serial Number | 74613472 |
| Filing Date | December 20, 1994 |
| Current Filing Basis | 44E |
| Original Filing Basis | 44E |
| Published for Opposition | November 21, 1995 |
| Registration Number | 1956024 |
| Registration Date | February 13, 1996 |
| Owner | (REGISTRANT) HAVANA RUM & LIQUORS, S.A. CORPORATION CUBA Calle 44, No. 305 Playa, Ciudad La Habana **CUBA** |
| Attorney of Record | A. YASMINE RASSAM |
| Disclaimer | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "RON", "ORO LIGHT", "LEGITIMO RON CUBANO" APART FROM THE MARK AS SHOWN |
| Description of Mark | The stippling is for shading purposes only and does not indicate color. The lining is a feature of the mark and does not indicate color. |
| Type of Mark | TRADEMARK                    **A-1** |
| Register | PRINCIPAL |
| Affidavit Text | SECT 8 (6-YR). SECTION 8(10-YR) 20060327. |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | Browse Dict | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST
FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY



# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

**Logout** Please logout when you are done to release system resources allocated for you.

**Start** List At: [        ] OR **Jump** to record: [        ] **Record 6 out of 212**

---

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| **Word Mark** | ATMOSPHERE |
|---|---|
| **Goods and Services** | IC 014. US 002 027 028 050. G & S: Jewelry; [watches] * excluding watches and clocks; * ; goods made of precious metals and goods coated with precious metals, namely cufflinks, tie pins, tie clips, and tie fasteners |

IC 016. US 002 005 022 023 029 037 038 050. G & S: Paper, namely notebook paper, art paper, craft paper, bond paper, and copy paper; cardboard and goods made from these materials, namely diaries, note books, and notebook dividers; bookbindings; photographs; artist's materials, namely pens; paint brushes; plastic sheets for writing, printing, and marking; paper sacks and bags for wrapping and packaging

IC 018. US 001 002 003 022 041. G & S: Leather and imitations of leather sold in bulk, handbags, trunks, umbrellas, parasols, walking sticks, whips, harness and saddlery

IC 030. US 046. G & S: Coffee, artificial coffee, tea, cocoa, sugar, candy; sauces, spices

IC 033. US 047 049. G & S: Alcoholic beverages, namely brandy, cognac, rum, and wine

IC 035. US 100 101 102. G & S: Business management

IC 043. US 100 101. G & S: Restaurant services, bar services, cafeterias, and hotels

| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
|---|---|
| **Design Search Code** | 26.11.20 - Rectangles inside one another<br>26.11.21 - Rectangles that are completely or partially shaded |
| **Serial Number** | 79007311 |
| **Filing Date** | June 1, 2004 |
| **Current Filing Basis** | 66A |
| **Original Filing Basis** | 66A |
| **Published for** | |

A-3

| | |
|---|---|
| Opposition | November 1, 2005 |
| Change In Registration | CHANGE IN REGISTRATION HAS OCCURRED |
| Registration Number | 3093373 |
| International Registration Number | 0838940 |
| Registration Date | May 16, 2006 |
| Owner | (REGISTRANT) CORPORACION HABANOS, S.A. CORPORATION **CUBA** Avenida 3ra No. 2006 entre 20 y 22 Miramar, Playa; Ciudad de La Habana **CUBA** |
| Attorney of Record | MICHAEL KRINSKY |
| Priority Date | March 5, 2004 |
| Description of Mark | The colors gold, white and black are claimed as a feature of the mark. The color black appears in the background of the mark as the color of the background. The color white appears in the lettering of the word "ATMOSPHERE" in the mark as the color of the lettering. The color gold appears in the dots arranged in a rectangular formation in the mark as the color of the dots which are above the word "ATMOSPHERE". |
| Type of Mark | TRADEMARK. SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

ESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSR DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

[.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

A-4

# Trademarks > Trademark Electronic Search System (TESS)

TESS was last updated on Wed Nov 7 04:06:54 EST 2007

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSER DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
|---|---|---|---|---|---|---|---|---|---|---|

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |
|---|---|---|---|

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [        ]   OR   Jump   to record: [        ]   **Record 7 out of 212**

---

| TARR Status | ASSIGN Status | TDR | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*
|---|---|---|---|



| | |
|---|---|
| **Word Mark** | DELEGGEND |
| **Goods and Services** | IC 003. US 001 004 006 050 051 052. G & S: Soaps, namely soap for personal use and hand soaps; essential oils for personal use; cosmetics; hair lotion; dentifrices |
| | IC 014. US 002 027 028 050. G & S: Jewelry; watches; goods made of precious metals and goods coated with precious metals, namely cufflinks, tie pins, tie clips, and tie fasteners |
| | IC 016. US 002 005 022 023 029 037 038 050. G & S: Paper, cardboard and goods made from these materials, not included in other classes, namely diaries, note books, notebook paper, and notebook dividers; bookbinding material, namely bookbinding wire and tapes, and book bindings; photographs; artist's materials, namely pens; paint brushes;plastic sheets for writing, printing, and marking; paper sacks and bags for wrapping and packaging |
| | IC 018. US 001 002 003 022 041. G & S: Leather and imitation leather sold in bulk, handbags, trunks, umbrellas, parasols, walking sticks, whips, harness and saddlery |
| | IC 021. US 002 013 023 029 030 033 040 050. G & S: Table sets of beverage glassware, kitchen containers made of porcelain,tableware, namely coffee cups and saucers, not made of precious metal |
| | IC 025. US 022 039. G & S: Shirts, t-shirts, sweat-shirts, jackets, blouses, skirts, trousers, shorts, swimming suits, pajamas, scarves, neckties, hats, socks, stockings, shoes, sports shoes |
| | IC 030. US 046. G & S: Coffee, artificial coffee, tea, cocoa, sugar, confectionary, namely candy; sauces, spices |
| | IC 033. US 047 049. G & S: Alcoholic beverages, namely brandy, cognac, rum, and wine |
| | IC 035. US 100 101 102. G & S: Business management services, namely managing the business affairs of others |
| | IC 043. US 100 101. G & S: Restaurants, bar services, cafeterias, hotels |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |

| | |
|---|---|
| **Design Search Code** | 23.01.01 - Epees; Foils; Rapiers; Sabers; Swords<br>26.11.21 - Rectangles that are completely or partially shaded |
| **Serial Number** | 79007310 |
| **Filing Date** | June 1, 2004 |
| **Current Filing Basis** | 66A |
| **Original Filing Basis** | 66A |
| **Published for Opposition** | September 20, 2005 |
| **Registration Number** | 3029500 |
| **International Registration Number** | 0838939 |
| **Registration Date** | December 13, 2005 |
| **Owner** | (REGISTRANT) CORPORACION HABANOS, S.A. CORPORATION **CUBA** Avenida 3ra No. 2006 entre 20 y 22 Miramar, Playa; Ciudad de La Habana **CUBA** |
| **Attorney of Record** | Thomas Viles |
| **Priority Date** | January 14, 2004 |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | **LIVE** |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

A-6


Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [          ]   OR   Jump   to record: [          ]   **Record 8 out of 212**

---

| TARR Status | ASSIGN Status | TDR | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | LA GIRALDILLA LA HABANA CUBA |
| **Translations** | The foreign wording in the mark translates into English as "The Weathervane Havana, Cuba". |
| **Goods and Services** | IC 035. US 100 101 102. G & S: Publicity and sales promotion relating to goods and services |
| | IC 016. US 002 005 022 023 029 037 038 050. G & S: Paper coasters, postcards, posters, calendars, date books, wrapping paper, cardboard packaging, and paper and cardboard boxes |
| | IC 033. US 047 049. G & S: Alcoholic beverages, namely whisky, mm brandy, vodka, and liquor |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 01.11.01 - Full moons (not a moon with craters)<br>01.17.13 - Islands, maps of; Maps of islands<br>22.05.03 - Sculptures, of Humans; Statues, human<br>26.03.17 - Concentric ovals; Concentric ovals and ovals within ovals; Ovals within ovals; Ovals, concentric<br>26.03.21 - Ovals that are completely or partially shaded |
| **Trademark Search Facility Classification Code** | ART-01.17 Maps or outlines of continents, countries and other geographical areas"<br>ART-17.07 Measuring instruments<br>ART-22.05 Sculptures<br>SHAPES-ASTRO Astronomical shapes consisting of celestial bodies, globes and geographical maps<br>SHAPES-CIRCLE Circle figures or designs including semi-circles and incomplete circles<br>SHAPES-COLORS-3-OR-MORE Design listing or lined for three or more colors<br>SHAPES-OVALS Oval figures or designs including incomplete ovals and one or more ovals |
| **Serial Number** | 78911540 |
| **Filing Date** | June 19, 2006 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44D |
| **Published for Opposition** | August 21, 2007 |

A-7

| | |
|---|---|
| **Registration Number** | 3329320 |
| **Registration Date** | November 6, 2007 |
| **Owner** | (REGISTRANT) Corporacion **Cuba** Ron, S.A. CORPORATION **CUBA** 200 Street, No. 1708, Atabey, Playa Havana **CUBA** |
| **Attorney of Record** | David B. Goldstein |
| **Priority Date** | May 30, 2006 |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "LA HABANA - CUBA" AND THE DESIGN OF THE ISLAND OF CUBA APART FROM THE MARK AS SHOWN |
| **Description of Mark** | The color(s) White, Black, Gold is/are claimed as a feature of the mark. The mark consists of a figure of a woman in gold and highlighted in black holding a gold weathervane in her left hand, standing on top of a white circle, and on top of an outline of the island of Cuba in gold, with the area of La Habana Province in black, where the figure is standing, and a black and gold oval background. On the top, inside the oval, to the left of the figure is written "LA GIRALDILLA" in stylized letters. Below the figure and inside the oval is written "La HABANA - CUBA" in stylized letters. |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

ESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   TOP   HELP   PREV LIST   CURR LIST   NEXT LIST

FIRST DOC   PREV DOC   NEXT DOC   LAST DOC

|.HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY

A-8


Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [        ] OR Jump | to record: [        ]   **Record 31 out of 212**

---

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| **Word Mark** | SANTIAGO DE CUBA CUNA DEL RON LIGERO RON SANTIAGO DE CUBA AÑEJO RON CUBANO |
|---|---|
| **Translations** | "Santiago de Cuba cuna del ron ligero," translates as "Santiago de Cuba, the cradle (as in birthplace) of light rum." Please note that Santiago de Cuba is the name of a city in eastern Cuba, and as such, should not itself be translated. "ron Santiago de Cuba," translates as "rum from Santiago de Cuba." "ron Cubano" translates as "Cuban rum." |
| **Goods and Services** | IC 033. US 047 049. G & S: Alcoholic beverages, namely rum |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 01.01.10 - Stars, three or more; Three or more stars<br>01.01.13 - Stars - multiple stars with five points<br>01.15.25 - Coal; Dust; Light rays; Liquids, spilling; Pouring liquids; Sand; Spilling liquids<br>07.09.01 - Pyramids, monument<br>24.01.05 - More than one shield or crest; Shields or crests (more than one)<br>26.03.17 - Concentric ovals; Concentric ovals and ovals within ovals; Ovals within ovals; Ovals, concentric<br>26.03.21 - Ovals that are completely or partially shaded<br>26.11.13 - Rectangles (exactly two rectangles); Two rectangles<br>26.11.20 - Rectangles inside one another<br>26.11.21 - Rectangles that are completely or partially shaded<br>26.11.25 - Rectangles with one or more curved sides<br>26.17.05 - Bands, horizontal; Bars, horizontal; Horizontal line(s), band(s) or bar(s); Lines, horizontal<br>26.17.25 - Other lines, bands or bars |
| **Serial Number** | 78537635 |
| **Filing Date** | December 23, 2004 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | April 18, 2006 |
| **Registration** | 3113884 |

**A-9**

| | |
|---|---|
| **Number** | |
| **Registration Date** | July 11, 2006 |
| **Owner** | (REGISTRANT) Corporacion **Cuba** Ron, S.A. CORPORATION **CUBA** 200 Street, No. 1708, Atabey, Playa Havana City **CUBA** |
| **Attorney of Record** | David B. Goldstein |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "Santiago de Cuba," "Santiago de Cuba cuna del ron ligero," "ron Santiago de Cuba" or "Ron Cubano" APART FROM THE MARK AS SHOWN |
| **Description of Mark** | The mark consists of an image of a fortress, with a small shield with stars and pyramids above the fortress, with the stylized letters "Ron Santiago de Cuba" as shown. |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | **LIVE** |

ESS HOME    NEW USER    STRUCTURED    FREE FORM    BROWSE DICT    SEARCH OG    TOP    HELP    PREV LIST    CURR LIST    NEXT LIST

FIRST DOC    PREV DOC    NEXT DOC    LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST
FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start List At: [      ] OR Jump to record: [      ]  **Record 130 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*

# cubay

| | |
|---|---|
| **Word Mark** | CUBAY |
| **Goods and Services** | IC 033. US 047 049. G & S: DISTILLED LIQUOR |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Serial Number** | 75915669 |
| **Filing Date** | February 10, 2000 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | December 26, 2000 |
| **Registration Number** | 2436862 |
| **Registration Date** | March 20, 2001 |
| **Owner** | (REGISTRANT) Havana Rum & Liquors, S.A. CORPORATION CUBA 44 Street, No. 305 between 3rd and 5th Avenues Miramar, Havana CUBA |
| **Attorney of Record** | Raphael Golb |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST
FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

| .HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY


# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [_____] OR Jump | to record: [_____]   **Record 166 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status   ( *Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | ARTEX |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: pre-recorded phonerecords, cassete tapes, compact disks, videotapes featuring entertainment in the nature of music or dance performances. FIRST USE: 19890204. FIRST USE IN COMMERCE: 19911206 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 74727361 |
| **Filing Date** | September 11, 1995 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | January 28, 1997 |
| **Registration Number** | 2054133 |
| **Registration Date** | April 22, 1997 |
| **Owner** | (REGISTRANT) ARTEX, S.A. DBA ARTEX CORPORATION CUBA 5ta Avenida, No. 8002 Miramar Ciudad Habana CUBA |
| **Attorney of Record** | DAVID B. GOLDSTEIN |
| **Prior Registrations** | 1942726 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20061027. |
| **Renewal** | 1ST RENEWAL 20061027 |
| **Live/Dead Indicator** | **LIVE** |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC


## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout   Please logout when you are done to release system resources allocated for you.

Start | List At: [          ]    OR   Jump   to record: [          ]   **Record 167 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status    *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | ARTEX |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: pre-recorded phonorecords, cassette tapes, compact disks and videotapes featuring entertainment in the nature of music or dance performances. FIRST USE: 19890204. FIRST USE IN COMMERCE: 19911206 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 24.15.03 - Arrows formed by words, letters, numbers or punctuation |
| **Serial Number** | 74620859 |
| **Filing Date** | January 13, 1995 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | September 26, 1995 |
| **Registration Number** | 1942726 |
| **Registration Date** | December 19, 1995 |
| **Owner** | (REGISTRANT) ARTEX, S.A. CORPORATION CUBA 5ta Avenida, No. 8002 Miramar, Ciudad Habana CUBA |
| **Attorney of Record** | DAVID B. GOLDSTEIN |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20060411. |
| **Renewal** | 1ST RENEWAL 20060411 |
| **Live/Dead Indicator** | LIVE |

United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [          ]   OR   Jump   to record: [          ]   **Record 176 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | MELAGENINA |
| **Goods and Services** | IC 005. US 018. G & S: PREPARATION FOR EXTERNAL USE IN THE TREATMENT OF VITILIGO |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 73573505 |
| **Filing Date** | December 16, 1985 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | August 5, 1986 |
| **Registration Number** | 1414696 |
| **Registration Date** | October 28, 1986 |
| **Owner** | (REGISTRANT) EMPRESA EXPORTADORA E IMPORTADORA DE PRODUCTOS MEDICOS TA MEDICUBA CORPORATION CUBA MAXIMO GOMEZ NO. 1 HABANA VIEJA CUBA |
| **Attorney of Record** | DAVID B GOLDSTEIN |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). SECTION 8(10-YR) 20061023. |
| **Renewal** | 1ST RENEWAL 20061023 |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

[.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

**A-14**


## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start | List At: [       ]  OR  Jump to record: [       ]  **Record 177 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

| | |
|---|---|
| **Word Mark** | EL TIEMPO |
| **Translations** | THE ENGLISH TRANSLATION OF THE SPANISH WORDS "EL TIEMPO" IN THE MARK IS "THE TIME". |
| **Goods and Services** | IC 016. US 038. G & S: NEWSPAPERS WRITTEN IN THE SPANISH LANGUAGE AND DIRECTED TO AFFAIRS AND INTERESTS OF THE HISPANIC COMMUNITY. FIRST USE: 19640400. FIRST USE IN COMMERCE: 19640400 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 73533830 |
| **Filing Date** | April 24, 1985 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | November 5, 1985 |
| **Registration Number** | 1380360 |
| **Registration Date** | January 28, 1986 |
| **Owner** | (REGISTRANT) EL TIEMPO DE NUEVA YORK COMPOSED OF ELBA ROSA CAYON, U.S. CITIZEN, AND JOSE C. CAYON; CUBA CITIZEN. PARTNERSHIP UNITED STATES G.P.O. BOX 1155 NEW YORK NEW YORK 10116 |
| **Attorney of Record** | JOSE C. CAYON |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20060503. |
| **Renewal** | 1ST RENEWAL 20060503 |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME   NEW USER   STRUCTURED   FREE FORM   Browse Dict   SEARCH OG   BOTTOM   HELP   PREV LIST   CURR LIST   NEXT LIST

FIRST DOC   PREV DOC   NEXT DOC   LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start List At: [     ]   OR  Jump  to record: [     ]   **Record 188 out of 212**

TARR Status   ASSIGN Status   TDR   TTAB Status   ( Use the "Back" button of the Internet Browser to return to TESS)



| | |
|---|---|
| **Word Mark** | REPUBLICA DE CUBA CUBAN GOVERNMENT'S WARRANTY FOR CIGAARS EXPORTED FROM HAVANA SELLO DE GARANTIA NACIONAL DE PROCEDENCIA PARA TABACOS |
| **Goods and Services** | IC A . US A . G & S: Cigars and Cut Tobacco. FIRST USE: 19300505. FIRST USE IN COMMERCE: 19300505 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 06.09.25 - Cemeteries<br>24.01.02 - Shields or crests with figurative elements contained therein or superimposed thereon<br>26.03.02 - Ovals, plain single line; Plain single line ovals<br>26.03.13 - Ovals, exactly two (not concentric); Two ovals |
| **Serial Number** | 72153423 |
| **Filing Date** | September 18, 1962 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Registration Number** | 0756558 |
| **Registration Date** | September 10, 1963 |
| **Owner** | (REGISTRANT) Republic of Cuba UNKNOWN LA HABANA Havana **CUBA** |
| **Disclaimer** | The exclusive use of the individual words is disclaimed apart from the mark as shown in the drawing, all common law rights to the mark as a whole being reserved. |
| **Type of Mark** | CERTIFICATION MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECTION 8(10-YR) 20040717. |
| **Renewal** | 2ND RENEWAL 20040717 |
| **Other Data** | THE MARK CERTIFIES THE ORIGIN OF THE TOBACCO PRODUCTS WITH WHICH THE MARK IS USED. |
| **Live/Dead** | **LIVE** |

A-16

ESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Trademarks > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

**Logout** Please logout when you are done to release system resources allocated for you.

**Start** List At: [          ] OR **Jump** to record: [          ]    **Record 3 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# CEMI

| | |
|---|---|
| **Word Mark** | CEMI |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: Raw tobacco, processed tobacco, cigars, cigarettes, small cigars, fine-cut pipe tobacco, smokers' items, namely cigarette lighters not of precious metal and smoking pipes, matches, tobacco cases, namely humidors |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 79026857 |
| **Filing Date** | June 14, 2006 |
| **Current Filing Basis** | 66A |
| **Original Filing Basis** | 66A |
| **Published for Opposition** | July 17, 2007 |
| **Registration Number** | 3302856 |
| **International Registration Number** | 0893209 |
| **Registration Date** | October 2, 2007 |
| **Owner** | (REGISTRANT) CORPORACION HABANOS, S.A. SOCIEDAD ANÓNIMA CUBA Avenida 3 No. 2006 entre 20 y 22 Miramar, Playa; Ciudad de La Habana CUBA |
| **Attorney of Record** | David B. Goldstein |
| **Priority Date** | March 10, 2006 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |


# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

**Logout**  Please logout when you are done to release system resources allocated for you.

**Start** List At: [        ] OR **Jump** to record: [        ]  **Record 4 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# WARACHA

| | |
|---|---|
| **Word Mark** | WARACHA |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: Raw tobacco, cigars, cigarettes, small cigars, fine-cut tobacco, matches and smokers' articles, namely cigarette lighters not of precious metal and smoking pipes |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 79026856 |
| **Filing Date** | June 14, 2006 |
| **Current Filing Basis** | 66A |
| **Original Filing Basis** | 66A |
| **Published for Opposition** | July 17, 2007 |
| **Registration Number** | 3302855 |
| **International Registration Number** | 0893208 |
| **Registration Date** | October 2, 2007 |
| **Owner** | (REGISTRANT) CORPORACION HABANOS, S.A. Sociedad anónima CUBA Avenida 3ra. No.2006 entre 20 y 22 Miramar, Playa; Ciudad de La Habana CUBA |
| **Attorney of Record** | David B. Goldstein |
| **Priority Date** | March 14, 2006 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

## Trademarks > Trademark Electronic Search System (TESS)

TESS was last updated on Wed Nov 7 04:06:54 EST 2007

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [        ] OR Jump | to record: [        ]   **Record 5 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*

# GUARACHA

| | |
|---|---|
| **Word Mark** | GUARACHA |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: Raw tobacco, cigars, cigarettes, small cigars, fine-cut tobacco, matches and smokers' articles, namely cigarette lighters not of precious metal and smoking pipes |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 79026855 |
| **Filing Date** | June 14, 2006 |
| **Current Filing Basis** | 66A |
| **Original Filing Basis** | 66A |
| **Published for Opposition** | July 17, 2007 |
| **Registration Number** | 3302854 |
| **International Registration Number** | 0893207 |
| **Registration Date** | October 2, 2007 |
| **Owner** | (REGISTRANT) CORPORACION HABANOS, S.A. Sociedad Anónima **CUBA** Avenida 3ra. No.2006 entre 20 y 22 Miramar, Playa; Ciudad de La Habana **CUBA** |
| **Attorney of Record** | David B. Goldstein |
| **Priority Date** | March 14, 2006 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY


# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

**Logout** Please logout when you are done to release system resources allocated for you.

**Start** List At: [        ] OR **Jump** to record: [        ]   **Record 104 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | COMPAY SEGUNDO |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: tobacco products, namely cigars, cigarettes and matches |
| | IC 041. US 100 101 107. G & S: live musical performances by a musical group, and motion picture film production services |
| | IC 043. US 100 101. G & S: restaurant services, coffee shop services, and hotel services |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 09.05.02 - Top hats<br>22.01.06 - Banjos; Guitars; Ukuleles<br>27.03.05 - Objects forming letters or numerals |
| **Serial Number** | 76626287 |
| **Filing Date** | December 30, 2004 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | July 18, 2006 |
| **Registration Number** | 3152535 |
| **Registration Date** | October 10, 2006 |
| **Owner** | (REGISTRANT) Labrada, Salvador Repilado INDIVIDUAL **CUBA** Calle 19, numero 1263, Apartment 6 Vedado, Municipio Plaza de La Revolucion Ciudad de La Habana **CUBA** |
| **Attorney of Record** | Edward A. Pennington |
| **Description of Mark** | The mark consists of the words COMPAY SEGUNDO with the O of COMPAY being formed from a guitar and the C covered with a hat. |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Other Data** | The name COMPAY SEGUNDO does not identify a living individual. |

A-21

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY


## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST
FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout   Please logout when you are done to release system resources allocated for you.

Start  List At: [        ] OR Jump to record: [        ]   **Record 105 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*

# COMPAY SEGUNDO

| | |
|---|---|
| **Word Mark** | COMPAY SEGUNDO |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: Tobacco products, namely, cigars, cigarettes and matches |
| | IC 041. US 100 101 107. G & S: live musical performances by a musical group, and motion picture film production services |
| | IC 043. US 100 101. G & S: restaurant services, coffee shop services, and hotel services |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 76631250 |
| **Filing Date** | February 22, 2005 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44D |
| **Published for Opposition** | June 20, 2006 |
| **Registration Number** | 3140950 |
| **Registration Date** | September 12, 2006 |
| **Owner** | (REGISTRANT) Labrada, Salvador Repilado INDIVIDUAL CUBA Calle 19, numero 1263, Apartment 6 Vedado, Municipio Plaza de La Revolucion Ciudad de La Habana CUBA |
| **Attorney of Record** | Edward A. Pennington |
| **Priority Date** | January 12, 2005 |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Other Data** | The name COMPAY SEGUNDO does not identify a living individual. |
| **Live/Dead Indicator** | LIVE |

A-23

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

[.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [          ]  OR  Jump  to record: [          ]  **Record 106 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# IRAKERE

| | |
|---|---|
| **Word Mark** | IRAKERE |
| **Translations** | The foreign wording of the mark translates from the Yoruba language into English as "wood" or "forest". |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: Series of pre-recorded phonorecords, cassette tapes, compact disks and videotapes featuring entertainment in the nature of musical performances. FIRST USE: 19730000. FIRST USE IN COMMERCE: 19790000 |
| | IC 041. US 100 101 107. G & S: Entertainment, namely live performances by a musical band. FIRST USE: 19730200. FIRST USE IN COMMERCE: 19780625 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 76618145 |
| **Filing Date** | October 28, 2004 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | February 7, 2006 |
| **Registration Number** | 3125403 |
| **Registration Date** | August 8, 2006 |
| **Owner** | (REGISTRANT) Rodriguez, Jesus Valdes INDIVIDUAL **CUBA** Calle 14, Miramar Ciudad Habana **CUBA** |
| **Attorney of Record** | DAVID B GOLDSTEIN |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

**Logout**   Please logout when you are done to release system resources allocated for you.

**Start**   List At: [        ]   OR **Jump** to record: [        ]   **Record 138 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | FRESKITO |
| **Goods and Services** | IC 029. US 046. G & S: fresh, preserved and frozen fish and shellfish |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 75158408 |
| **Filing Date** | August 30, 1996 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | June 3, 1997 |
| **Registration Number** | 2091185 |
| **Registration Date** | August 26, 1997 |
| **Owner** | (REGISTRANT) EMPRESA CUBANA EXPORTADORA DEL CARIBE DBA CARIBEX CORPORATION **CUBA** Aparthotel Las Brisas Apto. 3B 31-32 Havana **CUBA** |
| **Attorney of Record** | DAVID B. GOLDSTEIN |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). SECTION 8(10-YR) 20071102. |
| **Renewal** | 1ST RENEWAL 20071102 |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# Trademarks > Trademark Electronic Search System (TESS)

TESS was last updated on Wed Nov 7 04:06:54 EST 2007

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout Please logout when you are done to release system resources allocated for you.

Start List At: [          ] OR Jump to record: [          ] **Record 142 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status    *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | LA PERLA |
| **Translations** | The English translation of the words "LA PERLA" in the mark is "the pearl". |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: cured and uncured tobacco for smoking, chewing, snuff or cigarettes |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 75011206 |
| **Filing Date** | October 27, 1995 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | October 21, 1997 |
| **Registration Number** | 2128050 |
| **Registration Date** | January 13, 1998 |
| **Owner** | (REGISTRANT) EMPRESA CUBANA DEL TABACO DBA CUBATABACO CORPORATION CUBA Calle O'Reilly No. 104 La Habana CUBA |
| **Attorney of Record** | DAVID B. GOLDSTEIN |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). SECTION 8(10-YR) 20070508. |
| **Renewal** | 1ST RENEWAL 20070508 |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |



# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [      ]  OR  Jump  to record: [      ]   **Record 143 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| Word Mark | LA VIGIA |
| Translations | The English translation of the words "LA VIGIA" in the mark is "lookout" or "watch". |
| Goods and Services | IC 034. US 002 008 009 017. G & S: raw tobacco, cigars, cigarettes, cut tobacco, rappee, manufactured tobacco of all kinds, matches, tobacco, smoking pipes, pipe holders-not of precious metal, ashtrays-not of precious metal, match boxes-not of precious metal, cigar cases-not of precious metal, humidors-not of precious metal |
| Mark Drawing Code | (1) TYPED DRAWING |
| Serial Number | 75136144 |
| Filing Date | July 18, 1996 |
| Current Filing Basis | 44E |
| Original Filing Basis | 44E |
| Published for Opposition | August 12, 1997 |
| Registration Number | 2110538 |
| Registration Date | November 4, 1997 |
| Owner | (REGISTRANT) HABANOS, S.A. CORPORATION CUBA Mercaderes No. 21 La Habana CUBA |
| Attorney of Record | DAVID GOLDSTEIN |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Affidavit Text | SECT 8 (6-YR). SECTION 8(10-YR) 20070217. |
| Renewal | 1ST RENEWAL 20070217 |
| Live/Dead Indicator | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC


# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [          ]   OR   Jump   to record: [          ]   **Record 168 out of 212**

---

TARR Status   ASSIGN Status   TDR   TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | EDMUNDO DANTES LA HABANA CUBA |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: cigarettes, cut tobacco, rappee, manufactured tobacco of all kinds, matches, tobacco, pipes, pipe-holders, ashtrays not made of precious metal, match boxes, cigar cases and humidors |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 07.03.02 - Cathedral; Churches<br>24.13.25 - Cross, ankh; Cross, Maltese; Other crosses, including ankh, Maltese |
| **Serial Number** | 74576942 |
| **Filing Date** | September 22, 1994 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | October 24, 1995 |
| **Registration Number** | 1948393 |
| **Registration Date** | January 16, 1996 |
| **Owner** | (REGISTRANT) EMPRESA CUBANA DEL TABACO CORPORATION **CUBA** Calle O'Reilly No. 104 Ciudad Habana **CUBA** |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | DAVID B GOLDSTEIN |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "LA HABANA" and "CUBA" APART FROM THE MARK AS SHOWN |
| **Description of Mark** | The stippling in the drawing is a feature of the mark and not intended to indicate color. |
| **Type of Mark** | TRADEMARK |

| | |
|---|---|
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). SECTION 8(10-YR) 20050610. |
| **Renewal** | 1ST RENEWAL 20050610 |
| **Other Data** | The name in the mark "EDMUNDO DANTES" is a fictional character and does not identify a living individual. |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC


# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [        ]  OR  Jump  to record: [        ]   **Record 169 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | EDMUNDO DANTES |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: cigarettes, cut tobacco, rappee, manufactured tobacco of all kinds, matches, tobacco, pipes, pipe-holders, ashtrays not made of precious metal, match boxes, cigar cases and humidors |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 74576941 |
| **Filing Date** | September 22, 1994 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | November 28, 1995 |
| **Registration Number** | 1957322 |
| **Registration Date** | February 20, 1996 |
| **Owner** | (REGISTRANT) EMPRESA CUBANA DEL TABACO CORPORATION **CUBA** Calle O'Reilly No. 104 Ciudad Habana **CUBA** |
| **Attorney of Record** | DAVID B GOLDSTEIN |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). SECTION 8(10-YR) 20050818. |
| **Renewal** | 1ST RENEWAL 20050818 |
| **Live/Dead Indicator** | **LIVE** |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

United States Patent and Trademark Office
Case 1:06-cv-01692-RCL  Document 35-4    Filed 07/23/2008    Page 33 of 63
Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [          ]  OR  Jump  to record: [          ]  **Record 53 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status |  *( Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

| | |
|---|---|
| **Word Mark** | DAN DEN |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Entertainment namely, live performances by a musical band. FIRST USE: 19881223. FIRST USE IN COMMERCE: 19881223 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 78085330 |
| **Filing Date** | September 24, 2001 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | October 15, 2002 |
| **Registration Number** | 2672228 |
| **Registration Date** | January 7, 2003 |
| **Owner** | (REGISTRANT) Alfonso, Juan Carlos INDIVIDUAL CUBA Avenida 17 #1205, e/ 18 y 20 Apartamento 1 Vedado, Ciudad de la Habana CUBA |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY



# Trademarks > Trademark Electronic Search System (TESS)

TESS was last updated on Wed Nov 7 04:06:54 EST 2007

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [          ]  OR  Jump  to record: [          ]  **Record 111 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status |  *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | CALLS2CUBA |
| **Goods and Services** | IC 038. US 100 101 104. G & S: Telecommunication services, namely, transmission of voice and data by means of telephone, providing value-added telecommunications network transmission services; long distance telephone communication services sold over the Internet. FIRST USE: 20020200. FIRST USE IN COMMERCE: 20020305 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 76412902 |
| **Filing Date** | May 28, 2002 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Supplemental Register Date** | May 5, 2003 |
| **Registration Number** | 2824164 |
| **Registration Date** | March 16, 2004 |
| **Owner** | (REGISTRANT) ETECSA Empresa De Telecomunicaciones De Cuba S.A COMPANY CUBA Egido No. 610 entre Gloria y Apodaca Habana Vieja Ciudad Habana CUBA |
| **Attorney of Record** | Jacqueline Levasseur Patt |
| **Type of Mark** | SERVICE MARK |
| **Register** | SUPPLEMENTAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | Top | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [        ]   OR   Jump   to record: [        ]   **Record 139 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status    *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | HABANOS UNICOS DESDE 1492 |
| **Translations** | The English translation of the words "HABANOS UNICOS DESDE" in the mark is "unique Havana cigars since". |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: raw tobacco, cigars, cigarettes, cut tobacco rappee, matches, tobacco, tobacco pipes, pipe-holders, ashtrays, match boxes, cigar cases, and humidors |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 05.03.25 - Leaf, single; Other leaves<br>26.11.21 - Rectangles that are completely or partially shaded |
| **Serial Number** | 75151320 |
| **Filing Date** | August 16, 1996 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 1B;44E |
| **Published for Opposition** | February 17, 1998 |
| **Registration Number** | 2177837 |
| **Registration Date** | August 4, 1998 |
| **Owner** | (REGISTRANT) CORPORACION HABANOS, S.A. CORPORATION CUBA Mercaderes No. 21 Entre O'Reilly y Empedrado Havana CUBA |
| **Attorney of Record** | David B. Goldstein |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "HABANOS UNICOS DESDE 1492" APART FROM THE MARK AS SHOWN |
| **Description of Mark** | The mark consists of a black rectangle with the design of a tobacco leaf and the wording "HABANOS UNICOS DESDE 1492.". The mark is lined for the colors red and gold. The lining composing the design of the tobacco leaf does not indicate color but is a feature of the mark. |
| **Type of Mark** | TRADEMARK |

| | |
|---|---|
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). SECTION 8(10-YR) 20071026. |
| **Renewal** | 1ST RENEWAL 20071026 |
| **Live/Dead Indicator** | **LIVE** |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY


offUnited States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST
FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start | List At: [ ]  OR  Jump | to record: [ ]  **Record 148 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | VEGAS ROBAINA R HABANA CUBA |
| **Translations** | The English translation of the Spanish words "TUDA UNA TRADICION Y EXPERIENCIA" is "All a tradition and experience". The English translation of "VEGAS ROBAINA" is "the tobacco farms belonging to Robaina". |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: RAW TOBACCO, CIGARS, CHEWING TOBACCO, CIGARETTES, CUT TOBACCO, RAPPEE, MATCHES, TOBACCO PIPES NOT OF PRECIOUS METALS, TOBACCO PIPE HOLDERS NOT OF PRECIOUS METALS, ASHTRAYS NOT OF PRECIOUS METALS, MATCH BOXES NOT OF PRECIOUS METALS, CIGAR CASES NOT OF PRECIOUS METALS, AND HUMIDORS NOT OF PRECIOUS METALS |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 02.01.37 - Busts of men in profile; Heads of men in profile; Men - heads, portraiture, or busts in profile; Portraiture of men in profile<br>06.01.04 - Mountains (landscapes); Scenery with mountains<br>06.09.05 - Other cultivated areas<br>19.05.05 - Crates<br>26.01.02 - Circles, plain single line; Plain single line circles<br>26.01.21 - Circles that are totally or partially shaded.<br>26.17.03 - Dotted line(s); Lines, dotted |
| **Serial Number** | 75493632 |
| **Filing Date** | May 27, 1998 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | June 6, 2000 |
| **Registration Number** | 2380359 |
| **Registration Date** | August 29, 2000 |
| **Owner** | (REGISTRANT) Corporacion Habanos, S.A. DBA Habanos, S.A. CORPORATION CUBA Mercaderes No. 21 Entre O'Reilly y Empedrado Havana CUBA |

A-36

| | |
|---|---|
| **Attorney of Record** | MICHAEL KRINSKY |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "1885", "HABANA CUBA", "VEGAS", "TODA UNA TRADICION Y EXPERIENCIA" and designs of a cigar and cigar case APART FROM THE MARK AS SHOWN |
| **Description of Mark** | The mark consists of a picture of a tobacco field with a path running through it, with two houses, four trees and a mountain range in the background, with a man in a fedora with a cigar in his hand in the foreground right side, an open cigar box in the lower right corner, and a ribbon with the words "TODA UNA TRADICION Y EXPERIENCIA" across sprigs of tobacco plants across the bottom with a circle in the middle with the letter "R" with the date "1855" underneath and the words "HABANA CUBA" below the picture. The lining and stippling are features of the mark and do not indicate color. |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). |
| **Other Data** | The name "Robaina" identifies a living individual whose consent is of record. |
| **Live/Dead Indicator** | LIVE |

---

| ESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

---

| .HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

A-37

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start | List At: [       ] OR Jump to record: [       ] **Record 149 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | LA CASA DEL HABANO |
| **Translations** | The English translation of "LA CASA DEL HABANO" is "the house of the Cuban cigar". |
| **Goods and Services** | IC 042. US 100 101. G & S: social club services, bar services, and restaurant services |
| | IC 035. US 100 101 102. G & S: retail store services featuring tobacco and smokers' accessories |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 26.03.07 - Ovals with a decorative border, including scalloped, ruffled and zig-zag edges<br>26.11.26 - Oblongs as carriers for words, letters or designs<br>26.17.12 - Angles (geometric); Chevrons |
| **Serial Number** | 75151529 |
| **Filing Date** | August 16, 1996 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | April 14, 1998 |
| **Registration Number** | 2212119 |
| **Registration Date** | December 22, 1998 |
| **Owner** | (REGISTRANT) EMPRESA CUBANA DEL TABACO DBA CUBATABACO CORPORATION CUBA O'Reilly No. 104 Ciudad La Habana CUBA |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | MICHAEL KRINSKY |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "LA CASA DEL HABANO" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

**Logout** Please logout when you are done to release system resources allocated for you.

**Start** List At: [          ] OR **Jump** to record: [          ] **Record 152 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | BIORAT |
| **Goods and Services** | IC 005. US 006 018 044 046 051 052. G & S: biological rodenticides for agricultural and domestic use |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 75398992 |
| **Filing Date** | December 2, 1997 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | December 1, 1998 |
| **Registration Number** | 2225596 |
| **Registration Date** | February 23, 1999 |
| **Owner** | (REGISTRANT) Laboratorios Biologicos Farmaceuticos DBA LABIOFAM CORPORATION **CUBA** Avenida Independencia, Km 1648 Boyeros, Havana **CUBA** |
| **Attorney of Record** | MICHAEL KRINSKY |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

| .HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY


## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST
FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [          ]   OR  Jump  to record: [          ]   **Record 154 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*



*Consultoria Juridica Internacional*
ABOGADOS - LAWYERS

| | |
|---|---|
| Word Mark | CONSULTORIA JURIDICA INTERNACIONAL ABOGADOS-LAWYERS |
| Translations | The English translation for "CONSULTORIA" is "Consulting firm", for "Juridica" is "Legal", for "Internacional" is "International", and for "Abogados" is "Lawyers". |
| Goods and Services | IC 042. US 100 101. G & S: legal services. FIRST USE: 19860514. FIRST USE IN COMMERCE: 19930500 |
| Mark Drawing Code | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| Serial Number | 75264322 |
| Filing Date | March 14, 1997 |
| Current Filing Basis | 1A;44E |
| Original Filing Basis | 1A;44E |
| Published for Opposition | June 9, 1998 |
| Registration Number | 2185528 |
| Registration Date | September 1, 1998 |
| Owner | (REGISTRANT) Consultoria Juridica Internacional CORPORATION CUBA Calle 16 No. 314, e/ 3ra. y 5ta. Avenida Miramar, Playa Ciudad de la Habana CUBA |
| Attorney of Record | JAY SANCHELIMA |
| Disclaimer | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "CONSULTORIA JURIDICA INTERNACIONAL" and "ABOGADOS-LAWYERS" APART FROM THE MARK AS SHOWN |
| Type of Mark | SERVICE MARK |
| Register | PRINCIPAL |
| Affidavit Text | SECT 15. SECT 8 (6-YR). |
| Live/Dead Indicator | LIVE |

A-41

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST


# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [          ]  OR  Jump  to record: [          ]  **Record 155 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

| | |
|---|---|
| **Word Mark** | VEGAS ROBAINA |
| **Translations** | The English translation of "VEGAS ROBAINA" is the "tobacco farms belonging to Robaina". |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: cigars; cigarettes; cut tobacco; rappee; matches; tobacco pipes not of precious metals; tobacco pipe holders not of precious metals; ashtrays not of precious metals; match boxes not of precious metals; cigar cases not of precious metals; and humidors not of precious metals |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 75240789 |
| **Filing Date** | February 12, 1997 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44D |
| **Published for Opposition** | July 28, 1998 |
| **Registration Number** | 2197155 |
| **Registration Date** | October 20, 1998 |
| **Owner** | (REGISTRANT) CORPORACION HABANOS, S.A. CORPORATION **CUBA** Mercaderes No. 21 Entre O'Reilly y Empedrado Havana **CUBA** |
| **Attorney of Record** | DAVID B. GOLDSTEIN |
| **Priority Date** | October 22, 1996 |
| **Prior Registrations** | 0121931 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). |
| **Other Data** | "ROBAINA" is the name of a living person who has consented to the use of his name in the mark. |
| **Live/Dead Indicator** | LIVE |

A-42

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

# Trademarks > Trademark Electronic Search System (TESS)

TESS was last updated on Wed Nov 7 04:06:54 EST 2007

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
|---|---|---|---|---|---|---|---|---|---|---|
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

**Logout**   Please logout when you are done to release system resources allocated for you.

**Start** | List At: [＿＿＿]   OR   **Jump** to record: [＿＿＿]   **Record 156 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

| | |
|---|---|
| **Word Mark** | COHIBA |
| **Translations** | The English translation of the word "cohiba" is properly translated as "tobacco" or "to restrain". |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: raw tobacco; cigars; chewing tobacco; cigarettes; cut tobacco; matches; tobacco pipes not of precious metals; tobacco pipe holders not of precious metals; ashtrays not of precious metals; match boxes not of precious metals; cigar cases not of precious metals; and humidors not of precious metals |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 75226002 |
| **Filing Date** | January 15, 1997 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Owner** | (APPLICANT) EMPRESA CUBANA DEL TABACO CORPORATION **CUBA** Calle O'Reilly No. 104 Ciudad Habana **CUBA** |
| **Attorney of Record** | MICHAEL KRINSKY |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |
|---|---|---|---|---|---|---|---|---|---|---|
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY



# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
|---|---|---|---|---|---|---|---|---|---|---|

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |
|---|---|---|---|

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [          ] OR Jump to record: [          ] **Record 157 out of 212**

---

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to*
|---|---|---|---|---|

*return to TESS)*



| | |
|---|---|
| **Word Mark** | HABANA HABANA CUBA |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: raw tobacco; cigars; chewing tobacco; cigarettes; cut tobacco; matches; tobacco pipes not of precious metals; pipe holders not of precious metals; ashtrays not of precious metals; match boxes not of precious metals; cigar cases not of precious metals; and humidors not of precious metals |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 06.09.03 - Farms<br>26.01.21 - Circles that are totally or partially shaded. |
| **Serial Number** | 75188521 |
| **Filing Date** | October 28, 1996 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44D |
| **Published for Opposition** | August 18, 1998 |
| **Registration Number** | 2202488 |
| **Registration Date** | November 10, 1998 |
| **Owner** | (REGISTRANT) CORPORACION HABANOS, S.A. CORPORATION CUBA Calle Mercaderes No. 21 Ciudad Habana CUBA |
| **Attorney of Record** | MICHAEL KRINSKY |
| **Priority Date** | July 23, 1996 |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "HABANA, "HABANA CUBA" and the representation of the design of the rolled cigars APART FROM THE MARK AS SHOWN |
| **Description of Mark** | The mark consists of a picture in oval shape of a tobacco field with a house in the background, a tree on the right side, a shield on the lower left corner, a stack of rolled cigars in the lower right corner, above the picture an oval shape, and the words "HABANA * CUBA" below the picture. The mark is lined for the colors green, blue, brown, gold, |

A-44

red and yellow.

| | |
|---|---|
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). |
| **Live/Dead Indicator** | **LIVE** |

TESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   TOP   HELP   PREV LIST   CURR LIST   NEXT LIST

FIRST DOC   PREV DOC   NEXT DOC   LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY



Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Trademarks > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

**Logout** Please logout when you are done to release system resources allocated for you.

**Start** List At: [          ] OR **Jump** to record: [          ] **Record 159 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# CUABA

| | |
|---|---|
| **Word Mark** | CUABA |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: raw tobacco, cigars, cigarettes, cut tobacco, rappee, manufactured tobacco of all kinds, matches, tobacco, tobacco pipes, pipe-holders, ashtrays, match boxes, cigar cases and humidors, all of the foregoing not of precious metals |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Serial Number** | 75132819 |
| **Filing Date** | July 11, 1996 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 1B;44E |
| **Published for Opposition** | November 17, 1998 |
| **Registration Number** | 2237940 |
| **Registration Date** | April 13, 1999 |
| **Owner** | (REGISTRANT) HABANOS, S.A. CORPORATION **CUBA** Calle Mercaderes, No. 21 Ciudad Habana **CUBA** |
| **Attorney of Record** | MICHAEL KRINSKY |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |


Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start List At: [        ]  OR  Jump to record: [        ]  **Record 160 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status |  *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | VEGUEROS |
| **Translations** | The English translation of the word "VEGUEROS" in the mark is "a farmer of a fertile lowland" or "a tobacco farmer or planter". |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: raw tobacco, cigars, cigarettes, cut tobacco, rappee, manufactured tobacco of all kinds, matches, tobacco, smoking pipes, pipe holders-not of precious metal, ashtrays-not of precious metal, match boxes-not of precious metal, cigar cases-not of precious metal, humidors-not of precious metal |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 75011205 |
| **Filing Date** | October 27, 1995 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | March 30, 1999 |
| **Registration Number** | 2254638 |
| **Registration Date** | June 22, 1999 |
| **Owner** | (REGISTRANT) HABANOS, S.A. CORPORATION CUBA Mercaderes No. 21 La Habana CUBA |
| **Attorney of Record** | MICHAEL KRINSKY |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

**Logout** | Please logout when you are done to release system resources allocated for you.

**Start** List At: [        ] OR **Jump** to record: [        ] **Record 163 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| Field | Value |
|---|---|
| **Word Mark** | SUCHEL |
| **Goods and Services** | IC 003. US 001 004 006 050 051 052. G & S: perfume, cologne, skin lotion, essential oils for personal use, perfumed skin soaps, deodorants for personal use, talcum powder, hair shampoo, hair lotions, cosmetics, namely, lipstick, mascara, eyeliner, eyeshadow, face powder |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 05.05.01 - Lilies; Orchids; Tulips |
| **Serial Number** | 74620860 |
| **Filing Date** | January 13, 1995 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | October 7, 1997 |
| **Registration Number** | 2124635 |
| **Registration Date** | December 30, 1997 |
| **Owner** | (REGISTRANT) EMPRESA de JABONERIA Y PERFUMERIA DBA SUCHEL CORPORATION **CUBA** Calzada de Buenos Aires No. 353 Ciudad La Habana **CUBA** |
| **Attorney of Record** | DAVID B. GOLDSTEIN |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

A-48

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [         ]   OR   Jump   to record: [         ]   **Record 165 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | LA CASA DEL HABANO |
| **Translations** | The English translation of "LA CASA DEL HABANO" is "the house of the Cuban cigar". |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: raw tobacco; cigars; cigarettes; cut tobacco; rappee; manufactured tobacco of all kinds; matches; tobacco; smoking pipes; pipe-holders, not of precious metal; ashtrays, not of precious metal; match boxes, cigar cases and humidors, not of precious metal |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 26.11.26 - Oblongs as carriers for words, letters or designs<br>26.17.12 - Angles (geometric); Chevrons |
| **Serial Number** | 74576950 |
| **Filing Date** | September 22, 1994 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | September 5, 1995 |
| **Registration Number** | 1970911 |
| **Registration Date** | April 30, 1996 |
| **Owner** | (REGISTRANT) Empresa Cubana Del Tabaco DBA Cubatabaco CORPORATION **CUBA** Calle O'Reilly No. 104 Ciudad Habana **CUBA** |
| **Attorney of Record** | CHRISTOPHER J. KLATELL |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "CUBAN CIGAR" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |

**Affidavit Text**    SECT 8 (6-YR). SECTION 8(10-YR) 20050907.
**Renewal**    1ST RENEWAL 20050907.
**Live/Dead
Indicator**    **LIVE**

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC


## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
|---|---|---|---|---|---|---|---|---|---|---|

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |
|---|---|---|---|

**Logout** Please logout when you are done to release system resources allocated for you.

**Start** List At: [          ] OR **Jump** to record: [          ] **Record 174 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)* |
|---|---|---|---|---|



| | |
|---|---|
| **Word Mark** | BEHIKE |
| **Translations** | THE ENGLISH TRANSLATION OF THE WORD "BEHIKE" IN THE MARK IS "INDO-CUBAN WITCH DOCTOR". |
| **Goods and Services** | IC 034. US 008 009 017. G & S: RAW TOBACCO; CIGARS, CIGARETTES, CUT TOBACCO, RAPPEE, MANUFACTURED TOBACCO OF ALL KINDS, MATCHES, TOBACCO-PIPES, PIPE HOLDERS, ASHTRAYS, MATCH BOXES, CIGAR CASES, HUMIDORS |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 02.03.01 - Busts of women facing forward; Heads of women facing forward; Portraiture of women facing forward; Women - head, portraiture or busts facing forward<br>02.03.02 - Silhouettes of women; Women depicted as shadows or silhouettes of women<br>02.03.17 - Pigtails; Ponytails; Women with ponytails or pigtails<br>02.03.24 - Women, stylized, including women depicted in caricature form<br>25.03.02 - Backgrounds covered with other squares or rectangles<br>26.11.10 - Rectangles divided once into two sections<br>26.11.20 - Rectangles inside one another<br>26.11.21 - Rectangles that are completely or partially shaded |
| **Serial Number** | 73742915 |
| **Filing Date** | July 29, 1988 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Published for Opposition** | June 27, 1989 |
| **Registration Number** | 1557163 |
| **Registration Date** | September 19, 1989 |
| **Owner** | (REGISTRANT) EMPRESA CUBANA DEL TABACO CORPORATION **CUBA** O'REILLY 104 STREET HAVANA CITY **CUBA** |
| **Attorney of** | HOWARD N. ARONSON |

A-51

| | |
|---|---|
| Record | |
| Prior Registrations | 1441404 |
| Description of Mark | THE DRAWING OF THE MARK IS LINED FOR THE COLORS YELLOW AND GOLD. |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Affidavit Text | SECT 8 (6-YR). |
| Live/Dead Indicator | LIVE |

[ESS HOME]   [NEW USER]   [STRUCTURED]   [FREE FORM]   [BROWSE DICT]   [SEARCH OG]   [TOP]   [HELP]   [PREV LIST]   [CURR LIST]   [NEXT LIST]

[FIRST DOC]   [PREV DOC]   [NEXT DOC]   [LAST DOC]

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY


## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [          ] OR Jump | to record: [          ]  **Record 179 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

| | |
|---|---|
| **Word Mark** | QUAI D'ORSAY |
| **Goods and Services** | IC 034. US 008 009 017. G & S: RAW TOBACCO; CIGARS; CIGARETTES; CUT TOBACCO; RAPEE; MATCHES; TOBACCO PIPES; PIPE RACKS; ASHTRAYS; MATCH-BOXES NOT OF PRECIOUS METAL; CIGAR CASES NOT OF PRECIOUS METAL; HUMIDORS NOT OF PRECIOUS METAL |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 73729557 |
| **Filing Date** | May 20, 1988 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | UNKNOWN |
| **Published for Opposition** | May 21, 1991 |
| **Registration Number** | 1653845 |
| **Registration Date** | August 13, 1991 |
| **Owner** | (REGISTRANT) EMPRESA CUBANA DEL TABACO TA CUBATABACO TA CUBATABACO CORPORATION **CUBA** 104 O'REILLY STREET VEDADO, HAVANA CITY **CUBA** |
| **Attorney of Record** | CHRISTINE HAIGHT FARLEY |
| **Priority Date** | December 24, 1987 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). SECTION 8(10-YR) 20010819. |
| **Renewal** | 1ST RENEWAL 20010819 |
| **Live/Dead Indicator** | **LIVE** |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |



# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [     ] OR Jump to record: [     ]  **Record 1 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | ESPLÉNDIDOS |
| **Translations** | The English translation of the foreign word(s) in the mark is: Splendid. |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: Raw tobacco, processed tobacco for smoking, chewing or as snuff, cigarette, small cigars, fine-cut tobacco, smokers' articles, namely ashtrays, cigar cutters, match boxes, cigar cases, and matches |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 02.05.01 - Busts of children; Children, heads, portraiture, busts; Heads of children<br>02.05.02 - Children depicted in silhouettes or profiles of children; Silhouettes of children<br>02.05.04 - Children, girl(s); Girls<br>25.03.05 - Backgrounds covered with dots; Dotted backgrounds<br>26.11.02 - Plain single line rectangles; Rectangles (single line)<br>26.11.21 - Rectangles that are completely or partially shaded |
| **Serial Number** | 79041168 |
| **Filing Date** | December 18, 2006 |
| **Current Filing Basis** | 66A |
| **Original Filing Basis** | 66A |
| **International Registration Number** | 0931046 |
| **Owner** | (APPLICANT) EMPRESA CUBANA DEL TABACO (CUBATABACO) CORPORATION **CUBA** O'Reilly 104, Habana Vieja Ciudad de La Habana **CUBA** |
| **Priority Date** | July 17, 2006 |
| **Description of Mark** | "The color(s) gold, black, white, yellowish orange is/are claimed as a feature of the mark.". "The mark consists of a rectangular shape with curved corners, outlined in gold. The top half is black with white dots, and contains the silhouette of a head of an Indian in gold, outlined in white. The bottom half is in yellowish orange, and contains the word ESPLENDIDOS in black. The rectangle is divided in half with a gold line, and a white rectangle in the center of the mark. ." |

| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

ESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY


# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME    NEW USER    STRUCTURED    FREE FORM    Browse Dict    SEARCH OG    BOTTOM    HELP    PREV LIST    CURR LIST    NEXT LIST

FIRST DOC    PREV DOC    NEXT DOC    LAST DOC

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [        ]   OR   Jump   to record: [        ]   **Record 2 out of 212**

TARR Status    ASSIGN Status    TDR    TTAB Status    *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | FUNDADA EN 1519 |
| **Translations** | "The foreign wording in the mark translates into English as FOUNDED IN 1519" |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: Raw and processed tobacco for smoking, chewing or as snuff, cigarette, small cigars, ashtrays, matches, smokers' articles, namely cigarette lighters not of precious metals and smoking pipes, and humidors being containers for cigars which maintain an appropriate humidity level |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 06.03.05 - Bay; Cove; Harbors<br>07.01.04 - Detached house<br>18.07.04 - Brigs (boats); Clippers (boats); Schooners (boats); Ships with two and three masts, including brigs, clippers and schooners<br>19.05.05 - Crates<br>24.09.07 - Advertising, banners; Banners<br>25.01.25 - Borders, ornamental; Other framework and ornamental borders<br>26.11.21 - Rectangles that are completely or partially shaded |
| **Serial Number** | 79026884 |
| **Filing Date** | June 14, 2006 |
| **Current Filing Basis** | 66A |
| **Original Filing Basis** | 66A |
| **Published for Opposition** | October 2, 2007 |
| **International Registration Number** | 0893280 |
| **Owner** | (APPLICANT) CORPORACION HABANOS, S.A. Sociedad Anónima CUBA Avenida 3ra. No.2006 entre 20 y 22, Miramar, Playa; Ciudad de La Habana CUBA |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "FUNDADA EN 1519" APART FROM THE MARK AS SHOWN |

| | |
|---|---|
| **Description of Mark** | The color(s) White, Brown, Red, Gold, Yellow and Blue is/are claimed as a feature of the mark. The mark consists of an image boats in harbor framed with a decorative border having packages, a key, and the wording FUNDADA EN 1519 below the image; the water and sky are the color blue, the boats are in the color brown with white sails, the town behind the boats contains white buildings with brown accents, the buildings in front of the boats are brown with the ground being a shade of yellow, the decorative border is gold, the packages below the decorative border are variations of the color brown, the key design is yellow and the wording FUNDADA EN 1519 is in the color white having a red banner design as a border with a yellow backing, below the packages is a flooring of a shade of brown; the overall mark has white shading followed with the color brown |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY




TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST
FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

United States Patent and Trademark Office    35-4
Case 1:08-cv-01692-RCL    Document 35-4    Filed 07/23/2008    Page 61 of 63
Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [          ] OR Jump to record: [          ]   **Record 92 out of 212**

TARR Status | ASSIGN Status | TDR | TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*

# HABANOS

| | |
|---|---|
| **Word Mark** | HABANOS |
| **Goods and Services** | IC A . US A . G & S: cigars |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 77157193 |
| **Filing Date** | April 16, 2007 |
| **Current Filing Basis** | 1B;44D;44E |
| **Original Filing Basis** | 1B;44D;44E |
| **Owner** | (APPLICANT) Empresa Cubana del Tabaco a/k/a Cubatabaco entity with juridical personality established by law No. 1191, dated April 25, 1966, of the Republic of Cuba, and is subject to the jurisdiction of a Cuban ministry CUBA Calle O'Reilly No. 104 La Habana CUBA |
| **Attorney of Record** | David B. Goldstein |
| **Priority Date** | April 13, 2007 |
| **Type of Mark** | CERTIFICATION MARK |
| **Register** | PRINCIPAL |
| **Other Data** | The certification mark, as intended to be used by authorized persons, is intended to certify that the product bearing the certification mark has the exclusive character of pure Cuban cigars or tobacco produced in Cuba, "Cuba" meaning the entire national territory of the Republic of Cuba. |
| **Live/Dead Indicator** | LIVE |

A-60

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY


# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Nov 7 04:06:54 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

**Logout**   Please logout when you are done to release system resources allocated for you.

**Start**   List At: [          ]   OR   **Jump** to record: [          ]   **Record 113 out of 212**

| TARR Status | ASSIGN Status | TDR | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | GUANTANAMERA |
| **Translations** | The foreign wording in the mark translates into English as " a woman from Guantanamo. |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: cigars, matches, cigar cutters, cigar boxes, cigar holders, tobacco pouches, smokers' pipes, ashtrays, matchboxes and humidors |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 76396128 |
| **Filing Date** | April 15, 2002 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44E |
| **Owner** | (APPLICANT) Corporacion Habanos, S.A. CORPORATION CUBA Avenida 3ra No. 2006 Miramar Havana CUBA |
| **Attorney of Record** | David Goldstein |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

# EXHIBIT 2

1 of 1 DOCUMENT

Copyright 1998 The Washington Post
The Washington Post

October 21, 1998, Wednesday, Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 1642 words

**HEADLINE:** House Passes Spending Bill; Massive Omnibus Measure Larded With Pet Projects

**BYLINE:** George Hager, Washington Post Staff Writer

**BODY:**

The House approved a massive year-end spending measure last night, funding scores of federal agencies, averting a government shutdown and leaving the members who voted for it in the dark about most of what it contained.

"Who among the rank-and-file members of the House can say they've read and understood the entire package?" asked Rep. Peter A. DeFazio (D-Ore.). "Heck, half the members couldn't even lift it, let alone read it."

The 40-pound, 16-inch-tall bill includes dozens of high-profile spending compromises on issues such as funding the International Monetary Fund, hiring 100,000 new teachers, providing relief for hard-pressed farmers and ranchers and injecting billions more into the nation's armed forces.

At the same time, though, members honeycombed the bill with scores of smaller provisions to name post offices, extend Mississippi's duck hunting season, fund water projects and earmark money for local airports.

And as the last major legislation leaving Congress before the House and Senate adjourn, the measure became a vehicle for bills that members could not finish any other way, including measures to implement the international chemical weapons treaty and reorganize the nation's foreign policy agencies.

From the sublime to the ridiculous, the crucial to the arguably inconsequential, the bill's 3,825 pages included so many provisions that even members who helped draft it confessed to ignorance about exactly what was in it.

"Do I know what's in this bill?" asked Senate Appropriations Committee ranking Democrat Robert C. Byrd (W.Va.). "Are you kidding? No. Only God knows what's in this monstrosity."

House Passes Spending Bill; Massive Omnibus Measure Larded With Pet Proj

The measure also includes a $ 9.2 billion, nine-year package of tax provisions that extend eight expiring tax and trade items, including the research and development credit for business and an assistance program for workers harmed by the lowering of U.S. trade barriers.

Other tax provisions include one that will accelerate to 2003 previously enacted legislation to allow self-employed persons to deduct 100 percent of their health insurance costs. The measure was paid for with four changes to tax law, chiefly one that affects real estate investment trusts.

The Senate was expected to vote to approve the measure this morning, joining the House in clearing the measure for President Clinton's signature and sending members home to campaign barely two weeks before the Nov. 3 elections.

Despite criticism from conservative Republicans that the bill broke budget discipline and was laden with special-interest projects, the House voted 333 to 95 to approve it. Sixty-four Republicans joined with 31 Democrats to oppose the bill.

The enormous measure allows Congress to finally finish an annual funding process that was badly hobbled this year by an election-shortened schedule, policy disputes between House and Senate Republicans, and a desire by GOP hard-liners to confront the president on fiscal issues. This was in sharp contrast with last year, when Republicans compromised with the White House to generate the first balanced budget in a generation.

The omnibus bill packaged eight spending measures Congress never finished, funding at least 10 Cabinet departments and scores of federal agencies for the rest of the fiscal year that began Oct. 1. The government has been kept open pending passage of this bill by a series of short-term funding measures.

In a bow to election-year spending pressure, the huge bill also permits $ 21 billion of spending beyond legally imposed caps for measures that evade budget limits, on the grounds they are emergencies: Bosnia peacekeeping, anti-ballistic missile defense, embassy security, relief for farmers and ranchers, and other matters.

Congress in effect earmarked nearly a third of this year's surplus for such spending. Critics said most of the "emergencies" in the measure could have been foreseen and accommodated in the regular spending bills, had their colleagues been willing to cut other spending.

Estimates of the bill's size varied. The House Appropriations Committee pegged the measure at less than $ 490 billion, but other calculations showed it to be roughly $ 520 billion -- nearly one-third of all federal spending.

Members from both parties reviled the year-end negotiations that brought them the bill.

"We have this godawful mess on the floor [that] represents an incredibly outrageous way to do the country's business," said Rep. David R. Obey (Wis.), the House Appropriations Committee's ranking Democrat.

"I'm not going to stand here and defend the process because I think it has been ugly," agreed House Appropriations Chairman Bob Livingston (R-La.). But Livingston defended the bill and urged his colleagues to vote for it. "By adopting this bill we can show that we can govern," he said. "It is important to vote for this bill and go home to our districts to explain why we should come back."

House Passes Spending Bill; Massive Omnibus Measure Larded With Pet Proj

Republicans sold their colleagues on the measure's increases for defense, anti-drug efforts and other GOP priorities. Democrats touted big increases for education and other social spending.

Negotiators jockeyed for almost two weeks to assemble the measure, and most of the high-profile additions and subtractions were measured in the billions -- for example, nearly $ 18 billion for the IMF and more than $ 1 billion each for hiring teachers, providing disability payments for Persian Gulf War veterans and allowing the Tennessee Valley Authority (TVA) to refinance expensive federal loans.

But the battles were also won and lost down in the fiscal weeds, often for amounts smaller than $ 1 million.

For example, Senate Majority Leader Trent Lott (R-Miss.) led a successful effort to wedge $ 750,000 into the omnibus bill to pay half the cost of rebuilding a flood-destroyed dam on Archusa Lake in Quitman, Miss.

The money had been removed from an earlier Senate-passed supplemental appropriations bill, in part, critics said, because the lake is purely recreational and the dam is not the sort of flood control, navigation or shoreline protection project the U.S. Army Corps of Engineers normally performs.

While the Mississippians were winning, however, New York's delegation lost a battle to provide a tax exemption that would have been worth about $ 370,000 to David Kaczynski, who plans to turn over to victims the $ 1 million reward he got from the FBI for turning in his brother, Unabomber Theodore J. Kaczynski. The tax exemption would have increased the amount that could go to the victims.

Included in the spending measure at the last minute was a bill to bring the United States into compliance with a treaty -- banning production, storage or use of chemical weapons -- that was approved last year by the Senate. The treaty compliance bill had been held up earlier by maneuverings involving a variety of other issues, including payment of back dues to the United Nations and an unrelated antiabortion restriction.

The legislation authorizes inspection of American chemical facilities by international personnel but only under restrictions demanded by lawmakers as the price for approval of treaty. These restrictions give the president authority to block surprise inspections on national security grounds, require an FBI counterintelligence officer to attend inspections and mandate that samples from American inspection sites be tested in this country.

Without passage of the law, the United States would have been in technical violation of the treaty.

The bill also was expanded to include long-delayed legislation to reorganize foreign policy agencies, including merging the U.S. Information Agency and the Arms Control and Disarmament Agency into the State Department.

Staff writers Charles R. Babcock and Helen Dewar contributed to this report.

Special Interests

Below are some of the more controversial provisions that were hashed out in the massive year-end spending measure.

Issue

House Passes Spending Bill; Massive Omnibus Measure Larded With Pet Proj

Sponsor Outcome

Extend duck hunting season in Mississippi

Lott (R)/Cochran (R) In

Credits to Russia for chickens ($ 350 million)

Lott (R)/Cochran (R) Out

Superfund liability exemption for scrap metal industry

Lott (R) Out

Unabomber reward tax break

Moynihan (D) Out

Alaska overflight tariff ban

Stevens (R) Out

Change patent extension process/Claritin

Lautenberg (D) Out

Mohair loan program

Stenholm (D)/Bonilla (R) Out

Military pension increase

Murtha (D) Out

Curtail federal prosecutors

Murtha (D)/McDade (R) In*

Tobacco export promotion ($ 10 million)

Faircloth (R) Out

Home health care funding ($ 1.7 billion)

Several members In

Tennessee Valley Authority loan refinancing

Thompson (R)/Frist (R) In

Funding for I-69 construction project in Arkansas

Dickey (R) In

Auto salvage bill

Lott (R) Out

Red Cross disaster relief ($ 30 million)

Unknown In

Dole Institute at University of Kansas

House Passes Spending Bill; Massive Omnibus Measure Larded With Pet Proj

Roberts (R) In

* Provision doesn't take effect for six months.

House Budget Committee Chairman John R. Kasich (R-Ohio), left, chats with Speaker Newt Gingrich (R-Ga.) at adjournment rally. House Speaker Newt Gingrich and colleagues share a laugh as Gingrich is introduced by Majority Whip Tom DeLay at GOP celebration of 105th Congress.

**GRAPHIC:** PH,,ROBERT A. REEDER; IG,,TWP

**LOAD-DATE:** October 21, 1998

# EXHIBIT 3

**Abraham, Kyra**

| | |
|---|---|
| **From:** | Slutter, Nancy |
| **Sent:** | Monday, August 21, 2006 8:00 AM |
| **To:** | Slutter, Nancy |
| **Subject:** | Bacardi/Pernod litigation |

Bacardi's Cuban Rumble Spills Into U.S.

<u>Return to Top</u> O'Connell, Vanessa
Wall Street Journal, The
August 17, 2006

Spirits Maker Releases Its Version Of Havana Club Rum And Battles Pernod's Bottles

Page B2

Drinkers all over the world are big on Havana Club, a century-old rum brand with an enticing Cuban history and a dark, rich taste flavored by barrel-aged Cuban sugarcane molasses. .

Now, after an absence of nearly five decades, Havana Club has gone on sale in the U.S., priced at $20 a bottle. But rum aficionados shouldn't get too excited. This isn't the famous Cuban rum once sold in the Stork Club in New York: Instead it is a version made in Puerto Rico by Bacardi Ltd.

Bacardi's challenge to the storied Havana Club name is the latest twist in a political and legal saga that stretches back 50 years, to the days of Fidel Castro's takeover of Cuba, pitting the Castro regime against the family that owns Bacardi. Caught up in the battle is the French liquor giant Pernod Ricard SA, which sells Havana Club in 80 countries through its joint venture with the Cuban government.

At stake is future control of the world rum market. While Bacardi Rum outsells Havana Club by nearly 10 to 1, sales of the Cuban brand have been increasing rapidly in recent years even as Bacardi has struggled to reverse sliding sales.

In the near term, Bacardi's position in the U.S. is safe. Not only does the longstanding trade embargo block import of Cuba-owned products, but Cuba this month lost the right to the Havana Club trademark in the U.S.

Bacardi has fought long and hard to protect its business. In 1959, when Fidel Castro took control of Cuba, his new government seized the rum distilleries owned by both Bacardi and Havana Club. The Bacardi family fled the island and moved production to their Puerto Rico plant, eventually building Bacardi into a global rum giant. Havana Club's family owners, the Arechabala family, weren't so lucky. While they escaped, they only had one plant -- in Cuba -- and had to abandon the business. In 1973 the family let their U.S. trademark on Havana Club expire.

Cuba continued producing the rum, initially for the domestic market and the Soviet bloc. After expiration of the family's trademark, a Cuban state export company registered the Havana Club brand with the U.S. Patent and Trademark Office, and eventually, dozens of other countries. In 1993, it got more aggressive, making a deal with Pernod to sell the rum throughout the world. The deal has paid off: In the year to June 30, Havana Club's world-wide sales hit 2.4 million cases -- compared with tens of thousands in 1993. Bacardi, in comparison, sold

USPTO FOIA
07-128
395 of 1077

1

about 20.1 million cases of rum last year, about the same amount as in 1993.

About half of Bacardi's sales are in the U.S. Bacardi, worried that the death of Fidel Castro could some day end the embargo, has pulled out all the stops to keep Cuba's Havana Club out of the market. Despite the expiration of the Arechabala's trademark, Bacardi struck a deal with the family for rights to the brand and in 1995 began selling a Bahamas-made rum with the Havana Club label in the U.S. marketplace. It pulled the product after Pernod sued, triggering a decade of courtroom battles over the trademark ownership that are still going on.

Bacardi also went to Washington, lobbying successfully for passage of a law -- dubbed the "Bacardi Bill" -- which blocks renewal of trademarks for brands whose ownership was confiscated by the Castro regime. On Aug. 3, about seven years after the bill became law, it paid dividends for Bacardi when Cuba's U.S. registration of the Havana Club brand expired. Shortly before, the U.S. Treasury's Office of Foreign Assets Control had denied a Cuban government agency the license needed to renew the trademark. Francisco de la Vega, a spokesman for Pernod Ricard in Paris, blamed the "Bacardi Bill" for the trademark lapse.

Days after the trademark expired, Bacardi began shipping its new Havana Club bottles to stores. "Developed in Cuba circa 1930," its sleek bottles note, with a barely visible Bacardi imprint under the brand logo. Bacardi executives say the company had been planning the launch for at least three years, and say they are basing the new rum on original Arechabala family recipes. In contrast to Cuba's Havana Club, with its amber tint, red-and-black label and Cuban-government stamp, Bacardi's Havana Club is clear, like water. Bacardi says its trademark application is pending.

Croton-on-Hudson, N.Y., spirits consultant Gary Regan says the Bacardi Havana Club "has a wonderful sharp quality" and "holds its own with the best of the best white rums out there," such as Appleton White and Rhum Barbancourt. Earlier this month, Mr. Regan shared his bottle, provided by Bacardi in advance of its launch, with a group of eight bartenders from prominent bars, mainly in New York. They tasted the rum blind and learned this week it was Bacardi's Havana Club, as part of a gambit to prime the market and boost the chances of post-launch buzz.

Mr. Regan says he hasn't tasted the Cuban Havana Club, but says he would like to see it sold in the U.S., too. Generally, Cuban rums tend to be less sweet and drier than Puerto Rican rums, say spirits experts such as F. Paul Pacult, editor of the Spirits Journal.

Bacardi's Havana Club is "not as rounded as the Cuban Havana Club, but it's not too far off," says Sam Ross, a bartender at Milk and Honey in Manhattan, who has tasted both. Bacardi's version "tasted lovely, definitely silky smooth, rich and chocolaty and caramel-y," he says. Although Bacardi's version lacked the seven years' aging that benefits the Cuban Havana Club rum, he adds, "I think that will definitely satisfy the thirst for Havana Club here in the U.S., where we can't have it."

Marketers agree that a Cuban-made Havana Club -- should its sale ever be allowed in the U.S. -- would catch on. "I think it would be very, very popular in the U.S.," says Brian Sudano, a managing director at Beverage Marketing Corp., a New York consulting group.

Mr. de la Vega says Pernod Ricard filed a new lawsuit against Bacardi this week on the grounds that Bacardi is misleading consumers and that the Havana Club name can't be used for any rum that isn't Cuban. It also plans to appeal the decision by the U.S. trademark office that blocked the renewal of its registration of the brand.

Others warn Cuba might retaliate by ignoring the trademark protection it has afforded to U.S. brands. "Given this action by Bacardi, the temptation by the Cubans would be to say, if you don't respect the trademark agreement then we won't either," says Wayne Smith, head of the Cuba program for the Center for International Policy in Washington.

USPTO FOIA 07-128
396 of 1077

Some liquor executives hope Bacardi's Havana Club will give a lift to the U.S. rum market, which has been expanding about 5% or 6% a year. Skyy Spirits LLC, which markets a Dominican Republic-made rum as "made in the tradition of Cuba," says it might ramp up the Cuba-related themes in its marketing.

Write to Vanessa O'Connell at vanessa.oconnell@wsj.com1

*Battle Over Rights to Havana Club Rum Brand

Return to Top Los Angeles Times
August 17, 2006


BYLINE: From Bloomberg News

SECTION: BUSINESS; Business Desk; Part C; Pg. 3

Bacardi Ltd. said Wednesday that it would defend itself vigorously against a lawsuit by Pernod Ricard for the U.S. rights to the Havana Club rum brand, the subject of a 10-year legal battle.

Pernod, the Paris-based maker of Stolichnaya vodka, said Aug. 8 that it would appeal a U.S. Patent and Trademark Office ruling barring the company from selling the rum in the U.S.

Bacardi said in a statement Wednesday that it had applied to register the brand in its own name. A Cuban government agency had registered the trademark in the U.S. in 1976.

The dispute over the Havana Club rights has drawn in U.S. courts and the World Trade Organization. Pernod sells the rum in 183 countries in a joint venture with Cuba's government, which has used the brand name since seizing the company that originally made the spirit in 1960. Bacardi has said it bought the brand from its family owners in 1996.

Pembroke, Bermuda-based Bacardi, the world's biggest maker of rum, has said it is putting the 80-proof Havana Club on sale in the U.S. this month at a suggested retail price of $19.99 a bottle. The patent office Aug. 3 declared Cuba's U.S. registration of the trademark "canceled/expired," according to the distiller.

USPTO FOIA
07-128
397 of 1077

3

# EXHIBIT 4





NOTICE
THIS MATERIAL MAY BE
PROTECTED BY COPYRIGHT

N.Y.P.L.

OCT c · 1998

An Inside Washington Publication

S.I.B.L.

Best and industry trade action

Vol. 16, No. 42 - October 23, 1998

## BRITTAN, BARSHEFSKY CONTINUE TO WORK ON REMAINING PROBLEMS IN TEP

U.S. Trade Representative Charlene Barshefsky and European Union External Relations Commissioner Leon Brittan failed in an Oct. 19 meeting to reach final agreement on bilateral trade measures to be taken under the Transatlantic Economic Partnership, according to informed sources. As a result, the two sides will continue to work on the TEP in the hopes of completing it in time for an Oct. 26 meeting of the EU Council of member states.

One informed source said it is possible that there "may still be a few brackets" in the text presented to the Council next week. But this is unlikely to cause a serious problem, since member states only plan to begin examining the TEP at that time, and are not scheduled to approve it until a November 9 meeting.

The two sides failed to bridge their differences on bilateral negotiations on government procurement, according to these sources. Going into this week, the EU was seeking a more aggressive opening of procurement procedures and an

*continued on page 18*

## BUDGET BILL WOULD SHUT OFF TRADE WITH SOME CUBAN JOINT VENTURES

The omnibus spending bill that was passed by both houses of Congress this week includes language that would effectively shut off U.S. trade with certain joint ventures between foreign companies and Cuban-owned entities, according to informed sources. These sources said the language would deny these joint-venture companies the right to apply for a U.S. trademark license if the trademark in question was once expropriated by the Cuban government.

Sources said U.S. and foreign government officials were still examining the language, which is found in Section 211 of the bill, reprinted below. But these sources said the language is expected to be controversial, since it will likely impact Havana Club Holding (HCH), a joint-venture rum distributor formed by Pernod Ricard of France and a Cuban-owned company.

*continued on page 19*

## DALEY ATTACKS CHINA AS ADMINISTRATION AVOIDS SECTION 301 CASE

U.S. Commerce Secretary William Daley this week attacked China for what he called the lack of openness in its market and its demands that U.S. firms transfer technology as a condition of investment. U.S. technology then allows Chinese goods to compete with U.S. products, contributing further to a spiraling trade deficit, he charged.

"The lack of openness in China is bad for business, and its bad for our overall relationship," Daley said in Oct. 21 remarks to the World Affairs Council of Washington, DC. "And, frankly, it may stimulate a domestic backlash if it persists much longer."

Daley added that the growing trade deficit with China "does not sit well" with him, "with President Clinton, with Congress, or with American firms and workers."

But Daley's tough message stands in contrast to an Administration decision earlier this month not to launch

*continued on page 20*

## GEPHARDT CALLS FOR STEEL SECTION 201 AS USTR CHIDES EU FOR QUOTAS

House Democratic Leader Richard Gephardt (D-MO) this week urged the Administration to act against increased low-priced steel imports beyond a quick review of four pending trade remedy petitions targeting Russia, Japan and Brazil. One possible option is to have the International Trade Commission initiate a Section 201 investigation along with temporary quotas, Gephardt said in an Oct. 20 letter to President Clinton.

"I advocate the strongest possible action to assist the industry," he said. "For example, a USTR request to ITC for a self initiated 201 investigation coupled with temporary quantitative restrictions on imports is a response that could be pursued."

Strong Administration action is needed to protect U.S. workers from unfair competition, especially since the U.S. has acted on a priority demand of U.S. business by replenishing the International Monetary Fund,

*continued on next page*

## U.S., EU CLASH OVER PLANNED RETALIATION FOR EU BANANA POLICY

The U.S. and European Union this week clashed in a World Trade Organization meeting on whether the U.S. is entitled to prepare retaliation measures against the EU for what it expects to be a failure to change its pending banana import policy. U.S. Ambassador to the WTO Rita Hayes told the Oct. 21 meeting of the WTO Dispute Settlement Body that the U.S. is entitled to prepare for what it expects to be an EU failure to comply, while EU Ambassador Roderick Abbott charged that the U.S. threat of retaliation appeared to be based on a unilateral U.S. determination that the EU's proposed system is not WTO consistent.

Any retaliatory action based on a unilateral determination would be illegal under Article 23 of the Dispute Settlement Understanding and would be challenged by the EU, he said. Instead, the U.S. must allow a panel established under Article 21.5 to determine EU compliance, he said.

Only then can a member seek compensation or withdraw concessions under Article 22, which allows for these steps in the event that panel rulings are not implemented within the reasonable period of time allowed.

Hayes responded that U.S. law requires a public comment period before taking action and the U.S. has been very transparent in announcing the domestic procedures that it will follow for responding to the EU's anticipated failure on January 1 to implement a WTO panel and appellate body ruling on its banana policy.

The domestic process will allow the U.S. to exercise its rights under Article 22 of the DSU, Hayes said.

Hayes also criticized the EU for refusing to consult with it and the other complainants in the banana dispute on how to change its system in a way that complies with the ruling.

"We have provided ample opportunity for the EC to test its claim that its new measures are WTO consistent," she said. "We are exercising our rights under the WTO to withdraw concessions if the EC is not in compliance, which it clearly is not."

The U.S. said it is well within its rights under the WTO and U.S. law to begin considering how to respond to what it expects will be EU non-compliance with WTO rules. The Clinton Administration earlier this month assured Congress that it will retaliate against the EU if it fails to change its banana import policy in accordance with the ruling (*Inside U.S. Trade*, Oct. 16, p. 1).

In a related development, the Office of the U.S. Trade Representative yesterday (Oct. 22) published a notice in the *Federal Register* requesting public comment on the EU measures and the pending USTR determination that they will fail to meet WTO obligations.

Hayes also countered that the EU is the party taking a unilateral approach to the implementation of the panel decision, and said the U.S. and other claimants had been rebuffed in their efforts to work with the EU to find an acceptable solution. She added that the U.S. continues to hope that a WTO-consistent solution can be found before having to request suspension of concessions. U.S. Trade Representative Charlene Barshefsky this week also publicly emphasized her determination to negotiate a settlement (see related story).

Ecuador, speaking at the meeting for the complaining parties Guatemala, Honduras, Mexico, Panama and the U.S., urged the EU to consult with the complaining parties on implementing a WTO-consistent arrangement before the end of the year, trade sources said.

*continued on page 21*

## *In This Issue*

Brittan, Barshefsky continue to work on remaining problems in TEP ........................ p.1

Budget bill would shut off trade with some Cuban joint ventures ............................. p.1

Daley attacks China as Administration avoids Section 301 case ................................ p.1

Gephardt calls for steel Section 201 as USTR chides EU for quotas ......................... p.1

Korea to open auto market, end negative campaign on foreign cars ....................... p.3

OECD nations forego MAI decision, agree to examine possible changes ................. p.5

Private-sector skepticism creates new hurdle for Helms-Burton deal ...................... p.7

Final deal on IMF funding includes reform conditions, targets Korea ...................... p.8

Roth, Moynihan urge Administration hardline on foreign subsidies ......................... p.11

EU assessing U.S. proposal to improve U.S. meat testing system ........................... p.12

Congress approves anti-bribery bill after last-minute wrangling .............................. p.13

CIT judge to decide case on lumber classification without trial ............................... p.14

Congress directs USTR to scrutinize subsidies to Korea steel firms ........................ p.15

U.S. signals acceptance of EU terms in wine talks, but waits for EU ...................... p.16

Union calls on EU to drop WTO challenge of Massachusetts Burma law .................. p.17

U.S., EU clash over planned retaliation for EU banana policy .................................. p.22

**SPENDING BILL PROVISION LIKELY TO DRAW FIRE FROM EU . . . begins page one**

Informed sources this week noted that HCH's trademark license was already revoked by the Treasury Department's Office of Foreign Assets Control (OFAC) last year. But sources said the language in the appropriations bill would effectively codify that decision, which could spark strong EU criticism.

In turn, sources said this could increase friction in the U.S.-European Union effort to resolve an ongoing dispute over the Helms-Burton law. While the two issues are technically unrelated, these sources said France and the rest of the EU are likely to see the language as another extraterritorial U.S. law. They could decide to demand changes to the language before the Helms-Burton agreement can be finalized (see separate story).

Adding to the controversy is that the language was specifically pushed by Bacardi-Martini USA, a competitor of HCH that has been fighting for the right to use the Havana Club trademark, informed sources said. Bacardi purchased the trademark right from the original owner, which prompted HCH to sue Bacardi based on the argument that HCH was the owner of the trademark. When Bacardi countered that HCH was not the owner, OFAC learned of the case and decided to revoke HCH's license.

Until the language in the appropriations bill was passed this week, sources said HCH might have been able to reapply for the license after the lawsuit. The case is expected to go to trial next year, and is now focused on HCH's claims that Bacardi should not be allowed to use the Havana Club trademark because Bacardi is not based in Cuba.

In addition to HCH, the language will likely affect other Cuban joint ventures such as Trinidad Cigar, which could lose its U.S. trademark license if the law is applied.

Informed sources said Bacardi won the support of Sens. Connie Mack (R-FL) and Bob Graham (D-FL), who put the language in the appropriations bill that was signed by President Clinton on Oct. 21. While one informed source said the language is supported by the International Trademark Association, another said only that ITA worked with Bacardi on the language to ensure that the Patent and Trademark Office would not be burdened with deciding which trademark licenses to revoke.

In its final form, Treasury is charged with drafting regulations for the implementation of the provision.

Specifically, the language would prevent the U.S. from accepting payment in exchange for licenses for trademarks that were "confiscated" unless the original owner of the trademark has consented. This would appear to prevent the U.S. from licensing the Havana Club trademark to HCH, since the Cuban government confiscated that trademark in the 1960s from the original owner.

Second, the language would prevent U.S. courts from recognizing or otherwise validating claims to a trademark by a "designated national." Designated nationals are identified by OFAC, which then places certain restrictions on these entities.

Sources said the apparent intention of this section is to deny HCH and possibly other joint ventures the right to fight the provision by preventing them from arguing in court that they are the rightful holders of a trademark.

Third, the language said that "[n]o U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national." While the meaning of this is also unclear, one source said it appears to require the U.S. to ignore international treaties that might otherwise hold that the designated national in question does in fact hold a trademark right.

A number of sources criticized this last provision, since it seems to be an effort to override pre-existing U.S. commitments. One source indicated that the Clinton Administration is likely to put forward the argument that treaty rights still supersede the amendment.

While Clinton signed the bill into law this week, informed sources indicated that the Administration may already be examining ways to get around the language. Sources said one possible way around the provision could be to argue that the Havana Club trademark was not technically confiscated by Cuba, and was merely picked up by Cuba after the revolution as a trademark that fell into disuse.

This reasoning could allow the Administration to argue that the trademark in question does not fall under the purview of the provision, sources said.

Other sources criticized supporters of the amendment for injecting it into the appropriations bill without leaving enough time to debate its possible impacts on international law. These sources said international law would hold that the Cuban-owned company is the true owner of the Havana Club trademark, since Cuba expropriated the trademark in the 1960s from Cubans.

The amendment would reject this finding by preventing HCH from filing a trademark license in the U.S., they said.

But supporters argued that the language would not violate international law, because Cuba never compensated the original owners for the trademark, and therefore the trademark does not belong to the Cuban company. Instead,

Bacardi should be seen as the rightful owner, since it paid the original owner for use of the trademark, these sources said.

OFAC last year revoked HCH's trademark license after deciding that the sale of the trademark from the Cuban-owned company to the joint venture with Pernod Ricard could be seen as the Cuban government's sale of a U.S. asset, the trademark, for money from the French company. As OFAC is charged with enforcing the Trading with the Enemy Act, it found that this transaction was a violation of U.S. law and revoked HCH's U.S. license (*Inside U.S. Trade*, Aug. 22, p. 1).

## *Spending Bill Language on Trademark Rights*

SEC. 211. (a)(1) Notwithstanding any other provision of law, no transaction or payment shall be authorized or approved pursuant to section 515.527 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

(2) No U.S. court shall recognize, enforce or otherwise validate any assertion of rights by a designated national based on common law rights or registration obtained under such section 515.527 of such a confiscated mark, trade name, or commercial name.

(b) No U.S. Court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national or its successor-in-interest under sections 44 (b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126 (b) or (e)) for a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

(c) The Secretary of the Treasury shall promulgate such rules and regulations as are necessary to carry out the provisions of this section.

(d) In this section:

(1) The term "designated national" has the meaning given such term in section 515.305 of title 31, Code of Federal Regulations, as in effect on September 9,1998, and includes a national of any foreign country who is a successor-in-interest to a designated national.

(2) The term "confiscated" has the meaning given such term in section 515.336 of title 31, Code of Federal Regulations, as in effect on September 9, 1998.

## DALEY BLASTS CHINA ON TRADE DEFICIT, TECH TRANSFER . . . begins page one

any Section 301 cases against China, informed sources said. The Administration decided against announcing such a case in the context of renewing the Super 301 provision this month despite an acknowledgment that the bilateral trade relationship faces problems in agriculture, intellectual property and telecommunications, an official said. The official indicated that the Administration is leaning toward not making any announcements on trade cases at that time, even though a final decision has not been made yet.

In a meeting of the National Economic Council earlier this month, Commerce and the Office of the U.S. Trade Representative were advocating in favor of a Section 301 case, but met with opposition from the Treasury Dept., sources said. Treasury's position was backed by the State Dept., one informed source said.

At the same time, informed sources said that no U.S. business association or firm favors such a confrontational approach with China for fear of retaliation. As a result, they argue, it is highly unlikely that the U.S. would ever launch a case against China.

The bilateral trade problems and a burgeoning trade deficit come at a time when negotiations for China's accession into the World Trade Organization are stalled. China's negotiator Long Yongtu last week made very vague proposals for further concessions to the U.S., but insisted to business representatives that he hopes to wrap up negotiations by April next year.

U.S. government officials have said they assume China's accession would take at least another two to three years, with other estimating three to five years. Some U.S. officials have said these time periods have been conveyed by Chinese officials, and are not independent U.S. estimates.

After his speech, Daley said the Clinton Administration is considering possible steps to effectively address its problems with China, but he refused to specify what these might be. In addition, the U.S. must remain adamant that China not be allowed to enter the WTO before making better market access offers, he said.

Daley said that U.S. investors and consumers have shown faith in China and that he will press China to show reciprocal faith in U.S. goods and services in the upcoming December meeting of the U.S.-China Joint Commission on Commerce and Trade.

# EXHIBIT 5

Statement
*United States Senate Committee on the Judiciary*
**An Examination of Section 211 of the Omnibus Appropriations Act of 1998**
July 13, 2004

**The Honorable Larry Craig**
United States Senator , Idaho

Mr. Chairman, Mr. Leahy, thank you for holding today's hearing.

This hearing is a first step in resolving the problems Section 211 poses for the U.S. in terms of honoring the commitments we have undertaken in various international trademark agreements.

Clearly we must do something legislatively about Section 211 and we must do it by December 31 if we are to meet the WTO's deadline for the U.S. to cure that law's violations of the Trade Related Aspects of Intellectual Property Rights Agreement (TRIPS).

To that end, Mr. Chairman, S. 2373 modifies Section 211 slightly based on the notion that minor amendments will make the law compliant with TRIPS and in so doing will put an end to the EU's WTO case.

By contrast, a bill I introduced last year, S. 2002, repeals Section 211 outright. We took that approach for a simple reason: Even if S. 2373 is successful in amending Section 211 to bring it into compliance with the TRIPS Agreement -- and I understand there is some doubt about that -- a straight repeal of that law is an indisputable guarantee of a quick end to the ongoing WTO dispute.

This has been confirmed by the U.S. Trade Representative who has told Congress more than once that repealing Section 211 would bring the U.S. into immediate compliance with the TRIPS Agreement.

Therefore the question is, why forego repeal and adopt a half-measure, such as S. 2373, when it will most likely only breed further TRIPS-based disputes in Geneva with the EU?

Simply put, there is no case to be made for Section 211, so why preserve it?

To succeed, an argument for amending Section 211 (rather than repealing it) must demonstrate convincingly that there are positive aspects to that law. A successful argument for amending Sec. 211 instead of repeal must also demonstrate an absence of negatives in such an approach. In other words, preserving Section 211 makes sense only if: (1) it is of real benefit to U.S. intellectual property holders and (2) it can be guaranteed to do them no harm.

Without question, Section 211 fails on both counts.

First, section 211 benefits one foreign company alone. This point bears emphasis, no U.S. company receives the slightest advantage from that law. If anyone doubts this I suggest they ask the law's sole beneficiary, Bacardi, Inc., to name one U.S. company that benefits from and supports Section 211.

Second, Section 211 is a positive danger to U.S. trademarks because, until it is taken off the statute books, the U.S. will remain in violation of the Inter-American Convention for the Protection of Trademarks. Section 211's violation will place thousands of U.S. trademarks registered in Cuba in serious jeopardy.

Some may ask why the Inter-American Convention on Trademarks matters and why Section 211 puts U.S. Companies' Trademark Rights under the convention in danger?

Not long ago nearly 300 American companies from over 30 states – including Idaho – participated in the first exposition of U.S. agricultural products in Havana in nearly 50 years. Many of the exhibitors were producers or distributors of branded food products. For example one mid-western exhibitor, ConAgra Foods, displayed samples of such trademarked goods as Hunt's Ketchup, Wesson Oil, Chef Boyardee, Orville Redenbacher and Swiss Miss Cocoa. Other exhibitors included Gallo, Wrigley's, Libby's, Chiquita, Smithfield Foods, Archer Daniels Midland, Sara Lee, Cargill, Gerber, Land O' Lakes, Perdue Farms, Southcorp Wines and Unilever Bestfoods which includes Knorr, Lipton, Hellman's and Ragu brands.

The present and future importance of sales of branded foods to Cuba is recognized by the U.S. Department of Agriculture. In its guide to exporting to Cuba, under the Trade Sanctions Reform Act of 2000, U.S.D.A. states that it:

"highly recommend[s] that U.S. exporters make every effort to register their trademarks and brand names in Cuba."

Those marks can only be registered pursuant to the Inter-American Convention on Trademarks, a reciprocal intellectual property agreement signed in 1928 that governs trademark protection between the U.S. and Cuba to this day.

Even to this day, the Convention remains in effect despite the U.S. embargo on Cuba. The fact that a U.S trade embargo was imposed on Cuba in the early 1960's did not affect the operative status of the Convention.

It is important to note that the one area of continuing commercial cooperation between the U.S. and Cuba, in the forty years of the embargo, has been in the field of trademark protection. Since the Cuban embargo's inception, specific provisions of U.S. laws and regulations have made it legal for American companies to pay fees to register, renew and even litigate the enforcement of their trademarks in Cuba. Until Section 211 was enacted, Cuban trademark owners had reciprocal rights in the U.S. under the Inter-American Convention.

The common sense inherent in the U.S. government's policy of ensuring reciprocal trademark protection with Cuba is irrefutable. Every U.S. embargo is meant to be a temporary halt of trade with the targeted country. U.S.-origin trademarks must be kept in good order in embargoed countries, such as Cuba, if we are to ensure a rapid and efficient resumption of trade when an embargo is terminated.

Failure to do so will inevitably produce the situation in Cuba we witnessed in South Africa where, following the end of the apartheid regime, a number of U.S. companies including Burger King and Victoria's Secret, discovered that their trademarks had been appropriated by South African companies during the apartheid era. Recovering the rights to their trademarks required lengthy and expensive litigation or buying out the South African registrant. Efforts to secure trademarks before the political transition would have saved many companies from improper exploitation and would have facilitated market reform.

In contrast to South Africa, a treaty – the Inter-American Convention – protects U.S. trademarks in Cuba. Section 211 unfortunately and unnecessarily puts that treaty in grave jeopardy.

What is the status of the Inter-American Convention on Trademarks?

A U.S. federal court of appeals ruled recently, in 2000, that the Inter-American Convention on Trademarks:

"remains in force between the United States and Cuba" and "governs trademark relations between the two countries."

Nearly 5,000 U.S. trademarks are currently registered in Cuba under the Convention. More are being registered every day. In fact, applications for new registrations from U.S. companies have, in the four years post-TSRA, created an administrative backlog at the Cuban Trademark Office.

As I just pointed out, U.S. corporations invoke the Inter-American Convention regularly not only to register and renew their trademarks, but also to defend them from infringers. Examples include, Jello, Winchester, Pizza Hut and Dupont.

Until Section 211 was enacted, owners of Cuban trademarks enjoyed identical and reciprocal rights in the U.S. Section 211 removed those rights by denying U.S. courts the jurisdiction to enforce certain Cuban-origin trademarks. This was done in direct violation of the Convention, which in the ruling of one U.S. federal judge,

"compels signatory nations to grant to the nationals of other signatory nations the same rights and remedies which their laws extend to their own nationals."

What are Cuba's International Law Remedies for U.S. Violations of the Inter-American Convention? Well, Section 211 effectively entitles Cuba to suspend U.S. rights under the Convention.

Cuba's remedy for U.S. breaches of the Inter-American Convention is found in international treaty law. Article 60(2) of the 1969 Vienna Convention on Treaties provides:

"A material breach of a multilateral treaty by one of the parties entitles a party specially affected by the breach to invoke it as a ground for suspending the operation of the treaty in whole or in part in the relations between itself and the defaulting State."

Our bill, S. 2002, the full repeal of Sec. 211, will put all questions to do with the validity of Cuban-Origin Trademarks back in U.S. Federal Courts.

I gather one of today's witnesses will be a member of a family that owned a rum business in Cuba that was expropriated by the Cuban government in 1960. He has my sincere sympathy.

As a conservative, I have no tolerance for coerced governmental takings of anyone's property anywhere. It is wrong to expropriate private enterprises without compensation.

However, I ask members of the committee to keep in mind that nothing that happened in Cuba over 40 years ago required enactment of Section 211 in 1998.

Trademarks registered in the U.S. were untouched by the expropriations in Cuba. The witness's family lost its Havana Club registration in the U.S. solely because family members chose not to renew it here in Washington, D.C. in 1973. That decision was made fully 14 years after the revolution in Cuba and the expropriation of the family's business there.

o the same extent that I believe in property rights, I believe in the responsibilities that accompany such rights. If someone fails to maintain a trademark as required by law, ordinarily it will be deemed abandoned and he will lose all rights to it. In saying this, I am not prejudging the ultimate outcome of Bacardi's claim to the U.S. trademark it purportedly purchased from today's witness and other members of his family twenty-five years after they let it expire at the U.S. Patent and Trademark Office.

A repeal of Section 211 simply returns the question of ownership to the courts where it belongs. Indeed if Section 211 had not been enacted several weeks before trial in the Havana Club dispute, the ownership of that trademark would have been judicially determined over five years ago.

It is time to repeal Section 211 and let the company that engineered that law – to the extent that it has a case – go tell it to a judge and let Congress out of the trademark dispute resolution business.

So far Cuba has continued to honor U.S. trademarks -- even though it is entitled by international law to suspend the obligations it owes U.S. companies under the Convention. However, if Congress fails to repeal Section 211 and merely amends the law in a WTO-specific fashion (as S. 2373 proposes), it will thereby reaffirm the U.S. breach of the Inter-American Convention vis-à-vis Cuba. At that point Cuban forbearance can be expected to end. The result will very likely be disastrous for U.S. companies with trademarks registered in Cuba.

As I previously stated, the problem with S. 2373's approach is that even if it makes Section 211 technically compliant with TRIPS, it does nothing to remedy that provision's breaches of the Inter-American Convention. For that reason alone it should not be voted out of this Committee.

Some of you no doubt co-sponsored S. 2373 from the conviction that it is necessary for the U.S. to return to compliance with the TRIPS Agreement. I agree. But, as I said earlier, not only does S. 2002 ensure such compliance, it also preserves U.S. trademarks registered in Cuba under the Inter-American Convention. Accordingly, it deserves the support of the Committee as it seeks to fulfill its mandate to protect the intellectual property rights of this country's corporate citizens, wherever in the world those assets are located.

I'll conclude with this – let's not let the hostility that exists today between Cuba and the U.S. poison trade relations in a more hopeful future.

Once again, thank you Mr. Chairman for affording me the opportunity to offer my views on the important issues before the Committee in today's hearing.

# EXHIBIT 6

## WASHINGTON REPORT

## Hidden Provision Sparks New Dispute Over Cuba



Cuban Nuclear Plant Also in Budget Bill

A new statute aimed at helping Bacardi-Martini U.S.A. win a battle over the prized Havana Club trademark threatens to spark new disputes between the United States and its allies over investment in Cuba.

The provision was tucked away in the massive omnibus spending bill that will fund most federal agencies in the coming year. President Bill Clinton signed it into law in October following weeks of tense negotiations between the White House and Congressional leaders.

Florida Sens. Connie Mack, a Republican, and Bob Graham, a Democrat, championed the provision affecting Cuba. It bars U.S. courts from upholding trademarks that were "used in connection with a business or assets that were confiscated" by Fidel Castro's government, unless the "original owner of the mark...has expressly consented." Responsibility for determining whether the disputed trademark is linked to confiscated property would lie with the courts and the Treasury Department's Office of Foreign Assets Control, which grants licenses to those hoping to register Cuban trademarks in the United States.

The provision was slipped into the 4,000-page omnibus bill to help Bacardi-Martini win the right to market a premium grade under the Havana Club name. From to 1995, the trademark was assigned to ..na Club Holdings of Luxembourg, a joint venture between a Cuban state enterprise and Pernod Ricard, a French company.

Havana Club Holdings registered the trademark in Washington in the hopes of distributing Cuba's premier rum in the United States after the U.S. embargo against Cuba is lifted. Bacardi-Martini successfully challenged the trademark in the U.S. Patent and Trademark Office, claiming Havana Club Holding has no right to the name of a rum that was once made by Jose Arechabala, S.A., a Cuban company nationalized in 1960.

Moreover, in 1995, Bacardi began producing its own aged rum in the Bahamas under the Havana Club label (see CUBANEWS, May 1997), prompting Havana Club Holdings to sue Bacardi in a federal court in New York. That case, scheduled for trial early next year, could be affected by the new trademark law.

"We've said you ain't going to be able to trademark (Havana Club) in the United States because you've stolen it," an aide to Mack said.

Registered in Bermuda and founded by Cuban exiles, Bacardi-Martini is not a U.S. company. Nonetheless, the aid to Mack said the Florida senators sponsored the provision on behalf of constituents, namely Bacardi enterprises in Florida and Floridians who work for the giant liquor company.

Rick Wilson, an attorney for Bacardi-Martini in Miami, said the new law does nothing more that codify existing case law that prohibits trademarks that are confiscated without compensation from being recognized in the United States.

Wilson also said codification of the case law will "provide clearer guidance" to courts in trademark disputes. But the Bacardi provision's impact will reach further than the U.S. court system.

The French government has complained of the extraterritoriality of the law, echoing a criticism leveled at the Helms-Burton Act. The new law also threatens to upset a truce between the European Union and the United States over Helms-Burton. Moreover, say critics, the provision may violate international patent and trademark agreements.

The new trademark law caught many in the Clinton administration by surprise.

Linda Beresford, an attorney for the U.S. Patent and Trademark Office who specializes in legislation and international trade, said the provision was included in the bill during the last, hectic hours of negotiations between the White House and Republican congressional leaders.

Beresford said international reaction to the Bacardi amendment could take several forms. Cuba may interpret the provision as an abrogation of their right under the 1931 Interamerican Convention on Trademarks to file and maintain a trademark in the United States. In retaliation, Cuba could argue that it is relieved of its treaty obligation to recognize some 400 U.S. trademarks registered in Cuba, including Hilton, Coca-Cola and Palmolive.

France, as well as other nations, could

also maintain that the new law may violate other international trademark accords, possibly resulting in a challenge to the U.S. law at the World Trade Organization, the Geneva-based trade dispute settlement organization, according to Beresford.

A State Department official, speaking on condition of anonymity, conceded the new law is likely to provoke new trade and diplomatic problems and that it might hurt U.S. efforts to keep allies from challenging Helms-Burton at the WTO. The official said he thinks the administration failed to object because the last-minute nature of the omnibus bill negotiations prevented a thorough review by the administration.

Mike Helzer, the legislative affairs director of the New York-based International Trademark Association, said his group does not endorse the Bacardi provision and is "shocked" that it was made law. "It was just thrown in at the last minute," Helzer said, echoing Clinton administration officials. "We were not given notice at all."

Helzer also complained that the new law could be applied in other disputes over Cuban trademarks, that it is ambiguously worded and that there's "a degree of uncertainty as to how it will be implemented."

Yet, even if the new law is applied only in the dispute between Bacardi-Martini and Havana Club Holdings, it's likely to cause Washington problems.

At the very least, Beresford of the U.S. Patent and Trademark Office said, the new law blunts the message the United States wants to send to other nations. "We're certainly out there pushing other people to protect intellectual property," she said.

—*Ana Radelat*

Flora 646·728·2910

# EXHIBIT 7

**Meltzer, Eleanor**

| | |
|---|---|
| **From:** | Toupin, James |
| **Sent:** | Thursday, April 10, 2003 7:35 AM |
| **To:** | Meltzer, Eleanor; Katopis, Chris |
| **Subject:** | FW: Thank you very much for your help with this! |

fyi

-----Original Message-----
From: Kathleen_Hatfield@byrd.senate.gov
[mailto:Kathleen_Hatfield@byrd.senate.gov]
Sent: Wednesday, April 09, 2003 9:01 PM
To: James.Toupin@USPTO.GOV
Subject: Thank you very much for your help with this!


Bacardi has contacted me directly and says this fix will probably apply to only this one
company in this unique situation. Will try to determine if that's true. So, unless I
learn something different between now and tomorrow, I think I will recommend no objection.
However, it's possible it could be stripped in conference because the House is insisting
that the supplemental be "clean" and wants the Senate to drop these extraneous provisions.
Hollings, tho, is a big supporter of Bacardi and, Lila Helms, his chief clerk on CJS tells
me Hollings assuredly will help Bacardi with this. Senator Byrd rarely disagrees with
Hollings. But I still have to present all of the facts objectively and the fact that we
still won't really be in compliance seems wrong. But, in my new job I have learned: who
cares about the WTO anyway? Plus, I need to hear from Leahy's people and clear any
Appropriations Committee procedural hurdles (like legislating on an appropriations bill)
that could be a problem. But I presume Bacardi is shopping this around before the fact
precisely to avoid an objection on that score. Don't worry about finding out who is
counsel to Havana Club; Bacardi gave me the scoop on that.



-----Original Message-----
From:       James.Toupin@USPTO.GOV [mailto:James.Toupin@USPTO.GOV]
Sent: Wednesday, April 09, 2003 4:18 PM
To:    Hatfield, Kathleen (Byrd)
Subject:    RE: Don't worry about getting back to me today.

What's your phone number?

-----Original Message-----
From: Kathleen_Hatfield@byrd.senate.gov
[mailto:Kathleen_Hatfield@byrd.senate.gov]
Sent: Wednesday, April 09, 2003 3:54 PM
To: James.Toupin@USPTO.GOV
Subject: Don't worry about getting back to me today.


      They've postponed the conference on the supplemental until maybe
tomorrow.


-----Original Message-----
From:       James.Toupin@USPTO.GOV [mailto:James.Toupin@USPTO.GOV]
Sent: Wednesday, April 09, 2003 2:24 PM
To:    Hatfield, Kathleen (Byrd)
Subject:    RE: Are you familiar with the 211 fix sought by Bacardi?

please call -- 703-305-5726

USPTO FOIA
07-128
229 of 1077

1

```
-----Original Message-----
From: Kathleen_Hatfield@byrd.senate.gov
[mailto:Kathleen_Hatfield@byrd.senate.gov]
Sent: Wednesday, April 09, 2003 2:12 PM
To: James.Toupin@USPTO.GOV
Subject: Are you familiar with the 211 fix sought by Bacardi?
```

They want to slip it into the supplemental in conference and don't want Sen. Byrd to oppose it.  I need to know more about it.  May I call you to discuss this?  It's urgent.  Let me know.

USPTO FOIA
07-128
230 of 1077

2

# EXHIBIT 8



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

November 30, 2007

RE: 2007-01-026

Ms. Amy E. Craig
Ropes & Gray LLP
One Metro Center
700 12th St., N.W. - Ste. 900
Washington, DC  20005-3948

Dear Ms. Craig:

This office is in receipt of your November 9, 2007, follow-up letter requesting a timeline of when you can expect to receive a response to a Freedom of Information Act (FOIA) request submitted by your colleague, Peter M. Brody.

We have forwarded your inquiry to the Office of Foreign Assets Control which is responsible for processing your FOIA requests.  However, that office is experiencing a substantial backlog of FOIA requests.  Although the requests in the queue are processed on a first-in, first-out basis, that office is not able meet the normal time limits.  Your request will be answered as soon as possible, and we regret the delay in processing your request.

Sincerely,

Dale Underwood
Deputy Director, Disclosure Services

# EXHIBIT 9



**United States Department of State**

*Washington, D.C. 20520*

NOV 2 6 2007

Ropes & Gray LLP
One Metro Center
700 12th Street, NW
Suite 900
Washington, DC 2005-3948

Re: Freedom of Information Act Request No. 200700470

Dear Ms. Craig:

Thank you for your inquiry concerning the status of your Freedom of Information Act request number 200700470.

The Statutory and Compliance Division initiated searches of the following records systems: the Central Foreign Policy Records (the principal records system of the Department of State) and the Bureau of Economic, Energy, and Business Affairs.

The search of the Central Foreign Policy Records has been completed and resulted in the retrieval of material that may be responsive to your request. That material is currently being prepared for review. The search of the Bureau of Economic, Energy, and Business Affairs is continuing.

When all of the search and review processes have been completed, you will be notified in writing. Unfortunately, this Office is unable to provide you with a completion date of your request. However, every effort will be made to process this request in as timely manner as possible.

If you need further assistance, you may contact the Requester Liaison Division at (202) 261-8484 or fax us at (202) 261-8582. Please be sure to refer to your new case number 200701894 in all future correspondence or inquiries.

Thank you for your patience and cooperation.

Sincerely,

Thomas W. Everett
Advocacy and Oversight
Office of Information
    Programs and Services

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BACARDI & COMPANY LIMITED,
1000 Bacardi Road
New Providence, Bahamas

and

BACARDI U.S.A., INC.,
2100 Biscayne Boulevard
Miami, Florida 33137

                            Plaintiffs,

              v.

EMPRESA CUBANA EXPORTADORA DE
ALIMENTOS Y PRODUCTOS VARIOS d/b/a
CUBAEXPORT
Calle 24, n 55, edif. MINCEX, 8vo, piso.
Havana, Cuba

and

HAVANA CLUB HOLDING, S.A. d/b/a
HCH, S.A.
5 Rue Eugène Ruppert L2453
Luxembourg

                          Defendants.

Civil Action No. _____

ENTERED IN DOCKET
3/29/04 Mtc

## COMPLAINT

    Plaintiffs, by their attorneys, Kelley Drye & Warren LLP and Covington & Burling,

allege upon personal knowledge as to their own acts and information and belief as to all other

acts, as follows:

NATURE OF THE ACTION

1.    Plaintiffs in this case sought cancellation of U.S. Registration No. 1,031,651 of

the trademark HAVANA CLUB & DESIGN for rum in Cancellation Proceeding No. 92024108,

styled *"Galleon S.A. et al. v. Havana Club Holding, S.A., et al."* (the "HC Cancellation

Proceeding"), before the Trademark Trial and Appeal Board ("TTAB") of the U.S. Patent and

Trademark Office ("PTO").  On January 29, 2004, the TTAB issued a decision (the "TTAB

Decision") dismissing Plaintiffs' Supplemental and Amended Petition to Cancel the aforesaid

U.S. Registration.  This is an action seeking:  (a) review of the TTAB Decision and rectification

of the PTO records by striking or canceling U.S. Registration No. 1,031,651 of the trademark

HAVANA CLUB & DESIGN for rum (henceforth sometimes referred to as the "Extant U.S.

HAVANA CLUB Registration"); (b) a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and

2202 resolving actual controversies between the parties concerning the use and ownership of the

HAVANA CLUB & DESIGN trademark in the United States and the rights arising out of the

Extant U.S. HAVANA CLUB Registration; and (c) an injunction prohibiting Defendants from

using or registering any mark incorporating the words HAVANA CLUB and from interfering

with Plaintiffs' use and registration of the HAVANA CLUB mark.

SUMMARY

2.    This dispute arises from the Cuban government's confiscation of the HAVANA

CLUB trademark in Cuba and its subsequent attempts to extend the effects of that confiscation to

the HAVANA CLUB trademark in the United States.  The HAVANA CLUB trademark for rum

was originally created, registered and used in Cuba, the United States and elsewhere by José

Arechabala S.A. ("JASA"), a Cuban company owned by the Arechabala family.

-2-

3.    In 1960, the Cuban revolutionary government forcibly seized and then purported to expropriate JASA's assets, including the HAVANA CLUB trademark, without compensation. JASA was thus deprived of all means of conducting business and its directors, officers and shareholders were driven into exile or imprisoned. After the purported confiscation of JASA's assets, the Cuban government purported to assign the worldwide rights to the HAVANA CLUB mark to defendant Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport"), a state-owned foreign trade enterprise. Cubaexport waited until JASA's registrations of the HAVANA CLUB trademark had expired in 1973 and then it obtained U.S. Registration No. 1,031,651 HAVANA CLUB & DESIGN for rum, in a manner that concealed from the PTO that the original Cuban trademark had been confiscated. The Extant U.S. HAVANA CLUB Registration includes the Spanish legend *"Fundada en 1878,"* a phrase copied from JASA's HAVANA CLUB mark, which refers to the year in which the Arechabala family business was founded.

4.    In 1993, the Cuban government caused Cubaexport to purport to transfer the HAVANA CLUB mark and the Extant U.S. HAVANA CLUB Registration to Havana Rum & Liquors S.A. ("HRL"), another company controlled by the Cuban government, and from HRL to defendant Havana Club Holdings, S.A. ("HCH"). In a subsequent U.S. lawsuit filed by HCH against Galleon S.A. (a predecessor of Bacardi & Company Ltd. ("BACO")) and affiliates, the court nullified that transfer. *See Havana Club Holding, S.A. et al. v. Galleon, S.A. et al.*, 62 F. Supp. 2d 1085 (S.D.N.Y.), *aff'd*, 203 F.3d 116 (2d Cir. 2000), *cert. denied*, 531 U.S. 918 (2000). Neither Cubaexport nor any of its purported successors in interest has ever used the HAVANA CLUB trademark in the United States. In 1997, BACO became successor in interest to JASA's rights in and to the HAVANA CLUB trademark worldwide.

-3-

5.    In the HC Cancellation Proceedings initiated by BACO to cancel the Extant U.S.

HAVANA CLUB Registration, the TTAB refused to strike that Registration from the PTO's

records despite Cubaexport's failure to file a timely renewal application, and dismissed BACO's

petition to cancel that Registration for failure to state a claim. The TTAB declined to rule

whether Cubaexport's registration should be cancelled because it rested on an uncompensated

expropriation of JASA's assets. The TTAB further stated that Bacardi had not adequately shown

that Cubaexport made material false representations in obtaining, maintaining, and renewing the

Extant U.S. HAVANA CLUB Registration.

6.    In this action, Plaintiffs seek:

(a)    Reversal of the TTAB's decision and rectification of the records of the

PTO by (i) striking the Extant U.S. HAVANA CLUB Registration from the Principal Register of

the PTO on the ground that Cubaexport failed to file the mandatory renewal application and

declaration prior to the end of the statutory period or (ii) alternatively, canceling that Registration

on the grounds, among others, that the Extant U.S. HAVANA CLUB Registration was

fraudulently obtained, maintained, and renewed; that the registered mark was abandoned; and

that the registered mark misrepresents the source of goods;

(b)    A declaration that BACO owns the common law rights in the HAVANA

CLUB mark for rum and that Defendants have no common law or other rights in any mark

incorporating or consisting of the words HAVANA CLUB;

(c)    A declaration that Plaintiffs' use of the HAVANA CLUB mark does not

infringe on any mark owned by the Defendants or otherwise violate any enforceable rights of the

Defendants, because longstanding U.S. public policy and Section 211 of the Omnibus

Consolidated and Emergency Supplemental Appropriations Act, Public Law No. 105-277, 112

Stat. 2681 (Oct. 21, 1998) ("Section 211"), preclude recognition and enforcement of purported rights in a trademark or registration that are founded on the Cuban government's expropriation of assets; and

(d)     An injunction prohibiting Defendants from using or registering in the PTO or in any State of the United States any mark incorporating or consisting of the words HAVANA CLUB and from interfering with Plaintiffs' use and registration of the HAVANA CLUB mark.

## PARTIES AND RELATED ENTITIES

### Plaintiffs and Related Entities

7.     Plaintiff Bacardi & Company Limited ("BACO") is a Liechtenstein company having its principal place of business at 1000 Bacardi Road, New Providence, Commonwealth of the Bahamas. BACO is the successor to Compañía Ron Bacardí S.A., a Cuban *sociedad anónima* (joint-stock company) which was headquartered in Santiago de Cuba, Republic of Cuba, until its assets in Cuba were confiscated by the Cuban government in October 1960.

8.     BACO, through its affiliates, licensees, and distributors, produces and markets distilled spirits worldwide. BACO owns the internationally renowned name and mark BACARDI, together with the registrations of that name and mark and the related business and goodwill, on a worldwide basis. BACO was a party to the HC Cancellation Proceeding.

9.     José Arechabala S.A. ("JASA") is a *sociedad anónima* organized and existing under the laws of the Republic of Cuba. JASA's headquarters and principal place of business were in Cárdenas, Cuba, until its assets in Cuba were confiscated by the Cuban government in 1960. JASA's current principal place of business is in Vaduz, Principality of Liechtenstein. JASA is the creator and the original owner of the HAVANA CLUB trademark in Cuba, the United States, and other countries, and the trademark registrations associated therewith. JASA is

-5-

owned substantially by members of the Arechabala family. JASA is currently in the process of
voluntary corporate liquidation, by decision of its shareholders, who have formed a substantially
mirror-image company, Jose Arechabala International Ltd., to carry on the family's business.

10.    José Arechabala International Ltd. ("JAI") is a joint-stock company organized and
existing under the laws of the Principality of Liechtenstein, having its principal place of business
in Vaduz, Liechtenstein. JAI is owned substantially by the same persons who are shareholders
of JASA.

11.    In April 1997, JASA conveyed to JAI all right, title, and interest in and to the
HAVANA CLUB trademark worldwide and certain associated assets and goodwill, including the
secret family formula for the HAVANA CLUB rum (the "HAVANA CLUB Assets"). At the
same time persons comprising substantially all of the shareholders and holders of undivided
equity interests in JASA conveyed to JAI any and all right, title and interest that each of them
might hold in and to the HAVANA CLUB Assets. JAI in turn sold to BACO all right, title, and
interest in and to the HAVANA CLUB Assets worldwide. BACO is accordingly the successor
in interest to the original owners of the HAVANA CLUB trademark and the other HAVANA
CLUB Assets worldwide.

12.    Galleon S.A. ("Galleon"), a wholly owned subsidiary of BACO, was a *sociedad
anónima* organized and existing under the laws of the Commonwealth of the Bahamas, with its
principal place of business in Nassau, Commonwealth of the Bahamas. Galleon was also a party
to the HC Cancellation Proceeding. In 1997, Galleon merged into BACO and BACO, as the sole
surviving entity, succeeded to all the assets of Galleon and assumed all of Galleon's liabilities.
BACO was substituted into the federal court action styled *Havana Club Holding, S.A. et al. v.*

-6-

*Galleon, S.A. et al.,* 96 Civ. 9644 (SAS), as the successor to Galleon in respect of the claims and counterclaims asserted therein.

13.     Plaintiff Bacardi U.S.A., Inc. ("Bacardi U.S.A.") (formerly named Bacardi-Martini U.S.A., Inc.) is a Delaware corporation having its principal place of business at 2100 Biscayne Boulevard, Miami, Florida 33137. Bacardi U.S.A. owns all the requisite federal and state permits to import rum and other distilled spirits into the United States and to sell such distilled spirit products to licensed wholesalers throughout the United States wherever the sale of distilled spirits is permitted by law. Bacardi U.S.A. is BACO's exclusive distributor in the continental United States of BACARDI, CASTILLO, and HAVANA CLUB rums. Bacardi U.S.A. was a party to the HC Cancellation Proceeding. Bacardi U.S.A., BACO, and Galleon will henceforth be collectively referred to as "Bacardi."

14.     Bacardi U.S.A., under the authority of BACO's predecessor, Galleon, began use of the HAVANA CLUB trademark for rum in interstate commerce in the United States in 1995, including advertising, distribution, and sales of HAVANA CLUB rum. Bacardi U.S.A. engaged in such use after reaching an interim understanding with JASA's representatives.

15.     BACO owns registrations of the mark HAVANA CLUB for rum in forty-four states, including New York, New Jersey, Texas, Pennsylvania, Michigan, Maryland, and Virginia. BACO is also the owner of Application Serial No. 74/572,667 pending in the PTO for registration of the word mark HAVANA CLUB for rum. This application was filed on September 12, 1994 as an intent-to-use application, and later was amended to allege use, with a first use date as early as 1934.

**Defendants and Related Entities**

16.     Defendant Cubaexport is a Cuban state-owned foreign trade enterprise which was established in 1965 by the Cuban Ministry of Foreign Commerce for the purpose of exporting

-7-

food and other products. Cubaexport is a "foreign state" within the meaning of 28 U.S.C. § 1603 and a "designated Cuban national" as defined in 31 C.F.R. § 515.305. Cubaexport's offices are at Calle 24, n 55, edif. MINCEX, 8vo. piso, Havana, Cuba. Cubaexport was joined as a party to the HC Cancellation Proceeding.

17.    Pernod Ricard S.A. ("Pernod") is a *société anonyme* (joint stock company) organized and existing under the laws of France, with offices at 142 Boulevard Hausmann, Paris, France. Pernod is one of the largest companies engaged in the business of manufacturing, distribution and sale of spirits worldwide.

18.    Havana Rum & Liquors, S.A. ("HRL") is a *sociedad anónima* organized and existing under the laws of the Republic of Cuba, with offices at 305A Miramar, Havana, Cuba. HRL is wholly owned by Cuban nationals and is effectively controlled by the Cuban government. HRL is a "foreign state" within the meaning of 28 U.S.C. § 1603 and a "designated Cuban national" as defined in 31 C.F.R. § 515.305.

19.    Defendant Havana Club Holding, S.A. ("HCH") is a *société anonyme* organized and existing under the laws of Luxembourg, with offices at 5, Rue Eugene Ruppert L2453, Luxembourg. HCH is owned equally by Pernod and HRL and each has equal representation on HCH's Board of Directors. HCH purports to hold title to trademark registrations for HAVANA CLUB rum in countries other than Cuba. HCH was a party to the HC Cancellation Proceeding. HCH is a "designated Cuban national" as defined in 31 C.F.R. § 515.305.

20.    Havana Club International, S.A. ("HCI") is a mixed company organized and existing under the laws of the Republic of Cuba, controlled equally by HRL and Pernod, with its headquarters and principal place of business in Havana, Cuba. HCI exports HAVANA CLUB

rum from Cuba under an exclusive license by HCH.  HCI is a "designated Cuban national" as
defined in 31 C.F.R. § 515.305.

## JURISDICTION

21.    The Court has subject matter jurisdiction under 15 U.S.C. §§ 1071(b), 1119, and
1121; 28 U.S.C. §§ 1330, 1331, 1338(a), 1605(a)(1)-(4), 2201, 2202, and principles of
supplemental and pendent jurisdiction.  Venue is proper in this district under 15 U.S.C. §
1071(b) and 28 U.S.C. § 1391.

## FACTS ENTITLING PLAINTIFFS TO RELIEF

**A.    JASA Creates and Uses the HAVANA CLUB Trademark**

22.    The Arechabala family business was founded by José Arechabala Aldama in
1878.  The business included rum distilling and other enterprises.  JASA, which was
incorporated in or around 1924, carried out the family's rum business.

23.    JASA created, registered, and first used the trademark HAVANA CLUB for rum
in Cuba, the United States and other countries.  On or about March 19, 1934, JASA obtained
Cuban Registration No. 53,614 of the mark HAVANA CLUB for "alcohol, rum, etc."  In August
1935, JASA was issued Cuban Registrations Nos. 54,890 and 54,890-A for HAVANA CLUB
Design marks.

24.    JASA produced HAVANA CLUB rum primarily for export, principally to the
United States.  JASA began to use the trademark HAVANA CLUB for rum sold in commerce in
the United States at least as early as 1934.  On May 14, 1935, JASA registered the words
HAVANA CLUB on the Principal Register of the PTO as a trademark for "Ethyl alcohol, rum,
etc." under U.S. Registration No. 324,385.  On June 16, 1936, JASA registered a label design
including the words HAVANA CLUB on the Principal Register of the PTO as a trademark for

"Rum, etc." under U.S. Registration No. 335,919. The design portion of that registered mark included the words *"Fundada en 1878"* (founded in 1878), a reference to the year in which the Arechabala family business was first established in Cuba.  On August 11, 1953, JASA obtained U.S. Registration Nos. 578,679 and 578,680 on the Supplemental Register of the PTO for label design trademarks incorporating the words HAVANA CLUB.

25.    From 1934 to the end of 1959, JASA continued to export HAVANA CLUB rum for distribution and sale in the United States.  HAVANA CLUB rum sold by JASA in the United States was produced at various times both in Cuba and Puerto Rico.  Before 1959, however, JASA had discontinued its production of rum in Puerto Rico and all HAVANA CLUB rum was produced in Cuba.

26.    The words "Havana Club" were also used by JASA as a trading style or trade name to identify that part of JASA's business dealing with the production, export, distribution, and sale of HAVANA CLUB rum to the United States and elsewhere.

**B.    The Cuban Revolutionary Government Confiscates JASA's Assets in Cuba, Including the HAVANA CLUB Mark**

27.    On January 1, 1960, troops of the Castro revolutionary government forcibly entered JASA's headquarters in Cárdenas, Cuba, taking control of the whole industrial complex, including the rum distillery, other industrial facilities, equipment, offices and business records. The members of the family who ran the rum distillery and other family businesses were expelled and not allowed to remove any papers or other property from their offices.  The Deputy General Counsel and Secretary of the company was arrested and imprisoned for ten years.  All other executives and shareholders were eventually forced to leave Cuba.  The Cuban government designated an administrator to run the business to the exclusion of JASA and its owners.

28.     Under Law No. 890, dated October 13, 1960, the Cuban government purported formally to expropriate the physical assets, property, accounts, business records, and trademarks of a large number of Cuban businesses, including JASA and Compañía Ron Bacardí, S.A. This expropriation purported to affect all of JASA's tangible and intangible assets in Cuba, which comprised substantially all of the assets owned by the company, and also the trademark rights and related registrations owned by JASA in other countries, including the HAVANA CLUB trademark rights and related registrations in the United States.

29.     Law No. 890 specified that subsequent legislation would provide compensation for owners of property expropriated by Law No. 890. No such legislation has ever been enacted and neither JASA nor any of its shareholders has received any compensation for any assets of JASA that were seized by the Cuban government in 1960. The expropriation of those assets was, therefore, a confiscation. The value of the assets of JASA confiscated by the Cuban government exceeded 25 million dollars at the time of the confiscation.

30.     On November 1, 1966, the Cuban government purported to transfer to Cubaexport the trade names and registered trademarks that had been confiscated from JASA, including the HAVANA CLUB mark and related registrations. As a Cuban government enterprise, Cubaexport knew that all these names and marks transferred into its name had been expropriated from JASA under Law No. 890 without payment of any compensation. Soon thereafter, Cubaexport began selling HAVANA CLUB rum made in the distillery that had been confiscated from JASA.

31.     The Cuban government transferred the physical assets seized from JASA that had been associated with the production of HAVANA CLUB to another Cuban state enterprise, Empresa de Bebidas y Licores. In 1993, those assets were further transferred to Corporación

-11-

Cuba Ron, S.A. ("Cuba Ron"), still another enterprise owned or controlled by the Cuban government.

32.     The Cuban government deprived JASA of its assets, took away its rum and other businesses, seized its funds and corporate records (including records of JASA's trademark registrations abroad and its trademark agents), and imprisoned or intimidated JASA's senior executives and shareholders and eventually drove them into exile in various countries. As a result, JASA was unable to continue its business in or outside Cuba or to renew or maintain its trademark registrations in the United States. Despite this adversity, JASA and its shareholders maintained their determination to protect their rights and to resume production and sale of HAVANA CLUB rum when it became possible, either through political change in Cuba leading to restitution of their confiscated assets or, later, through an arrangement with a suitable partner contributing financial and managerial resources to that venture.

C.     **The Cuban Asset Control Regulations**

33.     In 1963, the United States imposed a total embargo of trade between the United States and Cuba under the Trading with the Enemy Act, 50 U.S.C. App. § 1 *et. seq.* The embargo has been implemented by the Cuban Asset Control Regulations ("CACR"), 31 C.F.R. Part 515, which are administered by the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury. In 1996, Congress enacted the Cuban Liberty and Democracy Solidarity Act (the "Libertad Act"), which, among other things, codified the Cuban embargo. 28 U.S.C. § 6032(h).

34.     The CACR prohibit, *inter alia*, the importation, distribution or sale in the United States of rum produced in Cuba. 31 C.F.R. Part 515. This prohibition has been in effect since the inception of the CACR.

-12-

35.     Section 515.201(b)(1) of the CACR prohibits (except as specifically authorized by OFAC) all transfers by any person subject to the jurisdiction of the United States of property (or evidences of ownership of property) in which Cuba or any Cuban national (including a designated Cuban national such as Cubaexport) has had, at any time since July 8, 1963, any interest of any nature whatsoever, direct or indirect.  Section 505.201(b)(2) of the CACR prohibits (except as specifically authorized by OFAC) all transfers outside the United States involving any such property or property interests subject to the jurisdiction of the United States. Accordingly, rights in U.S. trademarks or trademark registrations in which Cuban nationals have an interest cannot be transferred under the CACR without an OFAC license.

36.     Section 515.201(c) of the CACR further prohibits "any transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" of Section 505.201(b). Section 515.203(a) of the CACR provides that any transfer that violates the CACR is null and void and that such transfers "shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege with respect to such property."

**D.      U.S. Public Policy Does Not Recognize Cuba's Confiscatory Acts in Respect of Property in the United States**

37.     As described below, Defendants have claimed certain rights based on actions by the Cuban government purporting to confiscate JASA's property, including the HAVANA CLUB trademark for rum.  Actions by a foreign government that expropriate assets without adequate compensation are repugnant to United States public policy.  Accordingly, the United States will not recognize or give effect to any such confiscatory act that purports to affect property situated in the United States (the "Non-Recognition Doctrine").

38.     On October 21, 1998, Congress passed Section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, Public Law No. 105-277, 112 Stat. 2681 (Oct.

21, 1998) ("Section 211"), codifying, in part, the Non-Recognition Doctrine.  Section 211(b)

provides that:

> "No U.S. court shall recognize, enforce or otherwise validate any assertion of
> treaty rights by a designated national or its successor-in-interest under sections
> 44(b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126(b) or (e)) for a mark,
> trade name, or commercial name that is the same as or substantially similar to a
> mark, trade name, or commercial name that was used in connection with a
> business or assets that were confiscated unless the original owner of such mark,
> trade name, or commercial name, or the bona fide successor-in-interest has
> expressly consented."

39.     The term "designated national" is defined to mean "Cuba and any national thereof

including any person who is a specially designated national." *See* Section 211(d)(1) and 31

C.F.R. § 515.305.  The term "specially designated national" is defined in the CACR to include,

among others, any entity that is owned or controlled by the Cuban government. *See* 31 C.F.R. §

515.306(a)(3).  The term "confiscated" is defined in Section 211 to mean "expropriated by the

Cuban government on or after January 1, 1959, without payment of adequate and effective

compensation." *See* Section 211(d)(2) and 31 C.F.R. § 515.336.

E.     **Cubaexport's Registration of the Confiscated HAVANA CLUB Mark**

40.     After Law No. 890 was issued, the Cuban government or its successors claimed

title to property owned by Cuban companies located outside Cuba, including rights to the

BACARDI trademark.  In a series of cases decided over several years and involving Cuban

companies in exile, courts in the United States and elsewhere refused to recognize such claims,

including claims to the BACARDI trademark, based on the principles underlying the Non-

Recognition Doctrine.

41.     Having failed to obtain worldwide title to the BACARDI trademark, BACARDI

being the most popular rum that had been produced in Cuba, the Cuban government then turned

to HAVANA CLUB, the mark designating the second most popular Cuban rum.  As a result of

-14-

the earlier court decisions, Cubaexport and the Cuban government knew that their claims to the

HAVANA CLUB mark in the United States or any other U.S. mark that Cuba had purportedly

confiscated under Law No. 890 would not be recognized in the United States. Cubaexport then

engaged in a multifaceted effort (a) to conceal from the PTO that Cubaexport's claim to the

HAVANA CLUB name and trademark derived from the Cuban government's confiscation of

JASA's assets and (b) to mislead the U.S. public into believing that Cubaexport's HAVANA

CLUB rum, which Cubaexport intended eventually to sell in the United States, was the same as

JASA's HAVANA CLUB rum, which had been sold in the United States for more than two

decades.

    42.    On June 12, 1974, shortly after JASA's HAVANA CLUB Registrations expired,

Cubaexport applied to the PTO, under Section 44 of the Lanham Act, 15 U.S.C. § 1126, to

register a trademark consisting of a label design displaying the words HAVANA CLUB. The

application was based on a newly issued Cuban Registration No. 110,353, dated February 12,

1974. Although Cubaexport still held Cuban HAVANA CLUB registrations that had been

confiscated from JASA, Cubaexport obtained in its own name the new Cuban Registration No.

110,353 and used this new registration as the basis of its U.S. trademark application, in order to

conceal from the PTO that Cubaexport's claim of title to the HAVANA CLUB mark was based

on the confiscation of JASA's assets.

    43.    In filing this application to register the HAVANA CLUB & DESIGN mark,

Cubaexport consented to jurisdiction in the United States and appointed Rabinowitz, Boudin,

Standard, Krinsky, & Lieberman, PC as its domestic (U.S.) representative for service of process

in proceedings affecting the mark.

44.    The HAVANA CLUB & DESIGN mark that Cubaexport sought to register in the

United States prominently displays the Spanish legend *"Fundada en 1878."* Cubaexport

intentionally copied this legend from the label design that had been registered by JASA in U.S.

Registration No. 335,919 in 1936. Cubaexport was founded in 1965, not in 1878. Cubaexport

also knew that it would not be deemed to be JASA's successor under U.S. law. The statement

*"Fundada en 1878"* was intentionally used by Cubaexport to mislead the American public into

believing that Cubaexport's HAVANA CLUB rum had a family heritage dating back nearly a

century and came from, or was associated with, or approved by, JASA, the original producer of

the HAVANA CLUB rum that they had previously purchased and enjoyed in the United States.

Cubaexport also knew that the HAVANA CLUB mark that it was applying to register still

symbolized an invaluable reputation and goodwill as the result of the excellent quality and sales

success of JASA's HAVANA CLUB rum in the United States.

45.    When Cubaexport applied to register the HAVANA CLUB & DESIGN mark in

the United States, Cubaexport was well aware that JASA had discontinued making HAVANA

CLUB rum only because the Cuban government had forcibly seized and confiscated JASA's rum

distillery and other assets and because JASA's directors, officers, and shareholders had been

driven into exile or imprisoned.

46.    Neither Cubaexport nor the Cuban government ever possessed the secret

Arechabala family formula used by JASA to produce the HAVANA CLUB rum sold in the

United States and elsewhere. The Cuban government surreptitiously concocted a new formula to

produce its ersatz HAVANA CLUB rum, in a manner intended to deceive purchasers of

HAVANA CLUB rum into believing that they were buying the same product that JASA had

made. At all relevant times, Cubaexport knew that the formula used in the HAVANA CLUB

-16-

rum it sold was not the one that had been used by JASA. Therefore, Cubaexport's intended use

of the HAVANA CLUB mark was designed to deceive U.S. consumers regarding the true source

of the rum so marked.

47.    On January 27, 1976, the PTO issued U.S. Reg. No. 1,031,651 of the HAVANA

CLUB & DESIGN mark (the Extant U.S. HAVANA CLUB Registration) to Cubaexport.

48.    Neither JASA, JAI, their shareholders, nor BACO, as JASA's bona fide successor

in interest, has ever consented to the registration or use of the trademark and trade name

HAVANA CLUB by Cubaexport, HRL, or HCH.

49.    The rights to the HAVANA CLUB & DESIGN mark and the related federal

registration are intangible property rights with a situs in the United States. Rights in a trademark

in the United States may be acquired only by lawful use of that mark in interstate or foreign

commerce. Such usage confers common law trademark rights. The failure to register a mark

does not affect common law trademark rights. Nor does lapse of a registration, in the event that

one is obtained, affect common law trademark rights.

50.    Under Section 44 and Sections 1 and 45 of the Lanham Act, 15 U.S.C. § 1051 *et

seq.*, a foreign applicant must have a good faith intent to use the mark applied for in commerce in

the United States. When a foreign national such as Cubaexport registers a mark under Section

44 of the Lanham Act, that registrant must use the registered mark in commerce in the United

States within a reasonable period after filing an application under Section 44 of the Lanham Act.

51.    Cubaexport has never sold rum in the United States under the HAVANA CLUB

& DESIGN mark. Cubaexport has claimed that its failure to use the trademark is excused by the

Cuban embargo under the excusable-non-use doctrine codified in Section 8(b)(2) of the Lanham

Act, 15 U.S.C. § 1058(b)(2). Because of its familiarity with the excusable-non-use doctrine,

-17-

Cubaexport knew that JASA's non-use of the HAVANA CLUB mark after 1960 has been excused by the Cuban government's seizure of JASA's property and destruction of JASA's organization and management structure.

52.     To maintain its trademark registration, Cubaexport was required to file between the fifth and sixth years after its HAVANA CLUB & DESIGN mark was registered, an affidavit averring ownership and continued use of the mark.  On or about January 12, 1982, such an affidavit was filed by Cubaexport in the PTO in respect of the Extant U.S. HAVANA CLUB Registration.  This declaration, ostensibly signed by Fausto Alfonso Man, averred that Cubaexport was the owner of said mark and registration and invoked the embargo and the excusable-non-use doctrine to satisfy the use requirement of Section 8.  For the same reasons set forth in paragraphs 44 to 46 above, Cubaexport knew in January 1982 that Cubaexport was not the lawful owner of the HAVANA CLUB & DESIGN mark in the United States, and continued to conceal and misrepresent the pertinent facts that would have undermined its claims.

F.     The Joint Venture between the Cuban Government and Pernod

53.     In the early 1990s, the Cuban government sought to obtain hard currency by enticing private foreign investments in Cuba.  One prospective partner was Pernod.  In November 1993, Pernod and the Cuban government entered into a joint-venture arrangement to exploit the HAVANA CLUB trademark worldwide.  Pernod knew, prior to concluding this joint-venture with the Cuban government, that the HAVANA CLUB mark, along with the related rum-producing assets, had been confiscated from JASA by the Cuban government.

54.     In anticipation of the transaction with Pernod, the Cuban government caused Cubaexport to transfer all its rights to the HAVANA CLUB trademark outside Cuba and associated assets to HRL, a company controlled by the Cuban government.  Luis Perdomo, a senior Cuban rum industry executive, was named President of HRL, and Vidal Manuel Prieto

-18-

Espina, who had previously served as managing director of Cubaexport, was made a managing director of HRL. Other officers were transferred from Cubaexport to HRL. Accordingly, on October 29, 1993, Cubaexport transferred to HRL its entire business connected with the HAVANA CLUB rum, including the goodwill associated with that business worldwide, and the right to export HAVANA CLUB rum to all the territories in the world. As part of this transfer of the HAVANA CLUB rum business, Cubaexport assigned to HRL its worldwide rights to the HAVANA CLUB trademark, including the rights to the Extant U.S. HAVANA CLUB Registration, together with the goodwill of the business symbolized by that mark. With this transfer of all its rum assets, Cubaexport left the rum business.

55.     The joint-venture arrangement was implemented in an agreement called *Convenio Asociativo* (Association Agreement) (the "Convenio") dated November 23, 1993, between Pernod and HRL. The object of the joint-venture was to advertise, distribute, and sell HAVANA CLUB rum worldwide. The parties agreed to create a Luxembourg entity, HCH, owned in equal parts by Pernod and HRL, which was to hold title to registrations of the HAVANA CLUB trademark. HCH was to be managed by a board of directors in which Pernod and HRL would be equally represented. Luis Perdomo was appointed Vice President of HCH and one of two Cuban directors on HCH's four-person board. HCI was established to handle the export of HAVANA CLUB rum from Cuba.

56.     At the closing of the transaction, Pernod paid to HRL a fixed sum (the amount of which has not been publicly disclosed, but which is believed to be many millions of dollars) and agreed to a continuing royalty arrangement. In exchange, HRL transferred to HCH all of HRL's rights in the HAVANA CLUB trademark for rum outside Cuba, together with the goodwill of the

business. HCI appointed Pernod as the exclusive distributor of HAVANA CLUB rums outside Cuba.

57.    In aid of the joint venture arrangements, Cuba Ron, a state-owned company, was organized in 1993 to distill rum in Cuba. Since 1993, Cuba Ron has supplied to HCI the rum sold under the HAVANA CLUB mark. Cuba Control, S.A., another Cuban entity, has been charged with overseeing and controlling the quality of that HAVANA CLUB rum.

58.    By written assignment dated January 10, 1994, Cubaexport purportedly confirmed the prior transfer to HRL of the rights to the U.S. HAVANA CLUB trademark and the Extant U.S. HAVANA CLUB Registration, along with the goodwill of that business. The assignment was executed by Milda Picos River, who was identified as Manager of Cubaexport. This purported assignment was recorded in the PTO at Reel 1104, Frame 047 on February 10, 1994. Cubaexport neither applied for nor obtained approval from OFAC for this transfer at that time. Accordingly, the transfer was in violation of the CACR and hence null and void.

59.    Cubaexport, HRL, HCH and Pernod understood and intended that the November 1993 transfer by HRL to HCH of the worldwide rights to the HAVANA CLUB trademark included such rights in respect of the U.S. HAVANA CLUB trademark and the related federal registration, together with the related goodwill of the business and the exclusive right to distribute HAVANA CLUB rum in the United States.

60.    Cubaexport, HRL and HCH knew that the CACR prohibited all transfers of U.S.-based intellectual property rights owned by Cuban nationals without the specific prior approval of OFAC. Such approval could be obtained only through an application to OFAC for a specific license in which the particulars of the transfer were fully and truthfully disclosed. Further, as OFAC had never granted a license for a transfer and sale which resulted in a substantial

monetary payment to the Cuban government, Cubaexport, HRL, and HCH knew in late 1993 or early 1994 that OFAC would not approve an assignment of the U.S. rights to the HAVANA CLUB trademark and the related federal registration from HRL to HCH if full information were disclosed.

61.     In 1993, Pernod caused its Spanish counsel to contact members of the Arechabala family in Spain in an effort to buy their worldwide rights to the HAVANA CLUB trademark. The Arechabalas broke off the talks when it became apparent that Pernod was not prepared to pay a fair price for the mark. In the course of the discussions, Pernod was advised by the Arechabala family representatives that JASA's prior rights to the HAVANA CLUB mark would be enforced.

62.     The Cuban government, Cubaexport, HRL and Pernod knew, at the time the Convenio was being concluded, that JASA had discontinued use of the HAVANA CLUB mark only under compulsion and that, rather than abandoning that mark, the Arechabalas were attempting to resume production and sale of HAVANA CLUB rum. Accordingly, the relationship between the Cuban government, Cubaexport, HRL and HCH was structured in an attempt to hide that the transfers violated U.S. statutes and regulations and that the chain of title for the HAVANA CLUB mark traced back to JASA.

63.     To this end, Cubaexport, HRL and HCH took actions that were intended to conceal from OFAC the November 1993 transfer to HCH of the U.S. HAVANA CLUB & DESIGN trademark and related federal registration pursuant to the Convenio, a transfer which was in violation of the CACR. Their plan called for placing record title to the HAVANA CLUB mark in the United States in HCH's name without revealing the transfer under the Convenio to the PTO or OFAC. HCH was to apply for a new registration of the HAVANA CLUB trademark

in the United States under Section 44 of the Lanham Act, on the basis of a Luxembourg

registration that HCH had acquired under the Convenio. Once HCH's new U.S. registration of

the HAVANA CLUB trademark was ready to issue, the Extant U.S. HAVANA CLUB

Registration would be renounced or allowed to expire. Under this scheme, the Defendants would

not reveal to OFAC or the PTO the prior November 23, 1993 assignment of that mark to HCH,

or the consideration paid to HRL by Pernod.

64.    In furtherance of this scheme, Cubaexport, HRL, and HCH originally chose not to

memorialize in a separate U.S. assignment document the purported transfer of the Extant U.S.

HAVANA CLUB Registration from HRL to HCH. On May 15, 1995, HCH did apply for a new

U.S. registration of the HAVANA CLUB mark, under Section 44 of the Lanham Act, based on

its Luxembourg registration. But the plan to keep the Convenio transfers secret went awry, as

described below, when a cancellation proceeding brought by José María Arechabala Rodrigo

against Cubaexport in the PTO in May 1994 eventually forced Cubaexport to disclose the prior

transfers to HRL and HCH.

G.    Protests by the Arechabala Family

65.    After general information about the Pernod/Cuban joint venture to market

HAVANA CLUB rum appeared in the trade press, Ramón Arechabala, individually and on

behalf of the other shareholders of JASA, sent a letter to Pernod's Chairman, Patrick Ricard, in

December 1993. The letter stated, *inter alia*, that the HAVANA CLUB mark belonged to the

Arechabala family and had been unlawfully seized without payment of compensation, that

Pernod's attempt to acquire rights in the trademark HAVANA CLUB rum without the consent of

JASA and its shareholders would be ineffective, and that JASA and its shareholders were

prepared to bring legal claims to vindicate their rights. In addition, Juan Prado, a senior Bacardi

executive, wrote to Mr. Thierry Jacquillat, a senior Pernod executive, in December 1993, to warn Pernod that the rightful owner of the HAVANA CLUB trademark was the Arechabala family.

H.    **The Collapse of the Scheme to Conceal the Transfer from OFAC**

66.    On May 3, 1994, José María Arechabala Rodrigo filed a cancellation petition against Cubaexport in the PTO, seeking to cancel the Extant U.S. HAVANA CLUB Registration on the ground of abandonment (the "Arechabala Cancellation Proceeding").

67.    As HCH had not yet obtained a new U.S. registration of the HAVANA CLUB mark, the Arechabala Cancellation Proceeding forced HCH publicly to claim ownership of the Extant U.S. HAVANA CLUB Registration as a result of the November 23, 1993 assignment. HRL and HCH then executed a separate U.S. assignment deed on June 24, 1994, which purported to confirm the prior November 23rd transfer from HRL to HCH of the U.S. rights to the HAVANA CLUB & DESIGN mark and the related federal registration, along with the goodwill of that business. This purported assignment was then recorded in the PTO at Reel 1219, Frame 0428 on September 13, 1994. This transfer was in violation of the CACR and hence null and void.

68.    After having the assignment to HCH recorded in the PTO, HCH and HRL were substituted for Cubaexport as respondents in the Arechabala Cancellation Proceeding. HCH and HRL then challenged Mr. Arechabala's standing to contest HCH's Extant U.S. HAVANA CLUB Registration, arguing that HAVANA CLUB rum could not be made outside Cuba because of the alleged geographic significance of the mark. This contention was made notwithstanding that, at the very same time, HRL (with the knowledge of HCH and Cubaexport) was having HAVANA CLUB rum made in Panama with Panamanian rum. In fact, one out of every five bottles of the "seven-year" HAVANA CLUB rum produced for sale by HRL in 1994 and 1995 contained Panamanian rum. Declarations were filed in the PTO cancellation proceeding making

-23-

the knowingly false statements that HCH's HAVANA CLUB rum was exclusively made in Cuba of Cuban ingredients.

69.     The Arechabala Cancellation Proceeding was ultimately dismissed by the TTAB on the ground that the non-use of the HAVANA CLUB mark by HRL and HCH did not constitute abandonment because the Cuban embargo barred these entities from using the mark in the United States.

**I.     Bacardi's Acquisition of the HAVANA CLUB Mark**

70.     Bacardi had been interested in acquiring JASA's rights to the HAVANA CLUB mark since the 1970's and renewed that pursuit in 1993. Bacardi knew that the HAVANA CLUB mark had been purportedly confiscated from JASA under the same Law No. 890 that purported to confiscate the BACARDI name and mark, as well as the assets of Compañía Ron Bacardí S.A.

71.     After an agreement-in-principle between Bacardi and the Arechabala family had been reached in 1995, the Arechabalas undertook to reactivate JASA and to obtain the requisite corporate and shareholder approvals for the transaction. As a consequence of this process, the JASA shareholders decided to create JAI substantially as a mirror image of JASA, in order to operate in the future through a more flexible and modern corporate structure established outside Cuba. The JASA shareholders then initiated the process of liquidating the company.

72.     In April 1997, JASA, the JASA shareholders, JAI, and BACO reached final agreements regarding the HAVANA CLUB trademark. First, JASA transferred to JAI all of its right, title, and interest in and to the HAVANA CLUB trademark worldwide, the related goodwill of the business, and certain other related assets such as JASA's secret formula for the manufacture of HAVANA CLUB rum. Simultaneously, substantially all of JASA's shareholders transferred to JAI any and all right, title, and interest that they might hold in the HAVANA

-24-

CLUB trademark worldwide, and the related assets transferred from JASA to JAI. Second, JAI

transferred to BACO all right, title, and interest in and to the HAVANA CLUB trademark

worldwide and such other related assets, that JAI had acquired from JASA.

73.     Under the 1997 agreements, BACO is the owner of all title, right, and interest in

and to the mark HAVANA CLUB in the United States, Cuba, and elsewhere that previously

were owned by JASA and their shareholders.

**J.     Bacardi's Sale of HAVANA CLUB Rum in the United States**

74.     In 1995, under the interim understanding with the Arechabalas, Bacardi U.S.A.

imported into the United States rum produced in the Bahamas under the authority of Galleon,

and sold that rum under the HAVANA CLUB trademark in interstate commerce in the United

States.

75.     On July 14, 1995, Bacardi U.S.A. obtained BATF approval for the original labels

used on HAVANA CLUB rum. The first sales by Bacardi of HAVANA CLUB rum in the

United States took place in 1995. Bacardi shipped HAVANA CLUB "Light" and HAVANA

CLUB "Gold" rum to distributors in New York, Illinois, California, and Florida. Those

distributors sold the HAVANA CLUB rum to retailers which, in turn, sold HAVANA CLUB

rum to consumers. During 1996, Bacardi expanded the sale of HAVANA CLUB rum to licensed

wholesalers in other selected markets across the United States.

**K.     The HAVANA CLUB Litigation**

76.     On September 12, 1994, Galleon filed an "intent-to-use" application to register

the word mark HAVANA CLUB for rum on the Principal Register of the PTO.

77.     In July 1995, Galleon and Bacardi U.S.A. initiated the HC Cancellation

Proceeding before the TTAB, seeking cancellation of the Extant U.S. HAVANA CLUB

Registration, record title to which was at that time in the name of HCH. Galleon contended,

*inter alia,* that the recorded assignments of the HAVANA CLUB & DESIGN mark and the

related federal registration, first from Cubaexport to HRL, and then from HRL to HCH, violated

the CACR and that such void transfers, under the language of the CACR, could not serve as "the

basis for the assertion or the recognition of any interest in, or right, remedy, power or privilege

with respect to such [Registration]." Cancellation was also sought on the ground that the Extant

U.S. HAVANA CLUB Registration was fraudulently obtained, maintained, and renewed, that

the registered mark was abandoned, and that the intended use of the registered mark

misrepresented the source of the goods.

78.     On October 5, 1995, Cubaexport, HRL and HCH belatedly applied for a

retroactive OFAC license that would authorize the two successive assignments of the HAVANA

CLUB trademark. The application filed with OFAC contained the knowing misstatements that

(a) the "aforesaid assignments were part of the reorganization of the Cuban rum and liquors

industry" and (b) "each of the assignors and assignees are nationals of Cuba." The application

thus concealed the fact that the HAVANA CLUB mark had been sold to a Luxembourg

company, HCH, which was 50% owned by Pernod, a French and that neither of these companies

was part of the Cuban rum "industry."

79.     On November 13, 1995, OFAC granted License No. C-18147 retroactively for the

assignments of the HAVANA CLUB & DESIGN mark and the related federal registration, but

that license was explicitly subject to the conditions that "this license is granted upon the

statements and representations made in your application" and "if this license was issued as a

result of a willful misrepresentation on the part of the applicant or his duly authorized agent, it

may . . . be declared void from the date of its issuance."

80.    The Extant U.S. HAVANA CLUB Registration had to be renewed by early 1996 by its owner or that registration would automatically expire.  On January 18, 1996, HCH filed an application for renewal with a declaration signed by Luis Perdomo, Vice Chairman (the "Renewal Declaration").  The Renewal Declaration did not correct any of the misstatements and omissions that had been made in the previous submissions to the PTO, and the declaration asserted HCH's ownership of the Extant U.S. HAVANA CLUB Registration, explicitly referencing the PTO records showing the assignments to HCH.  On January 27, 1996, the PTO issued a Certificate of Renewal for the Extant U.S. HAVANA CLUB Registration in the name of HCH pursuant to Section 9 of the Lanham Act .

81.    ·In December 1996, HCH and HCI brought an action in the U.S. District Court for the Southern District of New York styled *Havana Club Holding, S.A. et al. v. Galleon S.A. et al.*, 96 Civ. 9655 (SAS), for infringement of the federally registered HAVANA CLUB & DESIGN trademark, false designations of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and unfair competition.  Bacardi counterclaimed for cancellation of HCH's Extant U.S. HAVANA CLUB Registration on several grounds, including abandonment, fraud, and violation of the CACR.

82.    On March 17, 1997, the HC Cancellation Proceeding was stayed pending disposition of the federal court action, which involved some of the same issues.

83.    On April 17, 1997, OFAC issued a Notice of Revocation of Cubaexport's License No. C-18147 concerning the assignments of the HAVANA CLUB trademark and the related federal registration, based on "facts and circumstances that have come to the attention of this Office that were not included in the application of October 5, 1995."  OFAC, therefore, directed

that "License No. C-18147 issued to Cubaexport on November 13, 1995 is hereby revoked

retroactive to the date of issuance," which was November 13, 1995.

84.    On August 8, 1997, the United States District Court for the Southern District of

New York dismissed HCH's federal trademark infringement claim against Bacardi on the ground

that HCH had never acquired any interest in the HAVANA CLUB & DESIGN registration that

could be infringed, because the purported transfers from Cubaexport were null and void under

the CACR. *Havana Club Holding, S.A. v. Galleon S.A.*, 974 F.Supp 302 (S.D.N.Y. 1997).

85.    On October 20, 1997, the court entered a Partial Judgment (the "Judgment")

implementing the August 8th decision.  That Judgment ruled that ". . . [HCH] and [HCI] have no

rights to the registered trademark HAVANA CLUB for 'rum' in the United States." (Judgment

¶ 7).  The Judgment also held:

> "Neither [HRL], [HCH], nor its licensee, [HCI] ever obtained any rights to the
> HAVANA CLUB mark in the United States by transfer." (Judgment ¶ 6)

> "Any rights that [HCH] may have had, may have, or claims to have had in the
> Registration of the HAVANA CLUB trademark (U.S. Reg. No. 1,031,651) from
> forever until today are hereby canceled." (Judgment ¶ 8)

86.    The District Court declined to decide whether Cubaexport had any rights in the

U.S. HAVANA CLUB & DESIGN Registration, because Cubaexport was not a party to the

action and had refused to join as a party.  The Court held:

> "Those provisions of the original transfer agreement relating to transfers of the
> U.S. Rights to the HAVANA CLUB mark and the related U.S. Registration were
> rendered null and void by the CACR, § 515.201(b)(1), and the attempted
> assignment of said HAVANA CLUB mark and the related U.S. Registration were
> invalid and of no force and effect and *void ab initio*." (Judgment ¶ 4)

> "As a result, the status quo ante as of the October 29, 1993 date of said abortive
> original transfer agreement is restored, and Cubaexport retained whatever rights it
> had in said mark and the related U.S. Registration as of said date, notwithstanding
> the invalid transfers." (Judgment ¶ 5)

The court added:

-28-

"Nothing herein shall prevent Cubaexport, if it so chooses, from asserting or seeking to enforce rights in the trademark HAVANA CLUB rum in the United States and nothing herein shall prevent the defendants or others from contesting those rights or contending that said rights were lost as a result of acts or omissions by Cubaexport." (Judgment ¶ 10)

87.     After a bench trial, the District Court held, among other things, that Section 211 barred HCH from asserting rights in the "Havana Club" trade name, because that name was substantially similar to the HAVANA CLUB mark that was previously used by JASA in association with the business seized by Cuba without payment of compensation and because HCH had not obtained Bacardi's consent to that use as the successor to JASA.

88.     On February 4, 2000, the United States Court of Appeals for the Second Circuit unanimously upheld the trial court's decision. *See* 203 F.3d 116 (2d Cir. 2000). The Second Circuit's Mandate became final on February 25, 2000, and HCH's petition for a writ of *certiorari* was denied on October 2, 2000. Under Section 37 of the Lanham Act, 15 U.S.C. § 1119, certified copies of the decisions of the District Court, the Second Circuit, and the U.S. Supreme Court were filed with the PTO.

89.     Instead of implementing the Judgment pursuant to 15 U.S.C. § 1119, the PTO issued an Order to Show Cause on October 26, 2001, giving the parties 14 days to demonstrate why the Director of the PTO should not rectify the PTO's records to reflect the District Court's order invalidating the recorded assignments of the entire interest and goodwill in the U.S. HAVANA CLUB & DESIGN mark and the related federal registration from Cubaexport to HRL and from HRL to HRH. The Order to Show Cause omitted any reference to Paragraph 8 of the Judgment, which cancelled any right or claim that HCH may ever have had, may have, or claims to have had in the Extant U.S. HAVANA CLUB Registration, and also omitted reference to Paragraph 4, which ruled that Cubaexport's transfers were void *ab initio*.

-29-

90.     A Notice of Recordal of an Assignment Document was put in the PTO record, together with a related Order signed by Lynne Beresford directing the PTO's Assignment Division to record an assignment of the Extant U.S. HAVANA CLUB Registration to Cubaexport. The conveying party was identified as the U.S. District Court for the Southern District of New York and the conveyance was by court order dated October 20, 1997. This assignment document did not restore the *status quo ante* as of the date of the abortive transfer, which was November 23, 1993.

91.     On January 15, 2002, the PTO issued a notice pursuant to 15 U.S.C. § 1119 stating that, having considered the initial submissions and replies from each party, the PTO's registration records would be rectified to conform with the assignment records.

L.    The Interim Agreement

92.     In a contract dated March 19, 2002, and purported to be made retroactive to October 4, 2000, Cubaexport, HRL, HCH, HCI, Cuba Ron, and Pernod agreed to amend the Convenio and all related agreements so that the HAVANA CLUB & DESIGN mark, the assets associated with the U.S. HAVANA CLUB rum business and certain other related rights conditionally reverted back to Cubaexport (the "Interim Agreement"). The parties further agreed that if (a) they were able to obtain an OFAC license authorizing the transfer of the mark to HCH or HRL, or (b) the PTO determined that Cubaexport did not own the HAVANA CLUB & DESIGN mark, or (c) "[a]ny other event [ ] makes possible the realization of the initial intent of the parties" to transfer the mark to.HCH as expressed in the Convenio, then the mark and related rights would again return to HCH. Several provisions of the Interim Agreement purport to transfer property rights that are subject to the CACR without OFAC approval and are thus void *ab initio*.

-30-

**M.    The TTAB Cancellation Proceeding**

93.    On March 15, 2002, BACO, as successor to Galleon, and Bacardi U.S.A. filed a motion in the HC Cancellation Proceeding to resume the proceeding (which had been stayed during the court action), to substitute parties, and for summary judgment.  On January 21, 2003, the TTAB resumed proceedings, set a briefing schedule, and joined Cubaexport as a defendant along with HCH.

94.    The basis for Bacardi's summary judgment motion was that the Extant U.S. HAVANA CLUB Registration had expired pursuant to 15 U.S.C. § 1059 and Rule 2.183 of the Trademark Rules of Practice, 37 C.F.R. §§ 2.181-2.184 (1995), because Cubaexport had failed to file the mandatory renewal application and declaration.  A Renewal Declaration had been filed by HCH, but the October 20, 1997, Judgment held that any rights that HCH may have had, may have or claims to have had in the Extant U.S. HAVANA CLUB Registration "from forever until today are canceled" (Judgment ¶ 8) and further held that the attempted assignments of that mark and the related federal registration "were invalid and of no force and effect and void *ab initio*." (Judgment ¶ 4).  As the Renewal Declaration had not been filed by the owner of the registration, the registration had not been validly renewed and had to be stricken from the Principal Register of the PTO.

95.    In a decision mailed on January 29, 2004 (the TTAB Decision), the TTAB denied Bacardi's motion for summary judgment.  The TTAB Decision was in error, as will be demonstrated in this proceeding.  Among other errors, the TTAB mistakenly concluded that, because HCH's Renewal Declaration had presented a complete application that met the formal requirements for renewal, Cubaexport itself could have filed a renewal application and declaration that would satisfy those same requirements.  By 1996, however, Cubaexport had left

the rum business and could not truthfully aver that, but for the Cuban embargo, it was ready and
able to export HAVANA CLUB rum to the United States.

96.     The TTAB agreed with Bacardi that "[a] proper renewal application must be
executed and filed by the owner of a registration" (TTAB Decision p. 36) and stated, citing 15
U.S.C. § 1127, that the term "registrant" includes "both the original registrant [Cubaexport] and
a person who has acquired ownership through *proper transfer* of title." (TTAB Decision p. 36 n.
23) (emphasis added). Therefore, the TTAB concluded, "continuity of title from the registrant to
the present owner must be shown." (TTAB Decision p. 36).

97.     The TTAB stated that "well before the nine-month renewal period commenced
[on July 27, 1995] it appeared that Cubaexport was no longer the owner of the registration."
(TTAB Decision P. 37) This statement disregarded the Judgment, which had held that the
transfers were void and that the *status quo ante* as of November 23, 1993, was restored.
Cubaexport, not HCH, was then the putative owner of the Extant U.S. HAVANA CLUB
Registration as of November 23, 1993, and through April 27, 1996, the statutory deadline for
filing a valid renewal application and declaration.

98.     The TTAB also stated that "[a]ccording to HCH and Cubaexport, all of the parties
concerned considered HCH as the owner of the registration." (TTAB Decision p. 37). This
statement ignored that the United States was also a concerned party and that HCH and
Cubaexport had created their own predicament by violating the CACR. The Judgment held,
among other things, that HCH never "obtained any rights in the HAVANA CLUB mark in the
United States by transfer" (Judgment ¶ 6). Therefore, Cubaexport was the only party that the
TTAB could deem to be the putative "owner" of that registration consistent with the Judgment.

99.     The TTAB then observed that:

"[T]here is no opportunity now for Cubaexport to file a new, substitute or amended renewal application. The statutory renewal period has long passed, and neither we, nor the parties, may extend or reopen that period." (Judgment, p. 38)

But the TTAB went on to conclude, contrary to Section 211 and the Judgment, that HCH had

complied with the PTO Renewal Rules when it filed its renewal application in its own name, that

it had filed a proper renewal application, that the PTO had acted properly in accepting the

renewal application and renewing the application in HCH's name, and that the resulting renewal

application was valid.

100.    The TTAB never ruled on Section 211. The only rationale the TTAB offered for

ignoring the nullification of the transfers ordered by the Judgment is that, to avoid confusion and

administrative burden on the PTO, the TTAB "must focus on circumstances when the renewal

applicant filed its application, not on the circumstances which existed years later." (TTAB

Decision p. 38) This was legal error. The Judgment conclusively established that HCH never

had any claim whatsoever to legal or equitable title to the Extant U.S. HAVANA CLUB

Registration, so the TTAB was bound to treat HCH's renewal filing as a nullity.

101.    The TTAB Decision went on to consider whether any of the other claims in

Bacardi's 1996 Supplemental and Amended Petition were ones on which the TTAB could grant

relief. The TTAB dismissed Bacardi's claim of fraud in obtaining the registration on the ground

that Bacardi did not allege that JASA had used the HAVANA CLUB mark in the United States

in 1974 when Cubaexport filed its trademark application. Similarly, in dismissing Bacardi's

claim of fraud in maintaining the registration, the TTAB found that Cubaexport could not have

knowingly made a misrepresentation concerning ownership of the mark in its Section 8 affidavit,

since no allegation of JASA's use of the mark in the United States in 1974 was made. In 1974,

however, JASA was not able to use the mark in the United States because its assets had been

-33-

confiscated by the Cuban government and because, as a Cuban entity, it was barred by the Cuban embargo from selling rum in the United States.

102.    The TTAB further held that, since OFAC had not explained the reasons for revoking the transfer license, the allegation that Cubaexport and HCH had willfully violated the CACR and that HCH had knowingly filed a false Renewal Declaration failed to state a claim for fraudulent renewal. This confused the rules for pleading fraud with proof of a fraud allegation. The TTAB declined to determine whether there was a fraudulent transfer of the mark under the CACR on the ground that the TTAB "has little or no experience in determining violation of statutes or regulations that do not directly concern registrations of trademarks." (TTAB Decision p. 51).

103.    The TTAB rejected the abandonment claims on the ground that the assignment-in-gross rule does not apply to this case because Cubaexport, HRL and HCH never had business assets in the United States that could be separated from the trademark.

104.    Finally, the TTAB refused to consider whether the HAVANA CLUB & DESIGN mark was being used to misrepresent the source of the goods because this "claim is premised on the assumption that Cubaexport is not the true and legitimate owner of the HAVANA CLUB mark, which can only be regarded as a political question based on the premise that the Cuban government is not legitimate." (TTAB Decision p. 55). The TTAB added that it did not have the authority to answer this question. The TTAB did not rule on the applicability of the Non-Recognition Doctrine or the other bases, including Section 211, for concluding that Cubaexport was not the true owner of the Extant U.S. HAVANA CLUB Registration.

COUNT I

APPEAL FROM THE TTAB DECISION

A.    **The U.S. HAVANA CLUB & DESIGN Registration Must be Stricken Because Cubaexport Omitted Filing the Mandatory Renewal Application and Declaration**

105.    Paragraphs 1 through 104 are incorporated herein by reference.

106.    The Judgment voided the recorded transfers and left Cubaexport with whatever rights it had in the HAVANA CLUB & DESIGN mark in the United States and the related federal registration as of November 23, 1993, the date of the void transfers. The court did not reach the merits of Bacardi's claim for cancellation of the Extant U.S. HAVANA CLUB Registration because Cubaexport, which had a claim to title to that registration was not a party, and had refused to be joined voluntarily as a party, to the action before Judge Scheindlin. Therefore, the Judgment provided that "[n]othing herein shall prevent Cubaexport, if it so chooses, from asserting rights in the trademark HAVANA CLUB rum in the United States and nothing shall prevent [Bacardi] from contesting those rights or contending that said rights were lost as a result of acts or omissions by Cubaexport." (Judgment ¶¶4, 10). As Cubaexport was a party to HC Cancellation Proceeding, the TTAB was obliged to decide the effect of Cubaexport's omission, as the record owner, to renew the Extant U.S. HAVANA CLUB Registration.

107.    The Extant U.S. HAVANA CLUB Registration nominally owned by Cubaexport was set to expire automatically at the end of its 20-year term (plus the statutory grace period) on April 27, 1996 under Section 9(a) of the Lanham Act, 15 U.S.C. § 1059(a), unless the mandatory renewal application and declaration was filed by its owner prior to that deadline.

-35-

108.    Cubaexport did not file a renewal application and declaration on or before April 27, 1996, or thereafter. As a result of this omission by Cubexport, the Extant U.S. HAVANA CLUB Registration expired automatically under the Lanham Act.

109.    On or about January 18, 1996, HCH filed a Renewal Declaration in its own name, claiming, under pain of perjury, that HCH owned the Extant U.S. HAVANA CLUB Registration based on the recorded assignments from Cubaexport to HRL and from HRL to HCH. The Judgment held, however, that those recorded assignments were null and void *ab initio* under 31 C.F.R. § 515.203(a), and also canceled any rights HCH may have had, may have or claims to have had in the Extant U.S. HAVANA CLUB Registration from forever until the October 27, 1997 date of the Judgment (¶8). Therefore, HCH could not satisfy the renewal requirement of continuity of title from Cubaexport and was not at that or any other time the owner of the Extant U.S. HAVANA CLUB Registration.

110.    Furthermore, the HAVANA CLUB trademark that is the subject of the aforesaid federal registration is, as the District Court held, similar to the HAVANA CLUB mark used with the assets of JASA seized by the Cuban government without compensation in 1960, so the TTAB was proscribed from recognizing or enforcing any interest of HCH in said registration.

111.    No renewal application and declaration was ever filed by the owner of the Extant U.S. HAVANA CLUB Registration prior to the statutory deadline for filing such renewal applications and declarations.

112.    Because the requirements of 15 U.S.C. § 1059 were not met, and the Extant U.S. HAVANA CLUB Registration expired, the records of the PTO must be rectified by striking and expunging said registration from the Principal Register of the PTO.

-36-

**B.    Fraud in Obtaining and Maintaining Registration by Cubaexport**

113.    Paragraphs 1 through 112 are incorporated herein by reference.

114.    The Cuban government, after having first failed to establish rights to sell its export rum under the BACARDI trademark, then turned in 1974 to the HAVANA CLUB mark, which had been used by JASA on the second most popular Cuban rum. Cuba had lost a series of U.S. court decisions in similar cases under the Non-Recognition Doctrine. Cubaexport, as an arm of the Cuban government, knew that its claims to the HAVANA CLUB mark in the United States or any other U.S. mark that Cuba had purportedly confiscated under Law No. 890 would be denied if the facts were fully disclosed to U.S. authorities and that it would not be deemed to be the successor to JASA under U.S. law.

115.    Nonetheless, on June 12, 1974, Cubaexport applied to the PTO, pursuant to Section 44 of the Lanham Act, 15 U.S.C. § 1126, to register a trademark consisting of a label design displaying the words HAVANA CLUB (the "HAVANA CLUB & DESIGN" mark). Although Cubaexport still held Cuban HAVANA CLUB registrations that had been confiscated from JASA, Cubaexport's June 12th application was based on a newly issued Cuban Registration No. 110,353, dated February 12, 1974. This course of action was adopted to conceal that Cubaexport's claim of title to the HAVANA CLUB mark was based on the previous confiscation of JASA's assets.

116.    The HAVANA CLUB & DESIGN mark that was the subject of Cubaexport's U.S. trademark application prominently displays the Spanish legend *"Fundada en 1878,"* which Cubaexport intentionally copied from the label design that had been registered by JASA in the United States under Registration No. 335,919 in 1936. Cubaexport's intention in prominently displaying *"Fundada en 1878"* as part of the HAVANA CLUB & DESIGN mark was to mislead the American public into believing that Cubaexport's HAVANA CLUB rum had a family

-37-

heritage dating back nearly a century and came from, or was associated with, or approved by, JASA, the original producer of the HAVANA CLUB rum that they had previously purchased and enjoyed in the United States. Cubaexport's decision to adopt the HAVANA CLUB mark for export rum was further based on the determination by senior Cuban rum executives that, in 1974, the HAVANA CLUB mark still had a valuable reputation and goodwill in the United States. That goodwill had been created by the success of JASA's HAVANA CLUB rum and it rightfully belonged to JASA in the United States.

117.    Moreover, when Cubaexport applied to register the HAVANA CLUB & DESIGN mark with the PTO in 1974, Cubaexport knew that JASA had only discontinued making HAVANA CLUB rum because JASA's rum distillery and other assets had been forcibly seized and confiscated by the Cuban government and its officers, executives, and shareholders had been driven into exile or imprisoned.

118.    Cubaexport never obtained the secret formula used by JASA to produce the HAVANA CLUB rum sold in the United States and elsewhere. So Cubaexport surreptitiously concocted a new formula for its ersatz HAVANA CLUB rum, which materially changed the character of the rum. Nonetheless, the HAVANA CLUB & DESIGN mark which Cubaexport had applied to register in the United States was designed by Cubaexport with the intent of misleading prospective purchasers into believing that they were buying the same product that JASA had made and sold in the United States.

119.    Accordingly, Cubaexport, made the following material false statements and omissions in connection with its application to register the HAVANA CLUB & DESIGN mark with knowledge of their falsity and with the intent of deceiving the PTO and keeping material information from coming to their attention:

     a.    That Cubaexport was the owner in the United States of the HAVANA CLUB & DESIGN mark for rum. This statement was knowingly false because Cubaexport knew:

          i.    that JASA's HAVANA CLUB mark still enjoyed a strong reputation in the United States;

          ii.   that JASA continued to have common law trademark rights in the HAVANA CLUB mark for rum in the United States, and

          iii.  that the interruption of JASA's use of the HAVANA CLUB mark was caused by the confiscation of JASA's assets by the Cuban government and JASA had no intention of abandoning its United States trademark rights.

     b.    That the label statement "Fundada en 1878" ("founded in 1878") referred to JASA's business, not to Cubaexport, which was founded in 1965, and that said label statement was intentionally designed to mislead consumers as to the provenance and the source of the rum sold under that mark; and

     c.    That Cubaexport's use in the United States of the HAVANA CLUB & DESIGN mark in connection with the sale of rum would deceive U.S. consumers as to the source of the rum so marked.

120.    On January 27, 1976, U.S. Reg. No. 1,031,651 of the HAVANA CLUB & DESIGN mark was issued to Cubaexport.

121.    Neither JASA, JAI, their shareholders, nor Bacardi, as JASA's bona fide successor in interest, has ever consented to the registration or the use of the trademark and trade name HAVANA CLUB by Cubaexport, HRL, or HCH.

122.    To maintain the Extant U.S. HAVANA CLUB Registration, Cubaexport was required to file an affidavit between the fifth and sixth year after the registration, averring ownership and continued use of the mark. On or about January 12, 1982, such an affidavit was filed by Cubaexport in the PTO in connection with the Extant U.S. HAVANA CLUB Registration. This declaration, ostensibly signed by Fausto Alfonso Man, averred that

Cubaexport was the owner of said mark and registration and invoked the embargo and the

excusable nonuse doctrine to satisfy the use requirement of Section 8.

123.    For the same reasons set forth in paragraphs 114 through 119 above, Cubaexport

also knew in January 1982 that Cubaexport was not the owner of the HAVANA CLUB &

DESIGN mark in the United States; that JASA was the owner in the United States of common

law trademark rights in the HAVANA CLUB mark for rum; that JASA's HAVANA CLUB

mark for rum still enjoyed a strong reputation; and that if Cubaexport were allowed to sell its

rum labeled with the HAVANA CLUB & DESIGN mark in the United States, American

consumers would be deceived as to its quality and source of origin.

124.    Wherefore, the U.S. HAVANA CLUB & DESIGN Registration has been

fraudulently obtained and maintained in violation of 15 U.S.C. § 1064(3) and should be

cancelled.

C.    **Fraud in Obtaining and Renewing Registration by HCH**

125.    Paragraphs 1 through 124 are incorporated herein by reference.

126.    Cubaexport, HRL, and HCH were, at all relevant times in 1993 and 1994, aware

of the fact that their purported transfers of the HAVANA CLUB & DESIGN mark and the

related federal registration in the United States were prohibited by the CACR absent a specific

license from OFAC.  Accordingly, in order to put and maintain the U.S. HAVANA CLUB &

DESIGN Registration in HCH's name by false means, Cubaexport, HRL, and HCH deliberately

caused their duly authorized representative to make statements on their behalf in an OFAC

License Application that they all knew contained material misleading omissions and material

affirmative false statements that were made with the intent of deceiving OFAC and putting the

federal registration in the name of HCH by false means.  These statements were as follows:

-40-

a.   That the assignments were made as "part of the reorganization of the Cuban rums and liquors industry"; and

b.   that "each of the assignors and assignees are nationals of Cuba."

127.   Furthermore, on or about January 18, 1996, defendant HCH knowingly filed a false Renewal Declaration averring that HCH owned the U.S. HAVANA CLUB & DESIGN mark and the related federal registration, when Cubaexport, HCH, and HRL all knew that the transfers had been the subject of false statements that had been made to OFAC and thus were void under the CACR because no valid OFAC license therefore had been obtained and that putative title to the Extant U.S. HAVANA CLUB Registration remained in Cubaexport.

128.   HCH also knew that Bacardi was using the HAVANA CLUB mark for rum in the United States on and before January 18, 1996 and HCH knew, for that reason as well, that HCH was not the true owner of the U.S. HAVANA CLUB & DESIGN mark and the related federal registration in the United States at that time.

129.   Wherefore, the U.S. HAVANA CLUB & DESIGN Registration was falsely and fraudulently put in HCH's name by Cubaexport and HCH and fraudulently renewed by HCH in violation of 15 U.S.C. § 1064(3) and should be cancelled.

**D.   Abandonment**

130.   Paragraphs 1 through 129 are incorporated herein by reference.

131.   On or about November 23, 1993, after assigning the rights to the U.S. HAVANA CLUB & DESIGN mark and the related registration to HRL and transferring its marketing employees to HCI, Cubaexport left the rum business. From 1993 to the present, a period of more than 3 years, Cubaexport has not advertised, licensed for sale, or sold HAVANA CLUB rum anywhere in the world.

-41-

132.    Cubaexport, since 1993, has held bare title to the Extant U.S. HAVANA CLUB Registration but at no time during that period has Cubaexport been ready or able to export HAVANA CLUB rum to the United States or anywhere else in the world.

133.    Cubaexport also abandoned the Extant U.S. HAVANA CLUB Registration and whatever claims it had to rights in the HAVANA CLUB & DESIGN mark in the United States by allowing the aforesaid federal registration to lapse.

134.    Wherefore, the HAVANA CLUB & DESIGN mark has been abandoned by Cubaexport within the meaning of Section 45 of the Lanham Act, 15 U.S.C. § 1127, and the Extant U.S. HAVANA CLUB Registration should be cancelled.

**E.    Misrepresentation of Goods**

135.    Paragraphs 1 through 134 are incorporated by reference.

136.    Defendant Cubaexport has allowed HCH and/or HCI (a) to prepare and cause advertisements for Defendants' ersatz HAVANA CLUB rum to appear in magazines and publications distributed through the channels of interstate commerce in the United States and (b) to pay promotional fees or to give other inducements to motion picture producers to cause their HAVANA CLUB rum and their purported HAVANA CLUB & DESIGN mark to be depicted in motion pictures distributed in interstate commerce in the United States, including the film "The Firm." These advertisements and the use and depiction of said mark in films are designed to induce American consumers into buying Defendants' ersatz HAVANA CLUB rum abroad and to build up a demand for said product in the United States.

137.    Cubaexport's use of the labeling statement incorporated in the HAVANA CLUB & DESIGN mark falsely indicating that the producer was "founded in 1878" is part of a deliberate scheme to pass off Defendants' ersatz HAVANA CLUB rum as being somehow

approved by JASA, or as being the same quality as the only HAVANA CLUB rum ever sold legally in the United States, which was produced by JASA.

138.    Furthermore, said advertising and promotional use of said HAVANA CLUB & DESIGN mark and Cubaexport's other aforesaid acts and omissions are intended to confuse the American public into wrongly believing that Cubaexport is somehow the legitimate successor to the original producer of the HAVANA CLUB rum sold in the United States, JASA.  Indeed, the use of the statement "founded in 1878" as part of the HAVANA CLUB & DESIGN mark can have no other purpose.

139.    Through the aforesaid acts, Cubaexport has used the purported HAVANA CLUB & DESIGN mark as a vehicle for fraud and said mark is being used in violation of 15 U.S.C. § 1064(3) to misrepresent the source of Defendants' ersatz HAVANA CLUB rum.

140.    Wherefore, said mark was used by or with the permission of Cubaexport in violation of § 1064(3) and the registration thereof should be cancelled.

### COUNT II
### DECLARATION OF COMMON LAW RIGHTS IN THE HAVANA CLUB TRADEMARK

141.    Paragraphs 1 through 140 are incorporated herein by reference.

142.    BACO is the true owner of the common law rights in and to the HAVANA CLUB mark as the bona fide successor-in-interest to JASA, the original owner of those rights.  JASA never abandoned its rights in and to the HAVANA CLUB mark; JASA was prevented from using the mark in the United States and elsewhere as a result of the Cuban government's confiscation of JASA's assets in 1960.  At all times prior to BACO's acquisition of the mark, JASA intended to resume use of the mark when it had the means to do so.

-43-

143.    BACO also established common law rights in the HAVANA CLUB mark as a result of its own use of the mark in the United States. BACO used the mark in the United States in 1995 and 1996 and only discontinued use under an agreement with HCH and HRL. BACO is prepared, and intends, to resume use of the HAVANA CLUB mark in the United States. Similarly, BACO has not abandoned the common law rights to the HAVANA CLUB mark that it acquired from JASA.

144.    Defendants have no common law or other rights in any mark incorporating the words HAVANA CLUB. Defendants' alleged rights in any such a mark stem from Cuba's confiscation of JASA's assets. As a matter of public policy, the United States will not recognize a claim of right in a U.S. trademark that is based in whole or in part on such a confiscation.

145.    Further, Section 211 prohibits any United States court from recognizing, enforcing or otherwise validating Defendants' assertion of rights in a mark incorporating the words HAVANA CLUB because such a mark is the same as or substantially similar to the HAVANA CLUB mark that JASA used in connection with the assets that were confiscated by the Cuban government in 1960. Neither JASA nor Bacardi, as JASA's bona fide successor in interest, has consented to Defendants' use of a mark incorporating the words HAVANA CLUB. Accordingly, Defendants have no enforceable rights in any such mark.

146.    An actual controversy exists between the parties with respect to the foregoing claims of common law ownership and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below. Plaintiffs have no adequate remedy at law.

## COUNT III

### DECLARATION OF NON-VIOLATION OF FEDERAL TRADEMARK LAWS

147.    Paragraphs 1 through 146 are incorporated herein by reference.

148.    Plaintiffs' use of the HAVANA CLUB mark in connection with the sale, distribution, and advertising of HAVANA CLUB rum in the United States does not constitute trademark infringement or unfair competition in violation of Section 32 or Section 43(a) of the Lanham Act, 28 U.S.C. §§ 1114 or 1125(a).

149.    Plaintiffs' use of the HAVANA CLUB mark does not infringe under any federal law any mark purportedly owned by Defendants, or constitute unfair competition in violation of any right purportedly owned by Defendants under any federal law.

150.    Defendants have not been damaged, and will not in the future be damaged, by Plaintiffs' use of the HAVANA CLUB mark or by any alleged violation of federal law based on Plaintiffs' use of said marks.

151.    An actual controversy exists between the parties with respect to the foregoing claims of non-violation and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below.  Plaintiffs have no adequate remedy at law.

## COUNT IV

### DECLARATION OF NON-VIOLATION OF STATE LAW

152.    Paragraphs 1 through 151 are incorporated herein by reference.

153.    Plaintiffs' use of the HAVANA CLUB mark does not infringe under any state law any mark incorporating the words HAVANA CLUB purportedly owned by Defendants, or constitute unfair competition in violation of any right purportedly owned by Defendants under any state law based on a mark or trade name incorporating the words HAVANA CLUB.

154.    Defendants have not been damaged, and will not in the future be damaged, by
Plaintiffs' use of the HAVANA CLUB mark or by any alleged violation of state law based on
Plaintiffs' use of said marks.

155.    An actual controversy exists between the parties with respect to the foregoing
claims of non-violation and the controversy is of sufficient immediacy to warrant the declaratory
and injunctive relief requested below.  Plaintiffs have no adequate remedy at law.

## COUNT V
### TREATY VIOLATIONS AND CONSTITUTIONAL GROUNDS

156.    Paragraphs 1 through 155 are incorporated herein by reference.

157.    Contrary to Section 44 of the Lanham Act, 15 U.S.C. § 1126, and international
conventions, the HAVANA CLUB mark was not used in commerce in the United States within a
reasonable period after Cubaexport's original application was filed.

158.    Indeed, the HAVANA CLUB mark has never been used by the original registrant,
Cubaexport, in interstate or foreign commerce of the United States.

159.    Wherefore, the purported HAVANA CLUB mark has never been used in
commerce which may lawfully be controlled by Congress, so the PTO has no power to maintain
the U.S. HAVANA CLUB & DESIGN Registration on the Principal Register of the PTO and
said registration should be cancelled.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs pray for relief as follows:

160.    Plaintiffs request that this Court enter judgment:

(a)    Adjudging and declaring that Reg. No. 1,031,651 of the HAVANA CLUB
& DESIGN mark be cancelled and stricken from the Principal Register of the PTO;

-46-

(b)    Declaring that BACO owns the common law rights to the HAVANA

CLUB trademark in the United States, that BACO's use of the HAVANA CLUB trademark does

not infringe on any mark owned by Defendants or otherwise violate any enforceable rights of the

Defendants, and that Defendants have no rights in any mark incorporating the words HAVANA

CLUB;

(c)    Enjoining Defendants, their agents, servants, employees, parents,

subsidiaries, affiliates and all persons in active concert with Defendants, from using or

registering in the PTO or in any State of the United States any mark incorporating or consisting

of the words HAVANA CLUB and from interfering with Plaintiffs' use and registration of the

HAVANA CLUB mark;

(d)    Awarding Plaintiffs their costs and attorneys' fees pursuant to 15 U.S.C. §

1117 and applicable state law; and

(e)    Awarding Plaintiffs such further relief as the Court may deem just and

proper.

Respectfully submitted,

William R. Golden, Jr.                    Eugene D. Gulland (D.C. Bar No. 175422)
KELLEY DRYE & WARREN          Oscar M. Garibaldi (D.C. Bar No. 251330)
101 Park Avenue                           Gregory M. Williams (D.C. Bar No. 467950)
New York, New York 10178            COVINGTON & BURLING
(212) 808-7800                              1201 Pennsylvania Avenue, N.W.
                                                     Washington, D.C.  20004-2401
                                                     (202) 662-6000

Attorneys for the Plaintiffs Bacardi & Company Limited
and Bacardi-Martini U.S.A., Inc.

-47-

# EXHIBIT 11

B 24500/361                    im

74572667

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICATION FOR TRADEMARK REGISTRATION

MARK:                    **HAVANA CLUB**

APPLICANT:               Galleon S.A.

INTERNATIONAL CLASS:     33

TO THE COMMISSIONER OF PATENTS AND TRADEMARKS:

GALLEON S.A., an International Business company with an office located at First Floor, 49 Collins Avenue, Nassau, Bahamas, has a <u>bona fide</u> intention to use the trademark shown in the accompanying drawing in commerce on or in connection with the following goods in Class 33:

Rum and Rum Specialty Drinks

and requests that said mark be registered in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946.

The trademark will be used by applying it to labels and packaging for the goods and in other ways common to the trade.

Applicant hereby appoints William R. Golden, Jr., Keith E. Sharkin and Margaret Ferguson (members of the Bar of the State of New York) of the firm of Kelley Drye & Warren, 101 Park Avenue, New York, New York 10178, its attorneys to prosecute this application to register, with full powers of substitution and revocation, to make alterations and amendments therein, to

## NY33/SALEB/27908.21

transact all business in the Patent and Trademark Office in connection therewith, and to receive the Certificate of Registration.

Kelley Drye & Warren, whose postal address is 101 Park Avenue, New York, New York 10178 is hereby designated applicant's representative upon whom notice of process in proceedings affecting the mark may be served.

## DECLARATION

Catherine Lorandos, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any registration resulting therefrom, declares that she is a Director of applicant corporation and is authorized to execute this instrument on behalf of said corporation; that she believes said corporation to be entitled to use such mark in commerce; that to the best of her knowledge and belief no other person, firm, corporation, or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods or services of such other person, to cause confusion, or to cause mistake, or to deceive; that the facts set forth in this application are true; and that all statements made of her own knowledge are true and all

SEP-07-1994 15:28 FROM  BACARDI & CO.           TO        KELLEY DRYE    P.02
SEP 07 '94 14:49 FR KELLEY DRYE WARREN NY212 808 7897 TO #2043562013#31889 P.04 W

statements made on information and belief are believed to be
true.

Dated:  September 7  , 1994

                              GALLEON S.A.

                              By:  _Catherine Lorandos_
                                   Name:  Catherine Lorandos
                                   Title: Director

Express Mail, Mailing No. EF440597962

Date of Deposit ___September 12, 1994___

I hereby certify that this paper or fee is being
deposited with the United States Postal Service
"Express Mail Post Office to Addressee" service
under 37 CFR 1.10 on the date indicated above
and is addressed to the Commissioner of Patents
and Trademarks, Washington D.C. 20231

___Barbara Salerno___
(typed or printed name of person mailing
paper or fee)

_Barbara Salerno_
(Signature of person mailing paper or fee)

                                              TOTAL P.02
SEP 07 '94 15:19                809 362  1918   PAGE.02

TRADEMARK APPLICATION SERIAL NO. 74572667

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

060 KK 11/14/94 745''2667

0 361     245.00 CK

PTO-1555
(5/87)

# EXHIBIT 12

# UNITED STATES DEPARTMENT OF COMMERCE
## Patent and Trademark Office

| | | |
|---|---|---|
| **SERIAL NO.** 74/572667 | **APPLICANT** GALLEON S.A. | **PAPER NO.** |
| **MARK** HAVANA CLUB | | **ADDRESS:** ASSISTANT COMMISSIONER FOR TRADEMARKS 2900 Crystal Drive Arlington, Virginia 22202-3513 |
| **ADDRESS** William R. Golden, Jr. 101 Park Avenue New York, NY 10178 | **ACTION NO.** 01 | If no fees are enclosed, the address should include the words "Box 5." |
| | **MAILING DATE** 03/14/95 | Please provide in all correspondence: |
| | **REF. NO.** | 1. Filing Date, serial number, mark and Applicant's name. 2. Mailing date of this Office action. 3. Examining Attorney's name and Law Office number. 4. Your telephone number and ZIP code. |
| **FORM PTO-1525 (5-90)**     U.S. DEPT. OF COMM. PAT. & TM OFFICE | | |

A PROPER RESPONSE TO THIS OFFICE ACTION MUST BE RECEIVED WITHIN 6 MONTHS FROM THE DATE OF THIS ACTION IN ORDER TO AVOID *ABANDONMENT*. *For your convenience and to ensure proper handling of your response, a label has been enclosed. Please attach it to the upper right corner of your response. If the label is not enclosed, print or type the* Trademark Law Office No., Serial No., *and* Mark *in the upper right corner of your response.*

RE: Serial Number 74/572667

The examining attorney refuses registration because the mark consists of or comprises deceptive matter in that the mark contains a geographic designation where the goods for which registration is sought are produced and the goods do not originate from that geographical location. Trademark Act Section 2(a), 15 U.S.C. Section 1052(a). *See In re Budge Mfg. Co.,* 857 F.2d 773, 8 USPQ2d 1259 (Fed. Cir. 1988); *In re Perry Mfg. Co.,* 12 USPQ2d 1751 (TTAB 1989); *In re Shapely, Inc.,* 231 USPQ 72 (TTAB 1986); TMEP section 1203.02.

The primary significance of the term "Havana" is geographic. The public is likely to believe that the goods come from this place. Futhermore, this belief would materially influence consumers to purchase the goods. *In re House of Windsor, Inc.,* 221 USPQ 53 (TTAB 1983), *recon. denied,* 223 USPQ 191 (TTAB 1984). *See* TMEP sections 1210.04 and 1210.07.

If the goods, however, will not originate in Havana, the examining attorney refuses registration on the Principal Register because the mark is primarily geographically deceptively misdescriptive of the applicant's goods. Trademark Act Section 2(e)(3), 15 U.S.C. Section 1052(e)(3); TMEP section 1210.06.

A mark which, when used on or in connection with the applicant's goods or services, is primarily geographically deceptively misdescriptive of them, is registrable upon a showing of acquired

74/568588                                        -2-

distinctiveness under Trademark Act Section 2(f), 15 U.S.C. Section 1052(f), only if it became distinctive of the goods or services in commerce before December 8, 1993, the date of the enactment of the North American Free Trade Agreement Implementation Act, Public Law 103-182, 107 Stat. 2057. Similarly, such a mark, capable of distinguishing the applicant's goods or services, may be registered on the Supplemental Register only if it has been in lawful use in commerce by the owner since before December 8, 1993.

The examining attorney refuses registration under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d), because the applicant's mark, when used on or in connection with the identified goods, so resembles the mark in U.S. Registration No. 1,031,651 as to be likely to cause confusion, to cause mistake, or to deceive. TMEP section 1207. See the enclosed registration.

Although the examining attorney has refused registration, the applicant may respond to the refusal to register by submitting evidence and arguments in support of registration.

The examining attorney encloses information regarding pending Application Serial No. 522,925. The filing date of the referenced application precedes the applicant's filing date. There may be a likelihood of confusion between the two marks under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d). If the referenced application matures into a registration, the examining attorney may refuse registration in this case under Section 2(d). 37 C.F.R. Section 2.83; TMEP section 1208.01.

The wording "rum specialty drinks" in the identification of goods is unacceptable as indefinite. The applicant must amend the identification to specify the commercial name of the goods. If there is no common commercial name for the product, the applicant must describe the product and its intended uses. TMEP section 804.

David C. Reihner, Examining Attorney
Law Office 12, (703) 308-9112 ex 223

DCR

\*\*\* User: EX188284 \*\*\* Serial Number: 73023981 \*\*\*



Word Mark
     HAVANA CLUB

Goods/Services
     IC 033; US 049; G & S: RUM; FIRST USE: 1913.11.01; FIRST USE IN COMMERCE:
     1913.11.01

Mark Drawing Code
     (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS

Design Search Code
     04.01.25; 20.03.10; 26.11.21

Serial Number
     73-023981

Filing Date
     1974.06.12

Registration Number
     1031651

Registration Date
     1976.01.27

Owner Name/Address
     (REGISTRANT) EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS
     DBA CUBA EXPORT COMPANY CUBA 55, 23RD ST. VEDADO HAVANA CUBA

Section 44
     SECT 44

Disclaimer

*Renewed for 10 years from 1996*

\*\*\* Search: 3 \*\*\* Document Number: 58 \*\*\*                                    (cont)

*** User: EX188284 *** Serial Number: 73023981 *** 

    APPLICANT DISCLAIMS THE WORDS "HAVANA" AND "FUDNADA EN 1878" APART FROM
    THE MARK AS A WHOLE.

Description of Mark
    THE DRAWING IS LINED FOR THE COLOR GOLD.

Type of Mark
    TRADEMARK

Register
    PRINCIPAL

Affidavit
    SECT 8.

*** Search: 3 *** Document Number: 58 ***

*** User: EX188284 *** Serial Number: 74522925 ***

Word Mark
    HAVANA CLUB

Goods/Services
    IC 033; US 049; G & S; distilled liquors

Mark Drawing Code
    (1) TYPED DRAWING

Serial Number
    74-522925

Filing Date
    1994.05.02

Owner Name/Address
    (APPLICANT) JOSE MA. ARECHABALA RODRIGO INDIVIDUAL SPAIN Paseo Castellana
    132 Madrid SPAIN 28046

Type of Mark
    TRADEMARK

Register
    PRINCIPAL

Abandoned 7/97

# EXHIBIT 13

12-14-2000

U.S. Patent & TMOfis/TM Mall Rept. Dt. #



## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:              BACARDI & COMPANY LIMITED

Trademark:              HAVANA CLUB

Serial No.:             74/572,667

Filed:                  September 12, 1994

International Class:     33

RECEIVED
2000 DEC 14 P 11
T.M.E.O.
LAW OFFICE 107

To the Assistant Secretary and Commissioner of Patents and Trademarks:

Applicant, BACARDI & COMPANY LIMITED hereby requests that Application

Serial No. 74-572,667 for HAVANA CLUB be lifted from suspension and be allowed to proceed

to publication. The reason for this request is that the time for all appeals having expired, a final

judgment has been rendered in the case of *Havana Club Holding, S.A. et al. v. Galleon, S.A. et*

*al*, 96 Civ. 9655 (S.D.N.Y.), which was the civil action on which the suspension was based

Dated:    New York, New York
          December 13, 2000

Respectfully submitted,

KELLEY DRYE & WARREN
Attorneys for Applicant
Bacardi & Company Limited

T.M.E.O.
LAW OFFICE 107
2000 DEC 18 A 10 38
RECEIVED

By: *William R. Golden, Jr.*
    William R. Golden, Jr.
    Margaret Ferguson
    101 Park Avenue
    New York, New York 10178
    (212) 808-7800

NY01/FERGM/577834.1                    -1-

12-14-2000
U.S. Patent & TMOffice/TM Mail Rcpt. Dt. #40

107

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

AMENDMENT TO ALLEGE USE UNDER 37 CFR 2.76, WITH DECLARATION

Applicant:      BACARDI & COMPANY LIMITED

Mark:           HAVANA CLUB

Serial No.:     74-572667

Filed:          September 12, 1994

Int'l Class:    33

To The Assistant Secretary and Commissioner of Patents and Trademarks:

      Applicant, BACARDI & COMPANY LIMITED ("BACARDI"), which by

merger and operation of law is the surviving corporation and successor-in-interest to Galleon,

S.A., the original applicant, requests registration of the above-identified trademark in the United

States Patent and Trademark Office on the Principal Register established by the Act of July 5,

1946 (15 U.S.C. § 1051 et seq., as amended).  One (1) specimen per class showing the mark as

used in commerce is submitted with this amendment, along with the filing fee of $100.00.

      Applicant is using the mark in commerce on or in connection with the following

goods identified in the Notice of Allowance in this application:

12/19/2000 THARLEY  00000070 74572667
01 FC:362              100.00 OP          Rum in International Class 33.

      The trademark was first used on or in connection with the aforesaid goods

through BACARDI's predecessor-in-interest, Jose Arechabala, S.A. ("JASA") at least as early as

1934; was first used on or in connection with the goods in interstate commerce at least as early as

1934 through BACARDI's predecessor-in-interest, JASA; and BACARDI, initially through its

predecessor-in-interest and related company, Galleon, S.A., and then after the aforesaid merger,

in its own name, has been using said mark in connection with the goods in interstate commerce

since 1995. BACARDI through an agreement with JASA and its successors and equity holders acquired all right, title and interest in and to the HAVANA CLUB trademark for rum in the United States, so that BACARDI has the consent of the original Cuban trademark owner, within the meaning of Section 211, Pub. L. No. 105-277 (1998), to use the HAVANA CLUB trademark in the United States.

The HAVANA CLUB trademark is not geographically misdescriptive as was determined by the Commissioner of Patents and Trademarks with respect to the use of the very same mark by JASA, BACARDI's predecessor-in-interest. *See Jose Arechabala, S.A. v. Ramirez*, 66 U.S.P.Q. 7 (June 23, 1945). A true and correct copy of the aforesaid decision is attached hereto as Exhibit A. Furthermore, the HAVANA CLUB mark was being used by BACARDI in interstate commerce in the United States on and before January 1, 1996, and in connection with the adoption of the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809, all such trademarks then in use which consist of a geographical indication, and which, when used on or in connection with wines or spirits, identifies a place other than the origin of the goods, are grandfathered, so the designation HAVANA CLUB may not be denied registration on the Principal Register as a trademark for rum.

## DECLARATION

The undersigned being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, declares that: the declarant is properly authorized to execute this Amendment to Allege Use on behalf of the applicant; that she believes the applicant to be the owner of the trademark sought to be registered; the trademark is now and was in use in commerce on and



before January 1, 1996;[1] and that all statements made of her own knowledge are true and all

statements made on information and belief are believed to be true.

Dated: _November 2_, 2000                    BACARDI & COMPANY LIMITED

By: _____

Name:  Linda Beidler-D'Aguilar

Title:  Vice President - Legal

---

[1]    Bacardi's sales of HAVANA CLUB were temporarily suspended in order to facilitate the
       appeal in the related litigation.





ported to be granted to the purchaser * * *" (Starr) including the "right to make one or more motion picture versions thereof and to assign to others the right to do so." (Italics mine)

The contract between plaintiff and Starr required the latter to announce on the film and in paid advertising of such motion picture photoplays that came was based or adopted from or suggested by the aforesaid literary or musical composition written by plaintiff.

"Together with the name of the Sellers, except where the name of such photoplay shall be published with the names of other photoplays in group or list advertising, the name of MAUDE NUGENT need not be announced in connection therewith."

4. On July 10, 1925 Starr sold, assigned, conveyed and transferred to Columbia Pictures Corp., all his right, title and interest in and to the motion picture rights in the musical composition "Sweet Rosie O'Grady."

The assignment to Columbia by Starr was made subject to the foregoing provision of the contract between Starr and plaintiff.

B. Thus plaintiff assigned to Starr and his assigns, all her motion picture rights in her song and she gave Starr or his assigns permission to obtain a copyright on any motion picture that might be produced under the assignment. A motion picture was made by Columbia and it obtained a copyright thereon Nov. 22, 1926. (See Special Stat. of 1912, 37 Stat. 488; 17 U.S.C.A. Sec. 6, which allowed it to do so.)

Attached to defendant's motion papers is an affidavit of Leo Jaffe, Assistant Treasurer of Columbia, who avers that Columbia has not transferred, conveyed or assigned to plaintiff any right or interest of any kind or type which Columbia acquired by assignment from Starr.

C. Plaintiff's contention that only a license to "make one motion picture was granted by her assignment to Starr is squarely negated by the wording of the contract and the recorded assignment to Starr.

D. It does not appear that Columbia ever assigned or licensed defendant to produce the motion picture entitled "Sweet Rosie O'Grady", whether it infringes upon Columbia's copyright or whether Columbia has ever sued defendant for or claimed an infringement.

[X] E. But as each new arrangement of a song is separately copyrightable, Carte v. Evans, 27 F. 861, 862 (S. D. Mass.) Edmonds v. Stern, 248 F. 897 (CCA 2), so each new motion picture made from a particular song might be so distinct as to be separately copyrightable, Harper & Bros. v. Kalem Co. 169 F. 63, 64 (CCA 2) aff'd 222 U.S./55.

(2) Since Columbia was given the right only to protect the copyright on its own motion picture against infringement, Columbia might not be the proper party to sue and the plaintiff could in that event sue for infringement of the song copyright under the rights she reserved in her contract with Starr. Kalem Co. v. Harper Bros., 222 U. S. 56; See Goldwyn Pictures Corp. v. Howells Sales Co., Inc., 282 F. 3 (CCA 2). This latter case seems to hold that the owner of the original material could sue for infringement of a motion picture allegedly made from that material, provided there is no outstanding copyright, on a motion picture made with the consent of the owner of the original material, which would also be infringed. See O'Neill v. General Film Co., 171 App. Div. 854, 866, 869; Societe des Films Menchen v. Vitagraph Co., 251 F. 258, (CCA 2); De Croisset v. Vitagraph Co. of America, 262 F. 100.

F. It appears, therefore, a question of fact exists whether plaintiff is the proper party to sue for alleged infringement because it has not also been shown whether defendant's picture is made with the consent of, or infringes upon, the Columbia copyright or may be within the domain of the plaintiff's copyright. Motion denied.

---

### Commissioner of Patents

JOSE ARECHABALA, S. A. v. RAMIREZ

Decided June 23, 1945

### TRADE MARKS

1. Identity and similarity—Words Dominant "Havana Gold" above descriptive "Porto Rican Rum," with pictorial design, is confusingly similar to "Havana Club".

Appeal from Examiner of Interferences.

Trade mark cancellation No. 4159 by Jose Arechabala, S. A., against Victor M. Ramirez, Registration No. 383166 issued June 10, 1941. From decision sustaining petition, registrant appeals. Affirmed.

*Ex parte Journeymen Barbers Intern'l. Union of America* · 65 USPQ

JONES & ROE, New York, N. Y., for Jose
Arechabala, S. A.
VICENTE PALES MATOS, Mayaguez, Puerto
Rico, and BEEKMAN AITKEN, New York,
N. Y., for Ramirez.

FRAZER, Acting Commissioner.

This is an appeal from the decision of
the Examiner of Interferences sustaining
the petition of Jose Arechabala, S. A.,
to cancel trade mark registration No.
388,166, issued June 10, 1941, under the
provisions of the Act of March 19, 1920,
to Victor M. Ramirez.

The registered mark, which is applied
to "distilled alcoholic rum," is a com-
posite one. It comprises the notation
"Havana Gold" above the descriptive
legend "Porto Rican Rom," displayed in
association with a pictorial design. Its
dominant feature unquestionably is the
notation "Havana Gold."

Petitioner has established prior use of
the trade mark "Havana Club," likewise
registered under the Act of 1920, for
"ethyl alcohol, rum, brandy, cognac, and
other potable distilled liquors." Thus the
sole issue to be determined is whether
petitioner's mark and respondent's mark
are confusingly similar.

Respondent asserts that the only simi-
larity between his mark and petitioner's
resides in the word "Havana," and that
this word is "geographically descriptive."
He says it is "common knowledge" that
Havana "is noted as an important source
of rum." I must confess that I lack such
knowledge, and respondent has adduced
no evidence from which I might be so
informed. In fact, what evidence there
is in the record is derogative of respond-
ent's position. Petitioner's labels indi-
cate that its "Havana Club" rum is dis-
tilled and bottled in Cardenas, Cuba, and
identify it as Cuban rum. And respond-
ent's labels indicate that his "Havana
Gold" rum is produced and bottled in
Ponce, P. R., and identify it as Porto
Rican rum.

[1] From the record before me, I am
convinced that purchasers would pay con-
siderable attention to the word "Havana"
as denoting origin of the rum in ques-
tion. It therefore seems clear to me that
concurrent use of petitioner's and re-
spondent's marks on goods of this char-
acter would be reasonably likely to cause
confusion.

The decision of the Examiner of In-
terferences is affirmed.

## Commissioner of Patents

*Ex parte* THE JOURNEYMEN BARBERS'
INTERNATIONAL UNION OF AMERICA.
Decided June 26, 1945.

TRADE MARKS.

1. Acquisition of marks—Character of
goods on which used
Registration—Act of 1920
1920 Act registration of collective
mark for union shop cards is refused
since everything appearing on drawing is
functional part of union card rather than
trade mark for union shop cards; also, mark
is devoid of trade mark significance in
connection with alleged "goods".

Petition from Examiner of Trade
Marks.

Application for registration of trade
mark of The Journeymen Barbers' Inter-
national Union of America, Serial No.
455578, filed Sept. 15, 1942. From deci-
sion refusing registration, applicant peti-
tions. Affirmed.

See also 36 USPQ 559.

LESTER L. SARGENT, Washington, D. C.,
for applicant.

FRAZER, Acting Commissioner.

This is a petition from the refusal of
the Examiner of Trade Marks to reg-
ister an alleged trade mark, under the
provisions of the Act of March 19, 1920,
as amended by the Act of June 10, 1938,
as a collective mark for "union shop
cards, issued at irregular intervals."

In a decision rendered February 28,
1938 (488 O.G. 388, 36 USPQ 559), I
affirmed the examiner's refusal to reg-
ister this same mark for the same goods
under the Act of February 20, 1905; the
only difference being that a portion of
the subject matter then sought to be
registered has now been deleted.

The examiner has rejected the applica-
tion on the ground that the mark is
"merely applicant's goods or a substan-
tial part of the goods." The basis of his
decision is thus the same as in the prior
case; and the views I there expressed are
equally applicable here. It is still
[1] true that everything appearing on
the drawing is a functional part of a
union card rather than a trade mark for
a union card. Also, the mark is plainly
devoid of any possible trade mark sig-
nificance in connection with applicant's
alleged "goods."

The decision of the Examiner of Trade
Marks is affirmed.

# EXHIBIT 14



**KELLEY DRYE & WARREN** LLP

A LIMITED LIABILITY PARTNERSHIP

101 PARK AVENUE

NEW YORK, NEW YORK 10178

(212) 808-7800

WASHINGTON, DC
TYSONS CORNER, VA
LOS ANGELES, CA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ
———
BRUSSELS, BELGIUM
HONG KONG
———
AFFILIATE OFFICES
BANGKOK, THAILAND
JAKARTA, INDONESIA
MUMBAI, INDIA
TOKYO, JAPAN

FACSIMILE
(212) 808-7897
www.kelleydrye.com

DIRECT LINE (212) 808-7684
E-MAIL: mferguson@kelleydrye.com

April 12, 2002

VIA EXPRESS MAIL

BOX RESPONSES – NO FEE
Assistant Commissioner for Trademarks
2900 Crystal Drive
Arlington, VA 22202-3513

Attention:    David Reihner, Esq.
              Examining Attorney
              Law Office 107

Re:    Mark: HAVANA CLUB
       Serial No. 74/572,667

Dear Sir:

In connection with the above-captioned trademark application, we enclose a
Response to Office Action No. 5 and the accompanying Affidavit of Ramon Arechabala.

Kindly acknowledge receipt of same by stamping and returning the enclosed self-
addressed postcard.

Sincerely,

Margaret Ferguson

MF:aie
Enclosures

NY01/FERGM/565931.1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

SERIAL NO.:            74/572,667

TRADEMARK:            HAVANA CLUB

APPLICANT:            BACARDI & COMPANY LIMITED

EXAMINING ATTORNEY: DAVID C. REIHNER, ESQ.
                    LAW OFFICE 107
                    (703) 308-9107, Ext. 169

**TO THE ASSISTANT COMMISSIONER OF TRADEMARKS:**

This is in response to Office Action No. 5 relating to the above-referenced application by Bacardi & Company Limited (hereinafter "Bacardi" or "Applicant") that was mailed on October 12, 2001.

**I.        REQUEST FOR SUSPENSION**

Applicant respectfully requests that prosecution of the instant application, Serial No. 74/572,667, be suspended. One of the issues addressed in the Office Action is the maintenance of a refusal to register the mark under Section 2(d) of the Trademark Act on the basis of Registration No. 1,031,651 for HAVANA CLUB for rum. It is noted that at the time this Office Action was served, Bacardi believed Registration No. 1,031,651 had been canceled. Thereafter, the Patent and Trademark Office (the "PTO") issued, on October 26, 2001, an Order to Show Cause relating to the aforesaid Registration and, on January 15, 2002, a Notice (the "Notice") that the assignments of said Registration were being deleted from the records of the PTO. On March 15, 2002, Bacardi filed a Petition for Review of the Notice in the United States Court of Appeals for the Federal Circuit, which is pending. On April 9, 2002, Bacardi was advised by the interlocutory attorney at the Trademark Trial and Appeal Board that the cancellation proceeding Bacardi had commenced in the PTO relating to Registration No.

 

1,031,651 would be suspended pending the outcome of the Petition for Review of the Notice in the Federal Circuit and that an order confirming the aforesaid suspension would be issued. Moreover, in 2001 Bacardi was advised by Thomas LaMone of the PTO that the instant application would remain suspended until such time as the aforesaid cancellation proceeding was resolved.

Accordingly, in light of the foregoing, Bacardi respectfully requests that its application Serial No. 74/572,667 be suspended immediately until after a decision has been rendered in the pertinent cancellation proceeding relating to Registration No. 1,031,651, which has itself been suspended pending a resolution in the Federal Circuit as to the Petition for Review of the Notice.[1] Bacardi further submits that the instant request for a suspension be without prejudice and that upon the resolution of the aforesaid cancellation proceeding and the re-instatement of this application, applicant be permitted to submit arguments and evidence in response to any and all bases that have been or are to be raised by the examining attorney as precluding registration of the instant application, Serial No. 74/572,667.

**II.        DESCRIPTION OF GOODS**

The Examining Attorney has noted that the Amendment to Allege Use (the "Amendment") filed in connection with Application Serial No. 74/572,667 contained fewer goods than was previously set forth in the application and has inquired as to whether this was intentional. Specifically, the Amendment alleged use for "rum" and the application pertained to "rum, distilled spirits specialty containing rum and prepared alcoholic cocktail containing rum."

---

[1]     A cancellation proceeding has also been commenced by Bacardi against Registration No. 1,956,660 for CUBAN CLUB RUM, which proceeding is pending. The aforesaid registration has been cited under Section 2(d) of the Trademark Act against the instant application.

 

Notwithstanding that applicant has filed the Amendment as to "rum", applicant continues to have a *bona fide* intention to use the mark HAVANA CLUB for "distilled spirits specialty containing rum and prepared alcoholic cocktail containing rum." Accordingly, applicant intends, pursuant to 37 C.F.R. Section 2.6(a)(1), to divide out of Application Serial No. 74/572,667 the goods "distilled spirits specialty containing rum and prepared alcoholic cocktail containing rum" and to request that a new application with the same filing date as the instant application be created therefor.

**III.    APPLICANT'S CLAIM, IN THE ALTERNATIVE, OF ACQUIRED DISTINCTIVENESS**

The Examining Attorney has suggested the possibility of a claim under Section 2(f) of the Trademark Act that the HAVANA CLUB mark for rum has acquired distinctiveness, which claim, if accepted, would cause the refusal to register under Section 2(e)(3) to be withdrawn. The Examining Attorney was unaware that in a prior decision by the Commissioner of Patents a determination which is *res judicata* was made that the HAVANA CLUB mark is inherently distinctive and not misdescriptive in any manner for rum. *See Jose Arechabala, S.A. v. Ramirez*, 66 U.S.P.Q. 7 (June 23, 1945), attached as Exhibit D to the Affidavit of Ramon Arechabala enclosed herewith and ¶ 16 of said Affidavit. Applicant maintains in accordance with this decision that the HAVANA CLUB mark is inherently distinctive for rum.

If, notwithstanding the foregoing, the Examining Attorney adheres to the suggestion that a claim under Section 2(f) may be appropriate, but is of the view that such a claim cannot be preserved and asserted at a later time and, thus, must be asserted now, then applicant, in the alternative and solely in the interest of advancing the prosecution of the instant application, submits that said HAVANA CLUB mark has acquired distinctiveness by reason of substantially exclusive and continuous use in commerce by applicant and its predecessors.



§ 1212.02(c). Since applicant maintains that the underlying basis for the refusal to register the instant mark under Section 2(e)(3) is improper, this alternative claim under Section 2(f) is not a concession that the mark at issue is not inherently distinctive. TMEP § 1212.02(c).

Jose Arechabala, S.A. ("JASA") was a Cuban corporation headquartered in Cardenas, Cuba. JASA succeeded to the rum business originally founded by the Arechabala family in the latter half of the 1800's. In the early 1930's, JASA adopted and began to use the trademark HAVANA CLUB for rum, produced mainly for export to the United States. The HAVANA CLUB trademark for rum was first used in the United States by JASA and its shareholders commencing at least as early as 1934. *See* Affidavit of Ramon Arechabala ¶¶ 1-4.

In that year, Cuban Registration No. 53,614 of the mark HAVANA CLUB was issued to JASA for "alcohol, rum, etc." On May 14, 1935, the trademark HAVANA CLUB for "Ethyl alcohol, rum, etc." was registered by JASA under No. 324,385 in the United States Patent and Trademark Office ("PTO"). On June 16, 1936, JASA registered the trademark HAVANA CLUB and Design for "rum, etc." in the PTO under No. 335,919. The Design portion of that registered mark included the words "Founded 1878", a reference to the date the Arechabala family rum business began in Cuba. On August 11, 1953, the PTO issued two registrations to JASA on the Supplemental Register of Design trademarks incorporating the words HAVANA CLUB under Nos. 578,679 and 578,680, respectively. Registration No. 632,828 for the mark HAVANA CLUB for "rum" issued on August 14, 1956. *See* Affidavit of Ramon Arechabala at ¶ 5 and Exhibit A attached thereto.

During the period from 1934 to 1960, JASA continued to export HAVANA CLUB rum for distribution and sale in the United States. JASA's HAVANA CLUB rum was produced both in Cuba and Puerto Rico. JASA began exporting HAVANA CLUB rum from

Cuba to the United States in 1934 through a U.S. distributor. *See* Affidavit of Ramon Arechabala at ¶ 6. JASA sales representatives maintained offices in the United States through which JASA promoted sales of HAVANA CLUB rum throughout the country. *Id.* at ¶ 7. JASA extensively promoted, advertised and sold its HAVANA CLUB rum in U.S. hotels, nightclubs and bars, and among consumers, *Id.* at ¶¶ 7, 8, & 9 and Exhibits B & C attached thereto, and, on information and belief, the mark was the subject of extensive third party press. *Id.* at ¶ 10. As a result of this long and extensive advertising, promotion, and sale, the HAVANA CLUB mark came to be known in the United States as identifying rum emanating exclusively from JASA and as distinguishing that rum from the products of others. JASA's HAVANA CLUB rum had become so famous that it had achieved secondary meaning which persists to date.

In October 1960, the Revolutionary Cuban Government promulgated Cuban Law 890 ("Law No. 890"). By its terms, Law No. 890 expropriated the physical assets, property, accounts and business records of all Cuban manufacturing companies, including JASA. *Id.* at ¶¶ 11 & 12. The seizure of JASA property, assets and records was effected by Cuban armed forces. JASA's plant was taken over, all corporate books and records were confiscated, and, in the following weeks, key JASA representatives were jailed. *Id.* at ¶¶ 13 & 14. No compensation was ever paid directly or indirectly to JASA or its owners, by the Cuban government. *Id.* at ¶ 12. Not long after the expropriation of the JASA operations, JASA shareholders fled Cuba and were prevented from taking any personal belongings, corporate records or money and compelled to leave the physical assets of the manufacturing plant for HAVANA CLUB rum in the control of the Cuban special forces. *Id.* at ¶ 15. Members of JASA were nonetheless able to take with them the secret formula for JASA's HAVANA CLUB rum, which had been committed to memory. *Id.* at ¶ 17.

In 1963, the United States Department of the Treasury pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 1 et. seq. issued the Cuban Asset Control Regulations ("CACR") imposing a total embargo on all trade between the United States and Cuba. These regulations, inter alia, have prohibited the importation, distribution or sale in the United States of rum produced in Cuba. (31 CFR Part 515). Those regulations remain in effect today.

Throughout the period of time following the confiscation in 1960 of the JASA facilities and assets in Cuba leading up to the 1990s, the surviving former executives of JASA and the great majority of its shareholders believed that the tyranny of the existing regime would not long survive in Cuba and that once the rule of law was restored, that the property and assets that had been forcibly taken from JASA would be returned. JASA executives and shareholders did their best to preserve their rights, but since the principal assets of JASA had been situated in Cuba and were confiscated without any compensation, the resources available to them were extremely limited. Nonetheless, the JASA shareholders never gave up their fight and through their perseverance, a deal was ultimately reached with Bacardi that put them in the position to achieve their objectives. Id. at ¶¶ 1, 18 & 19. Prior to January 1, 1996, Bacardi, with the Arechabalas' consent, produced rum which was being offered for sale under the HAVANA CLUB mark in interstate commerce in the United States. Id. at ¶ 19.

Pursuant to the Lanham Act, 15 U.S.C. § 1052(a), et. seq., as amended, a trademark for rum such as the HAVANA CLUB mark which may arguably have geographic significance but which was in use prior to January 1, 1996 is exempt from any statutory proscription against the use of trademarks on the ground that it might otherwise be considered geographically misdescriptive. In the Statement of Administrative Authority, Cong. Rec. Vol. 140 (1994), U.S.C.C.A.N., 103d Cong. 2d Sess. 1994, Congress, in connection with TRIPs,

explicitly stated, with respect to wine and spirits brands, that "[a]ny trademark containing a geographic indication that is currently registered or *in use*, or that is registered or *in use* [before January 1, 1996] *may be maintained*" (emphasis added). This policy was incorporated in the amendment to 15 U.S.C. § 1052(a), which "grandfathers" the usage by applicant of the mark HAVANA CLUB. Thus, the geographic misdescriptiveness objection under Section 2(e)(3) is not well founded.

IV.        **SECTION 2(D)**

Applicant respectfully submits that if the instant application is not suspended as requested herein, *supra*, that the refusal to register the instant mark under Section 2(d) of the Trademark Act based upon, *inter alia*, Registration No. 1,031,651 for HAVANA CLUB and No. 1,956,660 for CUBAN CLUB RUM be withdrawn inasmuch as neither Registration has been validly maintained.

No application for renewal by Empresa Cubana Exportadora de Alimentos y Productos Varios, the putative owner, is on file with the U.S. Patent and Trademark Office as to Registration No. 1,031,651 and the permissible time for filing same has long been closed. Thus, in accordance with the provisions of the Trademark Act, Registration No. 1,031,651 has expired. An expired registration merely constitutes evidence that the registration issued and hence, an expired registration is incompetent as evidence of any presently existing rights in the designation that had once been the subject of the registration. *See Sunnen Products Co. v. Sunex Int'l Inc.*, 1 USPQ2d 1744, 1747 (TTAB 1987). Although the Examining Attorney has cited Registration No. 1,031,651 against the instant application, Section 2(d) presupposes that a cited registration be validly subsisting which Reg. No. 1,031,651 cannot be since it never was validly renewed as is shown by the PTO's records. Judicial notice of the correct facts as evidenced in the records of

 

the PTO must be taken. *Cf.* 703.02(a) Trademark Manual of Board Procedure and the cases cited

therein.  Accordingly, as judicial notice must be taken of the records of the PTO showing that no

renewal has been filed, the aforesaid Registration cannot be deemed in good standing and cannot

be cited as evidence of any existing rights under Section 2(d) of the Trademark Act.

Similarly, on information and belief, no affidavit of continued use has been filed

as to Registration No. 1,956,660.  That registration, which should be cancelled as well, cannot be

the basis for a proper objection to registration.

In light of the foregoing, the objections to registration under Section 2(d) of the

Trademark Act should be withdrawn.

V.       **CONCLUSION**

For the reasons stated herein, applicant respectfully requests that the instant

Application Serial No. 74/572,667 be suspended or, in the alternative, that the bases for the

refusal to register set forth in the Office Action be withdrawn and the application be allowed to

proceed to publication.

Dated: New York, New York                   Respectfully submitted,
      April 12, 2002                         KELLEY DRYE & WARREN LLP
                                    Attorneys for Applicant

                                  By: *Margaret Ferguson*
                                     William R. Golden, Jr.
                                     Margaret Ferguson
                                     Michelle M. Graham
                                     101 Park Avenue
                                     New York, New York 10178
                                     (212) 808-7800



**CERTIFICATE OF EXPRESS MAILING**

**EXPRESS MAIL LABEL NO.:** E *T6 22700814* US

**DATE OF DEPOSIT: APRIL 12, 2002**

      The undersigned hereby certifies that this paper or fee is being deposited with the United

States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the

date indicated above and is addressed to the Box RESPONSES NO FEE, Assistant

Commissioner for Trademarks, 2900 Crystal Drive, Arlington, Virginia 22202-3513.

Margaret Ferguson

NY01/FERGM/717352.4           9

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

STATE OF FLORIDA    )
                    ) ss:
COUNTY OF DADE      )

### AFFIDAVIT OF RAMON ARECHABALA

RAMON ARECHABALA, being duly sworn, deposed and says:

1.    I am a member of the Arechabala family which commenced the manufacture of HAVANA CLUB rum at our distillery in Cardenas, Cuba in 1878. I was a shareholder in the family-owned company, Jose Arechabala, S.A. ("JASA"), and was employed by that company from 1956 through 1960 as Sales Manager. JASA is the predecessor-in-interest of Applicant, Bacardi & Company Limited ("Bacardi").

2.    I make this Affidavit in support of Bacardi's Application Serial No. 74/572,667 for registration of the mark HAVANA CLUB for "rum."

3.    JASA's HAVANA CLUB rum was made with a secret Arechabala family formula which was passed down from generation to generation by word of mouth. Our HAVANA CLUB rum has been praised by connoisseurs throughout the world for its smooth flavor. I am one of the few remaining Arechabala family members with knowledge of the secret formula for HAVANA CLUB rum which was passed along to Bacardi's rum masters. The secret formula for HAVANA CLUB rum was never disclosed to the Cuban government or to Pernod.

4.    The HAVANA CLUB mark was registered by JASA in Cuba in 1934 and later in the United States.

5.    The United States Patent and Trademark Office issued to JASA the following trademark registrations for the mark HAVANA CLUB and related bottle label designs:

NY01/GRAHM/698635.1

- Registration No. 324,385 for the mark HAVANA CLUB for "ethyl alcohol, rum, brandy, cognac and other potable distilled liquors" which issued on May 14, 1935;

- Registration No. 335,919 for the HAVANA CLUB bottle label design for "rums, brandies and whiskies" which issued on June 16, 1936;

- Registration No. 578,679 for the HAVANA CLUB bottle label design for "rum" which issued on August 11, 1953;

- Registration No. 578,680 for the HAVANA CLUB bottle label design for "rum" which issued on August 11, 1953; and

- Registration No. 632,828 for the mark HAVANA CLUB for "rum" which issued on August 14, 1956.

Attached as Exhibit A are true and correct copies of the Certificates of Registration for the above marks.

6.      JASA began exporting HAVANA CLUB rum from Cuba to the United States in 1934. JASA's U.S. distributor was Williams Importers, a division of R.C. Williams & Co., with a place of business at 610 Fifth Avenue, New York, New York.

7.      My uncle, Ramon Arechabala Torrontegui, held the position of JASA's sales representative to the United States and maintained his office at the offices of our U.S. distributors, Williams Importers, at 610 Fifth Avenue, New York, New York. In that position, he promoted sales of HAVANA CLUB rum and secured contracts for the company, including a major contract with the Hilton Hotels organization in which the hotel chain sold HAVANA CLUB rum at all of its hotels throughout the country.

8.      JASA's efforts to associate the mark HAVANA CLUB with its rum in the United States was supported by substantial expenditures on advertising and promotional activities and materials featuring that mark.

9.      JASA extensively promoted the mark HAVANA CLUB for rum in the United States in print advertising, at nightclubs and bars and on printed collateral materials

2

distributed to consumers. For example, one of New York City's most celebrated nightclubs – El

Morocco – posted advertisements and displays prominently featuring the HAVANA CLUB

mark. Attached as Exhibit B is a true and correct copy of an advertisement for HAVANA CLUB

rum in the United States. Attached as Exhibit C is a promotional drink recipe booklet promoting

HAVANA CLUB RUM which was distributed to nightclubs, bars and consumers.

        10.     Upon information and belief, JASA's HAVANA CLUB rum has also

received significant press coverage after its introduction to the United States.

        11.     In October 1960, Cuban Law 890 was enacted to "definitively eliminate

the economic power of privileged interests" and to "proceed with nationalizing leading

manufacturing and trading companies which have not adapted and can never adapt to the

revolutionary reality of our nation," by confiscating without compensation the physical facilities

and other assets belonging to all Cuban manufacturing companies.

        12.     JASA headed the list of distilleries that were expropriated. No

compensation was ever paid to JASA or its owners by the Cuban government for the confiscated

property and assets.

        13.     The armed forces of the revolutionary Cuban government of Fidel Castro

seized JASA's Cardenas plant at gun point in 1960. All of JASA's corporate books and records

were taken. My family and I were physically searched to prevent us from taking any documents

home.

        14.     After our family business was confiscated, I tried to stay on, even without

pay, but was eventually ordered to stay away. My cousin, Javier Marquez Arechabala, who

served as JASA's lawyer and corporate secretary, was sent to jail. I too was eventually jailed for

no reason, without due process.

NY01/GRAHM/698635.1

3

15.    After my release from jail, I was told that the government would concoct a charge to keep me there indefinitely unless I left Cuba.  Soon thereafter, I left Cuba with my wife and infant son with only the clothes on our backs.  Cuban government forces even confiscated the diaper bag my wife carried, placing our baby's bottles and diapers in a paper bag because they said her diaper bag was too expensive.  Like most of my relatives, we fled to Madrid; other family members went to the United States.  None were allowed to take any personal belongings or corporate records or money.

16.    Jose Arechabala, S.A. made HAVANA CLUB rum under license in Puerto Rico as well as Cuba.  The Commissioner of Patents and Trademarks determined that use of the "HAVANA CLUB" mark on rum made in Puerto Rico was not misdescriptive.  *See Jose Arechabala, S.A. v. Ramirez*, 66 U.S.P.Q. 7 (June 23, 1945).  Attached as Exhibit D is a true and correct copy of that decision.

17.    My brother, Jose, and I, nevertheless, managed to take with us the secret formula for HAVANA CLUB rum which I had committed to memory.

18.    Bacardi acquired the original formula to make HAVANA CLUB rum in 1997 when it purchased JASA's rights to the HAVANA CLUB mark, the related goodwill of the business and any rum business assets that my family still owned.

19.    Bacardi, with the consent of the Arechabala's, resumed sales of HAVANA CLUB rum in the United States and that HAVANA CLUB rum was being offered for sale under the HAVANA CLUB trademark on and before January 1, 1996.  I have tasted the HAVANA CLUB rum made by Bacardi and it meets the high standards the Arechabala's set for the HAVANA CLUB rum made at our family distillery.  I have also tasted the bogus HAVANA

4

CLUB rum put out by the Cuban government, and this product emphatically does not meet our standards.

DATED:  March 19, 2002
             Miami, Florida

Sworn to me before this 17th day of March 2002.

_____
Ramon Arechabala

_____
Notary Public

Ginny Adames
MY COMMISSION #  D0084708  EXPIRES
February 5, 2006
BONDED THRU TROY FAIN INSURANCE, INC.



E  3459

Registered May 14, 1935

Trade-Mark 324,385

# UNITED STATES PATENT OFFICE

Jose Arechabala S. A., Cardenas, Cuba

Act of March 19, 1920

Application October 25, 1933. Serial No. 342,567

# HAVANA CLUB

## STATEMENT

To the Commissioner of Patents:

Jose Arechabala S. A., a corporation organized under the laws of the Republic of Cuba, and doing business at block limited by Dts. 2nd and 3rd and 11th and 13th Aves., Cardenas, Matanzas Province, Republic of Cuba, has adopted and used the trade-mark shown in the accompanying drawing, for

Ethyl Alcohol, Rum, Brandy, Cognac, and Other Potable Distilled Liquors, in Class 49, Distilled alcoholic liquors, and presents herewith five specimens (or facsimiles), showing the trade-mark as actually used by applicant upon the goods, and requests that the same be registered in the United States Patent Office in accordance with the act of March 19, 1920.

The trade-mark has been continuously used and applied to said goods in applicant's business since September 4, 1933.

The mark has been in bona fide use for not less than one year in commerce between the Republic of Cuba and the United States of America by the applicant.

The trade-mark is applied or affixed to the goods, or to the packages containing the same by means of labels whereon the trade-mark is shown.

Said trade-mark has been registered in the Republic of Cuba under No. 53,614, dated March 19, 1934.

The undersigned hereby appoints the firm of Hervey, Barber & McKee, consisting of Lanier McKee, Morrison T. Hankins, and Wm. Sherman Greene, Jr., whose postal address is 34 Nassau Street, New York city, New York, its true and lawful attorneys, to prosecute this application for registration, with full powers of substitution and revocation, and to make alterations and amendments therein, to receive the certificate, and to transact all business in the Patent Office connected therewith. Said firm is designated on whom process or notice of proceedings affecting the right to ownership of said trade-mark brought under the laws of the United States may be served.

JOSE ARECHABALA S. A.,
By J. FERMIN ITURRIOZ,
Vice-President.

DEFENDANT'S
EXHIBIT
583

E 3460

Registered June 16, 1936      Trade-Mark 335,919

# UNITED STATES PATENT OFFICE

José Archabala, S. A., Cárdenas, Cuba

Act of February 20, 1905

Application March 9, 1936. Serial No. 243,333



HAVANA CLUB
BRAND
*Straight Cuban*
RUM

JOSE ARECHABALA, S. A.

FEBRUARY 27, CUBA

## STATEMENT

*To the Commissioner of Patents:*

José Archabala, S. A., a corporation organized under the laws of the Republic of Cuba, and doing business at block limited by 2d, 4th, 7th Street, and 11th and 13th Avenues, Cárdenas, Matanzas Province, Republic of Cuba, has adopted and used the trade-mark shown in the accompanying drawing, for RUMS, BRANDIES AND WHISKIES, in Class 49, Distilled alcoholic liquors and presents herewith five specimens (or facsimiles) showing the trade-mark as actually used by applicant upon the goods, and requests that the same be registered in the United States Patent Office in accordance with the act of February 20, 1905, as amended.

This trade-mark has been continuously used and applied to said goods in applicant's business since February 5, 1935; applicant also being the owner of trade-mark registration No. 315,595, dated July 31, 1934.

All wording appearing in the drawing, with the exception of "Founded 1878" and applicant's name, is disclaimed apart from the mark shown in the drawing.

The trade-mark is applied or affixed to the goods, or to the packages containing the same by means of labels whereon the trade-mark is shown.

The undersigned hereby appoints the firm of Harvey, Barber & McKee, consisting of Lester M. Kee, Morrison T. Hankins and Wm. Sherman Greene Jr., whose postal address is 24 Nassau Street, New York city, New York, its true and lawful attorneys, to prosecute this application for registration, with full powers of substitution and revocation; to make alterations and amendments therein; to receive the certificate, and to transact all business in the Patent Office connected therewith.

Said trade-mark was registered in the Republic of Cuba on January 9, 1936, under No. 35,452. Said firm of Harvey, Barber & McKee, is designated on whom process or notice of proceedings affecting the right to ownership of said trademark brought under the laws of the United States may be served.

JOSÉ ARECHABALA, S. A.

By JOSÉ FERMIN ITURRIOZ Y. LLAGUNO,
*Vice-President.*

E 3461

Registered Aug. 11, 1953

AFFIDAVIT SEC. 8
ACCEPTED

Registration No. 578,679

SUPPLEMENTAL REGISTER
Trade-Mark

# UNITED STATES PATENT OFFICE

José Arechabala, S. A., Cardenas, Matanzas, Cuba

Act of 1946

Application November 24, 1951, Serial No. 621,463



## STATEMENT

José Arechabala, S. A., a corporation duly organized under the laws of Cuba, located at Cardenas, Cuba, and doing business at Calle 5, between the Avenues 11 and 13, Cardenas, Province of Matanzas, Cuba, has adopted and is using the trade-mark shown in the accompanying drawing, for RUM, in Class 49, Distilled alcoholic liquors, and presents herewith five specimens showing the trade-mark as actually used in connection with such goods, the trade-mark being applied by means of printed labels affixed to the bottles containing the goods, and requests that the same be registered in the United States Patent Office on the Supplemental Register, in accordance with the act of July 5, 1946.

The trade-mark was first used on June 3, 1950 and first used in commerce between Cuba and the United States which may lawfully be regulated by Congress, on June 3, 1950, and has been in lawful use in such commerce and in commerce among the several States of the United States

which may lawfully be regulated by Congress upon or in connection with the goods for the year preceding the filing of this application.

The lining on the drawing indicates the colors yellow-beige, and red.

Applicant is the owner of the following United States Trade-Mark Registrations: No. 335,919 dated June 16, 1936; No. 324,385 dated May 14, 1935; No. 315,536 dated July 31, 1934.

Haseltine, Lake & Co. (Robert S. Waters and Eric H. Waters being the members of the firm), whose postal address is 19 West 44th Street, New York 18, N. Y., U. S. A., are designated as applicant's representatives on whom notices or process in proceedings affecting the mark may be served.

JOSÉ ARECHABALA, S. A.
BY CORNELIO LARTITEGUI Y ACHIRICA,
Presidente p. s.

E  3462

Registered Aug. 11, 1953

Registration No. 578,680

AFFIDAVIT SEC. 8
ACCEPTED

SUPPLEMENTAL REGISTER
Trade-Mark

# UNITED STATES PATENT OFFICE

José Arechabala, S. A., Cárdenas, Matanzas, Cuba.

Act of 1946

Application November 20, 1951; Serial No. 631,461



## STATEMENT

José Arechabala, S. A., a corporation duly organized under the laws of Cuba, located at Cardenas, Cuba, and doing business at Calle 5, between the Avenues 11 and 13, Cardenas, Province of Matanzas, Cuba, has adopted and is using the trade-mark shown in the accompanying drawing, for RUM, in Class 49, Distilled alcoholic liquors, and presents herewith five specimens showing the trade-mark as actually used in connection with such goods; the trade-mark being applied by means of printed labels affixed to the bottles containing the goods, and requests that the same registered in the United States Patent Office on the Supplemental Register in accordance with the act of July 5, 1946.

The trade-mark was first used on June 3, 1950, and first used in commerce between Cuba and the United States which may lawfully be regulated by Congress, on June 3, 1950, and has been in lawful use in such commerce and in commerce among the several States of the United States which may lawfully be regulated by Congress, upon or in connection with the goods for the year preceding the filing of this application.

The lining on the drawing indicates the color red.

Applicant is the owner of the following United States Trade-Mark Registrations: No. 335,919; dated June 16, 1936; No. 324,345, dated May 14, 1935; No. 315,596 dated July 31, 1934.

Hazeltine, Lake & Co. (Robert S. Waters and Eric H. Waters being the members of the firm), whose postal address is 19 West 44th Street, New York 18, N. Y., U. S. A., are designated as applicant's representatives on whom notices or process in proceedings affecting the mark may be served.

JOSÉ ARECHABALA, S. A.

By CORNELIO LARTITEGUI Y ACHIRICA,
Presidente p. s.

E 3463

# United States Patent Office

632,828
Registered Aug. 14, 1956

### PRINCIPAL REGISTER
Trademark

**CANCELLED
SECTION 8**

Ser. No. 695,377, filed Sept. 27, 1955

## HAVANA CLUB

Jose Arechabala, S. A. (Cuban corporation)
5 Calle, between the Avenues 11 and 13
Cardenas, Matanzas Province, Cuba.

For: RUM, in CLASS 49.
First use Sept. 4, 1933; and in commerce Sept. 4, 1933.
Sec. 2(f).
Owner of Reg. Nos. 335,919, 578,679, and 578,680.





*Smoother drinks come from* **HAVANA CLUB RUM**





JOSE ARECHABALA, S. A., CUBA



Why have the West Indies been known for centuries as the source of the world's choicest rums? Because fine molasses of sugar cane is the indispensable base of high quality rum, and these islands produce the world's finest sugar cane.

Outstanding among Cuban rums is Havana Club, the pride of Jose Arechabala, one of the largest sugar planters on the island. Controlling, as they do, the quality of all their raw materials, Havana Club rums have maintained a standard of excellence unsurpassed by any

other producer and have been famous for this quality ever since Don José established the House of Arechabala back in 1878.

This is the rum praised by connoisseurs throughout the world for its smoothness and warm, mellow bouquet. This is the rum enjoyed by countless American tourists at the historic Havana Club Bar in Havana. And this is the rum now being enjoyed by Americans at home.

Millions of gallons of Havana Club are aging in huge warehouses at Cardenas, near romantic Havana, where visitors are always cordially welcomed. Yet not a single wooden cask is withdrawn for bottling and shipping until the rum reaches the Havana Club standard of quality.

# ARECHABALA'S
# EXTRA AGED RUM 75

Havana Club Rum (Gold Label)

Havana Club Rum (White label)

Arechabala's Brandy

Arechabala's Vermouth

Arechabala's Gin

Cordials of:

    Cacao

    Banana

    Pine-apple

    Appricot

    Mint (Green)

    Triple Sec

    Anisette



**SMOOTHER DRINKS COME**     **FROM HAVANA CLUB RUM**



ARECHABALA'S EXTRA AGED RUM

Prepare for a treat!
Three taste-tingling
cocktails... thanks to
the matchless smooth-
ness of mellowed
Havana Club Rum.

ARECHABALA'S
HAVANA CLUB RUM (GOLD LABEL)

*As Served at the Famous Havana
Club Bar in Havana, Cuba*

### FROZEN DAIQUIRI

*Havana Club Special*

* 1 jigger Havana Club White Label Rum
* Juice of half a lemon (or lime)
* 1 teaspoon of sugar
* Shake well with cracked ice
* Strain into a cocktail glass

*El Presidente Special*

* 1 jigger Havana Club Gold Label Rum
* Juice of half a lemon
* 1 teaspoon of Grenadine
* teaspoon of pineapple juice
* Shake well with cracked ice
* Strain into cocktail glass

## ARECHABALA'S
## HAVANA CLUB RUM (WHITE LABEL)

### Cuban Cocktail
* ⅔ Havana Club White Label Rum
* ⅓ Cointreau
* Juice of half a lemon (or lime)
* Shake well with cracked Ice
* Strain into cocktail glass

### Alexander Cocktail
* ⅓ Arechabala's Brandy
* ⅓ Arechabala's Cream de Cacao
* ⅓ sweet cream
* Shake well with cracked ice
* Strain into cocktail glass

### Frisco Cocktail
* ⅔ Havana Club White Label Rum
* ⅓ pineapple juice
* Juice of half a lime
* 1 teaspoon of sugar
* Shake well with cracked ice
* Strain into cocktail glass

## ARECHABALA'S BRANDY



### Habana Club Sour
* 1 jigger Havana Club Gold Label Rum
* Juice of half a lemon
* 1 teaspoon of sugar
* Shake well with Ice
* Strain into a sour glass
* Garnish with orange slice and cherry

### Old Fashioned Cocktail
* In an Old Fashioned Cocktail Glass
* ½ lump of sugar
* 2 dashes of bitters
* Add enough water to cover sugar
* Muddle well
* 1 cube of Ice
* 1 jigger Havana Club Gold Label Rum
* Stir well
* Garnish with orange slice and cherry



### ARECHABALA'S
#### CREAM OF COCOA CORDIAL

### ARECHABALA'S
#### HAVANA CORDIAL

### Rum Collins

In a Tall Glass
+ Juice of 1 lemon
+ 2 teaspoons of sugar
+ 2 ozs. Havana Club White Label
  Stir well and add ice
  Fill with sparkling water
  Garnish with a cherry

### Cuba Libre

In a Tall Glass
+ 1 jigger Havana Club
  Rum (Gold or White)
+ Juice of half a lemon (or lime)
+ Fill with your favorite Cola beverage
+ Add ice and stir well

### Rum Highball

In a Tall Glass with Ice
+ 1 jigger Havana Club Rum or Añejo 71
+ Fill with sparkling water or pale dry ginger ale
+ Twist of lemon or lime peel

### Rum Rickey

In a Medium Size Glass with Ice
+ 1 jigger Havana Club White Label Rum
+ Juice of half a lemon (or lime)
+ Add ice more (or lime) peel
+ Fill with sparkling water and stir well

### Silver or Golden Fizz

In a Cocktail Shaker
+ 1 jigger Havana Club White
  Label Rum
+ Juice of half a lemon
+ 1 teaspoon of sugar
+ White or yoke of an egg
  Add cracked ice and shake well
  Strain into medium size glass
+ Fill with iced sparkling water

### Rum Mint Julep

Tall Glass
teaspoon of sugar
+ A few small mint leaves
+ A few drops of lemon or lime juice
  Crush and muddle. Fill glass with crushed ice
+ Add 1 jigger Havana Club White Label Rum
+ Dash Ardine Green Crème de Menthe
  Stir very well and garnish with mint sprig

### ARECHABALA'S
# PINE APPLE



### ARECHABALA'S
# APRICOT CORDIAL

## Milk Punch

In a Cocktail Shaker
- 1 Jigger Havana Club Gold Label Rum
- ½ glass of milk
- 1 teaspoon of sugar
- Shake well with cracked ice, strain into glass
- Sprinkle with grated nutmeg

## Egg Nogg

In a Cocktail Shaker
- 1 Jigger Havana Club Gold Label Rum
- ½ glass of milk or milk and cream
- 1 egg
- 1 teaspoon of sugar
- Shake well with cracked ice
- Strain into medium size glass
- Top with grated nutmeg

## C. And C.

Arechabala's Delicious After Dinner Drink
- 1 Jigger of Arechabala's 3-A. Cofiac (Brandy)
- 1 Jigger of Arechabala's Cream of Cocoa
served on a pony glass

## Planters Punch

In a Tall Glass Filled with Shaved Ice
- 2 teaspoons of powdered sugar
- Juice of ½ lime
- A few dashes of sparking water
- 1 dash orange bitters
- Stir well until glass is frosted
- 2 oz. Havana Club Yellow Label Rum
- Decorated with a slice of lemon, a slice of orange and cherries
- Serve with straws

## ARECHABALA'S ANISETTE CORDIAL



### Hot Rum Punch (8 people)

+ 1 pint Havana Gold Label Rum
+ ½ pint Arechabala's Brandy
+ 2 ozs. Chartreuse
+ 2 ozs. Arechabala's Anisette
+ Juice and peel of 1 orange and 1 lemon
+ Sugar to taste

Put all ingredients in bowl and add 3 pints of boiling water. Stir vigorously and serve immediately. (Grapefruit or limes may be substituted for orange or lemon.)

## MINT (GREEN) CORDIAL

For years, rum has been recognized as a most excellent and versatile flavoring. Good chefs know that a touch of rum makes plain dishes memorable. Sauces take on a new piquancy. Puddings, cakes and pies become "something special". Or ask any lover of good living about fresh fruit dessert bathed in rum flavored sugar syrup—better yet, try it yourself. Just follow these recipes—depend on Havana Club Rum and its smooth blending qualities to provide the taste delights that go only with fine rum.

### Honey Moon Special

+ The juice of half lime or lemon
+ 1 Jigger of Arechabala's Banana Cordial
+ 1 Jigger of Arechabala's Añejo 75 Rum
+ One hand full of cracked ice

Strain into cocktail glass

## ARECHABALA'S TRIPLE SEC CORDIAL

### Ice Cream Sauce

- 1½ tablespoons Havana Club Gold or Yellow Label Rum
- ½ teaspoon vanilla
- 1½ cup sifted confectioners sugar
- 1 egg, separated
- 2 ozs. butter, 1 cup light cream

Add sugar, a little at a time, to well creamed butter. Next add egg yolk, vanilla and rum; mix thoroughly. Add cream gradually, stirring constantly, and finally fold in stiffly beaten egg white.

### Rum Syrup

Take three equal parts Havana Club Rum Gold or Yellow Label, water and sugar. Bring sugar and water to a boil and when cool add rum.

### Hard Sauce

- 1½ tablespoons Havana Gold Label Rum
- 1½ cups confectioners sugar
- 4 ozs. butter

Add sugar, a little at a time to well creamed butter. Beat mixture vigorously until light and fluffy. Add rum gradually. Chill before using.

## ARECHABALA'S VERMOUTH

### Fruit Cup

Cut up your favorite fresh fruits and put them in bowl. Pour Havana Club Rum Syrup over and lightly coat each piece of fruit. Chill thoroughly before serving.

### Suggestions from the Chef

*Cake Flambé:* To add the holiday spirit to your fruit cake or plum pudding, brown slices in sugar and butter melted in a chafing dish over a low flame. Turn several times then pour a generous dash of Havana Club Rum (Gold Label) over each slice and ignite. *Omelette Cubana:* Use for your filling crushed pineapple soaked in Havana Club Rum (Gold Label). Dust with powdered sugar. *Rum Watermelon:* Soak watermelon with Havana Club Rum (Gold Label), serve chilled cubes. A summertime sensation! *Rum Demi Tasse:* A dash of Havana Club Rum (Gold Label) makes even the best coffee taste better!

We hope that this little book of recipes will add not only to your pleasure of entertaining but also to your appreciation of rum—most versatile of all distilled spirits.

Rum is traditional for its warming qualities, a universal standby in cold climates. Yet it is just as popular in the tropics where cooling rum drinks have long been top favorites. Many are the special drinks where nothing but rum will do, yet rum replaces whiskey, gin or brandy in any drink calling for those liquors. Short drinks and long drinks, hot drinks and cold drinks, highballs and cocktail—a good rum makes them all.

With a bottle of Havana Club Rum (White or Gold) and a few accessories you're in a position to please the most discriminating guest.









*Jose Arechabala, S. A. v. Ramirez*                            9

ported to be granted to the purchaser
" " " (Starr) including the "right to
make one or more motion picture ver-
sions thereof and to assign to others
the right to do so." (Italics mine)

The contract between plaintiff and
Starr required the plaintiff to announce on
the film and in paid advertising of such
motion picture photoplays that same was
based or adopted from or suggested by
the aforesaid literary or musical com-
position written by plaintiff,

"together with the name of the
Sellers, except where the name of such
photoplay shall be published with the
names of other photoplays in group or
list advertising, the name of MAUDE
NUGENT need not be announced in
connection therewith."

4. On July 10, 1925 Starr sold, as-
signed, conveyed and transferred to
Columbia Pictures Corp., all his right,
title and interest in and to the motion
picture rights in the musical composition
"Sweet Rosie O'Grady."

The assignment to Columbia by Starr
was made subject to the foregoing pro-
vision of the contract between Starr and
plaintiff.

B. This plaintiff assigned to Starr and
his assigns, all her motion picture rights
in her song and she gave Starr or his
assigns permission to obtain a copyright
on any motion picture that might be pro-
duced under the assignment. A motion
picture was made by Columbia and it
obtained a copyright thereon Nov. 22,
1926. (See Special Stat. of 1912, 37
Stat. 488; 17 U.S.C.A. Sec. 5, which al-
lowed it to do so.)

Attached to defendant's motion papers
is an affidavit of Leo Jaffe, Assistant
Treasurer of Columbia, who avers that
Columbia has not transferred, conveyed
or assigned to plaintiff any right or in-
terest of any kind or type which Colum-
bia acquired by assignment from Starr.

C. Plaintiff's contention that only a li-
cense to make one motion picture was
granted by her assignment to Starr is
squarely negated by the wording of the
contract and the recorded assignment to
Starr.

D. It does not appear that Columbia
ever assigned or licensed defendant to
produce the motion picture entitled
'Sweet Rosie O'Grady'; whether it in-
fringes upon Columbia's copyright or
whether Columbia has ever sued defend-
ant for or claimed an infringement.

[1] E. But as each new arrangement
of a song is separately copyrightable,
Carte v. Evans, 27 F. 861, 862 (D.
Mass.). Edmonds v. Starr, 248 F. 897
(CCA 2), so each new motion picture
made from a particular song might be

so distinct as to be separately copyright-
able. Harper & Bros. v. Kalem Co., 169
F. 61, 64 (CCA 2) aff'd 222 U.S. 55.

[2] Since Columbia was given the
right only to protect the copyright on
its own motion picture against infringe-
ment, Columbia might not be the proper
party to sue and the plaintiff could in
that event sue for infringement of the
song copyright under the rights she
reserved in her contract with Starr.
Kalem Co. v. Harper Bros., 222 U. S. 55;
See Goldwyn Pictures Corp. v. Howells
Sales Co., Inc., 282 F. 9 (CCA 2). This
latter case seems to hold that the owner
of the original material could sue for
infringement of a motion picture al-
legedly made from that material, pro-
vided there is no outstanding copyright,
on a motion picture made with the con-
sent of the owner of the original mate-
rial, which would also be infringed. See
O'Neill v. General Film Co., 171 App.
Div. 854, 866, 869; Societe des Films
Menchen v. Vitagraph Co., 251 F. 258,
(CCA 2); De Croisset v. Vitagraph Co.
of America, 282 F. 100.

F. It appears, therefore, a question of
fact exists whether plaintiff is the proper
party to sue for alleged infringement
because it has not also been shown
whether defendant's picture is made with
the consent of, or infringes upon, the
Columbia copyright or may be within the
domain of the plaintiff's copyright. Mo-
tion denied.

----

Commissioner of Patents

Jose Arechabala, S. A. v. Ramirez

Decided June 23, 1945

TRADE MARKS

1. Identity and similarity—Words

Dominant "Havana Gold" above de-
scriptive "Porto Rican Rum," with pic-
torial design, is confusingly similar to
"Havana Club".

Appeal from Examiner of Interfer-
ences.

Trade mark cancellation No. 4159 by
Jose Arechabala, S. A., against Victor
M. Ramirez, Registration No. 388156 is-
sued June 10, 1941. From decision sus-
taining petition, registrant appeals. Af-
firmed.

*6*                      *Ex parte Journeymen Barbers Intern'l. Union of America*                      66 USPQ

JONES & ROB, New York, N. Y., for Jose Arechabala, S. A.
VICENTE FALES MATOS, Mayaguez, Puerto Rico, and BERKMAN AITKEN, New York, N. Y., for Ramirez.

FRAZER, Acting Commissioner.

This is an appeal from the decision of the Examiner of Interferences sustaining the petition of Jose Arechabala, S. A., to cancel trade mark registration No. 388,138, issued June 10, 1941, under the provisions of the Act of March 19, 1920, to Victor M. Ramirez.

The registered mark, which is applied to "distilled alcoholic rum," is a composite one. It comprises the notation "Havana Gold" above the descriptive legend "Porto Rican Rum," displayed in association with a pictorial design. Its dominant feature unquestionably is the notation "Havana Gold."

Petitioner has established prior use of the trade mark "Havana Club," likewise registered under the Act of 1920, for "ethyl alcohol, rum, brandy, cognac, and other potable distilled liquors." Thus the sole issue to be determined is whether petitioner's mark and respondent's mark are confusingly similar.

Respondent asserts that the only similarity between his mark and petitioner's resides in the word "Havana," and that this word is "geographically descriptive." He says it is "common knowledge" that Havana "is noted as an important source of rum." I must confess that I lack such knowledge, and respondent has adduced no evidence from which I might be so informed. In fact, what evidence there is in the record is derogative of respondent's position. Petitioner's labels indicate that its "Havana Club" rum is distilled and bottled in Cardenas, Cuba, and identify it as Cuban rum. And respondent's labels indicate that his "Havana Gold" rum is produced and bottled in Ponce, P. R., and identify it as Porto Rican rum.

[1] From the record before me, I am convinced that purchasers would pay considerable attention to the word "Havana" as denoting origin of the rum in question. It therefore seems clear to me that concurrent use of petitioner's and respondent's marks on goods of this character would be reasonably likely to cause confusion.

The decision of the Examiner of Interferences is affirmed.

Commissioner of Patents

*Ex parte* THE JOURNEYMEN BARBERS' INTERNATIONAL UNION OF AMERICA

Decided June 26, 1945

TRADE MARKS

1. Acquisition of marks—Character of goods on which used

   Registration—Act of 1920

   1920 Act registration of collective mark for union shop cards is refused since everything appearing on drawing is functional part of union card rather than trade mark for union card; also, mark is devoid of trade mark significance in connection with alleged "goods".

Petition from Examiner of Trade Marks.

Application for registration of trade mark of The Journeymen Barbers' International Union of America, Serial No. 455,578, filed Sept. 15, 1942. From decision refusing registration, applicant petitions. Affirmed.

See also 36 USPQ 559.

LESTER L. SARGENT, Washington, D. C., for applicant.

FRAZER, Acting Commissioner.

This is a petition from the refusal of the Examiner of Trade Marks to register an alleged trade mark, under the provisions of the Act of March 19, 1920, as amended by the Act of June 10, 1938, as a collective mark for "union shop cards, issued at irregular intervals."

In a decision rendered February 28, 1938 (488 O.G. 888, 36 USPQ 559), I affirmed the examiner's refusal to register this same mark for the same goods under the Act of February 20, 1905; the only difference being that a portion of the subject matter then sought to be registered has now been deleted.

The examiner has rejected the application on the ground that the mark is "merely applicant's goods or a substantial part of the goods." The basis of his decision is thus the same as in the prior case; and the views I there expressed are equally applicable here. It is still [1] true that everything appearing on the drawing is a functional part of a union card rather than a trade mark for a union card. Also, the mark is plainly devoid of any possible trade mark significance in connection with applicant's alleged "goods."

The decision of the Examiner of Trade Marks is affirmed.

66 USPQ

Circuit Court of

DELLAR v. SAMUE
No. 278      D

COPYRIGHTS

1. In general
   Infringement

   Monopoly inher of copyrighted and "ideas" may rowed; there is all similarity end far enough into d to reach "express ants' motion pictu only in broadest,

2. Infringement

   Motion picture features which fi it may omit fea tains, but only se only film can in

3. Infringement

   Nothing is to acter of original leged to infringe in the several se stantly changed

4. Pleading and

   Plaintiff has b defendant's moti to judge was doct nal film.

Appeal from D ern District of N 50 USPQ 372.

Action by Clar Goldwyn, Inc., S Cantor, and Unit for copyright inf ment dismissing peals. Affirmed.

See also 37 US 43 USPQ 353.

CLARA DELLAR, p PAUL D. O'BRIEN appellees.

Before L. HAND, CLARK, Circuit

PER CURIAM

When this cas years ago, (Dellar Inc., 104 F.2d 66 we said that we ants' "cutting cor sions of the play; the defendants

# EXHIBIT 15

7

T.M.E.O.
**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Application of                    2001 MAR -1 P 3: 22

BACARDI & COMPANY LIMITED        RECEIVED    Law Office 107

Serial No: 74/572,667            :    Examining Attorney
                                 :       David Reihner
Filed: September 12, 1994        :
                                 :
Mark: HAVANA CLUB               :


**L E T T E R**


Assistant Commissioner for Trademarks
2900 Crystal Drive
Arlington, Virginia  22202-3513

Dear Sir:

        By correspondence, hand-carried and filed on

December 14, 2000, Applicant filed an Amendment to Allege Use

Under 37 CFR 2.76, with Declaration, along with Exhibit A

(5pgs.), one specimen (2pgs.), and a check in the amount of

$100.00 to cover the government filing fee.  Applicant also

requested that the U.S. Patent and Trademark lift the suspension

of the application since a final judgment had been rendered in

the civil action case in which the suspension was based.

        Enclosed are copies of the decisions rendered in the

case of Havana Club Holding, S.A. et al. v. Galleon S.A. et al.,

974 F. Supp. 302 (S.D.N.Y. 1997); the corresponding decision

reached by the U.S. Court of Appeals for the Second Circuit at

203 F.3d 116 (2d Cir. 2000); and, the corresponding decision by

 

Serial No. 74/572,667

the Supreme Court of the United States denying Hanava Club
Holding's petition for writ of certiorari at 121 Ct. 277 (Oct. 2,
2000).

In light of these decisions, Applicant submit that the
present application is in condition for allowance, and that the
application be allowed to proceed to publication.

The trademark Examining Attorney is requested to direct
all further communications to Applicant's attorneys of record,
William R. Golden, Jr. and Margaret Ferguson with the firm of
Kelley, Drye & Warren LLP, 101 Park Avenue, New York, New York
10178, (212) 808-7800.

Respectfully submitted,

Date: _March 1, 2001_    By: _____

James E. Shlesinger.
Associate Counsel for Applicant

SHLESINGER, ARKWRIGHT & GARVEY LLP
3000 South Eads Street
Arlington, Virginia 22202
(703) 684-5600
mdt

# EXHIBIT 16

 

# UNITED STATES PATENT AND TRADEMARK OFFICE

| | | PAPER NO. |
|---|---|---|

**SERIAL NO.**            **APPLICANT**

74/572667  GALLEON S.A.

**MARK**

HAVANA CLUB

**ADDRESS**

William R. Golden, Jr.
101 Park Avenue
New York, NY  10178

**ACTION NO.**
04

**MAILING DATE**
04/26/01

**REF. NO.**

DDRESS:
**Commissioner for Trademarks**
**2900 Crystal Drive**
**Arlington, VA 22202-3513**
**www.uspto.gov**

.o fees are enclosed, the address should include the
:ds "Box Responses - No Fee."

:ase provide in all correspondence:

Filing Date, serial number, mark and
Applicant's name.
᰿. Mailing date of this Office action.
3. Examining Attorney's name and
   Law Office number.
4. Your telephone number and ZIP code.

**FORM PTO-1525 (5-90)**            **U.S. DEPT. OF COMM. PAT. & TM OFFICE**

---

**A PROPER RESPONSE TO THIS OFFICE ACTION MUST BE RECEIVED WITHIN 6 MONTHS FROM THE DATE OF THIS ACTION IN ORDER TO AVOID *ABANDONMENT*. *For your convenience and to ensure proper handling of your response, a label has been enclosed. Please attach it to the upper right corner of your response. If the label is not enclosed, print or type the Trademark Law Office No., Serial No., and Mark in the upper right corner of your response.***

RE: Serial Number: 74/572667

This letter responds to the applicant's communication filed on March 1, 2001.

Applicant filed September 12, 1994, this trademark application to register the mark "Havana Club" for rum and rum specialty drinks.  Registration was refused under Trademark Act § 2(d) based upon subsisting U.S. Trademark Registration no. 1,031,651 (owned by Empresa Cubana Exportadora De Alimentos Y Productos Varios d.b.a. Cuba Export Company, a Cuban state Enterprise) for the mark "Havana Club" and design for rum.  The cited mark was registered January 27, 1976, and renewed in 1996 for a 10-year term of protection.  Applicant now claims that its mark is registrable due to various decisions issued by the Federal District Court for the Southern District of New York all of which were affirmed by the Court of Appeals for the Second Circuit in the case of *Havana Club Holding S.A. v. Galleon S.A.*, 53 USPQ2d 1609 (2nd Cir. 2000). Is applicant's mark now registrable?

A cyclone of claims, counterclaims, issues, policies, regulations, licenses, and politics swirl around the trademark "Havana Club", yet it is the only constant that does not change.  Cutting through all the issues and actions to the eye of this legal storm reveals a few clearly decided points.  The attempt by the assignees of Cuba Export Company to assign the rights in the mark from Cuba Export Company to themselves was unsuccessful and the rights in the mark and U.S. Trademark

74/572667                                    -2-

Registration no. 1,031,651 reside in Cuba Export Company.  The attempts of the assignees of Cuba Export Company to protect their rights in the mark vis-à-vis applicant in the United States were unsuccessful because, succinctly stated, the assignees do not own the mark.   Further, U.S. Trademark Registration no. 1,031,651 was neither cancelled nor determined to be the property of applicant.  Finally, applicant's registration rights were unaddressed.  Correspondingly, the refusal to register the mark under Trademark Act § 2(d) based upon both U.S. Trademark Registration nos. 1,031,651 and 1,956,660 is maintained.

The refusal to register the mark under Trademark Act § 2 (e)(3) is maintained.

Applicant failed to respond to paragraphs 5, 6, 7, and 8 of Office Action dated February 8, 2001. Applicant is required to address these issues: the assignment of the mark and application, a possible claim of distinctiveness, and the amendment of the identification of goods to contain fewer goods contained in the Amendment to Allege Use.

David C. Reihner, Examining Attorney
Law Office 107,
Telephone 703-308-9107 ext. 169

# EXHIBIT 17

# UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO:** 74/572667

**APPLICANT:** BACARDI & COMPANY LIMITED

**CORRESPONDENT ADDRESS:**
William R. Golden, Jr.
101 Park Avenue
New York, NY 10178

**RETURN ADDRESS:**
Commissioner for Trademarks
2900 Crystal Drive
Arlington, VA 22202-3513
**ecom107@uspto.gov**

**MARK:**    HAVANA CLUB

**CORRESPONDENT'S REFERENCE/DOCKET NO:** N/A

**MAILING DATE:**    May 7, 2002

**CORRESPONDENT EMAIL ADDRESS:**
N/A

Please provide in all correspondence:

1. Filing date, serial number, mark and applicant's name.
2. Mailing date of this Office Action.
3. Examining Attorney's name and Law Office number.
4. Your telephone number and ZIP code.

## OFFICE ACTION

**TO AVOID ABANDONMENT, WE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF OUR MAILING OR E-MAILING DATE.**

To respond formally using the Office's Trademark Electronic Application System (TEAS), visit **http://www.uspto.gov/teas/index.html** and follow the instructions.

To respond formally via E-mail, visit **http://www.uspto.gov/september11/tmelecresp.htm** and follow the instructions.

To respond formally via regular mail, your response should be sent to the mailing Return Address listed above and include the serial number, law office and examiner's name on the upper right corner of each page of your response.

To check the status of your application at any time, visit the Office's Trademark Applications and Registrations Retrieval (TARR) system at **http://tarr.uspto.gov/**

For general and other useful information about trademarks, you are encouraged to visit the Office's web site at **http://www.uspto.gov/main/trademarks.htm**

**FOR INQUIRIES OR QUESTIONS ABOUT THIS OFFICE ACTION, PLEASE CONTACT THE ASSIGNED EXAMINING ATTORNEY.**

RE: Serial Number  74/572667

This letter responds to the applicant's communication filed on April 12, 2002.

74/572667                                        -2-

It is called to applicant's attention that Cancellation Proceeding no. 24,108, relating to U.S. Trademark Registration no. 1,031,651, and Cancellation Proceeding nos. 25,346 and 40,287, relating to U.S. Trademark Registration no. 1,956,660, are ongoing at this time. Correspondingly, the refusal to register under Trademark Act § 2(d) based upon U.S. Trademark Registration nos. 1,031,651 and 1,956,660 is maintained.

Registration is refused under Trademark Act § 2(e)(3). Due to the extensive use of the mark in commerce by applicant, applicant was informed that a claim of distinctiveness could be filed under Trademark Act § 2(f) and the refusal to register would be withdrawn. While applicant submitted April 12, 2002, an Affidavit of Ramon Arechabala, the affidavit does not constitute a claim of distinctiveness. The affidavit contains only a history of the "Havana Club" trademark from the prospective of the Arechabala family, the original owner of the "Havana Club" trademark. An allegation that the mark has become distinctive of the goods due to use in commerce or promotion was not presented in the affidavit. Correspondingly, the refusal to register the mark under Trademark Act § 2(e)(3) is maintained.

In Office Action dated October 12, 2001, applicant was apprised of the fact that the Amendment to Allege Use lists only "rum" as the goods for which the mark is used. This listing contains fewer goods than were indicated in the recitation of goods. Applicant was required to indicate whether the omission of the items -- distilled spirits specialty containing rum and prepared alcoholic cocktail containing rum -- were intentional. Applicant responded by stating that it intended to file a Request to Divide the application to form a separate application for the distilled spirits specialty containing rum and prepared alcoholic cocktail containing rum. Correspondingly, the following is noted:

In the amendment to allege use, the applicant has described the goods more narrowly than those described in the application itself. Therefore, the applicant must either confirm that the identification indicated in the amendment to allege use is proper or submit an amended identification. The goods identified in the amended identification may not exceed the scope of those identified in the application itself. TMEP §1104.09(C).

If the applicant amends to add goods not specified in the amendment to allege use, the applicant must verify, with an affidavit or a declaration in accordance with 37 C.F.R. §2.20, that the mark is now in use in commerce on or in connection with the additional goods. TMEP §1104.09(c). Of course, the applicant may withdraw the amendment to allege use or request that the application be divided. TMEP §§1104.10 and 1110 *et seq.*

Applicant must amend the recitation of goods by either: stating that the goods are restricted to rum, only; or adding some or all of the goods listed in the recitation of goods to the goods in the amendment to allege use supported with either an affidavit or declaration signed by applicant's representative indicating that the mark is now in use in commerce on or in connection with the additional goods; or filing a request to Divide the application to form a separate application for the goods other than rum.

74/572667                                    -3-

Because a proper listing of the goods contained in an Amendment to Allege Use does not involve a statutory refusal, but rather constitutes and informality, the application may not be suspended until the informality is resolved. Suspension of action is in order only after all issues have been resolved or are in condition for a final action. See: TMEP § 1108. Therefore, action on this application will not be suspended until applicant resolves the issue relating to the recitation of goods.

It is noted that if an applicant fails to completely respond to all the issues contained in an outstanding Office Action within six months after the mailing date of an Office Action, the application shall be deemed to have been abandoned. Trademark Rule 2.65(a).

David C. Reihner, Examining Attorney
Law Office 107, 703-308-9107 ext. 169
                703-746-8107 fax.

# EXHIBIT 18

A 389

*56*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

HAVANA CLUB HOLDING, S.A. and
HAVANA CLUB INTERNATIONAL, S.A.,

                    Plaintiffs,

     - against -

GALLEON, S.A., BACARDI-MARTINI U.S.A.,
INC., GALLO WINE DISTRIBUTORS, INC.,
G.W.D. HOLDINGS, INC. and PREMIER
WINE AND SPIRITS,

                 Defendants.

----------------------------------------x

No. 96-Civ.-9655 (SAS)

ANSWER, AFFIRMATIVE
DEFENSES AND
COUNTERCLAIMS TO FIRST
AMENDED COMPLAINT

JURY TRIAL DEMANDED

Defendants BACARDI-MARTINI U.S.A., Inc. ("BACARDI-MARTINI") and

Galleon, S.A. (now after its merger into its parent, Bacardi & Company Limited, the

surviving entity of the merger, known as Bacardi & Co. Ltd.) ("Bacardi"), for their Answer

to the First Amended Complaint and their Affirmative Defenses and Counterclaims herein,

through their undersigned counsel, Kelley Drye & Warren, LLP, allege as follows:

        1.      Admit, in respect of paragraphs 1 and 2 of the First Amended

Complaint, that plaintiffs have instituted the present action under the Lanham Act, 15 U.S.C.

§ 1051 et seq. and 28 U.S.C. § 1331, but deny any violations of the Lanham Act or any

other law or treaty of the United States, and except as so admitted, deny each and every

other allegation contained therein.

2.    Admit, in respect of paragraph 3 of the First Amended Complaint, that venue is alleged under 28 U.S.C. § 1391, and that Bacardi is an alien, but deny that these defendants are residents of this district within the meaning of 28 U.S.C. § 1391 and further deny each and every other allegation contained therein.

3.    Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 4 and 5 of the First Amended Complaint and, therefore, deny same.

4.    Admit, in respect of paragraph 6 of the First Amended Complaint, that the party sued as Galleon, S.A. was formerly a separate Bahamian company, but aver that Galleon, S.A. was merged into its parent, Bacardi, a company organized and existing under the laws of Liechtenstein, with its headquarters at Millar Road, Nassau, Commonwealth of the Bahamas, which is the sole surviving entity of said merger and succeeded to all the assets of Galleon, S.A., including its rights in the HAVANA CLUB trademark for "rum," and assumed all its liabilities.

5.    Admit, in respect of paragraph 7 of the First Amended Complaint, that defendant BACARDI-MARTINI is a Delaware corporation and deny each and every other allegation contained therein. .

6.    Deny the allegations contained in paragraphs 8 and 9 of the First Amended Complaint, except admit that the defendants Bacardi and BACARDI-MARTINI are under common ownership and control and admit that "Exclusive Imports" is a d/b/a of BACARDI-MARTINI.

7.    Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 10 and 11 of the First Amended Complaint and, therefore, deny same.

8.    Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 12, 13, 14 and 15 of the First Amended Complaint and, therefore, deny same.

9.    Deny each and every allegation contained in paragraphs 16 and 17 of the First Amended Complaint, except admit that the Cuban Asset Control Regulations prohibit the importation of rum and other goods from Cuba.

10.    Deny each and every allegation contained in paragraphs 18, 19, 20, 21, 22, 23, 24, 25, 26 and 27 of the First Amended Complaint, except admit that rum produced in the Bahamas under the authority of Bacardi's predecessor-in-interest, Galleon, S.A., was imported into the United States, distributed and sold exclusively by defendant BACARDI-MARTINI under the mark HAVANA CLUB in interstate commerce in the United States through various wholesalers, including Gallo Wine Distributors, Inc., in New York and elsewhere, which distributors sold said HAVANA CLUB rum to retailers which, in turn, sold it to consumers and that said HAVANA CLUB rum was listed and offered for sale in Beverage Media, Metro New York, and other publications and that copies of photographs of these products are attached as Exhibit A to the First Amended Complaint, and aver that the labeling and trade dress are as appears on the products themselves.

11.    Admit, in respect of paragraph 28, that Cuba is an island and aver that both Cuba and the islands that comprise the Commonwealth of the Bahamas are in the

A 392

Caribbean region, and except as so admitted and averred, deny each and every other allegation contained therein.

12.    Admit, in respect of paragraphs 29 and 30 of the First Amended Complaint, that the labeling and trade dress for the HAVANA CLUB rum made under authority of Bacardi's predecessor-in-interest, Galleon, S.A., is as it appears on the product itself, and except as so admitted, deny each and every other allegation contained therein.

13.    Admit, in respect of paragraph 31 of the First Amended Complaint, that bottles of liquor are generally displayed on retail shelves with the bottle turned to the front and except as so admitted, deny each and every other allegation contained therein.

14.    Deny each and every allegation contained in paragraph 32 of the First Amended Complaint.

15.    Admit, in respect of paragraph 33 of the First Amended Complaint, that Havana is the capital of Cuba and that it is a city located in Cuba, and except as so admitted, deny each and every allegation contained therein.

16.    Deny each and every allegation contained in paragraphs 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47 and 48 of the First Amended Complaint.

17.    Answering each and every allegation contained in paragraph 49 of the First Amended Complaint, repeat and reallege each and every response to paragraphs 1-31, 33, 39-48 of the First Amended Complaint as though fully set forth herein.

18.    Deny, in respect of paragraphs 50, 51 and 52, each and every allegation contained therein and specifically aver that defendants and their predecessors-in-interest did use the trademark HAVANA CLUB for rum and the labeling therefor in interstate commerce in the United States prior to January 1, 1996.

19.     Answering each and every allegation contained in paragraph 53 of the First Amended Complaint, repeat and reallege each and every response to paragraphs 1-31, and 40-44 of the First Amended Complaint, as though fully set forth herein.

20.     Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67 and 68 of the First Amended Complaint, and, therefore, deny same, except to specifically deny that the HAVANA CLUB mark was legally adopted and used in Cuba by these plaintiffs prior to the defendants' use of the HAVANA CLUB trademark for rum in the United States, and deny that defendants adoption of their mark was in bad faith or that defendants' use will lead to error or confusion.

## AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant-counterclaimants Bacardi and BACARDI-MARTINI, as and for their Affirmative Defenses and Counterclaims (collectively, the "Counterclaims"), allege upon personal knowledge as to their own acts and, upon information and belief as to the acts of others, as follows:

## AS AND FOR A FIRST
## AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### I.

### False and Fraudulent Renewal of the
### Purported HAVANA CLUB and Design Registration
### In Violation of § 38 of the Lanham Act.

1.      Bacardi is a company organized and existing under the laws of Liechtenstein, with a place of business at Millar Road, Nassau, Bahamas.

2.      BACARDI-MARTINI is a Delaware corporation with its principal place of business in Miami, Florida.

3.      Plaintiff-counterclaim-defendant Havana Club Holding, S.A. ("Havana Holding") a corporation organized under the laws of Luxembourg, was established in November 1993 and has its offices in Paris, France.  Havana Holding never has done business in the United States and does not own and never has owned any of the federal or state permits required to engage in the distilled spirits business in the United States.

4.      Plaintiff-counterclaim defendant Havana Club International, S.A. ("HCI") is a Cuban company which never has done any business in the United States.  HCI does not hold and never has held any of the federal or state permits required to engage in the distilled spirits business in the United States.

5.      Neither Havana Holding nor HCI ever obtained a label approved from the U.S. Bureau of Alcohol, Tobacco and Firearms (ATF) for any distilled spirits product, including, but not limited to HAVANA CLUB rum.

6.      BACARDI-MARTINI is engaged, among other things, in the business of importing, distributing, and selling distilled spirits, including BACARDI, CASTILLO, and

HAVANA CLUB rums, in interstate commerce throughout the United States. The rums sold by BACARDI-MARTINI in the United States were produced in Cuba until the unlawful expropriation of the Bacardi facilities and distillery there by the Castro regime and are now produced principally in Puerto Rico and The Bahamas.

7.    Bacardi and its predecessors-in-interest, including Galleon S.A. and Jose Arechabala S.A. ("Arechabala"), have been engaged in the spirits business since before the turn of the century and Bacardi owns the mark HAVANA CLUB for rum in the United States and App. Ser. No. 74/572,667 to register the mark HAVANA CLUB for "rum and rum specialty drinks" in International Class 33 in the U.S. Patent and Trademark Office (the "PTO").

8.    The Bacardi rum business is presently owned by the descendants of Don Facundo Bacardi, who over a century ago in Cuba originated a recipe and process for the distillation and manufacture of rum that has been sold ever since under the BACARDI name and mark. Compania Ron Bacardi, S.A., a Cuban joint-stock company formerly headquartered in Santiago de Cuba, formerly produced BACARDI rum in Cuba.

9.    As a result of the extensive advertising, promotion and sale of BACARDI rum, American consumers have long recognized BACARDI rum as being of the highest quality. Indeed, BACARDI rum is today the best-selling brand of spirits in the world.

10.    On October 14, 1960, the Cuban properties of the defendant-counterclaimants' predecessors Compania Ron Bacardi, S.A. and Arechabala were unlawfully expropriated by the Castro regime.

11.    Defendant-counterclaimants have a bona fide intent to produce rum in the future in a democratic Cuba. When the President of the United States, pursuant to the Cuban Democracy Act of 1992, 22 U.S.C.A. Section 6007(b), certifies that a democratic government has been re-established in Cuba and the U.S. trade embargo with Cuba is lifted, then defendant-counterclaimants intend once again to produce rum in Cuba, the land where Bacardi's rum business began.

12.    At present, however, it is not possible to make rum in Cuba and import and sell that rum in the United States. As American consumers are well aware due to the long-standing embargo of items manufactured in Cuba, rum produced there cannot at present be lawfully sold in or imported into the United States.

13.    BACARDI-MARTINI has been importing and will continue to import and distribute rum in the United States made under authority granted by Bacardi and its predecessor-in-interest. That rum is being sold under the trademark HAVANA CLUB and is carefully made in the style developed by Cuban rum masters prior to Castro's unlawful confiscation of the distilleries of Ron Bacardi S.A., Arechabala, and other Cuban rum producers.

14.    The Cuban Asset Control Regulations ("CACR"), implemented in 1963 under Section 5(b) of the Trading With The Enemy Act of 1917, as amended, 50 U.S.C. App. 1-44, prohibit transfers of property, including trademarks, in which a Cuban entity has an interest except when authorized by the Office of Foreign Assets Control ("OFAC") acting on behalf of the Secretary of the Treasury.

15.    In 1976, the trademark HAVANA CLUB for "rum" was registered in the United States Patent and Trademark Office ("related U.S. Registration") by Empresa Exportadora de Alimentos y Productos Varios ("Cubaexport"), a Cuban state enterprise.

16.    On October 29, 1993, Cubaexport entered into an agreement purportedly transferring the U.S. rights to the HAVANA CLUB trademark and the related U.S. Registration to Havana Rum & Liquors, S.A. On or about November 22, 1993, Havana Rum & Liquors, S.A. entered into an agreement purportedly transferring the aforesaid mark and the related U.S. Registration to Havana Club Holding, S.A.

17.    Those provisions of the original transfer agreement relating to transfers of the U.S. rights to the HAVANA CLUB mark and the related U.S. Registration were rendered null and void by the CACR, § 515.201(b)(1), and the attempted assignment of said HAVANA CLUB mark and the related U.S. Registration were invalid and of no force and effect and void ab initio.

18.    As a result, the status quo ante as of the October 29, 1993 date of said abortive original transfer agreement was never changed, and Cubaexport retained whatever rights it had in said mark and the related U.S. Registration as of said date, notwithstanding the invalid transfers.

19.    Neither Havana Holding nor HCI ever sold any rum under the HAVANA CLUB mark in the United States.

20.    Plaintiffs Havana Holding and HCI have never obtained rights to the trademark HAVANA CLUB for "rum" in the United States.

21.    Any rights that Havana Club Holding, S.A. may have had, may have or claims to have had in the Registration of the HAVANA CLUB trademark (U.S. Reg. No.

1,031,651) from forever until the present have been cancelled by order of the Court stayed subject to an appeal.

22.    If Cubaexport ever had any rights in the HAVANA CLUB mark in the United States and the related U.S. Registration 1,031,651, which is denied, those rights, if any, still subsisted in Cubaexport after the purported assignment to Havana Holding and never were transferred from Cubaexport, and its purported assignment of said mark and related U.S. registration was a naked and unlawful assignment which was of no force and effect.  Nonetheless, Havana Holding purported to renew said registration on or about January 12, 1996.  The purported attempts by Cubaexport and plaintiff-counterclaim-defendants to transfer said mark and registration were, in addition to being invalid assignments-in-gross, null and void ab initio pursuant to 31 CFR § 515.203(a) and cannot serve as the basis for recognizing any rights to said mark in Havana Holding.

23.    Cubaexport and plaintiff-counterclaim-defendants Havana Holding and HCI were at all relevant times aware of the fact that the purported transfers of the HAVANA CLUB and Design mark in the United States and said registration thereof were prohibited by the CACR and willfully violated those regulations and knowingly caused their counsel to file a false and fraudulent application with OFAC to try to have said trademark retroactively approved.  Indeed, said fraudulent and false application was only made after a petition to cancel the purported U.S. registration of said mark was filed in the PTO.  Furthermore, Havana Holding knowingly falsely represented that it owned said mark and registration in connection with the renewal declaration filed on or about January 12, 1996.

24.    Cubaexport, plaintiff-counterclaimants-defendants' alleged predecessor-in-title obtained U.S. Registration No. 1,031,651 of the mark HAVANA CLUB and Design

for rum by false means, including making false or fraudulent representations to the PTO, that it owned said mark in the United States.

25.    Havana Rum & Liquors, SA, also an alleged predecessor, obtained title to U.S. Reg. No. 1,031,651 of the mark HAVANA CLUB and Design for rum by false means, including making false or fraudulent representations, both orally or in writing, to the PTO and OFAC, which statements were designed to conceal its unlawful activities as alleged above.

26.    Plaintiff-counterclaim-defendant Havana Holding knowingly obtained record title to U.S. Registration No. 1,031,651 of the mark HAVANA CLUB and Design by false means, including making false or fraudulent representations, to the PTO as alleged above in connection with the purported renewal of said mark in the name of Havana Holding and to OFAC in an effort to conceal its unlawful activities as alleged above.

27.    As a result of plaintiff-counterclaim-defendants' aforesaid acts, defendant-counterclaimants have sustained, and are continuing to sustain, damages to their business in the United States under the HAVANA CLUB mark for rum, including lost sales here of said product and have been forced to incur attorneys fees on their own behalf and on behalf of independent distributors who have been threatened and sued by plaintiff-counterclaim-defendants ostensibly relying on their fraudulently or falsely obtained rights in U.S. Reg. No. 1,031,651 for their purported HAVANA CLUB and Design mark, all in violation of Section 38 of the Lanham Act 15 U.S.C. § 1120.

28.    Notwithstanding plaintiff-counterclaim-defendants knowledge of their violations of the CACR, Havana Holding and HCI are still falsely asserting rights in the HAVANA CLUB mark in the United States.

A  400

WHEREFORE, defendant-counterclaimants pray for the relief requested hereinafter.

## AS AND FOR A SECOND
## AFFIRMATIVE DEFENSE AND COUNTERCLAIMS

## II.

### Abandonment

29.    Paragraphs 1 through 28 of the Counterclaims are incorporated herein by reference.

30.    If plaintiff-counterclaim-defendants ever obtained any common law rights in the mark HAVANA CLUB for rum, which is denied, plaintiffs nevertheless presently have no rights whatsoever to the mark HAVANA CLUB for "rum" in the United States because their aforesaid actions after the abortive assignments have caused it to lose any significance as a source of origin.  As between Havana Holding and HCI, on the one hand, and Cubaexport on the other, Cubaexport owns the reputation or goodwill, if any, that exists in the United States as a result of the purported advertising and sale of Castro regime HAVANA CLUB rum.  Any attempt by plaintiff-counterclaim-defendants to claim right to that reputation and goodwill, if any, constitutes abandonment of any rights therein.

WHEREFORE, defendant-counterclaimants pray for the relief requested hereinafter.

AS AND FOR A THIRD
AFFIRMATIVE DEFENSE AND COUNTERCLAIM

III.

Misrepresentation of Goods

31.    Paragraphs 1 through 30 of the Counterclaims are incorporated herein
by reference.

32.    The aforesaid actions of plaintiff-counterclaim-defendants, including
their use of the labeling statement incorporated as a component of the Design portion of the
aforesaid mark that falsely indicates that Havana Holding or its predecessor was "founded in
1878", is part of a deliberate scheme by plaintiff-counterclaim-defendants to pass off their
ersatz HAVANA CLUB rum as being somehow approved by the producer of, or as being the
same quality as, the only Cuban origin HAVANA CLUB rum ever sold legally in the United
States which was produced by defendants' predecessor-in-interest, Arechabala, which
truthfully traced its origins to 1878.

33.    Furthermore, plaintiff-counterclaim-defendants' other aforesaid acts and
omissions are intended to confuse anyone purchasing their ersatz product, including visitors
to Cuba, into wrongly believing that they are somehow the legitimate successor to the
original producer of the HAVANA CLUB rum sold in the United States, Arechabala.
Indeed, the use of the statement "founded in 1878" as part of the Design portion of the mark
can have no other purpose.

34.    Through the aforesaid acts, plaintiff-counterclaim-defendants have used
the purported HAVANA CLUB and Design mark as a vehicle for fraud and said mark is

being used in violation of 15 U.S.C. § 1064(3) to misrepresent the source of their ersatz

HAVANA CLUB rum.

WHEREFORE, defendant-counterclaimants pray for the relief requested

hereinafter.

### AS AND FOR A FOURTH
### AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### IV.

### Unclean Hands

35.    Paragraphs 1 through 34 of the Counterclaims are incorporated herein

by reference.

36.    Plaintiff-counterclaim-defendants have willfully violated civil and

criminal statutes of the United States in their efforts to claim ownership of the HAVANA

CLUB mark for rum in the United States.

37.    Plaintiff-counterclaim-defendants have sold under the mark HAVANA

CLUB a rum product in Panama and elsewhere that contained rum made outside of Cuba,

including rum specifically produced in Panama.

38.    Accordingly, Havana Holding and HCI are barred by the doctrine of

unclean hands from being awarded any equitable relief herein, on the ground that the mark

HAVANA CLUB has geographic significance.

WHEREFORE, defendant-counterclaimants pray for the relief requested hereinafter.

## AS AND FOR A FIFTH
## AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### V.

### Declaratory Judgment

39.    Paragraphs 1 through 38 are incorporated herein by reference.

40.    This is a counterclaim for a declaratory judgment brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the Lanham Act, 15 U.S.C.§ 1051, et. seq, which arises from an actual controversy between defendant-counterclaimants and plaintiff-counterclaim-defendants as to whether defendant-counterclaimants are entitled to use of the term HAVANA CLUB as a trademark for rum in the United States.  Plaintiff-counterclaim-defendants have asserted that this use by defendant-counterclaimants infringes on their purported rights in the mark HAVANA CLUB and Design as a result of a purported registration obtained under Section 44 of the Lanham Act, which issued  on January 27, 1974 and/or violates Section 43(a) of the Lanham Act.

41.    Neither plaintiff-counterclaim-defendants Havana Holding nor HCI has ever used the mark HAVANA CLUB and Design in interstate commerce in the United States and plaintiffs have no rights whatsoever in the HAVANA CLUB mark for rum in the United States.  Furthermore, plaintiff-counterclaim-defendants could not lawfully sell HAVANA CLUB rum in the United States if the embargo were lifted tomorrow.

42.    Long before January, 1986, the HAVANA CLUB name and mark was used on rum produced by or under the authority of Bacardi's predecessors-in-interest,

A 404

including Galleon, S.A. and Arechabala, that was distributed, offered for sale, and sold in interstate commerce in the United States.

43.    Pursuant to the Lanham Act, 15 U.S.C. § 1052(a), as amended, trademarks of spirits which may have geographic significance but which were in use prior to January 1, 1996 are exempt from any statutory proscription against the use of trademarks that might otherwise be considered geographically misdescriptive. In the Statement of Administrative Authority, Cong. Rec. Vol. 140 (1994), U.S.C.C.A.N., 103d Cong. 2nd Sess. 1994, Congress, in connection with TRIPs, explicitly stated, with respect to wine and spirits brands, that "[a]ny trademark containing a geographic indication that is currently registered or in use, or that is registered or in use [before January 1, 1996] may be maintained" (emphasis added). This policy was incorporated in the amendment to 15 U.S.C. § 1052(a), which "grandfathers" defendants' said usage of the mark HAVANA CLUB.

44.    Consequently, even assuming, arguendo, that the mark "Havana Club" may have geographic significance, which defendant-counterclaimants deny, defendant-counterclaimants are entitled to maintain use of that term as a trademark for rum in the United States.

45.    By reason of the foregoing, this Court should declare that defendant-counterclaimant Bacardi has the prior, superior, and exclusive right to use of the designation HAVANA CLUB as a trademark for rum in the United States and that plaintiff-counterclaim-defendant Havana Holding has acquired no valid rights in or to use of the words HAVANA CLUB as a trademark for rum in the United States and cannot stop Bacardi from use of said mark as aforesaid.

46.    Defendant-counterclaimants have been and are being damaged by Havana Holding's assertion of trademark rights in the term HAVANA CLUB and an actual controversy exists as to the existence of said rights as is demonstrated by the institution of the present suit.

WHEREFORE, defendant-counterclaimants respectfully pray for the relief requested hereinafter.

AS AND FOR A SIXTH<br>AFFIRMATIVE DEFENSE AND COUNTERCLAIM

VI.

Failure to State Claim

47.    Paragraphs 1 through 46 are incorporated herein by reference.

48.    The First Amended Complaint fails to state any claims against defendant-counterclaimants upon which relief can be granted and plaintiffs have failed to demonstrate standing to assert said claims.

WHEREFORE, defendant-counterclaimants respectfully pray:

A.    That the First Amended Complaint herein be dismissed with prejudice; and that defendant-counterclaimants be awarded their reasonable attorneys' fees and their costs and disbursements incurred herein.

B.    That with respect to the Affirmative Defenses and Counterclaims asserted herein, the Court adjudge and decree as follows:

1.    That this Court declares that defendant-counterclaimant Bacardi has the exclusive right to use the trademark HAVANA CLUB for rum in the United States and that Havana Holding and HCI have acquired no rights in said trademark in the United

A  406

States and are permanently enjoined from using said mark in the United States and from interfering in any manner with Bacardi's lawful use of said mark;

        2.    That defendant-counterclaimants recover their monetary damages suffered as a result of the aforesaid violations of 15 U.S.C. § 1120 as well as their costs and attorneys fees incurred in prosecuting said claim; and

        3.    That defendant-counterclaimants have such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Defendant-counterclaimants hereby demand trial by jury on all issues so triable as of right.

Dated:    New York, New York
           October 17, 1997

                          Respectfully submitted,

                          KELLEY DRYE & WARREN, LLP

                          By: _____
                            William R. Golden, Jr. (WG9406)
                            Margaret Ferguson (MF4036)
                            Jennifer Bernheim (JB9897)
                Attorneys for Defendants-counterclaimants
                Bacardi & Company Limited and
                BACARDI-MARTINI U.S.A., Inc.
                101 Park Avenue
                New York, New York 10178
                (212) 808-7800

# EXHIBIT 19

## In The Matter Of:

*HAVANA CLUB HOLINGS, S.A., et al. v.*
*GALLEON, S.A., BARCARDI-MARTINI U.S.A, et al.*

---

*Trial Volume Number 13*
*February 11, 1999*

---

*SOUTHERN DISTRICT REPORTERS, P.C.*
*Official Court Reporters*
*500 Pearl Street*
*Room 330*
*New York, NY  10007*
*(212) 805-0300*

*Original File 92bthauf.txt, 146 Pages*
*Min-U-Script® File ID: 3289538323*

## Word Index included with this Min-U-Script®

HAVANA CLUB HOLINGS, S.A., et al.    v.
GALLEON, S.A., BARCARDI-MARTINI U.S.A, et al.

Trial Volume Number 13
February 11, 1999

---

Page 1798

[1] in passing on what Havana Club International could do.
[2]    THE COURT: Mr. Golden, I don't want you to spend
[3] so much time on the unclean hands defense. We have so much
[4] to cover. If you were planning a lot more, don't.
[5]    MR. GOLDEN: I hear you, your Honor.
[6]    Finally, I would like to turn very briefly to
[7] Bacardi's counterclaim. Bacardi has sought declaratory
[8] relief in this manner, your Honor. The relief that Bacardi
[9] is seeking is simply an injunction against these plaintiffs
[10] interfering with Bacardi's use of the Havana Club mark in
[11] the United States.
[12]    We are not asking that the court declare that
[13] Bacardi has the exclusive right to the mark because we think
[14] in view of the prior holdings in the case with respect to
[15] Cuba Export and the fact that Cuba Export is not in the case
[16] right now, that probably would be unfair to ask the court to
[17] do. But we would ask that they be enjoined.
[18]    It is clear that although the Bacardi defendants
[19] are the principal defendants in this case, there is another
[20] defendant, Gallo Winery, that's a distributor of Bacardi,
[21] and plaintiffs' actions have interfered with our
[22] distributorship relations. So we believe we are entitled to
[23] the injunctive relief we request.
[24]    Thank you very much, your Honor.
[25]    THE COURT: Thank you, Mr. Golden.

---

Page 1799

[1]    All right, Mr. Sims? Now, Mr. Sims, I do hope
[2] you are going to address standing.
[3]    MR. SIMS: Yes.
[4]    THE COURT: I hope you are going to address the
[5] actual use issue. You were planning that too, weren't you?
[6]    MR. SIMS: Absolutely.
[7]    THE COURT: And I wondered if you were planning
[8] to address that secondary meaning argument that your
[9] adversary made.
[10]    MR. SIMS: I wasn't, other than to say in our
[11] brief we made clear that it is not an element – we don't
[12] claim that there is evidence in this record of our secondary
[13] meaning in the United States.
[14]    THE COURT: If you don't claim that you have
[15] clear secondary meaning, I just want you to address briefly
[16] his argument that you need to.
[17]    MR. SIMS: Maybe Mr. Krinsky will briefly address
[18] that.
[19]    THE COURT: Mr. Who?
[20]    MR. SIMS: Maybe Mr. Krinsky will briefly address
[21] that little piece.
[22]    THE COURT: Who is he saying?
[23]    MR. KRINSKY: I think me.
[24]    MR. SIMS: On secondary meaning we did brief it
[25] and I didn't think it would come up today.

---

Page 1800

[1]    THE COURT: All right. Ready?
[2]    MR. SIMS: Before I address those issues and
[3] place the facts in the boxes that litigators are accustomed
[4] to place them, the Section 43(a) fact, the Panama fact, the
[5] Arechabala fact, I want to step back for a moment and recall
[6] for the court the broader factual picture that the evidence
[7] has painted, because it was that –
[8]    THE COURT: I really think you better start with
[9] standing. I just don't think you can avoid it any longer.
[10]    MR. SIMS: I am not trying to avoid it, your
[11] Honor.
[12]    THE COURT: Then let's really face it. Let's
[13] face the standing question. Just do it just the way your
[14] adversary did it. Start with Havana Club Holding and move
[15] on to Havana Club International.
[16]    MR. SIMS: Okay. Your Honor, with respect to
[17] standing, standing on the 43(a) claim arises from two
[18] factors. I think it is important for the court to look back
[19] at the way the statute read before 1989 because it was
[20] revised in 1989 in ways that the courts have held and
[21] Congress said we are not intended to change the law.
[22]    The prior version of the statute, which I know
[23] you will find in McCarthy in section 27, and it is in many
[24] of the cases as well, said expressly that there was standing
[25] for parties with respect to geographic origin by any party

---

Page 1801

[1] who was selling in the area.
[2]    This is the original language of the Lanham Act.
[3] It was applied in the Black Heels case. That's one of the
[4] places where that can be found. And it embodies Congress'
[5] recognition that if you are selling from an area and
[6] somebody else is putting that area's origin on its
[7] product –
[8]    THE COURT: One second, one second. I have a
[9] computer glitch. Until I fix it I am not going to be
[10] concentrating on what you said. In fact, you may have to
[11] back up for a minute.
[12]    (Pause)
[13]    THE COURT: Okay. Would you start again when you
[14] said got to look to the pre-'89 version and just go from
[15] there. Thanks.
[16]    MR. SIMS: The Lanham Act provision in its
[17] pre-1989 version and, I believe, from its original
[18] enactment, had language that expressly said standing with
[19] respect to geographic origin claims only would be available
[20] for anybody who was selling – I don't have the exact
[21] language – in that area. And generally standing is
[22] available, and then it used the present language, to persons
[23] or businesses who believed that they had been or are likely
[24] to be damaged.
[25]    So we think it is plain – because the cases have

---

# EXHIBIT 20

*UNITED STATES–SECTION 211 OMNIBUS*
*APPROPRIATIONS ACT*

(DS176)

SECOND SUBMISSION

OF THE

UNITED STATES OF AMERICA

February 15, 2001

USPTO FOIA
07-128
921 of 1077

the U.S. law, and that what section 211 does is prevent the legitimate owner from enforcing his rights.

40.     In light of the detailed description of U.S. and European jurisprudence on the subject of recognition of foreign confiscations, it is incorrect that it is "legally undisputed" that confiscating entities have ownership rights in the United States with respect to trademarks used in connection with confiscated assets. It is precisely this ownership that is disputed under U.S. law, both in the jurisprudence and in section 211.

41.     Section 211 requires a decision-maker to consider, based on the particular facts at issue, numerous "ownership" issues. Among others, it appears that the decision-maker must determine that a business or assets existed and that it was owned by someone; that the business or asset was taken away from that owner without the payment of just and adequate compensation; that there were trademarks, trade names or commercial names used in connection with that business or assets (the Panel should recall that, under U.S. law, "use" in connection with a business or assets may create ownership rights in the trademark, trade name or commercial name); that there is an "original owner" of the trademark trade name or commercial name; that the trademark, trade name or commercial name disputed under section 211 is identical to, or substantially similar to the trademark, trade name or commercial name used in connection with the confiscated assets (which addresses in part who the owner of that trademark, trade name or commercial name is); and whether the original owner of the trademark, trade name, or commercial name has consented to its registration and/or use by someone else.

42.     All of these questions raise "ownership" issues: they address the issue of who is, and who is not, the owner of the trademark, trade name or commercial name in the United States. Each of these questions must be resolved by the decision-maker on the basis of the particular facts before him or her, in order to decide whether section 211 applies. If the answers to these questions establish that the confiscating entity is not the true owner of the trademark, trade name or commercial name (and does not have the consent of the original owner), then section 211 directs the court not to "recognize, enforce or otherwise validate" any assertion of rights by that person.

43.     The outcome of the court's determination under section 211 – that the assertion of rights by the confiscating entity not be recognized, enforced, or otherwise validated – cannot be read, as the EC apparently does, as a decision not to recognize, enforce or otherwise validate legitimate ownership rights. To the contrary, this outcome is the necessary result of the conclusion that the person asserting the rights has no such ownership rights.

44.     With respect to TRIPs enforcement obligations, it is not the U.S. position that the TRIPs Article 42 obligation is limited to "open[ing] the doors of the courthouse", as claimed by the EC in its oral statement at paragraph 73. As detailed in the First Submission of the United States, at paragraphs 84 - 86, TRIPs requires the availability of civil enforcement procedures only to remedy violations of rights "covered by this Agreement". Where there is no right, there is no

USPTO FOIA
07-128
928 of 1077

# EXHIBIT 21

TOM DeLAY
22D DISTRICT, TEXAS
MAJORITY WHIP
COMMITTEE ON
APPROPRIATIONS
SUBCOMMITTEES:
TRANSPORTATION
VA/HUD/INDEPENDENT
AGENCIES

02 - 0000 98 - C
2230 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–4322
(202) 225–5951

10701 CORPORATE DRIVE, SUITE 118
STAFFORD, TX 77477
(281) 240–3700
(800) 755–5748

One Hundred and Seventh EXECUTIVE SECRETARIAT
**Congress of the United States**
**House of Representatives**
Washington, DC 20515–4322

PM 3: 33

November 16, 2001

The Honorable Donald L. Evans
Secretary of Commerce
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, DC 20230

Dear Secretary Evans:

I am writing to bring to your attention an important issue at the U.S. Patent and Trademark Office that has been pending for some time and mandates resolution through the cancellation of U.S. Registration No. 1,031,651 of the Havana Club mark.

As you may know, in 1960, the Castro regime tried by fiat to take the rights to the Havana Club trademark for rum in the United States from its lawful owner and place title in a state-owned enterprise, Cubaexport. In 1997, the federal court in Manhattan found that Havana Club Holding ("HCH"), a partnership between Castro and Pernod Ricard, a French company, had violated the Cuban Asset Control Regulations by its efforts in 1994 to acquire the stolen Havana Club mark. Accordingly, summary judgment was granted to cancel all rights claimed by HCH in U.S. Registration No. 1,031,651 of the Havana Club mark.

In October 1999, the U.S. Court of Appeals unanimously upheld the trial court judgment. Later that same year, the U.S. Supreme Court denied HCH's petition. After losing recourse in every level of the court system, all the way to the Supreme Court, Pernod convinced the French government to institute a World Trade Organization proceeding, which they also lost overwhelmingly.

The time for justice has come. As the courts have ruled, Cubaexport and HCH committed fraud against the U.S. government when Cubaexport tried to sell to HCH the U.S. registration of the Havana Club mark it had stolen in 1960.

The United States Patent and Trademark Office must now put this dispute to rest by canceling U.S. Registration No. 1,031,651 of the Havana Club mark, as mandated by the courts over a year ago. We would like you to examine this situation and advise us on the status, as well as the future plans of the U.S. Patent and Trademark Office on the issue.

Thank you for your assistance in this matter.

Sincerely,

Tom DeLay

PRINTED ON RECYCLED PAPER

# EXHIBIT 22



**THE SECRETARY OF COMMERCE**
Washington, D.C. 20230

FEB - 7 2002

The Honorable Tom DeLay
House of Representatives
Washington, D.C. 20515

Dear Representative DeLay:

Thank you for your letter requesting the current status of U.S. Registration No. 1,031,651 (HAVANA CLUB and Design), as well as the future plans of the United States Patent and Trademark Office (USPTO) on the issue of cancellation of this registration.

Your letter states that "[t]he United States Patent and Trademark Office must now put this dispute to rest by canceling U.S. Registration No. 1,031,651 of the Havana Club mark, as mandated by the courts over a year ago."

Pursuant to Section 17 of the Trademark Act, 15 U.S.C. § 1067, absent a court order, applications to cancel the registration of a mark are reviewed by the USPTO's Trademark Trial and Appeal Board (Board). Such a cancellation proceeding involving U.S. Registration No. 1,031,651 is pending before the Board, although the proceedings are currently stayed, at the request of the parties. With respect to the federal court holding to which you refer, we enclose a copy of the partial judgment issued by the United States District Court, Southern District of New York, on October 20, 1997. As you will see, the Court did not order cancellation of U.S. Registration No. 1,031,651. Rather, the Court ordered the USPTO to amend its records to reflect ownership of U.S. Registration No. 1,031,651 in Empresa Exportadora de Alimentos y Productos Varios ("Cubaexport"). The USPTO has so amended its records and a copy of the USPTO's communication to the parties, informing them of this fact, is also enclosed. Thus, since the Court did not order cancellation of U.S. Registration No. 1,031,651, and because the cancellation proceeding is currently in a "suspended" status at this time, the USPTO is without authority to take the action you have suggested.

We note that the World Trade Organization (WTO) proceeding to which you refer was not an appeal from the litigation between Bacardi and Pernod-Ricard with respect to the trademark "HAVANA CLUB." Rather, the WTO proceeding involved Section 211 of the Omnibus Appropriations Act of 1998 (Section 211). The report of the Appellate Body was issued on January 2, 2002, and is available from the WTO Web site at www.wto.org.

USPTO FOIA
07-128
433 of 1077

Representative Tom DeLay
Page 2


I look forward to working with you in the future. Please contact me or Brenda Becker,
Assistant Secretary for Legislative and Intergovernmental Affairs, at (202) 482-3663, should
you have any further questions.

Warm regards,

Donald L. Evans


Enclosures

# EXHIBIT 23



STATE OF FLORIDA

# Office of the Governor

THE CAPITOL
TALLAHASSEE, FLORIDA 32399-0001

www.flgov.com
850-488-7146
850-487-0801 fax

JEB BUSH
GOVERNOR

June 13, 2002

The Honorable James E. Rogan
US Patent and Trademark Office
Crystal Park, Building 2, Room 906
2121 Crystal Drive
Arlington, VA 22202

Dear Under Secretary Rogan:

I am writing on behalf of Florida-based Bacardi-Martini, USA, Inc. to ask that the Patent and Trademark Office take quick, decisive action on a pending application to expunge the registration of the trademark Havana Club. The out-dated registration belongs to a company owned by Fidel Castro called CubaExport and should be cancelled immediately.

Bacardi-Martini, USA, Inc. generates close to $1 billion of business a year nationally. The company's domestic headquarters are located in Miami and has a workforce of more than 300 Floridians and more than 600 employees throughout the United States.

As I understand, since 1997 Bacardi-Martini, USA, Inc. has sought, through every legal channel, to cancel the Fidel Castro regime's registration of the Havana Club trademark. In 1960, Fidel Castro confiscated the Havana Club brand from the family who owned the company. Castro transferred the brand name to CubaExport, a Cuban government-controlled company in 1976. In 1993, the company Havana Club Holdings, jointly owned by Castro's Cuban government and the French company Pernod-Ricard, applied for and was granted, legal registration of the brand for use in the United States. However, it was not theirs to register. Furthermore, Bacardi-Martini, USA, Inc. purchased the Havana Club brand and assets in 1997 from the original owners.

Though Bacardi-Martini, USA, Inc. has spent a great deal of time and money to cancel the delinquent registration owned by the Castro regime, there has been no relief for the company. Instead, they have been faced with a process mired in lengthy bureaucratic procedures, with no end in sight.



Governor's Mentoring Initiative
BE A MENTOR. BE A BIG HELP.
1-800-825-3786

USPTO FOIA
07-12
445 of 107

The Honorable James E. Rogan
June 13, 2002
Page Two

A swift resolution to this matter is imperative. Should you have further questions, please do not hesitate to contact my office. You may also feel free to contact my Washington, D.C., Office at 202/624-5885. Thank you for your consideration of this matter.

Sincerely,

Jeb Bush

USPTO FOIA
07-128
446 of 1077

# EXHIBIT 24



**UNITED STATES
PATENT AND
TRADEMARK OFFICE**
★★★★

Under Secretary of Commerce For Intellectual Property and
Director of the United States Patent and Trademark Office
Washington, DC 20231
www.uspto.gov

JUL - 3 2002

The Honorable Jeb Bush
Governor of Florida
Tallahassee, Florida 32399-0001

Dear Governor Bush:

Thank you very much for your letter of June 13, 2002, regarding the trademark "HAVANA
CLUB". I am grateful for the opportunity to provide you with specific information regarding
the status of the "HAVANA CLUB" trademark registration.

U.S. Trademark Registration No. 1,031,651 ("HAVANA CLUB" and design) is the subject of
Cancellation Proceeding No. 92-024108 before the United States Patent and Trademark
Office's (USPTO) Trademark Trial and Appeal Board (TTAB).

The cancellation proceeding was initiated in 1995 by Galleon S.A., Bacardi-Martini U.S.A.,
Inc., and Bacardi & Company Ltd. ("Bacardi") against Havana Club Holding, S.A. and
Havana Rum & Liquors, S.A., d/b/a/ H.R.L., S.A. ("HCH"). At the request of the parties, the
proceeding was suspended on July 1, 1999, pending the outcome of other civil litigation. The
proceeding was revived, again at the request of the parties, earlier this year.

On January 15, 2002, pursuant to an October 20, 1997 Court order from the United States
District Court for the Southern District of New York, the USPTO's Commissioner for
Trademarks ordered USPTO assignment and registration records rectified to reflect ownership
of U.S. Trademark Registration No. 1,031,651 in Cubaexport. The assignment changes were
recorded in the USPTO's records at: Reel: 002398 Frames: 0855-0863.

On March 15, 2002, Bacardi filed a petition to substitute Cubaexport as the defendant in the
cancellation proceeding and to obtain summary judgment (for cancellation). On March 19,
2002, Bacardi filed with the U.S. Court of Appeals for the Federal Circuit a petition for
review of the Commissioner for Trademarks' January 15, 2002 order. *Galleon, S.A. v.
Chasser*, No. 02-1289 (Fed. Cir.). On May 13, 2002, the TTAB suspended action on the
cancellation proceeding pending the outcome of the relevant litigation (*Galleon, S.A. v.
Chasser*, No. 02-1289) in the U.S. Court of Appeals for the Federal Circuit.

-2-

I hope this information clarifies the status of the cancellation proceeding involving the "HAVANA CLUB" case. To an important degree, the parties themselves are determining the pace of final resolution with respect to Cancellation Proceeding No. 92-024108. The Office will act expeditiously when the proceeding reaches the stage where the TTAB has statutory and regulatory authority to render a final decision.

Thank you again for this opportunity to provide an update regarding the status of Cancellation Proceeding No. 92-024108. If you should have any questions about this matter, please call me or Jon Dudas, Deputy Under Secretary for Intellectual Property, at (703) 305-8700.

Sincerely,

JAMES E. ROGAN
Under Secretary and Director

*Please pass along my affectionate regards to two old friends: Kathleen Shanahan & Charles Canady!*

# EXHIBIT 25



Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451
www.uspto.gov

Re: Trademark Registration of          :
    Empresa Cubana Exportadora de       :
    Alimentos y Productos Varios d/b/a   :
    Cubaexport                           :
Registration No. 1,031,651              :        On Petition
Registered: January 27, 1976            :
Mark: HAVANA CLUB and Design            :
Petition Filed: January 25, 2006        :

Bacardi & Company Limited and Bacardi USA, Inc. (collectively, petitioner) have petitioned the Director of the United States Patent and Trademark Office (Director) to deny renewal of the subject registration. The Director has authority to review the request under 37 C.F.R. §2.146. The petition is denied.

## FACTS

The above-mentioned registration issued on January 27, 1976. On December 14, 2005, Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a Cubaexport (registrant) filed a combined Section 8 declaration of excusable nonuse and Section 9 renewal application (combined filing) pursuant to 15 U.S.C. §§1058 and 1059. This petition was filed on January 25, 2006.[1]

## ANALYSIS

Petitioner seeks to introduce documents and information for the Director's consideration in regard to the combined filing submitted by the registrant. The review of a combined filing is an *ex parte* matter. Neither the Trademark Act nor the Trademark Rules of Practice provide for a third party to intervene in an *ex parte* matter. Therefore, petitions filed by third parties to review actions taken in *ex parte* matters are generally denied. *Trademark Manual of Examining Procedure* (TMEP) §1705.01.

Here, petitioner seeks to involve itself in the Director's review of a combined filing in connection with a registration of which petitioner is not the owner. The Director will not consider the information or documents submitted with this petition because petitioner is a third party in this *ex parte* matter.

---

[1] On July 19, 1994, petitioner instituted cancellation proceedings regarding the subject registration before the Trademark Trial and Appeal Board (TTAB). While the proceedings were under way, the subject registration was granted a first renewal, on June 18, 1996, for a term of ten years. In a decision issued January 29, 2004, the TTAB dismissed the petition to cancel. On March 29, 2004, petitioner commenced a civil action in the United States District Court for the District of Columbia (District Court) seeking review of the TTAB decision. The District Court has not yet issued a decision in this matter.

DECISION

The petition is denied.

Sharon R. Marsh
Deputy Commissioner
  for Trademark Examination Policy

SRM:CPC

Date:   JUL 1 8 2006

Attorney for Petitioner:

William R. Golden, Jr.
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY  10178

Attorney for Registrant:

Vincent N. Palladino
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY  10020-1104

# EXHIBIT 26

Yahoo!  My Yahoo!  Mail    Make Y! your home page                                      Search: [_____]  [_____]

## YAHOO! FINANCE    Sign In    Finance Home - Help
New User? Sign Up

Welcome [Sign In]

Financial News                                                  To track stocks & more, Register

Enter symbol(s): [_____]  [Basic]  [_____]  Symbol Lookup

Press Release                                                   Source: Bacardi U.S.A., Inc.

# U.S. Government Resolves Havana Club Dispute In Bacardi's Favor
Tuesday August 8, 4:05 am ET

## Cuba's Trademark Registration "Cancelled/Expired"

MIAMI--(BUSINESS WIRE)--Aug. 8, 2006--Bacardi U.S.A. applauds the long-awaited decision by the U.S. Patent and Trademark Office (PTO) declaring that Cuba's registration of the HAVANA CLUB trademark is "cancelled/expired." The decision means that the Cuban government can no longer claim any rights to the mark in the United States. Bacardi -- which owns the rights to the brand based on use and as a successor to the original owners -- has a pending application to register the mark in its own name.

The PTO's action, dated August 3, comes just six days after the U.S. Treasury's Office of Foreign Assets Control (OFAC) denied a Cuban government agency a specific license that was necessary to seek renewal of the trademark registration at the PTO.

Bacardi purchased the HAVANA CLUB brand from the original owners, whose brand and other assets were confiscated by the Cuban government without compensation.

"Bacardi commends OFAC and the PTO for following U.S. law and worldwide principles that prevent registration or renewal of trademarks obtained through confiscation, without compensation to the original owners," said John P. Esposito, President and CEO of Bacardi U.S.A.

The OFAC and PTO decisions are watershed events in the ten-year dispute between Bacardi and the Cuban government and its French partner over the rights to the HAVANA CLUB trademark in the United States. In a case that went all the way up to the Supreme Court, the U.S. courts ruled that the Cuban-French joint venture had no rights to the trademark. Bacardi continued to fight the Cuban government's claim to the U.S. registration in the PTO and the courts, even though by law that claim cannot be recognized or enforced in the U.S. Now Cuba's registration has finally been declared expired and cancelled.

Bacardi has been preparing for a relaunch of Havana Club rum in the United States.

About Bacardi

Bacardi U.S.A. is the import, sales, and marketing arm of one of the world's leading wine and spirits producers. Bacardi U.S.A. boasts a brand portfolio of some the United States' most recognized and top selling spirits including: BACARDI rum, the favorite spirit in the U.S. and favorite rum in the world; GREY GOOSE vodka, the world leader in ultra premium vodka; MARTINI & ROSSI vermouth, the world leader in vermouth; DEWAR'S scotch whisky, the favorite selling blended scotch whisky in the United States; BOMBAY SAPPHIRE gin, the best selling super premium gin in the U.S.; and CAZADORES blue agave tequila, the top selling 100% blue agave tequila in the world and other fine brands.

Havana Club Background:

Havana Club rum was created in Cuba in 1935 by Jose Arechabala S.A., a company owned by the Arechabala family. The Arechabalas registered the trademark in the U.S. in 1935 and sold their rum in the U.S. over a twenty year period. The Castro regime seized the Arechabala business without compensation in 1960 and the Arechabalas were forced into exile, except for the company lawyer who was imprisoned for ten years. The Arechabala family had no means to make rum outside Cuba but always planned to resume producing and marketing Havana Club rum as soon as they could do so. Those plans became possible in the 1990s, when the Arechabalas formed an alliance with Bacardi.

U.S. Government Resolves Havana Club Dispute in Bacardi's Favor: Financial News - Yahoo! Fi...   Page 2 of 2

In 1976, after the Arechabala family's HAVANA CLUB trademark registration expired, Cubaexport (a Cuban government agency) registered the mark in the U.S. through a loophole in the trade embargo. In 1993 the Cuban government established a joint venture with the French liquor company Pernod Ricard to exploit the brand.

Congress closed the loophole in the Cuban embargo in 1998, when it passed a law to prevent registration, renewal or recognition of rights to trademarks confiscated without compensation by Cuba, except with the consent of the rightful owners.

As a result of the OFAC and PTO action, Cuba's registration has not been renewed and has been declared expired and cancelled. This confirms that Cuba has no rights in the HAVANA CLUB trademark in the United States.

*Contact:*

For Bacardi U.S.A., Inc., Miami
Amy Federman, 305-347-4343
or
Patricia Neal, 305-446-9050

Source: Bacardi U.S.A, Inc.

Copyright © 2006 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Ad Feedback
Copyright © 2006 Business Wire. All rights reserved. All the news releases provided by Business Wire are copyrighted. Any forms of copying other than an individual user's personal reference without express written permission is prohibited. Further distribution of these materials by posting, archiving in a public web site or database, or redistribution in a computer network is strictly forbidden.

# EXHIBIT 27

## • National Public Radio

**National Public Radio**
**All Things Considered**
August 8, 2006
**Rumble Brewing over 'Real' Cuban Rum**
Edition: 21:00-22:00 PM
Index Terms:
5627722
Estimated printed pages: 3
Article Text:

MELISSA BLOCK, host:
The Bacardi Company today announced it will soon start selling a new version of Havana Club Rum, a brand that originated in Cuba more than 70 years ago. The company that originally made Havana Club was taken over by the Cuban government in 1960. A Cuban made rum by that name is still sold in Cuba and around the world, though the U.S. embargo has blocked its distribution in this country.
As NPR's Tom Gjelten reports, the competition between the two Havana Club rums may foreshadow some of the battles to come in Cuba's future.

TOM GJELTEN reporting:
Back in pre-Castro Cuba, Bacardi and Havana Club were the two best known brands of rum on the island. Both were made by long established Cuban families, the Bacardis and the Arechabalas. John Gomez, the marketing director of Bacardi USA, says the Bacardis regarded Havana Club as a competitor to their own rum.

Mr. JOHN GOMEZ (Bacardi USA): This is a brand that was served in the hottest night spots in Havana. It was a favorite of American and European tourists there. And it was also sold in the U.S. from the 1930s until 1960.

GJELTEN: In 1960, both family companies were taken over by Fidel Castro's government. Bacardi had operations outside Cuba and was able to regroup. The Arechabalas were not so fortunate and got out of the rum business.

The Cuban government, however, continued to make rum at the Arechabalas' old factory, selling it under the Havana Club trademark, mostly to countries in the Soviet block. Thinks stayed that way until the early 1990s, when Cuba started looking for new markets. The French liquor firm Pernod Ricard began a joint venture with the Cuban government to market Havana Club Rum internationally.

The Arechabala family then sold its claim to the Havana Club trademark and its old rum recipe to Bacardi. There followed a long legal battle over who had the right to make and sell Havana Club. Bacardi ultimately won, but only with respect to the use of the Havana Club trademark in the United States. Again, John Gomez of Bacardi.

Mr. GOMEZ: Right now, we own the rights to this brand and we felt that this was the appropriate time to leverage the brand to take advantage of some of the hot trends that are taking place and to give the consumer what they're looking for.

GJELTEN: Havana Club Rum made by the state-owned Cuban company is now sold around the world, but not in the United States, where the trade embargo excludes all products made in Cuba. But now the Bacardi version of Havana Club will go on sale, a premium white rum based – according to the company – on the Arechabala family's original rum recipe. The product has been in preparation for more than three years, so its launch this week at a time when Cuba is back in the news is coincidental. The rum is made in Puerto Rico and the bottle will say so in large letters. John Gomez of Bacardi says the product will be marketed simply as a top quality white rum.

Mr. GOMEZ: Super premium rums were growing, but most of those rums were dark rums. And we felt that there was an opportunity in the marketplace for a super premium white rum. And that was one of the reasons we felt the time was right for Havana Club.

GJELTEN: The Bacardis' Cuban roots are still important, however. The company is still almost entirely owned by Bacardi family members, and they have not forgotten how Fidel Castro essentially forced them into exile. Beverage analyst Tom Pirko says the company's strong feelings about its Cuban heritage may be one reason it has moved to associate itself with an identifiably Cuban brand.

Mr. TOM PIRKO (BevMark LLC): They're trying to capitalize upon this extraordinary energy that is invested in Cuba and the changes that are taking place and will take place in Cuba. And so it's a business decision. However, that being said, anyone who looks at this company is looking at a culture that is this highly emotional and has a certain view of itself. Their attitudes in terms of what they do are uniquely Bacardian.

GJELTEN: The contest to see which Havana Club Rum will triumph is a fight that has much to do with the future of Cuba as well. Once Fidel Castro's regime is replaced by a democratic government and the U.S. trade embargo is lifted, made in Cuba products are likely to flood the United States. With its right to the Havana Club Rum brand now seemingly secure, Bacardi may have blocked the rival Havana Club product from getting a U.S. foothold.
Tom Gjelten, NPR News, Washington.

Copyright ©2006 National Public Radio®. All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to National Public Radio. This transcript may not be reproduced in whole or in part without prior written permission. For further information, please contact NPR's Permissions Coordinator at (202) 513-2030.
Record Number: 200608082106

3253545_1

# EXHIBIT 28



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

License No. CU-75745-a

## CUBAN ASSETS CONTROL REGULATIONS

### LICENSE AMENDMENT

(Granted under the authority of 50 U.S.C. App. 5(b), 22 U.S.C. 2370(a), 22 U.S.C. 6001 *et seq.*,
Proclamation 3447, and 31 CFR Parts 501 and 515)

To:    **Ropes & Gray LLP**
**1211 Avenue of Americas**
**New York, NY 10036-8704**
**Attn: Vincent N. Palladino, Esq.**

1.  Based upon your letter of March 22, 2007, on behalf of Empresa Cubana Exportadora de Alimentos y Productos Varios (the "Application"), and information otherwise available to the Office of Foreign Assets Control, the following transactions are hereby licensed:

\*    \*    \*    \*    **SEE REVERSE**    \*    \*    \*    \*

2.  This license is granted upon the statements and representations made in the Application, or otherwise filed with or made to the Treasury Department as a supplement to the Application, and is subject to the conditions, among others, that the Licensee complies in all respects with all regulations, rulings, orders and instructions issued by the Secretary of the Treasury under the authority cited above and the terms of this License.

3.  The Licensee shall furnish and make available for inspection any relevant information, records or reports requested by the Secretary of the Treasury or any duly authorized officer or agency of the Secretary.

4.  This license expires on **July 31, 2009**, is not transferable, is subject to the provisions of 31 C.F.R. Parts 501 and 515, and any regulations and rulings issued pursuant thereto and may be revoked or modified at any time at the discretion of the Secretary of the Treasury acting directly or through the agency through which this License was issued, or any other agency designated by the Secretary of the Treasury. If this License was issued as a result of willful misrepresentation, it may, in the discretion of the Secretary of the Treasury, be declared void from the date of its issuance, or from any other date.

5.  This License does not excuse compliance with any law or regulation administered by the Office of Foreign Assets Control or another agency (including reporting requirement) applicable to the transactions herein licensed. nor does it release the Licensee or third parties from civil or criminal liability for violation of any law or regulation.

Issued by direction and on behalf of the Secretary of the Treasury:

**OFFICE OF FOREIGN ASSETS CONTROL**

By *Clara David*                                          7/9/07
for   **Elizabeth W. Farrow**                             Date
**Assistant Director for Licensing**

[Attention is directed to 19 U.S.C.§§ 1592 and 1595a, 18 U.S.C. 545, 18 U.S.C. 1001, 50 U.S.C. App. 16, and 31 CFR 515.701 for provisions relating to penalties.]

License No. CU-75745-a                                      **Page 2 of 2**
Licensee: Ropes & Gray LLP

**SECTION 1 - AUTHORIZATION:**  Subject to the terms and conditions set forth herein, the law firm of Ropes & Gray LLP (the "Licensee") is authorized to receive payment of legal fees and reimbursement of incurred expenses  for the provision of services for the legal representation of  a Cuban company, Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport") before the United States Trademark Trade and Appeals Board in cancellation proceeding number 24,108 (including appeals of that proceeding), as authorized by 31 C.F.R. § 515.512 and as described in the Application, provided the funds are routed from Cuba to the United States via a third-country bank.

**SECTION 2 – CONDITIONS:**  (a) Payments to the Licensee for professional fees and expenses authorized by this License must not originate from a source within the United States or within the possession or control of a U.S. person, including its overseas branches, or from any entity or individual whose property or interests in property are blocked pursuant to any Executive order or Chapter V of Title 31 of the C.F.R.

(b) Any transfer of funds through the U.S. financial system pursuant to the authorization set forth above should reference the number of this license to avoid blocking or rejection of the transfer.

(c) The Licensee must submit a copy of this License to the relevant court or any other decision-making body or forum.

**SECTION 3 – WARNINGS:**  (a) Except as specifically and expressly authorized by the terms of this License, this License does not authorize the transfer of any blocked property or interest therein, the debiting of any blocked account, the entry of any judgment or order that effects a transfer of blocked property or an interest therein, or the execution of any judgment against any property or property interest which is blocked pursuant to any Executive order or Chapter V of Title 31 of the C.F.R. or Trading With the Enemy Act of 1917 (TWEA), 50 U.S.C. App. 1 *et seq.*

(b) This License does not authorize entry into a settlement agreement or the enforcement of any lien, judgment, arbitral award, decree or other order through execution, garnishment, or other judicial proceedings, or any other means.  Any such settlement agreement or enforcement action must be separately authorized by the Office of Foreign Assets Control.

**SECTION 4 – REPORTING REQUIREMENTS:**  (a) The Licensee is subject to the recordkeeping and reporting requirements of, *inter alia*, 31 C.F.R. §§ 501.601 and 501.602, including the requirement to maintain full and accurate records concerning the transactions undertaken pursuant to this License for a period of five years from the date of each transaction.

(b) In the event of litigation or similar proceedings described in 31 C.F.R. 501.605(a), other than proceedings to which the Office of Foreign Assets Control is a party, the Licensee is required to report by immediate telephone call or facsimile transmission to the Chief Counsel, Office of Foreign Assets Control (Tel: 202/622-2410; Fax: 202/622-1911), the scheduling of any hearing or status conference in legal proceedings whenever it appears that a court or decision-making body may issue an order or judgment or default judgment or is considering or may decide any pending request dispositive of the merits of the proceeding or of any claim raised in the proceeding.  See 31 C.F.R. § 501.605 for requirements regarding reports on litigation, arbitrations and dispute resolution proceedings.

**SECTION 5 - PRECEDENTIAL EFFECT:**  The authorization contained in this License is limited to the facts and circumstances specific to the Application.
**************************************************************************************

# EXHIBIT 29

Report to the President
Case 1:06-cv-01692-RCL    Document 35-32    Filed 07/23/2008    Page 2 of 4
Page 1 of 39



**Commission for Assistance to a Free Cuba**
July 2006

**Report to the President**

 

**Condoleezza Rice**
**Secretary Of State**
**Chair**

**Carlos Gutierrez**
**Secretary Of Commerce**
**Co-Chair**

**TABLE OF CONTENTS**

EXECUTIVE SUMMARY
INTRODUCTION

CHAPTER 1: HASTENING THE END OF THE CASTRO DICTATORSHIP: TRANSITION NOT SUCCESSION

I. Introduction
II. Determinations
III. Empowering the Cuban People
IV. Breaking the Regime's Information Blockade
V. Undermining the Regime's Succession Strategy
VI. Denying Revenue to the Castro Regime

CHAPTER 2: HELPING CUBANS RESPOND TO CRITICAL HUMANITARIAN AND SOCIAL NEEDS

I. Introduction
II. Water and Sanitation
III. Health-Care and Nutrition
IV. Food Security
V. Shelter
VI. Protection of the Most Vulnerable Populations
VII. Educational Systems

CHAPTER 3: HELPING CUBANS GET TO FREE AND FAIR ELECTIONS

I. Introduction
II. Release of Political Prisoners
III. Eliminating Legal Obstacles to Freedom of Speech, Freedom of the Press and Freedom of Political Association
IV. Preparing for Competitive Multi-Party Elections And Democratic Process
V. Support a Free and Independent Media

## RECOMMENDATIONS:

*Selected recommendations include the following:*

- *Lista de Esbirros*: Place the names of those credibly believed to be involved in orchestrating human rights abuses in Cuba into the Abuse Case Evaluation System (ACES) database that is currently maintained and managed by the Bureau of Democracy, Human Rights and Labor at the State Department;
- Place the names of individuals involved in the 2003 and subsequent trials of opposition activists, as well as those involved in orchestrating *Actos de Repudio*, on the visa lookout database;
- Amend Presidential Proclamation 5377 to permit the denial of immigrant, as well as non-immigrant visas, to officers and employees of the Government of Cuba or the Communist Party of Cuba;
- Authorize denial of the right to adjust status to legal permanent alien to any regime official when such an act would be detrimental to the interests of the United States; and,
- Submit the names of officials indicted for the murder of the "Brothers-to-the-Rescue" pilots to Interpol.

## MAKING MIGRATION SAFE, ORDERLY, AND A FORCE FOR CHANGE IN CUBA

The Cuban government has failed to honor its commitments under the September 9, 1994, Joint Communiqué and the May 2, 1995, Joint Statement, otherwise known as the "Migration Accords." While the 1994 Joint Communiqué obligates Cuba to take measures to ensure that migration is safe, legal, and orderly, the Cuban government continues to deny U.S. officials permission to monitor returned migrants outside of Havana; facilitates the departure of thousands of Cubans annually over the land borders into the U.S. via Mexico; deny exit permits to otherwise qualified Cuban citizens, making some people wait for years to emigrate; and flatly prohibit others from emigrating, including doctors and family members of government officials.

The regime has also enacted a series of other bureaucratic measures that impede the U.S. Interests Section's efforts to meet the U.S. commitments under the Agreement. As detailed in CAFC I, with these and other mechanisms, the Castro regime continues to manipulate migration flows to the United States. The regime does so to further its policies of generating additional hard currency and as a means to control its population — releasing pressure when necessary by permitting more exits. The regime further seeks to dampen the efforts of Cuban activists working for change by withholding exit permission to attend international conferences or receive awards.

## RECOMMENDATIONS:

*Selected recommendations include:*

In response to Cuba's repeated and consistent efforts to impede safe, legal, and orderly migration, we recommend a series of diplomatic efforts to notify the Castro regime of its failure to meet its obligations under the Migration Accords and protesting its efforts to interfere with and disrupt U.S. migration policy.

## VI. DENYING REVENUE TO THE CASTRO REGIME

The policies of the Castro regime continue to debilitate the Cuban economy, impoverish the Cuban people, and isolate Cuba from economic advances enjoyed by the rest of the Western Hemisphere. The regime ignores its obligations to its people and diverts its resources to maintain its grip on power, manage a succession of the regime, and destabilize democracies elsewhere in the Hemisphere. The more financially stressed the system is, the more difficult it will be for any leader who follows Fidel Castro to preside over a succession within the dictatorship

The first report of the Commission recommended, and the President directed be implemented, a comprehensive set of measures to deny the Castro regime the revenues it needs to maintain its repressive security apparatus. By the regime's own admission, these measures — and continued enforcement actions — have sharply cut licensed and unlicensed travel to the island each year since the implementation of the measures of the first report.

Limitations on travel, parcel deliveries and remittances have sharply curtailed the regime's manipulation of and profiteering from U.S. humanitarian policies. These measures have been successful and should continue to be implemented.

In order to undermine the regime's succession strategy, it is critical that the U.S. Government maintain economic pressure on the regime to limit its ability to sustain itself and repress the Cuban people. Moreover, as we rapidly approach the transitional moment, the more economic pressure there is on the regime, the greater the likelihood there will be dramatic and successful change for the Cuban people.

Report to the President
Case 1:06-cv-01692-RCL    Document 35-32    Filed 07/23/2008    Page 4 of 4
Page 13 of 39

**Improved Enforcement**

The Castro regime continues to seek new and additional ways to raise desperately needed hard currency by encouraging and facilitating unlicensed cash flows and travel from the United States to Cuba. The profits from these transactions continue to be critical for the maintenance of the regime's repressive security apparatus. The regime has facilitated the establishment of third-country travel and remittance companies whose primary purpose is to facilitate unlicensed transactions from the United States and to help individuals evade U.S. restrictions on such transactions. Similarly, in the last several years we have witnessed a surge in attempts to abuse existing license categories to engage in non-permissible activities, such as tourism or other non-licensable visits.

**RECOMMENDATIONS:**

*Selected recommendations include:*

- Establish an inter-agency Law Enforcement Task Force for better enforcement of U.S. economic sanctions on the Castro regime; and
- Issue a directive to law enforcement agencies to pursue criminal investigations, including prosecution, where possible and appropriate, of Cuban Assets Control Regulation and other violations, especially for those found to have been involved in organizing or facilitating unlicensed travel transactions with Cuba.

**Office of Foreign Assets Control (OFAC) Regulations:**

- Prohibit individuals who wish to send remittances from going directly to third-country institutions to send such remittances to Cuba and require instead that all remittances be sent through licensed U.S. remittance forwarders. Eliminate the use of cash-card services for licensed travel to Cuba;
- Expand the list of regime officials and agencies which are not permitted to receive licensed remittances, and ensure that those included in the "Lista de Esbirros" do not benefit from U.S. humanitarian policies by including them on the list of Specially Designated Nationals (SDNs) and by barring SDNs from receiving remittances;
- Implement new licensing criteria and reporting requirements for travel service providers (TSPs) and Carrier Service Providers (CSPs), including a requirement that TSPs and CSPs have an independent financial audit conducted annually; and
- Expand the use of Specially Designated Nationals (SDNs) to designate companies, including front companies, engaged in efforts to promote the sale of Cuban goods or unlicensed travel, remittances, and other transactions from the United States to Cuba.

**U.S. Department of Commerce Regulations:**

- Revise temporary sojourn license (TSL) regulations and implementing guidelines to ensure that licenses are not issued to maritime vessels, unless the vessel is solely registered to transport goods and is engaged in the regular transport of bulk commodities, or unless otherwise consistent with the foreign policy interests of the United States;
- Revise regulations and implementing guidelines to deny export licenses, consistent with U.S. law, for discretionary, cosmetic, or other medical equipment sales that would be destined to be used in large-scale medical programs that cater to tourists and foreign patients and not exclusively for the benefit and care of the Cuban people;
- Develop effective monitoring and certification requirements for medical equipment exports that ensure that these exports are used only for the use and benefit of the Cuban people and not diverted to tourist or foreign care institutions;
- Ensure monitoring for medical equipment is undertaken for the life of the product to ensure items exported are at intended end-use institutions. In the event that the Cuban government does not permit on-site monitoring at certain institutions, future exports will not be authorized to such locations;
- Reaffirm the U.S. Government's export license policy of a strict general policy of denial of Commerce export licenses, unless otherwise required by existing law; and
- Tighten regulations for the export of humanitarian items, other than agricultural or medical commodities, to ensure that exports are consigned to entities that support independent civil society and are not regime administered or controlled organizations, such as the Cuban Council of Churches.

**Target Regime Foreign Income and Assets Abroad**

Following the reductions in regime revenue as a result of the first Commission report, nearly half of the regimes' current foreign income is now derived from nickel exports. The revenue from these sales does not go to benefit the Cuban people, but is diverted to maintain the regime's repressive security apparatus and fund Castro's interventionist and destabilizing policies in other countries in the Hemisphere. Moreover, some of this revenue is derived from assets illegally expropriated from U.S. citizens after Castro came to power. In addition, there are growing indications of senior elements of the regime,

# EXHIBIT 30

## ASSIGNMENT

Whereas Empresa Cubana Exportadora de Alimentos y Productos Varios, S.A., doing business as Cubaexport, of 55, 23 Street, Vedado, Havana, Cuba, is the owner of the following trademark registered in the United States Patent and Trademark Office:

| Trademark | Registration No. | Date of Registration |
|---|---|---|
| HAVANA CLUB and Design | 1031651 | January 27, 1976 |

and Whereas Havana Rum and Liquors, S.A., doing business as H.R.L., S.A., of ___305, 44 Street, Miramar, Havana, Cuba___

------------------------------------------------
_____ (address),

is desirous of acquiring said mark and the registration thereof;

Now, therefore, for $10 and other good and valuable consideration, receipt of which is hereby acknowledged, said Empresa Cubana Exportadora de Alimentos y Productos Varios, S.A., doing business as Cubaexport does hereby assign unto the said Havana Rum and Liquors, S.A., doing business as H.R.L., S.A. all right, title and interest in and to the said mark, together with the good will of the business symbolized by the mark, and the above identified registration thereof.

Signed at Cuba export/ of 55, 23 Street, Vedado, Havana (address

of signing) this _10_ day of ___january___, 199_4_.

(Seal)

Empresa Cubana Exportadora de Alimentos y Productos Varios, S.A., doing business as Cubaexport

By: _____ (Signature)

Milda Picos River's / Manager
Type name and offical title

### Acknowledgment

On this _10_ day of ___january___, 199_4_, personally appeared _Milda Picos River's._ ___ (Name of Signing Officer), to me known and known to me to be the _Manager ___ (Title) of Empresa Cubana Exportadora de Alimentos y Productos Varios, S.A., doing

REEL 104 FRAME 047 TRADEMARK

business as Cubaexport, the assignor above named, and
acknowledged that he(she) executed the foregoing Assignment on
behalf of said assignor and pursuant to authority duly received.

_____
(Signature)

Hilda Picos Rivern's  /  Manager
(Type Name and Title)*

(Seal or Stamp of Authority)


    * The person who signs the acknowledgment must be authorized
to do so by the law of the jurisdiction where the document is
executed, and the seal or stamp of the notary, or other evidence
of authority in the jurisdiction of execution, must be affixed.

REEL: 1104 FRAME: 0418

TRADEMARK

FEB 10 94
RECORDED
PATENT AND TRADEMARK
OFFICE

-2-

## ASSIGMENT

Whereas HAVANA RUM AND LIQUORS, S.A., doing business as HRL,S.A., of 305, 44 Street, Playa, Havana, Cuba, is the owner of the following trademark registered in the United States Patent and Trademark Office:

| Trademark | Registration No. | Date of Registration |
|-----------|------------------|----------------------|
| HAVANA CLUB and Design | 1031651 | January 27, 1976 |

and Whereas HAVANA CLUB HOLDING,S.A., doing business as HCH,S.A., of 6, rue Heine, Luxembourg, is desirous of acquiring said mark and the registration thereof;

Now, thereof, for $ 10 and other good and valuable conside- ration, receipt of which is hereby acknowledged, said HAVANA RUM AND LIQUORS,S.A., doing business as HRL,S.A. does hereby assing unto the said HAVANA CLUB HOLDING,S.A., doing business as HCH,S.A. all right, title and interest in and to the said mark, together with the good will of the business symbolized by the mark, and the above identified registration thereof.

Signed at HRL,S.A./ of 305, 44 Street, Playa, Havana Cuba, this 22 day of June, 1994.

HAVANA RUM AND LIQUORS,S.A.
doing business as HRL,S.A.

By:

Vidal Manuel Prieto Espiña
General Director

### Acknowledgment

On this 22 day of June,1994, personally appeared Vidal Manuel Prieto Espiña, to me known and known to me to be the General Director of HAVANA RUM AND LIQUORS,S.A., doing business as HRL,S.A. the assignor above named, and acknowledged that he executed the foregoing Assignment on behalf of said assignor and pursuant to authority duly received.

Vidal Manuel Prieto Espiña
General Director
HRL,S.A.

RECORDED
PATENT & TRADEMARK OFFICE

SEP 13 94

# EXHIBIT 31



Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA  22313-1451
www.uspto.gov


Re:  Trademark Registration of                                      :
  Empresa Cubana Exportadora de Alimentos y Productos Varios  :
Registration No.  1031651                                        :          On Petition
Registered: January 27, 1996                                    :
Mark:  HAVANA CLUB                                            :
Petition Filed: October 5, 2006                                 :


The Petition to the Director, filed on October 5, 2006, to reverse the decision of the Post
Registration Division denying renewal of the above-captioned registration is noted.

After review of the petition and its attachments, the Office has determined that suspension of
action on this petition pending disposition of the complaint filed by petitioner against the
United States Department of the Treasury, et al., is appropriate because the decision therein
may have a bearing on this petition decision.  (Petition Attachment No. 7.)

Accordingly, matters with respect to this petition are suspended.  Petitioner has thirty (30) days
from the date of any disposition of the above-referenced civil action to notify the Office,
including any appeals.


Sharon R. Marsh
Deputy Commissioner
  for Trademark Examination Policy

SRM:JL

Date: December 6, 2006

Attorney for Petitioner:

Vincent N. Palladino, Esq.
Ropes & Gray LLP
1251 Avenue Of The Americas
New York, NY 10020

# EXHIBIT 32

**Abraham, Kyra**

| | |
|---|---|
| **From:** | Slutter, Nancy |
| **Sent:** | Tuesday, September 05, 2006 11:33 AM |
| **To:** | Slutter, Nancy |
| **Subject:** | Cuban retaliation possible for Bacardi cancellation |

Copyright war feared with Cuba

Return to Top Sacramento Bee
September 4, 2006

-By Mathew Haggman -- McClatchy Newspapers

Many companies expect retaliation after U.S. refuses to renew trademark for rum enterprise.

MIAMI -- In 1918 the Aunt Jemima trademark was registered in Cuba, and even after Fidel Castro seized power in 1959, a steady stream of U.S. companies from Ace Hardware to United Airlines continued to register their trademarks in the island nation.

Despite the decades-long U.S. economic embargo that precludes most trade with Cuba, more than 400 U.S. companies have registered in excess of 5,000 trademarks -- everything from McDonald's Golden Arches to Nike's famed Swoosh and Pepsi. And until recently, Cuba had no problem registering and renewing trademarks in the United States.

Now some fear the recent U.S. refusal to renew the Havana Club rum trademark claimed by a Cuban joint venture and Bacardi's launch of Havana Club -- a brand it also claims -- has placed the delicate balance of respecting other nations' trademarks in jeopardy. The recent developments also raise the possibility of Cuban retaliation, experts say.

Bacardi's fight with Cubaexport, a Cuban company that partnered with French liquor giant Pernod Ricard in 1993 to sell the rum around the world, has been simmering in U.S. courts, Congress and in the World Trade Organization for a decade. But the United States' recent decision to invalidate Cubaexport's Havana Club trademark registration really fanned the flames.

For the time being, there are two Havana Clubs -- one distilled in Puerto Rico by Bacardi and sold in the United States and another made in Cuba and distributed around the world.

"Our government has done a real injustice that will come back to bite a lot of other companies," said William Reinsch, president of the National Foreign Trade Council. The council, which is based in Washington, represents corporate members such as Microsoft, Wal-Mart, Caterpillar and General Motors.

But Patricia Neal, a Bacardi spokeswoman, rejected the notion that the rum company's efforts endanger other companies' trademarks in Cuba.

"All companies would fight to protect their brand," she said.

On Aug. 3 the U.S. Patent and Trademark Office said the Havana Club trademark would be "canceled/expired," although Cubaexport had filed its renewal application correctly with a $500 fee and on time.

USPTO FOIA
07-128
393 of 1077

1

The Patent Office refused to accept the renewal after J. Robert McBrien, the acting director of the Office of Foreign Assets Control, wrote the office had received guidance from the U.S. State Department "informing us that it would be inconsistent with U.S. policy." That decision stems from a provision called Section 211 that was inserted in a 1998 budget bill. Sometimes called the "Bacardi Bill," Section 211 has been criticized as a measure solely aimed at benefiting the rum giant.

Now the recent Havana Club denial has raised concerns that Cuba could return the favor by canceling U.S. trademark registrations based on the communist nation's own "policy" considerations.

Cuba could, for instance, cancel the trademarks for Levi's jeans or Heinz ketchup and sell its version in island stores. Those products could filter into other markets, too, harming U.S. companies that have long sought to keep fakes off store shelves abroad, said the National Foreign Trade Council.

Such a scenario could force U.S. companies to spend millions defending trademarks in many different countries and make the Cuba market ever more difficult to enter if it ultimately transitions into a market economy.

"Some day Cuba could say, 'The heck with it, we will not honor any of these (U.S.) registrations, because you guys are not honoring ours,'" said Jesus Sanchelima, a Miami lawyer who has represented U.S. firms in trademark cases in Cuba.

The 1990s had a flurry of U.S. trademark registrations in Cuba. Among them: Playboy, Bud, Huggies, The Home Depot, Pizza Hut, Kmart, McDonald's, Tommy Hilfiger, Old Spice, Hawaiian Tropic, Starbucks Coffee and Healthy Choice, according to the U.S.-Cuba Trade and Economic Council.

U.S. companies often sent their own representatives to register trademarks during the 1980s. But in recent years, they have hired Cuban law firms to go to the Oficina Cubana de la Propiedad Industrial in Havana to register and defend against misuse of corporate emblems.

Some now fear the decision could set a precedent that other countries can use to cancel trademarks or play politics with intellectual property law.

"Basically, (the United States) let politics trump trademark policy," Reinsch said. "They took care of one company at the expense of a lot of others."

USPTO FOIA
07-128
394 of 1077

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS d/b/a/CUBAEXPORT, | ) ) ) ) |
| Plaintiff, | ) Civil Action No. 1:06CV01692 (RCL) ) |
| v. | ) ) Hon. Royce C. Lamberth |
| UNITED STATES DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL, HENRY M. PAULSON, JR., as Secretary of Treasury, ADAM J. SZUBIN, as Director of the Office of Foreign Assets Control, and THE UNITED STATES, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## <u>PROPOSED ORDER</u>

This matter having come before the Court on Plaintiff's Motion For Summary Judgment

On Its Second And Third APA Claims, and the Court having considered the submissions of the

parties, the arguments of counsel, and the pleadings on file in this action,

IT IS HEREBY ORDERED THAT Plaintiff's Motion for Summary Judgment is

GRANTED.

IT IS SO ORDERED.


Dated: _____, 2008          By: _____

                                                            Royce C. Lamberth
                                                            United States District Judge

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2008, I caused a true and correct copy of the following

documents to be served on Defendants' counsel electronically by means of the Court's ECF

system:

    1.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON ITS SECOND
        AND THIRD APA CLAIMS;

    2.    PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
        FOR SUMMARY JUDGMENT ON ITS SECOND AND THIRD APA CLAIMS;

    3.    PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN
        SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ITS SECOND
        AND THIRD APA CLAIMS; AND

    4.    PROPOSED ORDER.

                        */s/ Peter M. Brody*
                        PETER M. BRODY
                        (DC Bar No. 398717)