# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| EMPRESA CUBANA EXPORTADORA | ) | |
| DE ALIMENTOS Y PRODUCTOS | ) | |
| VARIOS d/b/a CUBAEXPORT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06CV01692 (RCL) |
| | ) | |
| | ) | Hon. Royce C. Lamberth |
| UNITED STATES DEPARTMENT OF | ) | |
| THE TREASURY, OFFICE OF FOREIGN | ) | |
| ASSETS CONTROL, | ) | |
| HENRY M. PAULSON, JR., as Secretary | ) | |
| of Treasury, ADAM J. SZUBIN, as | ) | |
| Director of the Office of Foreign Assets | ) | |
| Control, and THE UNITED STATES, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants respectfully move to dismiss the Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). In the alternative, Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the claims in the Complaint. A proposed order is attached.

1

Dated July 23, 2008                          Respectfully submitted,

                                             GREGORY G. KATSAS
                                             Assistant Attorney General

                                             JEFFREY A. TAYLOR
                                             U.S. Attorney for the District of Columbia

                                             SANDRA M. SCHRAIBMAN
                                             (DC Bar No. 188599)
                                             Assistant Branch Director
                                             Federal Programs Branch


                                             ___*s/ Eric R. Womack*_____
                                             ERIC R. WOMACK (IL Bar No. 6279517)
                                             Trial Attorney
                                             U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
                                             Post Office Box 883
                                             Washington, D.C.  20001
                                             Tel: (202) 514-4020
                                             Fax: (202) 616-8470

                                             *Counsel for the Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
EMPRESA CUBANA EXPORTADORA )
DE ALIMENTOS Y PRODUCTOS )
VARIOS d/b/a CUBAEXPORT, )
)
               Plaintiff, )
)
        v. )     Civil Action No. 1:06CV01692 (RCL)
)
)     Hon. Royce C. Lamberth
UNITED STATES DEPARTMENT OF )
THE TREASURY, OFFICE OF FOREIGN )
ASSETS CONTROL, )
HENRY M. PAULSON, JR., as Secretary )
of Treasury, ADAM J. SZUBIN, as )
Director of the Office of Foreign Assets )
Control, and THE UNITED STATES, )
)
            Defendants. )
_____)

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 7(h), defendants submit this statement of material facts as to which there is no genuine issue:

### Background of the Parties

1.    The Office of Foreign Assets Control ("OFAC") is the office within the Department of the Treasury ("Treasury") that is principally responsible for administering United States economic sanctions programs to implement U.S. foreign policy and national security goals.  Declaration of Adam J. Szubin, Director of OFAC ("Szubin Decl.") ¶ 4.

2.    OFAC has been delegated authority under the Trading With the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 1-44, to regulate transactions in which Cuba or a Cuban national

1

has an interest.  See Szubin Decl. ¶¶ 4, 15.

3.      Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a Cubaexport

("Cubaexport") is a "Cuban state-owned enterprise located" in Cuba.  Compl. ¶ 5.

4.      "Cubaexport was established in 1965 by the Cuban Ministry of Foreign

Commerce for the purpose of exporting food and other products."  Id.

5.      President Kennedy imposed an embargo on all trade with Cuba in February 1962.

See Proclamation 3447 of February 3, 1962, 27 Fed. Reg. 1085 (1962).  The current terms of the

embargo and related restrictions are reflected in the Cuban Assets Control Regulations

("CACR"), see 31 C.F.R. § 515.101 et seq., which were promulgated pursuant to section 5(b) of

the Trading With the Enemy Act, 50 U.S.C. App. § 1 et seq.  See Szubin Decl. ¶ 9.

6.      Persons subject to the jurisdiction of the United States are prohibited from

engaging in economic transactions with Cuba or its nationals, including importing or purchasing

Cuban goods, unless licensed by the Secretary of the Treasury or its designated agent, OFAC.

See 31 C.F.R. §§ 515.201(b); 515.204; see also Szubin Decl. ¶ 9.

## General Background of the Havana Club Trademark

7.      In 1995, Cubaexport applied to OFAC for a specific license authorizing the

assignment of the "Havana Club" trademark from Cubaexport to Havana Rum & Liquors, S.A. to

Havana Club Holding, S.A. ("HCH").  See Szubin Decl. ¶ 23.

8.      On November 13, 1995, OFAC issued a license to authorize the assignment.  See

Szubin Decl. ¶ 24.

9.      All licenses issued by OFAC, whether general or specific, may be amended,

modified, or revoked at any time.  See 31 C.F.R. § 501.803; Szubin Decl. ¶ 17.

10.     On April 17, 1997, OFAC issued a Notice of Revocation for the license issued on

2

November 13, 1995. <u>See</u> Szubin Decl. ¶ 25.

11.     Both OFAC's grant of the November 13, 1995, specific license and its subsequent revocation of that license were litigated in a trademark infringement action brought by HCH and Havana Club International against a number of defendants, including Galleon S.A. and Bacardi-Martini USA, Inc. ("Bacardi").  <u>See, e.g.</u>, <u>Havana Club Holding, S.A., et al.  v. Galleon S.A., et al.</u>, 961 F. Supp. 498 (S.D.N.Y. 1997) ("<u>HCH I</u>"); 974 F. Supp. 302 (S.D.N.Y. 1997) ("<u>HCH II</u>"); 96 Civ. 9655, 1998 WL 150983 (S.D.N.Y. Mar. 31, 1998) ("<u>HCH III</u>"); 62 F. Supp. 2d 1085 (S.D.N.Y. 1999) ("<u>HCH IV</u>"); 203 F.3d 116 (2d Cir. 2000) ("<u>HCH V</u>").

12.     In <u>HCH I</u>, 961 F. Supp. at 503-05, the Court rejected Bacardi's challenge to OFAC's initial grant of the November 13, 1995, license.

13.     In <u>HCH II</u>, 974 F. Supp. at 306-11, the Court held that OFAC's revocation of the November 13, 1995, license authorizing transfer of the Havana Club trademark had the effect of eliminating the plaintiffs' rights in the mark.

14.     However, the Court refused to grant Bacardi's request to cancel the registration in <u>toto</u>, holding that the rights to the Havana Club trademark were restored to Cubaexport.  <u>Id.</u> at 311.

15.     Following this decision, the Court proceeded to a bench trial on the plaintiffs' trade name infringement claims against Bacardi.  <u>HCH IV</u>, 62 F. Supp. 2d 1085.

16.     In 1998, Congress passed section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act ("section 211").  Pub. L. No. 105-277, § 211, 112 Stat. 2681, 2681-88.  Prior to the passage of section 211, certain transactions by Cuban nationals relating to the registration and renewal of trademarks had historically been authorized by a general licensing provision.  31 C.F.R. § 515.527(a)(1).  Section 211 limited this general license

3

by prohibiting the approval of any "transaction or payment" pursuant to 31 C.F.R. § 515.527 "with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented." Pub. L. No. 105-277, § 211(a)(1), 112 Stat. 2681, 2681-88. In 1999, OFAC amended its regulations to reflect this statutory mandate. See 31 C.F.R. § 515.527(a)(2).

17. Section 211 also prohibited United States courts from "recogniz[ing], enforc[ing] or otherwise validat[ing] any assertion of rights by a designated national based on common law rights or registration obtained under such section 515.527 of such a confiscated mark, trade name, or commercial name," as well as "any assertion of treaty rights by a designated national or its successor-in-interest under sections 44(b) or (e) of the Trademark Act of 1946." Pub. L. No. 105-277, § 211(a)(2), (b), 112 Stat. at 2681-88.

18. In light of section 211's passage "prior to the trial but well into the course of this litigation," the Court held that the plaintiffs were prohibited from asserting a claim for trade name infringement under the General Inter-American Convention for Trademark and Commercial Protection, 46 Stat. 2907 (1931). HCH IV, 62 F. Supp. 2d at 1091-94.

19. The Court based this conclusion on "the evidence at trial," which "established that on October 13, 1960, the Revolutionary Cuban Regime confiscated the physical assets, property and business records of [Jose Arechabala, S.A. ("JASA")], the original owner of the Havana Club trademark" without affording any compensation to JASA. Id. at 1090, 1092.

20. The Court found that Bacardi was the successor-in-interest to JASA's interest in the Havana Club trademark. Id. at 1090.

4

21.     On appeal, the Second Circuit affirmed the district court's judgment.  HCH V, 203 F.3d 116.

22.     The Second Circuit refused to provide the plaintiffs with an opportunity to conduct additional discovery in an attempt to prove that the "Havana Club" trade name was not associated with confiscated property, holding that "[w]here Cuba has not returned JASA's property, not made even a gesture toward compensation, and not settled the claim, the confiscation inquiry ends."  Id. at 129-30.  The Court also found it "undisputed" that JASA has never consented to the Plaintiffs' use of the Havana Club trademark.  Id. at 129.

23.     Following the litigation, the United States Patent and Trademark Office ("PTO") amended its records to restore Cubaexport as the owner of the registration of the Havana Club trademark.  Galleon S.A. et al. v. Havana Club Holding, S.A. et al., 2004 WL 199225, at *11 (Trademark Tr. And App. Bd. Jan. 29, 2004); see also Compl. ¶¶ 21-22.

24.     Bacardi challenged this decision in its proceeding before the PTO, originally filed in 1995, seeking cancellation of the registration of the Havana Club mark.  See Galleon, 2004 WL 199225; Compl. ¶ 21.  However, the PTO concluded that the district court's decision in the Havana Club litigation contemplated that the registration would continue to exist in Cubaexport's name.  Galleon, 2004 WL 199225 at *14-16.

25.     In addition, the Trademark Trial and Appeal Board refused to cancel Cubaexport's registration of the mark on the basis of Bacardi's pleading of fraud in the original application.  Id. at *18-19.

26.     Bacardi has challenged the decision by the Board in United States District Court for the District of Columbia.  See Bacardi & Co. Ltd. v. Empresa Cubana Exportadora de Alimentos y Productos Varios, et al., 1:04-CV-00519 (EGS) (D. D.C.) (filed Mar. 29, 2004); see

<u>also</u> Compl. ¶ 23.  That litigation is ongoing.  Compl. ¶ 23.

### Recent Proceedings Between Cubaexport and OFAC Relating to Cubaexport's Application for a Specific License

27.     Under the CACR, a lawyer must seek a specific license from OFAC to receive compensation for fees and expenses incurred in representing the Cuban government or Cuban entities in legal proceedings.  <u>See</u> 31 C.F.R. § 515.512; Szubin Decl. ¶ 18.

28.     In order to obtain reimbursement for the fees and expenses related to the representation of Cubaexport in legal proceedings in the United States, including proceedings before the PTO Trademark Trial and Appeal Board, Cubaexport's attorneys have applied for and received various legal and travel licenses.  <u>See, e.g.</u>, License Nos. CU-75745, CT-7571, Administrative Record ("A.R.") 45-48; License Nos. CU-74488, CT-4558, A.R. 83-86; License No. CT-1943, A.R. 99-100.

29.     Ropes & Gray, which had merged with the law firm of Fish & Neave, Cubaexport's prior counsel, in January 2005, applied to OFAC for a renewal of the legal and travel licenses previously issued to Fish & Neave.  <u>See</u> January 5, 2005, Letter from Renee Stasio to OFAC, A.R. 97-98; Compl. ¶ 35; <u>see also</u> January 26, 2005, Letter from Renee Stasio to OFAC, A.R. 87.

30.     OFAC ultimately granted the application.  <u>See</u> License No. CU-74488, A.R. 83-84; Szubin Decl. ¶ 32.

31.     On December 13, 2005, counsel for Cubaexport filed an application with the PTO on Cubaexport's behalf to renew the Havana Club trademark.  <u>See</u> Letter from Vincent Palladino to Commissioner of Trademarks, A.R. 59-82.

32.     In the letter, counsel for Cubaexport represented that "[p]ayment of the filing fee

is being made pursuant to License No. CU 74488." A.R. 59.

33.    Ropes & Gray notified OFAC in a December 13, 2005, letter of Cubaexport's application for renewal with the PTO. Letter from Vincent Palladino to OFAC, A.R. 56; see also Szubin Decl. ¶ 33.

34.    On April 6, 2006, OFAC informed both Ropes & Gray and the PTO that, for the reasons stated in the April 6 letter, License No. CU-74488 "does not authorize Ropes & Gray LLP to pay a filing fee to the U.S. Patent and Trademark Office ("PTO") for renewal of Registration No. 1,031,651 (the "HAVANA CLUB trademark") on behalf of [Cubaexport]." Letter from OFAC to Vincent Palladino, A.R. 52; see also Szubin Decl. ¶ 34.

35.    In the April 6, 2006, letter, OFAC informed Ropes & Gray that its discussion was limited to the extent of authorization conferred by License No. CU-74488 and did not answer the question of whether renewal could be otherwise authorized:

> We note that this discussion does not in any way prejudice the ability of Ropes & Gray LLP to request separate authorization from OFAC to engage in transactions related to the renewal of the HAVANA CLUB trademark registration at the PTO. If you wish to request such a specific license or further guidance from OFAC, you may do so by writing directly to OFAC's Licensing Division. Should you have any further questions, please contact the Deputy Chief Counsel (Foreign Assets Control) . . . .

A.R. 53; see also Szubin Decl. ¶ 34.

36.    On April 7, 2006, Ropes & Gray responded to OFAC's letter by requesting a specific license to authorize payment for the renewal of the Havana Club trademark, on behalf of Cubaexport, for the reasons contained therein. Letter from Vincent Palladino to OFAC, A.R. 49-51; see also Szubin Decl. ¶ 35.

37.    As part of its consideration of the request for a specific license, OFAC referred the request to the United States Department of State for guidance concerning whether the grant of

such a license would be consistent with United States foreign policy.  <u>See</u> Mem. from State Department to OFAC, A.R. 2-3; Szubin Decl. ¶ 38.  In light of the guidance received from the Department of State, the facts and circumstances of the case, and the implementation of section 211 in the CACR, OFAC denied the request for a specific license.  July 28, 2006, Letter from OFAC to Vincent Palladino, A.R. 1; Szubin Decl. ¶ 40.

38.    There is no application process for a general license.  However, persons who are uncertain whether particular facts and circumstances meet the criteria for a general license may write to OFAC requesting guidance.  Supp. Szubin Decl. ¶ 21.

39.    In its April 6, 2006, letter, OFAC offered Cubaexport the opportunity to request further guidance from the agency on the question of renewal of the Havana Club trademark, including with respect to the applicability of the general license contained in 31 C.F.R. § 515.527(a)(1).  A.R. 53; <u>see also</u> Supp. Szubin Decl. ¶ 23.  Cubaexport did not do so in its request for a specific license.  Supp. Szubin Decl. ¶ 25.

40.    In its July 28, 2006, letter, OFAC indicated that "renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed."  A.R. 1; Supp. Szubin Decl. ¶ 5.

41.    This statement reflected "OFAC's position that Cubaexport could not rely on the general licensing provision . . . for transactions related to the renewal of the HAVANA CLUB trademark."  Supp. Szubin Decl. ¶ 6.

42.    This position was reached through OFAC's interpretation of its own regulation incorporating the limitations on the general licensing provision mandated by section 211, 31 C.F.R. § 515.527(a)(2).  OFAC concluded that the HAVANA CLUB mark constituted a "mark . . . that is the same as or substantially similar to a mark . . . that was used in connection with a

business or assets that were confiscated" and that "the original owner of the mark . . . or the bona fide successor-in-interest" had not "expressly consented" to that use.  Supp. Szubin Decl. ¶¶ 7-8.

43.    The primary basis for this conclusion was the factual findings made by courts in litigation in the Southern District of New York and the Second Circuit concerning the Havana Club mark and its connection to confiscated assets, as expressed in the following decisions: Havana Club Holding, S.A. v. Galleon, S.A., 961 F. Supp. 498 (S.D.N.Y. 1997) ("HCH I"); 974 F. Supp. 302 (S.D.N.Y. 1997) ("HCH II"); 96 Civ. 9655, 1998 WL 3150983 (S.D.N.Y. Mar. 31, 1998) ("HCH III"); 62 F. Supp. 2d 1085 (S.D.N.Y. 1999) ("HCH IV");. 203 F.3d 116 (2d Cir. 2000) ("HCH V").  Supp. Szubin Decl. ¶¶ 10-12.

44.    In light of these factual findings and the non-consent of Bacardi, a purported successor-in-interest to JASA, OFAC knew of no entity purporting to be either an original owner or a bona fide successor-in-interest to JASA that had consented to any transaction related to the registration and renewal of the HAVANA CLUB mark by Cubaexport.  Supp. Szubin Decl. ¶¶ 18, 19.

45.    The denial of a license request does not preclude the reopening of a license application or the filing of a further application, and an applicant may also request, at any time, further explanation of the reasons for a denial by correspondence or personal interview.  See 31 C.F.R. § 501.801; Supp. Szubin Decl. ¶ 24.

46.    Cubaexport never requested further explanation of the reasons for denial of its application.  Supp. Szubin Decl. ¶¶ 24, 25.

47.    While OFAC was considering Cubaexport's application, Ropes & Gray continued to pursue renewal of the Havana Club trademark with the PTO.  See Letters from Vincent Palladino to Commissioner for Trademarks, A.R. 6-9, 34-40; Szubin Decl. ¶ 37.  Counsel for

Bacardi opposed any such action in letters to the PTO.  See Letters from William Golden to Commissioner for Trademarks, A.R. 4-5, 10-33; Szubin Decl. ¶ 37.

48.    OFAC was copied on this correspondence.  See A.R. 4-40; Szubin Decl. ¶ 37.

49.    This correspondence did not convince OFAC to alter its reliance on the factual findings of the courts involved in the New York litigation, as it did not contain substantive evidence supporting a contrary conclusion.  Supp. Szubin Decl. ¶ 26.


Dated July 23, 2008                         Respectfully submitted,

                                            GREGORY G. KATSAS
                                            Assistant Attorney General

                                            JEFFREY A. TAYLOR
                                            U.S. Attorney for the District of Columbia

                                            SANDRA M. SCHRAIBMAN
                                            (DC Bar No. 188599)
                                            Assistant Branch Director
                                            Federal Programs Branch

                                              s/ Eric R. Womack
                                            ERIC R. WOMACK (IL Bar No. 6279517)
                                            Trial Attorney
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            Post Office Box 883
                                            Washington, D.C.  20001
                                            Tel: (202) 514-4020
                                            Fax: (202) 616-8470

                                            *Counsel for the Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

EMPRESA CUBANA EXPORTADORA )
DE ALIMENTOS Y PRODUCTOS )
VARIOS d/b/a CUBAEXPORT, )
                                  )
           Plaintiff, )
                                  )
          v. )     Civil Action No. 1:06CV01692 (RCL)
                                  )
                                  )     Hon. Royce C. Lamberth
UNITED STATES DEPARTMENT OF )
THE TREASURY, OFFICE OF FOREIGN )
ASSETS CONTROL, )
HENRY M. PAULSON, JR., as Secretary )
of Treasury, ADAM J. SZUBIN, as )
Director of the Office of Foreign Assets )
Control, and THE UNITED STATES, )
                                    )
           Defendants. )
_____)

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>PAGE(S)</u>

TABLES OF AUTHORITIES. ............................................................................... iii

INTRODUCTION............................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND. ........................................ 3

    I.     TRADING WITH THE ENEMY ACT. .................................................. 3

    II.    THE CUBAN ASSETS CONTROL REGULATIONS ("CACR")........................ 5

PROCEDURAL BACKGROUND........................................................................ 7

    I.     GENERAL BACKGROUND OF THE HAVANA CLUB TRADEMARK.......... 7

    II.    RECENT PROCEEDINGS BETWEEN CUBAEXPORT AND
          OFAC RELATING TO CUBAEXPORT'S APPLICATION FOR
          A SPECIFIC LICENSE. ...................................................................... 10

    III.   BACKGROUND OF THE PRESENT LITIGATION......................................... 14

STANDARD OF REVIEW. ............................................................................... 17

    I.     MOTION TO DISMISS STANDARD.................................................... 17

    II.    SUMMARY JUDGMENT STANDARD.......................................................... 17

ARGUMENT. ................................................................................................... 18

    I.     CUBAEXPORT LACKS STANDING TO ASSERT ITS FIFTH
          AMENDMENT CLAIMS................................................................... 18

    II.    EVEN ASSUMING CUBAEXPORT HAS RIGHTS GUARANTEED
          BY THE FIFTH AMENDMENT, ITS DUE PROCESS CLAIM LACKS
          MERIT. .......................................................................................... 23

         A.    OFAC's Actions Were Consistent with Procedural Due Process............. 23

               1.    Cubaexport Lacks a Property Interest in a License Authorizing
                     Transactions Related to Renewal of the Havana Club
                     Trademark. .................................................................... 24

        2.    OFAC Provided Cubaexport with All of the Process It Was
              Allegedly Due. ............................................................................ 27

    B.    OFAC Did Not Violate Cubaexport's Substantive Due Process
          Rights by Applying Section 211 and 31 C.F.R. § 515.527 Prospectively
          to Determine Whether the License Should Be Granted. ........................... 31

III.    EVEN ASSUMING CUBAEXPORT HAS CONSTITUTIONAL RIGHTS
        GUARANTEED BY THE FIFTH AMENDMENT, ITS TAKINGS CLAIM
        LACKS MERIT. .......................................................................................... 34

IV.    CUBAEXPORT'S APA CLAIM LACKS MERIT. ............................................. 37

    A.    A Deferential Standard of Review Governs Judicial Review of
          OFAC's Licensing Decision. ...................................................... 37

    B.    OFAC's Statement in Its July 28, 2006, Letter to Cubaexport
          Concerning the Applicability of 31 C.F.R. § 515.527(a)(1), (2)
          Is Neither Arbitrary Nor Capricious........................................... 39

CONCLUSION. ................................................................................................ 42

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

Am. Immigration Lawyers Ass'n v. Reno,
    18 F. Supp. 2d 38 (D.D.C. 1998). .................................................................... 22

Am. Int'l Group, Inc. v. Islamic Republic of Iran,
    657 F.2d 430 (D.C. Cir. 1981). .................................................................... 36

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986). .................................................................... 17

Banco Nacional de Cuba v. Farr,
    243 F. Supp. 957 (S.D.N.Y. 1965). .................................................................... 21, 33

Bd. of Regents of State Colleges v. Roth,
    408 U.S. 564 (1972). .................................................................... 24

Bell Atlantic Corp. v. Twombly,
    — U.S. — , 127 S. Ct. 1955 (2007). .................................................................... 17

Bergerco Canada v. OFAC,
    129 F.3d 189 (D.C. Cir. 1997). .................................................................... 32

Bloch v. Powell,
    348 F.3d 1060 (D.C. Cir. 2003). .................................................................... 25, 26

Boyden v. Commissioner of Patents,
    441 F.2d 1041 (D.C. Cir. 1971). .................................................................... 26

Caesar v. United States,
    258 F. Supp. 2d 1 (D.D.C. 2003). .................................................................... 17

Capital Cities/ABC Inc. v. Brady,
    740 F. Supp. 1007 (S.D.N.Y. 1990). .................................................................... 38

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986). .................................................................... 18

Chang v. United States,
    859 F.2d 893 (Fed. Cir. 1988). .................................................................... 36, 37

-iii-

Citizens to Pres. Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971)................................................................. 37

Coll. Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,
    527 U.S. 666 (1999)................................................................. 24

Comm. of U.S. Citizens Living in Nicaragua v. Reagan,
    859 F.2d 929 (D.C. Cir. 1988). ........................................... 32, 34

Consarc Corp. v. Iraqi Ministry,
    27 F.3d 695 (D.C. Cir. 1994). ................................................ 39

Consarc Corp. v. OFAC,
    71 F.3d 909 (D.C. Cir. 1995). ................................................ 39

Conti v. United States,
    291 F.3d 1334 (Fed. Cir. 2002)......................................... 25, 27

County of Sacramento v. Lewis,
    523 U.S. 833 (1998)................................................................. 32

Cruz v. United States,
    387 F. Supp. 2d 1057 (N.D. Cal. 2005). ............................... 22

Dames & Moore v. Regan,
    453 U.S. 654 (1981)................................................................. 38

De Cuellar v. Brady,
    881 F.2d 1561 (11th Cir. 1989). ............................................ 38

Dean Witter Reynolds, Inc. v. Fernandez,
    741 F.2d 355 (11th Cir. 1984). .............................................. 21

Eastern Enterprises v. Apfel,
    524 U.S. 498 (1998)................................................................. 35

Emergency Coal. to Defend Educ. Travel v. Dep't of Treasury,
    498 F. Supp. 2d 150 (D.D.C. 2007). ..................................... 42

First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,
    462 U.S. 611 (1983)............................................................ 20, 21

Freedom to Travel Campaign v. Newcomb,
    82 F.3d 1431 (9th Cir. 1996). ................................................ 38

Galleon S.A. v. Havana Club Holding, S.A.,
    2004 WL 199225 (Trademark Tr. and App. Bd. Jan. 29, 2004)................................. 9, 10

Global Relief Found. v. O'Neill,
    207 F. Supp. 2d 779 (N.D. Ill. 2002), aff'd, 315 F.3d 748 (7th Cir. 2002). ......... 30, 35, 36

Harisiades v. Shaughnessy,
    342 U.S. 580 (1952)................................................................................................ 23, 38

Havana Club Holding, S.A. et al. v. Galleon S.A. et al.,
    961 F. Supp. 498 (S.D.N.Y. 1997) ("HCH I");
    974 F. Supp. 302 (S.D.N.Y. 1997) ("HCH II");
    96 Civ. 9655, 1998 WL 150983 (S.D.N.Y. Mar. 31, 1998) ("HCH III");
    62 F. Supp. 2d 1085 (S.D.N.Y. 1999) ("HCH IV");
    203 F.3d 116 (2d Cir. 2000) ("HCH V"). ................................................................ passim

Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.,
    452 U.S. 264 (1981)...................................................................................................... 34

Holy Land Found. for Relief and Dev. v. Ashcroft,
    219 F. Supp. 2d 57 (D.D.C. 2002), aff'd, 333 F.3d 156 (D.C. Cir. 2003). ............... passim

Islamic Am. Relief Agency v. Unidentified FBI Agents,
    394 F. Supp. 2d 34 (D.D.C. 2005). .......................................................................... 28, 36

Jifry v. FAA,
    370 F.3d 1174 (D.C. Cir. 2004). .................................................................................. 22

Karpova v. Snow,
    402 F. Supp. 2d 459 (S.D.N.Y. 2005).......................................................................... 27

Landgraf v. USI Film Products,
    511 U.S. 244 (1994)...................................................................................................... 33

Legal Tender Cases (Knox v. Lee),
    79 U.S. 457 (1870)........................................................................................................ 36

Lopez v. FAA,
    318 F.3d 242 (D.C. Cir. 2003). .................................................................................... 25

Marsh v. Or. Natural Res. Council,
    490 U.S. 360 (1989)................................................................................................ 37, 38

Mathews v. Eldridge,
    424 U.S. 319 (1976)...................................................................................................... 28

Miranda v. Sec'y of Treasury,
    766 F.2d 1 (1st Cir. 1985). ...................................................................... 38

Nat'l Council of Resistance of Iran v. Dep't of State,
    251 F.3d 192 (D.C. Cir. 2001). .......................................................... 22, 27

Nielsen v. Sec'y of Treasury,
    424 F.2d 833 (D.C. Cir. 1970). ................................................................ 36

Orange v. Dist. of Columbia,
    59 F.3d 1267 (D.C. Cir. 1995). ................................................................ 24

Paradissiotis v. United States,
    304 F.3d 1271 (Fed. Cir. 2002). ................................................ 19, 35, 36, 37

People's Mojahedin Org. of Iran v. Dep't of State,
    182 F.3d 17 (D.C. Cir. 1999). .......................................................... 19, 22, 23

Pernod Ricard USA LLC v. Bacardi USA, Inc.,
    505 F. Supp. 2d 245 (D. Del. 2007). ....................................................... 40

Price v. Socialist People's Libyan Arab Jamahiriya,
    294 F.3d 82 (D.C. Cir. 2002). .......................................................... 18, 19

Propper v. Clark,
    337 U.S. 472 (1949). ................................................................................ 36

Reeve Aleutian Airways, Inc. v. United States,
    982 F.2d 594 (D.C. Cir. 1993). ................................................................ 29

Regan v. Wald,
    468 U.S. 222 (1984). ................................................................... 4, 5, 33, 38

Richardson v. Simon,
    560 F.2d 500 (2d Cir. 1977). ................................................................... 38

Rockefeller Ctr. Properties v. United States,
    32 Fed. Cl. 586 (1995). ........................................................................... 37

Rose Acre Farms, Inc. v. Madigan,
    956 F.2d 670 (7th Cir. 1992). .................................................................. 35

Russian Volunteer Fleet v. United States,
    282 U.S. 481 (1931). ............................................................................... 23

Ry. Labor Executives' Ass'n v. United States,
    987 F.2d 806 (D.C. Cir. 1993). ...................................................... 35

Scott v. City of Seattle,
    99 F. Supp. 2d 1263 (W.D. Wash. 1999)...................................... 31

South Carolina v. Katzenbach,
    383 U.S. 301 (1966)................................................................... 18

TMR Energy Ltd. v. State Prop. Fund of Ukraine,
    411 F.3d 296 (D.C. Cir. 2005). ..................................... 19, 20, 21, 22

Thornton v. City of St. Helens,
    425 F.3d 1158 (9th Cir. 2005). .................................................. 25

Tran Qui Than v. Regan,
    658 F.2d 1296 (9th Cir. 1981). .................................................. 36

Transamerica Leasing, Inc. v. La Republica de Venezuela,
    200 F.3d 843 (D.C. Cir. 2000). .................................................. 21

Trinity Methodist Church, South v. Fed. Radio Comm'n,
    62 F.2d 850 (D.C. Cir. 1932). .................................................... 26

Tuchman v. Connecticut,
    185 F. Supp. 2d 169 (D. Conn. 2002). ........................................ 26

United States v. Brodie,
    403 F.3d 123 (3d Cir. 2005).......................................................  5

United States v. Int'l Harvester Co.,
    387 F. Supp. 1338 (D.D.C. 1974). .............................................. 31

Universal Sanitation Corp. v. Trade Waste Comm'n of City of New York,
    940 F. Supp. 656 (S.D.N.Y. 1996).............................................. 27

Walsh v. Brady,
    927 F.2d 1229 (D.C. Cir. 1991). ............................................. 5, 38

Weininger v. Castro,
    462 F. Supp. 2d 457 (S.D.N.Y. 2006)........................................ 21

## STATUTES

28 U.S.C. § 1346(a)(2)..................................................................................... 34

5 U.S.C. § 706(2)........................................................................................... 37

50 U.S.C. App. § 5(b)(1)(B).............................................................................. 4

50 U.S.C. § 1701 et seq.................................................................................... 4

## REGULATIONS

31 C.F.R. § 501.801(b)............................................................................... 31, 32

31 C.F.R. § 501.803................................................................................... 25, 36

31 C.F.R. § 515.201(b)............................................................................. 5, 6, 36

31 C.F.R. § 515.318....................................................................................... 26

31 C.F.R. § 515.336......................................................................................... 6

31 C.F.R. § 515.512....................................................................................... 10

31 C.F.R. § 515.527.................................................................................. passim

31 C.F.R. § 515.560....................................................................................... 10

31 C.F.R. § 515.802......................................................................................... 4

## INTRODUCTION

Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport"), an agent of the Cuban government whose connections to this country are necessarily constrained by federal law, seeks to invalidate a decision by the Treasury Department's Office of Foreign Assets Control ("OFAC") denying an application for a specific license to authorize the payment of a filing fee to renew the "Havana Club" trademark in Cubaexport's name. On September 27, 2007, this Court rejected two of Cubaexport's three substantive challenges under the Administrative Procedure Act ("APA"). In doing so, this Court recognized the "significant deference" owed to OFAC "in interpreting its own regulatory authority"—an interpretation that is "virtually above reproach."

This same high degree of deference governs this Court's review of Cubaexport's sole remaining substantive challenge under the APA. That challenge seeks to invalidate OFAC's statement in its July 28, 2006, denial of Cubaexport's request for a specific license that "renewal of the HAVANA CLUB trademark . . . would be prohibited unless specifically licensed." This statement, which reflected OFAC's position that Cubaexport could not rely on the general licensing provision of 31 C.F.R. § 515.527(a)(1) for transactions related to the renewal of the HAVANA CLUB trademark, was based on OFAC's interpretation of its own regulation incorporating Congress's withdrawal of general licensing authority in section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999 ("section 211"). As this determination was supported by the findings of numerous courts in litigation involving the Havana Club trademark, and was not contradicted by any evidence from Cubaexport to the contrary, there is no basis to conclude that this determination was irrational.

The only remaining claims asserted by Cubaexport are constitutional in nature. However,

this Court lacks jurisdiction to entertain Cubaexport's constitutional claims. As a judicially-recognized agent or instrumentality over which the Cuban government exercises extensive control, Cubaexport stands in the shoes of the Cuban government for the purposes of the Fifth Amendment. Accordingly, as a foreign state lies outside of the constitutional structure of the nation, Cubaexport lacks rights guaranteed by the Fifth Amendment. Moreover, even if Cubaexport were deemed an entity independent from the Cuban government, it nevertheless is a Cuban national whose connections with the United States, which are inherently limited by the provisions of the Cuban Assets Control Regulations ("CACR"), are not substantial enough to entitle Cubaexport to constitutional protections.

Further, even assuming that this Court has jurisdiction over Cubaexport's Fifth Amendment claims, the claims lack merit. As an initial matter, given OFAC's discretion over licensing determinations, Cubaexport lacks an entitlement or property interest that is recognized by the Fifth Amendment. In addition, even assuming that Cubaexport is entitled to rights protected by the Fifth Amendment, OFAC's actions comported with constitutional requirements. First, OFAC satisfied the requirements of due process by providing Cubaexport with both notice and an opportunity to be heard on its request for a license. OFAC even provided Cubaexport with the opportunity to seek guidance on the applicability of the general licensing provision prior to OFAC's final determination on Cubaexport's application for a specific license, as well as the opportunity following that determination to request further information concerning OFAC's basis for decision. The fact that Cubaexport failed to avail itself of these procedural opportunities does not establish a constitutional violation.

Finally, as numerous courts have recognized, the adverse effect of OFAC's actions on entities subject to economic sanctions does not constitute a vested "taking" of private property.

2

To hold otherwise would render such sanctions schemes hollow, allowing the foreign targets of such regulations to simply stand in line to receive compensation for their losses.

For these reasons, OFAC respectfully requests that this Court reject Cubaexport's attempt to undermine the administrative process established by OFAC, incorporating a direction of Congress, to govern payments related to the registration and renewal of trademarks by Cuban entities.

## STATUTORY AND REGULATORY BACKGROUND

In response to the expropriation of U.S. property in Cuba and other acts by the Castro regime deemed antagonistic to the interests of this country, President Kennedy imposed an embargo on all trade with Cuba in February 1962. See Proclamation 3447 of February 3, 1962, 27 Fed. Reg. 1085 (1962). The current terms of the embargo and related restrictions are reflected in the CACR, see 31 C.F.R. Part 515, which were promulgated pursuant to section 5(b) of the Trading With the Enemy Act, 50 U.S.C. App. § 1 et seq.

## I.    TRADING WITH THE ENEMY ACT

Section 5(b) of the Trading With the Enemy Act ("TWEA") broadly authorizes the President, through a designated agency, to "investigate, regulate, . . . prevent or prohibit, any . . . use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or . . . transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. App. § 5(b)(1)(B). The President has authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes of TWEA. See, e.g., Exec. Order No. 12854, 58 Fed. Reg. 36587 (July 4, 1993). The Secretary of the Treasury has in turn delegated this authority to OFAC. See 50

U.S.C. App. § 5(b)(1)(B); 31 C.F.R. § 515.802.

As originally enacted in 1917, TWEA authorized the use of the specified economic powers only during times of war, see Act of Oct. 6, 1917, ch. 106, 40 Stat. 411, but it was expanded in 1933 to deal with peacetime national emergencies, see Act of March 9, 1933, ch. 1, 48 Stat. 1. Regan v. Wald, 468 U.S. 222, 226 n.2 (1984). In 1977, Congress amended section 5(b) to limit the President's authority under TWEA once again to times of war. See Pub. L. No. 95-223, § 101, 91 Stat. 1625, 1625-26; Wald, 468 U.S. at 227–28.[1]

The 1977 amendment, however, included a "grandfather clause," which authorized the President to continue to exercise his authority under section 5(b) of TWEA with respect to any country that was subject to sanctions on July 1, 1977, including Cuba. See Pub. L. No. 95-223, § 101(b), 91 Stat. 1625, 1625-26 (reported as note following 50 U.S.C. App. § 5); Wald, 468 U.S. at 228–29. The grandfather clause also provided that the President "may extend the exercise of such authorities for one-year periods upon a determination for each such extension that the exercise of such authorities with respect to such country for another year is in the national interest of the United States." Pub. L. No. 95-223, § 101(b), 91 Stat. 1625, 1625; Wald, 468 U.S. at 229. Pursuant to this authority, Presidents have annually, since 1978, determined that it is in the national interest to continue the exercise of emergency powers with respect to Cuba. See, e.g., Determination No. 2007-32, 72 Fed. Reg. 53409 (Sept. 13, 2007) (most recent renewal of the President's TWEA authority to continue economic sanctions against Cuba); see also Wald,

---

[1] In the same 1977 bill amending TWEA, Congress enacted the International Emergency Economic Powers Act ("IEEPA"), which governs the President's exercise of emergency economic powers during peacetime. See Title II, Pub. L. No. 95-223, 91 Stat. 1626 et seq., codified at 50 U.S.C. § 1701 et seq.; Wald, 468 U.S. at 227–28. The authorities granted to the President by section 203 of IEEPA are substantially similar to those in section 5(b) of TWEA. See Wald, 468 U.S. at 228, 228 n.8.

468 U.S. at 229; Walsh v. Brady, 927 F.2d 1229, 1230 (D.C. Cir. 1991).

## II.    THE CUBAN ASSETS CONTROL REGULATIONS ("CACR")

The CACR, 31 C.F.R. Part 515, were first promulgated in 1963 pursuant to TWEA and are administered by OFAC.  See United States v. Brodie, 403 F.3d 123, 127 (3d Cir. 2005); Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462, 465 (2d Cir. 2005).  Among other things, the CACR prohibit economic transactions in the United States involving property in which Cuba or any Cuban national has "any interest of any nature whatsoever, direct or indirect," except "as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him)."  31 C.F.R. § 515.201(b).  Accordingly, in order for Cuba or a Cuban national to engage in any prohibited transaction with an individual or entity in the United States involving property, that individual or entity must be licensed to engage in that transaction.  See id. § 515.201(b).  That license may be either general, where the terms of the authorization are set forth in OFAC publications or regulations, see id. § 515.317, or specific to an applicant or transaction, see id. § 515.318.

The CACR define the concept of property and property interests broadly, including interests in patents, trademarks, and copyrights.  Id. § 515.311.  Certain transactions relating to the registration and renewal of trademarks have historically been authorized under a general licensing provision.  See id. § 515.527(a)(1).  In 1998, however, Congress limited this general license in part through the passage of section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, which prohibited the approval of any "transaction or payment" pursuant to 31 C.F.R. § 515.527 "with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in

5

connection with a business or assets that were confiscated[2] unless the original owner of the mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented." Pub. L. No. 105-277, § 211(a)(1), 112 Stat. 2681, 2681-88.  In the same Act, Congress also prohibited United States courts from "recogniz[ing], enforc[ing] or otherwise validat[ing] any assertion of rights by a designated national based on common law rights or registration obtained under such section 515.527 of such a confiscated mark, trade name, or commercial name," as well as "any assertion of treaty rights by a designated national or its successor-in-interest under sections 44(b) or (e) of the Trademark Act of 1946." Id. § 211(a)(2), (b), 112 Stat. at 2681-88.

In accordance with the statutory mandate in section 211, see id. § 211(c), 112 Stat. at 2681-88, OFAC amended its regulations on May 13, 1999, to remove the general license authority for U.S. persons to engage in transactions or payments related to the registration or renewal of a mark, trade name, or commercial name in which a Cuban national has an interest that is the same as or substantially similar to a mark used in connection with confiscated assets unless the original owner or bona fide successor-in-interest has expressly consented.  31 C.F.R. § 515.527(a)(2).  This amendment precluded such transactions on behalf of Cuban nationals in the absence of a specific license issued by OFAC.  Id. § 515.318; see also Decl. of Adam J. Szubin ("Szubin Decl.") ¶ 22.

---

[2]  The term "confiscated" is defined to include "[t]he nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959: (1) Without the property having been returned or adequate and effective compensation provided; or (2) Without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure."  31 C.F.R. § 515.336.

**PROCEDURAL BACKGROUND**

I.    **GENERAL BACKGROUND OF THE HAVANA CLUB TRADEMARK**

In 1976, the United States Patent and Trademark Office ("PTO") granted Cubaexport's application to register a trademark including the name "Havana Club" in the United States. Compl. ¶¶ 12-13.  In 1995, Cubaexport applied to OFAC for a specific license authorizing the assignment of the "Havana Club" trademark from Cubaexport to Havana Rum & Liquors, S.A. to Havana Club Holding, S.A. ("HCH").  See Szubin Decl. ¶ 23.  On November 13, 1995, OFAC issued a license authorizing the assignment.  See id. ¶ 24.  However, on April 17, 1997, OFAC issued a Notice of Revocation of the license.  See id. ¶ 25.

Both OFAC's grant of the specific license to transfer the Havana Club mark and the effect of OFAC's subsequent revocation of that license were extensively litigated in a trademark infringement action brought by HCH and Havana Club International, S.A. ("the plaintiffs"), against a number of defendants, including Galleon S.A. and Bacardi-Martini USA, Inc. ("Bacardi").  See Havana Club Holding, S.A. et al. v. Galleon S.A. et al., 961 F. Supp. 498 (S.D.N.Y. 1997) ("HCH I"); 974 F. Supp. 302 (S.D.N.Y. 1997) ("HCH II"); 96 Civ. 9655, 1998 WL 150983 (S.D.N.Y. Mar. 31, 1998) ("HCH III"); 62 F. Supp. 2d 1085 (S.D.N.Y. 1999) ("HCH IV"); 203 F.3d 116 (2d Cir. 2000) ("HCH V").  In HCH I, 961 F. Supp. at 503-05, the Court rejected Bacardi's challenge to OFAC's initial grant of the license, holding that Bacardi lacked standing to challenge OFAC's issuance of the license, that the foreign policy considerations of the Executive Branch should not be disturbed by the judiciary, and that OFAC has considerable discretion in granting or revoking licenses.

Following OFAC's revocation of the specific license, Bacardi moved for summary judgment in the litigation on the ground that the plaintiffs had no continuing right to the Havana

7

Club trademark.  See HCH II, 974 F. Supp. at 306.  Giving "considerable weight" to OFAC's interpretation of the CACR, the Court, inter alia, held that the "express terms of the general license . . . compel the conclusion that OFAC has properly construed [TWEA] to preclude a transfer under the general license," that there was a rational basis to prohibit transfer of the mark under the CACR, and that the trademark fell within the scope of property covered by the CACR. HCH II, 974 F. Supp. at 306-11.  Accordingly, the Court held that the plaintiffs lacked rights in the Havana Club trademark.  Id. at 311.  However, the Court refused to grant Bacardi's request to cancel the registration in toto, holding that the rights to the registration of the Havana Club trademark reverted to Cubaexport.  Id.

Following this decision, the Court proceeded to a bench trial on the plaintiffs' trade name infringement claims against Bacardi.  HCH IV, 62 F. Supp. 2d 1085.  In light of Congress's passage of section 211 "prior to the trial but well into the course of this litigation," the Court held that the plaintiffs were prohibited from asserting a claim for trade name infringement under the Inter-American Convention.  Id. at 1091-94.  The Court based this conclusion on "the evidence at trial," which "established that on October 13, 1960, the Revolutionary Cuban Regime confiscated the physical assets, property and business records of [Jose Arechabala, S.A. ("JASA")], the original owner of the Havana Club trademark" without affording any compensation to JASA.  Id. at 1092.  The Court also found that the plaintiffs lacked standing to raise a claim under the Lanham Act, as the likelihood of competitive injury from Bacardi's actions was "too remote" given the Cuban embargo's prohibition on the sale of Cuban products in the United States.  Id. at 1099.  Accordingly, the Court entered judgment in Bacardi's favor.  Id. at 1100.

On appeal, the Second Circuit affirmed the district court's judgment.  HCH V, 203 F.3d 116.  The Second Circuit refused to provide the plaintiffs with an opportunity to conduct

8

additional discovery in an attempt to prove that the "Havana Club" trade name was not associated with confiscated property, holding that "[w]here Cuba has not returned JASA's property, not made even a gesture toward compensation, and not settled the claim, the confiscation inquiry ends." Id. at 129-30.

The effect of the HCH litigation was to add an element of confusion to the status of the Havana Club trademark. In January of 1996, HCH, as the "owner of record" of the mark, had renewed the registration of the mark for a period of ten years, to expire on July 27, 2006. Compl. ¶ 19. However, following the litigation, HCH maintained no continuing interest in the mark. Id. ¶ 20. To correct this situation, the PTO amended its records to restore Cubaexport as the owner of the renewed registration. Galleon S.A. v. Havana Club Holding, S.A., 2004 WL 199225, at *11 (Trademark Tr. and App. Bd. Jan. 29, 2004); see also Compl. ¶¶ 21-22.

Bacardi challenged this action in its proceeding before the PTO, originally filed in 1995, seeking cancellation of the registration of the Havana Club mark. See Galleon, 2004 WL 199225; Compl. ¶ 21. The PTO concluded that the district court's decision in the Havana Club litigation contemplated that the registration would continue to exist in Cubaexport's name. See Galleon, 2004 WL 199225 at *14-16. In addition, the Trademark Trial and Appeal Board refused to cancel Cubaexport's registration of the mark on the basis of Bacardi's pleading of fraud in the original application. Id. at *18-19.

Bacardi has sought review of the Board's decision in United States District Court for the District of Columbia. See Bacardi & Co. Ltd. v. Empresa Cubana Exportadora de Alimentos y Productos Varios, et al., 1:04-CV-00519 (EGS) (D.D.C.) (filed Mar. 29, 2004); see also Compl. ¶ 23. That litigation is ongoing. Compl. ¶ 23.

II.    **RECENT PROCEEDINGS BETWEEN CUBAEXPORT AND OFAC RELATING TO CUBAEXPORT'S APPLICATION FOR A SPECIFIC LICENSE**

As a result of the CACR's prohibition on persons subject to the jurisdiction of the United States engaging in transactions involving property in which the Cuban government or a Cuban national has an interest, a lawyer is unable to receive compensation for fees and expenses incurred in representing such entities in legal proceedings without authorization from OFAC. See 31 C.F.R. § 515.512. Similarly, that lawyer cannot engage in Cuba travel-related transactions to engage in research related to the legal representation without authorization. See 31 C.F.R. § 515.560. Accordingly, in order to obtain reimbursement for the fees and expenses related to the representation of Cubaexport in legal proceedings in the United States, including proceedings before the Trademark Trial and Appeal Board, Cubaexport's attorneys have applied for and received various legal and travel licenses. See, e.g., License Nos. CU-75745, CT-7571, Administrative Record ("A.R.") 45-48; License Nos. CU-74488, CT-4558, A.R. 83-86; License No. CT-1943, A.R. 99-100.

Ropes & Gray, which had merged with the law firm of Fish & Neave, Cubaexport's prior counsel, in January 2005, applied to OFAC for a renewal of the legal and travel licenses previously issued to Fish & Neave. See Compl. ¶ 35; see also January 5, 2005, Letter from Renee Stasio to OFAC, A.R. 97-98. In the application, Ropes & Gray asserted that it "will be the law firm representing Cubaexport in connection with the . . . matters" previously mentioned in the application. A.R. 98. The legal matters specifically referenced were the cancellation proceeding filed by Bacardi before the Trademark Trial and Appeal Board, number 24,108, and the Complaint filed by Bacardi against Cubaexport in federal district court. See A.R. 97; see also January 26, 2005, Letter from Renee Stasio to OFAC, A.R. 87.

OFAC granted the application on March 4, 2005.  See License No. CU-74488, A.R. 83-84.  The legal license that OFAC issued, License No. CU-74488, authorized "[a]ll transactions . . . to enable the Licensee, in connection [with] the legal representation of [Cubaexport] and Havana Club Holdings S.A. in legal proceedings in the United States related to the HAVANA CLUB trademark, as described in the application, to receive payment for such services and reimbursement for expenses related to such services."  A.R. 84.  OFAC also issued a companion travel license authorizing travel-related transactions in connection with the legal proceedings. License No. CT-4558, A.R. 85-86.  OFAC responded to Ropes & Gray's request for renewal of these licenses by issuing two new licenses in April 2006.  See License Nos. CU-75745, CT-7571, A.R. 45-48.

On December 13, 2005, Cubaexport filed an application with the PTO to renew the Havana Club trademark.  See Letter from Vincent Palladino to Commissioner of Trademarks, A.R. 59-82.  In a letter attached to the application, Ropes & Gray represented on Cubaexport's behalf that "[p]ayment of the filing fee is being made pursuant to License No. CU 74488 issued by the Office of Foreign Assets Control . . . on March 4, 2005 . . . in order to maintain the *status quo* by maintaining Registration No. 1,031,651 until a decision regarding cancellation of the registration can be rendered in ongoing litigation, *Bacardi & Company Limited v. Cubaexport and Havana Club Holding*, 1:04-CV-00519 (EGS) (D.D.C. 2004)."  A.R. 59.  Ropes & Gray forwarded a copy of this letter to OFAC, again explaining that Ropes & Gray "has relied on License No. CU 74488 to maintain the *status quo* until a decision in [*Bacardi & Company Limited v. Cubaexport and Havana Club Holding*] is rendered by the Court or by any court to which such a decision may finally be appealed."  December 13, 2005, Letter from Vincent Palladino to OFAC, A.R. 57.

11

On April 6, 2006, OFAC informed both Ropes & Gray and the PTO that License No. CU-74488 "does not authorize Ropes & Gray LLP to pay a filing fee to the U.S. Patent and Trademark Office ("PTO") for renewal of Registration No. 1,031,651 (the "HAVANA CLUB trademark") on behalf of [Cubaexport]." Letter from OFAC to Vincent Palladino, A.R. 52. As explained in the letter, "License No. CU-74488 pertains to a cancellation proceeding." A.R. 52. According to OFAC, the text of the license therefore authorized "legal representation of [Cubaexport], and Havana Club Holdings S.A. in legal proceedings in the United States related to the Havana Club trademark, as described in the application" submitted by Ropes & Gray for the license. A.R. 52. However, "[t]he only legal proceeding described in [the] application was 'a complaint [] currently pending in the U.S. District Court for the District of Columbia against . . . Cubaexport and Havana Club Holdings S.A." A.R. 52.

In the April 6, 2006, letter, OFAC made clear that its discussion was limited to the extent of authorization conferred by License No. CU-74488 and therefore did not prohibit the filing of a separate request for a specific license to authorize transactions relating to renewal of the Havana Club mark:

> We note that this discussion does not in any way prejudice the ability of Ropes & Gray LLP to request separate authorization from OFAC to engage in transactions related to the renewal of the HAVANA CLUB trademark registration at the PTO. If you wish to request such a specific license or further guidance from OFAC, you may do so by writing directly to OFAC's Licensing Division.

A.R. 53. OFAC closed the letter by referring Ropes & Gray to the Deputy Chief Counsel of OFAC for resolution of "any further questions." Id.

On April 7, 2006, Ropes & Gray responded to OFAC's letter by requesting a specific license to authorize payment for the renewal of the Havana Club trademark on behalf of Cubaexport. Letter from Vincent Palladino to OFAC, A.R. 49-51. The letter asserted as grounds

12

for issuance of such a license the same reasons provided in the December 13, 2005, letter, including maintaining "the status quo," preventing the "cancellation of the registration," allowing the D.C. district court "to reach a reasoned decision in the pending litigation," and preventing the decision of the Trademark Trial and Appeal Board from being "effectively overrule[d]." A.R. 50.

As part of its consideration of the request for a specific license, OFAC referred the request to the United States Department of State for guidance concerning whether the grant of such a license would be consistent with United States foreign policy. See Mem. from State Department to OFAC, A.R. 2-3; Szubin Decl. ¶ 38. The Department of State ultimately informed OFAC that "[d]enial of the license application would be consistent with the U.S. approach toward non-recognition of trademark rights associated with confiscated property" as well as "consistent with . . . the policy of the United States to deny resources to the Castro regime." A.R. 2-3. Accordingly, "[h]aving weighed the facts and foreign policy concerns presented by this referral, the Department of State recommend[ed] that OFAC deny Ropes & Gray's application." A.R. 3.

In accordance with this guidance, the provisions of the CACR, and OFAC's own consideration of the facts underlying the application[3], OFAC informed Ropes & Gray that it had denied the request for a specific license. Letter from OFAC to Vincent Palladino, A.R. 1; see also Szubin Decl. ¶¶ 40-41. In the letter, OFAC explains that the Department of State had

---

[3] While OFAC was considering the application, Ropes & Gray nevertheless continued to pursue renewal of the Havana Club mark with the PTO. See Letters from Vincent Palladino to Commissioner for Trademarks, A.R. 6-9, 34-40. Counsel for Bacardi opposed any such action. See Letters from William Golden to Commissioner for Trademarks, A.R. 4-5, 10-33. OFAC was copied on this correspondence with the PTO. See id.; see also Szubin Decl. ¶ 37.

informed OFAC that "it would be inconsistent with U.S. policy to issue a specific license

authorizing transactions related to the renewal of the HAVANA CLUB trademark."  A.R. 1.  On

August 3, 2006, the PTO informed Ropes & Gray that Cubaexport's renewal application could

not be accepted "[b]ecause the specific license is necessary for authorizing payment of the

required fee, and that license has been denied."  See Post Registration Office Action, attached as

Ex. 24 to Compl.

III.    **BACKGROUND OF THE PRESENT LITIGATION**

        Cubaexport's Complaint contains four counts.  The first three allege facial and as-applied

constitutional challenges to OFAC's denial of Cubaexport's license request, including procedural

and substantive due process challenges as well as an argument that OFAC's actions constitute an

unconstitutional taking of property without just compensation.  See Compl. at 17-19.  The final

count alleges that the April 6, 2006, and July 28, 2006, letters issued by OFAC to Cubaexport

violate the APA.  See id. at ¶ 74.  As recognized by this Court, Cubaexport later clarified this

count to include three specific challenges to statements made by OFAC: (1) OFAC's statement in

the April 6, 2006, letter that "license CU-74488 did not authorize Ropes & Gray to pay

Cubaexport's renewal fee"; (2) OFAC's statement in the July 28, 2006, letter that "Cubaexport

could not renew its trademark unless specifically licensed to do so"; and (3) OFAC's statement in

the July 28, 2006, letter that Cubaexport's request for a specific license to renew the Havana

Club mark would be denied.  Sept. 27, 2007, Mem. Op. & Order at 11.

        On December 21, 2006, OFAC moved to dismiss or, in the alternative, for summary

judgment, arguing that Cubaexport lacked standing to assert its constitutional claims, that the

constitutional claims lacked merit, and that OFAC's actions could not be deemed "arbitrary or

capricious" in violation of the APA.  On September 27, 2007, this Court issued a Memorandum

14

Opinion and Order granting the motion in part and denying it in part. The Court first evaluated Cubaexport's three separate claims under the APA. See Mem. Op. & Order at 12.

The Court granted summary judgment to OFAC with respect to two of Cubaexport's three APA claims. The Court first concluded that OFAC's statement in the April 6, 2006, letter that License No. CU-74488 does not authorize renewal of the Havana Club trademark "was both reasonable and fully warranted by the facts." Id. at 18. Recognizing the "significant deference" owed to OFAC "in interpreting its own regulatory authority"—an interpretation that "must be virtually above reproach"—the Court rejected Cubaexport's contention that OFAC's statement was contrary to the plain language of the license. Id. at 17. In fact, the Court held that this contention was "quite simply, wrong." Id. at 16.

The Court reached a similar conclusion with respect to Cubaexport's challenge to OFAC's denial of the request for a specific license to renew the Havana Club trademark. Recognizing both the broad deference granted to OFAC's issuance of specific licenses as well as to the foreign policy decisions of the political branches, the Court concluded that OFAC's decision was committed to agency discretion by law. Id. at 24. The Court specifically noted that this conclusion was not inconsistent with prior decisions by the agency to permit "Cubaexport's legal counsel to defend its *already-acquired* property rights in its *existing* HAVANA CLUB registration," as "Cubaexport had never before sought a specific license to renew the HAVANA CLUB mark and to thus *extend its rights in the mark for another ten years*." Id. at 23 (emphasis in original).

However, the Court was not prepared to grant summary judgment with respect to Cubaexport's final APA challenge to OFAC's statement in its July 28, 2006, letter that "renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless

15

specifically licensed." Id. at 18.  The Court stated that the record lacked explicit evidence

regarding the reasoning process supporting OFAC's determination, if any, on the applicability of

the general licensing provision in 31 C.F.R. § 515.527(a)(1).  Id. at 19.  Accordingly, the Court

ordered OFAC to supplement the administrative record with "evidence elucidating the

contemporaneous reasons for its decision that 'renewal of the HAVANA CLUB trademark . . .

would be prohibited unless specifically licensed.'" Id. at 20.

        OFAC provided the requested information through the supplemental declaration of the

Director of OFAC, Adam Szubin.  The supplemental declaration indicates that OFAC's

statement in its July 28, 2006, letter that "renewal of the HAVANA CLUB trademark . . . would

be prohibited unless specifically licensed" reflected "OFAC's position that Cubaexport could not

rely on the general licensing provision of 31 C.F.R. § 515.527(a)(1) for transactions related to the

renewal of the HAVANA CLUB trademark."  Supplemental Declaration of Adam J. Szubin

("Supp. Szubin Decl.") ¶ 6.  This position was reached through the interpretation of OFAC's own

regulation incorporating the limitations on the general licensing provision mandated by section

211, as OFAC concluded that the HAVANA CLUB mark constituted a "mark . . . that is the

same as or substantially similar to a mark . . . that was used in connection with a business or

assets that were confiscated" and that "the original owner of the mark . . . or the bona fide

successor-in-interest" had not "expressly consented" to that use.  See 31 C.F.R. § 515.527(a)(2);

see also Supp. Szubin Decl. ¶¶ 7-8.  The primary basis for this conclusion, one that was never

contested by Cubaexport to OFAC, was the factual findings of courts in litigation concerning the

Havana Club mark and its connection to confiscated assets.  See Supp. Szubin Decl. ¶¶ 10-12.  In

light of the express findings of these courts, and the absence of any evidence to the contrary

before OFAC, the agency concluded in the July 28, 2006, letter that the general licensing

provision of 31 C.F.R. § 515.527(a)(1) was inapplicable to transactions with respect to the

Havana Club mark.  See, e.g., id. ¶ 28.

Following the filing of the supplement to the administrative record pursuant to this

Court's previous order, the Court set a briefing schedule for renewal of the government's motion.

## STANDARD OF REVIEW

### I.    MOTION TO DISMISS STANDARD

A motion to dismiss should be granted when a court lacks subject-matter jurisdiction over

an action, or the complaint fails to "state a claim upon which relief can be granted."  FED. R. CIV.

P. 12(b)(1), (6).  A court may grant a Rule 12(b)(6) motion when a complaint does not contain

allegations that support recovery under a viable legal theory.  Bell Atlantic Corp. v. Twombly, __

U.S. __, 127 S. Ct. 1955, 1969 (2007).  The standard of review is substantially the same for

subject matter jurisdiction challenges pursuant to FED. R. CIV. P. 12(b)(1), but the Court may

consider materials outside of the pleadings to determine whether jurisdiction exists.  Caesar v.

United States, 258 F. Supp. 2d 1, 2-3 (D.D.C. 2003).

### II.    SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when "there is no genuine issue as to any material

fact and . . . the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

Summary judgment is "properly regarded . . . as an integral part of the Federal Rules as a whole,

which are designed to secure the just, speedy and inexpensive determination of every action."

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (internal quotation omitted).  The relevant

inquiry is "whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  "[T]here is no issue for trial unless there is

17

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If

the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted).

## ARGUMENT

## I.    CUBAEXPORT LACKS STANDING TO ASSERT ITS FIFTH AMENDMENT CLAIMS

The Due Process Clause of the Fifth Amendment provides that no "person" shall be

"deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V.

However, unlike citizens of the United States, or even "States of the Union," "foreign nations"

are "entirely alien to our constitutional system."  Price v. Socialist People's Libyan Arab

Jamahiriya, 294 F.3d 82, 96 (D.C. Cir. 2002).  It would therefore be "highly incongruous to

afford greater Fifth Amendment rights" to foreign entities than to the states who, despite

"help[ing] make up the very fabric of that system," possess no rights as a "person" under the

Fifth Amendment.  Id.; see also South Carolina v. Katzenbach, 383 U.S. 301 (1966).

In accordance with the textual limitations of the Due Process Clause, the judiciary has

been reluctant to extend Fifth Amendment protections to foreign states.  For example, the

Supreme Court has never "suggested that foreign nations enjoy rights derived from the

Constitution, or that they can use such rights to shield themselves from adverse actions taken by

the United States."  Price, 294 F.3d at 97.  Rather than mediating legal disputes between the

United States and a foreign nation through the Constitution, "the federal judiciary has relied on

principles of comity and international law to protect foreign governments in the American legal

system."  Id.  If Fifth Amendment protections were extended to foreign nations, "serious practical

problems might arise":

18

> For example, the power of Congress and the President to freeze the assets of
> foreign nations, or to impose economic sanctions on them, could be challenged as
> deprivations of property without due process of law. The courts would be called
> upon to adjudicate these sensitive questions, which in turn could tie the hands of
> the other branches as they sought to respond to foreign policy crises. The
> Constitution does not command this.

Id. at 99; see also People's Mojahedin Org. of Iran v. Dep't of State ("PMOI"), 182 F.3d 17, 22

(D.C. Cir. 1999) ("No one would suppose that a foreign nation had a due process right to notice

and a hearing before the Executive imposed an embargo on it for the purpose of coercing a

change in policy."). Based upon these legal and policy considerations, the D.C. Circuit has

expressly held that "foreign states are not 'persons' protected by the Fifth Amendment."[4] Price,

294 F.3d at 96; see also TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 300

(D.C. Cir. 2005).

Thus, the question for this Court is whether the Cuban government exerted "sufficient

control over [Cubaexport] to make it an agent of the State" for Fifth Amendment purposes.

TMR Energy, 411 F.3d at 301; see also First Nat'l City Bank v. Banco Para el Comercio Exterior

de Cuba, 462 U.S. 611, 629 (1983). If so, then "there is no reason to extend to [Cubaexport] a

constitutional right that is denied to the sovereign itself." TMR Energy, 411 F.3d at 301. In the

present case, it is clear from the pleadings and judicial precedent that Cubaexport is an agent of

the Cuban government.

Cubaexport describes itself in its Complaint as a "Cuban state-owned enterprise" located

---

[4] Although the D.C. Circuit's holding in Price focused on the Due Process Clause of the
Fifth Amendment, its justification for this holding supports the same conclusion under the
Takings Clause of the Fifth Amendment, as its analysis of Supreme Court precedent and practical
foreign policy considerations applies generally to the constitutional rights of foreign
governments. See Price, 294 F.3d at 97; see also Paradissiotis v. United States, 304 F.3d 1271,
1274 (Fed. Cir. 2002).

solely within Cuba.  Compl. ¶ 5.  Moreover, Cubaexport states that it "was established in 1965 by the Cuban Ministry of Foreign Commerce for the purpose of exporting food and other products."  Id.  This statement is supported by Cuban Resolution No. 234, attached by Cubaexport to the declaration of Francisco Santiago Pichardo as Ex. A (Docket No. 17), which outlines the purposes and structure of Cubaexport.  As revealed by the Resolution, Cuba created Cubaexport "[t]o better accomplish the objectives assigned to the Ministry of Foreign Commerce," including "assum[ing] the promotion and execution of all the operations of foreign commerce related to" a laundry list of products.  Pichardo Decl. Ex. A. ¶¶ 2, 5.  In addition, "[w]ith regard to its activity, operation and organization, Cubaexport will be governed by the Bylaws . . . and *in accordance with the instructions issued to it by the Ministry of Foreign Trade by virtue of the State plans for foreign trade*."  Id. ¶ 7 (emphasis added).  Accordingly, Cubaexport acknowledges that it is a state-owned entity created by the Cuban government for the purpose of executing state trade policy.  Cf. TMR Energy, 411 F.3d at 301-02 (holding that state exercises plenary control over entity based on several factors including creation of entity for purpose of enacting state policy); Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 849 (D.C. Cir. 2000) ("[A] sovereign need not exercise complete dominion over an instrumentality . . . .  If such domination were required, then agency principles would be superfluous . . . .").

In line with this acknowledgment, other courts have found Cubaexport to be a "wholly owned corporation[] of the Government of Cuba."  Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 357 (11th Cir. 1984); see also HCH V, 203 F.3d at 120 (describing Cubaexport as a "Cuban state enterprise"); HCH IV, 62 F. Supp. 2d at 1090 (describing Cubaexport as "a Cuban state foreign trade enterprise established by the Cuban Ministry of Foreign Commerce").  And at

least one court that has engaged in this agency analysis under the Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, 116 Stat. 2322, has recently held that Cubaexport is an agent of the Cuban government.  See Weininger v. Castro, 462 F. Supp. 2d 457, 498 (S.D.N.Y. 2006) ("[T]o the extent the funds in the . . . Account belong to Banco Nacional or to CUBAEXPORT, they belong to agencies or instrumentalities of Cuba and Plaintiffs may execute upon them to satisfy their judgment against Cuba.").  Accordingly, as an agent of the Cuban government, Cubaexport lacks status as a "person" protected by the guarantees of the Fifth Amendment.[5]  See TMR Energy, 411 F.3d at 302; see also Cruz v. United States, 387 F. Supp. 2d 1057, 1067-68 (N.D. Cal. 2005) (holding that entities acting as agents or instrumentalities of foreign state are outside the protections of the Due Process Clause); Banco Nacional de Cuba v. Farr, 243 F. Supp. 957, 977 (S.D.N.Y. 1965) ("Plaintiff is an instrumentality of the Cuban government and stands in its shoes.  For the purposes of this case at least, it is the Cuban government.").

However, even if Cubaexport is determined to have a separate juridical status from the government of Cuba, it is "far from obvious that even an independent [Cubaexport] would be entitled to the protection of the fifth amendment."  TMR Energy, 411 F.3d at 302 n.  This doubt arises from the fact that "[t]he Supreme Court has long held that non-resident aliens who have

---

[5]  This conclusion is supported by principles of equity, which weigh against recognition of Cubaexport as a separate juridical entity in the present case.  As will be discussed in detail in Section IV infra, the Havana Club trademark has been identified as a mark associated with property confiscated by the Cuban government.  See, e.g., HCH V, 203 F.3d at 119-20.  From 1972 to 1993, Cubaexport was the exclusive exporter of rum under the Havana Club mark.  See, e.g., id. at 120.  Now that Congress, through the passage of section 211, has qualified the extension of recognition for trademarks that are the same as or substantially similar to trademarks used in connection with confiscated Cuban property, it would be incongruous with congressional intent to allow this sanction to be avoided through recognition of constitutional protections in the entity that stands in the Cuban government's shoes with respect to goods sold under that trademark.  Cf. First Nat'l City Bank, 462 U.S. at 632-33.

insufficient contacts with the United States are not entitled to Fifth Amendment protections." Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004). The main exception to this rule applies when aliens "'have come within the territory of the United States and developed substantial connections with this country.'"[6] PMOI, 182 F.3d at 22 (quoting United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990)); see also Jifry, 370 F.3d at 1182; Am. Immigration Lawyers Ass'n v. Reno, 18 F. Supp. 2d 38, 59-60, 60 n.17 (D.D.C. 1998) (holding that plaintiffs had not demonstrated "substantial connections" to the United States despite regularly visiting family in the country).

Cubaexport is a non-resident corporation operating out of Cuba. See Compl. ¶ 5. Any activities that Cubaexport wishes to conduct within the United States are strictly regulated, if not expressly prohibited, by the CACR. See 31 C.F.R. Part 515. Accordingly, Cubaexport's ability to establish a presence within the United States is, for all practical purposes, restricted by federal law. In the present case, the only contact alleged by Cubaexport is the registration of a trademark, through counsel, in the United States PTO, and the defense of that trademark through litigation by counsel within the United States.[7] If such minimal presence is sufficient to enable a

---

[6] In Nat'l Council of Resistance of Iran v. Dep't of State ("NCRI"), 251 F.3d 192, 201-02 (D.C. Cir. 2001), an opinion issued prior to Jifry, the D.C. Circuit questioned in dicta whether an alien's connections need be substantial for the Fifth Amendment to apply. However, in NCRI the Court avoided confronting the question because the government's representations had already sufficiently established the alien entity's presence within the United States. See id. at 202.

[7] In Russian Volunteer Fleet v. United States, 282 U.S. 481, 489 (1931), the Supreme Court extended the protections of the Takings Clause to an "alien friend" with property in the United States. However, as the Supreme Court has subsequently explained, this recognition does not extend to "an enemy alien." Harisiades v. Shaughnessy, 342 U.S. 580, 587 n.9 (1952); see also Russian Volunteer Fleet, 282 U.S. at 489 ("There was no legislation which prevented it from acquiring and holding the property in question."). After all, an enemy alien whose contacts with the United States are prohibited or constrained by law stands in a much different position than those visitors who are fully encouraged to participate in commerce within the United States.

foreign entity to the protections of the Fifth Amendment, despite the existence of sanctions against that entity that statutorily limit the entity's presence, then it is unclear what force the "substantial connections" limitation maintains.  See PMOI, 182 F.3d at 22.

## II.    EVEN ASSUMING CUBAEXPORT HAS RIGHTS GUARANTEED BY THE FIFTH AMENDMENT, ITS DUE PROCESS CLAIM LACKS MERIT

In Count I of the Complaint, Cubaexport alleges that its procedural due process rights were violated because OFAC failed to provide Cubaexport with notice and an opportunity to be heard regarding the applicability of section 211 and 31 C.F.R. § 515.527(a)(2) to Cubaexport. See Compl. ¶ 63.  Cubaexport also alleges in Count II of the Complaint that OFAC's denial of a license to renew the Havana Club trademark was a violation of substantive due process, as OFAC's actions were inconsistent with the underlying purposes of the CACR and TWEA and were therefore "arbitrary and capricious."  See id. ¶ 68.  Both allegations are without merit.

### A.    OFAC's Actions Were Consistent with Procedural Due Process

In order to establish a violation of procedural due process, Cubaexport must establish the existence of a protected property interest as well as a violation of the procedural protections that were due.  See, e.g., Orange v. Dist. of Columbia, 59 F.3d 1267, 1273 (D.C. Cir. 1995).  In the present case, Cubaexport's unilateral expectation of a license from OFAC to permit transactions related to the renewal of the Havana Club trademark does not constitute a property interest protected by the Fifth Amendment.  Moreover, even if such a right exists, it is apparent that OFAC provided Cubaexport with notice and a meaningful opportunity to be heard on its application for a specific license.

23

1.    **Cubaexport Lacks a Property Interest in a License Authorizing Transactions Related to Renewal of the Havana Club Trademark**

The Supreme Court has explained that, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).  The extent of this protected interest is defined, not by the Constitution, but instead by statutes that establish a legitimate claim of entitlement to the benefit.  Id.

Cubaexport maintains that it has a vested property interest in the registration of the Havana Club mark.  See Compl. ¶ 60.  OFAC does not dispute that a property interest could exist in a trademark.  See generally Coll. Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 673 (1999).  However, as will be discussed infra in Section III, OFAC did not appropriate the Havana Club trademark from Cubaexport.  See also Mem. Op. & Order at 23.  Rather, OFAC declined to grant Cubaexport a license for transactions related to renewal of the trademark with the PTO.  This is an important distinction, as it narrows the due process inquiry to whether Cubaexport had a Fifth Amendment property interest in the grant of such a license.

Because a property interest recognized by the Fifth Amendment requires a claim of entitlement, rather than a unilateral expectation, a property interest does not exist "when a statute leaves a benefit to the discretion of a government official."  Bloch v. Powell, 348 F.3d 1060, 1069 (D.C. Cir. 2003); see also id. ("To create a protected property interest, regulations must limit discretion by . . . specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow."); Thornton v. City of St. Helens, 425

24

F.3d 1158, 1165 (9th Cir. 2005) ("[A]n applicant does not have a property interest in the renewal of a license if the reviewing body has discretion to deny renewal or to impose licensing criteria of its own creation."). This inquiry is particularly appropriate when attempting to determine whether a statute creates an entitlement in the renewal of a government license. See Thornton, 425 F.3d at 1165; see also Lopez v. FAA, 318 F.3d 242, 249 (D.C. Cir. 2003).

Unlike the average applicant for registration or renewal of a trademark before the PTO, Cubaexport's expectation was expressly conditioned on the licensing provisions of the CACR. See 31 C.F.R. § 515.527. Accordingly, when Cubaexport first registered the Havana Club trademark, it did so by virtue of a general licensing provision. See 31 C.F.R. § 515.527(a)(1). However, that general authorization was and is subject to "amend[ment], modifi[cation], or revo[cation] at any time." See 28 Fed. Reg. 6985 (July 9, 1963); 31 C.F.R. § 501.803. Thus, even prior to the passage of section 211, Cubaexport was on notice that its ability to register or renew a trademark was expressly revocable. See Conti v. United States, 291 F.3d 1334, 1341-42 (Fed. Cir. 2002) (finding no property interest in permit when regulations permitted government to "revoke, suspend, or modify" permit "at all times"); see also Trinity Methodist Church, South v. Fed. Radio Comm'n, 62 F.2d 850, 854 (D.C. Cir. 1932) ("All of these cases indubitably show . . . that one who applies for and obtains a grant or permit from a state, or the United States, to make use of a medium of interstate commerce, under the control and subject to the dominant power of the government, takes such grant or right subject to the exercise of the power of government . . . .").

Moreover, with the passage of section 211 in 1998, the process by which a Cuban entity can be licensed to register or renew a trademark was further conditioned on the relationship of that mark to property that had been confiscated. See 31 C.F.R. § 515.527(a)(2). Congress did

not list in section 211 extensive, mandatory procedures for making a specific licensing

determination under section 515.527, opting instead to qualify the existing general license.  Pub.

L. No. 105-277, § 211, 112 Stat. 2681, 2681-88; see also Compl. ¶ 30.  In situations where the

general licensing provision no longer applied, the ability to engage in transactions related to the

registration or renewal of a trademark would be prohibited absent the grant of a specific license

by OFAC.  See 31 C.F.R. § 515.318; see also Szubin Decl. ¶ 22.  As this Court recognized,

OFAC is given wide discretion to make this determination.  See Mem. Op. & Order at 22

(holding that "no provision in either the TWEA nor the CACR prescribes any procedure for

OFAC to follow . . . in issuing specific licenses"); cf. Bloch, 348 F.3d at 1069; Tuchman v.

Connecticut, 185 F. Supp. 2d 169, 174 (D. Conn. 2002) (holding that state permit statute granting

discretion to Commissioner to evaluate eligibility for permit does not create constitutional

entitlement).

        Accordingly, whatever interest Cubaexport has in obtaining a license from OFAC,

whether that license be general in nature or specific, is constrained to such an extent that it could

not constitute an "entitlement" protected by the Due Process Clause.  See Conti, 291 F.3d at

1341 (finding no property interest in permit even though plaintiff "could and did utilize his

permit . . . for more than a decade"); Universal Sanitation Corp. v. Trade Waste Comm'n of City

of New York, 940 F. Supp. 656, 661 (S.D.N.Y. 1996) (holding that existence of heavily

regulated industry disproves property right in continuing expectation of waiver); cf. Boyden v.

Commissioner of Patents, 441 F.2d 1041, 1043 (D.C. Cir. 1971) ("No person has a vested right

to a patent but is privileged to seek the protected monopoly only upon compliance with the

conditions which Congress has imposed. That rule applies to the payment of fees required for the

administration of the patent laws just as it demands compliance with other conditions, statutorily

imposed.") (internal citation omitted).

> **2.    OFAC Provided Cubaexport with All of the Process It Was Allegedly Due**

Even assuming that Cubaexport's ability to obtain a license was a property interest recognized by the Fifth Amendment, OFAC provided Cubaexport with all of the process it was due in making the licensing determination.  The Due Process Clause of the Fifth Amendment generally requires the government to afford notice and a meaningful opportunity to be heard before depriving a person of a recognized property interest.  See, e.g., Holy Land Found. for Relief and Dev. v. Ashcroft, 333 F.3d 156, 163-64 (D.C. Cir. 2003); Karpova v. Snow, 402 F. Supp. 2d 459, 470 (S.D.N.Y. 2005).  In the context of OFAC's enforcement authority under TWEA and IEEPA, courts have held that this opportunity does not entail a full hearing prior to agency action; an opportunity for an affected entity to respond to OFAC in writing is sufficient to satisfy due process.  See Holy Land Found., 333 F.3d at 163-64; Nat'l Council of Resistance of Iran v. Dep't of State ("NCRI"), 251 F.3d 192, 209 (D.C. Cir. 2001); Karpova, 402 F. Supp. 2d at 470; see also Mathews v. Eldridge, 424 U.S. 319, 335 (1976).  In fact, courts have recognized that OFAC's need for prompt action in the context of TWEA or IEEPA has justified the absence of pre-deprivation notice or an opportunity to be heard, even in instances in which an organization is effectively shut down by OFAC's actions.  See, e.g., Islamic Am. Relief Agency v. Unidentified FBI Agents, 394 F. Supp. 2d 34, 49 (D.D.C. 2005); Holy Land Found. for Relief and Dev. v. Ashcroft, 219 F. Supp. 2d 57, 76 (D.D.C. 2002), aff'd, 333 F.3d 156 (D.C. Cir. 2003).

Nevertheless, OFAC provided Cubaexport both notice and an opportunity to be heard prior to acting on the application for a license authorizing transactions relating to the renewal of

the Havana Club mark. In a December 13, 2005, letter, Ropes & Gray, on behalf of Cubaexport,

informed OFAC of Cubaexport's pending application with the PTO to renew the Havana Club

trademark and to pay the necessary filing fee under the authority granted by License No. CU-

74488. See A.R. 56-58. The letter asserted that the failure to maintain the registration of the

mark would be unfair because it would interfere with ongoing litigation and "[e]ffectively

overrul[e]" the decision of the PTO in the cancellation proceeding. See A.R. 57.

OFAC responded in a letter dated April 6, 2006, explaining that License No. CU-74488

"does not authorize Ropes & Gray LLP to pay a filing fee to the [PTO] for renewal of [the

'HAVANA CLUB trademark']," as the license authorized them only to engage in legal

representation of Cubaexport in a proceeding in United States District Court for the District of

Columbia that had been specifically referenced in the license application. A.R. 52. OFAC

concluded the letter by notifying Ropes & Gray that its explanation of the limitations of the legal

license did not prohibit issuance of a separate license for transactions related to the renewal of

the Havana Club trademark on behalf of Cubaexport, or further dialogue with the agency

regarding issues relating to renewal:

> We note that this discussion does not in any way prejudice the ability of
> Ropes & Gray LLP to request separate authorization from OFAC to engage in
> transactions related to the renewal of the HAVANA CLUB trademark registration
> at the PTO. If you wish to request such a specific license or *further guidance*
> from OFAC, you may do so by writing directly to OFAC's Licensing Division.
> Should you have any further questions, please contact the Deputy Chief Counsel
> (Foreign Assets Control) . . . .

A.R. 53 (emphasis added).

Thus, OFAC's April 6, 2006, letter placed Cubaexport on notice that the legal license did

not authorize transactions related to the renewal of the Havana Club trademark, and it provided

Cubaexport with at least two procedural options in light of this fact. First, Cubaexport could

have (as it ultimately did) requested a specific license. Second, Cubaexport could have sought

further guidance from the agency on issues relating to renewal, including the applicability of the

general licensing provision in 31 C.F.R. § 515.527(a)(1) to the Havana Club trademark. See

Supp. Szubin Decl. ¶¶ 21, 22. This opportunity would be the same presented to all other

applicants who "submit requests to OFAC seeking guidance on the applicability of OFAC

regulations to particular facts and circumstances," including asserting "that a general license

applies." See id. ¶ 22. If any confusion existed as to Cubaexport's options, the April 6, 2006,

letter also provided Cubaexport with the opportunity to contact OFAC directly. See Reeve

Aleutian Airways, Inc. v. United States, 982 F.2d 594, 600 (D.C. Cir. 1993) (holding that

notice's assurance of the right to communicate with decision maker reduces risk of erroneous

deprivation).

However, Cubaexport chose only the first procedural option offered by OFAC, applying

through Ropes & Gray for a specific license to "incur and receive payment for the expense of

renewing the registration."[8] A.R. 49-51. As support for this action, however, the application

simply repeated Ropes & Gray's arguments from the December 13, 2005, letter to support

expansion of the legal license. A.R. 50. Thus, the application filed on behalf of Cubaexport was

entirely silent on the issue of whether issuance of a specific license pursuant to 31 C.F.R.

§ 515.527 would be consistent with the CACR or other applicable statutes, such as section 211,

or whether such specific authorization was even necessary. See Supp. Szubin Decl. ¶¶ 23, 25; cf.

---

[8] In light of the information provided by Ropes & Gray on behalf of Cubaexport in the
December 13, 2005, letter, OFAC was aware that renewal of the Havana Club trademark with the
PTO was dependent upon payment of the renewal fee. See A.R. 56-58. In seeking authorization
to engage in a transaction that would expressly permit the renewal of the Havana Club mark,
Ropes & Gray was acting in a representative capacity on Cubaexport's behalf.

Global Relief Found. v. O'Neill, 207 F. Supp. 2d 779, 805 (N.D. Ill. 2002) ("That Global Relief opted to ignore its administrative due process rights . . . cannot be considered a constitutional violation on the part of defendants."), aff'd, 315 F.3d 748 (7th Cir. 2002).

Cubaexport was certainly aware that such considerations might be relevant to OFAC's decision on a specific license application that would authorize renewal of the Havana Club trademark.  In a series of letters copied to OFAC while OFAC was still considering whether to grant Cubaexport a specific license, Cubaexport, through counsel, requested that, inter alia, the PTO renew the Havana Club registration pursuant to the general licensing provision for trademarks, "31 CACR § 515.527(a)," without waiting for a decision by OFAC.  A.R. 34-40. That request advanced a series of policy arguments to the PTO that purportedly supported renewal of the trademark, including ones that had previously been rejected in the New York litigation.[9]  A.R. 35-39.  However, this request still did not include any substantive evidence to disprove the connection of the Havana Club trademark to confiscated assets.  See id.; see also Supp. Szubin Decl. ¶ 26.

Given the fact that OFAC notified Cubaexport of the need for additional authorization beyond legal License No. CU-74488 for transactions related to renewal of the Havana Club trademark, as well as Cubaexport's decision to respond to this notice by applying for a specific license in writing, there is no support for the conclusion that OFAC denied Cubaexport necessary procedural protections.  No final agency decision was issued on Cubaexport's ability to engage in transactions related to the renewal of the Havana Club trademark until OFAC denied Cubaexport's application in a July 28, 2006, letter.  See A.R. 1 ("Pursuant to the [CACR] . . .

---

[9] Cubaexport did not make these arguments directly to OFAC, instead choosing only to copy the agency on the correspondence.  See Szubin Decl. ¶ 37.

30

renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed. . . . [Y]our request is hereby denied."); see also United States v. Int'l Harvester Co., 387 F. Supp. 1338, 1340 (D.D.C. 1974) (holding that agency's preliminary decision to prosecute does not deprive individual of property interest); Scott v. City of Seattle, 99 F. Supp. 2d 1263, 1267-68 (W.D. Wash. 1999) (holding that deprivation does not occur until final action is taken to deprive individual of property).  From April 6 to July 28, Cubaexport was free to submit whatever materials it believed supported its ability to engage in transactions related to renewal of the Havana Club mark.  Accordingly, Cubaexport had ample opportunity to respond to the notice issued by OFAC before the agency's final determination.

Moreover, as the Supplemental Declaration of Adam Szubin explains, these pre-decisional procedures are supplemented by agency regulations, which provide applicants with an opportunity, following the agency's decision, to apply to reopen a license application or to file a further application.  See Supp. Szubin Decl. ¶ 24; see also 31 C.F.R. § 501.801(b).  Moreover, agency regulations provide an applicant the ability to request "further explanation of the reasons for a denial by correspondence or personal interview."  See id.  Cubaexport availed itself of neither of these options, even though they would have provided Cubaexport with whatever explanation they believe to be lacking from OFAC's decision letter.

**B.    OFAC Did Not Violate Cubaexport's Substantive Due Process Rights by Applying Section 211 and 31 C.F.R. § 515.527 Prospectively to Determine Whether the License Should Be Granted**

Cubaexport additionally alleges that section 211 and 31 C.F.R. § 515.527 constitute a violation of substantive due process.  Compl. ¶¶ 67, 68.  Such claims are difficult to maintain, requiring proof that the government has acted in an "arbitrary" manner.  E.g. County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998); Comm. of U.S. Citizens Living in Nicaragua v.

Reagan, 859 F.2d 929, 944 (D.C. Cir. 1988).  And "only the most egregious official conduct" can be deemed arbitrary in the constitutional sense.  County of Sacramento, 523 U.S. at 846; see also Holy Land Found., 219 F. Supp. 2d at 77 (rejecting substantive due process claim since designation of Muslim charitable organization as terrorist supporter and blocking of all of its assets did not "rise to the level of a constitutional violation"), aff'd, 333 F.3d. at 163.

Cubaexport purports to base its facial and as-applied substantive due process claims on two grounds.  First, Cubaexport argues that these laws, or their application, "retroactively deprive[]" it of a protected property interest in contravention of the Constitution.  Compl. ¶ 67.  As a "facial" claim, this allegation is difficult to comprehend, as it presumes that the law, *on its face*, operates to deprive Cubaexport of property, and that the law has no permissible prospective application.

However, the claim gains little in comprehensibility when stated as an "as-applied" challenge.  As the Supreme Court has explained, "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law."  Landgraf v. USI Film Products, 511 U.S. 244, 269 (1994) (internal citation omitted); see also Bergerco Canada v. OFAC, 129 F.3d 189, 192 (D.C. Cir. 1997).  OFAC's application of section 211, through its implementing regulation, to Cubaexport's request to renew the Havana Club trademark did not invalidate any prior registration or renewal of the mark, nor did it impose any additional liability based on the use of that mark during the term of ownership.  Instead, section 211 prospectively affects the manner in which a certain category of trademarks may be renewed or registered once a future application by an owner of such a trademark is made.  As this Court recognized, "[a] fundamental difference exists between a license to defend existing property rights and one to acquire additional property

32

rights." See Mem. Op. & Order at 23.  Accordingly, section 211 has not been applied in an impermissible manner.[10]

Cubaexport next contends that section 211 and 31 C.F.R. § 515.527 are "inconsistent with the underlying purposes of the CACR and the TWEA."  Compl. ¶ 68.  This allegation, as either a facial or as-applied claim, is equally meritless in light of the recognition by this Court and others of the extensive deference due the political branches in the realm of foreign affairs.  See, e.g., Mem. Op. & Order at 23-24 ("Our Constitution commits foreign policy to the sound discretion of the political branches, and federal courts do not evaluate foreign policy decisions' wisdom or consistency.") (quoting Wald, 468 U.S. at 242).  Accordingly, there is no basis to second-guess Congress's action in promulgating section 211 or OFAC's implementation of the statute.  See, e.g., Comm. of U.S. Citizens, 859 F.2d at 944-45 (expressing "reluctance to constitutionalize foreign policy choices").  Neither section 211 nor OFAC's implementation of that section in 31 C.F.R. § 515.527 constitutes "arbitrary" official conduct by the political branches in the realm of foreign affairs.  Among other purposes, both the statute and the regulation demonstrate Congress's desire to protect the integrity of intellectual property by ensuring that the United States does not, without consideration of current foreign policy objectives, recognize rights to intellectual property that are the same as or substantially similar to a mark used in connection with confiscated assets.  OFAC's denial of Cubaexport's application, following advice from the State Department, was fully consistent with this purpose, among

---

[10] Other courts have similarly decided that the language of section 211 does not have a retroactive effect.  See HCH IV, 62 F. Supp. 2d 1085, 1094-95 (S.D.N.Y. 1999) (rejecting argument that section 211 has "impermissibly retroactive effect"), aff'd, 203 F.3d at 129; Banco Nacional de Cuba, 243 F. Supp. at 978, 981 (holding that statute based on confiscation or other taking "after January 1, 1959" poses "no constitutional infirmity" despite allegation of retroactivity)

others.  See Mem. Op. & Order at 24 ("[T]his Court is in no position to second-guess the State

Department's interpretation of policies *it formulates* and to challenge its recommendations

thereon.") (emphasis in original).

### III.    EVEN ASSUMING CUBAEXPORT HAS CONSTITUTIONAL RIGHTS GUARANTEED BY THE FIFTH AMENDMENT, ITS TAKINGS CLAIM LACKS MERIT

In Count III of the Complaint, the plaintiff alleges that section 211 and 31 C.F.R. §

515.527, on their face or as applied by OFAC, constitute a "regulatory taking" of Cubaexport's

property for which Cubaexport received no compensation.[11]  Compl. ¶¶ 70-71.  As an initial

matter, this is not the appropriate forum for such a claim.  Except for cases in which the amount

in controversy is less than $10,000, the Tucker Act, 28 U.S.C. § 1491(a); see also 28 U.S.C. §

1346(a)(2), provides for exclusive jurisdiction in the United States Court of Federal Claims.  See

Ry. Labor Executives' Ass'n v. United States, 987 F.2d 806, 815-16 (D.C. Cir. 1993); Holy Land

Found., 219 F. Supp. 2d at 77; Global Relief Found., 207 F. Supp. 2d at 802.  This exclusive

jurisdiction exists even when a complainant styles its claim as a request for injunctive, rather

than monetary, relief.[12]  See Ry. Labor, 987 F.2d at 816; see also Rose Acre Farms, Inc. v.

Madigan, 956 F.2d 670, 673-74 (7th Cir. 1992).

---

[11]  The analysis of Cubaexport's takings claim will focus on the as-applied challenge. Cubaexport's suggestion that a facial claim exists against section 211 or 31 C.F.R. § 515.527 belies common sense and precedent.  The "mere enactment" of neither law by itself constitutes a taking of private property.  See Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc., 452 U.S. 264, 295 (1981).  The laws simply regulate the manner in which a Cuban entity may register or renew a trademark, whether by general or specific license.  Id. at 296.

[12]  In Eastern Enterprises v. Apfel, 524 U.S. 498, 520-21 (1998), the Supreme Court discussed the question of whether suits seeking only equitable relief are subject to the Tucker Act.  However, in finding that district courts have jurisdiction over the claim alleged in Eastern, the Supreme Court limited its reasoning to instances in which a government statute mandates a direct transfer of funds rather than burdening property.  Id. at 521.

Even if this Court has concurrent jurisdiction over Cubaexport's takings claim, the claim is without merit. Courts have consistently rejected such claims in the economic sanctions context. See, e.g., Paradissiotis v. United States, 304 F.3d 1271, 1274 (Fed. Cir. 2002) ("On several occasions, this court has addressed Fifth Amendment takings claims raised by persons or entities that have been adversely affected by actions taken for national security reasons to . . . prohibit transactions by . . . foreign entities . . . and on each occasion we have held that the actions have not violated the Takings Clause."); Holy Land Found., 219 F. Supp. 2d at 78. The fundamental basis for these decisions was first set forth by the Supreme Court and has been repeated frequently in the sanctions context despite the subsequent evolution of takings jurisprudence:

> A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared? . . . [W]as it ever imagined this was taking private property without compensation or without due process of law?

E.g. Paradissiotis, 304 F.3d at 1274; Chang v. United States, 859 F.2d 893, 897 (Fed. Cir. 1988) (quoting Legal Tender Cases (Knox v. Lee), 79 U.S. 457, 551 (1870)). After all, "[e]conomic sanctions would hardly be sanctions if the foreign targets of the sanctions could simply stand in line to be compensated for the losses those sanctions caused them." Paradissiotis, 304 F.3d at 1275.

Consequently, relying upon the broad executive authority conferred by IEEPA and TWEA, courts have recognized that a complete blocking of an entity's assets does not represent a taking because, inter alia, such sanctions are temporary and do not "vest" property in the United States. See, e.g., Nielsen v. Sec'y of Treasury, 424 F.2d 833, 844 (D.C. Cir. 1970); see also

35

Propper v. Clark, 337 U.S. 472, 481-82 (1949); Tran Qui Than v. Regan, 658 F.2d 1296, 1304 (9th Cir. 1981); Islamic Am. Relief Agency, 394 F. Supp. 2d at 51; Holy Land Found., 219 F. Supp. 2d at 78; Global Relief Found., 207 F. Supp. 2d at 802.  This reasoning has been extended even to those actions by OFAC that have had the effect of reducing or eliminating the value of blocked property.  See Paradissiotis, 304 F.3d at 1275-76; see also Nielsen, 424 F.2d at 843.

In denying a specific license to Cubaexport, a Cuban entity, OFAC did not vest any property in the United States government.  Nor did OFAC's denial prohibit all economically viable uses of the trademark, as the trademark could still be used in Cuba or other countries where the mark has been recognized.  Instead, OFAC's action had, at most, the effect of preventing Cubaexport from renewing recognition of the mark in the United States, a transaction that would otherwise be prohibited in the absence of governmental authorization.  See, e.g., 31 C.F.R. § 515.201(b); see also 31 C.F.R. § 501.803 ("[L]icenses (whether general or specific) . . . may be amended, modified or revoked at any time.").  The denial of such a limited expectation by an entity already the target of foreign sanctions could not be deemed a taking in violation of the Fifth Amendment.[13]  See Paradissiotis, 304 F.3d at 1275; see also Am. Int'l Group, Inc. v. Islamic Republic of Iran, 657 F.2d 430, 448 (D.C. Cir. 1981) ("[W]e fail to grasp how such

---

[13]  Even entities which are not themselves the targets of economic sanctions have been unable to state a valid regulatory takings claim when such sanctions interfere with their contracts with a foreign government.  "When dealing in foreign commerce, the possibility of changing world circumstances and a corresponding response by the United States government can never be completely discounted."  Chang, 859 F.2d at 897.  Accordingly, when an entity chooses to engage in business in or with a country that has strained relationships with the United States, it does so with the knowledge that such strain could negatively impact its business.  See id.; see also Rockefeller Ctr. Properties v. United States, 32 Fed. Cl. 586, 593 (1995).  This conclusion arises in large part out of the recognition that foreign commerce is subordinate to the President's foreign policy powers, including those powers granted by TWEA and IEEPA.  See Chang, 859 F.2d at 897; Rockefeller Ctr., 32 Fed. Cl. at 592-93.

interest obtained only by grace of a revocable license can be thought of as property.  The holders

of the interests had no reasonable expectation that, against the factual backdrop of an unresolved

international crisis, the President would not revoke what he had granted.").

## IV.    CUBAEXPORT'S APA CLAIM LACKS MERIT

### A.    A Deferential Standard of Review Governs Judicial Review of OFAC's Licensing Decision

Under the APA, a court may set aside agency action that is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review

under the arbitrary and capricious standard is narrow and the reviewing court may not substitute

its judgment for that of the agency.  See Mem. Op. & Order at 14; see also Marsh v. Or. Natural

Res. Council, 490 U.S. 360, 378 (1989); Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S.

402, 416 (1971).  Agency action is entitled to a "presumption of regularity," Mem. Op. & Order

at 13, and the relevant inquiry for the reviewing court is "whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment."

Marsh, 490 U.S. at 378 (internal quotation omitted).  "If the agency's reasons and policy choices

. . . conform to certain minimal standards of rationality . . . the rule is reasonable and must be

upheld, even though the Court itself might have made different choices."  Holy Land Found., 219

F. Supp. 2d at 67 (citation and internal quotation omitted).

In addition, the CACR involve "weighty concerns of foreign policy," Wald, 468 U.S. at

242; Walsh, 927 F.2d at 1235, and in the area of foreign policy, the Supreme Court has

recognized that special deference is owed to the Executive Branch, Wald, 468 U.S. at 242

("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the

political branches of government as to be largely immune from judicial inquiry or interference.'") (quoting Harisiades v. Shaughnessy, 342 U.S. 580, 589 (1952)); see also Miranda v. Sec'y of Treasury, 766 F.2d 1, 4 (1st Cir. 1985); Capital Cities/ABC Inc. v. Brady, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990). Accordingly, Congress has delegated to the President—who, in turn, has delegated to the Secretary of the Treasury—broad authority to administer TWEA.[14] See Dames & Moore v. Regan, 453 U.S. 654, 672 (1981); Miranda, 766 F.2d at 3.

Given the highly deferential standard under the APA and the broad authority vested in the Executive over foreign policy, a challenge to OFAC's interpretation of its regulatory authority "must either demonstrate that the statute clearly forbids the agency's interpretation or that the interpretation is unreasonable." Consarc Corp. v. OFAC, 71 F.3d 909, 914 (D.C. Cir. 1995); see also id. at 915 (holding that, in interpreting the CACR, OFAC is afforded an "'even greater degree of deference than the Chevron standard, and must prevail unless plainly inconsistent with the regulation.'") (quoting Consarc Corp. v. Iraqi Ministry, 27 F.3d 695, 702 (D.C. Cir. 1994)). Accordingly, "even if [OFAC's] interpretation of section 515.527(a)(1) were fairly debatable, the interpretation of the provision given by the agency charged with enforcing the embargo is normally controlling." HCH V, 203 F.3d at 125.

_____

[14] See also, e.g., Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431, 1439 (9th Cir. 1996) (declining to examine the policy reasons underlying the Cuban travel ban and citing the "history of judicial deference" to executive decision-making in the foreign policy area); De Cuellar v. Brady, 881 F.2d 1561, 1570 (11th Cir. 1989) (OFAC's application of CACR to a U.S. person and denial of a specific license is "entitled to great deference from this court"); Richardson v. Simon, 560 F.2d 500, 504 (2d Cir. 1977) ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.").

38

**B.      OFAC's Statement in Its July 28, 2006, Letter to Cubaexport Concerning the Applicability of 31 C.F.R. § 515.527(a)(1), (2) Is Neither Arbitrary Nor Capricious**

In its September 27, 2007, Memorandum Opinion & Order, this Court granted summary judgment to OFAC on two of Cubaexport's three APA claims.  The only remaining claim challenges OFAC's statement in the July 28, 2006, letter that "renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed."  Mem. Op. & Order at 18.  With regard to that claim, the Court ordered OFAC to supplement the administrative record with "evidence elucidating the contemporaneous reasons for its decision." Id. at 20.  OFAC provided that evidence through the supplemental declaration of Adam Szubin, and the record now permits decision on this claim.

As explained by the declaration of Adam Szubin, the challenged statement in the July 28, 2006, letter "expressed OFAC's position that Cubaexport could not rely on the general licensing provision of 31 C.F.R. § 515.527(a)(1) for transactions related to the renewal of the HAVANA CLUB trademark."  Supp. Szubin Decl. ¶ 6.  OFAC arrived at this position through an interpretation of its own regulation, 31 C.F.R. § 515.527(a)(2), which incorporated the congressional mandate expressed by section 211.  Id. ¶ 7.  In accordance with the regulation, OFAC concluded that "the HAVANA CLUB trademark constituted a 'mark . . . that is the same as or substantially similar to a mark . . . that was used in connection with a business or assets that were confiscated' and that 'the original owner of the mark . . . or the bona fide successor-in-interest' had not 'expressly consented' to that use."  Id. ¶ 8.

The primary basis for this conclusion came from the factual findings of courts in the Havana Club Holding litigation concerning the connection between the Havana Club trademark

39

and assets confiscated by the Cuban government.  <u>See</u> Szubin Decl. ¶ 27; <u>see also</u> Supp. Szubin

Decl. ¶ 10.  This litigation contained a challenge to a license issued by OFAC, and was therefore

"of particular interest" to the agency.  Supp. Szubin Decl. ¶ 10.  Among other findings made after

a bench trial, the United States District Court for the Southern District of New York concluded

that the Havana Club mark was used in connection with confiscated assets:

> The original producer of Cuban rum under the trademark 'Havana Club' was Jose
> Arechabala, S.A. ('JASA'). . . .  On or about January 1, 1960, . . . armed forces
> from the Castro government forcibly entered into possession and confiscated the
> property and assets of JASA. . . .  On October 15, 1960, Cuban Law No. 890
> ('Law No. 890') was issued, expropriating for the Cuban government the physical
> assets, property, accounts and business records of JASA. . . .  No compensation
> was ever paid to JASA or its owners by the Cuban government or any other entity
> on behalf of the Cuban government for the property and assets that were seized in
> 1960.

<u>HCH IV</u>, 62 F. Supp. 2d at 1089-90; <u>see also</u> <u>Pernod Ricard USA LLC v. Bacardi USA, Inc.</u>, 505

F. Supp. 2d 245, 249 (D. Del. 2007); Supp. Szubin Decl. ¶ 11.  Accordingly, when the district

court set out to determine whether the Havana Club mark was encompassed by the language of

section 211, i.e. whether the mark was the "same or substantially similar to one that was 'used in

connection with a [confiscated] business,'" the court held that the statutory language was "clearly

met here."  <u>HCH IV</u>, 62 F. Supp. 2d at 1094; <u>see also</u> Supp. Szubin Decl. ¶ 11.

    The Second Circuit adopted these findings and denied further discovery on the issue.

<u>HCH V</u>, 203 F.3d at 119-20 ("JASA exported its rum to the United States until 1960, when the

Cuban government, under the leadership of Fidel Castro, seized and expropriated JASA's assets.

Neither JASA nor its owners ever received compensation for the seized assets from the Cuban

government.").  In fact, the Second Circuit explained in no uncertain terms that, "[w]here Cuba

has not returned JASA's property, not made even a gesture toward compensation, and not settled

40

the claim, the confiscation inquiry ends." Id. at 130; see also Supp. Szubin Decl. at ¶ 12.

These courts did not stop at the question of confiscation, however, as they also examined whether the original owner had ever consented to use of the Havana Club trademark.  For example, the district court, in outlining the ownership of the Havana Club trademark by Cubaexport and its subsequent transfer to the named plaintiffs, explained that JASA and its successors never received compensation or reached an agreement for the use of that mark with an entity associated with the Cuban government.  HCH IV, 62 F. Supp. 2d at 1090-91; see also HCH V, 203 F.3d at 129 (noting it "undisputed" that JASA has not "expressly consented" to the use of the Havana Club name by the plaintiffs); Supp. Szubin Decl. at ¶ 13, n.1.  And Bacardi, the only entity who has, to OFAC's knowledge, purported to be a successor-in-interest of JASA's interests, has made its non-consent abundantly clear.  See Supp. Szubin Decl. ¶¶ 15-19; see also HCH V, 203 F.3d at 120; HCH IV, 62 F. Supp. 2d at 1090.

Given the holdings of these courts, it was entirely rational for OFAC to conclude that the language of section 211, as implemented by section 515.527(a)(2), applied to transactions to renew the Havana Club trademark.  Cf. Emergency Coal. to Defend Educ. Travel v. Dep't of Treasury, 498 F. Supp. 2d 150, 166 (D.D.C. 2007) (holding that OFAC's decision, based on findings of interagency commission, was not arbitrary and capricious despite plaintiffs' disagreement with commissions' methods and findings).  After all, Cubaexport submitted *no* evidence directly to OFAC in response to the April 6, 2006, letter that would have supported an opposite conclusion.  See Supp. Szubin Decl. ¶ 25.  And although Cubaexport copied OFAC on correspondence to the PTO, that correspondence also contained no substantive evidence demonstrating a disconnect between the Havana Club mark and confiscated assets.  See id. ¶ 26;

<u>see also</u> A.R. 34-40.

It is hardly surprising that Cubaexport did not contest this connection to OFAC in light of Cubaexport's own expressed understanding of the reach of section 211. Cubaexport's own filings and pleadings in this case assert that the passage of section 211 "was plainly aimed at the HAVANA CLUB registration." <u>See</u> Mem. in Opp. to Defs.' Mot. to Dismiss, Or in the Alt., for Summ. J. at 3; <u>see also</u> Compl. ¶ 27. In light of these representations, it is hard to see how Cubaexport could assert that OFAC "irrationally" concluded that section 211 applied to the Havana Club mark.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendants respectfully request that the Complaint be dismissed or, in the alternative, that summary judgment be entered in favor of the defendants.

Dated July 23, 2008                    Respectfully submitted,

                                       GREGORY G. KATSAS
                                       Assistant Attorney General

                                       JEFFREY A. TAYLOR
                                       U.S. Attorney for the District of Columbia

                                       SANDRA M. SCHRAIBMAN
                                       (DC Bar No. 188599)
                                       Assistant Branch Director
                                       Federal Programs Branch

                                       _s/ Eric R. Womack_
                                       ERIC R. WOMACK (IL Bar No. 6279517)
                                       Trial Attorney
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       Post Office Box 883

Washington, D.C.  20001
Tel: (202) 514-4020
Fax: (202) 616-8470

*Counsel for the Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2008, I caused a true and correct copy of the foregoing

Motion to Dismiss or, in the Alternative, for Summary Judgment; Statement of Undisputed

Material Facts; Memorandum in Support; and the accompanying Proposed Order to be served on

Plaintiff's counsel electronically by means of the Court's ECF system.


_____*/s/ Eric R. Womack*_____
ERIC R. WOMACK

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| EMPRESA CUBANA EXPORTADORA ) | |
| DE ALIMENTOS Y PRODUCTOS ) | |
| VARIOS d/b/a CUBAEXPORT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:06CV01692 (RCL) |
| ) | |
| ) | Hon. Royce C. Lamberth |
| UNITED STATES DEPARTMENT OF ) | |
| THE TREASURY, OFFICE OF FOREIGN ) | |
| ASSETS CONTROL, ) | |
| HENRY M. PAULSON, JR., as Secretary ) | |
| of Treasury, ADAM J. SZUBIN, as ) | |
| Director of the Office of Foreign Assets ) | |
| Control, and THE UNITED STATES, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## ORDER

Upon consideration of the Defendants' Motion to Dismiss or, in the Alternative, for

Summary Judgment; the memorandum of law in support thereof; and responses thereto, it is this

_____ day of _____, 2008, ordered that the Motion is GRANTED, and this

action is DISMISSED WITH PREJUDICE.


_____
UNITED STATES DISTRICT JUDGE