## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

————————————————————
)
EMPRESA CUBANA EXPORTADORA )
DE ALIMENTOS Y PRODUCTOS )
VARIOS, d/b/a CUBAEXPORT, )
)
    **Plaintiff,** )
)
    **v.** )    **Civil Action No. 06-1692 (RCL)**
)
UNITED STATES DEPARTMENT OF )
TREASURY, OFFICE OF FOREIGN )
ASSETS CONTROL, *et al.*, )
)
    **Defendants.** )
————————————————————)

## MEMORANDUM OPINION

Now before the Court is plaintiff's motion [35] for summary judgment, and defendants'

cross-motion [36] to dismiss or in the alternative, for summary judgment.  Upon consideration of

the motions, the oppositions, the replies, the entire record herein, and applicable law, the

defendants' motion [36] will be GRANTED; plaintiff's motion [35] will be DENIED.


I.      **BACKGROUND**

Two words—Havana Club—have been at the center of litigation that has now traversed

two federal Circuits, two federal agencies, and two decades.  The latest incarnation of this

controversy is a suit by plaintiff Empresa Cubana Exportadora de Alimentos y Productos Various

("Cubaexport") against the United States Department of Treasury, the Secretary of the Treasury,

the Director of the Office of Foreign Assets Control ("OFAC"), and the United States.  This

1

litigation arises out of OFAC's refusal to authorize Cubaexport to renew its trademark rights in

the "HAVANA CLUB" name with the United States Patent and Trademark Office.

Given this case's significant legal and factual underbrush, the Court will set out the

background to the case before delving into the specifics.

A.      United States Trade Embargo Against Cuba

The Trading With the Enemy Act ("TWEA") authorizes the President to impose and

administer trade embargoes during wartime.  50 U.S.C. App. § 5(b) (2007).  The President has

delegated this authority to the Secretary of the Treasury, who has in turn delegated it to the Office

of Foreign Assets Control ("OFAC"), a division of the United States Department of Treasury.

*Regan v. Wald*, 468 U.S. 222, 227 n.2 (1984).  In 1963, when the TWEA also applied to

peacetime emergencies, President Kennedy adopted the Cuban Asset Control Regulations

("CACR") "to deal with the peacetime emergency created by Cuban attempts to destabilize

governments throughout Latin America."  *Id*. at 226.  Congress later removed peacetime

emergencies from TWEA's scope but permitted the President to maintain existing embargoes,

including the embargo against Cuba.  *Id*. at 228–29.

The Cuban Asset Control Regulations ("CACR"), which implemented the trade embargo

against Cuba, generally prohibit transactions in the United States involving Cuban-owned

property unless the transaction is authorized by OFAC.  A transaction involving Cuban-owned

property can be authorized by OFAC in a couple of ways. The first way is through the general

license, which broadly authorizes entire classes of transactions.  31 C.F.R. 515, subpart E.  When

no general license applies, "[a]ny person having an interest in a transaction or proposed

transaction may file an application [with OFAC] for a [specific] license."  *Id*. § 515.801(b)(2).

Prior to 1998, the CACR included a general license for trademark registration and renewal by Cuban nationals:

> Transactions related to a registration and renewal in the United States Patent and Trademark Office or the United States Copyright Office of patents, trademarks, and copyrights in which the Government of Cuba or a Cuban national has an interest are authorized.

31 C.F.R. § 515.527.

Congress carved out a major exception to the general license provision, however, when it passed Section 211(a)(1) of the Omnibus Act in 1998, which states:

> [N]o transaction or payment shall be authorized or approved pursuant to section 515.527 of title 31 . . . with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name, or commercial name, or the *bona fide* successor-in-interest has expressly consented.

Omnibus Consolidation and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, § 211(a)(1), 112 Stat. at 2681–88.  Section 211(c) further instructed the Secretary of the Treasury, acting through OFAC, to "promulgate such rules and regulations as are necessary to carry out the provisions of this section."

Thereafter, OFAC amended its regulations to include a provision that essentially mimics Section 211(a)(1) and states that no general license for a trademark shall be authorized if the mark was used in connection with a business that was confiscated unless the original owner of the mark or the *bona fide* successor-in-interest has expressly consented.[1]  OFAC did not enact

---

[1] "No transaction or payment is authorized or approved pursuant to paragraph (a)(1) of this section with respect to a mark, trade name, or commercial name that is the same as substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated, as that term is defined in § 515.336, unless the original owner of the mark, trade name, or commercial name, or the *bona fide* successor-in-interest has expressly

any further regulations to implement Section 211.[2]

### B.    The Procedural History of this Case

Plaintiff Cubaexport is a Cuban state-owned enterprise headquartered in Havana, Cuba. (Pl.'s Compl. ¶ 5.)  The Cuban Ministry of Foreign Commerce chartered Cubaexport in 1965.  In 1974, Cubaexport adopted the HAVANA CLUB trademark and registered it in Cuba for use in connection with rum. (*Id.*)  Two years later, it applied to register the mark in the United States, and the United States Patent and Trademark Office ("USPTO") issued the registration on January 27, 1976.

Cubaexport periodically renewed the mark with the USPTO thereafter, but the registration was set to expire in January 2006.  Cubaexport wished to renew the mark.  Because Cubaexport is a state-owned company of Cuba, however, it needs either a specific or general license to overcome the CACR and conduct a transaction in the United States.  Cubaexport's counsel, the law firm of Ropes & Gray, already had a specific license authorizing it to defend Cubaexport in proceedings initiated by Bacardi & Company in the USPTO's Trademark Trial

---

consented."  31 C.F.R. § 515.527(a)(2).  "Confiscated" is defined in § 515.336, in relevant part, as "[t]he nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959: (1) Without the property having been returned or adequate and effective compensation provided; or (2) Without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually settlement procedure . . . ."  31 C.F.R. § 515.336(a)(1), (a)(2).

[2]According to defendant Szubin, OFAC's director, after Section 211's enactment, OFAC retained "the authority to issue a specific license, should facts and circumstances and current U.S. foreign policy militate in favor of authorizing a transaction that does not qualify for the general license."  (Szubin Decl. [5-2] at ¶ 22.)  *See also* 31 C.F.R. § 501.801(b)(1).

and Appeal Board[3] ("TTAB").  On December 13, 2005, Ropes & Gray sent a letter to the USPTO

enclosing a renewal application and filing fee for the HAVANA CLUB trademark, stating that

renewal was necessary in order to preserve the *status quo* until a decision regarding the

cancellation proceedings initiated by Bacardi could be rendered.  (Pl.'s Mot. [35] at 23[4].)  While

the application for renewal was pending, OFAC intervened in the registration renewal process

and sent a letter to Ropes & Gray and the USPTO on April 6, 2006.  The letter stated that the

specific license that had previously been granted to Ropes & Gray to defend Cubaexport in the

trademark registration cancellation proceedings initiated by Bacardi did not authorize Ropes &

Gray to pay a filing fee to the USPTO for renewal of the HAVANA CLUB registration.  (*Id*. at

12.)  OFAC also stated in that letter that Ropes & Gray could request separate authorization,

including a separate specific license to renew the HAVANA CLUB trademark registration.  The

letter also stated that Ropes & Gray could seek further guidance regarding the separate

authorization or ask any questions by contacting OFAC in writing or by telephone.  The next day,

April 7, 2006, Cubaexport, through Ropes & Gray, sought a specific license to renew the

registration.  Ropes & Gray also sent a letter to the USPTO[5] arguing that the trademark should be

---

[3]In that litigation, Bacardi claimed that the registration Cubaexport obtained for the
HAVANA CLUB mark for the ten year period beginning in 1996 and expiring in 2006 should be
cancelled.  The USPTO ultimately dismissed Bacardi's petition in its entirety.  *See Galleon, S.A.
v. Havana Club Holding, S.A.*, Cancellation No. 92024108, 2004 TTAB LEXIS 38, at *32, *69.
That decision was appealed to the United States District Court for the District of Columbia
(Sullivan, J., No. 04-cv-519).  That litigation is stayed pending outcome of this case.

[4]With regard to all filings in this case, the Court has used the page numbers reflected on
the document upon docketing in the ECF system, not the page numbers the parties themselves
placed on the documents.

[5]Ropes & Gray did not send this letter directly to OFAC, who is responsible for
implementing Section 211(a)(1) of the Omnibus Act.  *See* Pub. L. No. 105-277, Section 211(c).

renewed pursuant to the general license, in order to preserve the status quo until issues regarding

whether the HAVANA CLUB mark was "confiscated" could be resolved in the United States

District Court.

On July 28, 2006, one day after the deadline to renew the HAVANA CLUB registration

had passed, OFAC sent a letter to Ropes & Gray regarding the April 7, 2006 specific license

application.  The letter stated:

> Pursuant to the Cuban Asset Control Regulations, 31 C.F.R. Part 515,
> administered by the U.S. Department of Treasury's Office of Foreign Assets Control
> ("OFAC"), renewal of the HAVANA CLUB trademark under these circumstances would
> be prohibited unless specifically licensed.
>
> OFAC has been engaged in consultation with the relevant agencies in the U.S.
> Government, including the Department of State ("State"), on this issue.  We have
> received guidance from State informing us that it would be inconsistent with U.S. policy
> to issue a specific license authorizing transactions related to the renewal of the HAVANA
> CLUB trademark.  Accordingly, your request is hereby denied.

(*Id.*)

Cubaexport thereafter filed its complaint in this action, asserting claims under the

Administrative Procedure Act and the United States Constitution.  The plaintiff alleged that

OFAC violated the Administrative Procedure Act by: (1) deciding on April 6, 2006, that a

specific OFAC license to defend Cubaexport in litigation involving cancellation of its HAVANA

CLUB trademark did not authorize Ropes & Gray to renew Cubaexport's trademark registration;

(2) deciding on July 28, 2006, that renewal of Cubaexport's HAVANA CLUB trademark

registration "would be prohibited unless specifically licensed"; and (3) deciding on July 28,

---

It instead "copied" OFAC on the correspondence it sent to the USPTO.  (A.R. [6–2] at 42.)
Even in that correspondence, however, it provided no evidence that it did not confiscate the
HAVANA CLUB mark—it instead argued that the determination regarding compensation should
be made by Judge Sullivan in the United States District Court.  (*Id.* at 40.)

2006, that it would not grant a specific license authorizing payment of the trademark renewal fee. Cubaexport also lodged constitutional claims, alleging that these decisions deprived it of procedural and substantive due process and violated the Takings Clause.

On September 27, 2007, this Court granted partial summary judgment in favor of defendants.  The Court granted summary judgment in favor of defendants with respect to plaintiff's first and third APA challenges and denied without prejudice the defendants' summary judgment motion on the constitutional claims. The Court also denied without prejudice the defendants' motion for summary judgment on the second APA claim and remanded to OFAC to explain its second decision, the July 28, 2008 decision that the HAVANA CLUB trademark registration "would be prohibited unless specifically licensed."  The Court directed the defendants to explain "whether it concluded Cubaexport could not rely on the general license in 31 C.F.R. § 515.527(a)(1), and if so, how and why it determined the exception in part (a)(2) embraced Cubaexport's HAVANA CLUB registration.  Further, it should explain what process Cubaexport was afforded with respect to this particular determination."  *Cubaexport v. U.S. Dep't of Treasury*, 516 F. Supp. 2d 43, 56–57 (D.D.C. 2007).

In response to this Court's order, OFAC supplemented the administrative record with a second declaration of its director Adam Szubin. (Docket No. [29].)  Szubin's supplemental declaration addresses "the contemporaneous reasons for OFAC's decision at the time the July 28, 2006 letter was drafted." (Szubin Supp. Decl. ¶ 4.)  Szubin states that OFAC's decision that the general license provision was inapplicable to Cubaexport's HAVANA CLUB trademark was

"based primarily on factual findings made in litigation in the Southern District of New York[6] and

the Second Circuit[7] concerning the HAVANA CLUB trademark."  (Szubin Supp. Decl. ¶ 10.)

Szubin's declaration also states that OFAC considered letters sent by Bacardi & Company

Limited stating that it was the *bona fide* successor-in-interest to the HAVANA CLUB trademark

and that it had not consented to the renewal of the HAVANA CLUB registration by Cubaexport.

(Szubin Supp. Decl. ¶ 16.)  With regard to the process given Cubaexport, Szubin's declaration

states that OFAC gave Cubaexport an opportunity to comment and to seek guidance from OFAC

regarding the applicability of the general licensing provision.  (Szubin Supp. Decl. ¶ 23.)  Szubin

states that Cubaexport did not comment or seek guidance regarding the applicability of the

general license provision but that Cubaexport only applied for a specific license.  (Szubin Supp.

Decl. ¶ 23.)

The plaintiff has now renewed its motion for summary judgment on the second and third

APA claims[8], and the defendant has filed a cross-motion to dismiss, or in the alternative, for

summary judgment.  The Court will grant the defendants' motion and deny the plaintiff's motion

for the reasons set forth below.


## II.    APPLICABLE LAW

---

[6]*Havana Club Holding, S.A. v. Galleon, S.A.*, 961 F. Supp. 498 (S.D.N.Y. 1997); 974 F. Supp. 302 (S.D. N.Y. 1997); 1998 WL 150983 (S.D.N.Y. Mar. 31, 1998); 62 F. Supp. 2d 1085 (S.D.N.Y. 1999).

[7]*Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116 (2d Cir. 2000).

[8]Plaintiff renews its motion for summary judgment on the third APA claim despite the fact that summary judgment has already been granted in favor of defendants on that claim. *Cubaexport v. U.S. Dep't of Treasury*, 516 F. Supp. 2d at 60.

### A.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), a court must grant summary judgment[9]

when the evidence in the record demonstrates that there are no disputed issues of material fact

and that the moving party is entitled to judgment on the undisputed facts as a matter of law.  Fed.

R. Civ. P. 56(c); *Celotex Corp., v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of

material fact exists if the evidence, when viewed in a light most favorable to the non-moving

party, "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden is on the movant to make the initial

showing of the absence of a genuine issue of material fact in dispute.  *Celotex*, 477 U.S. at 323.

The moving party is then entitled to summary judgment if the non-moving party fails to make a

showing sufficient to establish the existence of an element essential to that party's claim, and on

which that party will bear the burden of proof at trial.  *Id*. at 322.  At the summary judgment

stage, a judge may not make credibility determinations, as that is the function of a jury.  *George*

*v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005).

### B.      APA Standard of Review

The Court must review two actions by OFAC in this case.  First, it must review the

meaning that it gave the words contained in Section 211 and in its own implementing

regulations.  Then, it must determine whether the administrative determinations made pursuant to

---

[9]Alternatively, defendants styled their motion as a motion to dismiss for failure to state a claim.  Because the defendants, and the Court, rely on declarations outside of the complaint, such as the Szubin declaration, the Court will treat the motion as one for summary judgment.  *See E.E.O.C. v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997) (stating that in ruling on a motion to dismiss for failure to state a claim, the Court can consider "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice").

the regulations were reasonable.

First, the Court must determine whether OFAC correctly interpreted the language in Section 211 and 31 C.F.R. § 515.527 when it decided that Cubaexport's attempt to renew the HAVANA CLUB registration was prohibited unless specifically licensed.  When the meaning of the words of an enabling statute are clear, the agency must give the statute its unambiguous meaning.  *Chevron U.S.A., Inc. v. NaturalResources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress").

Next, the Court must review the actual determination by OFAC that Cubaexport confiscated the HAVANA CLUB mark and therefore could not obtain a general license.  Courts reviewing agency actions under 5 U.S.C. section 706 must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(1)(A).  In assessing agency action against this standard, the Court need not find that the agency's decision is "the only reasonable one, or even that it is the result [the Court] would have reached had the question arisen in the first instance in judicial proceedings."  *Am. Paper Inst., Inc. v. Am. Elec. Power. Serv. Corp.*, 461 U.S. 402, 422 (1983).  The Court is also not entitled to substitute its judgment for that of the agency.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  When reviewing the record, the Court considers "whether the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Jifry v. FAA*, 370 F.3d 1174, 1180 (D.C. Cir. 2004).  A review of a decision made by OFAC is "extremely deferential" because OFAC operates "in an area at the intersection of national security, foreign

policy, and administrative law." *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C.

Cir. 2007). *See also Em. Coalition to Defend Educ. Travel v. United States Dep't of Treasury*,

498 F. Supp. 2d 150, 166 n.10 (D.D.C. 2007) ("[T]he regulations at issue here are entitled to an

even greater measure of deference [than *Chevron* deference] because they relate to the exercise of

the Executive's authority in the realm of foreign affairs.").

### C.     APA Scope of Review

The APA does not require agencies to hold a hearing or to make formal findings of fact

when rendering many decisions. *Camp v. Pitts*, 411 U.S. 138, 140–41 (1973). As such, when no

other applicable law requires a hearing, "the focal point for judicial review should be the

administrative record already in existence, not some record made initially in the reviewing

court." *Id.* at 142.

When that record fails to adequately explain the challenged action, a court may also

consider agency affidavits or testimony representing a "contemporaneous explanation of the

agency decision." *Id*. at 142–43. *See also Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996)

("[T]here is nothing improper in receiving declarations that 'merely illuminate reasons obscured

but implicit in the administrative record.'"); *Community for Creative Non-Violence v. Lujan*, 908

F.2d 992, 998 (D.C. Cir. 1990) (stating that if an agency's explanation for action is insufficient,

the case can be remanded to the agency for further explanation); *Office of Foreign Assets Control

v. Voices in Wilderness*, 382 F. Supp. 2d 54, 62–63 (D.D.C. 2005) (considering declaration of

agency's former director in evaluating claims against OFAC).

Following the Court's September 2007 ruling that directed OFAC to provide

contemporaneous reasons for its July 28, 2006 decision, OFAC supplemented the record with the

declaration of its director, Adam Szubin.  (Supp. Decl. Szubin, Docket [29-2].)  Plaintiff argues

that Szubin's declaration is an impermissible "post hoc rationalization" of the agency's decision

and therefore should not be considered by the Court.  Although Szubin's declaration was

submitted after the agency decision was made (as agency declarations often are), his declaration

provides background information that illuminates reasons for OFAC's decision that were implicit

but obscured in the administrative record and also explicitly states that it is a declaration of "the

contemporaneous reasons for OFAC's decision at the time of the July 28, 2006, letter . . . ."

(Supp. Decl. Szubin ¶ 4.)  Accordingly, it is the type of declaration that is routinely accepted by

courts in this Circuit.  *See supra*.

III.   **ANALYSIS**

   A.   **Plaintiff's APA Claim**

      1.   **OFAC's interpretation of Section 211 and its Regulation was Correct**

   OFAC gave the terms in Section 211—the statute that enabled OFAC to make the

determination that Cubaexport's renewal would be prohibited unless specifically licensed—their

correct meaning.  The dispositive term in the statute—"confiscated"—does not have an

ambiguous meaning, and Congress's intent was clear in enacting the underlying statute.

Accordingly, OFAC must give the statute its unambiguous meaning.  OFAC defined

"confiscation" as:

> "[t]he nationalization, expropriation, or other seizure by the Cuban Government of
> ownership or control of property, on or after January 1, 1959: (1) Without the property
> having been returned or adequate and effective compensation provided; or (2) Without
> the claim to the property having been settled pursuant to an international claims
> settlement agreement or other mutually settlement procedure . . . ."

31 C.F.R. § 515.336(a)(1), (a)(2).  With this definition, OFAC gave the word "confiscation" its

plain meaning and the meaning is in accordance with Congress's intent.[10]  *See Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116, 126 (2d Cir. 2000) (stating that Congress's purpose in Section 201 was "not to permit assignment of confiscated trademarks without the consent of the original owner").

The plaintiff conflates the inquiry into the meaning of the statute with the inquiry into OFAC's factual determinations pursuant to the statute; it simply makes a generalized assertion that OFAC is not entitled to any special deference in interpreting their own regulation because the regulation merely parrots Section 211.  (Pl.'s Mot. [35] at 41–42 (citing *Gonzalez v. Oregon*, 546 U.S. 243, 257 (2006)).  *Gonzalez*, however, is inapplicable to the present case.  In that case, the Attorney General issued an "interpretive rule" on the meaning of the words "legitimate medical purpose" contained in a 1971 regulation.  546 U.S. at 250.  However, the attorney general's regulation that restricted prescription drugs to drugs that had a "legitimate medical purpose" was based on a provision of the Controlled Substances Act that restricted prescription drugs to those that had a "legitimate medical purpose."  *Id*. at 257.  Accordingly, the Supreme Court rejected the government's argument that the attorney general acquired special authority to interpret his regulation because "the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute." *Gonzalez*, 546 U.S. at 258.

---

[10]Even if one were to read the word "confiscated" as ambiguous, however, OFAC's definition is clearly a permissible construction of the statute and therefore must be accepted by the Court. *See Chevron U.S.A., Inc.*, 467 U.S. at 843.  *See also Consarc v. Iraqi Ministry*, 27 F.3d 695,701–702 (stating that when OFAC interprets its own regulatory terms the Court has "warrant only to inquire whether OFAC's construction of the regulatory terms . . . so far departed from common usage as to be plainly wrong").

Here, however, OFAC does not claim that it acquired some special interpretive powers by virtue of the fact that it issued a regulation.  Indeed, as stated above it does not even need any "special deference" because, unlike in *Gonzalez*, the words in the underlying statute and in its regulations are not ambiguous.  Plaintiff uses *Gonzalez* to argue, confusingly, that because OFAC's regulation parroted the statute giving it authority to promulgate regulations it "acquired no special authority to decide, for example, whether consent was granted to obtain and maintain a trademark registration."  Plaintiff fails to apprehend the difference between OFAC's authority to interpret the words in Section 211 and its regulations and its authority to make decisions pursuant to those regulations.  By the express language of Section 211(c), Congress delegated authority to make determinations relating to the general licensing provision and its exceptions to OFAC. And, because the authority to make decisions regarding the general license exception was delegated to OFAC, not to the courts, the Court is not entitled to substitute its judgment for that of OFAC and must give OFAC substantial deference.  With respect to the meaning that it gave the words contained in the statute, OFAC gave the words their plain meaning—it is unclear how this "make[s] a mockery of the APA."  (Pl.'s Mot. [35] at 42.)

## 2.    Defendants' Procedures did not Violate the APA

Plaintiff argues that it is entitled to summary judgment on its claim that OFAC violated the APA because OFAC was arbitrary and capricious when deciding that renewal of the HAVANA CLUB trademark registration would be prohibited unless specifically licensed. Plaintiff's first argument is that it was denied its right to "timely notice and the application of quasi-judicial procedures by an appropriate trier of fact before a decision was made regarding the applicability of the amended regulation."  (Pl.'s Mot. [35] at 34.)

It is unclear why the plaintiff believes that it was entitled to quasi-judicial procedures before the decision was made as to the applicability of the general license.  Plaintiff merely asserts, without providing justification, that quasi-judicial procedures were required in this case. (*See id*. at 34–35.)  Contrary to plaintiff's claims, there is no indication in either the statute or the regulation that "quasi-judicial" procedures were required because neither the licensing statute nor the regulation specify that OFAC must make determinations on the record or after a hearing.  *See* 5 U.S.C. § 554(a) (requiring procedures for adjudication when the statue requires a determination "on the record after opportunity for an agency hearing"); *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 361 (D.C. Cir. 1981) (same).  Because the APA does not require a hearing or "quasi-judicial procedures" in this case, plaintiffs cannot prevail on a procedural challenge under the APA.[11]

### 3.   Defendants' Determination that the HAVANA CLUB Renewal would be Prohibited Unless Specifically Licensed was Reasonable

Because OFAC's decision was not procedurally defective under the APA, the Court must confine its analysis to whether OFAC's decision that the general license was inapplicable to Cubaexport's attempt to renew the HAVANA CLUB trademark was a reasonable one. According to Section 211 and OFAC's own regulations, if the HAVANA CLUB mark was "used in connection with a business or assets that were confiscated," the general license to renew the mark with the USPTO did not apply—unless "the *bona fide* successor-in-interest [to the trademark] has expressly consented" to renewal.  Pub. L. No. 105-277, § 211, 122 Stat. 2681

---

[11]The Court agrees with the defendants that Cubaexport's unsupported claim that they were entitled to "quasi-judicial" procedures under the APA is merely a constitutional due process argument masquerading as a challenge under the APA.  Plaintiff's constitutional challenges will be discussed below.

(1998); 31 C.F.R. § 515.527(a)(2).  Szubin's declaration states that OFAC's decision that

registration of the HAVANA CLUB trademark would be prohibited unless specifically licensed

was "based primarily on factual findings made in litigation in the Southern District of New York

and the Second Circuit concerning the HAVANA CLUB trademark." (Szubin Supp. Decl. [29-

2] at ¶ 10.)  Reliance on these opinions certainly provided a rational basis for OFAC to determine

that the general license did not apply; accordingly, this Court determines that OFAC's decision

was reasonable, not arbitrary, and that plaintiff's APA challenge fails as a matter of law.[12]

The litigation relied on by OFAC involved Havana Club Holding, a company to which

Cubaexport purportedly assigned its interest in the HAVANA CLUB trademark in 1994.

*Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116, 120 (2d Cir. 2000).  Havana Club

Holding sued the Bacardi company in the United States for trademark infringement.  The district

court and the Second Circuit held that HCH[13] had no rights in the HAVANA CLUB mark

---

[12]Plaintiff's attempt to argue that the case is inappropriate for summary judgment is unavailing because it misconstrues the nature of the Court's review of administrative action. Plaintiff argues that because it disputes the fact that the HAVANA CLUB trademark was confiscated and disputes the fact that Bacardi is a *bona fide* successor-in-interest (although OFAC never found that Bacardi was the *bona fide* successor-in-interest of the mark, *see infra*), material facts are in dispute and summary judgment is not appropriate.  Of course, plaintiff had an opportunity to argue these points before OFAC prior to the deadline for obtaining a new license to register its trademark.  Plaintiff is not entitled to raise these issues anew before this Court.  The Court's inquiry is confined to whether OFAC's decision that the HAVANA CLUB trademark was confiscated was a reasonable one and is not an opportunity for plaintiff to create a new record before the Court.  *Camp v. Pitts*, 411 U.S. 138, 141–42 (1973) (stating that review under the APA is not *de novo* when there was no requirement for a hearing; instead the appropriate standard is whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .").

[13]Havana Club Holding was joined in the litigation by Havana Club International ("HCI"), a joint stock company in Cuba that also claimed some rights in the HAVANA CLUB mark.  *Havana Club Holding*, 203 F.3d at 119.

because the Cuban embargo rendered null and void the transfer of the trademark registration by

Cubaexport, a Cuban national.  *Id*. at 122.   Accordingly, the rights in the HAVANA CLUB mark

reverted back to Cubaexport.  *Id*. at 121.  The Second Circuit also rejected a claim by HCI that

the refusal to recognize its rights in the HAVANA CLUB mark violated the Lanham Act, which

allows foreign corporations to sue to enforce trademark rights in the United States.  The Second

Circuit applied Section 211(b) of the Omnibus Act, which states that no U.S. court shall

recognize any assertion of treaty rights by a designated national or its successor in interest for a

trademark that "is the same as or substantially similar to a mark, trade name, or commercial

name that was used in connection with a business or assets that were confiscated unless the

original owner of such mark, trade name, or commercial name, or the bona fide successor-in-

interest has expressly consented."  *Id*. at 127; 112 Stat. at 2681–88.

        In determining that 211(b) applied to the case and barred HCI from asserting rights under

the Lanham Act, the Second Circuit had to determine whether the HAVANA CLUB mark had

been "confiscated" by Cubaexport.  "By 'confiscated,' section 211(b) refers to the

nationalization, expropriation, or other seizure of property by the Cuban Government on or after

January 1, 1959."  *Id*. at 129 (citing C.F.R. § 515.336).  The Court stated that "[i]t is undisputed

that JASA [Jose Arechabala, S.A., the original owner of the HAVANA CLUB name] used the

'Havana Club' name until the Cuban government expropriated the business in 1960 and has not

expressly consented to HCI's use of the 'Havana Club' name."  *Id*.  The Second Circuit also

affirmed the district court's refusal to allow HCI to conduct discovery regarding the confiscation

question.  The district court had determined that "all of JASA's assets were taken and that it

received no compensation."  *Id*.  The Second Circuit stated that the issue of confiscation was so

clear that the inquiry should end without the necessity of discovery.  *Id*. at 130 ("Where Cuba has

not returned JASA's property, not made even a gesture toward compensation, and not settled the

claim, the confiscation inquiry ends.").

Accordingly, there is square precedent in federal court to support OFAC's determination

in the present case that Cubaexport confiscated the HAVANA CLUB trademark and that the

original owner of the mark has not consented to the use of the mark by Cubaexport; indeed,

Szubin states that this was the primary source that OFAC used to determine that Section 211 also

applied to bar Cubaexport from obtaining a general license to renew its trademark.  In making

decisions under its regulations, OFAC's reliance on federal court precedent that squarely dealt

with the crucial issues was clearly reasonable.

Nevertheless, the plaintiff quarrels with OFAC's reliance on federal court precedent.

First, Cubaexport argues that it was unreasonable to rely on the Second Circuit litigation because

Cubaexport was not a party to that litigation.  Indeed, the fact that Cubaexport was not a party to

the earlier litigation means that it cannot be estopped in court from contesting the issues that

were decided in that case.  *Taylor v. Sturgell*, 128 S.Ct. 2161 (2008) (overturning D.C. Circuit

precedent that upheld the doctrine of "virtual representation"—the doctrine that states in some

circumstances a person may be bound by a judgment if she was adequately represented by a party

to the proceeding yielding that judgment).  However, a determination by an administrative

agency does not have to meet the same rigorous requirements as proceedings in court.[14]  If it did,

the administrative decision making process would come to a grinding halt.  Instead of being

---

[14]Particularly in a case like this when the underlying statute does not require a hearing on
the record.

required to fulfill all requirements and afford all processes that would be present in a court

proceeding, an administrative agency must "consider[] the relevant factors and articulate[]

rational connections between the facts found and the choice made."  See *Jifry v. FAA*, 370 F.3d

1174, 1180 (D.C. Cir. 2004)

  In this case, relying on the Second Circuit litigation was undoubtedly rational.  In the

Second Circuit litigation, HCH and HCI had similar motives to contest the confiscation issue as

Cubaexport did before OFAC—if they could prevail on an argument that the HAVANA CLUB

mark was not confiscated by Cubaexport as defined in Section 211 they could challenge

Bacardi's use of the mark under the Lanham Act.  And from the numerous and extensive

opinions issuing from the courts in the Second Circuit, it appears that the attorneys for HCH and

HCI vigorously pursued their arguments.  Moreover, the determination that the HAVANA CLUB

mark was confiscated by Cuba was squarely decided by the Second Circuit and necessary to its

judgment that HCI could not challenge Bacardi's use of the mark under the Lanham Act.

OFAC's reliance on the Second Circuit litigation under these circumstances was reasonable.

  Moreover, even if the Court were to accept the plaintiff's assertion that "an agency may

not take notice of the testimony and findings in a previous case to prove most of the key facts

against a respondent not a party in the prior case" as a truism,[15] Cubaexport would not prevail

because OFAC did not act in contravention of that principle.  Szubin's declaration makes it clear

that OFAC did not rely on the Second Circuit litigation to conclusively "prove" anything;

instead, OFAC determined that the findings made by the Second Circuit and the United States

---

  [15]The only authority the plaintiff provides for this statement is a sentence taken out of an
Administrative Law textbook published in 1991. (Pl.'s Mot. [35] at 36.)

District Court for the Southern District of New York outweighed the meager submissions provided by Cubaexport.[16]  In other words, OFAC's actions were not at all analogous to the employment of the doctrine of collateral estoppel because the Second Circuit litigation was only a consideration that OFAC took into account when determining that the general license did not apply to Cubaexport's HAVANA CLUB trademark—it did not decide that the findings in that litigation prevented Cubaexport from contesting the general license issue.

Plaintiff also argues that even if JASA's HAVANA CLUB mark was "confiscated" by Cuba, his business was bankrupt at the time and therefore the business was not confiscated "without adequate and effective compensation."  (Pl'.s Mot [35] at 37, n.32); 31 C.F.R. § 515.336.  This argument was raised by HCI in the Second Circuit litigation and promptly rejected by that Circuit[17], *Havana Club Holding*, 203 F.3d at 130; this Court similarly rejects that argument.  Although the finding by that court is of course not binding on this one, the Court finds it persuasive because it will not read a bankruptcy exemption into Section 211 where one does not exist.  Accordingly, even if this argument were presented to OFAC prior to its decision that

---

[16] *See* Szubin Supp. Decl. [29-2] at ¶ 26) (stating that Cubaexport's conclusory assertions to the USPTO that HAVANA CLUB was not confiscated were not enough to alter OFAC's own conclusion).

[17]Plaintiff states in its motion that the New York court did not address the critical distinction between confiscation and confiscation without adequate and effective compensation. (Pl.'s Mot. [35] at 37.)  That statement is patently false.  *See Havana Club Holding*, 203 F.3d at 130 ("We disagree with HCI's premise that no compensation is 'adequate and effective' compensation under section 515.336(a)(1) where the confiscated business allegedly had no positive net value at the time of expropriation.").  The Court will give plaintiff's attorneys the benefit of the doubt and chalk this mistake up to sloppy research instead of an intentional effort to mislead this Court (plaintiff does acknowledge that the Second Circuit did in fact address this distinction in its reply brief at 15).  While on the subject of briefing, the Court commends the government for its remarkably thorough, well-researched, and well-written briefs in this case.

the general license does not apply,[18] OFAC was reasonable in rejecting it.

Next, plaintiff argues that OFAC unreasonably did not take into account the fact that JASA "expressly consented to Cubaexport's registration of U.S. HAVANA CLUB by voluntarily surrendering the last of its U.S. HAVANA CLUB trademark registrations in 1973." (Pl.'s Mot [35] at 37.) This argument too was raised and rejected in the Second Circuit litigation. As noted by that Circuit, the fact that JASA abandoned the mark—even if true—is of no moment in determining whether Section 211 applies to Cubaexport's trademark renewal because Section 211 does not provide for an abandonment defense:

[W]e will not create an abandonment exception to section 211(b). Section 211(b) requires only that a trade name "was used" in connection with a confiscated business or asset, not that the trade name continues to be used . . . Moreover, Congress knows how to enact an abandonment defense; it has already provided conditions under which any trademark, service mark, collective mark, or certification mark shall be deemed abandoned. *See* 15 U.S.C. § 1127. It is not likely that Congress wished to disadvantage a company that understandably ceased to use its trade name after the confiscation of its business.

*Havana Club Holding*, 203 F.3d at 129. The Court finds the Second Circuit's reasoning persuasive and in accordance with the plain language of the statute.[19]

Plaintiff's next attack is that OFAC's issuance of the amended regulation, 31 C.F.R. § 515.527(a)(2),—despite the fact that it parrots Section 211 passed by Congress—is an invalid exercise of agency authority "because it rescinds Cubaexport's trademark registration renewal right without adequate justification. (Pl.'s Mem. [35] at 43.) Cubaexport argues that because

---

[18]This argument was not presented directly to OFAC but instead was presented to the USPTO.

[19]Accepting this argument would also run contrary to the language of Section 211, which requires the original owner's *express* consent to obtain a general license for a confiscated mark. *See* Pub. L. No. 105-277, § 211(a)(1), 112 Stat. at 2681–88.

OFAC had a longstanding policy of allowing Cuban companies to renew their trademark rights despite the embargo, OFAC's new regulation that does not allow for renewal of those registration rights by companies that have been confiscated is impermissible.  As defendants note, however, this argument has no merit when a change in agency policy derives from specific congressional action.  As the D.C. Circuit has explained:

> The agency's change in policy here came in response to Congress' change in the *statute* from which that policy derived. . . . Thus, any "presumption" that an agency's existing policies best maintain fidelity to congressional intent simply has no application here.  Given the modification of its statutory charter, it is hardly surprising that the Board reconsidered its longstanding policy governing the standards by which it approves mergers and acquisitions.

*Air Line Pilots Ass'n, Int'l v. Dep't of Transp.*, 791 F.2d 172, 175 (D.C. Cir. 1986).  The analysis in *Air Line Pilots* is applicable here.  OFAC changed its policy not unexpectedly or arbitrarily, but instead in response to the directly manifested intent of Congress in Section 211.  Accordingly, the change in policy was clearly not arbitrary agency action.

Plaintiff also makes much of its claim that OFAC relied on Bacardi's representations that it is the true successor-in-interest to JASA's rights in the HAVANA CLUB mark and that it did not consent to Cubaexport registering the mark.  Whether or not Bacardi is the successor-in-interest to the mark, however, or whether JASA never validly transferred the rights in the mark to Bacardi, however, is largely irrelevant.  OFAC never decided who was the rightful owner of the mark, but instead limited its determination to the scope of Section 211 and the regulations; it decided whether the HAVANA CLUB mark had been confiscated by Cubaexport and if so, whether the renewal of the registration had been consented to by the original owner or the successor-in-interest.  Cubaexport acknowledges that JASA was the original owner of the HAVANA CLUB mark, JASA has not consented to the registration of the mark by Cubaexport,

and Cubaexport has not offered any alternate party who has rights in the mark and has given

Cubaexport consent to register the mark.  Whether or not Bacardi now has an interest in the

mark, it is clear that Cubaexport is not the original owner of the mark or that owner's successor-

in-interest; accordingly, the general license exception of 211 applies to Cubaexport's registration

renewal attempt.

    The supplemental declaration of Adam Szubin reinforces the conclusion that OFAC

properly limited the scope of its decision.  As stated in Szubin's supplemental declaration, OFAC

determined that "to the extent Bacardi claims to be a bona fide successor-in-interest to JASA's

assets or rights to the [HAVANA CLUB] trademark, Bacardi has also not consented to any

transaction related to the registration and renewal of the HAVANA CLUB trademark by

Cubaexport."  (Supp. Szubin Decl. ¶ 18.)  In other words, OFAC decided that Cubaexport had

confiscated the HAVANA CLUB mark whether or not Bacardi was the true successor-in-interest

to the mark.

    Cubaexport also expends considerable ink arguing that "this Court should grant

Cubaexport summary judgment with respect to the third APA claim."  (Pl.'s Mot. [35] at 46–57.)

Of course, that claim is no longer in this action, as the Court granted summary judgment with

respect to the plaintiff's third APA claim in 2007. (Docket entry [26] at 25.)  The plaintiff

grudgingly acknowledges that the Court has already granted summary judgment on this claim but

bases many of its arguments on a declaration of Szubin made in 2006, meaning that those

arguments were either available[20] and not raised or rejected in plaintiff's first motion for

_____

    [20]One of the primary new arguments that plaintiff makes is that the third determination
was unreasonable because OFAC impermissibly decided that a specific license should not be
granted on merely because the general license was inapplicable.  This argument is completely

summary judgment.[21]   In any event, the Court sees no reason to depart from its original order

granting summary judgment in favor of the defendants on plaintiff's third APA claim.[22]

### B.     Plaintiff's Constitutional Claims

Cubaexport also asserts various facial and as applied constitutional claims.  Plaintiff

asserts that defendants deprived Cubaexport of its protected property interest without allowing it

an opportunity to be heard on the applicability of Section 211 and its implementing regulation

(Pl.'s Compl. 18), that Section 211 and 31 C.F.R. § 515.527 as applied violate the Due Process

Clause of the Fifth Amendment (*Id.* at 19), and that Section 211 and 31 C.F.R. § 515.527

constitute an uncompensated regulatory taking. (*Id.*)  Defendants raise various challenges to

─────────────

meritless as it is belied by the administrative record.  (A.R. [6-2] at 3) (OFAC writing Ropes & Gray and stating that it did not authorize a specific license for Cubaexport to renew the mark because it would be inconsistent with foreign policy).

[21]Although Federal Rule of Civil Procedure 54(b) would permit the Court to reconsider dismissal of the plaintiff's third APA claim, the Court's discretion to reconsider a non-final ruling is "subject to the caveat that where litigants have once battled for the court's decision they should neither be required nor without good reason permitted, to battle for it again.  The sure and speedy administration of justice requires no less."  *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101–02 (D.D.C. 2005) (internal citations omitted).  *See also Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) ("[A] court involved in later phases of a lawsuit should not re-open questions decided (i.e., established as the law of the case) by that court or a higher one in earlier phases.").  Here, the plaintiff's desire to reargue claims that have already been rejected is not adequate justification for reconsideration.

[22]The plaintiff states that the Court should reconsider its previous ruling because "specific license decisions are reviewable."  (Pl.'s Reply [41] at 24.)  Of course, this Court did not hold that the specific license decisions made by OFAC in this case were "unreviewable" or that it did not have jurisdiction over the specific licensing decisions.  It instead stated that because the specific license decisions were left to the complete discretion of OFAC, and OFAC made the decisions based on foreign policy objectives in conjunction with the State department, there was no justiciable standard for evaluating the specific licensing decisions and they could not be disturbed as a matter of law.  *Cubaexport v. United States Dep't of Treasury*, 516 F. Supp. 2d 43, 59 (D.D.C. 2007).

plaintiff's claims, which are appropriate for resolution on summary judgment because they are legal, not factual, in nature.

### 1.    Standing

Defendants first assert that Cubaexport lacks standing[23] to pursue its constitutional claims because it is not a "person" within the meaning of the Fifth Amendment to the United States Constitution.  Indeed, the D.C. Circuit has been "unwilling to interpret the Due Process Clause as conferring rights on foreign nations that States of the Union do not possess."  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 99 (D.C. Cir. 2002).  Of course, *Price* does not resolve this case because its holding explicitly "reaches only an actual foreign government"—plaintiff contends that Cubaexport is independent of the Cuban government.

Undoubtedly, Cubaexport does possess some characteristics of a "foreign nation." Cubaexport describes itself in its complaint as a "Cuban state-owned enterprise." (Compl. ¶ 5.) Moreover, Cubaexport is governed "in accordance with the instructions issued to it by the Ministry of Foreign Trade by virtue of the State plans for foreign trade."  (Resolution No. 234, Docket [17-32] at ¶ 7.)  However, it does not appear that the Cuban government exerted "sufficient control over [Cubaexport] to make it an agent of the State" for Fifth Amendment purposes.  *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005).

According to the managing director of Cubaexport, it engages in commercial operations,

---

[23]Standing is a threshold question.  The plaintiff must have suffered an injury in fact, the injury must be fairly traceable to the government conduct alleged, and it must be likely that the requested relief will redress the alleged injury.  *Rumber v. District of Columbia*, 2009 WL 483148 at *6 (D.D.C. February 26, 2009).  Defendants argue that if the plaintiff has no rights under the United States Constitution, the defendants' conduct cannot be in violation of the Constitution.

not government functions.  (Pichardo Decl. [17-31] at ¶ 5.) Moreover, it enters into contracts in
its own name, pays taxes to Cuba, and applied for the registration of the HAVANA CLUB
trademark in its own name.  (¶¶ 7–9.)  In other words, Cubaexport appears to be a government
instrumentality that has been established as "a separate juridical entity, with the powers to hold
and sell property and to sue and be sued . . . [it] is responsible for its own finances . . . [and] run
as a distinct economic enterprise . . . ."  *First Nat'l City Bank v. Banco Para El Comercio
Exterior de Cuba*, 462 U.S. 611, 627 (1983).  The Supreme Court has stated that government
instrumentalities such as Cubaexport that are "established as juridical entities distinct and
independent from their sovereign should normally be treated as such."  *Id.*[24]

    This presumption of independence can be overcome in certain circumstances—when
"equitable principles" weigh in favor of treating the independent entity as the sovereign nation
itself or when the instrumentality is so extensively controlled by the foreign state that a
relationship of principal and agent is created.  *Id.* at 630; *TMR Energy*, 411 F.3d at 301.  Those
circumstances are not present here.

    First, the equitable principles that have been applied in the cases cited by the defendants
do not weigh in favor of defendants.  *First National City Bank* involved a Cuban state-owned
bank ("Bancec") that had sued Citibank in United States District Court to collect on a letter of
credit.  462 U.S. at 613.  Because Cuba had nationalized Citibank property after the letter of
credit had been extended, however, Citibank sought to setoff its debt against the value of its

---

[24]The Supreme Court has warned that "[f]reely ignoring the separate status of government
instrumentalities would result in substantial uncertainty over whether an instrumentality's assets
would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties
to hesitate before extending credit to a government instrumentality without the government's
guarantee."  *First Nat'l City Bank*, 462 U.S. at 626.

Cuban branches that had been nationalized.  *Id*. at 614–15.  Bancec contended that it should be

able to collect on the letter of credit as a separate juridical entity but that it should not be subject

to a set-off because the Foreign Sovereign Immunities Act immunizes an instrumentality of a

foreign government from suit on a counterclaim based on actions taken by that government.  *Id*.

at 619–20.  The Court denied Bancec's attempt because it was a "foreign government invoking

our law but resisting a claim against it which fairly would curtail its recovery.  It wants our law,

like any other litigant, but it wants our law free from the claims of justice."  *Id*. at 632 (citing

*National City Bank v. Republic of China*, 348 U.S. 356, 361–62 (1955)).  In this case, however,

Cubaexport is not attempting to use the federal courts as a sword while invoking the Constitution

as a shield—the type of incongruous result that gave the Supreme Court pause in *First National

City Bank*.

       Nor has the government shown that Cubaexport is controlled by the Cuban government to

such an extensive degree to overcome the presumption that it is a separate juridical entity.  In

*TMR Energy Ltd v. State Prop Fund of Ukraine*, 411 F.3d 296, cited by the government in

support of its claim that Cubaexport has no standing, the D.C. Circuit held that the government

of Ukraine exerted sufficient control over the defendant in the case (the State Property Fund of

Ukraine) so that it was an agent of the state.  However, the government of Ukraine exercised

significantly more control over the State Property Fund[25] than the Cuban government exercises

---

[25]The State Property Fund "implement[ed] national policies in the area of privatization, was "subordinated and accountable to the Supreme Rada," was "governed by the Constitution and legislative acts of Ukraine," the chairman was "appointed and discharged by the President of Ukraine subject to the consent of the Supreme Rada," and "SPF's expenses [were] paid from the budget of the State of Ukraine."  411 F.3d at 302.  The Circuit held that the State Property Fund was "barely distinguishable from an executive department of the government."  *Id*.  In this case, the government argues that because Cubaexport is wholly owned by Cuba, was established in

over Cubaexport.  Cubaexport instead appears to be a "typical government instrumentality" of the kind the Supreme Court has stated is entitled to separate treatment.[26]  *First Nat. City Bank*, 462 U.S. at 624–626.

## 2.     Cognizable Property Interest

The next barrier that the government erects to impede plaintiff's claim is its argument that the plaintiff does not have a cognizable property interest that gives rise to constitutional claims in this case.  Defendants argue that the Fifth Amendment requires a claim of entitlement, not merely a unilateral expectation.  Therefore, it argues, denial of an application to *renew* a trademark is different from the cancellation or taking of a trademark and is not a property interest recognized by the Fifth Amendment.  (*See* Gov.'s Mot. 45–47.)  Plaintiff contends that OFAC's decision to deny renewal of Cubaexport's existing registration was no different from ordering cancellation of the registration because the decision clearly affected Cubaexport's vested rights and accomplished the same result—loss of the HAVANA CLUB trademark by Cubaexport. Although this issue presents difficult and interesting theoretical questions about the nature of a

---

1965 by the Cuban Ministry of Commerce for the purpose of exporting food and other products and because it must operate "in accordance with the instructions issued to it by the Ministry of Foreign Trade by virtue of the State plans for foreign trade," it must be treated as an agent of the Cuban government.  (Gov.'t Mot. [36] 19–21.)   However, it is clear that Cubaexport is not "barely distinguishable" from the Cuban government.  It operated independently of the Ministry of Foreign Commerce, has its own assets, and the "direction, administration, and legal representation" of Cubaexport is the exclusive responsibility of its managing director, who is not a government employee.  (Pichardo Decl. [17-31] at ¶¶ 1,5.)

[26]The government also contends that even if Cubaexport has a separate juridical status it has insufficient contacts with the United States to assert standing.  This argument is unpersuasive given that the lawsuit itself arises from Cubaexport's contact with the United States—denial of the license to renew Cubaexport's HAVANA CLUB trademark in the United States Patent and Trademark Office.

property interest, the Court need not resolve this argument because even assuming Cubaexport

had a property interest in the HAVANA CLUB trademark at the renewal stage, OFAC did not

violate its constitutional rights, as discussed *infra*.

### 3. The Merits of Cubaexport's Constitutional Claims

#### a. Cubaexport's Procedural Due Process Claim

Cubaexport's first constitutional claim is that the defendants violated its right to

procedural due process.  (Compl. ¶¶ 58–64.)  The Fifth Amendment states that no person may be

"deprived of life, liberty, or property, without due process of law."  United States Constitution,

Amendment V.  Due Process under the Fifth Amendment generally requires notice and the

opportunity to respond in writing.  *Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d

156, 164 (D.C. Cir. 2003).

In this case, OFAC provided Cubaexport with notice and a meaningful opportunity to

respond in writing before taking final action on Cubexport's license request.  On December 13,

2005, Ropes & Gray, counsel for Cubaexport, sent the USPTO a letter and registration fee,

attempting to renew the HAVANA CLUB trademark.  On April 6, 2006, OFAC intervened, and

sent a letter to Ropes & Gray, stating that the previous license that had been granted to Ropes &

Gray LLP to represent Cubaexport in a proceeding in the United States District Court for the

District of Columbia did not include the right to renew the HAVANA CLUB trademark before

the USPTO.  (Administrative Record [6-3] at 1.)  The letter also stated:

> We note that this discussion does not in any way prejudice the ability of Ropes &
> Gray LLP *to request separate authorization from OFAC to engage in transactions related
> to the renewal of the HAVANA CLUB trademark registration at the PTO.*  If you wish to
> *request such a specific license or further guidance* from OFAC, you may do so by writing
> directly to OFAC's Licensing Division.  *Should you have any further questions*, please
> contact the Deputy Chief Counsel (Foreign Assets Control) . . . .

29

(A.R. [6-3] at 2.) (emphasis added).

　　As noted by the government, this letter specifically put Cubaexport on notice that it would need "to request separate authorization from OFAC to engage in transactions related to the renewal of the HAVANA CLUB trademark" and gave it an opportunity to request a specific license, seek further guidance, or ask any further questions before the renewal deadline passed. Accordingly, the Due Process requirements of the Fifth Amendment were met by the April 6, 2006 letter.

　　It is clear that the explicit language of the letter did in fact put Cubaexport on notice that it would need to seek separate authorization from OFAC because it took action in response to the letter.  Cubexport applied for a specific license[27] "to incur and receive payment for the expense of renewing the registration."  (A.R. [6-2] at 49–51.)  As noted by the government, however, Cubaexport was entirely silent on whether issuance of a specific license pursuant to 31 C.F.R. § 515.527 would be consistent with the CACR or other applicable statutes, such as section 211, or whether such specific authorization was even necessary.[28]

　　Not only was Cubaexport specifically informed that it would need to "request separate authorization" in order to renew its trademark, it was well-aware that this would require it to either seek a general license or acquire a specific license.  For example, while Cubaexport's specific application was pending at OFAC, it separately argued to the USPTO that the USPTO

_____

　　[27]OFAC's regulations state that a specific license is only needed if a general license is not applicable.  31 C.F.R. § 501.801(b)(1).

　　[28]Adam Szubin states that this is contrary to frequent practice before OFAC in which litigants apply for a specific license, and in the alternative, argue that a general license authorizes the transaction in question.  (Szubin Supp. Decl. [29] ¶ 22.)

should renew Cubaexport's trademark pursuant to the general licensing provision for trademarks without awaiting a decision by OFAC.[29]  (A.R. [6-2] at 38–41.)  If there was any doubt at all about the licensing scheme or the implications of not obtaining a general or specific license by the licensing deadline, Cubaexport was offered a chance to seek further guidance or ask questions in writing or by telephone.  *See also Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 600 (D.C. Cir. 1993) (stating that an offer of follow-up contact in conjunction with imprecise actual notice is adequate to avoid a serious risk of erroneous deprivation of process).

Moreover, the plain language of the statute and regulations themselves—with which Cubaexport was intimately aware as demonstrated by its letters to the USPTO—were sufficient to put Cubaexport on notice that it would require either a general or specific license to renew its trademark.[30]  *See Lakeshore Broadcasting Co. v. FCC*, 199 F.3d 468, 474 (D.C. Cir. 1999) ("Lakeshore 'received, or should have received, notice . . . in the most obvious way of all: by reading the regulations.") (quoting *General Electric Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)).  Despite its familiarity with the regulations and their requirements, Cubaexport did not provide any evidence directly to OFAC that would enable it to decide that the general license was

---

[29]Cubaexport did not submit this argument directly to OFAC but instead "copied" them on a communication submitted to the USPTO.  (A.R. [6–2] at 42.)  Even in this letter that was copied to OFAC, however, Cubaexport did not provide any evidence to dispute the fact that it "confiscated" the Havana Club trademark and therefore was subject to Section 211.  It instead argued that it was not a party in the New York litigation and therefore the PTO should "preserv[e] the HAVANA CLUB Registration through renewal until Cubexport has had its day in court."  (*Id*. at 40.)  In other words, Cubaexport did not submit evidence to the appropriate decision makers at the time the licensing decision was being made by the administrative agency but instead argued it should be able to provide evidence and argument at a later time in federal court.  Of course, as stated above, Due Process does not require a hearing in court but instead notice and an opportunity to be heard in writing, which Cubaexport was given.

[30] 31 C.F.R. § 501.801(b)(1).

31

applicable before the time to renew the trademark expired.  Therefore, Cubaexport's complaint

that OFAC "did not advise Cubaexport that it intended to decide the issues underlying the

agency's general license regulation" (Def.'s Opp'n [40] at 42)  is unconvincing.  OFAC was not

required by the Constitution to spoon-feed Cubaexport arguments that it could make on the basis

of the regulations when Cubaexport was given notice that it would be required to seek separate

authorization and was given an opportunity to seek that authorization, ask questions, or seek

further guidance.

### b.    Cubaexport's Substantive Due Process Claim

Cubaexport's "substantive due process" claim is similarly meritless.  (Compl. ¶¶ 65–68.)

Substantive due process protects against "government power arbitrarily and oppressively

exercised."  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  "[O]nly the most

egregious official conduct can be said to be 'arbitrary in the constitutional sense' . . . ."  *Id*.  As

this Court already stated in its discussion of the APA claim, OFAC's decision-making was not

arbitrary under the APA; *a fortiori* its decision was not so arbitrary that it was of the "most

egregious" type prohibited by the Constitution.

Cubaexport argues, however, not only that OFAC's decision-making violated its right to

substantive due process but also that the very enactment of Section 211 and the implementing

regulation violate due process because they (1) "retroactively deprive" Cubaexport of a protected

property interest and (2) are inconsistent with the underlying purposes of CACR and TWEA.

With respect to the argument that the laws retroactively deprive Cubaexport of property,

the government is correct in noting that the facial argument makes little sense because the law

and regulation do not deprive any entity of property on their face.

The claim also fails as an "as-applied" challenge.  Merely because a new law prevented Cubaexport from renewing its registration, in contrast to a previous law that would have allowed Cubaexport to renew its registration, does not mean that the new law violated Cubaexport's substantive due process.  "A statute does not operate retrospectively merely because it is applied in a case arising from conduct antedating the statute's enactment . . . or upsets expectations based on prior law."  *Landgraf v. USI Film Products*, 511 U.S. 244, 270 (1994).  The government is correct in noting that Section 211 and its implementing regulation did not invalidate any prior registration or renewal of the mark and did not impose any additional liability based on the use of the mark during the term of ownership; it instead prospectively affected the conditions under which a trademark could be renewed.  This Court has already stated that there is a fundamental difference between a license to defend existing property rights (which Ropes & Gray was given) and one to acquire additional rights.  *Cubaexport*, 516 F. Supp. 2d at 59.  The latter is what was affected by Section 211 and its implementing regulation, and the burdening of Cubaexport's ability to acquire additional rights is not a "retrospective deprivation" of property.

Cubaexport next contends that Section 211 and the implementing regulation are "inconsistent with the underlying purposes of the CACR and the TWEA."  (Compl. ¶ 68.) Congress, however, made the decision that it would not recognize intellectual property rights that are used in connection with assets confiscated by the government of Cuba; this is a foreign policy choice that is better left to the discretion of Congress, not to a federal district court.  *See Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating to the conduct of foreign relations are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.") (internal citations omitted); *Comm. of U.S. Citizens v. Reagan*,

33

859 F.2d 929, 944 (1988) ("Our approach reflects concern about separation of powers and a reluctance to constitutionalize foreign policy choices . . . ."); *Cubaexport v. U.S. Dep't of Treasury*, 516 F. Supp. 2d 43, 59 (D.D.C. 2007) ("[F]ederal courts do not evaluate foreign policy decisions' wisdom or consistency.").  Congress itself passed Section 211—the Court will not usurp its discretion by determining that its law is inconsistent with underlying foreign policy.

### c.        Cubaexport's "Taking" Claim

The last count of Cubaexport's complaint alleges that applying Section 211 and the implementing regulation constitutes a "regulatory taking" for which Cubaexport received no compensation.[31]  (Compl. ¶¶ 70–71.)  Even assuming that the Court has jurisdiction over this claim[32], it is meritless because the law was enacted in the economic sanctions context and because it did not vest property in the United States.  Courts have been wary of classifying economic sanctions as Constitutional violations because this would significantly hamper the ability of Congress and the Executive to manage foreign relations.  *See, e.g.*, *Paradissiotis v. United States*, 304 F.3d 1271, 1274 (Fed. Cir. 2002) (stating that application of economic sanctions does not constitute a Fifth Amendment taking and that "[e]conomic sanctions would hardly be sanctions if the foreign targets of the sanctions could simply stand in line to be compensated for the losses those sanctions caused them.").  In addition, Section 211 did not vest assets in the United States and therefore cannot be considered a "taking" as that term is defined in the Fifth Amendment.  U.S. Const. amend V (No "private property [shall] be taken for public

---

[31] Count III as a facial claim is meritless because the law and regulation did not "take" any property on their face.

[32] The government argues that exclusive jurisdiction lies in the United States Court of Federal Claims.

use, without just compensation."); *Chang v. United States*, 859 F.2d 893, 896 (Fed. Cir. 1988) ("With regard to the 'character of governmental action,' the government did not appropriate to the public use, i.e., "take". . . .); *Islamic Am. Relief Agency*, 394 F. Supp. 2d 34, 51 (D.D.C. 2005); *Holy Land Found.*, 219 F. Supp. 2d 57, 77–78 (D.D.C. 2002).  The United States neither seized the HAVANA CLUB mark for its own use nor prevented Cubaexport from continuing to use the mark in other countries.


IV.     **CONCLUSION**

For the foregoing reasons, this Court concludes plaintiff's evidence presents no genuine issue of material fact as to its second APA claim, and defendants are entitled to judgment as a matter of law.  The plaintiff's evidence also presents no genuine issue of material fact as to its constitutional claims.  No reasonable trier of fact could find that the defendants violated the plaintiff's rights—if any—to procedural due process, substantive due process, or under the Takings Clause.  Therefore, the plaintiff's motion [35] for summary judgment will be DENIED; defendants' motion for summary judgment [36] will be GRANTED.

A separate order shall issue this date.

SO ORDERED.

Signed by Chief Judge Royce C. Lamberth on March 30, 2009.

.